# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO  DIVISION

| | | |
|---|---|---|
| **BILLIE WAYNE COBLE,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **CASE No. 6:12-cv-00039-WSS** |
| | § | |
| **RICK THALER,** | § | |
| **Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | **(Death Penalty Case)** |
| **Division,** | § | |
| **Respondent** | § | |
| | § | |

## PETITION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Petitioner Billie Wayne Coble (hereafter "Petitioner")  is currently confined in the Polunsky

Unit of the Texas  Department of Criminal Justice, Livingston, Texas, in the custody of the

Respondent, the Director of the Correctional Institutions Division of the Texas Department of

Criminal Justice.  Mr. Coble  is confined  in violation of the Constitution and laws of the United

States, and files this  Petition  for a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254 *et. seq.* in

order to secure the reversal of his in order to secure the reversal of his jury verdict of a sentence of

death imposed by the trial court.[1]

In support thereof, Mr. Coble would show the following:

---

[1]   This application concerns Mr. Coble's 2008 penalty phase re-trial. His original trial
was in 1990.

## I. PROCEDURAL HISTORY AND STATEMENT OF THE CASE

### A. Introduction.

Billie Wayne Coble, a Vietnam combat veteran who served his country honorably, contributed much to his community, and had absolutely no prison disciplinary record for the eighteen years prior to his penalty phase re-trial, was nevertheless re-sentenced to death in 2008 for the 1989 murder of his in-laws.   Mr. Coble's background and psychiatric problems have been well summarized by the Fifth Circuit Court of Appeals:

> Coble's father died before he was born and when he was eleven, his mother suffered a nervous breakdown so Coble was sent to live at a state facility.  He lived at the orphanage until he was seventeen, at which point he joined the Marines and served in Vietnam. During his four years of service, Coble served as a machine gunner and was involved in combat. Upon his return to the states, Coble was hospitalized due to trauma he had suffered in the war. Likewise, Coble's sister testified he was different when he returned from Vietnam. Coble offered testimony that he was involved with various youth programs over the years, that he had a good relationship with his son and that he got along well with co-workers. Coble served as a section leader in the U.S. Army reserves and was well respected....[a [psychiatrist] also testified that Coble suffered from post-traumatic stress disorder (PTSD)...and bipolar disorder...[the psychiatrist] traced the post-traumatic disorder to Coble's experience in Vietnam, and suggested that the bi-polar disorder might be hereditary...these illnesses made Coble susceptible to severe mood swings, which resulted in a loss of control on the day of the murders...Coble was suffering from severe depression at the time of the murders...Coble linked the loss of his wives with the loss of his mother, such that the divorces triggered severe bouts of suicidal depression...No one seems to dispute that the illnesses stemmed from events beyond Coble's control–such as hereditary factors, his childhood, and his combat experience...the psychiatrists seemed to agree that it was Coble's episodic depression, manic mood swings, and propensity for violence created by his combat experience that led him to act as he did when committing the crime...
> *Coble v. Cockrell,* 80 Fed. Appx. 301, 306-308 (5th Cir. 2003).

Despite strong community feeling against Mr. Coble in Waco and McLennan County and highly prejudicial and inflammatory media coverage for both his first trial and his penalty phase re-trial, defense counsel failed to request a change of venue.  Despite the fact that one of Mr. Coble's victims was now a deputy district attorney in the McLennan County prosecutor's office who testified as a State's witness, defense counsel failed to move to recuse the district attorney's office despite

an obvious conflict of interest.  Despite abundant evidence of war trauma, depression, and the convergence of unique stressful factors at the time of the murders, no psychiatric testimony was presented to explain the relation of these factors (which were "beyond Coble's control" in the words of the Fifth Circuit) to the murders or their mitigating significance.  Despite a complete lack of any evidence of future dangerousness in the eighteen years prior to his re-trial, his advanced age of almost 60 at the time of the re-trial, and evidence of his poor health and heart attacks, he was again sentenced to death.  Despite well-accepted statistical evidence that showed Mr. Coble had an extremely low probability of committing future violent acts, his death sentence was secured on the basis of two "experts" who claimed to have privileged insider knowledge of unreported prison violence not known even to the prison authorities.

One of these experts, Dr. Richard Coons,  confidently predicted Coble's future dangerousness in 1990, was wrong, yet again offered the same unscientific off-the-cuff, ad hoc "junk science" as in the first trial.  The other expert, A.P. Merillat, with no credentials and essentially a high-school education,  based his "methodology" on a hearsay anecdote of prison violence, presented demonstrably false testimony, and harbored extreme bias against the defense.  Both of these so-called "experts" have been so discredited that it is unlikely they will ever be called on again by the State to testify.  In this case, the Texas Court of Criminal Appeals held that the introduction of Dr. Coons' testimony was error that they do not want to see again in future cases.  Mr. Merillat's unreliable testimony has led to at least two reversals in death penalty cases for false testimony less prejudicial than he gave in this case, and he has been forced to remove himself from the prosecutorial expert roster.  Mr. Coble's death sentence represents the triumph of prejudice, superstition and bias over reason and the law.

**B.  Statement of the Case and Procedural History.**

Petitioner Billie Wayne Coble  was indicted in McLennan County, Texas, for the capital murders  of his brother-in-law John Robert Vicha, his father-in-law Robert John Vicha, and his mother-in-law Zelda Vicha, which occurred on August 29, 1989.  Exhibit 2. Mr. Coble  was tried before a jury in the 54th Judicial District Court, McLennan County, in Waco, Texas, Hon. George Allen, Judge presiding.  Mr. Coble was convicted of killing three individuals during the same criminal transaction (§19.03(a)(6)(A), Texas Penal Code (Vernon 1989)) and, after the jury answered the special issues in the affirmative, was sentenced to death  on April 12, 1990.  Exhibit 2. The Texas Court of Criminal Appeals ("CCA") affirmed the conviction and sentence on November 3, 1993, in Cause No. 71,084.  *Coble v. State,* 871 S.W.2d 192 (Tex. Crim. App. 1993), with Judge Clinton dissenting.   After the CCA affirmed Coble's conviction and sentence, the trial court on November 2, 1994 refused to appoint post-conviction counsel.[2]  Despite that action, the very same day the trial court set an execution date of  December 17, 1994 for Petitioner.[3]  On December 1, 1994, this Court, the United States District Court for the Western District of Texas, Waco Division, Judge Walter Smith presiding, stayed Coble's scheduled execution and appointed federal habeas counsel.

Undeterred, the trial court that very same day, December 1, 1994, rescheduled Petitioner's execution date for January 12, 1995  and issued a warrant of execution for the execution to take

---

[2]   I CR 103, November 2, 1994 order of the trial court denying the appointment of state post-conviction counsel, despite the fact that Coble was indigent and unable to pay for counsel. "CR" refers to the clerk's record in this case, in 14 volumes, with the volume number in Roman numerals with the page number following.

[3]   I CR 104-106, November 2, 1994 order of the trial court setting a date for Petitioner's execution

place on that date.[4]   On December 15, 1994, this Court again issued a stay of execution to counter this void action, and, to prevent further void date-settings, ordered that "all executions that may be scheduled prior to the time that Petitioner's § 2254 application is resolved are hereby STAYED."

In May of 1995, Coble's federal habeas application was dismissed from federal district court without prejudice in order to allow him to exhaust state remedies.   Undersigned counsel was appointed by the Texas Court of Criminal Appeals on March 18, 1997  to represent Coble in his state habeas application, and an amended application was filed later that year.

The Texas Court of Criminal Appeals ultimately denied habeas corpus relief on February 17, 1999, in an unpublished one-and-a-half-page order.   *Ex parte Billie Wayne Coble*, No. 39,707-01 (*per curiam*).   A few days later, on February 23, 1999, the McLennan County District Attorney, without prior notice to Coble or his counsel, once again applied *ex parte*  for the setting of another execution date, June 9, 1999, despite the fact that Coble had yet to commence, let alone conclude, federal habeas corpus proceedings.[5]   This execution date  was once again stayed by this federal district court on May 10, 1999.   This Court ultimately granted  summary judgment to the State  on August 23, 2000 and granted Coble a partial Certificate of Appealability ("COA") on one issue, on January 8, 2001.

On May 10, 2001, Coble filed his Appellant's Brief in the Fifth Circuit Court of Appeals, accompanied by a brief in support of his motion for an additional COA on several grounds.   A panel of that Court, after further briefing on the significance of *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"), on August 20, 2003  granted an additional  COA as to the  "claim that the special issue

---

[4]   I CR 107-109, December 1, 1994 order modifying date for execution.

[5]   I CR 142-145, trial court order setting execution date.

interrogatories and the supplemental instruction given to the jury during his sentencing trial were constitutionally inadequate because they did not provide an appropriate vehicle for the jurors to give effect to Coble's mitigating evidence..."   *Coble v. Cockrell,* No. 01-50010 (2003 WL 21982042, 5th Cir. Aug. 20, 2003).   Further briefing on this issue ensued.   On July 18, 2005, the Fifth Circuit panel issued an opinion denying Coble's appeal.  *Coble v. Dretke,* 417 F.3d 508 (5th Cir. 2005).  On July 25, 2005, Coble timely filed a petition for rehearing *en banc.*  The Fifth Circuit then requested that the State file a response to the petition for rehearing.

On March 22, 2006, the Fifth Circuit  panel withdrew the prior opinion, reopened the case, and filed a substituted opinion, also denying relief.  *Coble v. Dretke,* 444 F.3d 345 (5th Cir. 2006). The next day, once again  without any notice to  Coble or his counsel, the McLennan County Criminal District Attorney applied *ex parte*  and the trial court signed *ex parte* on March 23, 2006 an "Order Setting Date For Execution,"[6] scheduling it for August 30, 2006.   The trial court had no jurisdiction to set this date, as the matter was still pending in the Fifth Circuit. On April 4, 2006, Coble  timely filed petitions for panel rehearing and rehearing *en banc* in the Fifth Circuit Court of Appeals, relating to the substituted opinion of the Fifth Circuit.

On April 10, 2006, Coble filed with the trial court a "Motion to Vacate *Ex Parte*, Unnoticed Order Setting Execution Date Due To Lack of Jurisdiction."  On April 12, 2006, the trial court denied this motion,  ruling that "there is no basis by which the date of execution can be modified or withdrawn, or the warrant of execution can be recalled."[7]   On April 24, 2006, Mr. Coble then

---

[6]   I CR 150-154, "Order Setting Date for Execution," signed on March 23, 2006 by Judge George H. Allen, 54th Judicial District Court of McLennan County, Texas.

[7]   I CR 183, April 12, 2006 order denying motion to vacate execution date, by Judge George H. Allen, 54th Judicial District Court of McLennan County, Texas.

filed a "Motion for Leave to File a Petition for Writ of Mandamus" and a "Petition for Writ of Mandamus" with the Texas Court of Criminal Appeals, seeking to vacate the execution date.   On May 10, 2006 that Court denied the motion for leave to file a petition for writ of mandamus, with a dissent by Judge Price.  *In re Billie Wayne Coble,* WR-39,707-02 (Tex. Crim. App. May 10, 2006)(*per curiam, Price, J., dissenting*)(not for publication).[8]

The Fifth Circuit Court of Appeals then vacated the execution date and ultimately vacated its earlier opinion, granted relief, and ordered a new penalty phase trial.  *Coble v. Quarterman,* 496 F.3d 430 (5th Cir. 2007)(on rehearing, penalty phase relief granted, *superseding Coble v. Dretke,* 444 F.3d 345 (5th Cir. 2006) and *Coble v. Dretke,*  417 F.3d 508 (5th Cir. 2005)).

Mr. Coble's penalty phase re-trial was held in the 54th Judicial District Court of McLennan County, Texas,  Hon. Matt Johnson, Judge presiding.  On October 17, 2007, the trial court appointed Russ Hunt, Jr. and Scott Stevens as counsel for Mr. Coble.  (II CR 234.)  On April 25, 2008, Mr. Stevens moved to withdraw as counsel for Petitioner (II CR 329-331) and on May 14, 2008 Alexander Calhoun was appointed as second-chair counsel. (II CR 337.)[9]  Juror questionnaires were filed in the trial court on August 1, 2008 (VII CR through XI CR.)  Voir dire of the jury panel began on August 5, 2008.  (7 RR 5.)[10]

---

[8]   In that opinion, the CCA ruled that "[b]ecause [Coble's] federal habeas corpus proceeding is still in the Fifth Circuit Court of Appeals, we will defer to that court's determination concerning whether the original 1999 stay of execution is still in effect and of the validity of the state district court's order setting an August 30, 2006 execution date."

[9]   *See* Exhibit 1, appointment of trial counsel Russ Hunt, Jr. and Scott Stevens on October 17, 2007 (II CR 234); withdrawal of attorney Scott Stevens on April 25, 2008 (II CR 333); appointment of second-chair counsel Alex Calhoun on May 14, 2008 along with setting of pre-trial on May 23, 2008 and jury selection on August 4, 2008. (II CR 337).

[10]   "RR" refers to the Reporter's Record in this matter, in 33 volumes, with the volume number preceding the page number.

Petitioner's punishment phase re-trial commenced on August 25, 2008 in the 54th District Judicial Court of McLennan County.  (18 RR *et. seq*.)  Appearing for the State were McLennan County District Attorney John Segrest and Deputy District Attorney Crawford Long; appearing for Petitioner were Russell D. Hunt, Jr. of Waco, Texas as lead counsel and Alexander L. Calhoun of Austin, Texas as second-chair counsel.

On September 4, 2008, the jury answered the special issues as follows:

Special Issue No. One: Do you find from the evidence beyond a reasonable doubt that the conduct of Billie Wayne Coble that caused the death of Zelda Vicha was committed deliberately and with the reasonable expectation that the death of Zelda Vicha or another would result.

The jury answered this question affirmatively. (29 RR 186.)

Special Issue No. Two: Do you find from the evidence beyond a reasonable doubt that there is a probability that Billie Wayne Coble would commit criminal acts of violence that would constitute a continuing threat to society?

The jury answered this question affirmatively. (29 RR 186.)

Special Issue No. Three: Do you find from the evidence taking into consideration all of the evidence including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

The jury answered this question negatively. (29 RR 186-187; XIII CR 2358-2363.)[11]

---

[11]  *See* Exhibit 2, Original Grand Jury Indictment (Sept. 29, 1989); Indictment  read to the jury at this punishment phase re-trial (20 RR 21-22); Charge of the Court and Verdict (XIII CR 2347-2354); Judgment of Conviction (XIII CR 2358-2359).

As a result, Mr. Coble was re-sentenced to death on September 4, 2008.  (XIII CR 2358-2363)[12]

A Motion for New Trial was filed on October 6, 2008 (XIV CR 2486-2501) which was denied.  On September 18, 2008, undersigned counsel was appointed by the trial court to represent Mr. Coble  in his state post-conviction proceedings and the appointment was approved by the Texas Court of Criminal Appeals on November 3, 2008. (XIV CR 2507.)

On September 30, 2009 Petitioner, through court-appointed counsel Walter Reaves, Jr., filed his direct appeal brief in the Texas Court of Criminal Appeals.  *Coble v. State,* AP-76,019.  On October 13, 2010, the Texas Court of Criminal Appeals denied Petitioner's direct appeal.  *Coble v. State,* 330 S.W.3d 253 (Tex. Crim. App. 2011.)  (Exhibit 26.)  On January 12, 2011, that Court denied his petition for rehearing.  The United States Supreme Court denied Mr. Coble's petition for writ of certiorari on June 20, 2011.  *Coble v. Texas,* No. 10-1271.

On February 19, 2010, the trial court, Judge Matt Johnson presiding, granted Petitioner's "Motion for 90-Day Extension of Time To File Application For Writ of Habeas Corpus" and, under the provisions of Tex. Code Crim. Proc. Art. 11.071 Sec. 4(a), found there was good cause for the request and granted Petitioner until June 6, 2010 to file his state post-conviction application.[13]  Mr. Coble timely filed his application for writ of habeas corpus in the 54th Judicial District Court (Petitioner's trial court) and in the Texas Court of Criminal Appeals on June 3, 2010.  On December 8, 2010, the State filed their "Answer To An Application For Writ of Habeas Corpus In A Death Penalty Case" requesting that an evidentiary hearing be held on Petitioner's Claims 2, 3, 6, and 12(a)

---

[12]  *Id.*

[13]  *See* Exhibit 3, February 19, 2010, Order on Motion for 90-Day Extension of Time to File Application for Writ of Habeas Corpus, signed by Judge Matt Johnson.

through 12(d).  (Exhibit 27.) The trial court complied with that request and determined that "controverted previously unresolved factual issues material to the legality of the applicant's confinement exist[ed]" as requested by the prosecutor, and, as to those issues, that a live evidentiary hearing would be held. (Exhibit 28.) The evidentiary hearing was held on the same claims the State had requested.

That evidentiary hearing took place on February 11, 2011 in the above-named Court. The transcript of that hearing was filed on March 1, 2011.  Both partes timely submitted additional materials.  (Exhibit 30, Petitioner's additional post-hearing materials).  Proposed Findings of Fact and Conclusions of Law were submitted by both parties.  (Exhibit 29, State's proposed findings and conclusions).  The trial court signed the State's proposed findings of fact and conclusions of law, adopting them verbatim, without changing a comma, and then forwarded them to the Court of Criminal Appeals.

The Texas Court of Criminal Appeals denied Mr. Coble's application for writ of habeas corpus on February 8, 2012.  *Ex Parte Billie Wayne Coble,* No. WR-39,707-03 (Tex. Crim. App., Feb. 8, 2012)(not designated for publication).(Exhibit 31).

Undersigned counsel applied to this Court to represent Petitioner in his federal habeas corpus proceedings.  On February 28, 2012, undersigned counsel was appointed to represent Petitioner (Docket No. 6) and on March 19, 2012, Petitioner was granted leave to proceed *in forma pauperis.* (No docket number, text order only).  By subsequent order of this Court, Petitioner was first granted until January 5, 2013 to file his federal petition (Docket No. 18) and then was granted a ten-day extension to file the petition, or until January 15, 2013. (Docket No. 20).  Thus this petition is timely filed.

-10-

## II. STATEMENT OF FACTS

### A. Pre-trial Motions.

On March 25, 2008, the state announced they would call Dr. Richard Coons as a witness and gave the defense notice.  (2 RR 7.)  On the same date, the defense's motion for a witness list was granted and the State was ordered to produce it not later than 14 days prior to the date of the trial. (2 RR 7-8.)  The defense also filed a motion under *Brady v. Maryland,* 373 U.S. 83 (1963) for any exculpatory material.  This motion was granted.  (2 RR 9.)

On April 25, 2008, co-counsel and second chair Mr. Scott Stevens moved to withdraw as counsel, due to health issues and his admission that he was "extremely behind on my other work and...I could not properly attend to Mr. Coble's case and give him the representation that he deserves."  (2 RR 10-11; II CR 329-331.)  The motion to withdraw was granted that day.  (2 RR 11.)[14]  Mr. Hunt stated that he would recruit an approved attorney from the list.  (2 RR 11-12.)  The trial was set for August 4, 2008  at this time.  (2 RR 13.) Co-counsel Alex Calhoun was appointed by the Court on May 14, 2008 as "assistant trial counsel."  (II CR 336-337.)[15]  This was only about two-and-a-half months before jury selection began on August  5, 2008. (7 RR 5.)

On July 10, 2008, defense motions to find the Texas death penalty and the future dangerousness special issue statute declared unconstitutional were denied.  (4 RR 6-7.)   On this date, the defense mentioned that it was aware of the issue of a possible recusal of the district attorney's office, because one of their assistant district attorneys, Mr. J.R. Vicha, was a victim of

---

[14]   *See* Exhibit 1.

[15]   *See* Exhibit 1.

-11-

Mr. Coble's crime.  (4 RR 7.)  The lead defense attorney stated that  "the Government's position is that they have erected a Chinese wall, so there's no basis for recusal and they believe they separated themselves from Mr. Vicha, who is a prosecutor over in that office."  (4 RR 7.)  The defense stated that they were "still looking into it" to see if they had "a valid argument for a recusal, even if the court can order a recusal."  (4 RR 7.)  They also stated: "[s]o that's an issue that we still haven't gotten to the bottom of."  (4 RR 7.)  This was less than one month before the trial was to begin. (7 RR 5.)

Also on July 10, 2008, the defense stated that they were unsure about filing a motion for a change of venue "which was argued at the first trial."  (4 RR 8.)  Despite the fact that lead counsel Mr. Hunt had been appointed in October of 2007, nearly nine months previously,[16] his "understanding [was] that there continue to be letters to the editor that are angry from people in the community" and counsel concluded that "I'm not certain that a Motion for a Change of Venue would be appropriate at this time."  (4 RR 8.)  At this hearing, less than a month prior to the beginning of the trial, defense counsel stated that "we believe we're going to be ready by August." (4 RR 8.)  The Court told the defense attorneys that they should have the motions to disqualify the state's attorneys ready soon.  (4 RR 9.)

On July 30, 2008, the prosecution designated an assistant district attorney in their own office, J.R. Vicha, as a potential fact witness.  (5 RR 7.)

Mr. Coble was arraigned on August 1, 2008.  (6 RR 10.)  That same date, both the State and the defense announced ready for trial.  (6 RR 148.)

Prefiguring the problems with having the trial in Waco, the jury panel was asked if anyone

---

[16]  *Id.*

-12-

had formed an opinion or conclusion as to the defendant, and three potential jurors raised their hands.  (6 RR 160-161.)  Another prospective juror had represented a member of the victims' family.  (6 RR 172.)

The defense objected to a State's expert evaluating and interviewing Mr. Coble in person, as their expert, Dr. Mark Cunningham, was basing his testimony on an actuarial analysis only, and the other doctor who had evaluated Mr. Coble, Dr. Carter, would not testify.  (6 RR 181-184.)  The expert, Dr. Richard Coons, was allowed to testify.  (24 RR 202 *et. seq.*)

**B.  The penalty-phase re-trial.**

The following was the evidence adduced at Petitioner's penalty phase re-trial:

Voir dire of the jury panel began on August 5, 2008.  (7 RR 5.)  Testimony in Petitioner's punishment phase re-trial, *State v. Coble,* No. 1989-1036-C2,  commenced on August 25, 2008 in the 54th District Judicial Court, Hon. Matt Johnson presiding.  (18 RR *et. seq.*)  Appearing for the State were McLennan County District Attorneys John Segrest and Crawford Long; appearing for Petitioner were Russell D. Hunt, Jr. and Alexander L. Calhoun.

The juror questionnaires were ordered sealed and placed in the Clerk's Record.  (20 RR 15.)[17]  The Court instructed the jury at the commencement of the trial.  (20 RR 15-21.)  The prosecutor read the grand jury indictment: Petitioner was charged with causing the deaths of Robert John Vicha, Zelda Vicha, and their son John Robert Vicha on August 29, 1989, by means of a firearm, and all three murders were alleged to have been committed during the same criminal transaction.  (20 RR 21-22.)

The State gave an opening statement.  (20 RR 24-35.)  Defense attorney Alex Calhoun also

---

[17]   They appear in the Clerk's Record at volumes VII CR through XI CR. Subsequently, all of these questionnaires were unsealed for these proceedings by order of the trial court.

gave a short opening statement.  (20 RR 35-37.)[18]

**I) The State's case.**

**Pamela Wooley,** Petitioner's first wife, testified that she married Mr. Coble in 1970, when she was 20 years old.  (20 RR 40, 59, 66.)   She had been married twice previously.  (20 RR 66.)   At the time, Mr. Coble was working at the Central Texas Iron Works.  (20 RR 59.)[19]   Subsequently, Petitioner and Ms. Wooley managed a drive-in theater.  (20 RR 60-64, 80.)   Mr. Coble was nice to her and the marriage went well in the early years.  (20 RR 41, 66.)   He adopted Ms. Wooley's daughter from her first marriage, Charlene, and was a good parent to her. (20 RR 67.)  Two years after marrying, she had a son, Gordon Coble.  (20 RR 41.)   As Charlene and Gordon grew up, Mr. Coble was active in sports with them and he coached their football and baseball teams.  (20 RR 73.)   He received awards for his coaching involvement and once received an autographed Dallas Cowboys football in Dallas.  (20 RR 73-75.)

Ms. Wooley's testimony focused on various incidents of alleged emotional and physical abuse, some well over thirty years old, that she alleged occurred during the latter period of their marriage.  The witness related an incident from 1974, in which Petitioner became agitated in an argument over food that she had cooked.  (20 RR 43.)   Mr. Coble would occasionally hit her with an open hand and sometimes with a fist and sometimes he would be remorseful afterward and ask for forgiveness.  (20 RR 44-45, 58.)   The witness also related an alleged incident from 1980, a physical assault which occurred after a verbal altercation when they were divorcing.  (20 RR 46-49,

---

[18]   The defendant was wearing a leg brace (shackles) during the trial.  (25 RR 8.)

[19]   The witness related an incident told to her by Mr. Coble.  When he was working there, a person at the iron works had attacked him first and tried to hit him with a chain so he picked up a hammer and hit his attacker back.  (20 RR 87-88.)

68.)   Mr. Coble was opposed to the divorce.  (20 RR 70.)  Around the same time, Mr. Coble was

looking for sympathy and allegedly threatened to kill himself with a knife in an attempt to talk her

out of the divorce.  (20 RR 46-49, 76.)[20]   The witness testified about another incident, apparently

in the late 1970s,  when Ms. Wooley interrupted Mr. Coble and his young son when they were

playing baseball.  (20 RR 52-53.)  Mr. Coble threw a baseball at Ms. Wooley, hitting her in the back,

and she filed an assault charge.  (20 RR 52.)  Ms. Wooley admitted that there was "a lot of bitterness

and a lot of bad things" that occurred during the divorce, as "[I]t seemed to me that every time we

went to court, everything kind of went his way."  (20 RR 54.)  She also stated that "[h]e was a good

person as long as it went his way."  (20 RR 58.)  At the end of the divorce, Mr. Coble had visitation

rights with his son Gordon.  (20 RR 55.)  Since divorcing Mr. Coble, Ms. Wooley has been married

four more times, for a total of seven marriages, apparently all of them unsuccessful, as she was not

married at the time of the re-trial.  (20 RR 67.)

     **Patricia Wooley,** the sister of Petitioner's first wife Pam Wooley, testified she is seven-and-

a-half years younger than her sister.  (20 RR 97.)  This witness testified to an alleged incident that

occurred in 1970, thirty-eight years previously,  when she was 13.  (20 RR 98.)   She stated that

while she was in the back seat of a car with Petitioner, she felt some brief caressing on the outside

of her upper thigh.  (20 RR 106, 131-132.)   It ceased when she moved around.  (20 RR 106.)

     Ms. Wooley's sister married Mr. Coble in 1971 and until then, she thought he was a "very

nice guy."  (20 RR 107-108.)  Ms. Wooley also testified that sometime in 1972 or 1973 there was

an incident where he tickled her "outside of [her] clothing."  (20 RR 108.)  When the witness was

16, there was another alleged incident at Lake Waco when Mr. Coble was swimming under water

---

[20]  Another incident during the divorce occurred in the courthouse when Mr. Coble
attempted to jump off the rotunda to commit suicide.  20 RR 77.

and surfaced with his hands between her legs, at her vaginal and crotch area for a very short time.
(20 RR 110-111, 127-128, 136.)  This touching was outside her bathing suit.  (20 RR 128.)  She felt
that neither of these incidents were accidental but she did not report them to her sister or anyone
else.  (20 RR 111.)  Another time, when the witness was 17 or 18, Petitioner allegedly opened the
glass doors when she was taking a shower and made lewd remarks about her body.  (20 RR 113,
138.)  Again, she did not tell anyone of this alleged incident.  (20 RR 113.)  Ms. Wooley related
another incident at the time of Petitioner's divorce when he was attempting to pick up his son and
he hit Ms. Wooley, causing a "busted lip."  (20 RR 115.)  However, at the time, Ms. Wooley gave
a statement to the police that "it happened so quick, I couldn't say for sure it was an intentional act."
(20 RR 121-122.)   During Petitioner's marriage to her sister, the witness visited her family
frequently and they seemed to get along well with Mr. Coble.  (20 RR 124-125.)

Ms. Wooley testified that she was called on the phone by a district attorney investigator who
asked her if she had ever had any "bad experiences" with Mr. Coble.  (20 RR 118.)  She also used
to work in the Waco Police Department.  (20 RR 119.)  The witness had not seen Mr. Coble in 23
years, since 1984.  (20 RR 133.)  Ms. Wooley admitted she had not told anyone of these alleged
incidents until after Mr. Coble had been convicted of a crime.  (20 RR 135.)

**Christy Smith** testified that she was currently in custody in federal prison for drug offenses,
and had been for the last five-and-a-half years.  (20 RR 144.)  She was convicted of offenses in
1988, 1995, 1998, 2001 and 2003 and had been in the penitentiary since 1993, on and off.  (20 RR
144.)  There was one pre-1988 conviction for theft and she admitted there may have been other
convictions for theft, burglary of a motor vehicle, and shoplifting.  (20 RR 156, 158-159.)  Ms.
Smith admitted to being in trouble with the law for the last 20 years.  (20 RR 154.)  When she first
testified against Mr. Coble in 1990, she admitted that there may have been a motion pending to

-16-

revoke her probation.  (20 RR 159-160.)

In the early 1970s, she knew Mr. Coble from Pee-Wee football, as he was the coach.  (20 RR 146.)  Ms. Smith testified that thirty-five years prior, in 1973, when she was 13, there was an incident with Mr. Coble when he took several neighborhood children water-skiing. (20 RR 148-149, 152.)   As he was teaching her to get up on the skis, "he had his arms around [her] waist" and he touched her breast with one hand and put his hand between her legs and asked if it felt good.  (20 RR 149.)  She did not tell her mother or anyone else at the time, and admitted that she continued to baby-sit for the Cobles.  (20 RR 150, 153.)  The witness had not had any contact with Mr. Coble since 1973, nor had she seen him since the time of her testimony in 1990 at the first trial.  (20 RR 162.)

**Terry Ferguson** testified about an incident that occurred about thirty-four years prior to the trial, in 1974 or 1975, when she was 12 to 14 years old.  (20 RR 168, 172.)  Ms. Ferguson went to Petitioner's  house to apologize for not going water skiing with him.  (20 RR 171, 176.)   He allegedly tried to touch her around her shoulders and breasts.  (20 RR 171.)  Ms. Ferguson said she was going to scream and he backed off.  (20 RR 172.)   Despite this alleged incident, which she never reported at the time, Ms. Ferguson admitted that she later applied for and got a job at the drive-in that Mr. Coble and his wife ran.  (20 RR 172.)  This witness alleged that two or three times, Mr. Coble tried to do the same things to her he had done earlier at his house. (20 RR 174-176.)  Ms. Ferguson had not had any contact with Mr. Coble for over 30 years.  (20 RR 179.)

**Amy Loreis Ivey Zuniga,** Petitioner's niece, and sister of Karen Vicha, Petitioner's third wife, testified that, at first,  as she was growing up, she thought that Mr. Coble was "a model father figure."  (20 RR 182.)  She related an alleged event that occurred at the Le Chateau Apartments in 1986 when she was 15.  (20 RR 182.)  Ms. Zuniga's brother worked with Mr. Coble.  (20 RR 183.)

One day he came by the apartment to pick up her brother for work.  (20 RR 184.)  Mr. Coble saw her sitting in a chair and spread her legs with his hands and made licking motions with his tongue. (20 RR 184.)   Later that day, he returned and Ms. Zuniga opened the door, thinking he had come to apologize.  (20 RR 186.)   Mr. Coble grabbed her and started trying to kiss her, but then he stopped and sat down in the chair.  (20 RR 187.)   He threw her a five dollar bill, said he was sorry and left.  (20 RR 187.)   At this time, Mr. Coble was in his 30s.  (20 RR 187.)   Ms. Zuniga mentioned this incident to her mother but nothing was done.  (20 RR 188-189.)

The next year, when the witness moved to Silver City, Mr. Coble came to visit with his family.  (20 RR 188.)  Mr. Coble said that no one believed her and that she should stop telling stories.  (20 RR 190.)   Later, in 1989, the witness's family moved back to Waco and lived in a house with Mr. Coble and his wife Karen Vicha.  (20 RR 191.)    The witness related an alleged incident that occurred in this house in 1989.  (20 RR 207.)   As Ms. Zuniga was dressing, she heard her sister Karen rapping on the kitchen windows that overlook the backyard.  (20 RR 208.)  She was yelling and then went through Ms. Zuniga's room and out the back door.  (20 RR 208.)  Mr. Coble left in his truck.  (20 RR 208.)  Karen came back into the room and said she was upset because Mr. Coble had been looking into Ms. Zuniga's window as she dressed.  (20 RR 209.)[21]

The witness recalled a conversation between Mr. Coble and his sister when he said his wife's brother Bobby Vicha had threatened Mr. Coble and told him to stay away from his sister.  (20 RR 211.)

**Phillip Pierce,** an administrator in the Criminal District Attorney's Office in McLennan

---

[21]   The defense objected to this testimony as hearsay and a violation of the Confrontation Clause.  (20 RR 193-205.)  The Court admitted the testimony.  (20 RR 205.)  There was a running objection to the testimony regarding this incident.  (20 RR 209.)

County, testified that he reviewed some military records of Mr. Coble.  (20 RR 220.)  However, the records related to 1965 to 1969, when Mr. Pierce was not in the military.  (20 RR 222.)  He entered the military in 1974.  (20 RR 223.)  The defense objected to his testimony on Sixth Amendment grounds if the purpose of the testimony was "to elicit any kind of misconduct."  (20 RR 224.)  The Court allowed Mr. Pierce's summary of the records.  (20 RR 225.)

Mr. Coble enlisted in the Marines in 1965 and went to San Diego for his basic training.  (20 RR 226.)  At this time, the Vietnam war was escalating. (20 RR 231.)   In 1966 Mr. Coble was promoted to private first class and in June of 1966 he received a violation for sitting down at his guard post.  (20 RR 226.)  He was reduced in rank and then promoted again.  (20 RR 226.)  From December 1966 to November 1967, Mr. Coble served in Vietnam as a rifleman and a machine gunner.  (20 RR 226, 232.)  He participated in Operation Chinook "against enemy forces in Quang Tri province" from December 19, 1966 to January 26, 1967.  (20 RR 234.)  Mr. Coble also participated in Operations Prairie, Prairie II, Prairie IV, and Operation Hickory.  (20 RR 236, 238.)  He received a Vietnam service ribbon with two campaign stars.  (20 RR 237.)  Additionally, he also participated in Operation Cimarron and in the defense of Camp J.J. Carroll, and in Operation Buffalo and Operation Kingfisher.  (20 RR 239, 242.)  He was promoted to lance corporal in November of 1967.  (20 RR 226.)  Then he was assigned to the military police company in San Diego.  (20 RR 227.)  In March of 1968 he was transferred to Guantanamo Bay in Cuba.  (20 RR 227.)  In May of 1968, Mr. Coble was disciplined for dereliction of sentinel duties and reduced to private first class.  (20 RR 227.)  In November of 1968 he was sleeping at his guard post.  (20 RR 228.)  In 1969 he was reduced in rank to private for leaving his post without being properly relieved. (20 RR 228.)  These disciplinary actions are characterized as non-judicial "Article 15s" and "minor infractions."  (20 RR 245-246.)  In October of 1969 Mr. Coble was released from active service and he entered

the Marine Reserves; his service ended in October 1971. (20 RR 228.) His character of service was listed as honorable when he was discharged, the highest of three possible discharge categories. (20 RR 229, 244.)

Mr. Pierce's lack of relevant personal knowledge of the military in the years Mr. Coble served became evident on cross-examination. The witness was completely uninformed regarding the various military campaigns Mr. Coble participated in (20 RR 238-240); was not himself a veteran of Vietnam (20 RR 237); admitted he had "no personal knowledge of Coble's activities in Vietnam" (20 RR 238); did not know the location of Quang Tri province, where most of Mr. Coble's missions took place (20 RR 239-240); was not familiar with Mr. Coble's educational record (20 RR 243); had no knowledge of conditions at Guantanamo Bay (20 RR 248); did not know the pay schedule or how the demotions affected Petitioner financially (20 RR 248); and did not know whether Mr. Coble was entitled to legal representation at the disciplinary hearing in 1969. (20 RR 250.)

**Michael Trentham,** a retired Waco Police Officer, testified that he served on the police force for 29 years. (20 RR 254.) On July 19, 1989 he came into contact with Karen Vicha when her brother Bobby Vicha brought her in to the station. (20 RR 255- 256.) They claimed that Karen had been kidnaped by Mr. Coble and they wanted Mr. Trentham to talk with him. (20 RR 256.) Bobby Vicha wanted to accompany Trentham when he interviewed Mr. Coble and although Trentham did not want this, he allowed it. (20 RR 257, 268.) Trentham thought that normally it was not a good idea to take along someone who was personally involved in the case. (20 RR 268.)

They went to see Mr. Coble at his workplace. (20 RR 258, 268.) Bobby Vicha told Mr. Coble to talk to him if he wanted to speak to his sister and warned him to stay away from her. (20 RR 259, 266.) Mr. Trentham told Karen Vicha that she should obtain a protective order. (20 RR

260.)  Several days later, Mr. Trentham contacted Karen Vicha to see if she still wanted to press charges and she said she did.  (20 RR 260.)   Trentham wrote up a warrant for false imprisonment and took it before a magistrate.  (20 RR 261.)   The arrest warrant was issued.  (20 RR 261.)

On August 4, Bobby Vicha called and said he had spotted Mr. Coble and wanted an officer to help arrest him.  (20 RR 262.)   Mr. Coble was arrested for false imprisonment.  (20 RR 263.)  An indictment was then presented to the grand jury and Petitioner was indicted for kidnaping, a significant escalation of the charges.  (20 RR 263.)   The indictment was issued on August 24, 1989.  (20 RR 271.)

**Candy Ryan** testified that she was married to Mr. Coble from 1983 to 1987.  (21 RR 10-11.)  When they married, in September of 1983, she was 18 and he was 35.  (21 RR 10.)   At the time of their first planned marriage, Mr. Coble's wife obtained a warrant for child support and Mr. Coble was jailed for two or three days, so the ceremony had to be postponed.  (21 RR 59.)   The marriage went well the first year and then Mr. Coble "back-handed" her.  (21 RR 14.)   This occurred during had an argument while driving.  (21 RR 15.)   Ms. Ryan had previously told Mr. Coble she would leave him if he ever hit her.  (21 RR 16.)  He promised it would never happen again.  (21 RR 16.)

Mr. Coble's son G.W. [Gordon] stayed with them every other weekend.  (21 RR 16.)   Ms. Ryan felt that Coble favored his son over her.  (21 RR 17.)   The witness stated that Mr. Coble had a temper, and she complained that he did not allow her to watch soap operas, wear makeup, and tried to isolate her from friends.  (21 RR 19.)   One time at Christmas of 1983, there was an argument over a card game at Ms. Ryan's family's house, and they left.  (21 RR 21.)   The witness also complained that Mr. Coble wanted her to eat her food in a certain way, to complete one food item before she started on another.  (21 RR 21-22.)   Ms. Ryan would help Mr. Coble with his welding business.  (21 RR 23.)

-21-

Ms. Ryan related an incident in 1984 when Mr. Coble picked up "a handful of rocks [apparently driveway gravel] and peppered my back. I had a light jacket on, so it wasn't, you know, like, on skin...." (21 RR 25.) Ms. Ryan was angered and threw a rock at Mr. Coble which hit him in the neck. (21 RR 26.) Mr. Coble then threw a miniature sledgehammer which hit her in the back of her elbow. (21 RR 26.) He then apologized for throwing it, made a makeshift sling, said he didn't intend to hit her, only to scare her. No medical attention was needed. (21 RR 26.)

Continuing in the prosecution's presentation of seemingly every negative event of the four-year marriage, Ms. Ryan also related another occasion when Mr. Coble yelled at her about an incident at the mall (21 RR 27); a 1985 fight in the shop when she was shoved against a wall (21 RR 29); various times when she was hit without causing bruises (21 RR 29-30); an incident at a gas station when Mr. Coble accused her of flirting, yelled at her, and threw her purse (21 RR 37-38); and, when Ms. Ryan was working at night at a gas station in a rough area of town, Mr. Coble would park across the street, watch her, and sometimes accuse her of flirting with the customers. (21 RR 34.) Mr. Coble would hit her "[a]bout every three to five months." (21 RR 32.) In all, this occurred about 10 to 12 times in the four years of the marriage. (21 RR 78.) The witness admitted that this was never reported to the police. (21 RR 80, 94.) But "[she] had a lot of fun in between." (21 RR 32.) When Ms. Ryan left Mr. Coble the first time, she turned off his water and took half the money from their joint account. (21 RR 39.)

Ms. Ryan left Mr. Coble for the final time in 1987. (21 RR 40.) Before her departure, Ms. Ryan admitted she would conceal some of her earnings from Mr. Coble, instead of putting them in their joint bank account, and give them to her father to hold for her. (21 RR 43, 66.) Mr. Coble found out about it and they had a big fight. (21 RR 44.) When she told Mr. Coble she was leaving him, he slammed her head against a cabinet. (21 RR 44-45.) Ms. Ryan moved to an apartment and

-22-

Mr. Coble would call her repeatedly.  (21 RR 46-48.)  Several times, Mr. Coble, who had kept her dog, would make it yelp over the phone "to hurt [her]."  (21 RR 49.)  Ms. Ryan filed for divorce in 1987.  (21 RR 50.)  However, in the petition for divorce, she did not allege any instance of cruelty, but instead listed a "conflict of personalities."  (21 RR 91.)  She also thought Mr. Coble would be violent in the future and for the rest of his life.  (21 RR 52-53.)  But she also admitted that she has had no contact with Mr. Coble for the past 21 years.  (21 RR 93-94.)

According to Ms. Ryan, Mr. Coble appeared to love his son G.W. [Gordon]  and he would always exercise his visitation rights. (21 RR 54-55.)  After her divorce, Ms. Ryan became friendly with Mr. Coble's first wife, Pam Wooley  and found out that she would interfere with his visitation rights.  (21 RR 56-57.)  Ms. Ryan admitted that much of her marriage was "a lot of fun."  (21 RR 61.)  The witness also admitted that because these alleged incidents were over 20 years ago, it was hard to remember them exactly.  (21 RR 62.)  She also admitted that in her 1990 testimony, she did not say that Mr. Coble was controlling in making her eat her food a certain way and not wear makeup, and these were new allegations.  (21 RR 73-77.)   Additionally, she had never previously told about Mr. Coble's phone calls to her apartment after they split up.  (21 RR 78, 88.)  Mr. Coble taught her welding.  (21 RR 63.)  Ms. Ryan's parents did not approve of Mr. Coble.  (21 RR 67.)

**Naomi Rodriguez** testified that she worked at Kaybee Toys in August of 1989.  (21 RR 102.)  On August 24th of that year, she made a sale to Mr. Coble.  (21 RR 104, 110.)  He purchased two packages of toy handcuffs on that date.  (21 RR 105.)  Mr. Coble wanted several more but they were not available.  (21 RR 105.)  The witness also testified that Mr. Coble had made a threatening gesture when she testified at the first trial in 1990, a throat-slashing motion at her, but she admitted

that she had never told anyone in authority about this before the 2008 re-trial.  (21 RR 113-114.)[22]

     **James Head,** a detective for the Waco Police Department, testified that on August 4, 1989, he was called to arrest Mr. Coble on a false imprisonment warrant.  (21 RR 117-119.)  He was arrested and put in the patrol car.  (21 RR 121.)  The witness testified that, when being booked into the jail, Mr. Coble said something "under his breath" like "they're going to pay" or "somebody's going to be sorry"  (21 RR 123-124) and  "[i]t sounded like a threat to me."  (21 RR 124.)  Later, the witness warned Bobby Vicha and told him to be careful.  (21 RR 125.)  The witness thought that, during the booking procedures, "he [Bobby Vicha] did speak to Mr. Coble" but couldn't tell what was said. (21 RR 128.)

     **Anne Marie Tidmore**, Karen Vicha's oldest daughter, testified that her grandparents were John and Zelda Vicha and they had two children, Karen and Bobby Vicha, who was on the Waco Police force.  (22 RR 73-74.)  Karen had three daughters, the witness, Heather and Tracy.  (22 RR 75.)  Bobby Vicha had two children, Jennifer and J.R.  (22 RR 75.)  They all had houses near each other in Axtell, Texas.  (22 RR 76-77.)  Anne Marie was 16 years old in 1989.  (22 RR 76.)

     Mr. Coble and Karen Vicha married in 1988.  (22 RR 79.)   Their marriage seemed to be a good one at first. (22 RR 80.)  However, Karen asked for a divorce in 1989 and for awhile, Mr. Coble slept in his truck outside the house.  (22 RR 81.)  Prior to the events of August 29th, 1989, Mr. Coble had never done anything violent to her.  (22 RR 100.)

     On that day, August 29, 1989, Anne Marie came home from high school and found Mr. Coble in her room.  (22 RR 83.)  He had a gun and tried to handcuff her.  (22 RR 84.)  Tracy then

---

     [22]   No one in the courtroom apparently noticed this alleged gesture, including the judge, prosecutor, defense counsel, reporters, bailiff, spectators, or anyone else in the courtroom, as it does not appear in the record of the first trial, and there were no collaborating witnesses.

came in and Mr. Coble pointed the gun and handcuffed her.  (22 RR 86.)  Mr. Coble was talking in

a rambling way, saying he wouldn't be forgiven and they would be okay.  (22 RR 88.)   He told

Anne Marie that "he hated to do what he'd done, but when you love someone, you'll do anything

to make them understand sometimes." (22 RR 89.)   Mr. Coble was angry with Karen and said that

she was selfish and was going to pay for what she'd done. (22 RR 89.)

J.R Vicha, her cousin, and Heather,  her sister, then arrived and they were all handcuffed.

to Anne's bed.  (22 RR 90-91.)  Their feet were tied up with rope.  (22 RR 92.)  Mr. Coble said that

they should consider him and their mother dead.  (22 RR 91.)

At one point, Mr. Coble left and went to Bobby's house. (22 RR 92.)   Her grandfather's

truck was in the driveway.  (22 RR 93.)  She then heard two gunshots.  (22 RR 94.)  Later, she saw

Bill Coble driving her grandfather's truck.  (22 RR 94.)  He returned to their house and had a wound

in his hand.  (22 RR 95.)  He said they were all going to hate him for what he had done and

apologized for the tight handcuffs.  (22 RR 95.)   Later, he loosened them and loosened the cords

and took the tape off their mouths.  (22 RR 101.)  Mr. Coble left the house again, driving her

grandfather's truck.  (22 RR 97.)  Anne Marie saw her grandmother drive up to the house and she

was shot. (22 RR 98.)  Then Mr. Coble returned to Karen's house.  (22 RR 98.)   Karen then arrived

home and she was handcuffed.  (22 RR 99.)

Ms. Tidmore also testified about an incident about ten years ago, in 1998 in court at an

evidentiary hearing.  (22 RR 175.)  Mr. Coble turned around and smiled at her, and she found that

threatening.  (22 RR 177.)  He was handcuffed and he did not turn around again.  (22 RR 178.)

**Tracy Tidmore Habern,** Karen Vicha's middle daughter, was 14 years old on August 29,

1989.  (22 RR 105.)  She came home from school that day with Anne Marie and walked in the

house.  (22 RR 107.)  Bill Coble came toward her holding a gun.  (22 RR 107.)  She ran to the back

door but tripped and fell.  (22 RR 107.)  He told her to stop screaming and handcuffed her.  (22 RR 107.)  Bill Coble told them that he had originally planned to kill them all, and that he loved her mother.  (22 RR 109.)  He said he was angry with Karen for leaving him.  (22 RR 109.)  Heather and J.R. then arrived and they were handcuffed and placed in Anne Marie's room.  (22 RR 110.)  Their mouths were taped and their feet bound with curtain cords.  (22 RR 110.)  Bill Coble said that he had not kidnaped their mother and was innocent of that charge, and that they should consider him and their mother as deceased.  (22 RR 111.)

Mr. Coble left the house and Tracy heard gunshots.  (22 RR 112.)  He returned and she noticed blood on his pant legs.  (22 RR 112.)  Mr. Coble said he was waiting for their mother to return home  and he was going to kill her. (22 RR 113.)  Anne Marie saw their grandmother coming down the road.  (22 RR 113.) Mr. Coble left the house and returned a short time later.  (22 RR 113.)

When Karen came home, Mr. Coble told her to shut up and if she did what he told her to, he wouldn't hurt the kids.  (22 RR 114.)  Other people kept coming to the door, such as Anne Marie's boyfriend, another male friend and Bobby's girlfriend,  and this flustered Mr. Coble.  (22 RR 115-116.)  She kissed Karen goodbye and they left the house.  (22 RR 114.)  The incident has had a life-long impact on her and she is scared of Mr. Coble.  (22 RR 117.)

Before testifying, the witness reviewed her testimony from the 1990 trial.  (22 RR 119.)  During Bill and Karen's one-year marriage, she had never known Bill to be violent toward Karen or her sisters.  (22 RR 120.)  Their relationship did not seem to be bad and they did not yell at each other.  (22 RR 121.)  When Bill moved out of the house, Karen did not seem upset.  (22 RR 124.)  Bill did not smoke or drink, but Karen did occasionally.  (22 RR 126.)  Bill appeared to love Karen.  (22 RR 127.)  Tracy did not ever recall him being verbally abusive to Karen.  (22 RR 127.)  He appeared to get along with Karen's parents.  22 RR 127-128.  While he lived there, he tried to act

as a decent step-parent.  (22 RR 130.)   Bill was the softball coach for her team.  (22 RR 131.)   He tried to be friendly with her friends but did not do anything inappropriate and he was involved with a lot of her school activities.  (22 RR 133-134.)   Tracy was surprised at Bill's conduct on August 29th.  (22 RR 136.)   On that day, he talked in a rambling way, referred to Vietnam, and implied that he was going to kill himself.  (22 RR 138.)   When they were handcuffed, Mr. Coble asked whether they were comfortable and needed "a pillow, or something like that."  (22 RR 139.)   He loosened their cords and gave them a pillow.  (22 RR 139.)   Mr. Coble did not attempt to harm the children.  (22 RR 141.)   When Bill and Karen left the house, she was restrained.  (22 RR 142.)

**Heather Moss,** KarenVicha's youngest daughter, testified that Mr. Coble seemed to be "nice" and "fine" at first, when he married her mother Karen.  (22 RR 148.)   They were married for about one year.  (22 RR 159.)   Heather did not recall any instances when he was violent or verbally aggressive towards Karen.  (22 RR 159-160.)   Bill never lost his temper with her.  (22 RR 160.)   She did not recall any fights between Karen and Bill before they divorced.  (22 RR 162.)   Heather was not scared of him until August 29, 1989.

On that day, she returned home on the school bus with her cousin J.R. Vicha, who was a year older than her.  (22 RR 150.)   Bill Coble was there with a gun, and he told them to put their books down.  (22 RR 151.)   He didn't have enough handcuffs so he used cords from the blinds.  (22 RR 152.)   After they were tied up, Bill left the house.  (22 RR 153.)   Heather heard shots and then Bill returned to the house.  (22 RR 154.)   His thumb was bleeding, he went into the bathroom and then came out and talked about seeing bodies flying in Vietnam.  (22 RR 154.)   At one time Bill said "[c]onsider your mom and I deceased."  (22 RR 155.)   They saw their grandmother driving home and Bill left again.  (22 RR 156.)   He returned, had their mother say goodbye to them, and then left with her.  (22 RR 157.)   He did not threaten the children with harm that day. (22 RR 157.)   Heather

-27-

is still scared of Mr. Coble.  (22 RR 157.)

The State wished to call John Robert (J.R.) Vicha, Jr. as their next witness.  (22 RR 166.) He was one of the children tied up by Mr. Coble on August 29th, and his father, Bobby Vicha, was shot by Mr. Coble, along with his grandparents.   The prosecutor stated that "My office...built a 'Chinese wall' regarding J.R. Vicha in this particular case.  We don't think he's in the least disqualified as a witness in this case.."  (22 RR 166.)

**J.R. Vicha,** an attorney employed by the McLennan County District Attorney's office as a criminal prosecutor, testified that he was the son of Bobby Vicha.[23]  He was 11 years old in 1989. (22 RR 182.)   The prosecutor indicated that he knew him and hence addressed him as "J.R."  (22 RR 183.)   Karen, J.R.'s  father and his grandparents all lived close to each other.  (22 RR 184.) Before August 29, 1989, Mr. Vicha liked Mr. Coble.  (22 RR 185.)  On that day, Mr. Vicha returned from school on the bus with his cousin Heather Moss, a daughter of Karen Vicha.  (22 RR 186.)  His father's and grandparent's garage doors were closed so he went to Karen's house.  (22 RR 187.) When they entered the house, Mr. Coble was there.  (22 RR 190.)   He tied Mr. Vicha to a bedpost and put tape over their mouths, but it later fell off.  (22 RR 190.)   Bill asked when Bobby Vicha would return from work.  22 RR 191.

After he returned from Bobby Vicha's house, Mr. Coble said something about being on "America's Most Wanted."  (22 RR 192.)  At one time, he said he hurt his thumb.  (22 RR 193.) Ann Marie said "here comes Nanny."  (22 RR 194.)   Bill left and then came back.  (22 RR 194.) Then Karen returned home and she then left with Bill after telling the kids goodbye.  (22 RR 195.) She hugged them and told them she was sorry.  (22 RR 195.)   Later that night, Mr. Vicha learned

---

[23]   The jury was just informed that he was an "attorney" with no inquiry about where he practiced.

that his father had been killed.  (22 RR 196.)

A few days before this happened, Bobby Vicha told  J.R. where certain valuables were hidden in the house.  (22 RR 198-199.)  Mr. Vicha thought his father was doing that because he felt that something might happen to him.  (22 RR 200.)  The death of his father has affected him.  (22 RR 200.)

The prosecution tendered a tape recording of statements made by Mr. Coble while he was in the hospital on August 29, 1989, after his car had crashed.  (23 RR 6.)

**Michael Voss** testified that he was 17 on August 29, 1989 and was dating Anne Marie Tidmore.  (23 RR 10.)   About 5:30 p.m. that day, Mr. Voss went to her house.  (23 RR 11.)  He walked up to the front door and knocked.  (23 RR 12.)  Finally, Karen answered and opened the door just a little.  (23 RR 12.)  It looked like she had been crying and she seemed scared.  (23 RR 13.)  Karen said Anne Marie was grounded and couldn't see Mr. Voss.  (23 RR 13.)   He knew they were worried about Bill. (23 RR 14.)   Mr. Voss drove to a friend's house and called Anne Marie but no one answered.  (23 RR 15.)  They were worried so they went back to the house to see if anything was wrong.  (23 RR 15.)   Two friends, Chad Stanley and Travis Jackson went up to the door.  (23 RR 15.)  Karen again came to the door and looked as if she had been crying.  (23 RR 16.)  She said that Anne Marie had just left and gone to town.  (23 RR 17.)   Mr. Voss tried to call Bobby Vicha, her dad, and she finally reached his wife.  (23 RR 17.)   She was going to contact Juanita Casper, Anne Marie's other grandmother,  to see if she could go to the house to make sure everything was okay.  (23 RR 17.)  Mr. Voss and his friends went back to the house.  (23 RR 18.)  Chad opened the door and heard J.R. screaming and crying.  (23 RR 18.)  The boys found the children handcuffed and tied up.  (23 RR 18.)

Mr. Voss then went to Bobby Vicha's house.  (23 RR 19.)   His girlfriend was leaving and

she hadn't seen him.  (23 RR 19.)  Later, he found out that Robert, Zelda and Bobby Vicha were dead.  (23 RR 20.)

Mr. Voss had known Mr. Coble before August 29, 1989, and Coble had helped him fix a trailer.  (23 RR 21.)

**Karen Vicha,** ex-wife of Petitioner, and mother of Anne Marie and Tracy Tidmore and Heather Moss, testified that in the late 1980s she lived in Axtell near her parents and her brother Bobby.  (23 RR 23.)   She first met Bill Coble when she was in high school and they met again in 1987.  (23 RR 25, 103-104.)   He was good to Karen and  her children when they were dating.  (23 RR 26, 104.)   They married on July 3, 1988.  (23 RR 26.)  The first few months of the marriage went well.  (23 RR 27, 106.)   Bill got along well with Karen's parents and he seemed like he was trying to build a life with her.  (23 RR 106-107.)   He did not smoke or drink or go out a lot, but stayed around the house and took care of the children. (23 RR 107-108.)   Bill and Karen were involved in the local sports association and once they organized a sports banquet.  (23 RR 113-114.)   He was also active in the Army Reserve and coached youth baseball teams.  (23 RR 115-116.)  His relationship with his son G.W. was good.  (23 RR 116-117.)  Bill worked on a Mustang that he had bought for Karen.  (23 RR 110-111.)  He tried to sell insurance through a commission job, but it did not work out.  (23 RR 110-112.)  Karen did not understand why he wasn't earning a living.  (23 RR 112-113.)

Toward the end of their marriage, Ms. Vicha noticed some changes.  (23 RR 28.)  Mr. Coble almost got in a fight with a man at a club and then later threw a cup of soda at him at the fair.  (23 RR 29.)   She remembered another occasion when Mr. Coble almost got into a fight.  (23 RR 29.)  But in neither of these instances did he ever exchange blows.  (23 RR 117.)  Karen was "disturbed" because Bill Coble called her the "perfect woman" (23 RR 28, 30, 107) and, on another occasion

when she had a hysterectomy, he said that he hoped she would not gain weight.  (23 RR 30.)

Karen became suspicious and concerned when someone anonymously sent her a newspaper clipping about being careful about her daughters in terms of possible abuse.  (23 RR 31.)   Another time, her daughter had a sleep-over with a friend and she thought she observed Bill watch the young lady change clothes from another room.  (23 RR 33.)   Also remembered was a short argument in the car when "he just kind of hollered something at me and went like that, but he stopped.  He didn't actually hit me."  (23 RR 34.)

She filed for divorce in early July of 1989 because "I knew I didn't love him anymore."  (23 RR 35.)   Bill was dumbfounded and tried to talk her out of it.  (23 RR 35.)   He did not want to sign the divorce papers.  (23 RR 36.)   One night Karen drove with her brother Bobby to a bingo hall and they tried to have him sign the papers.  (23 RR 37.)

On July 18, 1989, shortly after she filed for divorce,  Bill was in the parking lot at Karen's work, and wanted to talk.  (23 RR 37.)    But Karen refused and drove off with her girlfriend to a dance hall.  (23 RR 37-38.)   Bill followed her to the club, and said that Karen had lied about not divorcing him "and that's something you're going to have to live with...and that's something you'll die with."  (23 RR 38-39.)   She thought he was being "melodramatic."  (23 RR 39.)   Karen left in her car and after about a block, Bill popped out of the trunk into the backseat with a knife.  (23 RR 41.)  He held her and stuck the knife in her side and told her to keep driving.  (23 RR 42-43.)   Karen started honking the horn but Bill made her stop.  (23 RR 43.)   He said that if he couldn't have her, no one would.  (23 RR 44.)   They pulled up at a mall and stopped the car.  (23 RR 45.)   They talked for 2 or 3 hours.  (23 RR 47.)   Bill said that she couldn't treat people that way and tried to talk her out of the divorce.  (23 RR 47.)   He calmed down and put the knife away.  (23 RR 48.)   Karen agreed to re-think the divorce and she took him back to his car, a red Mustang, that was actually in

Karen's name.  (23 RR 50.)   Karen had agreed to let Bill keep the car and make payments on the

note.  (23 RR 51.)   Bill let her leave, and then pulled her over to retrieve his belt from her car.  (23

RR 52.)

Karen drove home and called her brother Bobby and told him what had happened.  (23 RR

53.) Bobby told Karen to meet him at the police station in the morning.  (23 RR 53.)   The next day,

she thought about filing charges.  (23 RR 54.)  Karen and Bobby then went to see Bill to have him

sign the divorce papers.  (23 RR 54.)   Bobby talked with Bill and asked him to sign the papers, but

Bill refused and then Bobby became "very mad."  (23 RR 54, 56.)   Bobby then told Karen that she

"ought to go ahead and file charges."  (23 RR 54.)   Bill was then arrested and jailed.  (23 RR 56-

57.)   Karen was surprised when he bonded out and came to her work place.  (23 RR 58.)   He

wanted to get his clothes at the house but Bobby told him "he didn't want him to go over there."

(23 RR 58.)  When Bill went to the house to get his clothes, Bobby "confronted him."  (23 RR  58.)

As Bill had to leave the house, he slept in his car nearby.  (23 RR 59.)   Bobby had told him that "he

couldn't go over there [to the house] and pick up anything" even though he had "a lot of stuff" there.

(23 RR 59-60.)

On August 29, 1989, Karen worked until 5 p.m.  (23 RR 62.)  Karen wanted to go out with

her  girlfriend and tried to reach her family to have them babysit.  (23 RR 63.)   She couldn't reach

them so she drove home.  (23 RR 65.)   Karen walked in and saw Bill holding a gun.  (23 RR 66.)

The children were in a bedroom.  (23 RR 67.)   Bill told her to put handcuffs on, but Karen refused

at first.  (23 RR 68.)   Bill told her that he had killed her mother, father and brother.  (23 RR 68-69.)

Karen kissed the kids goodbye and then they waited for it to get dark, allegedly so that they could

"make [their] escape."  (23 RR 69, 72.)   Then Mike Voss came to the door and Karen told him that

Ann Marie was grounded.  (23 RR 70.)   Bill was standing nearby with a gun.  (23 RR 70.)   Karen

tried to show Mike that she was handcuffed.  (23 RR 71.)   Other people also came to the door: Carol, Bobby's girlfriend, and Chad Stanley.  (23 RR 72-73.)   Carol asked to use the phone but Karen refused.  (23 RR 74.)

Finally, Bill and Karen left the house.  (23 RR 76.) Bill brought the guns with him.  (23 RR 78.)  He mentioned that Karen should be grateful because he didn't hurt the girls.  (23 RR 79.)  Bill said he had some money which he had seen on Karen's mother's bed.  (23 RR 80.)   While Bill was obtaining items from the Mustang, Karen got her hands out of the handcuffs and got one of the guns that she thought was loaded, cocked it and put it on the floorboard, and then put her hands back in the cuffs.  (23 RR 82.)  She intended to shoot Bill.  (23 RR 82.)   They left her parent's house in the Corsica.  (23 RR 82.)

As they left in the car, they saw police cars going the other way and Karen grabbed the steering wheel to try to make the car go into the ditch.  (23 RR 84.)   The car came to a stop and Karen grabbed the gun and pointed it at Bill and pulled the trigger but it didn't go off.  (23 RR 84.)  Bill grabbed the gun and hit her with it as they struggled.  (23 RR 85.)   He then tried to strangle her and Karen slumped and pretended to be unconscious.  (23 RR 86.)

Bill drove away and told Karen that his reputation was ruined because she had him arrested and it was in the paper.  (23 RR 88.)   They drove to a field in Bosque County and looked for some water.  (23 RR 89-92.) Karen changed clothes.  (23 RR 91-92.)

Bill then said that he would probably appear on television.  (23 RR 97.)   They left the field and started driving again and were spotted by a police car.  (23 RR 97.)   Bill pulled out a knife and made a motion like he was cutting his throat.  (23 RR 99.)   Then he started stabbing Karen.  (23 RR 99.)  Bill said he didn't want to die in prison and he revved up the car and crashed it into a vehicle on the side of the road.  (23 RR 100.)   Karen thought this was an attempt to commit suicide and kill

-33-

her.  (23 RR 121.)  They were both extracted from the car and taken to the hospital.  (23 RR 102.)

Karen testified that Bill acted bizarrely that night: angry and saying awful things one moment and then kind and nice the next.  (23 RR 118-119.)

The witness recalled an incident at a court hearing in 1998 when he turned around and grinned at her.  (23 RR 122-123.)  She stated that she was still scared of him.  (23 RR 124.)

During her testimony, in full view of the jury, Karen blurted out that she hated Bill "for making [her] go through this again."  (23 RR 94.)  The statement was ruled inadmissable.  (23 RR 96.)  A motion for a mistrial was denied.  (23 RR 96.)

**Robert Brennand**  testified that he was a deputy sheriff in Bosque County in 1989.  (23 RR 129-130.)  On August 29, 1989, he was told to be on the lookout for a certain vehicle.  (23 RR 131.)  He received a report of the accident and arrived when the officers were pulling Bill and Karen from the wrecked car.  (23 RR 133.)   At the hospital, Mr. Brennand tape recorded some statements by Bill when he was on the gurney in the emergency room.  (23 RR 136-137.)   A transcription of the tape was given to the jury and the tape was played for them.  (23 RR 139.)  The tape was not a continuous recording but was turned on and off.  (23 RR 141.)

**Larry Fletcher** testified that he worked at the Dallas County Institute of Forensic Sciences in 1989.  (23 RR 143.)  He also worked for the Southwest Institute of Forensic Sciences.  (23 RR 143-144.)   He test-fired a newer .357 Smith and Wesson revolver and an older  .38 Smith and Wesson and compared the results to bullets he obtained from the crime scene in this case.  (23 RR 147-148.)  The bullets recovered from Zelda Vicha were fired from a .357 Magnum revolver.  (23 RR 149.)  Eight spent cartridge cases were recovered from the pocket of Mr. Coble.  (23 RR 150-151.)  There were six bullets from the newer gun and two from the older one.  (23 RR 159-160.)  The older  .38 caliber Smith and Wesson revolver was not operative when received in the

-34-

laboratory.  (23 RR 151.)  The witness made it operable but could not identify any bullets as having been fired from it.  (23 RR 152.)  This was allegedly the weapon that Karen Vicha pointed and fired at the defendant.  (23 RR 154.)  A piece of aluminum tubing was also submitted to the laboratory; it seemed to be an attempt to act as a silencer.  (23 RR 155.)   The tube came from the vehicle belonging to John Vicha.  (23 RR 157.)   The witness testified that his methodology was reliable and generally accepted.  (23 RR 158-164.)

**Dr. Jeffrey Barnard,** the chief medical examiner for Dallas County, and director of the Southwest Institute of Forensic Sciences in Dallas, testified that he was a medical examiner who sometimes performed autopsies.  (23 RR 167-170.)   He performed the autopsy on Robert Vicha. (23 RR 172.)    The autopsy on Zelda Vicha was performed by Dr. Joseph Guileyardo and Robert John Vicha's was done by Dr. John Parker. (23 RR 173.)   Although he only performed the one autopsy, Dr. Barnard reviewed the others and signed off on them.  (23 RR 174.)

Robert Vicha died from two gunshot wounds to the head.  (23 RR 174.)   John Robert Vicha had four gunshot wounds, including two leg wounds one to the neck.  (23 RR 176-177.)   Zelda Vicha had two gunshot wounds, one to the head and one to the wrist.  (23 RR 177-178.)

On cross examination, Dr. Bernard testified that his methods were scientifically valid and generally accepted.  (23 RR 179-183.)

**V. R. Price, Jr.,** an investigator with the Waco Police Department, testified that he knew Bobby Vicha.  (23 RR 188-189.)  Mr. Price thought he was a good neighbor and friend.  (23 RR 190-191.)  He also knew Bobby's parents, as Mr. Vicha senior had sold Mr. Price the land for his house.  (23 RR 191.)   Even well after that sale, Mr. Vicha was very curious about Mr. Price's activities and wanted to know "anything that we were doing to the land, whether it was building a fence or adding a building or anything, he would come down.  Not so much to...help..."  (23 RR

193.)  Mr. Price thought the Vichas were good people.  (23 RR 194.)

Mr. Price also took photographs in the investigation of their deaths and identified those photos.  (23 RR 194-202, 208-214.)     He identified a photo of the red Mustang as a car that belonged to Bill Coble.  (23 RR 197.)   The elder Mr. Vicha's body was covered with a wrap when it was found and his pants were consistent with being dragged.  (23 RR 199, 223-224.)  There was blood underneath a carpet which smelled as if cleaning agents had been used on it.  (23 RR 203-204.)  Zelda Vicha was found shot in the garage.  (23 RR 206.)  She may have been making defensive moves when she was shot.  (23 RR 207-208.)  Bobby was found dead outside of his house in his car.  (23 RR 216.)  A silencer was found in the car.  (23 RR 222.)  The phone lines were cut at Bobby's and Karen's residences.  (23 RR 209-210, 221.)

**Dr. Ralph G. Hodges**, a physician and a psychiatrist, was called by the State.  (24 RR 7.)  Dr. Hodges testified he was licensed in 1957 and began psychiatric consultations in 1958.  (24 RR 13.)  He performed a psychiatric consultation on Mr. Coble on May 6, 1964, over forty-four years prior to the trial.  (24 RR 9, 64.)   Dr. Hodges had no independent recollection of the interview but he was allowed to read it to the jury.  (24 RR 10.)   The interview took place when Mr. Coble was 15 years old.  (24 RR 11.)[24]   Dr. Hodges took notes of the interview.  (24 RR 92-93.)   The report contained much hearsay information regarding Mr. Coble's 14 year old brother, including statements that his brother been in trouble and was on probation.  (24 RR 11.)  The report also contained information about alleged thefts that Mr. Coble committed with his brother.  (24 RR 12.)  Mr. Coble's father had been killed in 1948, about the time of Bill's birth, and their mother had been hospitalized and Bill and his siblings were sent to the Corsicana Home when he was 11.  (24 RR 11.)

---

[24]  Mr. Coble turned 60 at the time of the re-trial in 2008.

The "purpose of the consultation was to try to determine whether or not there was any way to help Billie Wayne move in a direction other than the direction his brother had moved." (24 RR 11.)

Bill wanted to go home. (24 RR 12.)  He talked about taking the ball bearings from other kids' bicycles. (24 RR 12.)[25]   He seemed "paranoid, distant" and told about beating up a girl because he did not like her. (24 RR 12-13.)  "It is my impression this boy represents a sociopathic personality disturbance of the dissocial type...It is doubtful that this boy will achieve a better social adjustment than either his brother or his stepfather." (24 RR 13.) Despite the numerous hearsay references to Mr. Coble's brother, and the purpose of the consultation being to see if Bill would turn out like his brother, the testimony was heard by the jury without objection by the defense.

Dr. Hodges admitted that the diagnostic criteria changed in 1962, "that character disorders were not diagnosable before age 18.  And the revision of the diagnosis, according to the next DSM,[26] would have been conduct disorder." (24 RR 14-15, 26, 85.)   The diagnosis could have been made only if the traits "had been observed after the age of 18." (24 RR 15, 26.)   Today, a diagnosis of sociopathy is not made for someone under 18. (24 RR 82, 85.)   The reason for this change  is that the person's character is still forming. (24 RR 26-27.)   Dr. Hodges testified that a "sociopathic personality disturbance" is a condition in which individuals show "little regard of the cost in terms of money or pain that they inflict on others." (24 RR 15.)   But if he were doing the report today, Dr. Hodges would change the diagnosis to "conduct disorder." (24 RR 26.) The witness admitted that even for this diagnosis, "you have to see three or more criteria within 12 months" and one

---

[25]   The witness later contradicted himself and said that he though this referred to an incident when Bill was 10 or younger, before he arrived at the boys home, when he was unsupervised by his mother.  24 RR 7879.  Later, he said he thought it occurred at the home.  24 RR 79. Dr. Hodges did not recall any other anti-social acts at the home itself.  24 RR 79.

[26]   Diagnostic and Statistical Manual of Mental Disorders.

within six months.  (24 RR 87.)

Dr. Hodges also admitted that there have been many changes in the field of psychiatry since 1963.  (24 RR 17.)   The personality of an individual, and his brain,  continues to form "even into the early 20s."  (24 RR 19.)   There have been 5 or 6 revisions of the DSM since 1952.  (24 RR 21.) This book provides the guidelines for diagnosis.  (24 RR 23.)   There were major changes in the different versions of the DSM I, DSM II, and DSM III.  (24 RR 25.)   Earlier editions of the DSM were less specific and had fewer criteria.  (24 RR 28, 84.)  The DSM I had few criteria with which to make a diagnosis of sociopathy. (24 RR 30.)   The current edition has numerous criteria.  (24 RR 31.)   Dr. Hodges admitted that an individual can be shaped by environmental and genetic factors. (24 RR 31.)  A history of mental illness can run in a family.  (24 RR 31.)

Dr. Hodges examined a file from Bill Coble's stay at the Corsicana State Home.  (24 RR 34.) He also saw a medical record for his mother, Loreais Bird.  (24 RR 34.)   She had only a fourth grade education.  (24 RR 40, 52.)   Bill's father was killed three months before Bill was born.  (24 RR 40.)  Bill Coble was sent to the home on June 6, 1960, when he was 11.  (24 RR 36.)  Their mother remarried someone named Billy Bird and his daughter, Dora Jean, stayed home while the Coble kids were sent to the home.  (24 RR 38.)   That could have caused some psychological scarring in Bill.  (24 RR 38.)  There was conflict with the stepfather.  (24 RR 38-39.)  Bill's mother spent time in a mental institution and was mentally ill.  (24 RR 39, 44.)   The family lived in a "low income neighborhood" and the home was "in poor repair."  (24 RR 41-42.)  Bill's biological father was illiterate and worked as a laborer.  (24 RR 42.)   The Coble children were not properly supervised as the mother was unable to do it.  (24 RR 43.)

Loreais Bird, Bill's mother, had a nervous breakdown in 1953, when Bill was 5.  (24 RR 47-50.)  She was diagnosed as having a "premorbid personality," she was high-strung and bothered by

little things.  (24 RR 52.)   She was not satisfied with her marriage and the first 11 years of Bill's life were lived in an unhappy environment.  (24 RR 53-54.)  She was very depressed and the recommendations were for electroshock treatments.  (24 RR 54.)  This treatment is used for severe depression and schizophrenia. (24 RR 55.)

When Bill was 11, a court made a determination that the Coble children were not being properly supervised and sent then to the Corsicana Home.  (24 RR 45.)  The evaluation was that the 2 older children were more out of control than Bill.  (24 RR 58.)   The Corsicana  home is an institution with big dormitories.  (24 RR 45-46.)   Two supervisors in that home had charge of 35 kids.  (24 RR 56.)  When Bill was 15, and still at the state home, his older brother and sister had been discharged to return home.  (24 RR 60.)

Dr. Hodges admitted that his evaluation was somewhat subjective.  (24 RR 64-68, 75.)  In the evaluation, Bill stated that his life ambition was to be a painter.  (24 RR 70.)  Bill said, at age 15, that he didn't like Santa Claus because he never brought him anything and that he had been given a .410 shotgun.  (24 RR 71-74.)  The statement about the shotgun could have been wish fulfillment.  (24 RR 74.)

**Dee Smith,** a prison guard at the Polunsky Unit, testified that she was a property officer at the unit.  (24 RR 96.)  In July of 2008, the prosecution asked her to pull Bill Coble's property for them to examine and she identified photos taken of parts of the property.  (24 RR 96-98.)

**Lorna S. Sawyer,** a cousin of Bill's, testified that in 1979 he offered her a job at the Circle Drive-In movie theater when she was 16.  (24 RR 106.)  She worked there not quite three weeks, at the concession stand.  (24 RR 107.)  One day, Bill came to pick her up and he went to his house and he allegedly sexually assaulted her.  (24 RR 109.)  However, she admitted that she "probably will never ever remember exactly what happened...I don't know if it was brutal.  I don't know

anything about it."   (24 RR 111.)   The witness admitted she had not told anyone of this alleged

assault before, except her sister.  (24 RR 110.)  Nor did she go to the police.  (24 RR 121.)  Nor did

she remember telling her mother or her two brothers.  (24 RR 121.)  She also admitted she did not

tell her sister about this allegation until three years later.  (24 RR 120.)  Ms. Sawyer denied being

under the influence of drugs at the time of the alleged incident, but she admitted using drugs later

in her life.  (24 RR 122.)

The witness also admitted she refused to talk with defense counsel about these allegations.

(24 RR 112.)  The district attorney made her testify against her will.  (24 RR 113.)[27]  She did not go

to the police when it allegedly occurred and she did not go to the police at the time of Bill Coble's

first trial in 1990.  (24 RR 113.)  Nor did she testify at that trial.  The witness's sister, Jeanine Stokes

supposedly told the police about the alleged incident.  (24 RR 114.)

The defense attorney attempted to ask the witness if she had made similar accusations of

sexual assault against other members of her family and an objection was sustained.  (24 RR 115.)

The defense stated it went to her credibility as none of these accusations were ever proved and she

had not come forward with any of them nor "made any comments until recently.  She's making a

false accusation."  (24 RR 116.)  The prosecutor stated that she had been victimized as a child, but

had not provided the defense with this information.  (24 RR 117.)   However, the court ruled that

"this ground of inquiry is [not] appropriate."  (24 RR 119.)   The defense was also not allowed to

ask whether she had been under a psychiatrist's care (24 RR 123) or whether she had been

diagnosed with a mental illness or whether she was taking any kind of psychotropic medication.  (24

---

[27]  Despite the fact that the witness stated she did not want to testify, the district attorney
claimed that she was being victimized by the defense in their questioning about other allegations
she had made: "Instead of putting this woman through this and revictimizing her to what
occurred to her, if it did occur, it's bad enough that this man did it to her....(24 RR 119.)

RR 124.)

**Dr. Richard E. Coons,** an Austin psychiatrist who had incorrectly predicted that Mr. Coble would commit criminal acts of violence that would constitute a continuing threat to society (Tex. Code Crim. P. Ann. Art. 37.071(b))("future dangerousness")  at his trial in 1990, was allowed to testify as to Petitioner's propensity for future dangerousness.  This testimony is discussed in detail in Claim 7 *infra.*

After this witness, the State rested.  (24 RR 268.)

**ii) The defense case.**

**Joy Howard Marvin** was called as a defense witness.  (22 RR 8.)  She also testified at Mr. Coble's 1990 trial.  (22 RR 8.)  She was currently employed by Providence Health Center in the medical records department.   (22 RR 9.)  In 1988, she was the office manager/recruiter for Penn Corp. Financial, an insurance company.  (22 RR 10.)   They would recruit by running ads in the paper and they would screen the applicants  in an interview and then invite them in for a face-to-face interview.  (22 RR 12.)   If Ms. Marvin felt they were the kind of person they were looking for, she would schedule them for an interview with the manager, Tom Marvin, her husband.  (22 RR 13.) The jobs were solely based on commissions.  (22 RR 15.)   It meant being sociable with many people, knocking on doors, and dealing with people who were often not receptive.  (22 RR 16.)  A good salesman requires hard work, and flexible and long hours.  (22 RR 15-16.)  They had to first attend a 40-hour training school before selling insurance.  (22 RR 17-18.)   There was also three weeks of field training.  (22 RR 19.)  Only about ten per cent made it out to the field to sell insurance.  (22 RR 38.)

Ms. Marvin met Mr. Coble in March of 1989 and he was invited to come in to a recruiting interview.  (22 RR 21.)  She thought he would make a good candidate.  (22 RR 21.)  He took the

study course and she worked with him closely over two or three weeks.  (22 RR 22.)   Mr. Coble was a diligent student, "the best student I had in that group of people."  (22 RR 23.)  He got along well with the other people and did not lose his temper, although some of the material was very difficult.  (22 RR 23-24.)  He was not being paid at this time.  (22 RR 24.)  He had an excellent work ethic.  (22 RR 25.)  Ms. Marvin was not aware of any problems he had in the office or out in the field.  (22 RR 26.)  He could relate to people and got along well with them.  (22 RR 40.)  Mr. Coble eventually received a 90-day temporary license.  (22 RR 27.)  He worked for three months.  (22 RR 39.)

At some point, he began having problems attending work as he had to earn some money.  (22 RR 28.)  At that time, he phoned and said he had to do some mechanical work on a Mustang.  (22 RR 30.)  He was switching an automatic transmission to a Mustang that had a standard transmission.  (22 RR 30.)  Mr. Coble was planning on giving the Mustang to his wife Karen.  (22 RR 31.)  This project was keeping him from earning money and kept him from the job.  (22 RR 32, 40.)  He was concerned about his financial situation.  (22  RR 33.)

Bill and Karen were in charge of the All-Sports Banquet in Axtell that year.  (22 RR 33.)  Bill seemed very much in love with Karen, they seemed to get along well,  and he enjoyed his stepchildren.  (22 RR 34, 43.)  At the time the witness knew Mr. Coble, he did not seem dangerous.  (22 RR 45.)

When the witness heard about what happened on August 29, she was shocked and she could not believe it.  (22 RR 35.)   The only side of Bill that she saw was a peaceful and well-behaved side.  (22 RR 36.)  She did not see the bad side of him.  (22 RR 46.)

**Thomas Marvin,** the husband of Joy Howard, testified that he ran an insurance office with his wife, Joy Howard Marvin.  (22 RR 48-49).  He had been selling insurance for about 15 years.

-42-

(22 RR 49.)  Mr. Marvin met Bill Coble in 1989 at the hiring interview and he seemed a good candidate.  (22 RR 51.)  Bill started work in March of 1989.  (22 RR 65.)  Mr. Coble's job was to go door-to-door making cold calls.  (22 RR 51.)   There was a lot of rejection in this line of work because many people did not want to be talked to.  (22 RR 53.)  The business could be frustrating as it was purely based on commissions.  (22 RR 56.)   There were never any complaints about his behavior.  (22 RR 54.)  He worked well with his trainer and was a "good member of the team."  (22 RR 54.)  Mr. Coble was licensed by the state.  (22 RR 55.)  Mr. Marvin met with Bill's wife Karen to explain the difficulty of being a cold-call salesman.  (22 RR 59.)  They seemed to get along well and there did not seem to be any tension between them.  (22 RR 60.)

Bill began to have problems and he missed work.  (22 RR 57.)   He was trying to get a car fixed and he seemed frustrated by that, because it was taking time away from the job. (22 RR 58.) He was not violent in any way.  (22 RR 59.)  One time, he observed a theft and called the police. (22 RR 61.)  Bill made some sales in June of 1989.  (22 RR 62.)    During the four months he worked for Mr. Marvin, he thought Bill was a good guy.  (22 RR 63.)  Bill had never given any signs of violence.  (22 RR 64.)   Mr. Coble has sent Christmas cards over the years which indicate he has become involved with religion.  (22 RR 64.)

**Janine Swindler,** a first cousin of Bill Coble, was a former employee of the Veteran's Administration.  (25 RR 22.)   Mr. Coble was a machine gunner in Vietnam. (25 RR 23.)  After Bill came back from Vietnam, he distanced himself.  (25 RR 23.)  Bill returned  in 1969, when Ms. Swindler was nine.  (25 RR 26.)   After 1990, she started corresponding with Bill in the prison.  (25 RR 26.)   They wrote many letters back and forth.  (25 RR 26.)  Bill would ask for help in putting on sports tournaments for the inmates.  (25 RR 27.)   The inmates would send little thank you notes.  (25 RR 27.)    Bill would also send  her crafts projects such as Christmas

-43-

ornaments, to give to first grade classes.  (25 RR 28.)   He wanted her to give them to needy school children.  (25 RR 28-29.)   Once she gave a box of ornaments to a first grade class.  (25 RR 31.)   Another time, Bill sent her clown pictures drawn by the inmates at Ellis Unit.  (25 RR 33.)  He would often solicit assistance for the inmates.  (25 RR 34.)

Ms. Swindler also testified that Lorna Sue Sawyer, who previously testified, has a family reputation for being a drunk and being untruthful.  (25 RR 34-35.)  She has had no visits from her family in ten years.  (25 RR 35.)  But in 1979 she was the witness' best friend.  (25 RR 35.)  Lorna Sue Sawyer had taken a lot of drugs, mainly LSD.  (25 RR 36.)  The witness had personal knowledge of this as she did the drugs at the same time.  (25 RR 37.)   Ms. Sawyer "could not have made accurate accounts of anything."  (25 RR 39.)

She had seen marks on Pam and she figured Bill had hit her.  (25 RR 40.)  She believed that Mr. Coble was best off in prison and he was a danger to women.  (25 RR 42.)   Ms. Swindler said that Ms. Sawyer's remembrance of being molested by Mr. Coble could have happened or she could be mistaken. (25 RR 43-45.)

**Dr. Joseph Bond Browder** testified that he is the medical director of the McLennan County jail.  (25 RR 47.)   He is a specialist in internal medicine and has been in private practice in Waco since 1980.  (25 RR 48.)  He has been dealing with Mr. Coble in the county jail for the past year.  (25 RR 49.)   Mr. Coble at the time of the trial, was about to turn 60.  (25 RR 49.)   He is under treatment for high blood pressure, hypertension, high cholesterol, and heart disease.  (25 RR 49.)   He also takes a drug for acid reflux.  (25 RR 49-50.)   He had a heart attack in 2004.  (25 RR 50.)  Mr. Coble takes both long-lasting nitroglycerin pills and short-acting nitroglycerin pills.  (25 RR 50.)   This is for episodic pain.  (25 RR 51.)   Some of the drugs are to prevent another heart attack.  (25 RR 51.)   Mr. Coble was not physically incapacitated. (25 RR 52.)

The defense attorneys proposed to call several witnesses from prison who were serving sentences for murder.  (25 RR 8.)   These proposed witnesses were Mr. Terero, Barrientes, Rosales, and Draughon.  (25 RR 12.)  **Sgt. Jimmy Channon,** of the McLennan County Sheriff's office, testified that he believed it was appropriate that they wear a "belly chain" while they testify and it would pose a risk if they testified in street clothes.  (25 RR 16.)   The court denied the defense request that the inmates be allowed to testify in street clothes and required them to wear belly chains and be shackled and leg chained.  (25 RR 19.)

**Martin Draughon** testified he was serving a life sentence.  (25 RR 54.)   He has known Mr. Coble since 1991 or 1992.  (25 RR 54.)   They met at the Ellis Unit in Huntsville.  (25 RR 55.)   The prisoners there had all been convicted of capital murder.  (25 RR 55.)   Mr. Draughon was moved to the Polunsky Unit and was there from 1999 to April of 2006.  (25 RR 55.)   He knew Mr. Coble at the Polunsky Unit.  (25 RR 56.)   The guards, about half of whom were female, would interact with the prisoners.  (25 RR 57.)   At the Ellis Unit, there was seldom any trouble with guard assaults even though the inmates were not shackled.  (25 RR 58.)   They had interactions with medical personnel, nurses, and doctors.  (25 RR 59.)   Bill was well-liked by everyone, even the bad guys.  (25 RR 60.)   Mr. Draughon had never seen Bill get mad and he was always even-keeled, he never lost his temper even though it was a stressful place.   (25 RR 60.)

At the Ellis Unit, there was a garment factory and they made pants for the officers.  (25 RR 61.)   They would have access to scissors and shears and other tools and sharp objects.  (25 RR 61.)   Not all inmates qualified as "work capable" to work in the garment factory.  (25 RR 62.)   An inmate had to keep a clean disciplinary record to be in the garment shop and Bill worked there.  (25 RR 63.)   Bill was never violent toward any other inmates.  (25 RR 64.)   For

-45-

two summers, Bill also organized sports programs.  (25 RR 65.)   He went around trying to get people involved.  (25 RR 66.)   Bill wrote a little blurb about it in "The Echo" a prison newspaper.  (25 RR 67.)  He was a unit reporter for the paper.  (25 RR 68.)

Bill counseled younger inmates one-on-one and tried to talk some sense into them.  (25 RR 70.)  He would read their mail and write letters and help them correspond with their family.  (25 RR 71.)

When they were moved to the Polunsky Unit, there were fewer activities.  (25 RR 71.)  Bill's reputation there too was as someone who is peaceful.  (25 RR 73.)  The inmates were separated from each other at the Polunsky Unit.  (25 RR 74.)

Mr. Draughon was in general population when he testified.  (25 RR 75.)  While on death row, all the prisoners' cases were on appeal.  (25 RR 76.)  At the Polunsky Unit, they are basically locked down and let out one hour a day for recreation.  (25 RR 76.)

The defense requested statistics from the prison system regarding the average age of death of the inmates.  (25 RR 79.)  The record was admitted.   (25 RR 81.)

**Antonio Barrientes** testified that he was an inmate at the Estelle Unit who had been convicted of capital murder and used to be housed at the Ellis Unit.  (25 RR 84.)   He met Mr. Coble about 1990 at the Polunsky Unit and knew him until 2001.  Bill tried to help out people that were getting in trouble and would take younger inmates under his wing.  (25 RR 86.)  There were a lot of troublemakers at the Ellis Unit on death row.  (25 RR 86.)  Bill had a good reputation at the prison.  (25 RR 87.)  There was a work program at the Ellis Unit, and to be in it you had to have a good disciplinary record.  (25 RR 88.)  If people misbehaved, they could be removed from the program.  (25 RR 88.)

-46-

Mr. Barrientes worked in the garment factory at the Ellis Unit.  (25 RR 88.)  There were sharp objects available, such as scissors.  (25 RR 88.)  The guards there were both male and female.  (25 RR 89.)  The witness never saw Bill be aggressive toward the guards or the inmates.  (25 RR 89.)

Bill got a job as a trustee after the garment factory.  (25 RR 90.)  He would help the officers feed and clean up the wings.  (25 RR 90.)  He would have a lot of interaction with both the guards and the other inmates.  (25 RR 90-91.)   Bill would counsel the younger inmates and try to calm them down.  (25 RR 91.)  One time, he prevented an inmate from having trouble with some officers.  (25 RR 91.)

At the Ellis Unit, they had craft projects such as knitting and piddling, which meant they had sharp objects such as knitting needles and a razor.  (25 RR 92.)  The crafts they made were put up for sale.  (25 RR 93.)  One inmate, Noe Martinez, didn't have any support so Bill made him a clock and gave it to Martinez so he could send it to someone.  (25 RR 93.)  He did this for other inmates too.  (25 RR 93.)   Bill would also help others out if they couldn't obtain items from the commissary.  (25 RR 94-95.)   Bill would organize sports tournaments and furnish the prizes.  (25 RR 95, 99.)  These tournaments helped raise the morale.  (25 RR 95, 101.)   There is a lot of opportunity for frustration on death row.  (25 RR 95.)   Bill would take out his frustrations in a positive way.  (25 RR 96.)  Mr. Barrientes said there is more supervision at the Polunsky Unit than at the Ellis Unit.  (25 RR 98.)   But even at the Polunsky Unit, the inmates can get a reputation for being violent.  (25 RR 102.)  Bill would also help the inmates at the Polunsky Unit.  (25 RR 102.)  He has never had any problems at that Unit.  (25 RR 103.)  At least a third of the guards there were women.  (25 RR 104.)  Mr. Barrientes said, on cross

-47-

examination, that there was an incentive for good behavior on death row.  (25 RR 106.)  He also said there was violence at Ellis and Polunsky Units.  (25 RR 107.)

**Don Youngblood,** a Waco area investigator and former police officer in Waco and elsewhere, was the original fact investigator at Mr. Coble's 1990 trial.  (25 RR 110.)  As part of his duties, he requested some film tapes from the Department of Defense that related to Mr. Coble's Vietnam record and service in 1966 and 1967.  (25 RR 111, 127.)   Mr. Youngblood requested movie coverage of the particular campaigns in which Mr. Coble was involved.  (25 RR 111.)  He put the footage on a DVD tape which was received into evidence and played for the jury.  (25 RR 112.)   The footage covered about four of the ten campaigns in which Bill Coble was involved.  (25 RR 113.)   Mr. Youngblood narrated the footage as it was played.  (25 RR 114.)  He condensed it from about six hours to about 45 minutes to include samples of Coble's different campaigns.  (25 RR 115.)

The first footage involved Hill 484 in Vietnam, showing two soldiers firing a machine gun.  (25 RR 115-116.)  The second section is Operation Prairie Hill II and it showed Bill Coble walking across the screen.  (25 RR 118.)   He ran in front of two tanks.  (25 RR 118.)  The third section showed some closer firing, with hand grenades and mortars.  (25 RR 118.)   Another section also showed Operation Prairie Hill II, two miles northwest of Cam Lo, Vietnam.  (25 RR 119.)  It showed Marines getting ready to board a helicopter while it was under live fire.  (25 RR 119.)    The soldiers were moving into heavy jungle and it showed some dead Vietnamese.  (25 RR 119-120.)  Another section also shows Operation Prairie Hill II, and a large number of dead Vietcong and Marines taking weapons off them.  (25 RR 121.)   The next section showed a tank crossing a river during the same operation.  (25 RR 122.)   There was a dying U.S. soldier in this footage.  (25 RR 123.)    The fifth canister shows wounded Marines being evacuated during

Operation Chinook II.  (25 RR 123-124.)   It also shows a Vietcong prisoner walking carefully to avoid booby traps.  (25 RR 124.)   In the last section, a line of Marines is shown walking in single file to avoid creating a large target during Operation Prairie III.  (25 RR 126.)   Other footage showed Operation Cimarron.  (25 RR 126.)

**Mariano Rosales** testified he was bench warranted from the Polunsky Unit and he had been in prison for 23 years.  (25 RR 132.)  He knew Bill Coble well as he worked with him in the garment factory and as a porter.  (25 RR 132.)  They used sharp objects in the garment factory.  (25 RR 133.)  Bill never threatened other inmates in either job. (25 RR 134.)   He obeyed the rules and minded his own business.  (25 RR 136.)  Bill would also interact with the younger inmates and offer them advice.  (25 RR 136.)  He reacted well to confinement. (25 RR 138.)  They were later moved to Polunsky Unit, a more controlled environment.  (25 RR 138.)  Interaction is also possible at that unit, and there is outside recreation.  (25 RR 139.)  Bill's reputation is that he follows the rules.  (25 RR 140.)  Mr. Rosales remembers that Bill set up sports tournaments and would talk people into participating.  (25 RR 141.)  Bill also had a reputation of helping inmates who could not buy items at the commissary.  (25 RR 142.)  He also reacted well with female guards.  (25 RR 143.)

**Bernardo Tercero** met Mr. Coble at the Polunsky Unit where Mr. Tercero has been for eight years.  (25 RR 148.)  At that unit, they are on lockdown 23 hours a day.  (25 RR 149.)  But the inmates interact at recreation.  25 RR 149.   Bill helped Mr. Tercero, who is Spanish-speaking, with letters, legal matters, and in learning English.  (25 RR 150.)  He worked with the witness in pronouncing English words with the aid of a Spanish-English dictionary.  (25 RR 151.)  "He [Bill] is a person of high character who helps people who are interested in being helped."  (25 RR 151.)  He gives personal property to those who need it.  (25 RR 151.)  "He is

recognized by all as someone who helps others especially in legal matters." (25 RR 151-152.) "He has a reputation of being a loyal person and one of integrity and he knows the law." (25 RR 152.) Bill would counsel other inmates not to act out and has taken an interest in mentally retarded inmates, including one who needed help with personal hygiene. (25 RR 152-153.) On cross-examination, the witness denied that Bill had a temper. (25 RR 154.)

The defense had an affidavit received into evidence. It was from Joni White, Chairman of Classification and Records for the Texas Department of Criminal Justice, Institutional Division, in Huntsville, Texas. (25 RR 157.) Ms. White stated in the affidavit that "Offender Coble...show[s] no disciplinary records for his entire incarceration." (25 RR 157.)

The defense also offered records from the University of Texas Medical Branch, custodian of records for the Institutional Division of the Texas Department of Criminal Justice. (25 RR 158.) In 2007, the average age at death of prison inmates was 51. (25 RR 58.) In 2004, the average age was also 51. (25 RR 158.)

**Mary Oller,** Bill Coble's older sister, testified she remembered him as a little boy. (25 RR 8.) His mother's name was Loreais Bird and his father, who died before Bill was born, was Arthur Coble. (26 RR 7-8.) Their mother remarried when Bill was an infant. (26 RR 10.) Bill's father was an alcoholic and worked only part time. (26 RR 10.) They lived in a "shotgun" house, a kitchen and front room and a back room and a little porch with no bath in "Tin Top Alley." (26 RR 10-11, 16.) Loreais was sickly and distant, had mental problems, and was illiterate. (26 RR 11, 18, 30.) She hardly ever smiled. (26 RR 12.) She would call their father an "SOB" and scream at him. (26 RR 13.) The kids looked after each other. (26 RR 13.) Mary had to help the other children with medical problems. (26 RR 14.) Loreais did not nurture Bill, but would criticize him. (26 RR 15.) Once Bill almost drowned in a tub of water and the

-50-

iceman had to rescue him.  (26 RR 15.)   A few years later, they moved to a three room, one bedroom house.  (26 RR 16.)

When Loreais's sister died, it greatly affected her and she had a mental breakdown.  (26 RR 19.)   At that time, they moved out to the country.  (26 RR 20.)   Loreais's mental problems increased and once she wandered into an empty house with a goat and she did not know what she was doing.  (26 RR 21.)   She forgot her children's names or even that she had children.  (26 RR 22.)   At this time, Bill would pick pecans to sell to raise money for shoes.  (26 RR 23.)

When Loreais had her breakdown, her husband Mr. Bird would take her for shock treatments.  (26 RR 24.)   In all, she had 35 shock treatments.  (26 RR 24.)   She gradually began to recognize her children again.  (26 RR 25.)   Bill was concerned about his mother when she had this breakdown, which lasted two years.  (26 RR 26.)   When she got better, they moved back to town.  (26 RR 26.)   Mary had to take care of her siblings and her mother when she was 11 as her father was working during the day.  (26 RR 27.)   Loreais began fighting with Mr. Bird and the fights escalated to the point where she was breaking his physical property.  (26 RR 28.)   Once she broke windows on his car as he was cheating on her.  (26 RR 28.)

But then Loreais got sick again and the children were sent to the Corsicana State Home.  (26 RR 27, 91.)   Loreais went to the Austin State Hospital.  (26 RR 27.)   A woman from the probation department collected the children and drove them to Corsicana.  (26 RR 29.)   Mary told Bill they were going to summer camp.  (26 RR 29.)   She stayed with the boys through the summer and then went to a convent school in Dallas.  (26 RR 31.)   Bill was 7 or 8 at the time and he stayed at the state home until he was 17.  (26 RR 32.)   In these 10 years, Mary saw Bill only twice.  (26 RR 33.)   When Bill was 12, he ran away from the state home to visit his mother, who was sick.  (26 RR 33.)   Loreais called the police who took him back to the home.  (26 RR

34.)  Bill and his brother Arthur could not understand why she didn't take them out of the home. (26 RR 34, 91.)

At age 17, Bill signed up for the Marines.  (26 RR 35.)  He would visit Mary in San Diego during his basic training at camp Pendleton.  (26 RR 36.)  Bill turned 18 on the ship to Vietnam.  (26 RR 37.)  At this time, Bill was very happy, smiling and bubbly. (26 RR 37.)

When Bill returned from Vietnam after 13 months, he had changed.  (26 RR 38.)  He didn't smile and he didn't want to talk about his war experiences.  (26 RR 39-40.)  After he left the marines, Bill joined the Army Reserves and moved back to Waco.  (26 RR 40.)  He met Pam Wooley and bought a Mustang.  (26 RR 41.)  Bill married Pam about 1971.  (26 RR 42.)  She had a little girl, Charlene, and then Pam became pregnant.  (26 RR 42.)  Bill would take Charlene everywhere and started coaching sports teams before his own child was born.  (26 RR 43-44.)   Bill was proud to be a father to Charlene and looked forward to being a father to his own child.  (26 RR 43.)  But when G.W. was born, the marriage seemed to go bad.  (26 RR 44.) Mary knew Bill and Pam fought, but sometimes she made the situation worse.  (26 RR 94-95.) Pam was "running around" on Bill when they broke up.  (26 RR 95.)

Bill cared for children and G.W. was his life.  (26 RR 45.)  But when he divorced Pam, it hit him hard because he could not see G.W. as much as he wanted.  (26 RR 46.)  He was having a hard time making ends meet and paying child support.  (26 RR 46.)  During the divorce action, Bill once tried to jump off the courthouse rotunda, but his lawyer pulled him back.  (26 RR 47.)

After the divorce, Bill opened a welding shop.  (26 RR 48.)  He lived in his shop for awhile, and also part-time with Mary.  (26 RR 48-49.)  Then Bill met Candy and they were getting married, but Pam had Bill put in jail for non-payment of child support.  (26 RR 49-50.) Bill was working hard at this time, sometimes well into the night.  (26 RR 50.)  He is still close

to his son G.W.  (26 RR 51.)  The fact that Bill and Candy had a close and loving relationship made Pam "madder than all get out."  (26 RR 52.)  Bill's intention was that the marriage would last forever, but Candy got bored.  (26 RR 54.)  Mary was not aware that Bill hit Candy or made obscene gestures to her daughter Amy.  (26 RR 96-97.)  But Bill did tell her about trying to kiss Amy and he took "full responsibility" for the incident.  (26 RR 99.)

Regarding the gas station incident where Bill was observing Candy, Bill thought she was having an affair with someone who worked there.  (26 RR 55.)  Mary and Bill parked and they saw his wife fooling around with another man, "just hugging, kissing, touching, you know."  (26 RR 55.)   Bill and Candy finally broke up in 1987.

Bill then met Karen Vicha.  (26 RR 56.)  Mary also met her and saw that Bill was in love with her.  (26 RR 57.)  He bought a Mustang for one of Karen's girls and changed it from a stick shift to an automatic.  (26 RR 57.)  He was happy at first with Karen, but then his welding business went downhill and he sold insurance.  (26 RR 58.)  He was depressed about not earning a living.  (26 RR 58-59.)

Bill went back to school and obtained his GED.  (26 RR 59-60.)  He joined the Jaycees and was given a "Key Man" certificate for his help with an Easter egg hunt and carnival in 1980.  (26 RR 61-62.)  Bill also received a certificate of achievement from the Army for his work in the reserves in 1978 and a certificate for being one of the outstanding young men in America.  (26 RR 62.)[28]   It listed Bill's awards  including: La Vega peewee football trophy 1971 through 1973; a plaque in 1973; Connally pee wee football plaque 1977; Elks peewee football trophy 1977; Pop Warner plaque 1974, 1975, 1977, 1978; Midget Williamson County Bowl trophy 1978.  26

---

[28]   The book in which he was pictured was introduced into evidence.  (26 RR 64.)

RR 65-66.  He also completed an army reserve instructor training course in 1989 and traveled around the country for army training exercises.  (26 RR 63, 66.)

Bill was very broken up when Karen told him she wanted to divorce him in 1989.  (26 RR 66, 102.)  He was without much work and was spending a lot of time with Army Reserves.  (26 RR 67.)  His insurance work was not going very well.  (26 RR 68.)  When Bill split up with Karen he came to stay with Mary.  (26 RR 68.)  He lived on the back porch with Mary's son Dennis and seemed depressed and didn't have much energy.  (26  RR 70.)  Mary was worried because she saw elements of their mother's illness in Bill.  (26 RR 72.)  He was talking about killing himself by driving his truck off the river bridge.  (26 RR 73.)

Karen charged him with kidnaping and Bill needed money for bail.  (26 RR 74.)  Bill saw a lawyer who wanted tens of thousands of dollars to take the case, and he couldn't raise the money.  (26 RR 74.)  Bill had lost all hope after talking with the lawyer.  (26 RR 75.)  He then called Karen's father to give the Mustang back.  (26 RR 75.)  Mr. Vicha (senior) just laughed at him and said "We'll get the Mustang and you too."  (26 RR 76.)  His son Bobby Vicha had threatened Bill.  (26 RR 105.)

So Bill became more and more depressed.  (26 RR 76, 104.)  He had lost all hope.  (26 RR 104.)  Mary noticed that he was putting a lot of his things in the dumpster.  (26 RR 77.)  He threw away his "Outstanding Young Men in America" book; the football signed by the Dallas Cowboys which he was given for his work with peewee football.  (26 RR 79.)  He also threw away a photo album and many of his certificates.  (26 RR 80.)    All of these were his prized possessions.  (26 RR 80-81.)   Mary retrieved these items from the dumpster and put them in his desk.  (26 RR 81.)    About this time, there was a television show about Vietnam and Bill said "that's what I did" and told Mary's children about some of his experiences.  (26 RR 82.)

-54-

Ordinarily, he did not talk about Vietnam.  (26 RR 83.)   At this time, Mary found Bill down in the basement looking for his dog, but he had already given the dog away because Karen didn't want it at her house. (26 RR 84-85.)    He called Mary "MeMe" which he had not done since she was a child.  (26 RR 111-112.)  Bill threw her the keys to his truck and said that if anything happens, the truck was hers.  (26 RR 86.)  Bill had also applied for a visa to work in Australia but with the pending kidnaping charge he would not be able to go.  (26 RR 80, 103, 106.)  He told Mary that he wanted to talk to Karen about the divorce but she turned him in.  (26 RR 103.)

Since Bill has been in the penitentiary, Mary has kept in contact with him.  (26 RR 88.) She has a history of heart disease and there is also a family history of heart disease.  (26 RR 110.)

**Terry Lechler,** an accountant in Waco, managed the Waco and Circle Drive-in while Bill Coble worked there.  (26 RR 116.)  He would open the drive-in, set up the concession stands, and make sure it was running.  (26 RR 118.)  Bill was the assistant manager and later the manager.  (26 RR 119.)  It would open around 6 p.m. and close around 10 or 10:30 p.m. on weekdays, later on weekends.  (26 RR 118-119.)  Bill acted professionally and was responsible with the money handling.  (26 RR 120.)  He was dependable and she never had any complaints. (26 RR 121.)  This was around the late 1970s or early 1980s.  (26 RR 121.)  Bill gave notice when he left.  (26 RR 121.)  The witness has had bad and good employees and Bill was good. (26 RR 124.)

**Dennis Ivey,** the son of Mary Ivey, and the nephew of Bill Coble, worked for Bill around 1985 or 1986.  (26 RR 126.)  He had a welding business and he taught Mr. Ivey how to weld.  (26 RR 127.)  Mr. Ivey had been a welder for 15 years and got his start with Mr. Coble. (26 RR 128.)  Bill was a patient teacher and he never lost his temper when mistakes were made.

(26 RR 129.)  Although welding can often cause burns or injuries, Bill did not lose his temper easily.  (26 RR 140.)  They worked on apartment complexes near Baylor University and also restaurants.  (26 RR 130.)  Mr. Ivey observed the relationship between Candy and Bill, and he thought it was a loving relationship.  (26 RR 132.)  They were affectionate.  (26 RR 132.)  Candy would go out on his jobs with him.  (26 RR 133.)  Mr. Ivey never noticed anything strange about how Candy or Bill ate.  (26 RR 134.)  Bill also taught Mr. Ivey how to swim.  (26 RR 134.)  He would help out with Pop Warner football as a coach.  (26 RR 135.)  For Bill, everything revolved around his son.  (26 RR 136.)  Bill was always very appropriate around kids.  (26 RR 138.)

**Jerry Crowder,** who worked at the Army Air Force Exchange Service in Waco, knew Bill Coble for 10 or 11 years when they were in the Army Reserves.  (26 RR 144.)  They were in a light engineering detachment unit and Bill was a staff sergeant.  (26 RR 144.)  He supervised 20 to 25 men and was a good supervisor.   (26 RR 145, 149.)  He would take care of them and counsel them.  (26 RR 146.)  He was always fair.  (26 RR 146.)  They would go out on projects on the weekends and there would be a yearly drill.  (26 RR 147.)  Bill had many skills, such as electrical, plumbing, carpentry and welding.  (26 RR 149.)  The whole unit knew that Bill took very good care of his son.  (26 RR 150.)  Even when the work was stressful, Bill did not lose his temper.  (26 RR 152.)

**Paul E. Midgett** knew Bill Coble from working with Connally peewee football.  (27 RR 8.)  Bill was a coach for the smaller boys for a couple of years.  (27 RR 9.)  He was also secretary treasurer of the citywide Pop Warner organization around 1975.  (27 RR 9.)  Bill was very kind to the kids, a good role model as a coach, concerned about their safety and emotional health.  (27 RR 10.)  There were no complaints about his coaching.  (27 RR 10.)  The witness

-56-

remembered him once walking away from a confrontation with another coach. (27 RR 17.) Mr. Midgett also remembered Bill comforting a boy who was unhappy or crying because he had been hit hard or didn't get to play enough. (27 RR 11.) Bill was responsible for the money at the bowl games and he had good organizational skills. (27 RR 11.) As an award, Bill received a football signed by some players. (27 RR 12.) When Mr. Midgett heard about the killings, he was shocked as it seemed out of character. (27 RR 12.) He was not aware that Bill Coble had hit his wife or that the football was not actually an award. (27 RR 15.)

**Dewayne Kerr,** a former professional baseball player, knew Bill Coble from the Corsicana Home when Mr. Kerr was sent there in 1956. (27 RR 20.) It was a home for children whose parents couldn't take care of them. (27 RR 21.) Bill did not have a reputation as a troublemaker or a vandal. (27 RR 22.) Mr. Kerr had never heard of Bill beating up a girl. (27 RR 23.) They have corresponded in prison and Bill made Mr. Kerr two clocks, one of which he gave to Mickey Mantle. (27 RR 23.) Mr. Kerr said the Corsicana Home was a good place. (27 RR 25.) Bill participated in the Corsicana Alumni Association and he would come back for the reunions. (27 RR 29.)

**James Steele,** an oil field worker, also met Bill Coble at the Corsicana Home. (27 RR 31.) They were roommates on and off for about 10 to 12 years. (27 RR 31.) The boys lived 2 to 4 in a room and there were house parents on each floor, two parents for 25 to 30 children. (27 RR 33.) Bill used to clown around and never seemed paranoid. (27 RR 34.) Bill did not have a reputation as a vandal or bully. (27 RR 35.) Nor did he recall anything about Bill beating up a girl and if it had happened Mr. Steele would have known about it. (27 RR 36.) Bill's brother Arthur was a troublemaker, and they were like night and day. (27 RR 36.)

Mr. Steele had a calf he was raising and he ran away from the home; Bill took over the calf and raised and sold it so that Mr. Steele could get his money from it.  (27 RR 38.)  Bill paid off Mr. Steele's debt for the calf.  (27 RR 38-39.)  Bill sent Mr. Steele craft items he made on death row so that they could be given to a school.  (27 RR 39.)

**T. C. Bingham,** of Alamo Steel and Machine Company, hired Mr. Coble as a welder in 1975.  (27 RR 44-45.)  He worked there for five years.  (27 RR 45.)  He was very skilled in reading blueprints and in fitting pipe.  (27 RR 45.)  Bill was put in charge of a department and had several men working for him.  (27 RR 46.)  He performed very well as a supervisor.  (27 RR 46.)  There was nothing in his personnel file about problems with other workers.  (27 RR 46.)  The witness wrote a letter of recommendation for Bill.  (27 RR 47.)  If he got into fights with co-workers, Mr. Bingham would not have written the letter of recommendation.  (27 RR 47.)

**Dr. Mark D. Cunningham,** a defense expert, first testified in a closed hearing outside the presence of the jury.  (27 RR 50.)  He stated he proposed to testify as an expert on violence risk assessment.  (27 RR 51.)  He interviewed Mr. Coble on July 14, 2008 for four hours.  (27 RR 51.)  Dr. Cunningham also collected information, presented in a PowerPoint presentation, about Mr. Coble's incarceration in the McLennan County jail from August 1989 to June of 1990 and again from October of 2007 to August of 2008.  (27 RR 53.)  He also collected information on Mr. Coble's incarceration in TDCJ.  (27 RR 54.)  A chronology was put together from the interview with Mr. Coble.  (27 RR 55.)  The information was collected onto slides that he proposed to show the jury.  (27 RR 55.)  But the witness agreed to limit his testimony to evidence that was also independently derived so that the Fifth Amendment privilege was not waived.  (27 RR 61.)

Dr. Cunningham collected data on inmates serving life without possibility of parole sentences.  (27 RR 55-57.)  He stated that he would confine his risk analysis to the risk in prison but the jury could consider other factors.  (27 RR 57.)    He stated that the statute did not restrict testimony to future risk in prison society.  (27 RR 58.)  The witness would not tell the jury to ignore free society.  (27 RR 59.)

The prosecution objected, as they had been told by the defense attorneys that the testimony would not be based on anything he gained from the interview with Mr. Coble, as that would waive the Fifth Amendment privilege.  (27 RR 60-61.)  The defense stated that all the information was also independently verified.    (27 RR 62.)    The defense stated they had documentary evidence of Mr. Coble's participation in electrician school; past behavior in prison; and the fact that there were no disciplinary infractions.  (27 RR 62.)  Dr. Cunningham's assessment is an actuarial assessment and was not just based on his interview.  (27 RR 63.)  He stated that it is possible to do a risk assessment based on demographic factors.  (27 RR 64.)  His assessment could be based solely on information that is in the record.  (27 RR 65-67.)  For instance, the records indicate that Coble worked in the garment factory, had long-term gainful employment, has had contact with people in the penitentiary.  (27 RR 68.)

Dr. Cunningham was asked about his studies on life-without-parole inmates.  (27 RR 71.)  These prisoners were used to show statistically how capital offenders behave in prison as they were all capital inmates.  (27 RR 72-74.)  The study shows that life-sentenced individuals and those sentenced to death were only about one-half as likely to be involved in prison assaults as the parole eligible inmates.  (27 RR 75.)  The study also showed that when death-sentenced inmates are mainlined, and they still have a death sentence pending, they have the same rate of assaults as the life-without-parole inmates who don't have a death sentence pending, which

would negate the testimony that death-sentenced individuals have an incentive to behave.  (27 RR 75.)  The witness stated that you could not predict how violent someone is going to be in prison from the seriousness of the offense that sent them to prison.  (27 RR 76.)    The statistics showed that the life-without-parole inmates had about the same rates of violence as those serving long prison sentences.  (27 RR 78.)

The Court ruled that all statistics based on inmates who are serving life-without-parole sentences were irrelevant and this part of Dr. Cunningham's presentation was redacted.  (27 RR 90-94.)  The Court also ordered Dr. Cunningham to redact and not refer to any data that was obtained from his interview with Mr. Coble, or else the defendant would lose his Fifth Amendment privilege.  (27 RR 60-94.)

**Dr. Cunningham** then testified before the jury.  (27 RR 95.)  He stated that he was a clinical and forensic psychologist for the last 30 years.  (27 RR 95.)  The witness explained that clinical psychology related to treatment and forensic psychology related to legal issues and courts.  (27 RR 96.)  He is board-certified as a clinical psychologist and as a forensic psychologist, by the American Board of Professional Psychology, which is the board certification organization represented by the American Psychological Association.  (27 RR 97.)  There are only about 250 board-certified forensic psychologists in the United States, and only 15 in Texas.  (27 RR 97.)  The licensing requirements are rigorous and it required years of study; the exam had a 40 per cent failure rate.  (27 RR 97.)  The forensic certification process is even more rigorous.  (27 RR 98.)  Dr. Cunningham has also been one of the examiners at the oral exam.  (27 RR 98.)

He is licensed in Texas, Louisiana, Oklahoma, Arkansas, South Carolina, Tennessee, New York, Connecticut, Illinois, Indiana, Colorado, Idaho, Oregon, Arizona, New Mexico, 15

states in all.  (27 RR 99-100.)  He received a major award in 2005 from the Texas Psychological Association for outstanding contributions to the body of knowledge in psychology, an award given to a single person per year.  (27 RR 100-101.)  He also received the 2006 American Psychological Association award for distinguished contributions to research in public policy, in part based on future danger studies and violence in prison. (27 RR 101.)  There are 155,000 members of this association.  (27 RR 102.)  He is also a fellow of this association, a group of 2 or 3,000 out of 155,000 who are identified as having made a substantial contribution to psychology as a science on a national level.  (27 RR 104.)

Dr. Cunningham detailed his educational background, which included a doctorate in clinical psychology, a one-year clinical internship at the National Naval Medical Center, a staff clinical psychologist at the Naval Submarine Center for three and a half years, and part-time doctoral study at the Yale University School of Medicine.  (27 RR 104-105.)  He then had an academic appointment and went into private practice.  (27 RR 106.)  In 1995 he became board certified.  (27 RR 107.)  Unlike Dr. Coons, Dr. Cunningham has published a significant number of peer-reviewed papers in scientific journals.  (27 RR 108.)   The peer-review process is rigorous and in the last 9 or 10 years, Dr. Cunningham has had 20 to 25 papers that have passed that review process.  (27 RR 110.)  He has also had chapters in edited books concerning the behavior of convicts in prison.  (27 RR 110.)  He has also had chapters about how to perform capital sentencing evaluations.  (27 RR 110.)  He also has a book with a looming deadline to be published by Oxford University Press regarding "best practices" in forensic psychology.  (27 RR 111.)  For the same press, he has been asked to write a book on capital sentencing.  (27 RR 111.)

In referring to Dr. Coons' statement that he had not read any studies to justify the bases of his beliefs, Dr. Cunningham stated "that's a problem."  (27 RR 112.)  It is a problem because

-61-

"the expectation as...a professional, as a life science, medical or psychological professional is that [one's] practice and...techniques are scientifically informed.  And so, if...I can't identify any science supporting or refuting what I'm doing, than that is...potentially damning."  (27 RR 112-113.)   Dr. Cunningham did not know of anyone who has written more in this field in the last ten years other than himself unless it was his colleague and co-author John Sorensen.  (27 RR 114.) The witness has written about the causes of violence in prison and in society and among inmates on death row.  (27 RR 116.)  Dr. Cunningham has also attended continuing education, 60 to 80 hours a year on forensic psychology.  (27 RR 117.)  He has also presented at attorney, judge and prosecutor training sessions.  (27 RR 117.)  He has testified in court about 200 times in probably about 35 jurisdictions.  (27 RR 118.)  On all occasions he has been recognized as an expert in clinical and/or forensic psychology.  (27 RR 118.)

Dr. Cunningham reviewed a large amount of information in preparation for his testimony: records, transcripts, interview summaries, and the like and prepared a PowerPoint presentation to summarize it.  (27 RR 120.)  There are six factors that point to Mr. Coble having a positive adjustment to prison: his age, his past behavior in prison, the fact that he has obtained a GED, that he has a history of community employment, that he is in contact with others in custody, and the possibility of his serving a capital life sentence.  (27 RR 121.)  These factors have been shown by scientific research to be associated with a reduced likelihood of serious violence in prison.  (27 RR 121.)   The data supporting his conclusions came from various department of corrections and research studies.  (27 RR 122.)

Dr. Cunningham's assessment is that it is quite unlikely and a very, very low probability that Mr. Coble will commit serious violence if confined for life in the Texas Department of Criminal Justice.  (27 RR 123.)  Countering Dr. Coons' unsupported opinion, Dr. Cunningham

testified that while some violence may be undetected, the more serious violence involving staff assaults is necessarily documented.  (27 RR 124.)  Serious inmate assaults, as they would involve hospitalization, are also recorded.  (27 RR 125.)  Any unreported violence is likely to be minor.  (27 RR 125.)  The Texas Department of Criminal Justice issues a monthly report that details the assaults and violence in the prison system.  (27 RR 125-126.)  In February of 2001, the Texas prison system began separating out the more serious incidents of violence in their reporting and, as the system relies on its own data for recommended changes, they believe it is accurate.  (27 RR 127.)

Dr. Cunningham explained violence risk assessment and his methodology, using the PowerPoint slides.  (27 RR 128.)  The risk is expressed in terms of probability.  (27 RR 128-129.)  The rate of murder is 2.5 per 100,000 inmates per year.  (27 RR 129.)  The more severe the violence is, the less likely it is to occur.  (27 RR 129.)  The is a possibility of violence with any person, but we are talking about probability.  (27 RR 129.)  The statistics have shown that the risk is higher in younger inmates.  (27 RR 130.)  A person with a history of prison violence is more likely to commit future violence.  (27 RR 132.)  The most objective risk assessment technique is a group statistical approach.  (27 RR 133.)  For instance, an insurance company would keep track of statistics on 16-year old drivers.  (27 RR 133.)  This is less subjective and more accurate and reliable.  (27 RR 134.)  "It's not based on my gut feeling about something" in contrast to Dr. Coons' "methods."  "It's based on what the data tells me."  (27 RR 134.)  Another approach is a pattern approach, which holds that past behavior is the best predictor of future behavior.  (27 RR 135.)  However, the context must be similar and there must have enough behavior to form a pattern.  (27 RR 135.)  Violence in the community does not predict violence in prison.  (27 RR 136.)  Prison behavior predicts future prison behavior.  (27 RR 136.)

-63-

This method is somewhat more subjective and less objective than the group statistical method. (27 RR 136.)

The next approach is intensive clinical evaluation, where you look at an individual based on their history and other factors and you identify personality characteristics about them and use that to predict future violence.   (27 RR 137.)   "That approach is notoriously unreliable particularly for predicting violence in prison.  (27 RR 137.)  Many studies, such as those of the National Council on Crime and Delinquency,  have shown that the severity of the offense does not predict future violence in prison.  (27 RR 138.)   As Dr. Cunningham stated, "past violence in the community is not strongly or consistently associated with prison violence" according to Department of Justice research.  (27 RR 138-139.)  These Department of Justice studies show that:

1)  Past violence in the community is not strongly or consistently associated with prison violence;

2)  The current offense, prior convictions and escape history are only poorly correlated with prison misconduct; and

3) The severity of the offense that sent the person to prison is not a good predictor of prison violence.   (27 RR 139.)

These findings do not comport with what most people would expect.  (27 RR 140.)

Dr. Cunningham also testified about the "hypothetical inference," where an expert is given the facts that mirror the facts of the case, told to assume they are true, and then the expert is asked about the future risk of violence.  (27 RR 140-141.)  This is just "blind guessing" unless some of the factors have been correlated to prison violence.  (27 RR 141.)  This was the problem with an expert like Dr. Coons who did not know the scientific literature. (27 RR 141.)  If, like

Dr. Coons, the expert has never gone back to check his accuracy rate and is simply basing it on his gut experience, then "your accuracy level never improves." (27 RR 142.)[29]  There would never be any feedback as to whether the factors Dr. Coons was looking at had any correlation with the predictions. (27 RR 142.)  This is comparable to a "soothsayer's" method. (27 RR 144.)

Dr. Cunningham then related this research to Mr. Coble's case.  The first factor is his age: Mr. Coble was a week away from his 60th birthday at the time of the trial. (27 RR 145.)  A study of 34,000 inmates in Florida and "the older you are when you hit the prison gates, the less likely you are, dramatically less likely you are to be involved with violence in prison. (27 RR 147.)  Another study involving Texas prisons came to the same conclusion. (27 RR 147.)  The 18-year old inmates were getting two and a half disciplinary writeups a year and those over 41 got only one half per year. (27 RR 148.)  Those over 41 have one-seventh the likelihood of violence as teenagers and one-fifth the chance of those 18 to 20. (27 RR 148.)  This is true for convicted murderers in Texas and it is "one of the most well-established findings in prison science." (27 RR 149.)  The persons who committed their offenses at age 40 were much less likely to re-offend in prison. (27 RR 149.)  The critical factor is how old the inmate is, not the age at which he was sent to prison. (27 RR 150.)  A new study on New York prisoners and another also showed that the rate of misconduct peaks in the late teens and early 20s and by the time the inmate is 30 it is half as much and it is way down at age 60. (27 RR 151-152.)

His data also showed that if an inmate had gone for over ten years without an assault, then the likelihood after that was almost zero. (27 RR 153.)  Mr. Coble had been in prison for

---

[29]  Nor would there be any way to know what it was in the first place.

18 years without any disciplinary write-ups.  (27 RR 153.)  From 1990 to 1998 he was in a work-capable program, the garment factory, where he was interacting with others and handling scissors and needles, not locked in a cell.  (27 RR 154.)  This is similar to a general population facility, in that he had much contact with the other inmates.  (27 RR 159.)  They are double-celled and eat their meals in common.  (27 RR 155.)  Not only was there no violence on the part of Mr. Coble, there were no disciplinary write-ups, which is very difficult.  (27 RR 155.)  "He was displaying an unusual degree of...cooperation and compliance."  (27 RR 156.)  He was also a porter and helped organize sports activities.  (27 RR 155-156.)  Mr. Coble was doing crafts and occupying himself, which means he adapted well and contributed to the stability of the prison.  (27 RR 156.)

As inmates get older, they are less inclined to get into fights with younger inmates.  (27 RR 157.)  The prosecution's theory that Mr. Coble has been conciliatory for 18 years and then would shift to a threatening stance when he went to general population does not make sense and "there's no data that would support that at all."  (27 RR 158.)  The data supports the finding that Mr. Coble has working hard and showing that he is a person who can be relied upon.  (27 RR 158.)  The theory that he would suddenly make a shift at age 60 goes against his longstanding behavior patterns.  (27 RR 158.)  The is no research that supports the prosecution's assertion that a 60 year old would start threatening people when they never did that before.  (27 RR 158.)  The research shows that the longer one goes without an assault, the less likely it is to occur in the future.  (27 RR 159.)

After Coble's eight years in a general population-like setting, he and all the death row population were put into a super-maximum setting at the Polunsky Unit where he is in a cell 23 hours a day.  (27 RR 159.)  However, incidents do occur in these settings as the inmates are

frustrated and take it out on staff.  (27 RR 160.)  Here too, he does not get a single write-up or disciplinary infraction.  (27 RR 160.)  There is also evidence he taught other inmates English. (27 RR 161.)

In terms of education, Coble received his GED at McLennan Community College and later completed training courses in welding, blueprint reading, drafting, architecture.  (27 RR 162.)  Inmates who have earned a high school diploma or GED have lower rates of violence according to the studies.  (27 RR 162.)  A person with a GED is about half as likely to be involved in an assault, a powerful factor in reducing the likelihood of future violence.  (27 RR 163.)

In terms of community employment, this factor also indicates a low probability of future violence.  (27 RR 164.)  He was in the Marines, he worked as a steelworker, started his own business as a welder, and sold insurance door to door, from age 17 to 40.   (27 RR 164.)  This is what is called the "community stability factor" which increases the likelihood of an inmate being industrious in prison.  (27 RR 164.)   Coble also has links to the community.  (27 RR 165.) People outside have received cards from him, people have visited him, and this decreases his risk of future violence.  (27 RR 165.)

In early 2007, there were almost 2,000 inmates serving life sentences.  (27 RR 167.)  The rate of serious staff assaults was 2.7 per 1000 inmates per year.  (27 RR 167.)   The rate of serious inmate assaults was 1.4 per 100 inmates.  (27 RR 168.)  Even among capital murderers, the rate of serious injury assaults is not high.  (27 RR 168.)  These are capital inmates serving life sentences, where Mr. Coble would be if he got a life sentence.  (27 RR 168.)  In Florida,  35 percent of the inmates got a write-up per year, which says something about Mr. Coble's record of 17 years and no write-ups.  (27 RR 170.)  Forty-eight percent of the property offenders had a

write-up, so capital offenders were 20 percent less likely to offend.  (27 RR 170.)  The more severe the violence, the less likely it is to occur.  (27 RR 171.)

The study also looked at the prosecution's unsupported theory that the lesser levels of violence is due to the higher security, and that was found to be not true.  (27 RR 171-173.)  A study looked at Texas murderers, and found that 16 per cent of them would be involved in more serious violence in prison and the lifetime risk of killing an officer was 1 in 500 and of a serious assault was one in 100.  (27 RR 174.)

Dr. Cunningham also showed that the longer an inmate is in prison, the lower his rate of misconduct and assaults.  (27 RR 176.)  It is statistically incorrect to assert, as the prosecution's witnesses did, that a person serving a life sentence has nothing to lose.  (27 RR 177.)  The long sentence inmates do better than those with short sentences.  (27 RR 177.)  The longer an inmate is serving, the more important are his privileges.  (27 RR 179.)  These incentives are present whether a person is serving a death sentence or not.  (27 RR 179.)

Another study also looked at death-sentenced individuals in Texas and found that death-sentenced individuals weren't acting better because they had an appeal pending, as the prosecution's unsupported theory claimed, but the rates of misconduct were pretty similar to the inmates serving capital life sentences in general population.  (27 RR 179-180.)  The prosecution's theory has been tested on death-sentenced individuals in Texas, and the study found that death-sentenced individuals "were more likely to be involved in assaultive conduct than the guys serving capital life terms."  (27 RR 182.)  Other research additionally proved the falseness of the prosecution's theory that a death sentence assures good conduct.  (27 RR 182.)  It would have been important for the prosecution experts to have been aware of this research before they stated their unsupported opinion.  (27 RR 183.)

-68-

All violent felons are dangerous.  (27 RR 183.)  The issue is not whether he is dangerous but the special issue asks whether there is a probability of criminal acts of violence of a certain severity that would constitute a threat to society.  (27 RR 183-184.)  One study looked at 155 Texas cases where a mental health expert came and testified that there was a probability of future criminal acts of violence.  (27 RR 184.)  Of these, 67 have been executed after spending an average of 12 years on death row, 40 are still on death row for an average of eight years and 48 had their sentences reduced.  (27 RR 185.)  Nobody killed anyone in prison.  (27 RR 185.)  Only 8 of the 155 committed an assault that required more than first aid treatment. (27 RR 185.)  It did not matter which group the inmate was in.  (27 RR 185.)  Ninety-five per cent of them were never cited for a serious assault and 20 percent had no write-ups at all.   (27 RR 185.)  So the predictions were wrong 95 percent of the time.  (27 RR 186, 189, 190.)

Unlike Dr. Coons, Dr. Cunningham asked for data on the inmates he has assessed as not being risks for future violence.  (27 RR 187.)   59 percent had been sentenced to life sentences and 41 percent received death sentences.  (27 RR 187.)   Only 12 percent later engaged in assaultive infractions, almost all minor.  (27 RR 188.)  One person was charged with attempting a serious assault.  (27 RR 188.)  None of the 73 cases where he received data involved moderate or life-threatening injuries.  (27 RR 188.)  For Dr. Cunningham's cases, the error rate was 1.4 per cent as opposed to the 95 percent error rate of the predictions for future violence.  (27 RR 189.)  The accuracy rate for his predictions was therefore 98.6 percent.  (27 RR 189.)  Even the rate for minor assaults was only 11 percent.  (27 RR 190.)

Violence is almost never a function of just the person.  (27 RR 191.)  It is about a person in a particular context and a particular situation.  (27 RR 191.)  Billie Coble's history of violence is related to relationships with women.  (27 RR 192.)  He does not have a history of bar fights or

armed robberies.  (27 RR 192.)  Coble's mother was psychiatrically hospitalized and very angry and combative.  (27 RR 193.)  He did not have a nurturing family life.  (27 RR 194.)  His mother became mentally ill, he was raised by a sibling, and then placed in a boy's home.  (27 RR 194.) He went there because their mother could not care for them, not because he was unmanageable as Dr. Hodges' report stated.  (27 RR 195.)  His childhood had been fundamentally fractured, he came from a damaged setting, and he was not there because he was a junior sociopath.  (27 RR 196.)  Despite these shaky beginnings, Bill Coble joined the Marines.  (27 RR 196-197.)

The context in prison is different.  (27 RR 201.)  Bill would no longer be in relationships with women and it is a more structured environment.  (27 RR 201.)  The rate of homicides in prison is low, 2.5 homicides per 100,000 inmates per year.  (27 RR 202.)  The homicide rate among males in the free population in the U.S. is four times as high: 10 per 100,000 in the U.S.; 11.8 in Texas.  (27 RR 203.)  Deaths in prison cannot be under-reported. (27 RR 202.)   It doesn't happen with the frequency one would expect.  (27 RR 203.)  If the violence rate were all about the person, the murder rates in prison would be off the chart.  (27 RR 203.)  This shows that the context is critically important.  (27 RR 203.)  Security, staff, structure and confinement all hold in check those who would otherwise pose a great deal of risk for violence.  (27 RR 204.)

There are no factors that would put Mr. Coble at an increased risk for violence.  (27 RR 204.)  On the decreased risk side, he is 59, no violence in 19 years in prison, got a GED and technical classes, has community relationships.  (27 RR 205.)  He is a substantially lower risk than other inmates who don't have these factors.  (27 RR 205.)  Mr. Coble is in the lowest risk group.  (27 RR 206.)  His lifetime risk of serious violence is about 2 percent to 7.5 percent, his risk of aggravated assault on staff is less than 1 percent and his risk of killing another inmate is one-fifth of one percent.  (27 RR 207.)  Inmates matching Billie Coble were found, in another

-70-

study which used the "Burgess scale," to be in the lowest 2 percent risk group.  (27 RR 208.)  In all of the statistical models, Billie Coble is in the lowest risk group.  (27 RR 208.)

Dr. Cunningham also pointed out that the clinical, totally subjective factors used by Dr. Coons have been rejected by the American Psychological Association and the Texas Psychological Association as "below the standard of practice and unreliable." In fact, these two groups specifically identified and specifically criticized Dr. Coons' testimony and methodology. (27 RR 275-276.)[30]

These points were never refuted, or even addressed on cross-examination and the prosecution asked peculiar and largely irrelevant questions which, if they had any purpose at all, it was to appeal to the prejudices and biases of the jury and to confuse them.  The witness was first asked at length about the effect on average incomes if Bill Gates were sitting on the jury. (27 RR 209-211.)[31]  He was then asked at even greater length numerous questions about a hypothetical  18-year old good driver and a 35-year old alcoholic driver, which made the false assumption  that insurance rates would be based on the single variable of age.  (27 RR 212-221, 270.)[32]  The witness agreed that a sentencer would want to look at all the evidence in the case to make a decision.  (27 RR 222-225.)  The prosecutor then attempted to make the point that even

_____

[30]   As in fact the Texas Court of Criminal Appeals later rejected it in this case. *Coble v. State,* 300 S.W.3d 253 (Tex. Crim. App. 2011) (Exhibit 26.)

[31]   In an attempt to show how averages can be distorted.  However, this is a fallacy based on small sample sizes, which did not occur in the samples Dr. Cunningham was talking about, which involved tens of thousands of cases which would negate the "Bill Gates in the jury box" scenario.  (27 RR 268-269.)  This logical fallacy is called an outlier.  (27 RR 268.)  And Bill Gates was not in Mr. Coble's jury box.  (27 RR 269.)

[32]   "But you don't rely on a single factor.  But, in fact, you may have four or five factors that are very powerfully predicted."  (27 RR 270.)

though Mr. Coble was in a low risk group, a prediction of non-violence before the murders would have been wrong because he actually committed the murders.  (27 RR 227-230.)[33] However, even with this flawed logic, there were reasons to have predicted Mr. Coble's violence before the murders, given the breakup of his marriage, depression and career transition. (27 RR 230-231.)  The prosecutor then tried to make the untenable hypothesis that a lack of reporting of the signs of Mr. Coble's depression meant there were no "statistics" regarding it. (27 RR 231-233.)  Then the prosecutor asked about the testimony of Dr. Grigson, who testified in the first trial that Mr. Coble was not a risk of future violence.  (27 RR 235.)  Dr. Cunningham was also asked about a paper Dr. Grigson wrote discussing the Coble case.  (27 RR 235, 274.)  Although his prediction was ultimately proved to be correct, as Mr. Coble had no instances of violence in 18 years, his methodology was just as flawed as was Dr. Coons'.  (27 RR 271-274.)

The prosecution then proceeded to ask extensive questions regarding a totally unrelated case in which Dr. Cunningham had testified in 2001, *United States v. Osama bin Laden,* in a further attempt to bias the jury against Mr. Coble. (27 RR 238-252.)   Despite a total lack of relevance to the current case, the prosecutor was allowed to pursue this line of questioning for 14 pages of trial transcript.  (*Id.*) The defense objected after three pages of this testimony.  (27 RR 241.)   This is discussed in more detail *infra,* in the claim relating to prosecutorial misconduct.

---

[33]  Of course, this point is also logically flawed and proved nothing, as Mr. Coble had already committed the murders.  An analogy would be as follows:  Person A picks a card from a deck and then Person B asserts that if Person A had previously predicted a low probability of that particular card being picked, he would have been wrong.   In logic, this is called the *ex post facto* fallacy.

The prosecution also asked Dr. Cunningham about Mr. Coble having pictures of young gymnasts in his cell.  (27 RR 265-266.)   In a final attempt to appeal to the jury's prejudices, the prosecutor asked a hypothetical that assumed that Mr. Coble still hates Karen Vicha, was essentially delusional, was homicidally angry with her even today, was somehow suddenly at large in the community without supervision, and had access to her.  (27 RR 278-279.)

**Gordon W. Coble,** Bill Coble's son, testified that he was 35 years old and a licenced plumber.  (28 RR 17.)  After his parents divorced, custody was given to his mother.  (28 RR 21.)  Then he lived with his father for two months as his stepfathers were abusive.   (28 RR 21-22.)  He did not recall a time when he went back to his mother because he was not getting along with his father.  (28 RR 23.)  He also did not remember the incident about Mr. Coble hitting Ms. Wooley with a baseball or an incident when Mr. Coble was circling the block watching her.  (28 RR 23.)

Their divorce was contested and bitter.  (28 RR 44.)  When Bill had visitation rights, he would exercise them.  (28 RR 24.)  Because Ms. Wooley kept having him arrested when he would appear for visitation, eventually Gordon asked him not to show up.  (28 RR 24.)  He would be a little behind on child support, and Ms. Wooley would alert the police as to when he was going to pick Gordon up.  (28 RR 29.)  Bill would help Gordon with sports and they hunted together.  (28 RR 25-26.)  Bill also taught Gordon to weld.  (28 RR 26.)  Gordon would go on reserve training with Bill, once to Ohio.  (28 RR 27.)  Ms. Wooley did not want Gordon to talk with Bill, and would punish him if he did.  (28 RR 29.)   She would tape record Gordon's conversations with his father.  (28 RR 29.)

Once, a stepfather tried to prevent a visit with Bill, but Gordon told him he wanted the visit.  (28 RR 30.)  After that, the stepfather treated Gordon differently, like he wasn't part of the

family.  (28 RR 30.)  At times, Bill did not have a residence, and Gordon would have to sleep in a camper shell on visits.  (28 RR 31.)  Bill coached Gordon's sports teams (28 RR 32) and he was also involved in the community, especially the Waco JCs.  (28 RR 33-34.)  He was very involved with Pop Warner football and received a Man of the Year award from the Waco JCs. (28 RR 35.) Gordon was present at the Texas Stadium when Bill was awarded the football and all the players signed it.  (28 RR 36.)  This was the highlight of Gordon's life.  (28 RR 36.)   Bill also taught Gordon electrical skills.  (28 RR 36-37.)  He was a patient teacher and he never slapped or struck Gordon.  (28 RR 37-38.)  Bill would help people who were stranded on the road and he occasionally helped out an old lady who lived near Ms. Ryan. (28 RR 38-40.)

Since Bill has been in prison for 18 years, they have written, and Gordon gets birthday cards from Bill.  (28 RR 41.)  Bill has a good relationship with his grandchildren and they get upset when they have to leave the visits.  (28 RR 41.)  Gordon knows that Bill loves him.  (28 RR 49.)

**Marilyn Finley** testified that she knew Bill from when she worked at the HEB market around 1985.  (28 RR 51.)  Candy Ryan worked with her at the HEB store when she was married to Bill.  (28 RR 51.)  Ms. Finley recalled the incident at the Payless Gas station.  (28 RR 52.) Ms. Ryan was playing pinball with some males and she was touching and hugging them. (28 RR 52.) She had told Bill she would be working.  (28 RR 62.) Bill showed up and there was a confrontation but no violence.  (28 RR 53.)  Ms. Finley called the police.  (28 RR 54.)  Later, Ms. Finley and Bill had a friendship that was not romantic.  (28 RR 54.)  They would see each other frequently as Bill was friends with her son who was seven at the time.  (28 RR 55.)  Bill was a surrogate father figure for her son.  (28 RR 58.)  Bill was never aggressive with other

-74-

people.  (28 RR 56.)  Sometimes he would get very depressed.  (28 RR 57.)   At times, he had a hard time financially.   (28 RR 59.)

Ms. Finley knew Bill when he began to date Karen Vicha.  (28 RR 60.) Then their friendship cooled .  (28 RR 61.)  Bill helped her out, installed bars on her windows and once gave her a sewing machine.  (28 RR 61.)

The defense rested.  (28 RR 64.)

**iii) State's Rebuttal.**

The next witness was to be A.P. Merillat.  (28 RR 68.)  The defense objected as to relevance.  (28 RR 68.)  The prosecutors stated that Mr. Merillat testifies to prison conditions but the defense attorneys argued that this was not proper rebuttal.  (28 RR 68.)   Also, Mr. Merillat had no statistical data, just general classification issues regarding the prison.  (28 RR 68.)   His testimony is discussed in detail *infra.*

**iv) Instructions.**

The defense filed six objections to the instructions based on the 5th, 6th, 8th and 14th Amendments.  (29 RR 88.)   As to the first objection, the Court changed the instruction so that "life" was placed before the "death" option.  (29 RR 89.)  As to Request for Special Instruction No. 2, the defense requested that there be an instruction that if the jurors could not come to a conclusion as to the first and issues, that they should stop their deliberations and inform the judge. (29 RR 90.)  That was denied.  (29 RR 92.)  As to Request for Special Instruction No. 3, the defense asked for a definition of mitigating evidence as anything that could reduce the defendant's blameworthiness, nor do they have to agree on what constitutes mitigating evidence or how much weight to give to it, based on *Tennard.*  (29 RR 92.)  That was denied.  (29 RR 94.) As to request No. 4, the defense asked that references to parole being in the exclusive

jurisdiction of the Board of Pardons and Parole and the governor of Texas.  (29 RR 95.)  The defense argued that by informing them that there was such a board that they were being invited to consider parole, or executive clemency.  (29 RR 95.)  The prosecution cited a state case, *Rose v. State*, a 1988 case that was applicable at the time of the murder, that this was the standard instruction, to not consider parole.  (29 RR 95.)  The defense countered that the objections were made on Sixth and Fifth and Eighth Amendment rights and that by instructing jurors not to consider parole and then informing them specifically of the agencies responsible for executive clemency that they are in fact being invited to consider parole.  (29 RR 96.)  They argued that this is an internally inconsistent instruction, as in the *Penry* nullification instruction.  The Court granted the defense request that the instruction say, after the first sentence in the parole instruction, "such matters are not a matter of concern for the jury."  (29 RR 97.)  Left out was the language that "these things are within the exclusive jurisdiction of the Board of Pardons and Parole and the Governor."  (29 RR 97.)

As to Special Instruction No. 5, the defense asked for a definition of the term "criminal acts of violence and continuing threat to society" in the future dangerousness issue.  (29 RR 98.) Without such a definition, the jury had no way to apply an individualized decision.  The jurors

> have to be able to be instructed adequately as to what may be a real future danger versus what constitutes a future danger...in a way that isn't disproportional to any future misconduct...Without this, the problem of the jury...is that the jurors are able to regard any act in the future, any act of misconduct that may have a tincture of violence as being sufficient for imposing the ultimate penalty.  And therefore it tends to introduce an element of capriciousness and it's arbitrary and it's disproportional.  So we believe the jurors need more...structure in understanding what constitutes an act of violence and what constitutes a continuing threat to society.
> (29 RR 98.)

The prosecution countered that there was no need for definitions of deliberately, continuing acts of violence, society, probability. (29 RR 99.) The defense request was denied. (29 RR 99.)

The final request was that a limiting instruction as to extraneous offenses be provided in the jury charge, similar to that provided in non-capital cases, that instructs the jury that before they can consider any act of extraneous and unadjudicated misconduct or offenses, they must be persuaded that they occurred beyond a reasonable doubt. (29 RR 99-100.) The defense stated that heightened concerns for reliability dictated this and the extraneous circumstances should at least be held to as high a standard of proof that prevails for lesser crimes. (29 RR 100.) This was denied. (29 RR 102.) The objection to the 10-12 rule was re-urged but denied. (29 RR 102.) The defense also stated that introducing the consideration that the state's argument that Mr. Coble could be a future danger to the Vicha family were he ever released to the free world rendered the statute, Article 37.0711, unconstitutional under the Eighth Amendment as it introduced the possibility of Mr. Coble getting out when that was not a viable option. (29 RR 103.) The jury was being asked to make a decision on future dangerousness based on a situation which they are not supposed to contemplate, the possibility of his being paroled. (29 RR 103-104.) The prosecution stated that the concept of society includes all society, "whether in or out of prison." (29 RR 104.) The request was overruled. (29 RR 104.)

The court instructed the jury. (29 RR 111 et. Seq.) Counsel presented final arguments, which are discussed in more detail *infra*. The jury began deliberations around lunch time, and shortly thereafter, requested to see three evidentiary items: psychiatric evaluations, testimony of a 1967 fight while Petitioner was in the Marine Corps., and three pictures that had been taken from Petitioner's cell. (29 RR 182.)

At about four o'clock on the afternoon September 4, 2008, the jury reached a verdict on the three special issues.  Special Issue No. One was: "Do you find from the evidence beyond a reasonable doubt that the conduct of Billie Wayne Coble that caused the death of Zelda Vicha was committed deliberately and with the reasonable expectation that the death of Zelda Vicha or another would result?"  The jury answered this question affirmatively. (29 RR 186.)

Special Issue No. Two was: "Do you find from the evidence beyond a reasonable doubt that there is a probability that Billie Wayne Coble would commit criminal acts of violence that would constitute a continuing threat to society?"  The jury answered this question affirmatively. (29 RR 186.)

Special Issue No. Three was: "Do you find from the evidence taking into consideration all of the evidence including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?"  The jury answered this question negatively. (29 RR 186-187; XIII CR 2358-2363.)[34]

As a result, Mr. Coble was re-sentenced to death on September 4, 2008.  (XIII CR 2358-2363.)[35]

**C. Post-conviction proceedings and evidentiary hearing.**

Mr. Coble timely filed his application for writ of habeas corpus in the 54th Judicial District Court (applicant's trial court) and in the Texas Court of Criminal Appeals on June 3,

---

[34]  Exhibit 2.  *Also see* in Exhibit 2, Charge of the Court and Verdict (XIII CR 2347-2354); Judgment of Conviction (XIII CR 2358-2359).

[35]  *Id.*

2010.   On December 8, 2010, the State filed their "Answer To An Application For Writ of Habeas Corpus In A Death Penalty Case."   In their Answer, the State recommended that the trial court should determine that Claims 2, 3, 6 and 12(a), (b), ©, and (d) present "controverted, previously unresolved factual issues which could be material to the legality of Applicant's confinement, and the Court should therefore resolve such facts in an appropriate matter (sic) set forth in Art. 11.071(9)(a)..."  On December 9, 2010, that Court directed that a proposed order of findings of controverted previously unresolved factual issues be submitted by December 21, 2010. On December 8, 2010 the State filed its Answer to Applicant's writ application.

The trial court, Honorable Matt Johnson presiding, pursuant to Tex. Code Crim. Proc. Art. 11.071 Sec. 9(a), determined that "controverted previously unresolved factual issues material to the legality of the applicant's confinement exist[ed]." The Court ordered an evidentiary hearing on Claims 2, 3, 6 and 12 (a) through (d) of Applicant's writ application.

**I) The post-conviction evidentiary hearing.**

That evidentiary hearing took place on February 11, 2011 in the above-named Court.[36] *Ex parte Billie Wayne Coble,* No. WR-39,707-0; Trial Court Cause No. 1989-1036-C2B.  The State was represented by the McLennan County Criminal District Attorney's Office and Petitioner was represented by undersigned counsel and Ms. Trisha Trigilio.

Petitioner had subpoenaed A.P. Merillat at the Walker County Constable but they informed defense counsel the day prior to the hearing that Mr. Merillat was out of town and would be out of town for about two weeks. (EHT 12.)[37]  Mr. Merillat's office did not contact

---

[36]   The  transcript of that hearing was filed on March 1, 2011.

[37]   "EHT" stands for "evidentiary hearing transcript," the transcript of the February 11, 2011 hearing, with the page number following.

-79-

defense counsel about his unavailability although they knew about it about ten days prior to the hearing.  Mr. Merillat did not appear for the hearing. (EHT 13.)

As to the claims of prejudicial publicity and ineffective assistance of counsel for failure to file a motion for change of venue, **Tommy Witherspoon** of the Waco Tribune-Herald testified that he had been a staff writer for the paper for twenty-eight years. (EHT 14.)  He mentioned several cases that had received a lot of publicity, including the Matt Baker case. (EHT 14.)  This paper was the only one in Waco. (EHT 16.)  He has been the main reporter on the Coble case since 1989. (EHT 18, 20.) Mr. Witherspoon estimated that there have been eight to ten cases that ended up with a death penalty in Waco during the past twenty years. (EHT 21.) In reporting the Coble case, he interviewed Judge Ralph Strother. (EHT 23.)  He did not remember any comments made by Judge Strother but testified that judges in Waco are normally "pretty cautious" about making comments about specific cases, and he could not remember 'a judge ...sitting judge taking about a case." (EHT 24-25.)  Mr. Witherspoon remembered some letters were written to the paper about Mr. Coble but none were in his defense. (EHT 26.)  Many people in Waco knew the victims.  (EHT 28.)  The circulation of the paper was about 40,000 (EHT 28) and the Coble case was "one of the biggest" cases he had covered in his twenty-eight years at the paper (EHT at 15, 32). A memorial to slain police officers was held every year in McLennan County, and that would include Bobby Vicha.  (EHT 29.)

Trial co-counsel **Scott Stevens** testified that he has been practicing mainly criminal law in Gatesville, Texas and the surrounding counties for twenty-five years. (EHT 36.)  In October of 2007 he was appointed as second chair, or co-counsel, for Petitioner's penalty phase re-trial. (EHT 36.) Russ Hunt, Jr. was first chair. (EHT 36.) Mr. Stevens said that the two attorneys did not divide the trial responsibilities. (EHT 37.)  The case was of "major interest" in the Waco

area and there were reports about it on the radio, on television and in the newspapers. (EHT 38.) More than any case Mr. Stevens has handled, there was a "high degree of animosity and prejudice against Mr. Coble based on those media reports." (EHT 39.) The general opinion in the community regarding the penalty phase re-trial was "outraged." (EHT 41, 52.) The public opinion went beyond mere frustration over the re-trial, as "[f]rustration doesn't express the vitriolic-type of comments that I was seeing." (EHT 53.) The public attacks were not just about the justice system, "they were more personal attacks." (EHT 53.) Mr. Stevens thought it would be a good idea to file a motion for change of venue and had some discussions about this with lead counsel Mr. Hunt, but the issue was not addressed before he left the case. (EHT at 41-42.) Mr. Stevens withdrew as second chair counsel on April 24, 2008, having been on the case about six months. (EHT 43, 47.) Although Mr. Stevens expected to get guidance on trial issues from Mr. Hunt, he "felt like we were not moving forward as quickly as we should" and this was frustrating. (EHT 44.) He saw time passing and not much being done. (EHT 45.) Mr. Stevens has not tried a capital case prior to this. (EHT 44.)

As to the issue of J.R. Vicha being a member of the McLennan County District Attorney's office, there was "no question in [his] mind" that created a conflict of interest. (EHT 45), an "absolute conflict of interest...absolutely an ethical violation." (EHT 59, 60.) But it may not have been "an absolute bar to the District Attorney's office handling the case." (EHT 54, 59.) He thought that the only actual statutory bar to a district attorney prosecuting a case as when the actual district attorney had represented the defendant on "that same case." (EHT 61.) He thought that a disqualification motion was likely to be unsuccessful. (EHT 55.) But he felt there were grounds for the motion. (EHT 64.) A motion to recuse the district attorney's office

was discussed but he did not know if it was filed. (EHT 45.)  As to this issue, Mr. Stevens "would have investigated more than I personally did." (EHT 53.)

As to jury selection, Mr. Stevens was not involved in the preparation of the jury questionnaire. (EHT 57.)  He did not remember filing any discovery motions. (EHT 60.)

Mr. Stevens remembered talking to one possible witness, Gordon Coble. (EHT 46.)  He also met with Petitioner. (EHT 48.)  Mr. Stevens could not say one way or the other whether his representation in the case was effective or not:

> The reason that I feel like I'm not sure is because I know that at certain stages of the proceedings we were not in compliance with ABA guidelines that are generally used to follow standards.  I think there were appropriate reasons why we weren't following those particular guidelines.  But I know that courts sometimes hold people exactly to those guidelines.  And so a Court might say because of that, that what we did during that time period wasn't effective.
> (EHT 50.)

As to specifics, "we didn't develop that team [of experts] as quickly as the ABA guidelines would demand...I'd say I felt like we were out of compliance with that." (EHT 58.)  In summary, Mr. Stevens felt that his experience in this case was "frustrating." (EHT 61.)  He could not say one way or the other whether or not Mr. Hunt's representation was effective or ineffective. (EHT 64.)

Venireperson **Rebecca Emily Hodde** (now, Rebecca Babb (Evidentiary Hearing Transcript ("EHT") at 66) stated on her jury questionnaire that she had heard of the case through "word of mouth."   (VII CR 1285.) She was not chosen for the jury.   (EHT 67.) On her questionnaire she wrote that "when we came in [to the jury pool] , everybody already seemed to know what it [the Coble case] was."  (EHT 67.)  At the evidentiary hearing, Ms. Babb testified that her statement at trial was true (EHT at 67, 69) and that when they were given the questionnaire they were told that Mr. Coble had already been found guilty. (EHT at 70.)

Although she claimed not to remember it at the time of the hearing, at the trial she stated that most of the jurors seemed to know about the case. (EHT 69.) She said that was a true statement. (EHT 69.)

**Dr. Richard Coons,** testified in Mr. Coble's 2008 trial that it was his opinion that Mr. Coble would be a future danger, "that there was a probability that he would commit criminal acts of violence in the future which would constitute a continuing threat to society." (EHT 72.) He was paid $480.00 per hour by the county and a total of 26.25 hours for a total of $12,600. (EHT 72.) Dr. Coons has testified similarly in about 50 capital cases. (EHT 74.)

Dr. Coons was served with a subpoena duces tecum requesting that he bring a list of cases where he testified the defendant was not a future danger. (EHT 75.) He did not bring the list but testified there were two such cases. (EHT 78-79.)

Dr. Coons testified he was a clinical and forensic psychiatrist. (EHT 80.) He testified he could render a diagnosis based solely on "adequate" records without personally interviewing the patient. (EHT 81.) Dr. Coons said that rendering such an opinion would be ethical. (EHT 82.) He admitted that he did not know whether he had read the American Psychiatric Principles of Medical Ethics. (EHT 85.) He was not aware that it violates the principles of medical ethics to offer a professional opinion without meeting with a defendant. (EHT 85.) Dr. Coons did not know whether the APA had prohibited the rendering of opinions of future dangerousness unless there had been a psychiatric examination of the defendant. (EHT 87.) He was not aware that the APA guidelines state that "absent an in depth psychiatric examination and evaluation, the psychiatrist is unable to render a medical opinion with a reasonable degree of accuracy." (EHT 88.) Dr. Coons claimed that his records of his attempted interview with Mr. Coble in 1989 were lost in a flood. (EHT 89.) He rendered the 2008 opinion despite not having examined Mr. Coble

in the preceding 18 years. (EHT 90.)  Dr. Coons testified that the method he used to predict future violence---based on past history, attitude, what the case is about, future living situation, the defendant's personality—was of his own design. (EHT 91.)  This method had not changed since he started using it about 30 years ago. (EHT 91-92.)  He uses this method in every capital case where he has to make a prediction of future violence. (EHT 92-93.)   The features used by Dr. Coons are not in any per-reviewed literature. (EHT 93.)  He did not use any standardized assessment tools nor any statistically analyzed data. (EHT 94.)  Nor did he consider the base rate for severe acts of violence within a prison setting. (EHT 95.)  Dr. Coons could not tell where this method had been published or if it had. (EHT 95.) Nor could he identify any publications that validate his method of predicting future dangerousness. (EHT 96.)

Dr. Coons explained that "the reason you can't get...a base rate is that most of the violence that occurs in the prison system isn't reported...And the people who have published on this subject...for example, Dr. Cunningham who testified in this case, he uses only the violence that is reported and requires if there's physical injury and it requires a medical examination or treatment." (EHT 96.)  Dr. Coons also stated that unreported incidents or threats, such as taking another's commissary, do not go into the base rate. (EHT 97.)  He knew about this "unreported violence" from talking "with at least a thousand former inmates." (EHT 98.) He has never compiled this data or statistically analyzed it and it is strictly anecdotal. (EHT 99.)  Dr. Coons claimed this data was "widely known" within the prison system (EHT 99) but could not identify any publications that validated his methods of predicting future dangerousness.  (EHT 99.)  The alleged unreported violence in prisons was known by him through anecdotal sources (EHT 98-99.)  Dr. Coons testified that "treating [people] badly versus treating people nicely" figured into his "scheme." (EHT 100.)

The prosecutor objected to questioning of Dr. Coons on the grounds that "we have to put ourselves in trial counsel's shoes" and "we're not looking at what he could have done, we are looking at what was done." (EHT 102.) Counsel for petitioner argued that they were trying to show deficient performance under the *Strickland* [*v. Washington,* 466 U.S. 668 (1984)] standards. (EHT 103.)  The court subsequently limited the questioning of Dr. Coons.

The witness admitted that he was not aware of Mr. Coble's medical condition and heart problems, even though that could mean he would be less likely to be a future danger. (EHT 103.) and did not remember if he was asked about that at trial. (EHT 106.)  He believed that a good disciplinary record could mean that a prisoner would be less dangerous. (EHT 106.)  A further State's objection to Dr. Coons' testimony was sustained on the basis that "*Strickland* cautions us against...sitting from this point in time and looking backwards at what could have been done." (EHT 109.)[38]  Dr. Coons did not remember his prior testimony in the Ricky McGinn case (EHT 110-111); he was not aware of Mr. Coble's disciplinary history over the last 20 years (EHT 112); he did not know whether Mr. Coble had been violent over the last 20 years (EHT 114); and he was not aware that Mr. Coble had no history of violence for 20 years because there could have been times he was violent but it was not written up  (EHT 114-115).  Despite Mr. Coble's spotless prison disciplinary record over the past twenty years, Dr. Coons did not think he was wrong when in 1990 he predicted he would be a future danger. (EHT 116.)  Dr. Coons also stated that there was no way to know whether or not Mr. Coble has been violent over the past 20 years of his incarceration. (EHT 118.)  He also did not know about the American Psychiatric Association's condemnation of his testimony as allowing a psychiatrist to "masquerade his

---

[38]  This of course is incorrect, as discussed *infra.*

-85-

personal preferences as medical views without providing a meaningful basis for rebutting his conclusions." (EHT 119.)  His method had never been published in a peer-reviewed publication. (EHT 120.)   Dr. Coons did not know whether his theory was generally accepted in the psychiatric community. (EHT 122.)   He was not aware that the American Psychiatric Association disapproves of predictions of future dangerousness in general and that psychiatrists should not offer predictions of long-term future dangerousness when purporting to testify as a medical expert.  (EHT 124.)  Nor was he aware of the APA's statement that "medical knowledge has simply not yet advanced to the point where long-term predictions may be made with even reasonable accuracy."  (EHT 125.)   He was not aware that the APA has called his methods "unscientific" and unreliable and that they made this statement in an amicus brief in *State v. Fields,* a case involving Dr. Coons' testimony.  (EHT 126.)   Although Dr. Coons stated that he believed his method was "reliable" he could not state that "reliable" meant that it was right more than half the time. (EHT 128.)  He was not aware that the APA has said that predictions such as his were wrong two out of three times. (EHT 130.)  Dr. Coons repeated that there was no way to tell whether his method was reliable. (EHT 132.)  He was not aware that the APA has written that "[t]here is every reason to believe that the rate of error for Dr. Coons' methodology predicting dangerousness is exceedingly high." (EHT 133.)

The courts have never refused to allow him to testify. (EHT 133.)  On some cases, Dr. Coons has told prosecutors that he could not testify that the person would be a future danger. (EHT 134.)  He had never been qualified as an expert on conditions on death row but he has testified about those conditions. (EHT 137.)   He believed that people on death row behaved better because it would help their appeals. (EHT 139.)  This information was anecdotal, and not published. (EHT 140.)

**Joy Marvin,** a Waco medical records custodian, testified at both of Mr. Coble's trial. (EHT 143.)  One of the persons on Mr. Coble's 2008 jury was her superior, a Ms. Cheryl Sabo. (EHT 143.)  She told Mr. Coble's attorneys and they said it did not matter. (EHT 143.)

Before the 1989 murders, Ms. Marvin had employed Mr. Coble and he was a good employee and she never had any trouble with him. (EHT 144.)  He was employed by her in 1989 and she did not think he was a violent person. (EHT 151.)  Once, he intervened to stop an attempted theft of their property. (EHT 144.)  She did not believe the accusations of molestation or rape nor physical abuse of his wives. (EHT 152.)  Her belief was that Mr. Coble "snapped" because of his PTSD and that basically he "was a good, honest, decent man, and I consider him to be my friend." (EHT 155.)

Her opinion of Mr. Hunt's performance at the 2008 trial was that "I didn't think there was a defense." (EHT 144.)  They hardly ever objected to anything. (EHT 144.)  She observed only the part of the trial when she was testifying.  (EHT 149.)  Ms. Marvin had some favorable testimony she wanted to present—regarding the situation about a Mustang and Mr. Coble's PTSD as a result of his Vietnam service—but she was not allowed to testify to that. (EHT 145.) She would have liked to tell the jury about what she knew about PTSD and its effects. (EHT 147.)  The only person she remembered talking to about the 2008 trial was the investigator Mr. Don Youngblood, but not either of the trial attorneys. (EHT 148.)

**Tom Marvin,** Joy Marvin's husband, formerly ran an insurance office in Waco and employed Mr. Coble in 1989 for three or four months. (EHT 157.)  For his 2008 trial, he was contacted by the investigator Don Youngblood. (EHT 157, 162.)   Neither of Mr. Coble's attorneys talked to him about his testimony. (EHT 159.)  They did not seem to object to anything while he was testifying. (EHT 160.)

**Gordon Coble,** Petitioner's son, testified both at the 1990 trial and in the 2008 trial. (EHT 165.)   His mother is Pat Wooley. (EHT 165.)   No instances of molestation were ever mentioned to him by Ms. Wooley. (EHT 166.)   Their divorce was bitterly contested and there was a protracted custody battle, and if the molestation had actually occurred, he would have heard about it from his mother because "[i]f she had that kind of evidence, she would have used it" to obtain custody of Gordon. (EHT 166.)

The only contact he had with the 2008 trial attorneys was when Mr. Calhoun called him and came to his house for a visit. (EHT 167.)   Although he called Mr. Hunt five or six  times, he never called back. (EHT 167-168.)   His wife also tried to contact Mr. Hunt. (EHT 167.) Mr. Hunt's failure to contact him was very upsetting. (EHT 168.)   Neither has he ever spoken to Mr. Stephens. (EHT 168.)   The witness felt that Mr. Coble's attorneys should have objected more. (EHT 169.)   There were quite a few police officers in the courtroom when the verdict was announced, "they were just standing all down the middle of the aisles.  There was no other place to sit in this courtroom.  It was packed."  (EHT 171-173.)

Mr. **Alex Calhoun**, the second co-counsel, testified at the hearing that he was licensed to practice law in 1993. (EHT 178.)  Russ Hunt Jr. contacted him and asked him to be second chair. (EHT 178.)  This was Mr. Calhoun's first murder trial. (EHT 179.)  He was appointed on May 14, 2008 and the trial voir dire commenced on July 31st.   (EHT 179.)  There was a division of responsibilities: Mr. Calhoun was to look into mitigation because he "was familiar with the concept of doing an investigation of the client's background."  (EHT 180-181.)  When Mr. Calhoun began work on the case, his impression was that "not much had been done."  (EHT 181.)  Not many motions had been filed. (EHT 182.)  Regarding the motion for change of venue, "there was no in-depth investigation on my part to see whether or not one was necessary or one

would be successful." (EHT 190.)  Ultimately, no such motion was ever filed. (EHT 203.)  Mr. Calhoun could not speculate as to whether the failure to change venue had an adverse effect on the outcome of Mr. Coble's trial. (EHT 204.)

The mitigation investigator was Gerry Byington.  (EHT 182.)  Mr. Calhoun was dissatisfied with his work as he did not provide much feedback and Mr. Calhoun did not see much work product. (EHT 182.)  Much of the work had been done in the post-conviction case, and they tried to find additional witnesses. (EHT 182.)  But Mr. Byington had not done much work prior to coming on the case, "not as much as I would have liked to see him do,"  and had only met with Mr. Coble once. (EHT 183-184.) At a certain point when they were in trial, Mr. Byington stopped working on the case and subsequently disappeared. (EHT 184.) Mr. Calhoun remembered that he complained to Mr. Hunt about Mr. Byington's lack of work. (EHT 185.) Shown Mr. Byington's bills, Mr. Calhoun said that he could not say whether or not Mr. Byington pads his bills, but "he has a very bad reputation in Travis County [where Mr. Calhoun practices]" (EHT 213.)  Many attorneys will not hire him any more and "most judges feel that he probably does not do the work that he claims he does." (EHT 225.)  Mr. Byington "typically" charges about $6000 for his services in these capital cases"it's like a standard $6,000 bill." (EHT 226.) And "his work product that he gave to me was somewhat lacking.  He didn;t obtain your file, which is surprising, considering that would be the first thing you'd think he'd want to obtain...I don't remember getting any written reports from him." (EHT 226.)

As to evidence of Mr. Coble's PTSD, this was not presented and Mr. Calhoun did not know whether that was a strategic decision. (EHT 215.)  He could not say whether Mr. Coble was ever evaluated for this condition, and PTSD was ultimately rejected as a theory of mitigating evidence. (EHT 216.)

As to Dr. Coons, Mr. Calhoun admitted that the doctor "got the better of him" on cross examination. (EHT 216.)  Mr. Calhoun admitted that their expert on future dangerousness, Dr. Mark Cunningham, did not impeach Dr. Coons, as "the jurors obviously went back to what Dr. Coons thought about future danger." (EHT 220.)  Mr. Calhoun testified that there was a matter of impeachment that he did not present, one being another case that was similar to Mr. Coble's, involving an elderly individual with a perfect prison record, where Dr. Coons testified the individual would not be a future danger. (EHT 198.)

Background witnesses were interviewed and four TDC inmates were presented who talked about Mr. Coble's good character. (EHT 218.)  The defense attorneys looked into his medical records but Mr. Calhoun testified that his heart problems and ill health were not presented to the jury through expert testimony. (EHT 219.)

As a result, Mr. Calhoun felt "rushed" for the trial, and "would have liked more time just to see what else we could have come up with." (EHT 185.)  Mr. Cahoun was familiar with the "Colorado Method" of jury selection, which is a way of interacting with the potential jurors to determine who will be favorable and who will not. (EHT 186.) It also means conveying to the jurors specific items of mitigating evidence. (EHT 187.)   They were not successful in implementing the method at Mr. Coble's trial as neither of them were trained in the method. (EHT 187.)  Also, they were precluded from asking jurors their views about specific items of mitigation due to the Texas rule against asking "commitment" questions.  (EHT 188, 206.) However, Mr. Calhoun felt that any prohibition against asking such questions was unconstitutional under *Morgan v. Illinois.*  Mr. Calhoun could not remember why certain jurors were accepted and others rejected. (EHT 228-230.)

There was also some discussion about filing a motion to recuse the district attorney's office. (EHT 191.)   This discussion occurred fairly early from Mr. Calhoun's entry in the case, probably in May or June of 2008. (EHT 191.)  He looked at the district attorney's position that there was a "Chinese Wall" between Mr. Vicha and the rest of the office. (EHT 191.)  This was not a "major concern" to Mr. Calhoun. (EHT 192.)  Mr. Calhoun found nothing conclusive as to whether the failure to recuse was a conflict or a due process violation. (EHT 193.)   Mr. Calhoun was not familiar with, or did not present in this case, two cases that held that the failure of a prosecutor to recuse himself may be reversible error if it amounts to a due process violation (*State ex. rel. Eidson v. Edwards,* 793 S.W.2d 1 and *Hill v. Pirtle,* 887 S.W.2d 921).  (EHT 193.) The motion to recuse the district attorney's office was never filed. (EHT 209.)   Mr. Calhoun could not say whether Mr. Vicha's testimony affected the outcome of the case. (EHT 211.)

It was Mr. Calhoun's impression that not much happened in the case from the date that Mr. Hunt was appointed, October 17, 2007, until the date Mr. Calhoun was appointed, May 14, 2008. (EHT 194.)  A discovery motion was filed on April 25, 2008, and Mr. Calhoun found that unusual, in that he would not normally wait six months to file such a motion. (EHT 195.) Seventeen motions were filed before the trial. (EHT 211.)   However, fifteen of these motions were filed on one day, April 25, 2008, and they were all "boilerplate" motions. (EHT 225.)

After the trial, some things came to his knowledge regarding State's witness A.P. Merillat. (EHT 195.)   Mr. Calhoun learned that in other cases, Mr. Merillat had misstated the security levels of ingoing prisoners with a capital life sentence, that they can achieve a less secure security rating over time, when they actually cannot.  (EHT 196.)   Mr. Calhoun remembered Mr. Merillat's testimony regarding a beating/starvation case in another unit, and had

Mr. Calhoun known that testimony was false, he would have used that information as impeachment. (EHT 197.)

On the last day of the trial, the courtroom was packed with prosecution supporters and there were several outbursts from the spectators. (EHT 200.)  Overall, Mr. Calhoun described his experience in this trial as "draining." (EHT 200.)  Mr. Calhoun stated that he did not feel he was qualified to say whether his representation in this case was effective under the *Strickland* standards. (EHT 202.)  Nor could he say that his performance was in compliance with the American Bar Association Guidelines. (EHT 222.)  Mr. Calhoun received undersigned counsel's file on the case and Mr. Hunt had not previously arranged to receive it.  (EHT 222-223.)  Mr. Coble "was not happy with Mr. Hunt...Was he happy with the representation? I couldn't tell you. I don't think he complained that I was a bad lawyer.  He didn't want to see me anymore..." (EHT 217.)

Petitioner then rested. (EHT 234.)

The State called **J.R. Vicha** [the son and grandson of the victims in this case] testified that he was an employee of the McLennan County District Attorney's Office since April of 2006. (EHT 237.)  He testified he was not involved in the preparation and prosecution of the 2008 re-trial. (EHT 237.)  If the matter came up in a meeting, he would be asked to leave. (EHT 238.)  He was told that the district attorney's office could not talk about the case. (EHT 239.)  They were "maintaining that Chinese wall that's been in place from the time this case has been brought back to this office for retrial." (EHT 239.)  Mr. Vicha was not in a position to dictate policy. (EHT 240.)  The former district attorney, John Segrest, hired him. (EHT 240.)  Judge Ralph Strother has also been a mentor for Mr. Vicha. (EHT 240.)  He was friends with his colleagues in the office and he would attend social functions with them. (EHT 241.)

**ii. Post-hearing proceedings.**

The trial court  ordered, on February 21, 2011 that "the State and Applicant are ordered to file any post-hearing affidavits or materials not later than 15 days prior to the due date for the submission of the parties' proposed findings of fact and conclusions of law."  Both partes timely submitted additional materials pursuant to that order.  Mr. Coble's materials are in Exhibit 30 herein. The State's materials included an affidavit from trial counsel Mr. Hunt.

Ultimately the trial court adopted verbatim the State's Proposed "Findings of Fact and Conclusions of Law on Writ of Habeas Corpus In a Death Penalty Case." (Exhibit 29.)   On February 8, 2012, the Texas Court of Criminal Appeals denied Mr. Coble's habeas application. *Ex parte Billie Wayne Coble,* No. WR-39,707-03 (Tex. Crim. App. Feb. 8, 2012)(*per curiam*)(unpublished). (Exhibit 31.)

## III. THE STANDARD OF REVIEW UNDER 2254(d).

This Petition considers both the merits of Petitioner's claims and how they meet the heightened standards of review of 2254(d). In light of the recent cases of *Cullen v. Pinholster*, 563 U.S. __, 131 S.Ct. 1388 (2011) and *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770 (2011), "merits" review arguably encompasses separate but related inquiries, as described below.

### A.  Introduction.

The statutory authority of federal courts to issue a habeas writ for persons in state custody is 28 U.S.C. §2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under 28 U.S.C. § 2254(a), a federal court may "entertain an application for a writ of habeas corpus . . . only on the ground that [a petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." Under 28 U.S.C. § 2254(d), however, such an application "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . (2) . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

As the Supreme Court explained in *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000), this operates as a "constraint on the power of a federal habeas court to grant ... the writ" in cases in which the federal court has found constitutional error.  Regarding the order in which a federal court addresses the merits and the § 2254(d) determination, the Supreme Court has made clear that "AEDPA does not require a federal habeas court to adopt any one methodology." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  Within the Supreme Court's own jurisprudence the analysis of

whether § 2254(d) operates in a given case to bar relief is often preceded by a traditional analysis of the merits of the underlying constitutional claim.  *See*, *e.g.*, *Weeks v. Angelone*, 528 U.S. 225 (2000); *Ramdass v. Angelone*, 530 U.S. 156 (2000); *Penry v. Johnson*, 532 U.S. 782 (2001).  Thus, although one could argue that the question whether relief for an otherwise meritorious constitutional violation under § 2254(a) is barred by operation of § 2254(d) is a matter to be first raised by the Respondent, *cf. O'Neal v. McAnich*, 513 U.S. 432 (1995) (analogizing the State's harmless error argument to an affirmative defense), Mr. Coble will combine a discussion of the law governing the alleged constitutional violations with the discussion of the reasonableness or unreasonableness of the prior state court adjudications, where applicable.

The AEDPA deferential standard of review applies only to claims that were actually "adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d).  Where the state courts did not reach a federal constitutional issue, "the claim is reviewed *de novo*."  *Cone v. Bell,* 556 U.S. 449, 472 (2009).  Where no state court has squarely addressed the merits of a habeas claim, "we review the claim under the pre-AEDPA standard of 28 U.S.C. § 2243, under which we dispose of the matter as law and justice require."  *Toliver v. Pollard,* 688 F.3d 853, 859 (7th Cir. 2012).  The operative decision under review is that of the last state court to address a given claim on the merits.  *Greene v. Fisher,* 132 S. Ct. 38, 45 (2011).  Here, the "last state court" would be the Texas Court of Criminal Appeals ("CCA") for those issues brought on direct appeal and on state habeas.  For the issues brought on state habeas, we must look to the prosecutor's proposed findings of fact and conclusions of law, which were adopted verbatim by the trial court and then by the CCA.

For most claims, the analysis that the state court ruling was unreasonable will also entail an analysis of why Mr. Coble should prevail on the merits.  For some claims and sub-claims, a

finding that the state court decision lacked a reasonable basis upon which to base its holding will mean that Mr. Coble is entitled to *de novo* review of the merits of the claim(s)  in question and/or further factual development in this Court.  It must be noted, however, the State has not yet filed its Answer and therefore has not yet either admitted nor denied any of the alleged facts.  Thus, in some respects, this discussion of the merits must necessarily be preliminary.  Additional discussion of the significance of the facts alleged or proven must necessarily await the State's Answer and/or further factual development in this Court, such as an evidentiary hearing or depositions.

Recently, in *Cullen v. Pinholster*, 563 U.S. __ 131 S.Ct. 1388 (2011), the Supreme Court held that "§2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id*. at 1398.  When a federal habeas court is called upon to apply § 2254(d)(1), *Pinholster* held, the court's assessment of the reasonableness of the state court's adjudication must be determined on the basis of the facts that were before the state court.  *Id*. at 1400.  As will be shown herein, this case presents little or no *Pinholster* preclusion problems, in terms of this Court not being able to consider certain evidence or exhibits not presented in state court.  That is because the record before this Court is substantially the same as the record before the state court, all claims are exhausted, no new claims are presented herein, and undersigned counsel was also state habeas counsel.

Application of § 2254(d) in light of *Pinholster* should be considered in the statute's constitutional and historical context.  *Panetti v. Quarterman*, 551 U.S. 930, 945-46 (2007) ("purposes [of statute], and the practical effects of our holdings, should be considered when interpreting AEDPA").  *Pinholster* stresses that § 2254(d) review is distinct from the question raised under § 2254(a), *viz*. whether the petitioner has demonstrated that he is in custody in

violation of the Constitution of the United States.  131 S. Ct. at 1398.  That interpretation is consistent with earlier cases.[39]

### B. The 2254(d) standards.

In §§ 2254(d)(1) and (d)(2), Congress established two broad sets of conditions under which a federal habeas court could grant relief for a constitutional violation.  Congress stated these conditions in the disjunctive, leaving federal habeas courts alternatives for the exercise of their power to remedy constitutionally infirm state-court judgments.  *Detrich v. Ryan*, 619 F.3d 1038, 1059-60 (9th Cir. 2010), *vacated on other grounds*, *Ryan v. Detrich*, 131 S.Ct. 2449 (2011); *see also Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (granting relief after finding petitioner satisfied (d)(2) without mentioning (d)(1)); *cf. Garcia v. United States*, 469 U.S. 70, 75 (1984) ("terms in question are made separate and distinct from one another by Congress' use of the disjunctive").[40]

---

[39]  *See, e.g.*, *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (§ 2254(d) "sets forth a precondition to the grant of habeas relief . . . not an entitlement to it"); *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (explaining that § 2254(d) must be satisfied before "federal habeas relief may be granted"); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) ("Relief may not be granted unless" § 2254(d) is satisfied); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("The requirements for habeas relief established by 28 U.S.C. § 2254(d) are thus satisfied"); *Bell v. Cone*, 535 U.S. 685, 694 n.2 (2002) (referring to § 2254(d) as a "statutory provision governing respondent's ability to obtain federal habeas relief"); *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000) (§ 2254(d) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court").

[40]  In *Jefferson v. Upton*, 560 U.S. ___, 130 S. Ct. 2217 (2010), the Court reversed an Eleventh Circuit decision that failed to consider alternative grounds for overcoming the presumption of correctness under the pre-AEDPA § 2254(d).  The Court emphasized that Congress had adopted eight alternative means of overcoming the presumption and stated them in the disjunctive.  130 S. Ct. at 2221.  The Court held "the Court of Appeals did not properly consider the legal status of the state court's factual findings" when it considered only one of the eight enumerated exceptions despite the petitioner having argued that others applied.  *Id.* at 2222-23.

The distinction AEDPA's drafters created between the core question of habeas corpus law – whether the petitioner's custody is lawful – and whether the habeas court must deny relief out of deference to the state court responsible for that allegedly unlawful custody presents several constitutional questions.  Petitioner addresses those issues as well as the doctrinal origins of AEDPA's scheme *infra*, and at various points in this brief.

### 1.  Review of a State Court's Decision under § 2254(d)(1)

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law.  Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources."[41]  *Harrington v. Richter*, 536 U.S. ___, 131 S. Ct. 770, 780 (2011).  As the Supreme Court has emphasized, the deference § 2254(d) requires "does not imply abandonment or abdication of judicial review."  *Miller-el v. Cockrell*, 537 U.S. 322, 340 (2003).  On the contrary, recent cases such as *Richter* and *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct.  1388 (2011), make clear that AEDPA added a layer of judicial review – "§ 2254(d) review" – that a state court decision must survive in order to receive deference.

The means by which a federal habeas court discharges its duty may vary depending upon the circumstances of the case.  "AEDPA does not require a federal habeas court to adopt any one methodology" for applying § 2254(d).  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).  Such a

---

[41]  *See also*, *Murray v. Carrier*, 477 U.S. 478, 500 (1986) ("'The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.'") (*quoting Harris v. Nelson*, 394 U.S. 286, 290-291 (1969)); *Harris*, 394 U.S. at 292 ("There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law.").

limitation on federal courts' vigilance and independence would violate the separation of powers doctrine. *See infra*.

Like any Supreme Court case, *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388 (2011), decided the questions on which certiorari was granted. *Glover v. United States*, 531 U.S. 198, 205 (2001) ("As a general rule . . . we do not decide issues outside the questions presented by the petition for certiorari."); Sup. Ct. R. 14.1(a). The Court in *Pinholster*

> granted certiorari to resolve two questions. First, whether review under [28 U.S.C.] § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court. Second, whether the Court of Appeals properly granted Pinholster habeas relief on his claim of penalty-phase ineffective assistance of counsel.
> 131 S. Ct. at 1398.

In addressing the first question – review under § 2254(d)(1) generally – the Court observed that § 2254(d)(1) is one of "several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Ibid.* Review under § 2254(d)(1), or "§ 2254(d)(1) review," is distinct from the question presented by § 2254(a), which is whether the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." *Ibid.*[42] This distinction is written into the structure of § 2254, including the prerequisite for the application of § 2254(d), that the state court adjudicated the claim on the merits. Where that prerequisite is absent, the federal court conducts review *de novo*. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("our review is not circumscribed by a state court conclusion

---

[42]   *See also  Danforth v. Minnesota*, 552 U.S. 264, 270 (2008) (discussing distinction between violations of constitutional rights and redressibility of such violations in habeas cases); *Panetti*, *supra*, 551 U.S. at 953 (when "requirement set forth in § 2254(d)(1) is satisfied … federal court must then resolve the claim without the deference AEDPA otherwise requires"); *Gonzalez v. Crosby*, 545 U.S. 524, 532 n.4 (2005) (defining "merits" decision in habeas case as "determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. §§ 2254(a) and (d)"); 28 U.S.C. §§ 2241(c), 2243, cl. 1.

with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins*) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the Strickland claim de novo.") (internal citation omitted). *Cf. Wiggins*, 539 U.S. at 527-28, 531 (holding state court's determination of fact was unreasonable and that Court "therefore must determine, de novo" what the facts were).

In answer to this first question, *Pinholster* "h[eld] that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. at 1398. The statute's "backward-looking language requires an examination of the state-court decision at the time it was made." *Id.* "[R]eview under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399.

When a federal habeas court is called upon to apply § 2254(d)(1), *Pinholster* held, the court's examination of the reasonableness of the state court's adjudication must be based on the facts that were before the state court. *Id.* at 1399. Where a claim presents mixed questions of law and fact, such as a claim under *Strickland v. Washington*, 466 U.S. 668, 698 (1984), the Court held, as it had eleven years earlier, under § 2254(d)(1), if the state court decision identifies the correct governing legal principle in effect at the time of its decision, the federal court must ask whether the state court unreasonably applied that principle to the facts of the prisoner's case. *Id.*, 131 S. Ct. at 1399, *citing (Terry) Williams v. Taylor*, 529 U.S. 362, 413 (2000). But what constitutes the factual record that was before the state court?

In answering that question, *Pinholster* followed a long line of cases in which the Court examined state post-conviction cases in order to inform the federal habeas court's understanding

of what the state court knew and did.    Regarding summary review of claims, *Pinholster* observed,

> It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, *People v. Duvall*, 9 Cal.4th 464, 474, 37 Cal.Rptr.2d 259, 886 P.2d 1252, 1258 (1995), and will also "review the record of the trial ... to assess the merits of the petitioner's claims," [*In re*] *Clark*, *supra*, [5 Cal.4th 750] at 770, 21 Cal.Rptr.2d 509, 855 P.2d, at 742 [1993].
> 131 S. Ct. at 1402 n.12.

The Court surmised that in a habeas case, the factual record against which the reasonableness of the state court's adjudication is judged includes the allegations of the state habeas petition, its exhibits, and the record on appeal. *Pinholster*, at 1402 n.12. As discussed more *infra*, the Supreme Court did not have occasion to decide whether the state court in question [in *Pinholster*, the California Supreme Court] may have based its decision on an unreasonable determination of the facts.

That is the extent of *Pinholster*'s holding regarding the application of § 2254(d)(1). Once this Court has conducted the requisite "thorough review of the state court record," 131 S. Ct. at 1402, it must apply *either* the contrary-to standard, or the objective standard of reasonableness the Court adopted in *Terry Williams*, or both.[43] *Id.* at 1399; *see also Terry Williams*, 529 U.S. at 404-05 ("2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court" and lower court "properly accorded both the 'contrary to' and 'unreasonable application' clauses independent meaning"). The Court in *Pinholster* did not have occasion to apply § 2254(d)(1)'s contrary-to

---

[43]    *See also Cavazos v. Smith*, 565 U.S. ___, 132 S. Ct. 2 (2011) (*per curiam*) (observing that federal habeas relief is available "only if the state court decision was 'objectively unreasonable'") (quoting *Renico v. Lett*, 599 U.S. ___, 130 S. Ct. 1855, 1862 (2010)).

clause, which the statute lists in the disjunctive.  This case does require consideration of that clause.

In order for a state court's decision to be contrary to law it "must be substantially different from the precedent of [the Supreme] Court."  *Terry Williams*, 529 U.S. at 405.  Where a "state court applies a rule that contradicts the governing law," its decision "will certainly be contrary to . . . clearly established precedent."  *Id.*  "A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."  *Id.* at 406.

*Terry Williams* held the Virginia Supreme Court's reliance upon *Lockhart v. Fretwell*, 506 U. S 364 (1993), as one among other reasons to reject an ineffective-assistance claim, was "both contrary to and involving an unreasonable application of the standard set forth in *Strickland*."  *Panetti*, 551 U.S. at 953.  In *Terry Williams* the state court's decision was both contrary to and involved an unreasonable application of *Strickland* insofar as it was informed by the "erroneous view that a 'mere' difference in outcome is not sufficient to establish constitutionally ineffective assistance of counsel."  *Williams*, 529 U.S. at 397; *id.* at 413 (O'Connor, J., concurring).

The "contrary to" clause applies when a state court's decision relied to any extent on a legal standard that substantially differs from the clearly established Supreme Court precedent governing the petitioner's claim.  In *Terry Williams*, Justice O'Connor, the author of the standard for applying § 2254(d)(1), rejected the dissent's argument that the Virginia Supreme Court cited the correct legal standard for determining prejudice.  The majority observed, "It is impossible to determine . . . the extent to which the Virginia Supreme Court's error with respect to its reading

of *Lockhart* affected its ultimate finding that Williams suffered no prejudice." 529 U.S. at 414. It nevertheless held AEDPA was satisfied. *Id.*

That federal habeas review of claims previously adjudicated on the merits in state court involves the sort of two-tiered analysis described above – as opposed to a more superficial "reasonableness" examination suggested by terms like "deference" or "standard of review" – is confirmed by the Supreme Court's decisions granting relief in cases governed by § 2254(d). For example, in both *Rompilla* and *Wiggins*, *supra*, the Court first undertook its own detailed review of the merits of the petitioners' contentions that their trial counsel were ineffective for failing to adequately investigate, *Rompilla*, 545 U.S. at 381-387; *Wiggins*, 539 U.S. at 519-527, and then performed a careful analysis of the ways in which the state courts' decisions rejecting the petitioners' claims were based on an "unreasonable determination of the facts," and involved an "unreasonable application of" federal law. *Rompilla*, 545 U.S. at 389-390; *Wiggins*, 539 U.S. at 527-534. The Court took the same approach in *Miller-El v. Dretke*, 545 U.S. 231 (2005), again conducting a painstaking evaluation of the merits of the petitioner's claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), before further concluding that the state court's rejection of that claim was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding," such that federal habeas relief was appropriate. The Court used the same framework in *Porter v. McCollum*, 558 U.S. ___, 130 S. Ct. 447 (2009) – first conducting a careful review of the mitigating evidence Porter claimed his trial counsel ineffectively failed to uncover and present during the penalty phase of his capital trial, before then determining that the state court's decision that Porter suffered no prejudice was an unreasonable application of federal law.

This Petition follows the Supreme Court's model.   Whether a federal claim was well-pleaded to the state court is itself a federal question, which this Court must answer.  *See*, *e.g.*, *Carter v. Texas*, 177 U.S. 442, 447 (1900) ("[T]he question whether a right or privilege, claimed under the Constitution or laws of the United States was distinctly and sufficiently pleaded and brought to the notice of a state court, is itself a Federal question, in the decision of which this court, on writ of error, is not concluded by the view taken by the highest court of the state."); *Staub v. City of Baxley*, 355 U.S. 313, 318 (1958) ("'Whether a pleading sets up a sufficient right of action or defense, grounded on the Constitution or laws of the United States, is necessarily a question of federal law and, where a case coming from a state court presents that question, this court must determine for itself the sufficiency of the allegations displaying the right or defense, and is not concluded by the view taken of them by the state court.'") (quoting *First National Bank of Guthrie Center v. Anderson*, 269 U.S. 341, 346 (1926)).[44]

### 2.  Review of a State Court's Decision under § 2254(d)(2)

#### a.  Scope of the Factual Record

*Pinholster* concluded that the record a federal court may consider for purposes of § 2254(d)(1) review is limited to the factual record that was before the state court.  In reaching the conclusion that § 2254(d)(1) review is backward-looking, the Court drew on § 2254(d)(2)'s express prescription for the reasonableness determination to be made "'in light of the evidence presented in the State court proceedings.'"  131 S. Ct. at 1400 n.7 (quoting § 2254(d)(2)).  That explicit reference to the state-court record supported the inference that § 2254(d)(1)'s reasonableness determination also should be based on the evidence presented in state court.

---

[44]   *See also Davis v. Wechsler*, 263 U.S. 22, 24 (1923); *Schuylkill Trust Co. v. Pennsylvania*, 296 U.S. 113, 122-123 (1935); *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938).

Thus, in general, the statute limits review of the reasonableness of a state-court factual determination to "the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Section 2254(d)'s backward-looking language extends the principle underlying the exhaustion doctrine. What matters for purposes of exhaustion is what the petitioner presented and not what the state court did or did not do with a claim. *Smith v. Digmon*, 434 U.S. 332 (1978); *Dye v. Hofbauer*, 546 U.S. 1, 3 (2005). Similarly, the allegations and supporting documents presented in state court are what matters for purposes of the evidentiary record in § 2254(d)(2) review and not the status of item as "evidence." As long as factual matter introduced in federal court was part of the "evidence presented" in state court, this Court may consider it in its review under § 2254(d)(2).

### b. Application of § 2254(d)(2) in this Case

There are several circumstances in which a state court's factual determination will be held unreasonable. Federal habeas courts first conduct "intrinsic review of a state court's processes" for determining the facts. *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004). A challenge to the intrinsic reasonableness of a state court's factual determination

> may be based on the claim that the finding is unsupported by sufficient evidence, *see*, *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2538–39, 156 L.Ed.2d 471 (2003); *Ward v. Sternes*, 334 F.3d 696, 705-08 (7th Cir. 2003), that the process employed by the state court is defective, *see*, *e.g.*, *Nunes v. Mueller*, 350 F.3d 1045, 1055–56 (9th Cir. 2003); *Valdez v. Cockrell*, 274 F.3d 941, 961–68 (5th Cir. 2001) (Dennis, J., dissenting), or that no finding was made by the state court at all, see, e.g., *Weaver v. Thompson*, 197 F.3d 359, 363 (9th Cir. 1999); *cf.* *Wiggins*, 123 S.Ct. at 2539–41.

*Taylor v. Maddox,* at 999. As with review under § 2254(d)(1), this review "must be particularly deferential to . . . state-court colleagues" such that the federal court "must be satisfied that any

appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id*. at 1000; *cf. Pinholster*, 131 S. Ct. at 1399.

> [A]s the Supreme Court pointed out in *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), "Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable." *Id.* at 340, 123 S. Ct. 1029.   Indeed, the Supreme Court, our court and other circuits have all found the standard met. *See Wiggins*, 123 S.Ct. at 2538–39.

*Taylor* at 1000.

Just as there is no single way to conduct review under § 2254(d)(1), *Lockyer*, *supra*, 538 U.S. at 71,

> intrinsic challenges to state-court findings pursuant to the 'unreasonable determination' standard come in several flavors, each presenting its own peculiar set of considerations.   No doubt the simplest is the situation where the state court should have made a finding of fact but neglected to do so.   In that situation, the state-court factual determination is perforce unreasonable and there is nothing to which the presumption of correctness can attach.   *See, e.g.*, *Wiggins*, 123 S.Ct. at 2539–40; *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002); *Weaver*, 197 F.3d at 363; *Nunes*, 350 F.3d at 1055.   A somewhat different set of considerations applies where the state court does make factual findings, but does so under a misapprehension as to the correct legal standard.   *See, e.g.*, *Caliendo v. Warden*, 2004 WL 720362, at *6 (9th Cir. Apr.5, 2004); *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002); *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000). Obviously, where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it.
>
>   Closely related to cases where the state courts make factual findings infected by substantive legal error are those where the fact-finding process itself is defective. If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an "unreasonable determination" of the facts.   *See, e.g.*, *Weaver*, 197 F.3d at 363;  *Nunes*, 350 F.3d at 1055; *cf. Bryan v. Mullin*, 335 F.3d 1207, 1215–16 (10th Cir.2003) (declining to apply presumption where state court

failed to hold an evidentiary hearing).[45]  *But see Valdez*, 274 F.3d at 948–50 (sections 2254(d)(2) and (e)(1) apply despite defects in the state-court hearing). Similarly, where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable.  *See, e.g.*, *Wiggins*, 123 S.Ct. at 2538–39; *Hall [v. Comm. Corrections]*, 343 F.3d [976,] 983.  And, as the Supreme Court noted in *Miller–El*, the state-court fact-finding process is undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim.  *Miller–El*, 537 U.S. at 346, 123 S. Ct. 1029 ("Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony demonstrating that the Dallas County District Attorney's Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past."); *accord Collins v. Rice*, 365 F.3d 667, 685 (9th Cir. 2004).

*Taylor*, 1000-01.

As with review under § 2254(d)(1), review under § 2254(d)(2) must be based upon what the state court knew and did, and that assessment must be made in accordance with state law. Absent evidence of arbitrary or discriminatory action, federal habeas courts are bound by state supreme court decisions on state law, *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975), and must presume state court judges follow state procedural law in reaching their decisions, *Black v. Romano*, 471 U.S. 606, 615 (1985).

Had the CCA assumed the truth of any of Petitioner's allegations, that would constitute a "factual determination," and that determination would be entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1); *Burger v. Zant*, 498 U.S. 433, 436 (1991) (*per curiam*) (state court findings favorable to petitioner and adverse to State presumed correct).  However, as

---

[45]   A hearing was held here only on the specific issues the State requested.  As discussed herein, petitioner requested a hearing on additional issues of controverted issues of material fact, but this was denied.

shown herein, the CCA adopted only the State's proposed findings and conclusions, and adopted none of Petitioner's.

### C. State Court Holdings.

### 1. Introduction.

"Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision." *Richter*, 131 S. Ct. at 786.  In order to follow *Pinholster*'s prescription that "review under § 2254(d)(1) focus[] on what the state court knew and did," 131 S. Ct. at 1399, it is necessary to examine the state law that governed the decision under review in this case. *Pinholster* at 1402 n.12.  Review under § 2254(d)(1) also requires the federal court to examine what "arguments or theories...could have supported the state court's decision." *Richter,* 131 S. Ct. at 786.

In view of these issues, this Petition presents substantial, strong evidence that the CCA either applied legal standards that are contrary to clearly established federal law, unreasonably applied the correct legal standards, or either did not resolve factual disputes or did so in ways the Supreme Court and Fifth Circuit have held are unreasonable. Mr. Coble also requests discovery and an evidentiary hearing so that he may complete the available evidence and present it.

### 2. 2254(d) and ineffective assistance of counsel claims.

Where the U.S. Supreme Court has reviewed ineffective-assistance allegations for facial sufficiency, it has found viable claims on far less a showing than Mr. Coble made as to many of the claims discussed in this Petition.  For example, in *Kimmelman v. Morrison*, 477 U.S. 365 (1986), the court found facially sufficient evidence of deficient performance on the basis of the trial record.  It showed defense counsel learned during trial that a bed sheet had been seized from the defendant's apartment without a search warrant.  477 U.S. at 368-69.  Trial counsel had not

moved to suppress the sheet within the time prescribed by state law because he "had never asked for *any* discovery," although he had been on notice earlier that the sheet had been seized and tested in a laboratory.  *Id.* at 369 (emphasis in original).  The Supreme Court found the record showed trial counsel's performance was "unreasonable, that is, contrary to prevailing professional norms."  *Id.* at 385. The Court found the record "adequate for our application of *Strickland*'s competency standard," but "incomplete with respect to prejudice." *Id.* at 390.  The record was sufficient to indicate the seizure of the sheet was illegal but the Court held the State was "entitled to an opportunity to establish that [the] search came within one of the exceptions . . . to the Fourth Amendment's prohibition against warrant less searches."  *Id.* at 390-91.  The Court remanded the case back to federal court for further proceedings on the prejudice question.  *Id.* at 390.  In doing so the court noted

> [the habeas petitioner] may be unable to show that absent the evidence concerning the bed sheet there is a reasonable probability that the trial judge would have had a reasonable doubt as to his guilt.  If [the habeas petitioner] could not make this showing, a matter on which we express no view, there would of course be no need to hold an evidentiary hearing on his Fourth Amendment claim.

*Id.* at 387.

In *Padilla v. Kentucky*, 559 U.S. ___, 130 S. Ct. 1473 (2010), the Supreme Court held that defense counsel's failure provide accurate advise about the risk a conviction would carry for him to be deported was facially sufficient evidence of deficient performance.[46]  Padilla, a lawful permanent resident charged with drug-related offenses accepted a plea bargain after his attorney

---

[46]   The Supreme Court has repeatedly relied upon its own recent decisions applying *Strickland* when assessing whether an earlier state court decision satisfied § 2254(d).  *See*, *e.g.*, *Porter v. McCollum*, 558 U.S. ___, 130 S. Ct. 447, 452-53 (2009) (citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000), and *Wiggins v. Smith*, 539 U.S. 510, 524 (2003));  *Bobby v. Van Hook*, 558 U.S. ___, 130 S. Ct. 13, 17 (2009) (*per curiam*) (citing *Wiggins*); *id.* at 18 (citing *Williams*, 529 U.S. at 395; *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (citing *Wiggins*).

advised him that he would not be deported because he had been in the United States for a long time. *Id.*, 130 S. Ct. at 1478. In fact the plea made deportation "virtually mandatory." *Ibid*. In state post-conviction proceedings, Padilla claimed he would have insisted on going to trial if he had known the truth. *Ibid.* The state court summarily, but with explanation, held Padilla failed to state a claim under the performance prong of *Strickland* because defense counsel had no duty to advise him about what it considered a collateral consequence of conviction. *Ibid.*; *id.* 130 S. Ct. at 1481. The Supreme Court granted certiorari "to decide whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country." *Id.* at 1479. It held that *Strickland* applied, *id.* at 1482, and that Padilla's counsel's performance had been unreasonable under prevailing professional norms. *Id.* at 1482-83.

Apart from a discussion of immigration law, the Court's reasoning was straightforward. It did not matter whether deportation was a collateral consequence of conviction, what mattered were (1) the ABA Standards and those of other treatises and bar organizations, *id.* at 1482-83; (2) the importance to Padilla of what he faced, *id.* at 1483; and (3) that the law was clear that Padilla would face some consequences to his immigration status, *id.* at 1483. Based on that alone, the Court held:

> Accepting his allegations as true, Padilla has sufficiently alleged constitutional deficiency to satisfy the first prong of *Strickland*. Whether Padilla is entitled to relief on his claim will depend on whether he can satisfy *Strickland*'s second prong, prejudice, a matter we leave to the Kentucky courts to consider in the first instance.

*Id.* at 1483-84. *See also id.* at 1486-87 ("Taking as true the basis for his motion for postconviction relief, we have *little difficulty* concluding that Padilla has sufficiently alleged that

his counsel was constitutionally deficient.  Whether Padilla is entitled to relief will depend on whether he can demonstrate prejudice as a result thereof, a question we do not reach because it was not passed on below.") (emphasis added).

In *Terry Williams*, *supra*, the Court illustrated the meaning of § 2254(d)(1)'s "contrary to" clause with the example of a state court "reject[ing] a prisoner's claim of ineffective assistance counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different," as opposed to *Strickland*'s reasonable-probability standard.  529 U.S. at 405-06.

**3.Application of State-law standards to federal claims.**

§ 2254(d) applies only to claims that were adjudicated on the merits, that is, their merits under the applicable *federal* law.  *Pinholster*, 131 S. Ct. at 1399-1400 (distinguishing case where federal claims was procedurally defaulted such that § 2254(d) did not apply); *Richter*, 131 S. Ct. at 784.  As the Supreme Court recently restated,

> When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  *Cf. Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  [¶]  The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely.  *See, e.g.*, *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

*Richter*, 131 S. Ct. at 785-86.  All of Mr. Coble's state habeas claims were presented as federal constitutional claims. Mr. Coble has presented herein evidence to show that the state court's denial of his claims was based on the application of state-law presumptions apart from, or in addition to, federal law.

**D. Constitutional and Equitable Issues Related to the Application of§2254(d)**

**1. Constitutional Questions.**

**A.  AEDPA's Origin and Aftermath**.

The AEDPA statute's meaning and application continues to confound courts.   The Supreme Court has found that "in a world of silk purses and pigs' ears, the Act is not a silk purse of the art of statutory drafting."  *Lindh v. Murphy*, 521 U.S. 320, 335 (1997).

The partisan opportunism that gave birth to AEDPA helps explain why a statute that attempts to constrain both the constitutionally protected writ of habeas corpus and the independence of federal judges  has led to what scholars have described  as "chaos,"[47] an "intellectual disaster area,"[48] "a charade,"[49] and "so unworkable and perverse that reformers should feel no hesitation about scrapping large chunks of it."[50]  One of AEDPA's chief sponsors declared that under it "things have gotten worse, not better."[51]

The Supreme Court repeatedly has had to "resist[] an interpretation of the statute that would produce troublesome results, create procedural anomalies, and close our doors to a class of habeas petitioners seeking review without any clear indication that such was Congress' intent."  *Panetti*, 551 U.S. at 946 (internal quotation marks and citations omitted).   While it is

---

[47]  Larry W. Yackle, *State Convicts and Federal Courts: Reopening the Habeas Corpus Debate*, 91 Cornell L. Rev. 541, 542, 553 (2006).

[48]  Yackle, 91 Cornell  L. Rev. at 553 (quoting Larry W. Yackle, *The Figure in the Carpet*, 78 Tex. L. Rev. 1731, 1756 (2000)).

[49]  Joseph L. Hoffmann & Nancy J. King, *Rethinking the Federal Role in State Criminal Justice,* 84 N.Y.U. L. Rev. 791, 816 (2009).

[50]  Andrew Hammel, *Diabolical Federalism: A Functional Critique and Proposed Reconstruction of Death Penalty Federal Habeas*, 39 Am. Crim. L. Rev. 1, 42 (2002).

[51]  Marcia Coyle, *Congress Looks at More Limits on Habeas*, Nat'l L.J., July 25, 2005, at 18 (quoting Sen. Jon Kyl R-AZ)).

settled that a court should not recognize the progenitors of a bill as authorities on the meaning of an act, *Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*, 130 S. Ct. 1396, 1408-09 & n.17 (2010) (refusing to consider letter by statute's drafters purporting to clarify statute's meaning), AEDPA's origins explain the need to exercise care in applying the act to avoid perverse, inequitable or unconstitutional results.[52]

### B.  Avoiding an Unconstitutional Interpretation.

The Supreme Court interprets § 2254(d) in the context of other provisions of § 2254 and the habeas corpus law that preceded AEDPA.  *Pinholster*, 131 S. Ct. at 1399-1400; *Michael Williams*, 529 U.S. at 432-33; *Terry Williams*, 529 U.S. at 408-12; *Felker v. Turpin*, 518 U.S. 651, 658-61 (1996).  By doing so, the Court finds § 2254(d) represents "Congress' intent to channel prisoners' claims first to the state courts."  *Pinholster*, 131 S. Ct. at 1398-99.  Section 2254(d), like most other modifications of federal habeas law that date from the 1970s forward, is animated by concerns over comity, finality and federalism.  *Id.* at 1401 (citing earlier cases).

The concern over comity was most dramatically expressed by Justice Jackson in his concurring opinion in *Brown v. Allen*, 344 U.S. 443, 536-40 (1953).  More commonly, comity has been described as an effort to avoid results that "would be unseemly in our dual system of government" because the state courts did not first have the opportunity to correct alleged errors. *Duckworth v. Serrano*, 454 U.S. 1, 4 (1981).  Concern over comity was not to be found in the

---

[52]  *See*, *e.g.*, *Holland v. Florida*, 560 U.S. ___, 130 S. Ct. 2549, 2568 (2010) (Alito, J., concurring) (rejecting State's "perverse" argument that petitioner should have been heard only through attorney who abandoned him); *Panetti*, *supra*, 551 U.S. at 943 (quoting *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998), for proposition that State's interpretation of § 2244(b) would lead to "'far reaching and seemingly perverse'" result of executing incompetent inmate because he could not raise unripe claim); *cf.* Brief of California Attorney General as *amicus curiae* in *Martinez-Villareal*, 1997 WL 744599 (arguing Congress properly withdrew federal courts' jurisdiction to prevent wrongful execution of incompetent person).

habeas statutes that existed from 1867 through 1965. Yet it gained sway over the express Congressional intent that federal courts ensure that no one is in state custody pursuant to a judgment that violated the Constitution, *Fay v. Noia*, 372 U.S. 391, 424 (1963), when the Court began to rely on the Supremacy Clause's demand that federal law be supreme in state courts. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 259 (1973) (Powell, J., concurring) ("It is the sworn duty of these [state] courts, no less than federal ones, to safeguard personal liberties and consider federal claims in accord with federal law."). Therein lies a tension between the political or diplomatic concern over federal-state relations and the equally real concern that state courts do not always respect federal law. *Cf. Walker v. Martin*, 131 S. Ct. 1120, 1130 (state rule that is applied so as to discriminate against federal claims will not be applied to bar federal habeas review).

Before AEDPA, the Supreme Court endeavored to bring these two poles closer together by respecting state procedural rules, *Wainwright v. Sykes*, 433 U.S. 72 (1977), preventing novel constitutional rules of criminal procedure from upsetting state court judgments that became final before their expression, *Teague v. Lane*, 489 U.S. 288 (1992), and ratcheting up the exhaustion requirement, *Rose v. Lundy*, 455 U.S. 509 (1982). That the Court recognized the tension between constitutional-rights enforcement and friendly relations with state courts can be seen in *Rose*'s express desire that "state courts may become increasingly familiar with and hospitable toward federal constitutional issues." *Rose*, 455 U.S. at 519, citing *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490-91 (1973). It can also be seen in the Supreme Court's insistence that federal habeas courts not defer to state court decisions concerning federal law or on mixed questions of law and fact. *See*, *e.g.*, *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Against this historical backdrop it is easy to see how the interpretation and

application of § 2254(d) to individual cases pushes the limits of the Supremacy Clause and Congress's power to control the decisions of federal courts on matters of constitutional law.  *See O'Brien v. Dubois*, 145 F.3d 16, 21 (3rd Cir. 1998); *Terry Williams*, 529 U.S. at 387 n.13 (Stevens, J., concurring).

It is a historical fact that pique, racism, and local chauvinism have motivated state courts (and sometimes federal courts) to use local practice or belief to frustrate efforts to enforce federal constitutional rights.  Examples abound in the Supreme Court's habeas jurisprudence, including cases applying AEDPA, and in the development of other federal civil rights laws.  *See*, *e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) (overturning AEDPA § 2254(d) decision based on so-called "Texas nexus" requirement for mitigation which had "no foundation in the decisions of this Court"); *Tennard v. Dretke*, 542 U.S. 274, 284 (2007) (same); *Smith v. Texas*, 550 U.S. 297 (2007) (reviewing Texas death sentence for second time because state court applied procedural bar after Supreme Court held petitioner was entitled to relief on merits in *Smith v. Texas*, 543 U.S. 37 (2004)); *Miller-el v. Dretke*, 545 U.S. 231 (2005) (overturning AEDPA § 2254(d) decision that failed to account for racial discrimination in jury selection and that had adopted dissenting opinion from *Miller-el v. Cockrell*, 537 U.S. 322 (2003)); *Ford v. Georgia*, 489 U.S. 411 (1991) (overturning state court decision that applied procedural bar to claim raised under *Batson v. Kentucky*, 476 U.S. 79 (1991), where procedural rule had not existed previously); *James v. Kentucky*, 466 U.S. 341 (1984) (rejecting application of state procedural rule that placed form over substance of petitioner's federal law claim based on *Carter v. Kentucky*, 450 U.S. 288 (1981)); *Henry v. Mississippi*, 379 U.S. 443, 448-49 (1965) (rejecting state procedural bar to federal claim where application of bar served no legitimate state interest); *Barr v. City of Columbia*, 378 U.S. 146 (1964) (rejecting apparently discriminatory application

-115-

of state procedural rule to defeat federal claim); *Wright v. Georgia*, 373 U.S. 284, 290-91 (1963) (same); *Staub v. City of Baxley*, 355 U.S. 313 (1958) (same) ; *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) (rejecting application of state procedural rule applied in manner to frustrate review of federal claim).  Recognizing that these things happen, the Supreme Court announced a rule that "the assertion of Federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice."  *Davis v. Wechsler*, 263 U.S. 22, 24 (1923).

In order for § 2254(d) to be constitutional as applied to a state court's judgments, the state courts to which AEDPA channels the presentation of federal constitutional claims must be worthy of the presumption that they hold federal law supreme.  As to many claims, Mr. Coble demonstrates that the decision in several claims in his case was based on state law presumptions and interpretations that are inconsistent with the federal law governing his claims.  Were this Court to defer to the CCA's rulings on federal claims on state habeas review, § 2254(d) would be unconstitutional as so applied.

When interpreting or imposing habeas reforms, the Supreme Court has frequently noted the costs associated with habeas review, with some justices going so far as to say there is no social benefit to federal courts acting as a safeguard against States' failure to give defendants fair trials.  *E.g.*, *Teague*, *supra*, 489 U.S. at 389-90; *Mackey v. United States*, 401 U.S. 667, 691 (1971) (Harlan, J., concurring in judgment in part and dissenting in part).  These cases reflect the concern that the "relitigation" of claims in federal court "'must inevitably lead to the impairment of the public confidence in our judicial institutions.'"  *Brown v. Allen*, 344 U.S. 443, 539 n.13 (1953) (Jackson, J., concurring) (quoting Conference of Chief Justices-1952, 25 State Government, No. 11, p. 249 (Nov. 1952)).

-116-

Empirical evidence challenges the Supreme Court's assumptions about the costs and benefits of federal habeas review. Researchers have found that public confidence in the judicial system is *enhanced* by review mechanisms.  *See*, *e.g.*, Tom R. Tyler, *Why People Obey the Law* (Princeton U. Press 2006); Tom R. Tyler, *Procedural Justice, Legitimacy, and the Effective Rule of Law*, 30 Crime & Just. 283 (2003); Tom R. Tyler and Yuen J. Huo, *Trust in the Law: Encouraging Public Cooperation with the Police and Courts* (Russell Sage Foundation 1992). The evidence will show that "the procedural justice of experience determines its impact on views about the legitimacy of authority."  *Why People Obey the Law* 172.  In the present context this means, contrary to the Supreme Court's assumptions, it is the fullness and fairness of the process, not the results,  that determines people's confidence in the judicial system.  *Trust in the Law* 5, *id.* at 93 ("courts can encourage a more favorable orientation towards the law by exercising procedural fairness");  Tom Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231, 240 (2008).  Courts lose legitimacy when they do not provide fair mechanisms for reviewing decisions and correcting incorrect or unfair results.  *Why People Obey the Law* 119.  Where state courts in particular do a poor job of considering people's rights through full and fair procedures, confidence in them goes down.  *Trust in the Law* 192-95.

Specifically, confidence and legitimacy are harmed when courts do not appear to listen to claims, are not respectful of them, are not transparent, when they do not subject themselves to review by others, and when they do not follow their own rules.  *Trust in the Law* 53-57. Consistency – the like treatment of similarly situated people – also weighs heavily in people's perception of judicial legitimacy.  *Why People Obey the Law* 119.  Studies conducted by these

scientists find that when judicial procedures lack these qualities, people become less willing to cooperate in the legal process and even become less likely to obey the law themselves.[53]

*Pinholster*'s holding that 2254(d) review must look back at what the state court knew and did illustrates how AEDPA codified the model for federal habeas review championed by Professor Paul Bator.  The principle that federal habeas review should not be available where state courts afforded prisoners a full and fair process for hearing and adjudicating federal claims was set forth in his article, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441 (1963), which has been influential, although also a source of controversy.[54]

---

[53]  As the chief critics of the literature cited here have said,

> Tyler has argued persuasively that law's legitimacy (or at least a perception of it) is critical to a well-functioning criminal justice system and to public safety more generally.  Specifically, effective crime control depends on volitional deference to substantive law and to its enforcement and adjudication. And, significantly, perceptions of procedural fairness may well facilitate such deference.  *The importance of the legitimacy project cannot, therefore, be oversold.*

Josh Bowers & Paul H. Robinson, *Perceptions of Fairness and Justice:  The Shared Aims and Occasional Conflicts of Legitimacy and Moral Credibility* 4, U. Penn. Pub. L. & Legal Theory Research Paper No. 11-13, available at http://ssrn.com/abstract=1814006 (emphasis added).

[54]  *See*, *e.g.*, *Danforth v. Minnesota*, 552 U.S. 264, 272 n.6 (2008) (citing Bator as explanation for habeas jurisprudence development since the mid-Twentieth Century); *Calderon v. Thompson*, 523 U.S. 538, 555 (1998) (quoting Bator on importance of finality); *Custis v. United States*, 511 U.S. 485, 509 (1994) (Souter, J., dissenting) (citing Bator as evidence that majority,  led by Rehnquist, C.J., lost its way); *Wright v. West*, 505 U.S. 277, 285-86 & n.3 (1992) (opn. Thomas, J.) (citing Bator in dispute with Justice O'Connor); *McCleskey v. Zant*, 499 U.S. 467, 478 (1991) (citing Bator on history of federal habeas expansion during and after Reconstruction); Id. at 492 (citing Bator on philosophical justification for prizing finality); *id.* at 518 (Marshall, J., dissenting) (contrasting Majority's view of Bator with Justice Frankfurter's objection that Court "'under the guise of fashioning a procedural rule . . . wipe out the practical efficacy of a jurisdiction conferred by Congress on the District Courts'") (quoting *Brown v. Allen*, 344 U.S. at 498-99 (opn. Frankfurter, J.) (alterations omitted); *Fay v. Noia*, 372 U.S. 391, 421 n.30 (1963); *id.* at 449 n.1 (Harlan, J., dissenting).

Professor Bator observed that the Constitution itself requires that federal habeas courts in certain circumstances be available not only to review, but effectively correct, violations of law that were inadequately reviewed in state court.

> It is, after all, the essence of the responsibility of the states under the due process clause to furnish a criminal defendant with a full and fair opportunity to make his defense and litigate his case: the state must provide a reasoned method of inquiry into relevant questions of fact and law (including, of course, all federal issues applicable to the case). If a state, then, fails in fact to do so, the due process clause itself demands that its conclusions of fact or law should not be respected: the prisoner's detention can be seen as unlawful, not because error was made as to a substantive federal question fairly litigated by the state tribunals, but because the totality of state procedures did not furnish the prisoner with a fair chance to litigate his case.

Bator, *Finality*, 76 Harv. L. Rev. at 456-57.  Even under the most conservative view of federal habeas review,  a "state appellate court's perfunctory treatment of the [federal] question . . . amounting to nothing more than reliance on the presumptive validity of the trial, was not in fact acceptable corrective process and federal habeas would therefore lie to consider the merits of the claim." *Fay v. Noia*, 372 U.S. 391, 457-58 (1963) (Harlan, J., dissenting).  AEDPA manifestly does not require a petitioner to prove his due process rights were violated before federal courts do not have to defer to a state-court adjudication and § 2254(d) must be distinguished from § 2254(b)(1)(B) which waives the exhaustion requirement where there is no effective state corrective process.  Rather, § 2254(d) requires petitioners to show the process was either contrary to law or unreasonable.

Where Congress wanted to limit federal habeas corpus review to correcting unconstitutional interference with a state prisoner's ability to raise a claim, it did so by mentioning the Constitution.  *E.g.*, 28 U.S.C. §§ 2244(d)(1)(B), 2264(a)(1).  The Supreme Court has held (a) that AEDPA's provisions must be read in relation to each other, *e.g.*, *Pinholster*, 131

S. Ct. at 1399-1400, and (b) that the exclusion of language from one section of AEDPA that is included elsewhere in the Act reflects an intention that the language not be applied out of context, *e.g.*, *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1996).  *See also Pinholster*, 131 S. Ct. at 1400 n.7 ("omission of clarifying language from § 2254(d)(1) just as likely reflects Congress' belief that such language was unnecessary as it does anything else").  Courts interpreting other provisions of the federal habeas statute that reflect the process model have held their language does not require petitioners to show a due process violation before the state court process will be deemed inadequate for purposes of exhaustion.  *Jackson v. Duckworth*, 112 F.3d 878, 881 (7th Cir.), *cert. denied*, 522 U.S. 955 (1997) (interpreting 28 U.S.C. § 2254(b)(1)(B)); *see also Young v. Ragen*, 337 U.S. 235, 238-39 (1949); *Harris v. Champion*, 15 F.3d 1538, 1554-57 (10th Cir. 1994); *Hollis v. Davis*, 941 F.2d 1471, 1473-75 (11th Cir. 1991), *cert. denied*, 503 U.S. 938 (1992); *Hawkins v. Fulcomer*, 941 F.2d 246, 250 (3d Cir. 1991); *Brooks v. Jones*. 875 F.2d 30, 31-32 (2d Cir. 1989).  Applying these holdings to the meaning of "unreasonable" in § 2254(d), indicates that a state court's process of adjudicating a claim need not rise to the level of due process violation or be completely ineffectual before a federal court will move on to conduct de novo review of a claim.

However, Bator's criteria provide some insight into what is necessary for a reasonable adjudication of a federal constitutional claim.  "[T]he state must provide a reasoned method of inquiry into relevant questions of fact and law (including, of course, all federal issues applicable to the case)."  As reflected in *Pinholster* and elaborated more fully *infra*, the summary disposition to which many of Mr. Coble's habeas claims were subjected as a result of the trial court signing off verbatim on prosecutor-prepared pleadings, findings and conclusions, without changing so much as a comma, was  a limited method of inquiry in which there was no, or very

-120-

little, judicial inquiry into either the facts or the law, either by the trial court or ultimately by the CCA.

The Supremacy Clause, U.S. Const. art. VI, places limits on the power of States to impose rules that frustrate the enforcement of federal law in the state courts. *Brown v. Western Ry. of Alabama*, 338 U.S. 294 (1950).  The circumstances of *Brown* are similar to the circumstances of this case.  In *Brown*, the Georgia courts sustained a general demurrer to a claim raised under the Federal Employers' Liability Act on grounds that the complaint "failed to set forth a cause of action and is otherwise insufficient in law."  338 U.S. at 295 (internal quotation marks omitted).  The state court reached its conclusion "by following a Georgia rule of practice to construe pleading allegations 'most strongly against the pleader.'"  *Ibid.*

Where state law requires federal constitutional claims to be raised in a particular proceeding, as is the case here,

> Strict local rules of pleading cannot be used to impose unnecessary burdens upon rights of recovery authorized by federal laws.  "Whatever springs the State may set for those who are endeavoring to assert rights that the State confers, the assertion of Federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice."  *Davis v. Wechsler*, 263 U.S. [22,] 24.  *Cf. Maty v. Grasselli Chemical Co.*, 303 U.S. 197, 58 S.Ct. 507, 82 L.Ed. 745.  Should this Court fail to protect federally created rights from dismissal because of over-exacting local requirements for meticulous pleadings, desirable uniformity in adjudication of federally created rights could not be achieved.

*Brown*, 338 U.S. at 298-99.[55]

In short, § 2254(d) must be interpreted to be consistent with the principle that federal rights may not be frustrated, burdened, limited or precluded by state procedural rules.  *See, e.g.*,

_____

[55]  *See also Ward v. Love County*, 253 U.S. 17, 22 (1920) ("if nonfederal grounds, plainly untenable, may be . . . put forward successfully, our power to review easily may be avoided" which "cannot be disregarded without neglecting or renouncing a jurisdiction conferred by law and designed to protect and maintain the supremacy of the Constitution and the laws made in pursuance thereof.")

*Felder*, 487 U.S. at 141 ("States may not apply such an outcome-determinative law when entertaining substantive federal rights in their courts").  State courts purporting to competently adjudicate a federal claim must adhere to the procedural obligations that accompany that federal claim.

Whether a federal claim was well-pleaded to the state court or procedurally defaulted is itself a federal question, which this Court must answer.  *See*, *e.g.*, *Carter v. Texas*, 177 U.S. 442, 447 (1900) ("question whether a right or privilege, claimed under the Constitution or laws of the United States was distinctly and sufficiently pleaded and brought to the notice of a state court, is itself a Federal question, in the decision of which this court, on writ of error, is not concluded by the view taken by the highest court of the state"); *Staub*, *supra*, 355 U.S. at 318 ("'Whether a pleading sets up a sufficient right of action or defense, grounded on the Constitution or laws of the United States, is necessarily a question of federal law and, where a case coming from a state court presents that question, this court must determine for itself the sufficiency of the allegations displaying the right or defense, and is not concluded by the view taken of them by the state court.'") (quoting *First National Bank of Guthrie Center v. Anderson*, 269 U.S. 341, 346 (1926)).[56]

An interpretation of § 2254(d) that required federal courts to defer to novel state-court rules for applying the Constitution also would render the Act an unconstitutional encroachment upon the Judicial Power of Article III of the Constitution.  "Interpretation of the law and the Constitution is the primary mission of the [federal] judiciary when it acts within the sphere of its authority to resolve a case or controversy.  *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60

---

[56]  *See also*, *Davis v. Wechsler*, *supra*, 263 U.S. at 24; *Schuylkill Trust Co. v. Pennsylvania*, 296 U.S. 113, 122-123 (1935); *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938)

(1803) ('It is emphatically the province and the duty of the judicial department to say what the law is')." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545 (2001).  "Congress cannot wrest the law from the Constitution which is its source. 'Those then who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.'" *Legal Services Corp.*, 531 U.S. at 545, quoting *Marbury*, 1 Cranch at 178.

The power granted under Article III to decide "all cases, in law and equity, arising under this Constitution," is the power "to inquire not only whether the right was denied in express terms, but also whether it was denied in substance and effect, as by putting forward non-federal grounds for decision that were without any fair or substantial support." *Ward v. Love County*, 253 U.S. 17, 22 (1920).  Article III gives federal courts the power "not merely to rule on cases, but to *decide* them," which means that the "'judicial Power' is one to render dispositive judgments." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218-19 (1995).  As then-judge Kennedy put it, "If the essential, constitutional role is to be maintained, there must be both the appearance and the reality of control by Article III judges over the interpretation, declaration, and *application* of federal law." *Pacemaker Diagnostic Clinic of America, Inc. v. Instro-Medix*, 725 F.2d 537, 544 (9th Cir.) (*en banc*), *cert. denied*, 469 U.S. 824 (1984) (emphasis added). Accordingly, Congress "cannot . . . indirectly control the *action* of the courts[] by requiring of them a construction of the law according to its own view," *Plaut*, 514 U.S. at 218 (emphasis added), and may not directly control the action of courts "by setting aside their judgments" or directing changed outcomes. *Id.*, 514 U.S. at 225.  To the extent § 2254(d) is read to require a federal court to act as though no constitutional violation occurred in the view of the federal court, the provision violates Article III and the separation-of-powers doctrine.

For analogous reasons, an interpretation of § 2254(d) that required uncritical deference to the CCA's rulings in this case would violate the Suspension Clause of Article I, § 9, cl. 2. In *Boumediene v. Bush*, 553 U.S. 723, 128 S. Ct. 2229 (2008), the Court struck down a provision of the Military Commissions Act of 2006 on grounds that it denied petitioners access to the habeas *remedy* without providing "a constitutionally sufficient replacement for habeas corpus." 553 U.S. at 792. The Court "h[eld] that when the judicial power to issue habeas corpus is properly invoked the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release." *Id.* at 787.

Were § 2254(d) interpreted to prohibit this Court from ordering a new trial in this case, AEDPA would "effect an unconstitutional suspension of the writ." *Id.* at 787. However, because, the state court process and holdings were both contrary to and an unreasonable application of the clearly established law governing Mr. Coble's claims, this Court need not hold the statute unconstitutional. Consistent with *Boumediene*, this Court must provide a forum for *de novo* consideration of Mr. Coble's federal constitutional claims.

### 2. Grounds to question the fair-mindedness of the State courts.

Mr. Coble has demonstrated in his discussion of the individual claims that his state habeas petition presented a *prima facie* case, at least, for violations, among others, of the Sixth Amendment right to effective assistance of counsel under *Strickland*. Where the facts were disputed, the State often relied upon information of dubious providence, *e.g.*, the lead trial attorney's post-hoc rationalizations for his failure to investigate prior to trial, file motions for change of venue and recusal of the prosecutor, etc. The record and arguments set forth *supra* present all the grounds necessary for this Court to find § 2254(d) satisfied.

Proper respect for the federal Constitution and the legitimacy of federal habeas courts similarly calls upon this Court to consider evidence that may rebut the presumption of fairminded state adjudication.  The decision-making process of verbatim adoption of the State's pleadings, together with the accompanying arguments and exhibits form convergent lines of proof to rebut the presumption that the trial court and the CCA reviewed Mr. Coble's claims with a fair mind.

## IV. CLAIMS FOR RELIEF

**CLAIM ONE:  DUE TO PERVASIVE AND EXTREMELY PREJUDICIAL PRE-TRIAL AND TRIAL PUBLICITY, MR. COBLE'S TRIAL WAS CONDUCTED IN AN ATMOSPHERE THAT RENDERED IT INHERENTLY UNFAIR.**

Mr. Coble's sentence is invalid because he was deprived of his constitutional right to effective assistance of counsel, due process of law, equal protection of the laws, cross-examination and confrontation,  and a reliable sentence due to the fact that his trial was conducted in an inherently unfair venue.   U.S. Const. Art. VI, Amends. V, VI, VIII, XIV; International Covenant on Civil and Political Rights, Art. XIV and comparable provisions of the Texas Constitution.

Due to extensive media coverage of the events surrounding the murders, Mr. Coble's trial was conducted in an atmosphere calculated to deprive him of any chance of fairness, due to the extensive exposure of the jurors to that publicity. The pre-trial and trial coverage of the murders was both inflammatory and prejudicial, and could only have had the effect of depriving Petitioner of due process of law.

**A. Facts Presented to the State Courts.**

This claim was presented as Claim One in Petitioner's state habeas application.

**i) Juror knowledge of the case and exposure to pre-trial publicity.**

Eighty jurors submitted juror questionnaires in this case.  They are contained in five volumes of  the Clerk's Record, VII CR through XI CR, with sixteen questionnaires per volume. Because of the tremendous newspaper publicity and talk about the case in the community, many prospective jurors had already made up their minds as to Mr. Coble's punishment.

-126-

Of the 80 prospective jurors who submitted questionnaires, and from whom the ultimate jurors were chosen, most of them, 43 of 80, had heard of the case.[57]  (VII CR through XI CR.) Of these 43 who had heard of the case, most of them, 29 of the 43, had either made up their minds already or thought that "maybe" they had or were uncertain ("don't know").[58]  Of these 29, most of them, 17 of 29, had made up their minds for certain as to punishment.  17 had already made up their minds.  (VII CR through XI CR.)  Thus, a full 53.5% had heard of the case or admitted to hearing about the case; 36.25% had been influenced by what they had heard; and a full 21.25% of the panel had been so biased by the publicity and talk that they had already made up their minds as to punishment.  The prejudice to Mr. Coble extended to his actual jury.  Of those who sat, a full one-half, or 6 jurors, had heard of the case beforehand.[59]

Had the case been tried in a venue other than Waco, the jury panel would not have been tainted as this one was, as the crime concerned the local community of Waco and McLennan County.  There could have been no valid strategic reason for the defense attorneys' failure to file a motion for change of venue, given the intense community feeling and animosity against Mr. Coble.[60]  Local taxpayers in Waco would have been upset about the costs of the trial; local connections to the family of the victims were present; local feelings about the killing of a local

---

[57]   VII CR, 7 of 16; VIII CR, 9 of 16; IX CR 6 of 16; X CR 9 of 16; and XI CR 11 of 16; one juror, Mr. Lindsey did not answer on his questionnaire about his knowledge of the case (VII CR at 1261) but it was later ascertained at voir dire that he had heard of it. (7 RR 64.)

[58]   Thus, of the 43 prospective jurors who had heard of the case, only 14 checked "no" when asked if they had decided on the punishment they would most likely assess.

[59]   Jurors Marsha Money, Charles Lindsey, Antonio Saenz, Thomas Sperlingas, Brenda Rhodes and Leslee Huggins had heard of the case.

[60]   A change of venue motion was filed prior to Mr. Coble's first trial in 1990.  *See, e.g.,* 4 RR 8 (reference to motion for change of venue at first trial).

law-enforcement officer were present; a prominent local judge made highly inflammatory comments; and the fact that one of Mr. Coble's victims actually worked for the McLennan County District Attorney's Office as a criminal prosecutor all meant that a fair trial was impossible in Waco.

The defense attorneys themselves seemed to acknowledge this fact before trial, but inexplicably they failed to file the motion. Prior to trial, the defense stated they were unsure about a motion for a change of venue "which was argued at the first trial." (4 RR 8.) Despite the defense's "understanding that there continue to be letters to the editor that are angry from people in the community," counsel concluded that "I'm not certain that a Motion for a Change of Venue would be appropriate at this time." (4 RR 8.) No reason was given for the conjecture that it might not be "appropriate," given the attorney's acknowledgment of the hostile and prejudicial local community's feelings.

The lead defense attorney, in their questioning of juror Marsha Money, inadvertently admitted that their failure to file for a change of venue needlessly prejudiced their client:

> Q. [by Mr. Hunt]: Now, it certainly is not the case that we can get rid of everybody who lived in Waco in 1989 when this occurred because they might have heard of the case. That...that wouldn't be appropriate.
> A. Uh-huh.
> Q. But folks who have heard of the case and have made up their mind on what happened, folks who are close to some of the parties that were involved, folks that although they would like to try to put that all aside and decide only on the facts without putting their personal, uh...leanings into their decision making, might not be the appropriate juror in the case.
> (7 RR 181-182.)

Thus, the defense attorney felt it was not "appropriate" to file a change of venue motion; it was not "appropriate" to "get rid of" all potential jurors who lived in Waco in 1989 and had heard of the case; and also not "appropriate" for those who had heard of the case and were

"leaning" in their decision-making to sit on the jury. Of course, this dilemma would not have existed had a motion for a change of venue been filed and granted.

Just a small sample of the questionnaires and *voir dire* confirms the widespread knowledge of the case and the resulting bias. Venireperson Kevin Corley had heard about the case from "just about every source of, you know, radio, television, newspaper, talked about it, people you work with..." (9 RR 125.) He knew the Vicha family, people talked favorably about them, and conversation about the case has "picked up recently...in the past year....Since all this stuff started here." (9 RR 126.) Based on this, he had formed an opinion that Mr. Coble should receive the death penalty and he had "heard enough and [was] ready to vote" even before the trial had started. (9 RR 129.) Based on this, Mr. Corley was challenged for cause by the defense. (9 RR 131.)

Venireperson Carolyn Jackson lived in Axtell, the small community where the murders took place, knew the Vichas personally in the past, was familiar with the Vicha family, had an opinion on the case "based on rumors in Axtell. (11 RR 10-12.) Venireperson Phillip John Whitley had heard of the case through word of mouth and television (11 RR 17) and he was excused because he had pre-judged the case. (11 RR 21.) The prosecutor Mr. Segrest admitted that "I think most everyone has heard about this case. Television, newspaper, word of mouth." (11 RR 26.)

Venireperson Joe Bradley Hestilow had heard of the case through televison, newspaper and word of mouth and "was in the area" when it occurred and commented that "it's pretty well known." (11 RR 26.) Based on this publicity, Mr. Hestilow may have formed an opinion about the correct outcome in the case. (11 RR 27.) Based on this information, it would have been hard for him to change his mind. (11 RR 32.) He thought "the outcome [the death penalty] was

correct...I think the outcome of the first trial was correct" and "proper" and he agreed with the original death sentence. (11 RR 31-32, 34, 56-57, 58.)   Asked repeatedly about this, Mr. Hestilow stated that he thought the first jury's decision was absolutely correct.  (11 RR 62.)  He also stated that erring on the wrong side would be in not finding death, as "the wrong side is changing what's already been decided..." (11 RR 63.)

Frances Menefee had heard of the case through local radio, television, newspaper and word of mouth, knew Karen Vicha and all three of the Vicha victims and had formed an opinion of the case based on what she had heard or read.  (X CR 1706, 1717.)  Based on the local publicity, she felt this "was an unforgivable crime.  Even if I don't know all facts, no excuse to kill 3 people" and she had "already made up mind." (X CR 1715-1716.)  She added that she "feel[s] it is wrong to keep going to trail [sic] decision should be upheld as sentenced." (X CR 1716.)

Venireperson Margaret Louise Davis had heard of the case through local radio, television, newspaper and based on this media publicity had formed an opinion on the punishment she would most likely assess. (X CR 1718.)   Venireperson Toni Riley had heard of the case from local radio, television, and newspaper and this media exposure had made her decide on a punishment. She had heard of the Vichas. (X CR 1754.)

It is clear that this widespread knowledge and bias would not have existed had the trial been moved and the jury picked from a pool not exposed to the media circus surrounding this case.

**ii) The newspaper coverage**

The news coverage of the events leading up to Mr. Coble's 2008 re-trial was so pervasive and prejudicial that a fair trial was impossible in Waco or McLennan County. Due to the large

number of prominent stories on the case, the coverage of the Waco Tribune-Herald was undoubtedly the main source of the jurors' knowledge of the case.  This paper, according to the Audit Bureau of Circulation, in 2009 had a circulation of 32,294 on weekdays and a Sunday circulation of 37,990.[61]   In 2000, McLennan County had a total of 78,859 households, and in 2007 it had 91,908 "housing units" which indicated that the paper was received by more than 40 per cent of the households in the county.[62]   This roughly corresponds to the one-half of Mr. Coble's jury that had heard of the case.  Throughout the long history of this case, due to the prominence of the victims, the paper has given the Coble case extensive and prominent coverage. In 2008, the year of the re-trial, there were no less than 22 newspaper articles on the Coble case, and 61 television stories.[63]   These were even more articles than ran in 1989, the year of Mr. Coble's first trial, when there were 18 articles.[64]   In addition, six additional articles ran in 2007, when the 5th Circuit Court of Appeals granted the penalty phase re-trial.[65]   In these stories the newspaper gave prominence to the strong feelings of the victim's family and local law enforcement figures.   However, the most inflammatory, strongest and most prejudicial statements of all were repeatedly given by a local currently-sitting state district court judge, adding fuel to the fire.

---

[61]   *See* Exhibit 4, Audit Bureau of Circulation figures for Waco Tribune-Herald.

[62]   *See* Exhibit 5, Demographic and Crime Statistics for McLennan County, at 2.

[63]   *See* Exhibit 6, "Coble Media" summary.

[64]   *Id.*

[65]   *Id.*

On September 7, 2000**,** the Waco Tribune-Herald published a prominent story entitled "*Federal judge dismisses convicted killer's appeal*" by Tommy Witherspoon.[66] In that story, the McLennan County District Attorney, John Segrest, the principal prosecutor at Mr. Coble's 2008 penalty phase re-trial, was quoted as saying

> Personally, I cannot think of anyone more deserving of the ultimate punishment, and I look forward to carrying this thing to its just conclusion...I hope that under the findings made by Judge Smith that will be within the next six to 12 months."[67]

Also commenting in this same article was sitting Waco district court judge Ralph Strother,[68] the principal prosecutor at Mr. Coble's 1990 trial:

> This guy really does deserve it...That was really just an inexplicable crime, and he bragged about it.  After he wrecked out and was lying in the hospital, he bragged about how he had killed all those people.  Justice is one step closer.[69]

On April 4, 2001, the Waco Tribune-Herald published a letter entitled "*Glorifying killers*" from Vicha family relatives stating that "[o]ur family continues to wait for justice that

---

[66]   *See* Exhibit 6, Waco Tribune-Herald articles on the case, at 1.

[67]   *Id.*

[68]   Texas Code of Judicial Conduct Canon 3(B)(10) states that "[a] judge shall abstain from public comment about a pending or impending proceeding which may come before the judge's probable decision on any particular case."   As Judge Strother was Coble's initial prosecutor, the case was unlikely to come before him.  However, the Texas Disciplinary Rules of Professional Conduct states that "a lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding."  Rule 3.07(a) ("Trial Publicity").  Texas Disciplinary Rules of Professional Conduct Rule 3.07(b) states that "[a] lawyer ordinarily will violate paragraph (a), and the likelihood of a violation increases if the adjudication is ongoing or imminent, by making an extrajudicial statement of the type referred to in that paragraph when the statement refers to (1) the character, credibility, reputation or criminal record of a party...(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration..."

[69]   *See* Exhibit 6 at 2.

was decreed by the courts in 1990...Please remember Sgt. John Robert "Bobby" Vicha and Robert and Zelda Vicha by supporting the death penalty in Texas."[70]

On July 19, 2005, the same paper published an article by Tommy Witherspoon entitled "*Circuit court rejects killer Coble's appeal.*"[71]  District Attorney Segrest again commented that "This case was tried way back before I took office by (former district attorney) Paul Gartner and we have been working ever since to get it through the appellate process...This is just another of the hurdles that we had to cross before justice can be attained."

Judge Ralph Strother again publically aired his personal views on the case: "It's high time...He confessed in the hospital to a number of people what he had done.  There wasn't any question of him doing it.  It was just a cold-blooded execution of three innocent people.  They didn't get their day in court and he had his."[72]

On March 24, 2006, the same paper ran an article entitled "*Execution date set for triple murderer*" by Tommy Witherspoon.[73]  An execution date had been set for Mr. Coble, despite the fact that his case was still pending in the Fifth Circuit.  Waco District Court Judge Ralph Strother was again quoted similarly to his statement in the previous article:  "It's high time...He confessed in the hospital to a number of people what he had done.  There wasn't any question of him doing it.  It was just a cold-blooded execution of three innocent people.  They didn't get their day in court and he had his."[74]

---

[70]   *See* Exhibit 6 at 3.

[71]   *See* Exhibit 6 at 4.

[72]   *Id.* at 4-5.

[73]   *Id.* at 6.

[74]   *Id.* at 7.

On April 15, 2006, the Waco Tribune-Herald published a long article entitled "*Murdered officer's son is now a prosecutor*" by Tommy Witherspoon.[75]  The article informed local readers that J.R. Vicha, the son of victim Bobby Vicha and the grandson of victims Robert and Zelda Vicha, was starting work "as an assistant to McLennan County District Attorney John Segrest."[76]  Apparently aware of the conflict of interest, Mr. Segrest stated that "it was pure coincidence that Judge George Allen set Coble's execution date on March 23, three weeks before Vicha started work in the district attorney's office."[77]

On July 1, 2006, in an article entitled *"Stay of execution granted for convicted triple murderer"*, by Tommy Witherspoon, Judge Ralph Strother, once again sharing his views publically, was quoted as being too angry to comment, "saying '[a]nything that I would say right now would be unprintable.'"[78]

The Waco Tribune-Herald, on August 15, 2007, printed a lengthy front-page article entitled "*Court overturns Billie Wayne Coble's death sentence*" by Tommy Witherspoon.[79]  The first paragraph read:

> A year after the 5th U.S. Circuit Court of Appeals granted a stay of execution for Billie Wayne Coble and 18 years after he reportedly bragged about killing three people in Axtell, the New Orleans-based court has overturned Coble's death sentence and awarded him a new trial."[80]

---

[75]  *Id.* at 10.

[76]  *Id.*

[77]  *Id.*

[78]  *Id.* at 17.

[79]  *Id.* at 18-21.

[80]  *Id.* at 18.

Judge Ralph Strother of the 19th District Court once again eagerly seized the opportunity to share with the Waco public his personal opinions on this case, which was, as he knew, now set to be re-tried in Waco in the very same courthouse where his courtroom was located:

> 'I am just appalled and shocked and stunned and sickened at the busting of a death penalty case on these types of technicalities,'   Strother said. 'I defy anyone to fully understand what they are saying.  It makes no legal sense, no moral sense.'
> 'It is just clear that they didn't want to impose the death penalty in this case.  They are substituting their judgment for that of the jury and engaging in fanciful might-have-beens or what the jury might have done when the jury clearly had the facts before them and made the decision based on those facts,' he said...
> 'Here you have this vermin who snuffed out three innocent lives like they were nothing more than a candle, and now he may get to live the rest of his natural life,' Strother said.[81]

The same article quoted Ted Vicha, brother of victim Robert Vicha, as saying

> 'When someone brags about killing three people, how in the world can anybody take pity on him' Ted Vicha said. 'This don't make sense one cotton-pickin' bit.  I don't understand.  We have been waiting 18 years, and it's costing taxpayers all this for nothing when he should have been buzzard bait a long time ago.'[82]

On November 21, 2007, the same paper published a letter from a Jenny Dorsey, which stated, referring to Mr. Coble, "he deserves more than a needle."[83]  On November 26, 2007, the paper published another letter from a Donna M. Myers:

> My lunch sandwich stuck in my throat as I read Tommy Witherspoon's article [Nov. 14] on Billie Wayne Coble.
> My hands shook so badly I could hardly hold the newspaper.
> Coble is being taken from Death Row, where he has resided for 17 years on my tax dollars, and is being brought back to McLennan County because of a technicality?
> His rights were violated during the sentencing phase of his trial after being found guilty of the cold-blooded murder of three people?
> No crime of passion, no self-defense, a well thought-out plan.  He went to Axtell to murder the Vicha family.  The scales of justice are not just broken.  They have ceased to exist.

---

[81]   *Id.* at 19.

[82]   *Id.* at 20.

[83]   *Id.* at 29.

-135-

Maybe Judge Smith [sic] should take a trip to the Axtell cemetery.  He might revist his decision.
My opinion about the death penalty always vacillated until I had the great privilege of becoming friends with the Vichas.
Now I have no doubt that the first sentence was legitimate.[84]

On June 30, 2008, the Waco Tribune-Herald published a letter from a Dennis Cogliatti,

who wrote, "A new murder trial is set Aug. 4 for Billie Wayne Coble.  What a waste of the

court's time....The family has to deal with the fact that Coble is eating on the county's dollar.

Enough is enough.  Give Coble the needle."[85]

On July 11, 2008, shortly before the start of the trial, the Waco Tribune-Herald published

an article entitled "*Coble attorneys question fairness,*" by Tommy Witherspoon, which

highlighted J.R. Vicha's role as both victim and prosecutor:

> Coble, 59, was convicted of capital murder and sentenced to death in 1990 in Waco in the August 1989 shooting deaths of his estranged wife's parents, Robert and Zelda Vicha, and her brother, Waco police Sgt. Bobby Vicha, at their Axtell homes.
> Bobby Vicha was J.R. Vicha's father.  Coble tied up J.R. Vicha, who was 11 at the time, and his cousins before he kidnapped his wife, Karen Vicha Coble, after killing her parents and brother.
> Segrest said his office has built a 'Chinese wall' a barrier within the organization between Vicha and his office during its preparation for Coble's retrial.  Segrest said there is no conflict of interest for his office to retry Coble.
> 'There has been no motion presented, so there is really not an issue to address,' Segrest said.[86]

Once the trial commended, the publicity became even more frequent.  On August 3, 2008,

the Waco paper printed a letter from a David Calvert, who wrote,

> "Enough is enough.  The face of a cold-blooded killer is back on our front page [Coble]
> Two local lawyers (I have better names for them that the Trib won't print) are assisting

---

[84]   *Id.* at 30.

[85]   *Id.* at 36.

[86]   *Id.* at 37.

him.   New proceedings are given Coble at taxpayer expense.   I cannot accept an explanation that the attorney is 'just doing my job.'   When Coble was convicted, no 'life in prison without parole' possibility existed.   So he will be eligible for parole after 20 years, which is approximately two years from now.   Are we in line for another Kenneth McDuff?[87]

On August 6, 2008, the intense publicity continued with an article in the Waco Tribune-Herald entitled "*Two jurors selected in Billie Wayne Coble murder trial*" by Tommy Witherspoon.[88]   The article recounted the crime, and stated that "[a] federal appeals court...overturned his punishment, saying special issues jurors answered that resulted in the death penalty were unconstitutional as applied to him."[89]

There was another article in the Waco paper on August 19, 2008 entitled "*Date set for Billie Wayne Coble's capital murder trial*," by Tommy Witherspoon, which continued the coverage of jury selection.[90]   On August 25, 2008, the coverage in the Waco paper continued with an article entitled "*Jury to determine fate of convicted triple-murderer Billie Wayne Coble*" by Tommy Witherspoon.[91]   While the headline alone was prejudicial, the article stated that

> "[t]he trial will be a bit unusual from the standpoint that Coble no longer is afforded the presumption of innocence and the judge will instruct the jury from the start that he is guilty of murdering three people...He went to Axtell looking for his estranged wife, Karen Vicha Coble, and shot and killed her parents in their homes and then her brother after ambushing him in his garage as he came home.   Coble then kidnaped Karen Vicha and tied up her children and their cousin.   He later got into a high-speed chase with

---

[87]   *Id.* at 41.(Kenneth McDuff was a notorious Texas serial killer who was released from death row only to commit additional murders.)

[88]   *Id.* at 42-43.

[89]   *Id.* at 42.

[90]   *Id.* at 44.

[91]   *Id.* at 45-46.

authorities in Bosque County before wrecking his vehicle and injuring himself and his wife."[92]

On August 26, 2008, the Waco paper had a lengthy front-page article entitled "*Witnesses talk of sexual, physical abuse by Coble in murder retrial*", by Tommy Witherspoon.[93]  The article alleged that

> Waco police Sgt. Bobby Vicha warned Billie Wayne Coble to stay away from his sister, Karen, less than a month before Coble ambushed and shot Vicha with his own gun, killed his parents and then kidnapped Karen a second time, a retired police detective testified Monday.
> Prosecutors called seven witnesses Monday, the first day of testimony in Coble's capital murder punishment retrial, including four women who told jurors Coble had improper sexual contact with them when they were in their teens in the 1970s....
> Coble's first wife, Pam Wooley, opened testimony by telling jurors that Coble could be charming, hard-working and pleasant.  However, when things were bad, he turned abrasive, controlling and violent. 'He was dangerous and I think he still is dangerous," she said.[94]

The next day, August 27, 2008, a similar long and detailed article covered the second day of testimony, entitled "*Childhood fears of murder, threats revived in Waco's Billie Wayne Coble retrial*", by Tommy Witherspoon.[95]  Virtually the entire story was extremely prejudicial:

> A few days before he was ambushed and gunned down by Billie Wayne Coble, Waco police Sgt. Bobby Vicha, sensing trouble on the horizon, showed his young son where to find cherished family heirlooms in their home, J.R. Vicha testified Tuesday.

> The testimonies of J.R. Vicha and his three cousins, whom Coble tied up Aug. 29, 1989, during an incident in which he killed Bobby Vicha and his parents, Robert and Zelda Vicha, highlighted second-day testimony in Coble's capital murder punishment retrial.

---

[92]  *Id.* at 45-46.

[93]  *Id.* at 47-49.

[94]  *Id.*

[95]  *Id.* at 50-52.

The emotional stories in which the sisters and their cousin relived the terror Coble put them through that day had many in the crowded 54th State District Court dabbing at tears.

Coble, 59, is on trial for the second time, spending more than 17 years on death row before a federal appeals court left his capital murder conviction intact but overturned his death sentence and ordered a new punishment trial.

Coble, estranged from the girls' mother, Karen Vicha, seemed to be on a mission, the oldest of the girls told jurors. As he restrained them, he rambled about how he was going to teach their mother a lesson and how they would never forgive him for his actions.

Ann Marie Tidmore testified that Coble, who stuck a gun in each of their faces when they got home from school, methodically shackled her and her younger sister with metal toy handcuffs, waited for the younger two children to get home from school, then tied them up, too.

Coble, already twice-divorced after battering his first two wives, had come to try to persuade Karen Vicha, whom he had married the year before, not to divorce him and to dismiss kidnapping charges against him.

Trial testimony from Coble's first trial in 1990 revealed that he first shot and killed Robert Vicha in the kitchen of his home and tied up the children at Karen's home across the street, then killed Bobby Vicha after a struggle at Vicha's house down the road. He went back to Karen Vicha's house to check on the kids, then returned to the elder Vichas' home and killed Zelda Vicha when she got home from work.

After Karen Vicha got home, Coble told her to tell the kids goodbye and kidnapped her for the second time in two months. He was arrested later that night after he wrecked his vehicle in Bosque County after a high-speed chase with officers.

Ann Marie Tidmore, 16 at the time, told of her anguish as she helplessly watched from her bedroom window as her grandmother came home and then heard Coble leave her house.

"I looked out the window and saw my grandmother driving down the road," she said, breaking into tears. "I knew where he was going. I couldn't warn her. I couldn't tell her anything. She just drove up to her house and got shot. I couldn't tell her. That's a terrible feeling."

All three of Karen Vicha's daughters, Ann Marie Tidmore, Tracy Tidmore, who was 14 at the time, and Heather Moss, who was 10, said they still have nightmares about the ordeal.

-139-

"There's not a day that goes by that I don't check my locks on my doors 20 times a day and check the back seat of my car to make sure no one is there," Tracy said. "I have nightmares all the time, and we are talking about 19 years later."

While Coble waited for his estranged wife to come home, he told the children that he probably was going to jail the next day and likely would end up on "America's Most Wanted" television program.

"He said he hated to do what he was doing but he said my mother was selfish and she had to pay for what she had done," Ann Marie said. "He said when you love someone, you will do anything to make them understand, and he wanted her to know what it was like not to have a family."

At one point, Ann Marie and Tracy remembered, Coble told them that he should have "blown you away like I intended to do." He also told them that they should consider him and his mother "deceased," prompting 10-year-old Heather to ask her older sisters the meaning of the word. That's when she figured out the gravity of the situation, Heather told jurors.

J.R. Vicha, then 11, said Coble knelt to speak to him after tying him up. He asked how old he was.

"He said I should be grateful that I got to know my dad for 11 years because that was more time than he got with his father," said J.R. Vicha, now a prosecutor in the McLennan County district attorney's office.

Karen Vicha is expected to testify when prosecution testimony resumes this morning.[96]

The next day, August 28, 2008, the Waco Tribune-Herald printed another lengthy front-page story entitled "*Billie Wayne Coble's ex-wife testifies about the day he kidnapped her and killed her brother and parents*," by Tommy Witherspoon.[97]   This story was again severely prejudicial and showed the hostile mood in the community against Petitioner:

Nineteen years of hatred for her ex-husband came pouring out of the witness stand Wednesday as Karen Vicha lashed out at Billie Wayne Coble for making her and her three daughters relive the horrifying ordeal in which Coble killed her parents and brother and threatened to torture her.

_____

[96]   *Id.*

[97]   *Id.* at 53-55.

Karen Vicha was married to Coble for only 11 months, but she said he inflicted a lifetime of horror and grief on her and her family when he killed her parents, Robert and Zelda Vicha, and brother, Waco police Sgt. Bobby Vicha, at their homes in Axtell in August 1989.

Vicha told jurors in Waco's 54th State District Court that Coble smirked his familiar, "evil" grin at her at times during her two-hour testimony Wednesday morning.

Toward the end of her emotional testimony, she was telling jurors how Coble described to her how he killed her brother after ambushing him in his garage. Then she paused, stared straight at Coble and said, "I hate you for making me go through all of this again with my kids."

Judge Matt Johnson immediately called for a recess and later overruled a motion for mistrial from Coble's attorneys, Russ Hunt Jr. and Alex Calhoun, because of the outburst.

Vicha's three daughters and nephew, Bobby Vicha's son, testified Tuesday that Coble threatened them with a gun, tied them up and told them that they would never see Karen Vicha again. He had already killed Karen Vicha's family and then kidnapped her, pistol-whipped her and cut her face with a knife before wrecking her car in Bosque County when he was spotted by officers there.

Coble, 59, spent 17 years on death row before his death sentence was overturned and he was awarded a new punishment trial because of changes in the special issues posed to jurors when trying to determine whether the death penalty or a life sentence is more appropriate.

McLennan County District Attorney John Segrest and his top assistant, Crawford Long, who have called 20 witnesses since testimony started Monday, intend to call four more witnesses, including two psychiatrists, before resting their case today.

Karen Vicha told jurors she met Coble in high school shortly after he returned from serving in Vietnam and they dated a few times. She ran into him again in 1987 at a dance club and they started dating again. They married in July 1988, and at first, things went well, Karen said.

"To Bill, I was perfect," she said. "I'm not perfect, and I can't be perfect, and it was just strange the way he thought about me."

Coble's first two wives have testified that he controlled, manipulated and beat them until they managed to escape the horrible marriages.

Coble was frantic when Karen told him she wanted out, refusing to leave their house, sleeping in his car in her driveway and stalking her at work and when she went out to bars.

He hid in the trunk of her car in July 1989, crawled into the car through a fold-down back seat and stuck a knife in her ribs one night after she had been out with a friend, she said.

"He said if he couldn't have me, nobody could have me," Karen told jurors. "He said the divorce was all my fault, and I could not treat him that way."

She finally managed to persuade him to let her go, but reported the incident to her brother the following day, she said. Coble was later indicted for kidnapping her.

After the kidnaping, her brother bought her a German shepherd for protection. She said she found the dog dead in her front yard less than a week later.

On the afternoon Coble killed her family, she got home from work and Coble emerged from her bedroom with a gun.

"He said, 'I need to tell you that I've killed your mother and your father and your brother;" Karen said.

Incredulous, she asked for proof, and Coble showed her that he was carrying her brother's Waco police-issued .357-caliber revolver. Still not believing that he had killed her parents, she said Coble took her to the window and showed her that he was now driving her father's red and white pickup truck.

"He said, 'I really hated to do that to your mom, but when I told her what I had done, she just went crazy" she said, quoting Coble.

Coble told her to tell the restrained children goodbye because she wouldn't see them again.

"I didn't want to leave them but realized that the only way that they would be safe would be if I got him away from the house and away from the kids," Karen said.

She told Coble to take her and go, but he hesitated, saying they needed to wait until it got dark. She asked what they would use for money and Coble said he had stolen $1,000 from her mother's bedroom after he killed her.

Coble told her that he was going to torture her for "weeks," she said.

She told the jury Coble said, "You know I am going to have to die for this, but this is something you are going to have to live with forever."[98]

---

[98] *Id.* at 53-55.

-142-

The next day, August 29, 2008, the Waco paper ran an article entitled "*Prosecution rests in Waco's Billie Wayne Coble trial*" by Tommy Witherspoon.[99]   This article again showed the degree of bias against Petitioner in Waco:

> A relative of Billie Wayne Coble stared him down Thursday and called him "evil" before telling jurors that Coble raped her in 1979 when she was 16.
>
> The action prompted one of Coble's attorneys to call for a retrial, a motion 54th State District Judge Matt Johnson overruled.
>
> McLennan County District Attorney John Segrest and his first assistant Crawford Long rested their case against Coble Thursday after calling two psychiatrists, one who accurately predicted in 1964 that Coble's "long-term prognosis does not look good" and another who told jurors that Coble will continue to be dangerous.
>
> Prosecutors called two dozen witnesses in Coble's capital murder sentencing retrial in the August 1989 shooting deaths of his estranged wife's parents, Robert and Zelda Vicha, and her brother, Waco police Sgt. Bobby Vicha.
>
> Defense attorneys Russ Hunt Jr. and Alex Calhoun, who will try to convince jurors that Coble has changed after 17 years on death row and is no longer violent, will call defense witnesses when the trial enters its fifth day this morning.
>
> Coble's death sentence was overturned by a federal appeals court, which left his capital murder conviction intact. Jurors will be asked if Coble killed the Vichas intentionally, whether he constitutes a continuing threat to society and if sufficient mitigating factors exist to make a life prison term more appropriate.
>
> If the jury answers the first two questions yes and the last one no, the 59-year-old Vietnam veteran and former welder will return to death row to await execution. The trial bogged down Thursday afternoon as Calhoun and Hunt, with jurors waiting outside the courtroom, waged a lengthy but unsuccessful attempt to keep Richard E. Coons, an Austin forensic psychiatrist, from testifying that Coble is a sociopath who remains violent. The attorneys challenged the doctor's credentials and ability to predict a future threat.
>
> In earlier testimony, a relative of Coble told jurors that Coble raped her at his house 29 years ago after giving her a job at the Circle Drive-in that he and his first wife managed.

---

[99]   *Id.* at 56-57.

Before she took the witness stand, she was crying. However, she regrouped, stared sternly at Coble, called him evil and shouted an obscenity at him.

She apologized, but later told prosecutors when asked if she still was afraid of Coble that she wanted to come down and kick him. The woman said she initially resisted prosecutors' requests to testify against Coble because she didn't want to think about what he did to her.

"But now, I can get on with my life. This is finally behind me," she said.

In other prosecution testimony, Ralph Hodges, a Dallas psychiatrist with 51 years' experience, said he evaluated Coble when he was 15 and living at the Corsicana State Home.

Hodges read from his May 1964 report, which said that Coble, his brother and sister were all admitted to the home because of "unmanageability." Coble aspired at the time to become a painter, according to the report. He had confessed to the doctor that he committed several burglaries and said he stole ball bearings from bicycles to keep them from working because he never had a bike.

Hodges' report described Coble as paranoid, distant, "deliberately non-smiling" and with low self-esteem. He also exhibited a low opinion of women in general and told the doctor that he beat up a girl in a classroom when she made fun of him.

Coble was diagnosed with a sociopathic personality disturbance and it was noted that his long-term prognosis did not look good, Hodges read from the report.[100]

When the defense began to put on its case, a few newspaper articles did point out the good aspects of Mr. Coble's background and mitigating evidence.[101]   However, by this time the jury had already been chosen and most of the damage had been done.  Due to the prior extremely pervasive and inflammatory publicity, a fair trial for Petitioner was impossible in Waco, even if the Waco newspaper did publish stories covering the mitigating evidence put on at his trial.

---

[100]   *Id.*

[101]   *See, e.g.,* Exhibit 6 at 58-59 ("*Billie Wayne Coble's friendliness, helpfulness touted in court by fellow prisoners*"), Waco Tribune-Herald, August 30, 2008; *Id.* at 60-62, ("*Witnesses talk of Billie Wayne Coble's good qualities, difficult childhood during capital murder punishment retrial,*") Waco Tribune-Herald, September 3, 2008; *Id* at 63 ("*Billie Coble's son recalls happy, bad childhood memories,*") Waco Tribune-Herald September 4, 2008.

### iii.  Hostile trial atmosphere.

As a result of the pre-trial publicity, the notoriety of the case and the strong feelings that the re-trial engendered in the local community, the trial was conducted in an inherently prejudicial atmosphere.  Numerous comments from the gallery both disrupted the trial and showed the hostile attitude in Waco toward Mr. Coble.

1)  During defense cross-examination of Ms. Zuniga, as the defense attorney was taking her through a description of her house, there were comments and chuckling and the spectators who had to be admonished by the judge that they were not to comment on the proceedings.  (20 RR 215.)  There were numerous additional prejudicial incidents from the spectator's gallery which were highly hostile to Mr. Coble.  Their cumulative effect made a fair trial impossible in this highly charged atmosphere.  Had the trial been moved, the atmosphere in the court room would not have been so prejudicial and the outbursts would likely not have occurred.

2) There were media cameras outside the courtroom and the case was on local television.  (20 RR 272.)  There were no less than 61 television stories on the case in 2008.[102]  The media coverage in another county would have been less intense or even non-existent had the trial been moved.

3)  The prosecutor asked Ms. Howard "[s]o what you're saying is you completely misread the man?"  (22 RR 36.)  The transcript indicates "Snickering noises from the audience."  (22 RR 36.)  The defense had to object to "the laughing out in the gallery.  There has been a problem yesterday.  And I think there were some snickers today."  (22 RR 36.)  Instead of admonishing the gallery and threatening them with expulsion, the judge commented, "I realize occasionally things come up that are asked that do get a response just without control.  So I'll ask

---

[102]   *See* Exhibit 6, Coble Media Summary.

that everybody try to maintain some control over your...over your verbal responses."   (22 RR 37.)

Of course, any verbal responses whatsoever were improper, and the Court's statement, far from seeking to minimize or eliminate them seemingly gave them license, as understandable responses. Further, the Court pointed out that "You know, I find that it was spontaneous.  I don't think it was orchestrated." (22 RR 37.)

4) As an example of how invested the local community was in the events surrounding the deaths of the Vichas, the "main road" outside their former residence was re-named "Vicha Road" in their honor. (22 RR 76-77.)   The jury heard this through the trial testimony of Anne Marie Tidmore. (*Id.*)   This sent a very emphatic message to the local jurors who, even if they had no direct knowledge of the murders, would have felt compelled to honor the Vichas by giving Mr. Coble a death sentence, just as the county had honored them by re-naming the road. Had the trial been moved, the prejudicial impact would have been much less or non-existent.

5) Karen Vicha's three daughters, Anne Marie, Tracy and Heather, were all frequently crying on the stand both immediately before and during their testimony.   (*See., e.g.,* 22 RR 72, 98, 105, 107, 113, 114, 117, 153.)   The local jury could not have helped but being affected by this ongoing show of emotion from these three young ladies who had suffered the loss of their loved ones.  In fact, one of the jurors was observed to be crying when they heard the testimony of one of the prosecution's witnesses.[103]    Had the trial been moved to another locale, the three victims would undoubtedly have displayed similar emotions, but it would not have been so prejudicial to Mr. Coble.  Had the trial been conducted in another county, the jury would have not been so invested with their grief nor felt that it was their duty to vindicate it.   It is highly

---

[103]    *See* Exhibit 7, Affidavit of Gordon W. Coble, at 2.

likely that one or more of the local jurors were acquainted with one or more of these young ladies, which would have been much less likely had the trial been held in another county. No information was provided as to where the three ex-wives were now living, nor did the defense inquire, but it is highly likely that one or more of them or their friends, relatives or close acquaintances, were living locally.

### B. What the State Court Held.

This claim was Claim One in Mr. Coble's state habeas petition. This claim was summarily denied by the CCA when they adopted the trial court's findings and conclusions. *Ex parte Coble,* WR-39,707-03 (Tex. Crim. App. Feb. 8, 2012.) Looking to those findings and conclusions, written by the prosecutor and adopted verbatim by the trial court, the State argued that "at no time did Applicant move for a change of venue. He filed no motion, alleged no grounds for moving the case from McLennan County, and submitted no affidavits as required by Art. 31.03, despite the fact that the Court set the matter for several pre-trial hearings at which a motion for change of venue could have been urged...Without a timely motion for change of venue the issue is not preserved for appeal....[the] record shows this claim to be procedurally barred." State's Answer, at 2-3 (Exhibit 27). The State also argued that the claim should have been brought on direct appeal. *Id.* at 3-4. The trial court adopted those arguments verbatim, and in turn they were adopted by the CCA. The claim was denied by the CCA on these grounds as that Court adopted the trial court's findings and conclusions. The CCA also held that this claim was procedurally barred. *Ex parte Billie Wayne Coble,* WR-39,707-03 at 2 (Tex. Crim. App. Feb. 8, 2012). (Exhibit 31.)


### C. Why the State Court Holding Was Objectively Unreasonable Under 2254(d).

### i.  There is no procedural bar to this claim and hence the state court holding was erroneous.

The trial court and the CCA erred in finding this claim to be procedurally barred due to the fact it was not brought on direct appeal.  The State argued that "all the facts necessary to the proper disposition of Appellant's claim are in the trial record" (Exhibit 27, State's Answer at 4) and the trial court and ultimately the CCA adopted that argument.  However, this claim could not have been brought on direct appeal.  As discussed *supra,* the claim relies on numerous extra-record facts and documents.  In the factual summary presented to the state courts, there were four extra-record exhibits which were the factual basis of the claim, Exhibit 4, the circulation figures of the Waco Herald-Tribune, Exhibit 5, demographic and crime statistics for McLennan County, Exhibit 6, the extensive media summary and Waco Herald-Tribune articles on this case, and Exhibit 7, the affidavit of Gordon Coble.  Exhibits 4, 5, and 7 were each referenced once, and Exhibit 6, the main factual basis for the claim, was referenced no less than 39 times in many pages of factual presentation.

Article 11.071 proceedings are the first proceeding designated by Texas for a capitally-sentenced prisoner to adjudicate claims based upon extra-record evidence, *i.e.*, evidence that does not appear in the appellate record.  This claim relies on extra-record exhibits (4 through 7) that could never have been admissible on appeal.  In fact, it is black-letter law in Texas that "*the most basic characteristic of the appellate record is that it is limited to matters before the trial court. An appellate court may not consider such extra-record materials as affidavits attached to appellate briefs.*"  Dix, George E., *Criminal Practice and Procedure (Texas Practice Series)*, West, 3rd. ed. 2011, Sec. 55:48 ("Appellate Record") at p. 116 (emphasis added). *See, e.g., Hartman v. State,* 198 S.W.3d 829, 842-43 (Tex. App.–Corpus Christi 2006, pet.

Stricken)(manual attached to appellate brief not considered because it was not in the record); *Flowers v. State,* 133 S.W.3d 853, 859 (Tex. App.–Beaumont 2004)(court of appeals refused to consider document attached to motion to abate the appeal). Even in the situation when an appellant moves to supplement the appellate record with *his own affidavit,* the appellate courts have responded that since the affidavit was not placed into the record in the trial court, it could not be a proper part of the appellate record. *Bowler v. State,* 822 S.W.2d 334 (Tex. App.–San Antonio 1992, pet. ref'd).

The Texas rules prohibiting extra-record evidence on direct appeal apply equally to motions for a new trial. The Court of Criminal Appeals has held that a trial judge did not err in refusing to permit a defendant to put into the record of a motion for a new trial proceedings a document referred to during trial but never admitted into evidence or offered for that purpose. *Whitaker v. State,* 286 S.W.3d 355, 366 (Tex. Crim. App. 2009). *See also Wright v. State,* 178 S.W.3d 905, 916-17 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd)(DVD of Court TV coverage attached as exhibit to motion for new trial was not part of the record and court of appeals would not consider it); *Amador v. State,* 221 S.W.3d 666, 677 (Tex. Crim. App. 2007)(court of appeals erred by relying on a videotape that was viewed by the trial judge but not introduced into evidence or included in the appellate record); *Jackson v. State,* 139 S.W.3d 7, 21 (Tex. App.–Fort Worth 2004, pet. ref'd)(affidavit submitted in support of a motion for a new trial is not evidence); *Portillo v. State,* 117 S.W.3d 924, 930 n.7 (Tex. App.—Houston [14th Dist.] 2003 (court of appeals could not consider affidavits filed in support of motion to disclose informant where affidavits were never offered into evidence).

Thus, the state court holding, to the extent it held the claim was procedurally barred, was an unreasonable determination of federal law under 2254(d)(1) and of the facts under 2254(d)(2).

As to the 2254(d)(1) component, one may reasonably ask how the violation of Texas procedural rules implicates federal law? The scope of procedural safeguards required by the Due Process Clause is based upon the balancing of several factors. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

> As relevant here those factors include (1) the nature of "the private interest that will be affected," (2) the comparative "risk" of an "erroneous deprivation" of that interest with and without "additional or substitute procedural safeguards," and (3) the nature and magnitude of any countervailing interest in not providing "additional or substitute procedural requirement [s]."

*Turner v. Rogers*, ___ U.S. ___, 131 S. Ct. 2507, 2517-18 (2011) (quoting *Mathews*).  Section 2254(d) cannot be interpreted to require deference to a state court decision rendered in violation of the petitioner's federal right to due process of law. *Wellons v. Hall*, 558 U.S. ___, 130 S. Ct. 727, 730 n.3 (2010) (*per curiam*); *Panetti v. Quarterman*, 551 U.S. 930 (2007); *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998).  It requires only that a state court decision was "unreasonable."  If Congress had intended to require a due process violation before a federal court could decide on a remedy *de novo*, it knew how to write such a requirement.  28 U.S.C. § 2244(d)(1)(B).

In *Panetti* and the case it applied, *Ford v. Wainwright*, 477 U.S. 399 (1986), the Supreme Court held the state courts failed to provide the petitioners due process. For present purposes, the question posed by *Ford* and *Panetti* is whether the CCA afforded Mr. Coble a reasonable process for the adjudication of this claim.  Following *Panetti*, Mr. Coble further narrows the question to whether the procedural default holding was reasonable.  Because the AEDPA is satisfied with less than a showing of a due process violation, if the holding of  procedural default violates the minimum the Due Process Clause requires for the adjudication of a facially sufficient claim of this type, the procedural default rationale for the denial satisfies 2254(d).

Even if this Court were to hold that the claim should have been brought on direct appeal, the failure to do so was the result of ineffective assistance of direct appeal counsel, Claim 19 in this petition and in the State petition.

### ii.  The alternative holding: this claim is not barred for failure to object at trial.

The CCA also apparently adopted the State's reasoning that the claim was also barred for failure of trial counsel to file a motion for change of venue.  The State argued that "at no time did Applicant move for a change of venue.  He filed no motion, alleged no grounds for moving the case from McLennan County, and submitted no affidavits as required by Art. 31.03, despite the fact that the Court set the matter for several pre-trial hearings at which a motion for change of venue could have been urged...Without a timely motion for change of venue the issue is not preserved for appeal....[the] record shows this claim to be procedurally barred."  State's Answer, at 2-3 (Exhibit 27). Even if this Court were to accept this argument, then it was ineffective assistance of counsel for their failure to do so, which is Claim 2 in this petition (and in the State petition.)

### iii. The claim is meritorious and the State courts' holding is erroneous.

As to the merits of the claim, the State first irrelevantly argued that no relief was available for the mere violation of a procedural statute. ("Procedural errors or statutory violations may be reversible error on direct appeal, but are not 'fundamental' or 'constitutional' errors which require relief on a writ of habeas corpus. Violation of a procedural statute, even a mandatory statute, is not cognizable on a writ of habeas corpus."  Answer at 2 (Exhibit 27).  It then argued that the failure to object at trial and to bring the prejudicial situation to the Court's attention mandate denial of the claim. *Id.* at 3-4.  The State also argued that the claim was not meritorious. *Id.*

The State's categorization of this claim as a challenge to a "procedural statute" is puzzling and makes no sense.  This claim implicates fundamental due process concerns.  Pre-trial publicity, *see Sheppard v. Maxwell,* 384 U.S. 333 (1966), may make the trial process inherently unfair and violate due process of law.  "Where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, prejudice is presumed and there is no further duty to establish bias."  *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir. 1980).

The due process clause of the Fourteenth Amendment guarantees the right of state criminal defendants to be tried by an impartial jury.  The Fourteenth Amendment incorporates the essence of the Sixth amendment right to be tried "by a panel of impartial 'indifferent' jurors [whose] verdict must be based upon the evidence developed at the trial."  *Irwin v. Dowd,* 366 U.S. 717 (1961).  As Chief Justice Earl Warren noted in his concurrence in *Estes v. Texas,* 381 U.S. 532, 552 (1965) (Warren, C.J., concurring) due process requires the courts to safeguard against "the intrusion of factors into the trial process that tend to subvert its purpose." *Id.* at 560.  Specifically, the courts must guard against 'the atmosphere in and around the courtroom [becoming] so hostile as to interfere with the trial process, even though...all the forms of trial conformed to the requirements of law..."  *Id.* at 561; *Woods v. Dugger,* 923 F.2d 1454, 1456-57 (11th Cir. 1991).

As the leading case of *Sheppard v. Maxwell, supra,* observed, "legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Sheppard,* at 350, quoting *Bridges v. State of California,* 314 U.S. 252, 271 (1941).  A defendant is entitled to a fair trial "in a public tribunal free of prejudice, passion, excitement, and tyrannical

power." *Id.*   There is the requirement that "the jury's verdict be based on evidence received in

open court, not from outside sources", *Sheppard,* at 351, and the "prejudice from such material

'may indeed be greater' than when it is part of the prosecution's evidence 'for then it is not

tempered by protective procedures'" *Id.,* quoting *Marshall v. United States,* 360 U.S. 310, 313

(1959).   Juror statements "that [they] would not be influenced by the news articles, that [they]

could decide the case only on the evidence of record, and that [they] felt no prejudice against

petitioner as a result of the articles" are not considered dispositive. *Sheppard,* at 351.

In *Estes v. State of Texas,* 381 U.S. 532 (1965), the Supreme Court set aside a conviction

despite the absence of any showing of prejudice.   As the Court said in *Estes:*

> [i]t is true that in most cases involving claims of due process deprivations we
> require a showing of identifiable prejudice to the accused.   Nevertheless, at
> times a procedure employed by the State involves such a probability that
> prejudice will result that it is deemed inherently lacking in due process.
> *Id.,* at 542-43.

The procedure in question in *Estes* was the denial of a change of venue "to a locale away

from where the publicity originated; nor was his jury sequestered." *Sheppard,* at 352-53.

Similarly, *Rideau v. Louisiana*, 373 U.S. 723 (1963) dealt with the trial court's refusal to

grant a change of venue motion.   In *Rideau,* there was a single broadcast of a videotaped

confession.   The Supreme Court held that,

> for anyone who has ever watched television the conclusion cannot be avoided that this
> spectacle, to the tens of thousands of people who saw and heard it, in a very real sense
> was Rideau's trial...Any subsequent court proceedings in a community so pervasively
> exposed to such a spectacle could be but a hollow formality."
> *Rideau,* at 726.

Due process of law, the Court held, "required a trial before a jury drawn from a

community of people who had not seen and  heard" [the interview]. *Id.* at 727, and this same due

process, "preserved for all by our Constitution, commands that no such practice as that disclosed

by this record shall send any accused to his death." *Rideau, id.,* quoting *Chambers v. Florida,* 309 U.S. 227 (1940).

### iv. Bias and prejudice

Normally, a showing of either actual or inherent prejudice is required in order to prevail on a claim of denial of a fair trial. *Holbrook v. Flynn,* 475 U.S. 560 (1986); *Irvin v. Dowd,* 366 U.S. 717 (1961); *Woods v. Dugger,* 923 F.2d 1454, 1457 (11th Cir. 1991). The test for inherent prejudice is "not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Holbrook v. Flynn,* 475 U.S. at 570, quoting *Estelle v. Williams,* 425 U.S. 501 (1976).

But, as *Rideau* held, prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. *Rideau,* 726-27; *see also Sheppard v. Maxwell,* 384 U.S. 333, 352-55 (1966). Under such circumstances, it is not necessary to demonstrate actual bias. *Estes,* 381 U.S. at 542-43; *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir. 1980), *cert. denied,* 451 U.S. 913 (1981). As shown above, the record in Mr. Coble's case shows that the relevant community, McLennan County, was saturated in highly prejudicial and inflammatory publicity that assumed the guilt of Mr. Coble and served to create a hostile atmosphere in which a fair trial was impossible. As shown *supra,* six of his jurors had heard of the case and been exposed to the inflammatory pre-trial publicity. A local judge made highly prejudicial remarks, calling Mr. Coble "vermin" and demanding the death penalty. (Exhibit 6 at 19.) Thus, "prejudice is presumed, and there is no further duty to establish bias. *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir. 1980). Thus, if this Court should hold that a showing of bias is required in Mr. Coble's case, he has easily meet that burden.

**CLAIM TWO: DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO FILE A MOTION FOR CHANGE OF VENUE.**

Mr. Coble's sentence is invalid because he was deprived of his constitutional right to effective assistance of counsel, due process of law, equal protection of the laws, cross-examination and confrontation,  and a reliable sentence due to the failure of trial counsel to file a motion for change of venue.  U.S. Const. Art. VI, Amends. V, VI, VIII, XIV; International Covenant on Civil and Political Rights, Art. XIV and comparable provisions of the Texas Constitution.  As recounted *supra* in Claim I, due to extensive media coverage of the events surrounding the murders, Mr. Coble's trial was conducted in an atmosphere calculated to deprive him of any chance of fairness, due to the extensive exposure of the jurors to that publicity. The pre-trial and trial coverage of the murders was both inflammatory and prejudicial, and could only have had the effect of depriving Petitioner of due process of law. Yet, inexplicitly, counsel failed to file a motion for change of venue.

**A. Facts Presented to the State Courts.**

This claim was presented to the state courts as Claim 2 in Petitioner's state habeas application. Petitioner incorporates herein by reference the facts and argument in support of Claim 1 *supra,* as he did in the state courts.

Prior to trial, the defense was unsure about a motion for a change of venue although such a motion "was argued at the first trial."  (4 RR 8.)  Despite the defense's "understanding that there continue to be letters to the editor that are angry from people in the community" counsel concluded that "I'm not certain that a Motion for a Change of Venue would be appropriate at this time."  (4 RR 8.)  No such motion was ever filed. Nor was any explanation ever given as to why the motion was not "appropriate."

Of particular interest to this claim is the fact that defense counsel actually inadvertently admitted that their failure to file for a change of venue needlessly prejudiced their client.  In their questioning of juror Marsha Money, defense counsel Mr. Hunt stated as follows:

> Q. [by Mr. Hunt]: Now, it certainly is not the case that we can get rid of everybody who lived in Waco in 1989 when this occurred because they might have heard of the case. That...that wouldn't be appropriate.
> A. Uh-huh.
> Q.  But folks who have heard of the case and have made up their mind on what happened, folks who are close to some of the parties that were involved, folks that although they would like to try to put that all aside and decide only on the facts without putting their personal, uh...leanings into their decision making, might not be the appropriate juror in the case.
> 7 RR 181-182.

Of course, this dilemma would not have existed had a motion for a change of venue been filed and granted.

There were plenty of indications that the trial should never have been held in Waco.  As outlined in Claim I, *supra,* of the 80 prospective jurors who submitted questionnaires, and from whom the ultimate jurors were chosen, most of them, 43 of 80,  had heard of the case.[104]  (VII CR through XI CR.) Of these 43 who had heard of the case, most of them,  29 of the 43, had either made up their minds already or thought that "maybe" they had or were uncertain ("don't know").[105]   Of these 29, most of them, 17 of 29, had made up their minds for certain as to punishment.  17 had already made up their minds.  (VII CR through XI CR.)  Thus, a full 53.5% had heard of the case or admitted to hearing about the case; 36.25% had been influenced by what they had heard; and a full 21.25% of the panel had been so biased by the publicity and talk that

---

[104]   VII CR, 7 of 16; VIII CR, 9 of 16; IX CR 6 of 16; X CR 9 of 16; and XI CR 11 of 16; one juror, Mr. Lindsey did not answer on his questionnaire about his knowledge of the case (VII CR at 1261) but it was later ascertained at voir dire that he had heard of it. (7 RR 64.)

[105]   Thus, of the 43 prospective jurors who had heard of the case, only 14 checked "no" when asked if  they had decided on the punishment they would most likely assess.

they had already made up their minds as to punishment.

The extent of the wide-spread knowledge of the case was confirmed at *voir dire*. Venireperson Rebecca Emily Hodde stated on her jury questionnaire that she had heard of the case through "word of mouth." (VII CR 1285.) At *voir dire*, she revealed that virtually everyone else on the jury pool did too:

> Q [by prosecutor Mr. Long]. So, first of all, it says that you have heard some...a little bit about this case. Could you kind of tell us what you've heard?
> A. Just when we came in, *everyone seemed to already know what it was*.
> Q. Uh-huh.
> A. And that...so we talked about that, and having already been convicted and...
> Q. Okay. But outside of that, you don't know really any more specifics?
> (9 RR 135)(emphasis added.)

Thus, the prosecutor, interrupting her in mid-sentence, quickly cut her off from further elaborating on the prejudicial pre-*voir-dire* talk amongst the jurors. This resulted in pre-prejudicing the jury pool against Mr. Coble.

As discussed *supra,* just a small sample of the questionnaires and *voir dire* confirms the widespread knowledge of the case and the resulting bias and prejudice. Venireperson Kevin Corley had heard about the case from "just about every source of, you know, radio, television, newspaper, talked about it, people you work with..." (9 RR 125.) He knew the Vicha family, people talked favorably about them, and conversation about the case has "picked up recently...in the past year....Since all this stuff started here." (9 RR 126.) Based on this, he had formed an opinion that Mr. Coble should receive the death penalty and he had "heard enough and [was] ready to vote" even before the trial had started. (9 RR 129.) Based on this, Mr. Corley was challenged for cause by the defense. (9 RR 131.)

Venireperson Carolyn Jackson lived in Axtell, the small community where the murders took place, knew the Vichas personally in the past, was familiar with the Vicha family, had an

opinion on the case "based on rumors in Axtell.  (11 RR 10-12.)    Venireperson Phillip John Whitley had heard of the case through word of mouth and television (11 RR 17) and he was excused because he had pre-judged the case.  (11 RR 21.)    The prosecutor Mr. Segrest admitted that "I think most everyone has heard about this case.  Television, newspaper, word of mouth." (11 RR 26.)

Venireperson Joe Bradley Hestilow had heard of the case through televison, newspaper and word of mouth and "was in the area" when it occurred and commented that "it's pretty well known."  (11 RR 26.)  Based on this publicity, Mr. Hestilow may have formed an opinion about the correct outcome in the case.  (11 RR 27.)  Based on this information, it would have been hard for him to change his mind.  (11 RR 32.)    He thought "the outcome [the death penalty] was correct...I think the outcome of the first trial was correct" and "proper" and he agreed with the original death sentence. (11 RR 31-32, 34, 56-57, 58.)   Asked repeatedly about this, Mr. Hestilow stated that he thought the first jury's decision was absolutely correct.  (11 RR 62.)  He also stated that erring on the wrong side would be in not finding death, as "the wrong side is changing what's already been decided..." (11 RR 63.)

Frances Menefee had heard of the case through local radio, television, newspaper and word of mouth, knew Karen Vicha and all three of the Vicha victims and had formed an opinion of the case based on what she had heard or read.  (X CR 1706, 1717.)  Based on the local publicity, she felt this "was an unforgivable crime.  Even if I don't know all facts, no excuse to kill 3 people" and she had "already made up mind."  (X CR 1715-1716.)  She added that she "feel[s] it is wrong to keep going to trail [sic] decision should be upheld as sentenced."  (X CR 1716.)

Venireperson Margaret Louise Davis had heard of the case through local radio,

-158-

television, newspaper and based on this media publicity had formed an opinion on the punishment she would most likely assess.  (X CR 1718.)     Venire-person Toni Riley had heard of the case from local radio, television, and newspaper and this media exposure had made her decide on a punishment. She had heard of the Vichas. (X CR 1754.)

As shown above, the publicity in 2008 was even more intense than in 1990 at the time of the first trial.  In 1989, the year of the crime, there were 9 articles, and in 1990, the year of the first trial, there were 18 newspaper articles.[106]  However, in 2007, there were 6 newspaper articles relating to the 5th Circuit's reversal and 22 articles in 2008, the year of the trial.[107]  In addition, the publicity in 2007 and 2008 was more virulent than it was in 1989-1990 due to intense anger over the reversal, as was shown *supra* in the summary of the newspaper articles.

In addition, this belies lead trial counsel Russ Hunt Jr.'s explanation for the failure to file the motion for change of venue.[108]  His "anticipation" that the publicity for the second trial was less than for the first was not borne out, as shown herein.  Nor does the reason make much sense, as much of the publicity had already occurred by the time he was appointed and all of it was very hostile to Mr. Coble.  Second counsel Alexander Calhoun states that "I do not recall the reason why we did not file a motion [for change of venue]...I do recall that a change of venue, while discussed, was not a major issue/concern in the defense."[109]  In any case, there was no valid

---

[106]   *See* Exhibit 6, "Coble Media Summary."

[107]   *See* Exhibit 6, Summary and the actual articles.

[108]   *See* Exhibit 8, Declaration of Tina Church.  Ms. Church relates that Mr. Hunt told her the reason he did not file a motion for change of venue was that "he anticipated less media coverage than the first trial; therefore he felt that it was not necessary."  This had to be related through interviewer Ms. Church because Mr. Hunt has not yet furnished an affidavit at the time of this filing.

[109]   *See* Exhibit 14, Affidavit of Alexander Lee Calhoun at 2.

"strategic reason" for failing to file the motion, as there was no downside for so doing.

**B. What the State Court Held.**

This claim was presented as Claim 2 in the state habeas petition.  It was summarily denied by the CCA when they adopted the trial court's findings and conclusions.  *Ex parte Coble,* No. WR-707-03 (Tex. Crim. App. Feb. 8, 2012.)  Looking to those findings and conclusions, written by the prosecutor and adopted verbatim by the trial court, the State first admitted that the claim "presents controverted, previously unresolved factual issues material to the legality of Appellant's confinement, and [the trial court] should resolve such facts in an appropriate manner set forth in Art. 11.071(9)(a). (State's Answer at 6, Exhibit 27)

The State requested that an evidentiary hearing be held on this claim and the trial court complied.[110]  *See* "Order Designating Controverted Previously Unresolved Factual Issues on Writ of Habeas Corpus in a Death Penalty Case, Exhibit 28, at 3-5.

After the hearing, the State submitted its proposed "Findings of Fact and Conclusions of Law." (Exhibit 29).  These were adopted verbatim by the trial court and ultimately by the CCA. The holding was, in very general terms, that although the motion was not filed, it did not deprive petitioner of a fair trial and "Applicant has not met his burden to overcome the strong presumption that counsel's performance fell within the wide range of reasonable and professional assistance in not pursuing a change of venue motion." *Id.* at 3.

**C.   Why the State Court Holding Was Objectively Unreasonable Under 2254(d)**.

**i.   The state court holding was an unreasonable determination of the facts under 2254(d)(2).**

The State-prepared holding, in pertinent detail,  was as follows:

---

[110]   The facts developed at the evidentiary hearing have been summarized *supra.*

> Counsel discussed a change of venue but never decided to pursue it because they were under the belief that it was not meritorious.  Counsel had performed legal research on the issue.  Lead counsel was concerned that even if a change of venue were awarded, the case might be moved to a less favorable venue than Waco with potentially more pro-death penalty jurors.
> State's Findings and Conclusions at 2 (Exhibit 29.)

However, this summary, taken from lead counsel Mr. Hunt's self-serving affidavit, does not comport with the testimony of co-counsel Alex Calhoun.  At the hearing, Mr. Calhoun stated that when he began work on the case, his impression was that "not much had been done"  (EHT 181) and not many motions had been filed. (EHT 182.)   Regarding the motion for change of venue, Mr. Calhoun testified that there was "no in-depth investigation" to see whether the change of venue motion would be successful. (EHT 190.)   Ultimately, no such motion was ever filed. (EHT 203.)  Mr. Calhoun could not speculate as to whether the failure to change venue had an adverse effect on the outcome of Mr. Coble's trial. (EHT 204.)

Nor does it comport with the testimony of initial co-counsel Scott Stevens.  At the hearing, Mr. Stevens testified that he knew the case was of "major interest" in the Waco area and there were reports about it on the radio, on television and in the newspapers. (EHT 38.)  More than any case Mr. Stevens had ever handled, there was a "high degree of animosity and prejudice against Mr. Coble based on those media reports."  (EHT 39.) He stated that the general opinion in the community regarding the penalty phase re-trial was "outraged." (EHT 41, 52.)  The public opinion went beyond mere frustration over the re-trial, as "[f]rustration doesn't express the vitriolic-type of comments that I was seeing."  (EHT 53.)  The public attacks were not just about the justice system, "they were more personal attacks." (EHT 53.)  Mr. Stevens thought it would be a good idea to file a motion for change of venue and had some discussions about this with lead counsel Mr. Hunt, but the issue was not addressed before he left the case. (EHT at 41-42.)

-161-

Mr. Stevens withdrew as second chair counsel on April 24, 2008, having been on the case about six months.  (EHT 43, 47.)

Thus, both Mr. Stevens and Mr. Calhoun contradict Mr. Hunt's version.  There was never any decision not to pursue it "because they were under the belief that it was not meritorious," State's Findings and Conclusions at 2, it was simply not addressed by Mr. Hunt.  Neither Mr. Stevens not Mr. Calhoun had any motive to put themselves or their work in an unfavorable light by testifying that the change of venue issue was not addressed during their time on the case.  This contrasts with Mr. Hunt, who obviously had such a motive and whose account cannot be reconciled with those of his co-counsels.

Mr. Hunt's own billing records, submitted to the state courts in "Applicant's Submission of Post-Evidentiary Hearing Materials and Exhibits," as Exhibit 7 (herein, all these materials are collected at Exhibit 30), also show a failure to address this issue.  Mr. Hunt's first billing is on October 17, 2007, and from then until the beginning of the trial there is virtually nothing in Mr. Hunt's very detailed billing records that had anything to do with a change of venue.[111]

Mr. Hunt's affidavit states that "I was also concerned that even if we obtained a change of venue we might wind up in a less favorable venue than Waco...smaller, more rural and conservative counties that would have likely yielded jury panels more pro-death penalty than a McLennan County panel." Affidavit of Russell D. Hunt, Jr. at 1, (presented in the "State's Supplement to the Evidentiary Hearing"). This is unconvincing, as these other unnamed counties would not have been exposed to the massive publicity that was mainly confined to McLennan County.  The failure of the courts to change venue in 1989 would not have been determinative

---

[111]   These billing records were unsealed in state habeas proceedings.  There are several entries indicating media review (for instance "research: news coverage") but in total these entries total less than one hour.

either, nor would it have excused the failure to even file the motion, as Mr. Coble's attorneys did in the 1989-1990 proceedings. Both Mr. Stevens and Mr. Calhoun testified that they thought it should have been done, yet the matter was neglected. Neither of them indicated that the decision had been made for the "strategic" reason cited by Mr. Hunt in his after-the-fact affidavit.

Mr. Hunt's own concern with the pre-trial publicity (Hunt Affidavit at 1-2) seems only to underscore the need for at least an attempt at a change of venue to a locale not so heavily influenced by the publicity. In that affidavit, Mr. Hunt stated that he "felt we could use the jury questionnaire to adequately deal with the pretrial publicity issue" and "I did not feel at all that the jurors who ultimately served on the jury were not impartial or that Mr. Coble was prejudiced in any way by trying the case in Waco, especially with respect to the pretrial publicity issue." *Id.* at 2. These statements undermine his reasoning for the failure to file a motion for a change of venue: if pretrial publicity was such a major concern, why did he not seek to neutralize it by attempting to move the trial out of Waco and therefore out of the range of the unfavorable pretrial publicity?

Also completely unconvincing is Mr. Hunt's statement that "I visited with my father and others who do live in McLennan County about whether they felt that the community was inflamed about the Coble retrial and none were of the opinion that that was the case." *Id.* at 2. This statement simply cannot be reconciled with Mr. Stevens's testimony at the hearing, where he stated that more than any case he had handled in his entire career, there was a "high degree of animosity and prejudice against Mr. Coble." (EHT 39.) Mr. Stevens testified that the general opinion in the community regarding the penalty phase re-trial was "outraged." (EHT 41, 52.) He stated that the public opinion went beyond mere frustration over the re-trial, as "[f]rustration doesn't express the vitriolic-type of comments that I was seeing." (EHT 53.) These public

attacks were not just about the justice system, "they were more personal attacks." (EHT 53.) Mr. Hunt's statement that no one he talked to about the case felt that public opinion was not inflamed is simply not believable when compared to the newspaper accounts (particularly Judge Strother's extremely vitriolic comments, where he said his feelings about the retrial were unprintable, expressed outrage over the Fifth Circuit's reversal and grant of the re-trial, called Coble "vermin," and stated that he deserved death), the internet statements summarized herein, and the hearing testimony of Mr. Stevens. *See* Exhibit 6.

The state court holdings, prepared by the prosecutor, also allude to voir dire questioning which allegedly "would sufficiently alert them of individuals who had previously been exposed to the case..." *Id.* Left unaddressed is the fact that, had the motion been filed in the first place, they would not have to be on the alert for these jurors, as the publicity was concentrated in McLennan County. Nor was the questionnaire a sufficient excuse for failing to file the motion, which, had it been granted, would have undoubtedly resulted in a venue with less case-related publicity.

Thus the state court holdings are an objectively unreasonable determination of the facts and evidence presented to the state court under 2254(d)(2). Petitioner is entitled to relief.

### ii. The state court holdings are also an unreasonable application of the law under 2254(d)(1).[112]

Aside from citing *Strickland*, the state court holdings fail to engage with federal standards for effective assistance of counsel or Petitioner's arguments.

Mr. Coble's death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and comparable state law, because his attorneys failed to

---

[112] This legal standard is applicable to all claims and sub-claims of ineffective assistance of counsel herein, and is incorporated by reference as to those claims.

provide reasonably competent assistance at his punishment phase re-trial.  But for counsel's unprofessional actions and omissions, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. 510, 521, 534 (2003); *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

 An ineffective assistance of counsel claim has two components:  Mr. Coble must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Wiggins*, 539 U.S. at 521; *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008).  "To establish deficient performance, [Mr. Coble] must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'"  *Id.* (*quoting Strickland*, 466 U.S. at 688); *Reis v. Quarterman*, 522 F.3d 522, 526-27 (5th Cir. 2008); *Soffar v. Dretke*, 368 F.3d 441, 472 (5th Cir. 2004); *Thompson*, 9 S.W.3d at 812.  To establish prejudice, Mr. Coble"'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *Wiggins*, 539 U.S. at 534 (*quoting Strickland*, 466 U.S. at 694); *accord Reis*, 522 F.3d at 527; *Thompson*, 9 S.W.3d at 812.

 A "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."  *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (internal quotations omitted); *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App. - Houston 1996); *see Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) (*Strickland* does not require deference to decisions which do not yield any conceivable benefit to the defense).

 Reasonableness of counsel's performance is assessed by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards."  *Strickland*, 466 U.S. at

688; *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) ("[W]e have long referred [to the ABA Standards for Criminal Justice] as guides to determining what is reasonable") (*citing Wiggins*, 539 U.S. at 524); *Florida v. Nixon*, 543 U.S. 175, 191 (2004); *Wiggins*, 539 U.S. at 524; *see Ex Parte Martinez*, 195 S.W.3d 713, 727-38 (Tex. Crim. App. 2006). Because adequacy is based upon "counsel's perspective at the time," (*Strickland*, 466 U.S. at 589), courts must look to the guidelines then in effect. *Smith   v. Dretke*, 422 F.3d 269, 279 (5th Cir. 2005) (applying ABA Standards for Criminal Justice (2d Ed. 1980) which were in effect at time of trial); *see also Sonnier v. Quarterman,* 476 F.3d 349, 358 n.3 (5th Cir. 2007).

At the time of Mr. Coble's penalty phase re-trial, his attorneys' obligations were governed by the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 2003 (the "Guidelines") and the ABA Standards for Criminal Justice (3d Ed. 1993) (the "Standards"). "Those Guidelines applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases and imposed . . . similarly forceful directive[s]." *Rompilla*, 545 U.S. at 387 n.7 (referring to 1989 Standards). Pursuant to the Guidelines, counsel has an obligation to conduct at every stage a "thorough and independent investigation ( ) relating to the issues of both guilt and penalty." Guidelines 10.7(A). Similarly, the Standards imposed an affirmative obligation "to conduct a prompt investigation of the circumstances of the case and to explore *all* avenues leading to facts relevant to the merits of the case." Standards 4-4.1 (emphasis added). Most significantly, "[t]he duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id.*

Once capital trial counsel completes the necessary pretrial investigation, he must then formulate a defense theory "that will be effective in connection with both guilt and penalty . . . .

Guideline 10.10.1 (2003); *accord* Guideline 11.7.1 (1989).   Clearly established Federal law dictates that defense counsel must conduct a *reasonable investigation* or, at a minimum, to make a reasonable decision that makes specific investigation unnecessary.   *Strickland*, 466 U.S. at 691; *accord Sonnier*, 476 F.3d at 358.   Trial counsel may not limit the scope of their investigation unless it determined that further investigation would be "counterproductive or fruitless."   *Lewis v. Dretke*, 355 F.3d 364, 367, (5th Cir. 2003); *accord Smith v. Dretke*, 422 F.3d 269, 280 (5th Cir. 2005).

Given the community's animosity toward Mr. Coble, as shown *infra,* it was unreasonable under these standards for defense counsel to fail to file a motion for change of venue. The massive publicity was mainly generated by the local newspaper (Exhibit 6), along with other media such as television.   The level of interest in the crime would have been minimal to virtually non-existent even in nearby counties or in any nearby city such as Austin or Dallas.   The victims were well-known and one of them was a police officer.   The Waco community had vivid memories of the crimes even 18 years later, as the questionnaires and voir dire confirmed.   In fact, the anger level seems to have risen because of the Fifth Circuit's grant of a re-trial and the passage of time without any execution of Mr. Coble. (*See* Exhibit 6, media summary.)   Given the localized nature of the adverse publicity, there was no reasonable strategic reason for defense counsel not to at least try to have the trial moved out of Waco and McLennan County.

Mr. Coble has established the prejudice component of the *Strickland* test by showing that there was massive negative publicity that would have meant that a motion for change of venue likely would have been successful.   The massive publicity shown in Exhibit 6 documents clearly that a fair and unbiased jury in Waco would have been impossible.   The only chance Mr. Coble had of a fair trial depended on this matter being removed from Waco and McLennan County

where, nearly 20 years after the crime, passions and sentiment still ran high against Mr. Coble, especially in light of the reversal of his death sentence.

Respondent will point to the fact that such a motion was denied at the first trial. However,  the circumstances in 2008 were even more prejudicial than at the original trial in 1990: the family and community were extremely upset at the reversal of the death sentence, there was even more massive inflammatory newspaper coverage[113], Judge Strother made several inflammatory comments about Mr. Coble, referring to him as "vermin" (Exhibit 6 at 19) and there were many comments made about the cost of Mr. Coble's re-trial and long incarceration. Had the motion been denied, it would have been clear error to do so.  That is the gravamen of the prior claim.  *See* Claim 1 *supra.*  Under these circumstances, Mr. Coble has shown both deficient performance and prejudice under the *Strickland* standard.

The state court holdings are based on the premise that there was a reasoned, strategic decision not to file the motion for change of venue.  Nothing in either the record or the hearing comports with this holding, except Mr. Hunt's self-serving affidavit which is itself contradicted by the testimony of both co-counsel.  Far from seeing "strategy," they saw procrastination, inaction, and a complete failure to deal with this issue by lead counsel Mr. Hunt.  Therefore, the state court holding was also an unreasonable application of clearly established federal law, 2254(d)(1), and he is accordingly entitled to relief.

---

[113]   *See* Exhibit 6, "Coble Media Summary."

<u>**CLAIM THREE**</u>**: PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT *VOIR DIRE*.**

Mr. Coble's conviction and sentence are invalid because he was deprived of his constitutional right to effective assistance of counsel, due process of law, equal protection of the laws, cross-examination and confrontation, and a reliable sentence due to the failure of trial counsel to provide reasonably effective assistance at the voir dire of his jury. U.S. Const. Art. VI, Amends. V, VI, VIII, XIV; International Covenant on Civil and Political Rights, Art. XIV. And comparable provisions of the Texas Constitution.

Petitioner was deprived of effective assistance of counsel at the voir dire portion of his trial. Mr. Coble was tried and convicted by a jury that was overwhelmingly biased against him, overwhelmingly unwilling to accept basic concepts of mitigating evidence and massively in favor of the death penalty. These failures fundamentally impaired Mr. Coble's right to a fair trial.

The jury selection procedure in this case was accomplished through individual juror questionnaires, and then by individual questioning of the prospective jurors by counsel and occasionally the trial court. The questionnaires were designed to elicit information regarding the prospective jurors' background, beliefs and attitudes, including their attitudes toward the death penalty and mitigating evidence. Yet defense counsel often did not even refer to problematic answers in the questionnaire and left unanswered many potential areas of bias. Given the very hostile atmosphere described *supra* in Claims 1 and 2, prejudice has been shown.

**A. Facts Presented to the State Courts.**

This claim was presented to the state courts as Claim 3 in the state habeas petition.

When viewed as a whole, the *voir dire* at Petitioner's penalty phase re-trial was

startlingly ineffective for its intended purpose: to weed out biased and unqualified jurors who already had their minds made up that Mr. Coble should be re-sentenced to death.  Despite 12-page questionnaires filled out beforehand (VII CR through XI CR)[114] defense counsel rarely even referred to the prospective jurors' written answers, even when they called out of explanation and elucidation.  Nor were adequate efforts made to "life qualify" the jury after the prosecution had "death qualified" them, due to the Court's ruling these questions impermissible (*see* discussion of juror Sadro, *infra*).  As a result, the jury that ultimately was seated was fatally biased against Mr. Coble and reimposed a death sentence despite a complete lack of any evidence of his "future dangerousness" over the previous eighteen years.

A summary of the following jurors shows how the defense rendered ineffective assistance at  Mr. Coble's trial:

**1) Juror Cheryl Ann Sadro.**

Ms. Sadro was accepted by both the state and the defense and sat on Mr. Coble's jury (7 RR 88.)

Her questionnaire revealed serious questions about her attitudes and ability to be a fair juror that needed further elucidation by the defense.  (VII CR 1129-1140).  Ms. Sadro wrote that she believed that crime was increasing and becoming more violent (VII CR 1134); she had twice served on a criminal jury (VII CR 1135); believed it right for a jury's decision to be overturned "only if new evidence contradicts the original decision" (VII CR 1135); her feelings about the death penalty "depends on many factors; i.e., brutality of a crime; facts surrounding the cause of a crime, etc." (VII CR 1136);   "strongly agreed" that the death penalty prevents crime and is justified in some cases; gave somewhat contradictory answers that she both believed in the death

---

[114]   All of these questionnaires have been unsealed by the trial court.

penalty and believed it was morally wrong (*Id.*); disagreed that it was cruel and agreed that she could vote for death. (VII CR 1136-1137). She also disagreed that someone should be released from prison on a "technicality" (VII CR 1137); and disagreed that it is unlikely that someone confined in a cell 23 hours a day can commit other crimes in prison (VII CR 1137).

At voir dire, the prosecution briefly asked about her stance on the death penalty and she said she was "pretty fact based" and she could participate in the process. (7 RR 47-48.) However, when the defense tried to question her about her attitudes toward the death penalty ("Now I want to ask...I guess, talk to you a little bit about your belief in the death penalty..." 7 RR 67) this discussion was shut down completely and repeatedly by the trial court on the basis that the questions were "commitment" questions.  (7 RR 67-83.)  The defense made a running objection to this limitation, as to this juror and all future jurors:

> MR. CALHOUN: Okay.  We would ask the jurors about specific...whether they could consider specific acts of mitigation, meaning...uh, including troubled childhood, a disadvantaged childhood, mental illness, acting under extreme emotional distress, community service before and after the offense, age, kindness to others, work ethic, military service.
> MR. SEGREST: And, again, each of those are, uh...uh, objectionable on the grounds they are commitment questions.  They are asked to...the jurors...the future jurors to commit, to make a decision based upon specific facts.
> The law does not require the juror to give any weight to any factor.  If the juror said, no, I can't consider this, that is not a basis for cause, Your Honor.  It's not a challenge for cause.  It is simply a fishing expedition and tends to commit...or seeks to commit the juror to find certain facts and factors as mitigating.
> MR. CALHOUN: Judge, we disagree.  Um, jurors have to be able to consider whatever we present.  They don't have to ultimately buy it.  They have to be able to consider it. And if they can't consider it up front, they can say, I can't give it any weight, well, then they have predetermined the case.  They are biased against an aspect of evidence that we wish to present.  We're not asking for commitment, because all we're asking is if they can consider it.  If they can't consider it, well, then, they're biased under *Morgan v. Illinois*.  The questions that we're being forced to ask at this point to allow us to effectively determine what their baises are.  Again, it's a matter of whether we're saying, well, would you give...would you find him mitigating?  Would you return mitigating...an affirmative answer based upon this?  We're not asking that.  We're asking, could you? Could you theoretically do so?  And that's not a commitment question, Judge.

THE COURT: The State's objection is sustained.
(7 RR 88-91.)

**2) Juror Marsha Money.**

Juror Marsha Money was accepted as a juror by both the state and the defense.  (7 RR 202.)  In her questionnaire, Ms. Money gave answers regarding her attitudes toward the death penalty that needed further discussion and explanation.  She wrote that she had heard of the case through all listed means, radio, television, newspaper, and word of mouth. (VII CR 1165.)  She also indicated that she didn't know if she had already decided on the proper punishment as a result of this exposure (VII CR 1165) and stated that "I remember this case well, since I have lived in this county all my life." (VII CR 1175.)   She felt that "each case should be judged on its merits" (VII CR 1167); was friends with a member of the McLennan County Sheriff's Department (VII CR 1170); believed that crime was increasing (VII CR 1170); believed a jury's decision should be overturned only "if new evidence is presented" (VII CR 1171); felt the death penalty is justified "in certain cases if the evidence is clear" (VII CR 1172); strongly agreed that the death penalty is sometimes justified (VII CR 1172); disagreed that it is morally wrong (VII RR 1172); believed in the death penalty (VII CR 1172); did not believe it was cruel (VII CR 1173); and believed that she could vote for it (VII CR 1173).  She agreed with the statement that if a person is on trial he must have done something wrong (VII CR 1173);   she disagreed that a person should be released from prison because of a technicality (VII CR 1173); and she disagreed that there is a "life without parole" sentence (VII CR 1173).  Somewhat troubling was her statement that "my husband went to school with Bobby Vicha," one of the victims.  Also, a good friend once worked with Karen Vicha.  (VII CR 1175.)  She listed that she had heard of Mr. Coble, his attorney Mr. Hunt, the judge, Mr. Segrist and Mr. Long, the district attorneys, five

members of the Vicha family, and several others involved in the case.  (VII CR 1176.)

However, on voir dire many of these questions were unanswered or covered inadequately.  The district attorney interpreted her statement that she didn't know whether she had made up her mind as to the punishment by stating "you have an open mind going into the case" with which she agreed.  (7 RR 164.)  Her friendship with the Vicha family was dealt with by another leading question by the prosecutor ("Uh, because of that, you...don't have any preconceived outcome as to what sentence you could...should assess because of those relationships, do you?"  to which, unsurprisingly, Ms. Money answered in the negative. (7 RR 164-165.)  The remainder of the prosecutor's questioning was devoted to long "educational" questions in the form of statements to which the prospective juror agreed or simply said "yes."  (7 RR 165-179.)

The defense did ask about her husband's acquaintance with Bobby Vicha and Ms. Money stated that he did not know him well.  (7 RR 182.)  She was not asked what she thought of the Vichas, how long she had known them, whether their interactions were positive or negative, or any other related questions.  Next the defense asked about her hesitancy and statements that "I think I could try to be fair" and she still stated that "it's not 100 per cent certain" (7 RR 183) and the line of questioning was dropped.  Despite these questions regarding her ability to be fair, she was ultimately selected as a juror.  (7 RR 202.)

### 3) Charles Lindsay.

Mr. Lindsay's questionnaire answers presented much greater concerns and were more problematic for the defense than the two previously-questioned jurors.  He did not answer whether he had heard of the case previously or the second page regarding his address, political affiliation or gun ownership or the fourth page about his hobbies, education and family. (VII CR 1261-1262).  The answers he did provide were troublesome for the defense: he agreed with his

church's stand of non-opposition to the death penalty (VII CR 1263); he knew Joe Lindsey of the Sheriff's Department (VII CR 1266); he believed crime was increasing (VII CR 1267); he "strongly agreed" that he believed in the death penalty and that it is sometimes justified (VII CR 1268); and, most troubling, he "strongly agreed" that if a defendant is on trial, he must have done something wrong. (VII CR 1269.)   Although he also strongly agreed that a felon could be released because of a technicality and an old crime was not as important as a new one[115] (VII CR 1269) he also strongly agreed that there was no such thing as "life without parole" and that it was "very likely" that if someone has committed a crime in the past that they will commit the same or another crime in the future. (VII CR 1269-1270.)

At voir dire, the prosecution elicited some, but not all, of the missing information. (9 RR 60 *et. seq*.)  He stated he had heard of the case (7 RR 64) but his answer to whether this would influence him was equivocal and not informative: "Not no more than what I heard." (9 RR 64.) The defense asked him about his cousin Joe Lindsey (9 RR 91-93.)  Mr. Lindsey also stated that although he had heard about the case on the news, he "didn't pay it that much attention." (9 RR 97.)  This did not clarify what impact it had on his pre-formed opinions about the case.

Mr. Lindsey's answers actually raised more questions than they resolved:

Q.  I would think some people might say, well, you know, I think the person is always going to be eligible for parole, so unless I could be guaranteed that there's no parole, then I can't keep the idea of parole out of my mind.  It might affect my decision making.  I would think some people might say that.  No matter what the judge's instructions are, I still couldn't put it out of my mind and keep it from my decision making.  How about you?
A.  Well, it would have a bearing on it.  It sure would.
(9 RR 110.)

Yet the followup to this answer was equally disturbing:

---

[115]  He clarified at voir dire that he didn't understand the question and "a crime is a crime, whether it was a long time ago or yesterday." (9 RR 100.)

Q. Okay. So, are you saying that you wouldn't be able...even if the judge instructed you don't consider whether the person might get paroled or not, that's not a consideration at all. Are you saying you might have to consider that? You might not be able to follow that aspect of the law?

A. I believe if you got down to that last thing you would pretty well have in mind what you thought at that time. If you make it down to there I would stick with wherever I was when I got to there.

(9 RR 111.)

The defense questioning continued:

Q. Okay. So you're saying, once...in other words, your feeling is once I have...knowing that that guy's been convicted of this intentional killing...these intentional killings, knowing that I've decided the murder's deliberate, knowing that I've decide the guy is a threat to society, that you've already pretty much made up your mind before you get to this last decision?

A. Yeah. It might be no.

Q. Okay.

A. It might be yes. It might be no.

(9 RR 111.)

The Court intervened after several additional answers that indicated that Mr. Lindsey

might not be able to put the parole question out of his mind:

THE COURT: But I'm just asking you if you would be able to put it out of your mind and follow the instructions of the Court and answer the questions without considering parole?

VENIREPERSON LINDSEY: I may not be able to. So that might...I'd just be whatever I...whatever it was at that point I believe.

THE COURT: Okay. That's a fair answer. Thank you.

(9 RR 112.)

Of course, this was anything but a "fair" answer, at least from the defense standpoint.

Instead of following up on this, defense counsel then switched to a question regarding future

dangerousness:

Q. So, to flesh that out just a little more. When we're thinking about probable acts of violence so that they might be a continuing threat to society, are you saying it's possible after you hear the evidence that you might say, well, you know, I don't think he's a danger to the prison society, but if he got out on the street, and I think there's a good chance he might get out on the street...

MR. SEGREST: Your Honor, he's committing him. It's a commitment question.

-175-

THE COURT: I'll sustain the objection.
(9 RR 112-113.)

Mr. Lindsey then picked up on the prosecutor's hint: "...but I'm not going to commit myself until I've got to hear what you say." (9 RR 113.)

The following questioning on parole did not clear up the prospective juror's reluctance to put it out of his mind:

> Q.  One of the instructions the Judge would give you is that you can't take parole or any possibility of parole into account in making...in deciding the answers to these questions, okay?  That's...that's very clear, you can't take parole.
> So the question for you is, would you be willing to take that oath and swear up front that I will follow that instruction, if it's given to me?
> A.  A.  Yes, if he asked me...if he told me up front...I don't know...I didn't know that you couldn't.  I thought all people in the life prison had a chance of parole.

Then Mr. Lindsey was asked a final question regarding parole:

> Q. ...You have to put that [parole] out of your mind in making your decision.
> A.  That's not my decision.
> A.  That's exactly right.  And do you feel like you could follow that?
> A.  Yes. Yes.
> (9 RR 115.)

Although there were unanswered questions regarding the impact of what this juror had heard about the case,  and equivocal answers regarding his ability to ignore parole possibilities, Mr. Lindsey was accepted by the defense as a juror.  (9 RR 120.)  This questioning was entirely inadequate given the problems his questionnaire raised.

**4) William Chad Rhoden,** the fifth juror chosen, had some questionnaire answers that would have been troublesome for the defense.  He described himself as conservative (VIII CR 1455); he owned firearms (*Id.*); he believed it was wrong for a jury's decision to be reversed or overturned (VIII CR 1460); he thought Texas' use of the death penalty was "about right" (VIII CR 1461.)  Mr. Rhoden "strongly believed" in the death penalty and that it was sometimes

justified.  (VIII CR 1461-1462.)   He "strongly disagreed: that the death penalty is morally wrong, that it was cruel, that a felon should be released on a technicality, and disagreed that it is unlikely that a person confined to his cell 23 hours a day has a chance to commit other crimes. (VIII CR 1461-1462.)   He believed that the rights of a person charged with a crime are protected better than the rights of victims, that it is likely that an individual will re-offend, and even believed in the absurd statement that people in prison have a better quality of life than many taxpayers "who support their lifestyle."  (VIII CR 1462.)    All of these answers favored the prosecution.[116]   As such, he was a candidate for a challenge for cause or at least a peremptory challenge.

At voir dire, Mr. Rhoden was first asked "educational" questions by the prosecutor.  (11 RR 223-239.)  He stated:

> I absolutely do believe in the death penalty.  I wouldn't say for any situation.  I could say that this situation always deserves the death...I don't believe that...
> I do believe that there are certain circumstances or certain events that people do out there, that if they have made that choice and due to circumstances proven by the State or...or whoever has to prove the burden, that, yes that could be a feasible sentence.
> (11 RR 239-240.)

The defense, ignoring the above, stated that "[y]ou strike me as the kind of person who, if you're on the jury, could very well be the foreperson of the jury.  Primarily because you're supervising 100-plus people, which sounds pretty impressive to me". (11 RR 243.)

As far as a life or death sentence, Mr. Rhoden stated that "I really don't have a belief on either one."  (11 RR 257-258.)  He also agreed that being incarcerated was punishment.  (11 RR 260.)  Mr. Rhoden was accepted by the defense despite his many pro-death biases.  (11 RR 261.)

---

[116]   The only mildly positive note for the defense was that Mr. Rhoden strongly disagreed with the notion that if a defendant is on trial "he must have done something wrong."  (VIII CR 1462.)

**5) Antonio Saenz,** the sixth juror chosen, also had some answers in his questionnaire that would have given the defense some problems.  He wrote that he had heard of the case through television and word of mouth and that, based on this, he had "maybe" decided on the punishment he would likely assess.  (VIII CR 1466.)  He had a U.S.M.C. (United States Marine Corps) bumper sticker on his car, he owned guns (VIII CR 1467); thought the criminal justice system was too lenient on criminals, believed crime is increasing (VIII CR 1471); was ambivalent about the death penalty (VIII CR 1473) but agreed that someone on trial must have done something wrong and that convicted felons should get longer sentences (VIII CR 1474) while strongly disagreeing that a convicted felon should be released from prison because of a technicality (*Id.*)

At voir dire, Mr. Saenz stated to the prosecutor that he had heard "very little" about the case but had not yet decided which punishment was appropriate.  (12 RR 13.)  The defense failed to ask any questions at all about his media exposure, what he had seen on television and when he had seen it, what he had heard through word of mouth and when he had heard it, his impressions of the coverage, to what extent the media coverage had influenced him one way or the other.  (12 RR 38-68.)  This omission was serious in light of his questionnaire answer that the coverage had "maybe" influenced his opinion to the extent that he had decided on a verdict.  Nor did the prosecutor's inquiries answer these questions although Mr. Saenz did state at voir dire that he had not yet made up his mind as to the appropriate punishment.  (12 RR 13.)

As such, the defense through their omission allowed a juror to sit on the jury who had possibly made up his mind about the proper punishment through his exposure to pre-trial publicity and word of mouth.

**6) Leslee Kay Huggins** was the tenth juror chosen.   In her questionnaire, she stated that she had heard of the case, had not formed an opinion based on that, considered herself

conservative, had a nephew on the Hillsboro Police Department, was not sure whether a judge has the power to overturn a jury's decision, thought the death penalty is used about the right amount in Texas and her feelings about the death penalty depend on circumstances. (X CR 1694-1705.)

At voir dire, the prosecutor Mr. Long stated he was friends with her employer, Mr. Hill, who did his taxes.  (15 RR 128.)  They both agreed about what a "wonderful man" Mr. Hill was.  (15 RR 128-129.)   But neither the defense nor the prosecution ever asked Ms. Huggins any questions about what she had seen on television, possibly in other media, or how they had affected her opinions on the case.  (15 RR 123-169.)  Some of the prosecutor's statements to her were based on false assumptions, such as "it's hard to sit here having not heard anything" (15 RR 144.)   But she had heard something, the media accounts of the case, which were very biased against Mr. Coble.

At voir dire, the defense did nothing to question this juror regarding the concerns that her questionnaire raised.  (15 RR 150-167.)  She was merely asked whether she was related to Mr. Calhoun (15 RR 150-151) and then defense counsel went through the special issues in general terms.  (15 RR 151-167.)   At the conclusion of the defense questioning, she was asked, again in general terms, "[d]o you think that there might be a particular case where the life penalty is a sufficient penalty for this offense?"  (15 RR 167.)  She was then accepted as a juror by both sides (15 RR 168) without any attempt by the defense to probe for bias, to ascertain exactly what she had heard from the media, how it had affected her, or how the fact that her nephew was a law enforcement officer might affect her decision.

**7) Gary Szanto**, the eleventh juror chosen, stated on his questionnaire that he had heard of the case and failed to indicate whether his exposure to the pre-trial media had prejudiced him

(X CR 1742); knew or was related to a person in the McLennan County District Attorney's office (X CR 1747); strongly agreed with the statement that the rights of a person charged with a crime are better protected than those of the victims and that a defendant in a criminal case should testify or produce some evidence. (X CR 1750.)  He strongly disagreed that a felon should be released from prison on a technicality (X CR 1750); strongly agreed that there was no such thing as "life without parole" (*Id.*) and strongly disagreed that it was unlikely that a person confined in a cell 23 hours a day had a chance to commit other crimes(*Id.*); and thought it was very likely that a person who has committed a crime in the past will re-offend. (X CR 1751.)

The defense questioning of this juror first focused on the fact that he knew victim Bobby Vicha.  (17 RR 36-38.)  Despite equivocal answers ("I don't think it would affect my verdict," 17 RR 37) this juror was accepted by the defense. (17 RR 64.)  He was not questioned regarding his other pro-prosecution answers. A question regarding "aging out," the propensity for violence to decrease as a person ages, was objected to by the prosecution and sustained by the court.  (17 RR 57.)  This juror displayed very pro-prosecution and pro-death penalty views and both his acceptance on the jury and the inadequacy of the questioning were ineffective assistance of counsel.

A major reason for the defense failure may well have been the trial court's unwillingness to grant a continuance from the August 1, 2008 planned starting date.  Second chair counsel Alexander Calhoun stated:

> In preparation for jury selection, I remember trying to get up to speed on the so-called "Colorado Method" of jury selection, but there was not enough time for me to take a course on it.  Basically, we reviewed some written materials on the method which I obtained from resource counsel at Texas Defender Service, from capital resource counsel from TCDLA, and from a local Travis County practitioner who lectures on the method. It is fair to say that for me this method was "self-taught" and based only on studying the manuals, as opposed to any practice or 'moot court' training.  When it came to individual

> jury selection, we employed to the best we could the "Colorado Method"'s jury numbering system to identify favorable and unfavorable jurors, but the judge largely precluded us from fully employing the Method in the manner in which it was designed—to convey to jurors specific items of mitigation evidence and obtain their views upon that specific mitigation.[117]

Thus, the trial court may have been responsible for this ineffectiveness by failing to continue the trial due to Mr. Calhoun's late appointment.  The Court may have rendered trial counsel ineffective because of its failure to allow cross-examination on specific items on the grounds that they were "commitment" questions, as discussed *supra.* In any case, either through the court's restrictions or their own lack of preparedness, counsel were ineffective.

**B. What the State Courts Held.**

This claim was presented as Claim 3 in Petitioner's state habeas application. The prosecutor, in his Answer, recommended that an evidentiary hearing be held on this issue, and the trial court complied.  Exhibit 27, State's Answer at 8.  The claim was summarily denied by the CCA when they adopted the trial court's findings and conclusions. *Ex parte Coble,* No. WR-707-03 (Tex. Crim. App. Feb. 8, 2012, Exhibit 31.)  Looking first to the Answer, written by the prosecutor and adopted verbatim by the trial court, the State argued that "[n]one of Applicant's allegations show a juror so prejudiced or biased for the state or committed to the death penalty, or prejudiced or biased against Applicant that they would have been subject to a challenge for cause." State's Answer at 7, Exhibit 27.

In the prosecutor's proposed findings and conclusions, adopted verbatim by the trial court and subsequently by the CCA, the holding was as follows:

> While Mr. Calhoun was not able to remember facts about any specific juror, Mr. Hunt provided his notes on each juror, including their ranking on a

---

[117]   Exhibit 14, Affidavit of Alexander Calhoun at 2.  *Also see* Exhibit 15, materials on the "Colorado Method."

-181-

seven-point scale.  Applicant showed no reason why any of the seated jurors should have been struck from the panel or challenged for cause which would controvert Mr. Hunt's reasonable explanations.  Counsel consulted one another on voir dire decisions, but indicated they did consult with Applicant on the decision to accept, challenge, or strike individual jurors, but the final decision was always up to counsel.

The strategy employed by Counsel was to implement the Colorado Method of jury selection in death penalty cases, which both attorneys researched and prepared upon extensively.  Their goal was to get a jury of people who were not "automatic killers."  Given the information available at the time, all of the jurors were acceptable, fair and impartial in the eyes of counsel.  Counsel relied upon questioning and questionnaires which were completed by everyone in the venire.  No evidence indicates that any juror complained of by Applicant was unfair, partial, or denied Applicant a fair trial.

State's Proposed Findings and Conclusions at 4, Exhibit 29.

The State's conclusions of law adopted by the CCA were basically limited to generic assertions, without citations of legal authority:

> *Conclusions of Law.*
> The performance of Applicant's counsel in regard to each juror was within the standard of prevailing professional norms and counsel were at all times functioning as the counsel guaranteed the Appellant by the Sixth Amendment to the United States Constitution during jury selection.  Because their performance was not deficient, Applicant was not deprived of a fair trial.  Applicant has failed to meet his burden to overcome the strong presumption that counsel's performance fell within the wide range of reasonable and professional assistance in regard to jury selection.
> *Id.*

## C. Why the State Court Holding Was Objectively Unreasonable Under 2254(d)(1) and d(2).

The legal argument regarding the standards for ineffective assistance of counsel discussed *supra* in Claim 2 is incorporated herein by reference.

### i. The 2254(d)(1) analysis.

The state court holding is contrary to clearly-established federal law as determined by the Supreme Court of the United States. 2254(d)(1).  Citing *Delrio v. State,* 840 S.W.2d 443, 445-446 (Tex. Crim. App. 1992), the state court adopted verbatim the State's pleading, which cited

*Delrio* for the proposition that

> [s]ince 1931 we have not held, however, despite mandatory language in the provision, that an impartial jury is an inflexible constitutional imperative which cannot be procedurally defaulted or consciously waived.  Rather, we have recognized it to be a right of the accused, which must be pressed in some fashion at trial before reversal of his conviction may be predicated upon its breach.
>
> State's Answer at 7. (Exhibit 27)

This is incorrect under federal constitutional standards. A defendant's right to a fair and unbiased jury is a fundamental right which cannot be waived by trial counsel.  A defendant's trial and conviction by a biased jury is structural error which goes to the fundamental fairness of the proceedings, and defense counsel cannot waive their client's right to a fair trial and a fair jury.

The Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ."  U.S. Const., Amend. VI.  The Fourteenth Amendment extended the right to an impartial jury to criminal defendants in all state criminal cases.  *Duncan v. Louisiana*, 391 U.S. 145 (1968).  In addition, the Due Process Clause of the Fourteenth Amendment independently requires the impartiality of any jury empaneled to try a cause.  *Morgan v. Illinois*, 504 U.S. 719 at 726 (1992).

Whether a prospective capital juror is impartial within the meaning of the Sixth and Fourteenth Amendments is determined in part on the basis of their opinions regarding the death penalty.  A prospective capital juror is not impartial and "may be excluded for cause because of his or her views on capital punishment [if] the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); citing *Adams v. Texas*, 448 U.S. 38,  40 (1980).

A prospective juror who will automatically vote either for or against the death penalty regardless of the court's instructions will fail to consider in good faith evidence of aggravating and mitigating circumstances.  Such a juror is not impartial and cannot constitutionally remain on a capital jury. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S. Ct. 1770 (1968); *Morgan v. Illinois,* 504 U.S.719 at 728 (1992), 733-734.

In *Witherspoon*, the United States Supreme Court held that prospective capital-case jurors may not be excused for cause on the basis of moral or ethical opposition to the death penalty unless those jurors' views would prevent them from judging guilt or innocence, or would cause them to reject the death penalty regardless of the evidence.  Excusal is permissible only if such a prospective juror makes this position "unmistakably clear."  (391 U.S. at 522, fn. 21.) *Witherspoon* also holds that the defendant is entitled to an impartial jury at both phases of the trial, which was denied Petitioner here.

That standard was amplified in *Wainwright v. Witt,* 469 U.S. 412 (1985), where the Court, adopting the standard previously enunciated in *Adams v. Texas* (1980), 448 U.S. 38 at 45 (1980), held that a prospective juror may be excused if the juror's voir dire responses convey a "definite impression" (*Wainwright*, *supra*, 469 U.S. at  426) that the juror's views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  (*Id.* at  424.)  The *Witt* standard applies here.

Thus, this Court's duty is to

[E]xamine the context surrounding [the juror's] exclusion to determine whether the trial court's decision that [the juror's] beliefs would "substantially impair the performance of [the juror's] duties . . ." was fairly supported by the record. (*Darden v. Wainwright*, 477 U.S. 168, 176 (1986)

Petitioner has shown above that due to the ineffective *voir dire* of Mr. Coble' jury, he

was denied the fair, unbiased trial to which he was entitled.  The egregious examples cited above of the failure of his attorneys to properly challenge obviously pro-prosecution, pro-death jurors amounted to both deficient performance and  prejudice, the two prongs of the *Strickland* test. With the jury that sat on this trial, a sentence of death was a foregone conclusion.

The Sixth Amendment guarantees the accused the right to trial by an impartial jury. When a trial is biased against a defendant, the Fourteenth Amendment Due Process Clause requirement of an impartial and disinterested tribunal is violated and reversal is automatic.  *See Porter v. Singletary,* 49 F.3d 1483, 1489 (11th Cir. 1995) (evidence that "the judge had a fixed predisposition to sentence this particular defendant to death if he were convicted" warrants relief); *see also Arizona v. Fulminante,* 499 U.S. 279, 111 S. Ct. 1246, 1265 (1991); *Marshall v. Jerrico, Inc.,* 446 U.S. 238 (1980).

This bias analysis also applies to biased jurors.  In *Leonard v. United States,* 378 U.S. 544, 84 S. Ct. 1696 (1964) (*per curiam*), the Court reversed a conviction because of the "implied bias" of certain jury members at Leonard's second trial who had been in the courtroom during the announcement of the guilty verdict at his first trial.  There are other circumstances under which implied bias would be appropriate.  *See Smith v. Phillips,* 455 U.S. 209, 102 S. Ct. 940, 949 (1982) (O'Conner, J., concurring).   Juror bias, whether presumed or proven, requires automatic reversal.  *Id.*

Many other cases have been reversed for similar claims of ineffective assistance of counsel at the jury selection phase of the trial.   In  *Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992), counsel was held to be ineffective for failing to request removal for cause of four jurors who had previously sat on a jury convicting a co-defendant for the same crime and had already decided the defendant was guilty and for failing to inform the defendant of his right to

remove such jurors.   In *Presley v. State*, 750 S.W.2d 602 (Mo. Ct. App.), *cert. denied*, 488 U.S. 975 (1988), counsel was held ineffective for failing to challenge for cause a single venireman who admitted bias against defendant.  Prejudice was presumed.

In *Wilson v. State*, 406 S.E.2d 293 (Ga. Ct. App. 1991), trial counsel was ineffective in a rape case for  failing to challenge juror who was overheard prior to jury selection to say that defendant was guilty and  not knowing the applicable rules of evidence. In *State v. Chastain,* 947 P.2d 57 (Mont. 1997), counsel was ineffective in a child sex case because two jurors stated that they had heard of the case and had strong feelings about it which could affect their ability to be fair and impartial.  Nonetheless, counsel did not conduct additional voir dire, challenge for cause, and strike.   *State v. McKee*, 826 S.W.2d 26 (Mo. Ct. App. 1992), held that counsel was ineffective for failing to challenge two venirepersons who said it would bother them if the defendant did not testify.     In *Knight v. State*, 839 S.W.2d 505 (Tex. Crim. App. 1992),   trial counsel in burglary case was ineffective for failing to challenge 10 jurors who expressed a bias or prejudice including: a burglary conviction should always carry maximum sentence, if convicted should receive death penalty, all people indicted are guilty, and defendant's failure to testify would be held against him.   Two of these jurors were impaneled so prejudice was presumed.     In *Nelson v. State*, 832 S.W.2d 762 (Tex. Crim. App. 1992),     counsel was ineffective for failing to challenge jurors who stated that they presumed guilt if a defendant was charged.  Three of these jurors were impaneled.   In *Presley v. State*, 750 S.W.2d 602 (Mo. Ct. App.), *cert. denied*, 488 U.S. 975 (1988), counsel was ineffective for failing to challenge for cause a venireman who admitted bias against defendant.  Prejudice was presumed.

As to the prejudice prong of the *Strickland* test, the factual summary shows the actual seating of many biased pro-prosecution jurors.  As Petitioner has shown that no minimally

competent attorney would have allowed such an alarmingly pro-prosecution and pro-death jury to be seated in a capital trial, without even a minimal amount of probing for readily apparent bias, Mr. Coble  is entitled to relief on this claim.  A review of these jurors'  entire juror questionnaires and *voir dire* leaves the "definite impression" that they so strongly in favor of the death penalty that their ability to follow the law was substantially impaired within the meaning of *Witt*.  Hence, defense counsel's failure to effectively challenge their biases was ineffective assistance of counsel.

The state courts held that Petitioner had not shown that any juror was so biased against him that "they would have been subject to a challenge for cause" and that their inclusion was simple trial strategy.  State's Answer at 7, Exhibit 27.   The analysis in this claim *infra* shows that several jurors had views that would have been subject to such challenges, and one had known one of the victims.  However, this is one of those "very limited class of cases" where the "defects in the constitution of the trial mechanism, ... *defy analysis by 'harmless-error' standards* [,]" (*Arizona v. Fulminante* (1991), 499 U.S. 279, 309 (emphasis added)), and affect "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310."

### ii.  The 2254(d)(2) analysis.

As to the State's argument, adopted by the CCA, that the inclusion of these jurors was a result of trial strategy, it is unconvincing.  Co-counsel Mr. Calhoun was unable to remember the specifics of the jurors chosen or why they were chosen. (EHT 228-230.)  However, Mr. Hunt, in his affidavit, purports to give the rationale by providing a scoring system which was not mentioned by Mr. Calhoun at the hearing.  Affidavit of Mr. Hunt at 2-3 (presented in "State's Supplement to the Evidentiary Hearing").  Even on his own scale, the challenged jurors only

rated between 3 and 4 on a scale of 7, with 1 being the most favorable and 7 the worst. *Id.*

Mr. Hunt stated that he "felt we could use the jury questionnaire to adequately deal with the pretrial publicity issue" and "I did not feel at all that the jurors who ultimately served on the jury were not impartial or that Mr. Coble was prejudiced in any way by trying the case in Waco, especially with respect to the pretrial publicity issue." *Id.* at 2.  These statements undermine his reasoning for the failure to file a motion for a change of venue: if pretrial publicity was such a major concern, why did he not seek to neutralize it by attempting to move the trial out of Waco and the range of the unfavorable pretrial publicity?

Thus, the state court holding is also "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  2254(d)(2).

**CLAIM FOUR: PETITIONER WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL WHEN THE COURT DID NOT ALLOW THE DEFENSE TO "LIFE-QUALIFY" THE JURORS OR ALLOW INQUIRY INTO WHETHER THEY WOULD CONSIDER MITIGATING EVIDENCE OR IMPOSE THE DEATH PENALTY AUTOMATICALLY.**

Mr. Coble's death sentence is invalid under state and federal constitutional guarantees of due process, effective assistance of counsel, fair trial, a reliable sentence, and to be free from cruel and unusual punishment.   Petitioner is entitled to a new sentencing trial because the trial court  failed to allow the defense attorneys to life-qualify the jury, and prevented the defense from meaningfully questioning potential jurors concerning their views on the death penalty. Appellate counsel was ineffective for failing to failing to raise and litigate this meritorious issue. U.S. Const. amend. VI, VIII, XIII, & XIV and comparable provisions of the Texas Constitution.

The defense was not allowed to question the prospective jurors as to the circumstances they would consider as mitigating evidence and hence the defense was not allowed to ask them if they would impose the death penalty automatically without regard to these mitigating circumstances.  It is error under *Morgan v. Illinois,* 504 U.S. 719 (1992) and *Tennard v. Dretke,* 124 S. Ct. 2562 (2004) because if the prospective jurors were not allowed to state whether they would consider various aspects of Mr. Coble's mitigating evidence, the defense could not ascertain whether they would automatically impose the death penalty.   The court disallowed these questions on the erroneous premise that they were "commitment" questions.

**A.  Facts Presented to the State Courts.**

This claim was presented to the State courts as the twelfth point of error on direct appeal and also as Claim 4 in the state habeas petition, as constitutional error.

**i. Facts presented to the state courts on direct appeal.**

This claim was presented on direct appeal as "trial court error." While questioning the

second juror Petitioner attempted to determine what factors she might look at in deciding the mitigation issue. After stating she would look at all the factors in making her decision, appellant asked "What kind of facts would you look at? (7 RR 72). The state objected to the question, arguing it was a commitment question. The court sustained the State's objection, and Petitioner then asked "is there anything you consider based on that which might merit a life sentence, a life penalty?" (7 RR 73-74.) After an extensive discussion, the Court again sustained the State's objection. (7 RR 74-79.)

Petitioner then moved to focusing on specific factors. He first asked whether she could consider "troubled person in his childhood" as mitigation. (7 RR 79.) The Court again sustained the state's objection. (7 RR 79-80.) Petitioner then asked about several other factors, and the court sustained the State's objection to each one. Those factors were:

• mental illness or extreme emotional distress

• community service or behavior

• behavior after the crime

• age

• kindness to others

• defendant's work ethic

• military service (7 RR 82-84.)

After questioning of the second juror was complete, Petitioner re-urged his request to ask the above questions. (7 RR 89-91.) The trial court ultimately granted Petitioner a running objection to the court's refusal to allow the above questions. (7 RR 130.)

At the end of the first day of jury selection Petitioner submitted a brief to the court addressing his ability to ask the above questions. (7 RR 212.) The issue was again discussed, but

the court did not reverse its previous rulings. (7 RR 212-215.)

**ii. Facts presented to the state courts on state habeas.**

Petitioner presented basically the same facts as on direct appeal, but in more detail, as a federal constitutional issue.

The issue under review here is illustrated in the questioning of prospective juror Cheryl Sadro, who was eventually chosen as Juror No. 1. (7 RR 93.)   Because the defense was forbidden from asking these questions as to *all* future jurors, and there was a running objection as to all future jurors, the questioning of Ms. Sadro contains all the facts supporting this claim:

Q.  MR. CALHOUN [defense attorney] Okay.  Um, what kind of facts would you look at?

> MR. SEGREST:  Your Honor, that's a commitment question.  She would make a determination based upon a certain set of facts and she's not -- they're trying to commit her.
> MR. CALHOUN:  Judge, we're not committing her to anything.  We're asking questions to -- as to what she would look at, because we don't know what her criteria are.
> MR. SEGREST:  It's classic commitment question.
> MR. CALHOUN:  No, commitment, Judge -- I object.  Commitment means to -- to present her facts and see if she'll -- she'll, uh, vote based upon those particular facts.  We're inquiring as to her opinions and her beliefs.  We need to see whether or not she's qualified to sit on this case here which means we need to know what her parameters are in determining what is a proper case for a death sentence.
> MR. SEGREST:  What she -- what she feels or doesn't feel at this point is -- is, uh -- is not -- let me tender to the Court the case of Tommy Lynn Sells, deals specifically to the commitment questions.  Here's a copy for the defense.
> MR. CALHOUN:  Thank you.
> MR. SEGREST:  Asking for the juror to -- to determine or to list a certain set of criteria on which they would -- would base, uh, their opinion to -- or decision is a commitment question
> The commitment question -- question is one which seeks to commit a prospective juror resolve -- or refrain from resolving an issue in a certain way after

-191-

learning a particular fact -- and that's what this seeks to do.  It is for her to list out the facts upon which she would -- without her hearing the facts of this particular case, Your Honor.

THE COURT:  I'll sustain the State's objection.

MR. CALHOUN:  Please notice my objection under the, uh, 16th Amendment that we are entitled to ask the jurors what her beliefs are, what facts that she would, uh, determine so she doesn't predetermine the case, Your Honor.  We are entitled to know what she thinks about that -- about that.  We can't make effective challenges on material for cause without knowing her beliefs about the death -- about the penalty.

THE COURT:  You're free to ask her about her beliefs in the death penalty, sir.  I haven't ruled that you can't.

Q.  (BY MR. CALHOUN)  Ms. Sadro, um -- with respect to the issue of mitigation -- then, again, that's anything that you decide for mitigation.  I mean, is there anything that you would particularly -- I want you to imagine the defendant's been found guilty and jurors have determined that -- you know, determined that there was a probability that he will commit future acts of criminal misconduct.  Um, is there anything you consider based on that which might merit a life sentence, a life penalty?

MR. SEGREST:  Your Honor, again, if the -- if the question was, what would she consider as mitigation, that is to commit her to a certain fact or set of facts and act a certain way based upon those facts or certain set of facts, and she sets out whether he sets them out or not.  So it's a commitment question.

THE COURT:  State's objection is sustained.

MR. CALHOUN:  Judge, again, I would object under Morgan v. Illinois.  We need to determine what this witness' actual beliefs are.  Excuse me, this venireperson's actual beliefs are.  We need to determine, um -- Judge, I believe we need to -- under Morgan v. Illinois, our questions are appropriate.

MR. HUNT:  And, Your Honor, I would -- I would add to that, uh, looking at this Sell's case that the Government has provided you, uh, Subsection B on the future dangerousness question, that's the section that's talking about our issue.  I believe it's on the third -- third -- I'm sorry, maybe the sixth page of the opinion.

What the Court indicates is that it's an improper commitment question to say to the -- the

-192-

venireperson, well, tell me some facts where you would say no
to the special issues if you heard those facts.  That's not
the question we're asking.  The question we're asking is what
sorts of things would be important to you in determining if
mitigation exists?  Not what sort of things would cause you to
answer yes to mitigation, or what sorts of things would cause
you to answer no to the other questions?  We're not trying to
commit the venireperson.  We're trying to find out what sorts
of things are important -- important to the venireperson.

Is that correct, Alex?

So it's not a commitment question as we see it;
the way we're phrasing it.

MR. SEGREST:  In Sells v. State, the question
on which special issue would that be important, would you be
more likely than not, less likely and -- well, we won't go
there.  But it has been held on, uh -- I wish I had -- if it's
not in that case, I know it's in another, that to ask the
juror to list the facts and circumstances upon which they
would vote at this point is an improper commitment question.

MR. HUNT:  Judge, I think we're asking not
would but could.  And could is the important part here.
Because if you -- if you would do it, that's a commitment.
But could is -- is -- you know, it's hypothetical to know that
the jurors compare to a certain aspect of the case.  If you
can or cannot do something is different from asking would you
or would you not do something.

THE COURT:  Then I -- I -- I've already

sustained the State's objection.  I'm going to stand by that
ruling.

MR. HUNT:  Okay.

MR. CALHOUN:   May I have a moment, Your Honor?

THE COURT:  Yes, you may.

MR. HUNT:  Thank you.

MR. SEGREST:  Your Honor, if I could, I'll also
give the Court my copy.  I didn't make another copy of James
David Wingo v. State.  This paragraph here talks about exactly
what we're talking about; the parameters on which they were
making a decision.

MR. CALHOUN:  Judge, just -- just to -- well, I
intend to ask this juror, of course, whether she could
consider certain aspects of mitigation.  I believe that's
appropriate in order to determine whether there's a -- a
prejudging upon that, and that's, of course, essential for us
to make a decision, uh, for cause or for peremptories.  I'm

-193-

not asking would, but could.  I believe that's appropriate under Morgan v. Illinois as to determine the juror's fitness for sitting on this -- on this case.  If she cannot consider something, then, um, she --

     MR. SEGREST:  She can --

     MR. HUNT:  It's prejudged and -- and, you know, that's a bias.

     MR. SEGREST:  Your Honor, she is free as a juror to consider anything presented.  She's the exclusive judge of the facts proven and the credibility to be given to the testimony and the -- and the witnesses.  She's not required to commit to -- to mitigating, aggravating, or anything at this point.  That's a commitment question.

     MR. CALHOUN:  And we're not asking her -- I'm sorry.

     MR. SEGREST:  That's a commitment question.

     MR. CALHOUN:  We're not asking her to commit, Judge.  We're asking, can she consider it and give it a fact.  If she can or cannot is a -- goes directly to whether it's a challenge for cause or peremptory.

     MR. LONG:  Your Honor, I think he has the, uh, right to ask her, will she listen to all the evidence and then make a decision as to whether or not she believes any of it is, uh, mitigating or aggravating, either way.  But to specifically get to something like, uh -- no -- no juror has to accept, uh, age or drug usage or anything else is, uh, mitigating.  It's up to them.  They make the decision.  She has to be able to listen to all of the evidence then make a decision whether she thinks at the time it's mitigating or not.  But she doesn't have to commit to any particular evidence as being mitigating.

     MR. CALHOUN:  But we're asking for commitment, Judge, we're asking whether she can consider.  And meaningfully consider.

     Under Morgan v. Illinois, these general questions --

     THE REPORTER:  Could you slow down?

     MR. CALHOUN:  Under Morgan v. Illinois, these general questions are meaningless with respect to, uh, exercising a peremptory challenge.  We're not asking would she.  Would she is a commitment question.  Could she is inquiring as to the juror's beliefs and looking for legal and factual biases which are integral to a right of a fair trial and right to a fair jury.  We're not asking what weight they want to assign or would they assign weight.  But we are asking

-194-

can they, in a theoretical sense.

Otherwise, Judge, then the -- the case is predetermined.  There's a preset bias.  And any -- and a juror who has a preset bias is not a fair and impartial juror.

THE COURT:  And what are you asking me to do at this point in time?

MR. CALHOUN:  I'm just asking the Court, you know, to -- to -- to -- uh, in anticipation of an objection what I'm going to be doing right now.  And the State has -- has made an objection about -- I guess, we need a ruling ahead of -- of -- at this point.

THE COURT:  I mean, there's nothing on the table for me to rule on.  There's no question out there to this juror at this point in time.  The State has not made an objection.  And so I'm not sure what you want me to do right now.

MR. CALHOUN:  Okay.  Well, let me ask my question then, Judge.  But my argument is -- is what I've just related to the Court.

THE COURT:  When you're ready to ask your question, go ahead.

MR. CALHOUN:  Okay.

Okay.  Ms. Sadro, we anticipate you're going to be hearing various amounts of evidence at trial, um, going towards the mitigation issue.  All right.  And I might ask -- and you're entitled to -- to put whatever weight, after you've heard it, whatever weight you want.  You can assign it a lot of weight, you can assign it no weight.  That -- that's your individual moral reasoning at stake here.  Um, what my question is though, is not what would you do, but what could you do?  Okay.  Now, could you consider if you heard evidence of a -- of a troubled person in his childhood, could you consider that as mitigation?

MR. SEGREST:  We'll object.  It's a commitment question.  Setting the parameters of her -- to her discretion concerning the issue.

MR. CALHOUN:  And, again, Judge, we're asking whether she has a preset formed opinion about the mitigation that we intend to -- to introduce.

THE COURT:  The State's objection is sustained.

MR. CALHOUN:  Please note my objection, Judge.

Um, under the 6th and 8th Amendment, Morgan permits us to ask that question, permits a response.  Um, I'm going to give the rest of the remaining questions, Judge, I think would be the same objection and the same response, but

may I read them into the record?

THE COURT:  I'd prefer you just ask the question of the witness.

MR. CALHOUN:  All right.

Okay.  Ma'am, could you consider -- could you consider, not would, but could you consider in determining mitigation, the fact of mental illness or extreme emotional distress?

MR. SEGREST:  Objection.  Commitment question.

THE COURT:  Sustained.

MR. CALHOUN:  Same response, Judge.

THE COURT:  Sustained.

Q.   (BY MR. CALHOUN)  All right, ma'am, could you consider community service or behavior --

MR. SEGREST:  Objection, Your Honor, commitment question.

MR. CALHOUN:  Same response, Judge.

THE COURT:  Sustained.

Q.   (BY MR. CALHOUN)  Or could you consider Mr. Coble's behavior after the crime?

MR. SEGREST:  Objection, Your Honor, it's a commitment question.

MR. CALHOUN:  Same response, Judge.  I think Morgan permits it.

MR. SEGREST:  Specific facts to lay out the parameters of her discretion.

MR. CALHOUN:  See, Judge, the discretion is whether or not to -- to ultimately accept or not accept it.  But the question here is whether or not some --

THE COURT:  You know, I've heard a lot of your argument at this point in time.

MR. CALHOUN:  Okay.

THE COURT:  If you'll just give me a second to think --

MR. CALHOUN:  Yes, sir.

THE COURT:  -- I would appreciate it.

That your point -- the last question was whether or not the panel member, uh, Number 2, Ms. Sadro, would consider the defendant's behavior; is that right?

MR. CALHOUN:  I think it's could, Judge.  I'm trying to emphasize the could, not would.  That's the distinction.

THE COURT:  Then I'll sustain the State's objection.

MR. CALHOUN:  All right.

Again, ma'am, could you consider age?

MR. SEGREST:  Objection, Your Honor, it's commitment.

THE COURT:  Sustained.

MR. CALHOUN:  Same response, Judge.

Could you consider his kindness to others?

MR. SEGREST:  Your Honor, we -- objection, commitment, and I think we get the -- get the idea here, he's simply going to go through his voir dire.  And I think if further questions of this nature, we'd ask -- asking specific facts that are not in evidence in asking her is a commitment. We would ask the Court to -- well --

THE COURT:  I sustain the State's objection.

MR. HUNT:  Judge, can I do a Bill of Exception then on my questions?  Will that be speeded along, more appropriate?

THE COURT:  If you'd like to go ahead and, um, place in the record any questions you'd like to ask that you think may -- may get a State's objection, go ahead.

MR. CALHOUN:  Okay.  Judge, I would also ask whether the juror, this juror, and all subsequent jurors could consider aforementioned questions as well as, um, the defendant's work ethic, the defendant's military service.

I would also ask this venireperson and other venirepersons whether there's anything they can consider under the circumstances after having found Mr. Coble a future danger that they consider, uh, which might merit a life penalty.

I'd also ask this venireperson --

THE COURT:  I'm sorry, what was your last one?

MR. CALHOUN:  Is there anything which this venireperson could -- could -- could consider under the circumstances of having found Mr. Coble a future danger to society which might merit a life penalty?  I would ask that question to boot.

MR. LONG:  I don't have any problem.  Is there anything that's -- that's mitigation?

THE COURT:  Okay.

MR. HUNT:  You will not object to that?

MR. LONG:  I don't have any problem with that last one.

MR. SEGREST:  Unless you were going to ask her exactly what -- what she were to consider.

MR. CALHOUN:  Okay.  I would also ask then.

Okay.  Let me ask the question then.  Um, ma'am, imagine that Mr. Coble has been found guilty, as he

-197-

has.  Imagine that you-all determined the first three
questions affirmatively.  All right.  Is there anything in
which you could consider -- uh, which might merit a life
sentence?

    A.   Yes.

    Q.   (BY MR. CALHOUN)   What are those, may I ask?

       MR. SEGREST:  I object as commitment, Your
Honor.

        THE COURT:  Sustained.

       MR. CALHOUN:  Again, Judge, I think we need to
know that in order to determine whether this juror is -- is --
has a bias or prejudice against some aspect of the law.  I
think under Morgan v. Illinois that's appropriate.

       THE COURT:  I've sustained the State's
objection.

    Q.   (BY MR. CALHOUN)  Ms. Sadro, is there anything
about the defendant's life or background after having found
him -- after knowing he's guilty of intentional murder that
you would want to consider in deciding whether to assess a
life penalty?

       MR. SEGREST:  Your Honor, that's another
commitment question.

       THE COURT:  State's objection is sustained.

       MR. CALHOUN:  Okay.  Judge, I -- for the
record, I would ask this question of this venireperson and all
other subsequent venirepersons.  My objection is under the 6th
and 8th Amendment.

(7 RR 72-84.)

At the end of her voir dire, the defense stated she was acceptable *but with the running*

*objection* to the limitation on her questioning, which would apply to all jurors, since she was the

first chosen:

> MR. SEGREST: Your Honor, the juror is acceptable to the State.
> MR. CALHOUN: Acceptable to the defense, your Honor.
> Judge, we...may we have a running objection with respect to all subsequent jurors
> with respect with respect to the questions I asked of Ms. Sadro, that we would ask
> the same questions of subsequent jurors to determine their suitability and issue of
> biases against the law?
> THE COURT: Well, before I give you a running objection, I'd like to hear the
> questions that you want a running objection to.

MR. CALHOUN: Okay....Among the questions we would ask, also from the jurors, assuming that we have a capital murder that's intentional, that's premeditated, that was cold-blooded, that it was not self-defense, the defendant was not insane, that he was not intoxicated, that it was not an accident, the victim didn't provoke it, what are the juror's feeling about the death penalty?  That is one question that we would ask the jurors.  That is a question that we were precluded from asking Ms. Sadro.

MR. SEGREST: We feel that's an improper commitment question, Your Honor.

THE COURT: And I'll sustain the State's objection.

And I'll give you a running objection.

MR. CALHOUN: Okay.  We would also ask subsequent jurors, um...imagine the defendant's been found guilty, the jurors unanimously agree that there is a probability that he'll commit future acts of violence; is there anything which you can consider which under the circumstances which might merit a life penalty?  And then we would ask what are those?

MR. LONG: Your Honor, I don't object to him asking, is there anything you can consider on mitigation.  I do object to him...the first part, no objection to.

The second part, what are those, that's what we'd object to.

MR. SEGREST: That's the commitment.  That's where they're asking to set the parameters.

THE COURT: Then the State's objection to the second part of the question is sustained.  The first part is certainly free to ask.

MR. CALHOUN: Okay.  We would ask the jurors about specific...whether they could consider specific acts of mitigation, meaning...uh, including troubled childhood, a disadvantaged childhood, mental illness, acting under extreme emotional distress, community service before and after the offense, age, kindness to others, work ethic, military service.

MR. SEGREST: And, again, each of those are, uh...uh, objectionable on the grounds they are commitment questions.  They are asked to...the jurors...the future jurors to commit, to make a decision based upon specific facts.

The law does not require the juror to give any weight to any factor.  If the juror said, no, I can't consider this, that is not a basis for cause, Your Honor.  It's not a challenge for cause.  It is simply a fishing expedition and tends to commit...or seeks to commit the juror to find certain facts and factors as mitigating.

MR. CALHOUN: Judge, we disagree.  Um, jurors have to be able to consider whatever we present.  They don't have to ultimately buy it.  They have to be able to consider it. And if they can't consider it up front, they can say, I can't give it any weight, well, then they have predetermined the case.  They are biased against an aspect of evidence that we wish to present.  We're not asking for commitment, because all we're asking is if they can consider it.  If they can't consider it, well, then, they're biased under *Morgan v. Illinois.*  The questions that we're being forced to ask at this point to allow us to effectively determine what their baises are.  Again, it's a matter of whether we're saying, well, would you give...would you find him mitigating?  Would you return mitigating...an affirmative answer based upon this?  We're not asking that.  We're asking, could you?  Could you

-199-

theoretically do so?  And that's not a commitment question, Judge.
THE COURT: The State's objection is sustained.
(7 RR 88-91.)

Thus, the defense preserved this error for this prospective juror (Ms. Sadro, juror No. 1)

and all others that were ultimately chosen to serve on Mr. Coble's jury.

### B.  What the State Court Held.

This claim was presented to the State courts as the twelfth point of error on direct appeal

and also as Claim 4 in the state habeas petition.

On direct appeal, CCA held as follows:

> In *Raby v. State* [970 S.W.2d 1 (Tex. Crim. App. 1998)] we rejected appellant's
> claim that he is entitled to ask potential jurors in a death penalty case about what
> specific evidence that juror could or would consider as mitigating. We stated that
> '[a] trial court does not abuse its discretion by refusing to allow a defendant to ask
> venire members questions based on facts peculiar to the case on trial (e.g.
> questions about particular mitigating evidence).'  Appellant does not persuade us
> that *Raby* was wrongly decided.  We therefore overrule appellant's twelfth point
> of error.
> *Coble v. State,* 330 S.W.3d 253, 295 (Tex. Crim. App. 2011).(Exhibit 26)[118]

In state habeas proceedings, the State argued that the claim was raised on direct appeal.

State's Answer at 9, Exhibit 27.  The claim was denied on the merits, and also on the State's

arguments that it had been presented and denied on direct appeal.  *Ex parte Coble,* WR-39,707-

03 (Tex. Crim. App. 2012) at 2. (Exhibit 31.)

### C.  Why the State Court Holding Was Objectively Unreasonable.

---

[118]    The CCA also cited in a footnote *Davis v. State,* 313 S.W.3d 317, 346 (Tex. Crim.
App. 2010)(following *Raby* and holding that the trial court did not abuse his discretion in finding
that appellant's questioning consider (sic) specific mitigation evidence was an improper
commitment question); and *Rosales v. State,* 4 S.W.3d 228, 233 (Tex. Crim. App. 1999)("This
Court has held on numerous occasions that an appellant is not entitled to voir dire prospective
jurors on whether they could consider particular types of mitigating evidence during the capital
sentencing phase.")

To the extent that the CCA denied the claim because it should have been brought on direct appeal, then that failure was the result of ineffective assistance of appellate counsel, Claim 19 herein (and on state habeas.)

Since the state court holding denying the claim was based on the direct appeal, we will examine that holding as to the individual sub-claims:

**Claim Four(a): The state court holding failed to consider the federal constitutional right of Mr Coble to a fair trial because the trial court failed to allow the defense to life-qualify the jury, and prevented the defense from meaningfully questioning potential and actual jurors concerning their views on mitigating evidence.**

The CCA's holding failed to consider any aspect of the federal constitutional dimension of this claim, and the denial was based strictly on state law.  The direct appeal claim *did* cite federal law,  *Tennard v. Dretke,* 124 S. Ct. 2562 (2004) in support, and the habeas claim was grounded in federal constitutional law.

For the reasons discussed *infra*, the jury selection process employed in this case violated Mr. Coble's federal constitutional rights to a fair trial by an impartial capital jury in violation of the Sixth, Eighth, and Thirteenth Amendments, to due process in violation of the Fourteenth Amendment, to a reliable capital sentencing determination in violation of the Eighth Amendment, and to the effective assistance of counsel in violation of the Sixth Amendment.  Mr. Coble is entitled to a new sentencing trial before a properly-empaneled jury because of these errors.

It is well-settled federal constitutional law that a criminal defendant on trial for his life is guaranteed the right to an impartial jury.  Part of the guaranty of this right is an adequate voir dire to identify unqualified jurors.  "*Voir dire* plays a critical function in assuring the criminal

defendant that his [constitutional] right to an impartial jury will be honored.  Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (White, J., plurality opinion), *quoted in Morgan v. Illinois*, 504 U.S. 719, 730-31 (1992).

Since the United States Supreme Court's landmark decision in *Witherspoon  v. Illinois*, 391 U.S. 510, 522 (1968), it has been established that the Sixth Amendment right to an impartial jury is violated when a jury is empaneled that is "uncommonly willing to condemn a man to die." *Id.* at 521.  The jury selection process employed in this case deprived Mr. Coble of his federal constitutional rights to a fair trial and an impartial capital sentencing jury because the defense was not allowed to question the jurors on their most important task: whether or not they would consider Mr. Coble's mitigating evidence.

Under the Sixth Amendment, a juror is considered biased if the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The constitutional standard for determining juror bias is no different in a capital case than it is in any other case.  *Wainwright v. Witt,* 469 U.S. 412, 423 (1984) ("there is nothing talismanic about juror exclusion" in capital cases). In capital cases, "as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts.  That is what an 'impartial' jury consists of . . . ." *Id.* at 423.  Thus, in determining a juror's fitness to serve on a capital jury, the Supreme Court has ruled that "the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." *Adams v. Texas*, 448 U.S. 38, 51 (1980).  This is merely an application of the familiar legal

standard to the specific legal requirements of capital cases – that is "whether the [capital] juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Wainwright*, 469 U.S. at 424 (quoting *Adams,* 448 U.S. at 45); *Gray v. Mississippi*, 481 U.S. 648, 657 (1987); *Morgan v. Illinois*, 504 U.S. 719, 728 (1992).

Issues of juror bias most frequently arise in capital cases when the State seeks to exclude prospective jurors who are partial to the defense because their anti-death penalty views would prevent or substantially impair them from returning a death sentence, or when the court fails to exclude jurors who are partial to the State because their pro-death penalty views prevent or substantially impair them from returning a life sentence, *see, e.g., Witherspoon v. Illinois*, 391 U.S. 510, 521 n.20 (1968) (citing with favor holding in *Crawford v. Bounds*, 395 F.2d 297, 303-04 (4th Cir. 1968) that due process prohibited the seating of a juror "who felt it his 'duty' to sentence every convicted murderer to death," particularly "while those who admitted to scruples against the capital punishment were dismissed").  The process of identifying and excluding such jurors is called, respectively, "death-qualification" and "life-qualification."

A new sentencing proceeding is required whenever the court improperly death-qualifies the jury if the error results in the improper exclusion of even a single juror.  *Gray v. Mississippi*, 481 U.S. 648, 659 (1987); *Davis v. Georgia*, 429 U.S. 122, 122 (1976) (*per curiam*).  Similarly, a new sentencing is required whenever the court denies the defense the opportunity to life-qualify the jury, *Morgan, supra,* or a juror who is partial to the State at sentencing is actually empaneled.  *Ross, supra*.

As shown *supra,* the defense sought to ask broad-based questions that covered Mr. Coble's mitigating evidence:

-203-

MR. CALHOUN: Okay.  We would ask the jurors about specific...whether they could consider specific acts of mitigation, meaning...uh, including troubled childhood, a disadvantaged childhood, mental illness, acting under extreme emotional distress, community service before and after the offense, age, kindness to others, work ethic, military service.

MR. SEGREST: And, again, each of those are, uh...uh, objectionable on the grounds they are commitment questions.  They are asked to...the jurors...the future jurors to commit, to make a decision based upon specific facts.

The law does not require the juror to give any weight to any factor.  If the juror said, no, I can't consider it, that is not a basis for cause, Your Honor.  It's not a challenge for cause.  It is simply a fishing expedition and tends to commit...or seeks to commit the juror to find certain facts and factors as mitigating.

MR. CALHOUN: Judge, we disagree.  Um, jurors have to be able to consider whatever we present.  They don't have to ultimately buy it.  They have to be able to consider it.  And if they can't consider it up front, they can say, I can't give it any weight, well, then they have predetermined the case.  They are biased against an aspect of evidence that we wish to present.  We're not asking for commitment, because all we're asking is if they can consider it.  If they can't consider it, well, then, they're biased under *Morgan v. Illinois*.  The questions that we're being forced to ask at this point to allow us to effectively determine what their bases are.  Again, it's a matter of whether we're saying, well, would you give...would you find him mitigating?  Would you return mitigating...an affirmative answer based upon this?  We're not asking that.  We're asking, could you?  Could you theoretically do so?  And that's not a commitment question, Judge.

THE COURT: The State's objection is sustained.

(7 RR 88-91.)

Thus, the trial court erred by improperly failing to allow the defense to life-qualify the jury to see if they could give mitigating weight to Petitioner's evidence and by failing to allow questioning as to what mitigating evidence they would consider.  Questioning as to *all* of Mr. Coble's mitigating evidence was specifically prohibited  ("We would ask the jurors about specific...whether they could consider specific acts of mitigation, meaning...uh, including troubled childhood, a disadvantaged childhood, mental illness, acting under extreme emotional distress, community service before and after the offense, age, kindness to others, work ethic, military service."   (7 RR 90.))   As the defense was prohibited from asking any of these questions, they had no way of knowing what, if any, of Mr. Coble's evidence would be considered by the jurors.

-204-

By construing the claim as strictly one of state law under *Raby, Davis,* and *Rosales,* the CCA ignored the federal constitutional right to a fair and unbiased jury. This was especially important here, as there was no guilt phase, and all the jury was being asked to consider was mitigating evidence in this sentencing phase re-trial. Thus, the CCA's holding "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 2254(d)(1).

**Claim Four(b):** **The state court holding failed to consider the federal constitutional right of Mr. Coble to a new penalty phase trial because the trial court failed to allow the defense to uncover juror bias.**

Here too, the federal constitutional right to a fair and unbiased jury was not considered in the CCA's opinion. By not allowing Mr. Coble's attorneys to probe for bias, he was denied this right. Mr. Coble is entitled to a new sentencing hearing because the trial court's voir dire restrictions, discussed *supra,* prevented him from ascertaining whether prospective jurors' beliefs regarding mitigating evidence caused them to be biased against a life sentence.

The trial court's limitation on voir dire deprived Mr. Coble of the opportunity to individually life-qualify every venire-person to uncover bias or prejudice and to exclude prospective jurors who had a fixed opinion and were unwilling to follow the law regarding the consideration of mitigating evidence. As discussed *supra,* when the defense attempted to ascertain disqualifying biases such as the jurors' attitudes toward mitigating evidence, these questions were disallowed on the basis that they were "commitment" questions. If a juror harbored bias that would not allow him or her to consider various aspects of Coble's mitigating evidence, the court's ruling made it impossible for this bias to be discovered by the defense.

Because the death penalty was and is a sensitive issue, this voir dire was essential to

ensure that any biases held by potential jurors would be discovered during the voir dire process and that Mr. Coble's right to a neutral and impartial jury would be preserved.  Moreover, this voir dire to uncover juror bias was especially important in Mr. Coble's case because of extensive pretrial publicity that focused upon Mr. Coble's prior trial and death sentence.  The inadequacy of voir dire in this case requires that Mr. Coble's death sentence be vacated.

From the time of *Witherspoon* in 1968, it has been clear that due process prohibits the empaneling of a juror "who felt it his 'duty' to sentence every convicted murderer to death," particularly "while those who admitted to scruples against capital punishment were dismissed." *Id.* at 521 n.20 (quoting *Crawford v. Bounds*, 395 F.2d 297, 303-304 (4th Cir. 1968)).

Obviously, the right to an impartial jury also entitles a capital defendant to a sentencing jury that is capable of following the law and imposing a life sentence, no less than the State is entitled to a jury that is impartial on the issue of imposing a death sentence.  *See Ross v. Oklahoma*, 487 U.S. 81 (1988); *Morgan v. Illinois*, 504 U.S. 719, 728-29 (1992) (reiterating *Ross*); *see also Smith v. Balkcom*, 660 F.2d 573, 578 (5th Cir. 1981) ("The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case.  Clearly, the extremes must be eliminated – i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence."), *modified*, 671 F.2d 858, *cert. denied*, 459 U.S. 882 (1982).  Indeed, as Chief Justice Rehnquist indicated in *Ross* in 1988, life qualification and death qualification are part of the same legal doctrine.  *See Ross*, 487 U.S. at 83 (noting that "the trial court should have excused for cause under *Witherspoon v. Illinois*" a juror who would have automatically voted to impose the death penalty).

Similarly, in *Morgan*, the Supreme Court reiterated that life-qualification was nothing

more than a determination of bias based upon a juror's views on capital punishment.  The Court explained that the legal standard for ascertaining juror partiality was the standard announced by the Court in *Adams v. Texas*, 448 U.S. 38 (1980), and *Wainwright v. Witt*, 469 U.S. 412 (1985), the progeny of *Witherspoon*.  *See Morgan*, 504 U.S. at 728-29.  The standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  *Id.* at 728 (quoting *Wainwright v. Witt*, 469 U.S. at 424, and *Adams v. Texas*, 448 U.S. at 45).  The Court explained:

> We deal here with petitioner's ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt.  Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would never do so.

*Id.* at 733-34.

To uncover juror bias here, in a sentencing-phase-only trial, it would have been necessary to ask the jurors about their attitudes regarding the kind of mitigating evidence Mr. Coble's attorneys intended to present.  The defense attorneys could have educated the jurors regarding their duty to consider the evidence, *not their duty to give it mitigating weight*.  However, all of this was ruled impermissible. ("We would ask the jurors about specific...whether they could consider specific acts of mitigation, meaning...uh, including troubled childhood, a disadvantaged childhood, mental illness, acting under extreme emotional distress, community service before and after the offense, age, kindness to others, work ethic, military service."  (7 RR 90.)) The trial court failed to make this crucial distinction.

By framing the issue as questioning about "specific mitigating evidence, *Coble v. State*,

330 S.W.3d at 295, or a "commitment question" (the trial court and the prosecution) made it impossible for Mr. Coble's attorneys to tell if the jurors would consider any of Mr. Coble's reasons for a life sentence.   The jurors were not being asked whether they would "commit" to a life sentence based on the mitigation evidence, only whether they would *consider* it.   The court erred because this was not an "all or nothing" proposition. The consideration of the mitigating evidence did not imply a "commitment" to it, in the sense that the jurors must assign it mitigating value.   Even less did the questions of defense counsel compel a "commitment" to a life sentence.   The Court thus did not allow the defense to "life-qualify" Petitioner's jury.   To the extent that *Raby, Davis,* and *Rosales*, and the CCA's opinion in this case hold otherwise, they are unconstitutional under *Morgan v. Illinois* and the other authorities cited herein.   Thus, by ignoring these implications, the CCA's holding "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."   2254(d)(1).

**CLAIM FIVE:** **THE PROSECUTOR IN PETITIONER'S TRIAL HAD AN AUTOMATICALLY DISQUALIFYING CONFLICT OF INTEREST.**

The prosecutor at Petitioner's  trial, the McLennan County District Attorney's Office, had an automatically disqualifying conflict of interest that deprived Mr. Coble of due process and a fair trial and his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and similar provisions of the Texas Constitution.

A prosecuting attorney in the McLennan County District Attorney's Office, J.R. Vicha, was a victim in this case and he testified at Petitioner's trial.  Mr. Vicha's father, Bobby Vicha, and his grandparents Robert Sr. and Zelda Vicha were allegedly killed by Mr. Coble yet the McLennan County District Attorney's Office did not disqualify itself.

In addition, an administrator in the same prosecutor's office also testified as to his interpretation of Mr. Coble's military records.  This witness, a Mr. Price, was explicitly identified as an employee of the district attorney's office and thus the prosecutor vouched for his testimony.

### A) Facts Presented to the State Courts.

This claim was presented in state habeas proceedings as Claim 5.  It was denied by the CCA on the basis that it was procedurally barred for failure to litigate it at trial or present it on direct appeal and also on the merits.

### i) Mr. J. R. Vicha.

During pre-trial motions on July 10, 2008, defense attorney Mr. Hunt mentioned that it was aware of the issue of the possibility of recusing the McLennan County District Attorney's office because one of their assistant district attorneys, Mr. J.R. Vicha, was a victim of  Mr. Coble's crime.  (4 RR 7.)  The defense stated that it was "the Government's position is that they

have erected a Chinese wall, so there's no basis for recusal and they believe they separated themselves from Mr. Vicha, who is a prosecutor over in that office."  (4 RR 7.)  The defense attorney stated that they were "still looking into it" to see if they had "a valid argument for a recusal, even if the court can order a recusal."  (4 RR 7.)  He added that  "[s]o that's an issue that we still haven't gotten to the bottom of."  (4 RR 7.)

On July 30, 2008, the prosecution designated assistant district attorney J.R. Vicha as a potential fact witness.  (5 RR 7.)  Mr. Coble was arraigned on August 1, 2008.  (6 RR 10.)  That same day, both the state and the defense announced ready for trial.  (6 RR 148.)   No recusal motion was filed by the defense attorneys prior to trial.

Later,  during the course of Mr. Coble's penalty phase re-trial, the State announced that they wished to call John Robert (J.R.) Vicha, Jr. as their next witness.  (22 RR 166.)  At the time of the murders, Mr. Vicha  was one of the children tied up by Mr. Coble on August 29th, 1989, and his father, Bobby Vicha, was shot by Mr. Coble, along with Mr. Vicha's grandparents.[119]

The prosecutor stated that "My office...built a 'Chinese wall' regarding J.R. Vicha in this particular case.  We don't think he's in the least disqualified as a witness in this case.."  (22 RR 166.)

The following colloquy then ensued:

Mr. Hunt [first-chair defense attorney] : ...there's been this Chinese partition and he's not discussed the case with anyone other than his discussing his own prospective testimony. *So we'd just like to put that on the record so that's clear for future review...*
     And we also discussed, I believe, an agreed Motion in Limine where the Government won't go into the fact that Mr. Vicha is currently an assistant district attorney with their office, because we feel like that would reflect negatively and be of unfair prejudicial value.

---

[119]   *See* Exhibit 6 at 10-12, relating to Mr. Vicha's past as a victim in the case and his employment as a criminal prosecutor in the McLennan County prosecutor's office, the office that tried Mr. Coble.

J.R. Vicha was then called into chambers and questioned outside the presence of the jury:

Mr. Hunt: Mr. Vicha, I have a few questions for you....And you're currently employed by the District Attorney's office here in McLennan County; is that correct?

A. [Mr. Vicha] Yes.

Q.  Okay.  How long have you worked for the DA's office?

A.  Since April 06'.

Q.  April of 06.  So just over two years.  During that time period, can you tell me if you've had any involvement in handling this particular case, this capital murder case we're here for?

A.  No, I haven't.

Q.  And just to make clear for the record, you are a son of Bobby Vicha who was murdered in this particular case?

A.  Yeah.

Q.  Okay.  You haven't...so, specifically, have you reviewed any of the paper files in the District Attorney's office?

A.  No. I don't even know where they've been keeping them.

Q.  Okay.  Have you discussed the prosecution with Mr. Long or Mr. Segrest or any other prosecutor that's handling the case?

A.  No.

Q.  Did you have any involvement with the case while it was on appeal or anything like that?

A.  No.

Q.  Okay.  Un, so what you're saying is that your office has directed what we call a Chinese wall, you've had absolutely no interaction with anybody about the case, any discussions, not looked at any documents, not done anything in your portion of your job having to do with this case; is that correct?

A.  Right.  Basically, all I know is what I read in the paper, for the most part.

Q.  Okay.  And, of course, you've discussed your prospective testimony with Mr. Segrest?

A.  We haven't even...we've spoke very briefly even about that.

Q.  And you prepared a written statement?

A.  Yes, I did.

Q.  All right.  And did you do that with Ms. Stewart or by yourself?

A.  I did it by myself.

Q.  All right.  And Mr. Segrest, Mr. Long, nobody talked to you about what ought to be contained in that...in that written statement, did they?

A.  No.  They didn't even ask me to write a statement.  I did it on my own.

Q.  All right.  So that they would know what sort of information you would be able to add to this trial?

A.  That's correct.

Q.  All right.  And I assume you didn't find out until recently that you were even going to be on the witness list; is that correct?

A.  Fairly recently.

Q.  All right.  So you hadn't known for the last six months that you would be on the

-211-

witness list?

A.  Oh, no.  It's been a couple of weeks maybe at the most.

Q.  So you didn't have advanced warning, heads up, you know this fact through your employment at the district attorney's office; is that correct?

A.  Oh, no.  That's correct.

Q.  Okay, so in your opinion, you've been totally separated from the office in terms of handling this particular case?

A.  Yeah.

Q.  Un, well, let's sort of turn that upside down.  Have you...just so it's clear for the record...have you put any pressure on the district attorney, himself, to seek some particular punishment in this particular case?

A.  No.

Q.  Okay.  *In case somebody would later come by and accuse you of pressuring your boss to seek the death penalty, you can say no, you never put any pressure on them to do that?*

A.  Right.  And even since...since he is my boss, I've made it a point not to even say anything like that.  Because I like my job and I wouldn't want to...you know, I just tried to stay away from it.

Mr. SEGREST: Right.  You don't tell your boss what to do?

A.  Right.

(22 RR 166-172)(emphasis added).

The questioning continued in a similar vein with Mr. Coble's other attorney, Mr. Alex

Calhoun:


Q.  Well, I have only one question....Have you at any point seen any of the police reports that were generated s part of this case either intentionally or unintentionally?

A.  Um, I think back when the original trial happened, my...my mom or sister had a lot of stuff, but I never really looked through it.

Q.  Okay.

A.  If I did, it was back when I was...you know, I...

Q.  So within the last two years you've had no exposure to any document generated by the DA's office or by the Texas Attorney General's office or by the defendant's...

A.  No, other than the opinions that are issued by the Appellate Court.

Q.  Okay.  Let me ask you this, if I may.  When you prepared your written statement here, um, why is it that you prepared a written statement at all?

A.  Because I knew I remembered stuff and nobody asked me the first time and I kind of felt like it...I didn't want the trial to go by and turn out, well, you should have told us you knew such and such, so I just wanted to make sure.

Q.  Okay.  Had there been any discussions between you or anyone else in the District Attorney's office about testifying prior to your writing this statement down?

A.  No. As a matter of fact, when I wrote that, I was under the     understanding that I was not going to be testifying.

-212-

Q.  Okay.  No further questions.
(22 RR 172-173.)

The prosecutor then stated that

[i]f we could just inform the witness that we've agreed to not reveal to the jury the fact that you now work for the District Attorney's office.
Mr. Segrest: Basically you'll be asked what your profession is.  You're an attorney.
The Witness: Right.
(22 RR 173-174.)

Thus, **both** of Mr. Coble's attorneys joined in an effort to protect their own interests over those of their client, and **both** had this conflict of interest (*see* Claim 6, *infra*.)

Mr. Vicha was then allowed to testify in front of the jury.  He told the jury that he was the son of Bobby Vicha[120] and was 11 years old in 1989.  (22 RR 182.)   The main prosecutor, Mr. Segrest,  indicated that he knew him and hence addressed him as "J.R." before the jury.  (22 RR 183.)[121]   Karen Vicha, his father and his grandparents all lived close to each other.  (22 RR 184.)  Before August 29, 1989, Mr. Vicha liked Mr. Coble.  (22 RR 185.)   On that day, Mr. Vicha returned from school on the bus with his cousin Heather Moss, a daughter of Karen Vicha.  (22 RR 186.)  His father's and grandparent's garage doors were closed so he went to Karen's house.  (22 RR 187.)  When they entered the house, Mr. Coble was there.  (22 RR 190.)  He tied Mr. Vicha to a bedpost and put tape over their mouths, but it later fell off.  (22 RR 190.)  Mr. Coble asked him when Bobby Vicha returned from work.  (22 RR 191.)

Mr. Coble left to go to Bobby Vicha's house, and when he returned he said something about being on "America's Most Wanted."   (22 RR 192.)   At one time, he said he hurt his

---

[120]   The jury was informed that he was an "attorney" with no inquiry about where he practiced.

[121]   The jury could well have inferred from this familiarity alone that Mr. Vicha worked in the prosecutor's office.

thumb.  (22 RR 193.)   Bill Coble left again and then returned.  (22 RR 194.)  Then Karen Vicha

returned home.  (22 RR 195.)   She left with Mr. Coble after telling the kids goodbye.  (22 RR

195.) Later that night, Mr. Vicha learned that his father had been killed.  (22 RR 196.)

A few days before this happened, Bobby Vicha told J.R. where certain valuables were

hidden in the house.  (22 RR 198-199.)   Mr. Vicha thought his father was doing that because he

felt that something might happen to him.  (22 RR 200.)   He said that the death of his father has

affected him.  (22 RR 200.)

### ii) Mr. Phillip Price.

Another employee of the McLennan County District Attorney's office testified as an

"expert" witness.   Phillip Pierce, an administrator in the Criminal District Attorney's Office in

McLennan County, testified that he reviewed some military records of Mr. Coble.  (20 RR 220.)

However, the records related to 1965 to 1969,  when Mr. Pierce was not in the military.  (20 RR

222.)  He entered the military in 1974.  (20 RR 223.)  The defense objected to his testimony on

Sixth Amendment grounds if the purpose of the testimony was "to elicit any kind of

misconduct."  (20 RR 224.)  The Court allowed Mr. Pierce's summary of the records.  (20 RR

225.)

Mr. Coble enlisted in the Marines in 1965 and went to San Diego for his basic training.

(20 RR 226.)   At this time, the Vietnam war was escalating. (20 RR 231.)   In 1966 he was

promoted to private first class and in June of 1966 he received a violation for sitting down at his

guard post.  (20 RR 226.)   He was reduced in rank and then promoted again.  (20 RR 226.)

From December 1966 to November 1967,  Mr. Coble served in Vietnam as a rifleman and a

machine gunner.  (20 RR 226, 232.)   He participated in Operation Chinook "against enemy

forces in Quang Tri province" from December 19, 1966 to January 26, 1967.  (20 RR 234.)  Mr. Coble also participated in Operations Prairie, Prairie II, Prairie IV, and Operation Hickory.   (20 RR 236, 238.)   He received a Vietnam service ribbon with two campaign stars.  (20 RR 237.)  Additionally, he also participated in Operation Cimarron and in the defense of Camp J.J. Carroll, and in Operation Buffalo and Operation Kingfisher.   (20 RR 239, 242.)   He was promoted to lance corporal in November of 1967.  (20 RR 226.)   Then he was assigned to the military police company in San Diego.  (20 RR 227.)   In March of 1968 he was transferred to Guantanamo Bay in Cuba.  (20 RR 227.)  In May of 1968, Mr. Coble was disciplined for dereliction of sentinel duties and reduced to private first class.  (20 RR 227.)   In November of 1968 he was sleeping at his guard post.  (20 RR 228.)   In 1969 he was reduced in rank to private for leaving his post without being properly relieved. (20 RR 228.)   These disciplinary actions are characterized as non-judicial "Article 15s"  and "minor infractions."  (20 RR 245-246.)   In October of 1969 Mr. Coble was released from active service and he entered the Marine Reserves;  his service ended in October 1971.  (20 RR 228.)  His character of service was listed as honorable when he was discharged, the highest of three possible discharge categories.  (20 RR 229, 244.)

Mr. Pierce's lack of relevant personal knowledge of the military in the years Mr. Coble served became evident on cross-examination. The witness was completely uninformed regarding the details of the various military campaigns Mr. Coble participated in (20 RR 238-240); admitted he had "no personal knowledge of his activities in Vietnam" (20 RR 238); did not know the location of Quang Tri province, where most of Mr. Coble's missions took place (20 RR 239-240); was not familiar with Mr. Coble's educational record (20 RR 243); had no knowledge of conditions at Guantanamo Bay (20 RR 248); did not know the pay schedule or how the demotions affected Petitioner financially (20 RR 248); and did not know whether Mr. Coble was

entitled to legal representation at the disciplinary hearing in 1969.  (20 RR 250.)

**B. What the State Courts held.**

This claim was presented in state habeas proceedings as Claim 5.  It was denied by the CCA on the basis that it was procedurally barred for failure to litigate it at trial or present it on direct appeal and also on the merits.  *Ex parte Coble,* WR-39,707-03 (Tex. Crim. App. 2012) at 2. (Exhibit 31.)

**C.  Why the State Court Holding Was Objectively Unreasonable Under 2254(d).**

**1) The procedural default holding was erroneous.**

To the extent that the CCA denied this claim as procedurally barred for failure to litigate it at trial, then this failure was ineffective assistance of counsel, caused by their conflict of interest, which is the subject of the next Claim, Claim 6.

To the extent that the claim was denied by the CCA on the basis that it should have been raised on direct appeal, then that failure was a result of ineffective assistance of appellate counsel, raised as a separate claim on state habeas and also herein.

Additionally, to the extent that the claim was denied by the CCA on the basis that it should have been raised on direct appeal, that holding was clearly erroneous, as the claim relies on much extra-record evidence, such as the media reports of the adverse publicity, and Exhibits 10 and 11.

Article 11.071 proceedings are the first proceeding designated by Texas for a capitally-sentenced prisoner to adjudicate claims based upon extra-record evidence, *i.e.*, evidence that does not appear in the appellate record. This claim relies on several extra-record exhibits and habeas testimony that could never have been admissible on appeal and/or occurred

after the direct appeal was filed.   In fact, it is black-letter law in Texas that "the most basic characteristic of the appellate record is that it is limited to matters before the trial court. An appellate court may not consider such extra-record materials as affidavits attached to appellate briefs."  Dix, George E., *Criminal Practice and Procedure (Texas Practice Series)*, West, 3rd. ed. 2011, Sec. 55:48 ("Appellate Record") at p. 116 (emphasis added). *See, e.g., Hartman v. State,* 198 S.W.3d 829, 842-43 (Tex. App.–Corpus Christi 2006, pet. Stricken)(manual attached to appellate brief not considered because it was not in the record); *Flowers v. State,* 133 S.W.3d 853, 859 (Tex. App.–Beaumont 2004)(court of appeals refused to consider document attached to motion to abate the appeal).  Even in the situation when an appellant moves to supplement the appellate record with *his own affidavit,* the appellate courts have responded that since the affidavit was not placed into the record in the trial court, it could not be a proper part of the appellate record.  *Bowler v. State,* 822 S.W.2d 334 (Tex. App.–San Antonio 1992, pet. ref'd).

This conflict of interest involving Mr. Vicha required automatic disqualification of the McLennan County District Attorney's Office. Texas case law has held that when an alleged conflict of interest is at issue, a district attorney or his or her staff may not be disqualified unless an actual conflict of interest exists and that conflict rises to the level of a due process violation. *Landers v. State,* 256 S.W.2d 295, 303 (Tex. Crim. App. 2008).  Here, however, there was such a violation.

**2) The CCA's denial on the merits was also erroneous.**

The prosecutor-prepared pleadings which were adopted verbatim by the trial court and the CCA are erroneous under both 2254(d)(1) and (d)(2).  As to the d(1) "contrary to law" standard, the findings the state courts signed off on only consider conflicts of interest in a narrow manner: "[n]either the elected Criminal District Attorney, who prosecuted Applicant in this re-

trial, nor the witness, J.R. Vicha, ever represented Applicant in this triple murder."   State's

Answer at 11, Exhibit 27.   The state courts also held, somewhat confusingly, that there was no

conflict because "neither Mr. Vicha nor Mr. Pierce were acting as advocates in the re-trial, these

rules [on recusal of a district attorney] do not apply."   State's Answer at 11, Exhibit 27.   Of

course, there are many other situations where there may be a conflict other than when the

witnesses formerly represented Petitioner.

Left unexamined by both the trial court and the CCA was the central flaw in the

prosecutor's rationale for allowing Mr. Vicha to testify.   It was based on the so-called "Chinese

Wall" theory whereby Mr. Vicha was "walled off" from any decision-making authority or ability

to influence the case.   What the state courts failed to recognize was the basic fact that Texas does

not recognize the "Chinese Wall" concept, as discussed *supra.*   This was fatal to the

prosecution's entire premise allowing Mr. Vicha to testify and it is also fatal to the CCA's

holding.

### i) The district attorney's office, as both advocate and witness, violated the canon of ethics.

Counsel may be disqualified under the Texas Rules of Disciplinary Conduct when the

opposing party can demonstrate actual prejudice resulting from opposing counsel's service in the

dual role of advocate-witness.   *Gonzalez v. State,* 117 S.W.3d 831, 837  (Tex. Crim. App. 2003);

*House v. State,* 947 S.W.2d 251 (Tex. Crim. App. 1997); *Brown v. State,* 921 S.W.2d 227 (Tex.

Crim. App. 1996).

In determining whether counsel should be disqualified, we first look to the TEX.

DISCIPLINARY R. PROF'L CONDUCT, which outline when a lawyer, or another lawyer in the same

firm or office, may assume dual roles of an advocate and a witness in the same adjudication.

Rule 3.08 states:

> (a) A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated of pending adjudicatory proceeding if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client unless:
> 1) the testimony relates to an uncontested issue;
> 2) the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony;
> 3) The testimony relates to the nature and value of legal services rendered in the case;
> 4) the lawyer is a party to the action.

None of these exceptions applied here.

### ii) Texas law imputes the conflict to all members of the district attorney's office.

Under TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(b), reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, Art. 10, § 9 (Vernon 2005), the personal conflicts of one attorney are imputed to all other members of a firm.[122]   Comment 7 to Rule 1.09 states that this imputation can be removed when an attorney leaves a firm.  The Restatement (Third) of The Law Governing Lawyers also produces the same result.  The prohibition is similarly imputed to other members of a law firm under § 123 and it also provides that the imputation is lifted upon the attorney's departure from the firm. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 123, 124.   At the time of Mr. Coble's trial, Mr. Vicha was still a member of the prosecuting agency, the McLennan County District Attorney's office, as the above testimony shows.  In Texas, the sharing of confidences are presumed.  *Grant v. Thirteenth Court of Appeals,* 888 S.W.2d 466, 467-468 (Tex. 1994).

### iii) Petitioner was prejudiced by this conflict of interest.

A showing that the attorneys's office should have been disqualified does not entitle an

---

[122]   The current version of the Texas Rules became effective January 1, 1990. *See Clarke v. Ruffina,* 819 S.W.2d 947, 949 (Tex. App.-Houston [14th Dist.] 1991, writ dism'd w.o.j.)

appellant to relief on appeal unless the appellant or applicant can demonstrate actual prejudice resulting from the opposing party's service in the dual roles of advocate and witness. *Powers v. State,* 140 S.W.3d 851, 854 (Tex. Crim. App. 2004); *Gonzalez v. State,* 117 S.W.3d 831, 837 (Tex. Crim. App. 2003).

Petitioner was prejudiced in two ways:

**a) Petitioner was deprived of an unbiased decision on whether to seek the death penalty**.

First, and most importantly, he was deprived of an unbiased decision of the prosecutor as to whether to seek the death penalty. Because Mr. Vicha was a member of the district attorney's office and apparently his father had a special relationship with the head of that office, Mr. Segrist, and Mr. Vicha was personally close to a sitting judge,[123] there could not have been an impartial decision made as to whether that office would seek the death penalty or agree to a life sentence for Mr. Coble. Mr. Vicha's presence in that office made the decision a foregone conclusion and that office should have recused itself as soon as the case was remanded for the new penalty phase re-trial due to the inherent conflict.

There were many reasons why a disinterested prosecutor would not have sought a new penalty phase re-trial. Primarily, Mr. Coble's advanced age of nearly 60 at the time of the re-trial and his poor health meant that it was likely he would die in prison anyway, thus saving the county the considerable expense and time commitment of the prosecuting attorneys entailed in the re-trial.[124] Additionally, his absolutely violence-free record for the eighteen prior years and

---

[123] The Waco Tribune-Herald reported on April 15, 2006, that Mr. Segrest had known J.R. Vicha's father, Bobby Vicha "for just about forever." Exhibit 6 at 10. Additionally, Judge Strother "has served as sort of a mentor over the years for Vicha." *Id.* at 12.

[124] *See* summary of Dr. Browder's testimony, *supra.* Mr. Coble at the time of the trial, was about to turn 60. (25 RR 49.) He was under treatment for high blood pressure,

his good deeds in prison meant that the state would have a heavy burden in proving the future dangerousness special issue.  The first trial occurred in 1990, when witness recollections were much fresher.   With an impartial decision-maker, all these factors would have weighed heavily on the side of agreeing to a sentence of life in prison and foregoing a re-trial.  Thus, Mr. Coble can show prejudice in the fact that the decision to seek the death penalty was made by a biased decision-maker.

The "Chinese Wall" concept completely fails to address this inherent bias.  The danger was not that Mr. Vicha discussed the case with his colleagues, saw the case files, did something unethical or improper, or pressured them into seeking the death penalty.  It is unrealistic to assume that a newly-hired assistant district attorney had any decision-making authority whatsoever in this matter.  The bias and prejudice resulted from Mr. Vicha's status as a member of that office, which biased his bosses and their decision-making process in whether to seek the death penalty and made impossible a fair and impartial evaluation of the merits of a re-trial.

**b) The testimony of Mr. Vicha was itself prejudicial.**

Secondly, Mr. Coble was prejudiced by the testimony of Mr. Vicha. There was a real possibility that one or more of the jurors knew of his status as a district attorney as head prosecutor Mr. Segrest addressed him colloquially as "J.R.", and indicated that they knew each other.  (22 RR 183.)  The trial was held in Waco, and it was highly likely that one or more jurors knew of his status as an assistant district attorney, and would have communicated that fact to

---

hypertension, high cholesterol, and heart disease.  (25 RR 49.)   He also takes a drug for acid reflux.  (25 RR 49-50.)  He had a heart attack in 2004.  (25 RR 50.)  Mr. Coble takes both long-lasting nitroglycerin pills and short-acting nitroglycerin pills.  (25 RR 50.)  Some of the drugs are to prevent another heart attack.  (25 RR 51.)  The penalty phase re-trial cost the county at least $99,000 not counting prosecutor staff time, court time, and some unsubmitted attorneys bills.  Exhibit 6 at 68.

their fellow jurors.  That knowledge would have been tremendously prejudicial for Mr. Coble as Mr. Vicha, having lost his father and grandparents, was a tremendously sympathetic witness who would have garnered a considerable amount of empathy and compassion on the part of the jurors.  That sympathy and compassion for Mr. Vicha would have meant that a fair and unbiased decision by the jury would have been difficult or impossible and Mr. Coble was thereby prejudiced.

### iv) The district attorney's office was in a position that required automatic disqualification.

Even though no showing of actual prejudice is required in a case that requires automatic disqualification, there was actual prejudice here.  Mr. Coble was nearly 60 years of age at the time of the re-trial, and is the sixth-oldest person of the 323 inmates currently on Texas' death row.[125]   As an inmate beginning once again the appeals process, the decision to again seek death is at best questionable given the very high probability that Mr. Coble would have died in prison had he been given a life sentence. When granted a penalty phase re-trial, he faced a complete new round of trial, appeal and post-conviction proceedings from scratch, which would reasonably be expected to last for many years, as the district attorney Mr. Segrist himself admitted at final argument.[126]   The high cost of the re-trial, Coble's advanced age, his spotless discipline record for 18 years, and his poor health were all  reasons that would have inclined an impartial prosecutor to offer a plea to a life sentence from which Mr. Coble would likely never be released, rather than opt for the penalty phase re-trial.   Additional reasons included the

---

[125]   *See* Exhibit 9, Gender and Racial Statistics of Death Row Offenders and list of TDCJ death row inmates.

[126]   "If he dies there [on death row], so be it." (29 RR 180.)

unpleasant effects and trauma of the re-trial on the Vicha family, as Karen Vicha herself stated on the stand.[127]    Mr. J.R. Vicha's presence in the district attorney's office and his special relationship to Mr. Segrest give rise to the strong inference that the decision to re-try Coble was made at least partly because of Mr. Vicha's status as a member of the office.   In fact, the rule requiring automatic disqualification is precisely designed for extreme situations such as this, as there will never be an outright admission that "yes, we sought the death penalty for improper reasons." The facts of this case impute a presumption of impropriety.

### v) The alleged "Chinese Wall" failed to cure the conflict as there is a presumption of shared confidences.

Although the prosecutors went to great lengths to allegedly erect (and, inexplicably,  the defense attorneys to defend)  the  so-called "Chinese wall" between prosecutor Vicha and the rest of the office, this concept actually made no sense.   The premise upon which it is based, that somehow a junior, newly-hired assistant district attorney was somehow going to "pressure...[his] boss to seek the death penalty" (22 RR 172) is ludicrous.   Mr. Vicha was never in any position to "pressure" his boss, as he himself admitted (22 RR 171-172), and the "Chinese Wall" concept misses the point entirely.   It is based on the completely flawed premise that Mr. Vicha might have acted  improperly, rather than focusing on the actions and inherent bias of the district attorney's office itself.[128]   The alleged lack of sharing of information, interaction, involvement or discussion of the case, which the defense attorney was so eager to put on the record, was not at

---

[127]    During her testimony, Karen Vicha blurted out that she hated Bill "for making [her] go through this again."  (23 RR 94.)  Similarly, Lorna S. Sawyer**,** Petitioner's cousin, disturbed at having to testify, blurted out "evil piece of shit" directed at Petitioner.  (24 RR 101.)

[128]    Apparently lead counsel Mr. Hunt also shared this mis-perception.  Ms. Church states that Mr. Hunt told her he felt that Mr. Vicha "was not biased in any way" after speaking to him personally and having other attorneys speak to him. Exhibit 8.

all relevant.  The danger was not that the district attorney would have been pressured by Mr. Vicha, but that his mere presence on the staff and his position as a member of the district attorney's office would incline that office to make decisions adverse to Mr. Coble that they would not have made were they in an impartial posture regarding the case.  There was no need for the district attorney to discuss matters with Mr. Vicha, or "pressure" him, as the mere hiring of Mr. Vicha as a criminal district attorney put the entire office in a conflictual position regarding the prosecution of Mr. Coble.

The conflict does not relate to the possible sharing of information, or improper influence though conversations between Mr. Vicha and the other prosecutors or bias on the part of Mr. Vicha. Nor does it necessarily adhere to a possible improper vouching for the witness, as Mr. Vicha was not identified as a district attorney.  The conflict is inherent in the nature of the office as charged with seeking impartial justice and being in the position of having one of their members as a victim.  The district attorney under a duty to recuse themselves and let an impartial agency prepare, charge the defendant and prosecute the case.  They were serving two masters: to protect, advance and show solidarity with the interests of one of their employees in seeking the death penalty and, on the other hand,  in seeking justice impartially.  By failing to recuse themselves, their prosecution was fatally conflicted.

The "Chinese Wall" concept is typically used where there is some danger of confidential information being shared between conflicted and un-conflicted persons in a business entity.  For instance,   this concept may be relevant for a bank, to shield its investment banking operations, where corporate securities are bought and sold, from its commercial banking operations, where it may be acting as a creditor, fiduciary or guarantor for the same corporate clients who issued these securities.  In these situations, the conflict is clear as there are two sides of the same

organization whose interests may very well differ.  The investment side may have good reason not to know what the banking side is doing.

Here, however, there was no conflict that could be addressed by the "Chinese Wall" concept, because even if the Coble case information had been completely "walled off" from Mr. Vicha, the conflict remained.  The conflict inhered in the position of the district attorney's office as a whole, in that they were more inclined to seek the death penalty against Mr. Coble as a direct result of the status of Mr. Vicha as a victim, not because of some information that might be shared with him or his "pressuring" of his superiors regarding the direction of the case decisions.  The investigation, trial preparation, decision to seek death, allocation of resources, and the like were all decisions that were tainted by the fact that Mr. Vicha was a McLennan County assistant district attorney.

Texas law holds that there is a presumption of shared confidences.  *In re American Home Products,* 985 S.W.2d 68 (Tex. 1998).  Nothing in the colloquy between the defense attorney and Mr. Vicha rebutted that presumption because even unequivocal testimony that no information or confidences were shared is no evidence to defeat the presumption of a disqualifying conflict. *American Home,* 985 S.W.2d at 75; *Grant v. Thirteenth Court of Appeals,* 888 S.W.2d 466, 467. (Tex. 1994).

### vi) The "Chinese Wall" theory is not recognized in Texas and has been disavowed by the Texas Supreme Court.

A "Chinese Wall" is employed in cases where one member of a firm has previously represented a party whose interests are adverse to one of the firm's clients.  The Texas Supreme Court has held that, where the matters involved in the previous representation and the current representation are "substantially related," the former client "is entitled to a *conclusive*

*presumption* that confidences and secrets were imparted to the former attorney." *NCNB Texas Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989)(emphasis added). This presumption arises from Canon 9 of the former Texas Code of Professional Responsibility, which prohibited "even the appearance of professional impropriety." Tex. Code Prof. Responsibility Canon 9 (repealed 1990).

Previously, the "Chinese Wall" theory held that, given appropriate screening procedures to isolate the conflicted attorney from the case in question, the conflict need not be imputed to the attorney's entire firm. However, this theory was explicitly disavowed in *Petroleum Wholesale, Inc. v. Marshall*, 751 S.W.2d 295 (Tex. App.--Dallas 1988). The Fifth Court of Appeals found that, regardless of the effectiveness of a firm's screening procedure, there is a conclusive presumption that the conflicted attorney shared confidences from her previous client with her present firm. This necessitates disqualification of the entire firm:

> [W]hen an attorney in private practice has actual knowledge of the confidences of a former client in a particular case, and he or she undertakes employment with a law firm representing a party whose interests in that identical case are adverse to that former client, the construction of a Chinese wall does not refute the appearance of impropriety -- the possible disclosure of the former client's confidences -- which is prohibited by Canon 9 of the Texas Code of Professional Responsibility. In such a case, the entire new firm must be disqualified from representing the adversary of the challenged attorney's former client.

*Id.* at 301. The Texas Supreme Court has never ruled on the sufficiency of a "Chinese Wall" where the conflicted party is an attorney. In fact, the court explicitly declined to make such a ruling in *Phoenix Founders v. Marshall*, 887 S.W.2d 831, 835 (Tex. 1994) ("We need not decide whether *Petroleum Wholesale* itself was correctly decided . . . ."). However, the court has suggested that it agrees with the *Petroleum Wholesale* decision: "While the presumption that a legal assistant obtained confidential information is not rebuttable, the presumption that

-226-

information was shared with a new employer may be overcome. In this regard, we have recognized a distinction between lawyers and nonlawyers." *In re American Home Prods. Corp.*, 985 S.W.2d 68, 75 (Tex. 1998). If there is a distinction between lawyers and nonlawyers in this regard, the distinction must be that, unlike nonlawyers, lawyers *cannot* overcome the presumption that they share confidences with a new employer. Furthermore, the Texas Supreme Court has held that even for non-attorney employees, "a court must ordinarily presume that some sharing will take place." *Id.* (citing *Smart Ind. Corp. v Superior Court*, 876 P.2d 1176, 1185 (Ariz. Ct. App. 1994); *Herron v. Jones*, 637 S.W.2d 569, 571 (Ark. 1982); *In re Complex Asbestos Litigation*, 283 Cal. Rptr. 732, 747 (Cal. Ct. App. 1991)).

Since *Petroleum Wholesale* was decided, new Disciplinary Rules of Professional Conduct have been adopted to replace the Texas Code of Professional Responsibility. These rules do not include the "appearance of professional impropriety" language central to the *Coker* and *Petroleum Wholesale* decisions. Nevertheless, the courts have continued to apply *Coker*'s conclusive presumption. *See, e.g., In re Columbia Valley Healthcare Sys., L.P.*, 320 S.W.3d at 824; *In re American Home Prods. Corp.*, 985 S.W.2d at 74; *Texaco, Inc. v. Garcia*, 891 S.W.2d 255, 257 (Tex. 1995); *Henderson v. Floyd*, 891 S.W.2d 252 (Tex. 1995); *Phoenix Founders v. Marshall*, 887 S.W.2d 831, 834 (Tex. 1994). This suggests that *Petroleum Wholesale*'s presumption survived the change in professional rules as well.

Even if this so-called "Chinese Wall" theory had any validity, which it does not in Texas, the Professional Ethics Committee of the Supreme Court of Texas has refused to accept it:

> The Supreme Court of Texas [has] refused to accept the concept of a screening of a conflicted lawyer from other lawyers in a law firm (sometimes referred to as a "Chinese Wall") in order to allow representation by the law firm. That refusal is based upon the conclusive presumption that confidential information is shared among all lawyers in a firm.

*See Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831 (Tex. 1994)
Supreme Court of Texas, Professional Ethics Committee For The State Of Texas, Opinion
No. 569 (April 2006)[129]

*See also In re American Home Products Corp.,* 985 S.W.2d 68 (Tex. 1998)(presumption of

shared confidences). Thus, the very theory upon which the prosecution relied is invalid under the

ethical laws of this State.  *American Home* presents two requirements that have to be proved in

order for the firm or office to rebut the presumption of shared confidences or information: 1)

proof that the conflicted person was instructed not to work in the matter and 2) that the office

took *other reasonable steps to ensure* that the conflicted person did not work on the matter.

*American Home,* 985 S.W.2d at 69 (emphasis added).  As the Court stated, "[s]trict adherence"

to the screening process is required."  *Id.* at 76; *Phoenix Founders,* 887 S.W.2d at 834.  Here, all

we have is the assurances of the prosecutor and Mr. Vicha that there was no shared information

or confidences.  But, as discussed *supra,* this claim does not hinge on the existence or non-

existence of shared information.

**vii) The decision to recuse has been selectively exercised by the district attorney and it cannot be a purely discretionary matter.**

Respondent may take the position that recusal of the McLennan County District Attorney's

office was a matter purely within their discretion**.**  However, as discussed *supra,* when that

decision implicates a defendant's due process rights and right to a fair and unbiased charging

decision and trial, and he is prejudiced as a result, the recusal decision cannot be seen as a purely

discretionary act.

As an example of how the decision to recuse has been selectively exercised by the

McLennan County District Attorney, the recent case of former Waco attorney Tammy Polk is

---

[129] *See* Exhibit 10, Ethics Opinion 569.

illustrative.  Ms. Polk was charged with, and pled guilty to, various offenses, including "forging the signature of a former McLennan County prosecutor on a case-dismissal form in a case that the prosecutor has said she did not intend to dismiss."[130]   The case was prosecuted by the state Attorney General's office "because McLennan County District Attorney John Segrist recused his office, citing a conflict of interest."[131]  The conflict arose because "former assistant district attorney Melanie Walker's name was affixed to a case dismissal form in a case that Walker has said she was not going to dismiss. Walker's first name was misspelled on the form and the signature used was clearly not hers, officials said."[132]

In the Polk case, recusal was deemed proper because a *former* employee of the office, Ms. Walker, would have been a witness to the forgery, and the case involved falsification and forgery of district attorney forms.[133]  Yet in Mr. Coble's case, when the case involved the testimony of a *current* assistant district attorney, both as a victim *and* a direct witness to much more serious crimes, recusal was not an option.    If the "Chinese Wall" was effective in insulating Mr. Vicha from Mr. Coble's case, there is no reason why it could not have been employed in the Polk case, especially as the witness in question, Ms. Walker, was no longer an employee of that office, unlike Mr. Vicha. The impact of the crime on the witness was much greater in this case and the prejudice to the defendant was also much greater.  Clearly, the decision to recuse has been arbitrarily exercised by the McLennan County District Attorney's office, another reason to find

---

[130]   *See* Exhibit 11, "*Former Waco attorney pleads guilty to tampering with case records,*" by Erin Quinn, Waco Herald-Tribune, April 8, 2010.

[131]   *Id.*

[132]   *Id.*

[133]   *Id.*

that the failure to recuse here was an abuse of discretion.

**viii) Mr. Price's testimony was also prejudicial.**

For the reasons argued *supra,* the testimony of Mr. Price was improper and also represented a conflict of interest. The argument and authorities cited *supra* are incorporated herein by reference. Here, however, Mr. Price was explicitly identified as an administrator in the McLennan County District Attorney's office, and thus the prosecutor was vouching for his testimony.  This testimony regarding Mr. Coble's military service was seen as important by the jury, as one of the three items they requested to see in deliberations was "testimony of fight in 1967 in Marine Corps." (XIII CR 2355.)[134]  Thus, Mr. Coble was prejudiced thereby.

**ix) This claim also implicates federal constitutional law.**

Respondents may argue that this claim involves only state law and not federal constitutional law.  However, this claim implicates Mr. Coble's right to an unbiased decision as to whether to seek the death penalty, which in turn implicates his right to a fair penalty phase re-trial.  The only decision at issue here was life or death, and the McLennan County District Attorney's office was clearly not in a position to make an unbiased decision on whether to seek the death penalty, given that one of their attorneys was a victim of Mr. Coble and also a witness at his re-trial.  Nor was the decision to again seek the death penalty a foregone conclusion, given Mr. Coble's advanced age at the time of the re-trial (60), his poor health and history of serious heart attacks, his absolutely clean disciplinary record over the past twenty years, the length of time (almost 20 years) that had elapsed since his prior trial, and the costs and time expenditure it would involve.  Indeed, given these factors, the decision to again seek the death penalty was, on

---

[134]  *See* Exhibit 12,   XIII CR 2355-2356, Jury note requesting to see 3 pieces of evidence; Judge Johnson's statement furnishing these items.

its face, illogical, and a strong indication of prosecutorial bias in the decisional process.  Had the McLennan County District Attorney's Office recused themselves, or had they been recused by the trial court, there is a strong probability that an unbiased prosecutor would have settled the matter with a life sentence, with the knowledge that Mr. Coble's chances of ever being released were negligible to non-existent.

The Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ."  U.S. Const., Amend. VI.  The Fourteenth Amendment extended the right to an impartial jury to criminal defendants in all state criminal cases.  *Duncan v. Louisiana* 391 U.S. 145 (1968).   In addition, the Due Process Clause of the Fourteenth Amendment independently requires the impartiality of any jury empaneled to try a cause.  *Morgan v. Illinois*, 504 U.S. 719, 726 (1992).

Mr. Coble was deprived of his right to a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as his Eighth and Fourteenth Amendment rights not to be condemned to death except on the basis of unbiased and reliable procedures.  *United States v. Saimiento-Rozo,* 676 F.2d 146, 148 (5th Cir. 1982)

Thus, the state courts' denial of this claim was both an unreasonable interpretation of the law and an unreasonable application of the facts, under both 2254(d)(1) and d(2).  Mr. Coble is entitled to relief on this claim.

**<u>CLAIM SIX</u>: PETITIONER WAS DEPRIVED OF DUE PROCESS AND A FAIR TRIAL BECAUSE HIS ATTORNEYS HAD A CONFLICT OF INTEREST AND THEY WERE INEFFECTIVE BECAUSE THEY FAILED TO FILE A MOTION TO RECUSE THE PROSECUTOR.**

Petitioner was denied due process and a fair trial because his attorneys had a conflict of interest that precluded them from effectively representing him at trial.   This conflict of interest deprived Petitioner of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and similar provisions of the Texas Constitution.

As discussed *supra* in the prior claim, Mr. Coble's attorneys failed to file a motion to recuse the district attorney's office, and then put on the record their *voir dire* of Mr. Vicha designed to insulate themselves from future claims of ineffective assistance of counsel and to prevent their client from raising the issue of a conflict of interest. (*See supra,* 22 RR 166-173.) By this action, Mr. Coble's attorneys put their own interests in an adversarial posture to the interests of their client and they chose to protect their own interests ahead of those of their client. Their actions showed an actual conflict of interest and also prejudiced Mr. Coble by attempting to deprive him of a meritorious issue on appeal.   This failure also amounted to ineffective assistance of counsel, as there was no valid strategic reason for this failure and Mr. Coble was prejudiced as a result.

**A.  Facts Presented to the State Courts.**

This claim was presented as Claim 6 in the state habeas petition.

The Facts in Support of the prior claim are hereby incorporated by reference, as they were in the state courts.

As mentioned in that summary, defense attorney Hunt stated that it was "the Government's position is that they have erected a Chinese wall, so there's no basis for recusal

and they believe they separated themselves from Mr. Vicha, who is a prosecutor over in that office."  (4 RR 7.)   No recusal motion was filed by the defense prior to trial.   At trial, in a hearing outside the presence of the jury, defense attorney Mr. Hunt himself questioned Mr. Vicha on *voir dire* in an attempt to insulate himself from a claim of ineffective assistance of counsel for failure to file such a motion.   The prosecutor first indicated that the defense had first approached them regarding their efforts to insulate themselves:

> We had built a Chinese wall regarding J.R. Vicha in this particular case.  We don't think he's in the least disqualified as a witness in this particular case.  Un, and so we wnated to call him next as a fact witness.  And we, uh, the defense had approached and stated they would like to do some sort of inter—just to make sure or to perfect a record of some sort concerning if he's—if he's to testify and they want to put something in the record, if he's allowed to testify.
> (22 RR 166.)

As shown *supra,* Mr. Hunt then started the questioning by vouching for the prosecutor's version of events:  "there's been this Chinese partition and he's not discussed the case with anyone other than his discussing his own prospective testimony.  *So we'd just like to put that on the record so that's clear for future review...*"  *Id.*

Then, at the end of the questioning, Mr. Hunt quite clearly and perhaps inadvertently revealed the purpose of this exercise: "Q.  Okay.  *In case somebody would later come by and accuse you of pressuring your boss to seek the death penalty, you can say no, you never put any pressure on them to do that?*" (22 RR 172)(emphasis added).

What is most astonishing about this colloquy is that the questioner of the district attorney/witness/victim was not the prosecutor seeking to protect his witness and his office from disqualification,  but Mr. Hunt, the first chair defense attorney!  Defense counsel's  entire questioning was designed to foreclose their own client's right to challenge a blatant conflict of interest on appeal.   Mr. Hunt's eagerness to put this on the record "for future review" (*"So we'd*

-233-

*just like to put that on the record so that's clear for future review.."*.... "*in case somebody would later come by and accuse you of pressuring your boss to seek the death penalty"*)   actually amounts to an effort to protect himself against his own client's appellate rights.

The "somebody later" could only have referred to their own client's appellate or post-conviction attorneys.  Had Mr. Hunt been a little more direct and simply said "I want to put this on the record to deprive Mr. Coble of this issue on appeal and to prevent my client's appellate and post-conviction attorneys from raising this against me later on," no court would have the slightest trouble in finding a conflict of interest and error.  Yet that is exactly what happened here.

Nor do trial counsel's explanations explain this failure.  Ms. Church's declaration states that they did not file the motion because they felt that Mr. Vicha "was not biased" and if they had asked for recusal, that Coble "could end up with a bunch of civil lawyers that could do a better job then (sic) what they had."[135]  The idea that somehow civil lawyers or a civil firm could come in and take over this case, without much if any experience in the trial of criminal cases, yet alone a murder case, or any knowledge of this case, is simply ludicrous. As to Mr. Calhoun, he simply does not remember.[136]

**B. What the State Courts Held.**

This claim, presented as Claim 6 in the state habeas petition, was summarily denied by the CCA when they adopted the trial court's findings and conclusions.  Those findings and conclusions, written by the prosecutor and adopted verbatim by the trial court, held as follows:

All that went on at trial was duly recorded and is contained in the trial record.

---

[135]   Exhibit 8.

[136]   Exhibit 14 at 2.

The reasoning of this claim is otherwise convoluted and strained....
Although the trial record speaks for itself and that which occurred at trial is clearly explained and documented, and the matter was explored at the trial level, but nothing concerning Mr. Vicha and his testimony was presented on direct appeal, this issue should, out of an abundance of caution, be designated as a controverted, previously unresolved factual issue...
State's Answer at 12, Exhibit 27.

The trial court complied with the prosecutor's request and this claim was addressed at the

evidentiary hearing summarized *supra*.   The prosecutor's proposed findings of fact and

conclusions of proof were as follows:

A Chinese Wall had indeed been employed by the office of the McLennan County Criminal District Attorney, excluding Mr. J.R. Vicha from any decisions are (sic) access to any information regarding the retrial of Applicant.  Mr. J.R. Vicha did not violate the limitations thereof.  Counsel investigated, through other attorneys, whether Mr. Vicha was violating the terms of the Chinese Wall policy and concluded that he was not.  Mr. Vicha also testified that he respected the policy.
Applicant's trial counsel investigated the issue and performed legal research.  They came to the conclusion that they did not have a legal basis to challenge the representation of the Criminal District Attorney or his office on the case and decided not to pursue the issue.  Counsel were not necessarily concerned about Mr. Vicha's testimony because on the whole, it dd not damage Applicant's case.  Mr. Vicha did not advocate for the death penalty or mention that he worked at the Criminal District Attorneys' Office.  Counsel did not remember whether they had discussed this issue specifically with Applicant.  There was no objection to Mr. Vicha's testimony.
State's Proposed Findings and Conclusions at 5, Exhibit 29.

The prosecutor's conclusions of law, adopted verbatim by the trial court and the CCA,

were basically generic conclusions devoid of any legal citations:

*Conclusions of Law.*
There was not a conflict of interest in the representation which provided a legal basis to remove the Criminal District Attorney from the case.  Mr. Vicha's testimony before the jury was not prejudicial.  The performance of Applicant's counsel in regard to Mr. Vicha and the Criminal District Attorney's Office was within the standard prevailing professional norms and counsel were at all times functioning as the counsel guaranteed Applicant by the Sixth Amendment of the United States Constitution.   Since counsel's performance was not deficient, Applicant was not deprived of a fair trial and its result is reliable.  Applicant has

-235-

failed to overcome the strong presumption that counsel's performance fell within the wide range of reasonable and professional assistance in regard to the testimony of Mr. Vicha and the representation of the prosecutor's office.
*Id.*

### C.  Why the State Court Holding Was Objectively Unreasonable.

**Claim 6(a): By failing to move to disqualify the McLennan County District Attorney, and then attempting to insulate themselves from this failure, Mr. Coble's attorneys put themselves in a conflict of interest with their client.**

#### i.  Unreasonable application of federal law under 2254(d)(1).

Habeas petitioners normally do not have to show prejudice from a conflicted lawyer's performance to  establish a Sixth Amendment violation because "[t]he case law is clear that actual prejudice need not be shown.  Once a habeas petitioner has proved the existence of an actual conflict, only an adverse impact on the attorney's performance need be shown." *Ruffin v. Kemp,* 767 F.2d 748, 752 (11th Cir. 1985); *see also, Holloway v. Arkansas,* 435 U.S. 475 (1978); *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Burden v. Zant*, 24 F.3d 1298 (11th Cir. 1994); *Baty v. Balkcom,* 661 F.2d 391, 395 (5th Cir. 1982).

The Court's focus should be whether defense counsel did, or failed to do, something because of the conflict.  *Holloway v. Arkansas, supra,* 435 U.S. at 490 ("the evil – it bears repeating – is in what the advocate finds himself compelled to refrain from doing.")  *Zuck v. Alabama,* 588 F.2d 436, 439 (5th Cir. 1979) (actual conflict occurs when defense counsel is placed in a situation "inherently conducive to divided loyalties."*); United States v. Chronic*, 466 U.S. 648 (1984) (Where "the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance," prejudice is presumed.) (*citing, Powell v. Alabama*, 287 U.S. 45 (1932)). Under *Strickland v. Washington,* 466 U.S. 668, 692 (1985), the court has to *presume* prejudice if a conflict existed.

-236-

As recounted *supra,* trial counsel first failed to move to recuse the district attorney and then attempted to insulate themselves from the consequences of this failure. This conflict "adversely affected his lawyer's performance." *Strickland, supra,* 466 U.S. at 692. Petitioner is presumed to have been prejudiced by acts trial counsel *did not do* as a result of the conflict. *See, Cuyler v. Sullivan,* 446 U.S. 335 (1980) (the Court must focus on whether the attorney's performance was adversely affected); *Burden v. Zant,* 24 F.2d 1298 (11th Cir. 1994) (upon remand in *Burden v. Zant,* 510 U.S. 132 (1994); *Stoia v. United States,* 22 F.3d 766 (7th Cir. 1994).

In *Mickens v. Taylor,* 535 U.S. 162, 122 S. Ct. 1237 (2002) the Supreme Court held that in situations where the trial court failed to inquire into a potential conflict of interest about which it knew or reasonably should have known, a defendant has to establish that this conflict adversely affected counsel's performance. There are a number of reasons why this holding may not be applicable here. First, it is explicitly limited to situations where the court fails to inquire into a potential conflict and, as we have seen, there was a limited inquiry and questioning by the judge as to the propriety of the representation. (22 RR 166-173.) Secondly, *Mickens* involved a *prior* representation, whereas the conflicts here were *concurrent*. As the court in *Mickens* explained

> Both *Sullivan* itself...and *Holloway*...stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice...Not all attorney conflicts present comparable difficulties. Thus, the Federal Rules of Criminal Procedure treat concurrent representation and prior representation differently, requiring a trial court to inquire into the likelihood of conflict whenever jointly charged defendants are represented by a single attorney (Rule 44(c)) but not when counsel previously represented another defendant in a substantially related matter, even where the trial court is aware of the prior representation.
> *Mickens,* 122 S. Ct. at 1246.

In *Cuyler v. Sullivan, supra,* the court held that a showing of deficient performance was

required, but not requiring the additional *Strickland* showing of a probable effect on the outcome of the trial. *Mickens* was decided on the assumption that *Cuyler v. Sullivan* was applicable, and its decision did not hold, even in the successive representation situation, that *Sullivan* did not apply. In its conclusion, the Supreme Court stated that "[i]n resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question." *Id.* at 1246.

Therefore, we must look to *pre-Mickens* Fifth Circuit precedent, and precedents from other circuits. In *Perillo v. Johnson*, 79 F.3d 441 (5th Cir. 1996) (*Perillo I*) and, on remand, *Perillo v. Johnson,* 205 F.3d 775 (5th Cir. 2000) (*Perillo II*), the Fifth Circuit reaffirmed that when an actual conflict adversely affects trial counsel's performance, the governing legal standard is *Cuyler v. Sullivan*, 100 S. Ct. 1708 (1980) and its progeny. *See Strickland v. Washington*, 104 S. Ct. 2052, 2064-67 (1984); *Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995) (en banc). The *Cuyler* standard applicable when a criminal defendant alleges that counsel's performance was impaired by an actual conflict of interest differs substantially from the *Strickland* standard generally applicable to Sixth Amendment ineffectiveness claims. *See Strickland*, 104 S. Ct. at 2067; *see also Beets*, 65 F.3d at 1265.

*Cuyler* permits a defendant *who raised no objection at trial* to recover upon a showing that an actual conflict[137] of interest *adversely affected* counsel's performance. *See Cuyler*, 100

---

[137]   The Fifth Circuit stated in *Perillo, supra,* that an "actual conflict" exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client. *See Strickland* at 2067; *Perillo I*, 79 F.3d at 447; *United States v. Alvarez*, 580 F.2d 1251, 1254 (5th Cir. 1978).

S. Ct. at 1718; *Perillo I*, 79 F.3d at 447; *Beets*, 65 F.3d at 1264; *see also Strickland*, 104 S. Ct. at 2067.  The *Perillo* court stated that an "adverse effect" may be established with evidence that "some plausible alternative defense strategy or tactic" could have been pursued, but was not because of the actual conflict impairing counsel's performance.  *See, also Perillo I*, 79 F.3d at 449.  Assuming the defendant establishes an actual conflict that adversely affected counsel's performance, prejudice is *presumed* without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial.  *See Strickland*, 104 S. Ct. at 2067; *Cuyler*, 100 S. Ct. at 1719; *Beets,* 65 F.3d at 1265.

The Fifth Circuit recognized in *Perillo, supra*, that beyond those basic legal precepts, *Cuyler*'s "actual conflict" and "adverse effect" elements have been described as "rather vague," *see Beets*, 65 F.3d at 1265, and even a brief review of the precedent reveals that any categorical treatment of when an actual conflict exists is difficult.

The Fifth Circuit in *Perillo* found that the determination of actual conflict and adverse effect is tightly bound to the particular facts of the case at hand.  Petitioner is  claiming that trial counsel were conflicted due to his attorneys' putting their interests ahead of and in conflict with his.  There  could have been  no reasonable strategy in failing to at least file such a motion which would have preserved the  issue for appeal.   Yet, through either inadvertence or design, no motion was filed.

*Perillo* recognized that several circuits have drawn a distinction in Sixth Amendment conflict of interest cases, holding that an actual conflict may be more difficult to prove when it arises in the context of successive or serial representation rather than concurrent representation. *See, e.g.*, *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir.), *cert. denied*, 120 S. Ct. 57 (1999); *Maiden v. Bunnell*, 35 F.3d 477, 480 (9th Cir. 1994); *McConico v. Alabama*, 919 F.2d

1543, 1546 (11th Cir. 1990).  *But see Church v. Sullivan*, 942 F.2d 1501, 1511 (10th Cir. 1991) (rejecting the view that successive representation cases are necessarily more difficult to prove). This difficulty, however, does not preclude this Court finding that an actual conflict did exist because trial counsel put their personal interests ahead of their duty to Petitioner  An evidentiary hearing  will be the only opportunity to develop these facts.

The Fifth Circuit  has not limited *Cuyler* to concurrent representation cases.  The Fifth Circuit's recent *en banc* treatment of *Cuyler* in *Perillo II* expressly extends *Cuyler* to all cases of multiple representation, whether successive or concurrent. S*ee Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc) ("*Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or serial client context.") & *id*. at 1265 n.8 ("*Cuyler* has been routinely applied to cases in which an alleged attorney conflict resulted from serial representation of criminal defendants as well as simultaneous multiple representation. . . .  For convenience, we denominate both of these situations as 'multiple representation.'").  Moreover, *Cuyler* itself can be viewed as a serial or successive representation case.  The Third Circuit granted relief in *Cuyler* on the basis that the multiple representation involved a "possible" conflict of interest.  The Supreme Court vacated, but remanded for reconsideration of whether the successive representation of the three defendants created an actual, as opposed to possible, conflict of interest.  *See id*. at 1719.  *Cuyler* has routinely been applied to cases involving successive representation.

The Fifth Circuit, therefore, has not definitively embraced the theory that there is any real and inviolate substantive difference between conflicts of interest arising in the context of successive, as opposed to concurrent, representations.  Instead, the Fifth Circuit has  in each case focused upon the "guiding principle in this important area of Sixth Amendment jurisprudence,"

which is whether counsel's allegiance to the accused was compromised by competing obligations owed to others. *Alvarez*, 580 F.2d at 1255, 1258. In *Perillo*, the Fifth Circuit stressed that a conflict exists when counsel is prevented "by his interest in another's welfare from vigorously promoting the welfare of his [current] client." *Vega*, 149 F.3d at 360.  Certainly this would apply here, where the competing welfare was their own.

The issue is simply whether trial counsel were burdened by an actual conflict. An actual conflict may exist and the Constitution is implicated when an attorney is placed or places himself or herself in a situation "inherently conducive to divided loyalties" such as trial counsel did here when he put on the record his questioning of Mr. Vicha in order to protect himself from a later claim of ineffective assistance of counsel for failure to move to recuse the prosecutor. *Johnson v. Hopper*, 639 F.2d 236, 238 (5th Cir. 1981) (internal quotations omitted); *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979) (internal quotations omitted).  But, in keeping with the requirement for an actual, as opposed to a mere hypothetical or possible conflict, the Fifth Circuit  has also held that something more must be shown to demonstrate that the inherent potential for conflict actually moved into the realm of an actual conflict.  *See, e.g.*, *Olivares*, 786 F.2d at 663-64. Petitioner  has demonstrated "something more" and established the conflict.

The very essence of a conflict of interest is that it requires counsel to make a choice between competing interests.  This Court's focus must remain upon the adequacy of Petitioner's representation. *See Strickland*, 104 S. Ct. at 2064-67; *Cuyler*, 100 S. Ct. at 1718-19.  An adverse effect on counsel's performance may be shown with evidence that counsel's judgment was actually "fettered by concern" over the effect of certain trial decisions on other clients. *Perillo I*, 79 F.3d at 448.  As the Fifth Circuit held in *Perillo I*, when a petitioner's claim is premised solely upon what a conflicted lawyer failed to do on his or her behalf, the petitioner must

generally establish adverse effect  by demonstrating that there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict.  *See id*. at 449 (relying upon *Beets*, 65 F.3d at 1284 (King,J., dissenting), which in turn relied upon the Second Circuit's test for measuring adverse effect premised upon "what an attorney failed to do").  Thus Petitioner  has shown not only that trial counsel's performance was compromised, but that the compromises  were generated by the actual conflict between trial counsel's interests and Petitioner's interests.

A showing of intentional compromising of interests is not required.  The Fifth Circuit has stated that it is enough that there was an error in judgment that adversely affected trial counsel's performance.  *See Castillo*, 504 F.2d at 1245 ("We do not ascribe to Castillo's appointed attorney nor to the appointing judge improper motives, but they are chargeable with an error of judgment fatal to a fair trial.").   Neither does a showing of adverse effect require a "but for" inquiry.  *Nealy*, 782 F.2d at 1365 (finding adverse effect where the record suggested that defense counsel decided against calling a particular witness because he feared the witness would harm the petitioner's case, rather than because he also represented the potential witness); *see also Malpiedi*, 62 F.3d at 469.  To the contrary, the defendant need only establish that there was a plausible alternative defensive strategy that could have been pursued, but was not because of the actual conflict of interest.  Petitioner has done this.

**ii.  Unreasonable determination of the facts under 2254(d)(2).**

The CCA's holding, adopted from the prosecutor's argument, fails to deal with the basis of this claim and its factual findings are erroneous and contrary to the record.  Initial co-counsel Mr. Stevens and second co-chair Mr. Calhoun, contrary to the state court holdings, *did not* "come to the conclusion that they did not have a legal basis to challenge the representation," *did*

*not* decide "not to pursue the issue," *did not* "investigate through other local attorneys whether Mr. Vicha was violating the terms of the Chinese Wall," and was *not* satisfied with the extent that he "investigated the issue."  State's Findings and Conclusions at 5, Exhibit 29.

At the hearing, as to the issue of J.R. Vicha being a member of the McLennan County District Attorney's office, Mr. Stevens testified that there was "no question in [his] mind" that created a conflict of interest (EHT 45), an "absolute conflict of interest...absolutely an ethical violation." (EHT 59, 60.)  He stated that it may not have been "an absolute bar to the District Attorney's office handling the case."  (EHT 54, 59.)   Although Mr. Stevens thought that a disqualification motion was likely to be unsuccessful (EHT 55), he *did feel* there were grounds for the motion. (EHT 64.) As to this issue, Mr. Stevens stated he "would have investigated more than I personally did." (EHT 53.)

At the hearing, Mr. Calhoun testified that here was some discussion about filing a motion to recuse the district attorney's office. (EHT 191.)  Although this was not a "major concern" to Mr. Calhoun (EHT 192) he admitted that he  found nothing conclusive as to whether the failure to recuse was a conflict or a due process violation. (EHT 193.)  Mr. Calhoun also admitted that he was not familiar with, or did not present in this case, two cases that held that the failure of a prosecutor to recuse himself may be reversible error if it amounts to a due process violation (*State ex. rel. Eidson v. Edwards,* 793 S.W.2d 1 and *Hill v. Pirtle,* 887 S.W.2d 921).  (EHT 193.) Contrary to the state court's holding, Mr. Calhoun could not say whether Mr. Vicha's testimony affected the outcome of the case. (EHT 211.)

Against this testimony, we have only Mr. Hunt's self-serving affidavit, which is the basis for the state court's holding.  Affidavit of Russ Hunt, Jr., (presented in "State's Supplement to the Evidentiary hearing").  It is contradicted in many details with the sworn testimony of both

Mr. Stevens and Mr. Calhoun, who have no reason to paint their performance in an unfavorable light.  Although he claimed extensive research and investigation of this issue, Mr. Hunt failed to discover the elementary point that Texas does not recognize the concept of the "Chinese Wall" as discussed *supra.*  This alone should be sufficient for the court to discount Mr. Hunt's affidavit.  Nor does his affidavit or the CCA's findings account for the fact that, as summarized *supra,* Mr. Hunt was the person who questioned Mr. Vicha about the "Chinese Wall" and himself put on the record statements designed to protect himself at his client's expense (*e.g.,* as to Mr. Vicha's assertions he had nothing to do with this case, Mr. Hunt stated *"So we'd just like to put that on the record so that's clear for future review..."* (22 RR 166) and "*[i]n case somebody would later come by and accuse you of pressuring your boss to seek the death penalty, you can say no, you never put any pressure on them to do that?*" (22 RR 172)(emphasis added). These statements alone are sufficient to show that there was a conflict of interest.  Mr. Hunt was acting entirely inappropriately in 1) questioning Mr. Vicha in a manner designed to neutralize the issue and 2)  putting it on the record with the admitted purpose of foreclosing the issue on Mr. Coble's appeal.

Petitioner has proven that trial counsels' performance was adversely affected by the conflicts of interest.  This Court must conclude, based upon the particular factual context of this case, that trial counsel compromised their duty of loyalty to Petitioner  in order to accommodate their own interests.  Petitioner  has also demonstrated that there was a plausible alternative defense strategy (the recusal) that could have been pursued, but was not, because of the conflict between his own and his counsel's interests.

A review of the entire record in this case is persuasive that trial counsel's failure to pursue the alternative of recusing the district attorney only weakened  Petitioner's defense. This

failure was caused by the conflicts alleged demonstrated by Petitioner. This court should find that trial counsels' representation  was burdened by a conflict which adversely affected trial counsels' performance  throughout the trial.

Thus, under both the 2254(d)(1) and d(2) standards, Petitioner has shown both an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**Claim 6(b): Petitioner's trial counsel were ineffective for failing to file a motion to recuse the District Attorney's office.**

The facts and argument from Claims 2, 3,  5 and  6(a), *supra*, are hereby incorporated by reference.

Under the *Strickland* test, *supra,* Petitioner must show deficient performance and prejudice as a result of the deficient performance. He has done that here.  *See* facts and argument *supra.* First, it was deficient performance to fail to file the motion, as there were no strategic reasons for failing to do this.  There would have been no downside to filing the motion and there would have been a strategic advantage to the defense to have the case prosecuted by an office other than the "home team" of the local prosecutor's office who knew the local judges and had years of experience in their courts, experience in choosing local juries, and resources that would probably have been unavailable to a different prosecuting entity.

This "home team" advantage also goes to the prejudice prong of *Strickland.*  Another prosecuting entity would not have been so personally and emotionally  invested[138] with seeking the death penalty and would probably not have devoted the resources to the case that the

---

[138]   The chief prosecutor Mr. Segrist stated publicly that "Coble's punishment retrial was the most emotionally difficult case he's worked on in his 30-year career, adding that he broke down in tears four times."  (Exhibit 6 at 66.)

McLennan County District Attorney's Office did. A different prosecuting entity would have been non-conflicted in the decision to seek the death penalty.  Thus, Petitioner has shown deficient performance and prejudice as to this failure of defense counsel.

The prosecutor-prepared findings and conclusions point to an alleged rationale that Mr. Hunt feared, if the recusal motion was granted, that "the court could have appointed a special prosecutor who was even more aggressive and effective than the prosecutors we had...I was concerned that a special prosecutor could have been appointed who was highly experienced and who had significant recent trial experience."  Russ Hunt affidavit at 4, (presented in the "State's Supplement to the Evidentiary Hearing").  Significantly, neither Mr. Stevens nor Mr. Calhoun mention this "rationale" at all, leading one to suspect it is an after-the-fact rationalization.  The lack of details, the fact that this rationale was apparently only "[a] further consideration in [his] mind," and the fact that a recusal would have eliminated an office with a high personal stake in the matter additionally all weigh against the believability of Mr. Hunt's affidavit as to his alleged rationale.

Here too, under the 2254(d)(1) and d(2) standards, Petitioner has shown both an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

**CLAIM SEVEN:** THE ADMISSION OF UNRELIABLE AND UNSCIENTIFIC TESTIMONY OF "FUTURE DANGEROUSNESS" BY DR. COONS VIOLATED PETITIONER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

Petitioner's right to due process of law, equal protection of the laws, and a reliable sentence, trial by jury, and by an impartial sentencer, effective assistance of counsel, compulsory process, confrontation and cross-examination, proof of criminal offenses beyond a reasonable doubt and freedom from self-incrimination, was violated by the introduction of inaccurate, prejudicial and fundamentally flawed evidence of "future dangerousness" at the penalty phase through State's witness Dr. Richard Coons.   U.S. Const. Amends. V, VI, VIII, XIV and applicable sections of the Texas Constitution.

**A. Facts Presented to the State Courts.**

**Dr. Richard E. Coons,** an Austin psychiatrist who had incorrectly predicted that Mr. Coble would commit criminal acts of violence that would constitute a continuing threat to society (Tex. Code Crim. P. Ann. Art. 37.071(b))("future dangerousness")  at his first  trial in 1990, was initially called  at an *in camera  Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)]  hearing to establish the scientific reliability of his testimony before he was allowed to present it to the jury.  (24 RR 141.)  Dr. Coons claimed to have graduated from Hampton-Sydney College in 1961 and to have attended and graduated from the University of Texas Law School in 1964 and to have been licensed to practice law in Texas in 1964.  (24 RR 142-143.)[139]   He also claimed to have attended and graduated from the University of Texas Medical Branch in 1968.  (24 RR 143.)   Dr. Coons stated he had evaluated between 8,000 and

---

[139]   "Licensed" means passing the bar exam and being admitted to the State Bar. However, the website of the State Bar of Texas has no record of his admittance to the Texas State Bar.

10,000 people who were charged with crimes.  (24 RR 144.) He stated he has evaluated about 150 capital cases involving the issue of "future dangerousness" and testified about this issue 50 times.  (24 RR 145.)

Dr. Coons testified that psychiatry and forensic methods in general are legitimate scientific fields.  (24 RR 146.)   In making predictions of "future dangerousness" he stated that "the best predictor of the future is the past."  (24 RR 147, 160.)  He principally relied on "habit patterns or personality patterns" to make his assessments.  (24 RR 147.)   Dr. Coons made the analogy of making decisions regarding civil commitments where someone might be a danger to themselves, but admitted these civil commitments were only short or intermediate-term predictions.  (24 RR 148.)

The witness stated that he would testify that Mr. Coble has a probability of committing criminal acts of violence which would constitute a continuing threat to society.  (24 RR 150.) Dr. Coons admitted he completely relied on information that was furnished to him by the district attorney.  (24 RR 153.)  He stated that he relied on the following: certain unnamed records;  a 20-year old interview with Mr. Coble; an interview with Lorna Sawyer of undisclosed length and undisclosed time of occurrence;  Mr. Coble's brother's death certificate; a "note" from a district attorney investigator; a "narrative summary from the Naval Hospital In San Diego;" a 1989 report from a Dr. Griffith; a timeline of Mr. Coble's life prepared by the district attorney's office,  covering 1948 to 1989; Mr. Coble's military records from the 1960s; Dr. Coons' own 20-year-old report; and various other information, all of which was received from the district attorney's office.  (24 RR 151-152.)  The witness admitted that the information was current only up to Sept. 22, 1989, almost 20 years prior to the trial.  (24 RR 153.)

Dr. Coons stated that future dangerousness predictions concern the long term.  (24 RR

-248-

154.)  He also admitted that his methodology is entirely based on his own subjective judgments. (24 RR 154 *et. seq.*)   In general, he looks at the person's history, personality and the incident itself.  (24 RR 154.)  His methodology has not changed in 20 or 30 years.  (24 RR 156.)   Dr. Coons admitted none of this methodology could be traced to a particular textbook or professional journal, to his knowledge.  (24 RR 156-157.)   He repeated that his main criteria was that "the best predictor of the future is the past."  (24 RR 160, 164.)   But he admitted that "different weights" could be given to a history of violence.  (24 RR 165.)   Some psychiatrists could disagree about the conclusions using his methodology, he stated.  (24 RR 161.)   He claimed his method is a blend of the subjective and objective.  (24 RR 163.)   The person's attitude toward violence is also a factor, and this also is a subjective standard.  (24 RR 165-167.) The witness claimed that there was no external yardstick by which one could measure the information.  (24 RR 168.)   Dr. Coons was somewhat confused about what exactly he was considering in his evaluations:

Q.  And does attitude towards violence overlap with the factor of history towards violence?
A.  Well, I mean, when you say overlap, uh, if...if you are looking at what is their attitude about violence, and there's never been any violence, I mean there's a...there's a...you take both things into consideration at the same time.
(24 RR 169.)

Dr. Coons also testified that he admittedly  has a subjective view of the role that the nature of the offense plays in his evaluation.  (24 RR 171-172.)   Two different psychiatrists could come to differing conclusions based on the facts of a particular offense.  (24 RR 175.) Personality and behavior, as seen and judged  by Dr. Coons, also enter into the equation.  (24 RR 177-178.)  But rather startlingly,  the witness could not cite even one authority or article in support of his view and methodology.  (24 RR 178.)   In his view,  "conscience" is also a

subjective factor and not capable of objective measurement.  (24 RR 180.)   Dr. Coons also

opined, based on no authority,  that "everybody that's on death row...tend to be on their good

behavior....they have motivation to be on their better behavior if they're on death row."  (24 RR

184-185.)  But in general population, "they don't have [these] constraints."  (24 RR 185.)   In his

view, people will be on better behavior on death row than in general population.  (24 RR 186.)

By his own admission, Dr. Coons' testimony completely lacked any scientific basis and

was based on no authority other than his own views.  The witness was not aware of any studies

in psychiatric journals that supported  his view or any that talked about the accuracy of long-

range predictions of future violence.  (24 RR 188.)  As he admitted, "I mean, I can't quote them

to you." (24 RR 188.)  Nor could he cite any studies which discuss the accuracy or error rates in

these long-term predictions of future dangerousness.  (24 RR 188.)   Nor could he cite any

studies which discuss the diagnosis of future dangerousness in capital cases.  (24 RR 189.)   He

was not aware of any studies in psychiatric journals or textbooks which support the making of

these predictions of future dangerousness.  (24 RR 189-190.)  The witness had never gone back

to check prison records to see if his predictions had been accurate.  (24 RR 194-195.)   As a

result, the witness had no idea what his own accuracy rate was.  (24 RR 195-196.)  On re-direct,

the witness was read a list of prominent articles about future dangerousness predictions but he

admitted he had not read any of them.  (24 RR 196-197.)

Despite these multiple shortcomings, which should have foreclosed any "expert"

testimony from this witness,  the Court found "by reason of his knowledge, skill, experience,

training, and education" that Dr. Coons qualified as an expert and that his testimony was an

appropriate one for expert testimony and "admitting the expert testimony will actually assist the

factfinder in deciding this case."  (24 RR 199.)   The defense objected to this ruling on state and

federal constitutional grounds, including "that the evidence is not reliable enough to meet the standards for individualized sentencing and heightened reliability" under the Eighth Amendment. (24 RR 199-201.) The objection was overruled. (24 RR 201.) Thus, the defense objection to this testimony was preserved.

Dr. Coons was then allowed to testify in front of the jury. (24 RR 202.) He again testified to his credentials. (24 RR 202-205.) He stated that he has evaluated "or looked at" "maybe 150 capital cases and have testified in maybe 50." (24 RR 206.) Dr. Coons admitted that in most of these 50 cases he testified for the prosecution. (24 RR 265.) He also admitted he would sometimes give an opinion over the phone from a few facts:

> Well, there's a lot of what we call curbstone consults, where a prosecutor will call me or a defense attorney will call me and sort of give me the facts underlying the case. And I'll ask a few questions and I'll tell them, Well, I think you ought to plead this case...
> (24 RR 207.)

Dr. Coons claimed that he could form an opinion as to the probability of a man convicted of capital murder committing acts of violence in the future which would constitute a threat to society. (24 RR 207.) The data he would look at was the person's history of violence; the "instant offense"[140]; the person's personality; and whether they "treat people nicely." (24 RR 208-209.) Dr. Coons testified that people on death row "are more segregated and more closely watched than the general population" ...So that makes a difference about where that person's going to be about making a prediction about their violence." (24 RR 210.) The witness made a personal evaluation of Mr. Coble in 1990 but he did not have his notes. (24 RR 210.) The prosecutor then read to Dr. Coons a lengthy hypothetical that purported to track the facts of Mr.

---

[140]   As to this factor, Dr. Coons admitted to an entirely subjective standard: "the premeditated carrying out of a plan is a lot different in my mind than just some hip-shooting kind of a panicky deal." (24 RR 208.)

Coble's case and was based on many factual assumptions and interpretations of the evidence that mirrored the state's allegations.   (24 RR 211-218.)   Based on the hypothetical and the assumptions upon which it was based, Dr. Coons claimed that there was a probability that "the defendant would commit...be a continuing threat to commit criminal acts of criminal violence that would constitute a threat to society." (24 RR 219.)

Various reasons were given for this opinion.   First, Dr. Coons said his "scheme" for considering it looked at the history of violence, "[i]t has escalated from minor things to multiple homicide."  (24 RR 220.)[141]  Various subjective judgments were then discussed by Dr. Coons. He opined that Mr. Coble killed his wife's family out of revenge and to control and punish her. (24 RR 220.)   Dr. Coons said Dr. Hodges' report showed criminal activity when Coble was young.  (24 RR 220.)   He also stated that Mr. Coble showed a need for control in his eating preferences for his spouses:  "first, you've got to eat your spinach and then you can eat your corn and then you can eat the meat or whatever."  (24 RR 221.)   Dr. Coons also opined that Coble had no conscience, as "it doesn't cover murder...it doesn't cover killing absolutely innocent people...I mean, that's a weak conscience."  (24 RR 221.)   He also made the observation that conscience is "one of the things that keeps us on the straight and narrow...It makes you feel bad if you do something wrong."  (24 RR 222.)   Dr. Coons also considered it a bad sign that Coble allegedly made "an evil grin" at his ex-wife.  (24 RR 222.)  This allegedly "evil grin" showed "a truly defective conscience."  (24 RR 222.)

Dr. Coons' "last issue" was where does someone go after conviction of capital murder. (24 RR 222.)   He said that everyone on death row was "on appeal" so that they were on better

---

[141]  Of course, the term "escalating violence" in the context of a capital case is meaningless, as any prior violence is less serious than a capital crime, the most serious of all, and so in all cases where there is any prior violence it will be "escalating."

behavior.  (24 RR 223, 252.)   This information was offered without recourse to statistics, but  it was the "basis of his opinion."   (24 RR 223.)   Dr. Coons testified that people in general population "threaten people, fight and so forth."  (24 RR 224.)   The witness was asked about the "aging out" factor, the fact that as people age they become less violent, but he opined without citing any statistics  that "there are plenty of people of age who have shanks, pieces of metal that have been sharpened down and handles wrapped with something."  (24 RR 225.)   He testified that old people "can threat (sic)...they're wise about how they can threaten other people and get their commissary or have them do things for them or whatever."  (24 RR 225.)   Dr. Coons claimed to know more about the prisons than the prison officials themselves, and claimed to have "plenty of information about what goes on in...the penitentiary...that none of the officials ever know about..."  (24 RR 226.)   This hearsay testimony was allowed over the defense's objection as "a basis for the opinion."  (24 RR 227.)   The witness also claimed to have special information and to know about "plenty of violence ...that nobody ever hears about" except, of course, himself. (24 RR 227.)[142]

Dr. Coons was asked about the fact that the capital murder occurred when Mr. Coble was 40 years old and this was "the first major offense that he was convicted of."  (24 RR 228.) Despite the fact that Mr. Coble had no incarcerations prior to 1989, Dr. Coons testified that he "didn't really start at the top....he has escalated as he went along..."  (24 RR 228.)   Also without any authority, Dr. Coons testified that a personality becomes "pretty well fixed by the early 20's."  (24 RR 228.) He stated that "this is kind of a...uh, well, let's say at age 40 he's certainly able to bid (sic) a very extremely violent, planned, involved act that...that at that age, let's say,

---

[142]   This echoed the testimony of  State's witness A.P. Merillat, who also claimed to be in possession of prison violence information that no one else knew about, including the prisons.

you know, this is a very active, aggressive, uh, act for a 40 year old."  (24 RR 229.)  According to Dr. Coons, this is a "character flaw" that he will "continue to carry with him."  (24 RR 29-230.)

On cross examination, the witness was asked about his methods.  (24 RR 230.)  He again cited the history of violence, an "attitude toward violence," the nature of the offense, the personality of the individual, his conscience, and the society they will be in, or, rather, Dr. Coons' subjective evaluation of these factors.  (24 RR 230-232.)  "Probably all of it would be subsumed in terms of personality and habitual behavior."  (24 RR 233.)  Dr. Coons again claimed that there is no objective standard, or "ruler" that one could use.  (24 RR 234.)  He admitted that another "forensic psychiatrist could look at the data and come up with a different conclusion."  (24 RR 234.)  Dr. Coons admitted that others may have a different methodology.  (24 RR 236.)  Dr. Coons also admitted that his methodology was not published in any textbooks or in any scholarly journals.  (24 RR 239.)

Dr. Coons stated that his practice was about 80 per cent forensic (24 RR 239) but he also admitted that he was not board-certified in forensic psychiatry.  (24 RR 240.)  Nor had Dr. Coons ever published his methodology in scholarly journals throughout a 40-plus-year career.  (24 RR 240-241.)  He had not published in the American Psychiatric Association or American Academy of Psychiatry journals.  (24 RR 241.)  In fact, he seems to have not published at all in his claimed field of expertise since his licensing in 1968.  Dr. Coons again opined, without authority,  that there was no standardized manner of doing future dangerousness evaluations.  (24 RR 243.)

Dr. Coons admitted he gave an opinion and testified  in the capital case of Michael Blair, that he would be a future danger to society.   (24 RR 244.)   But Mr. Blair was cleared of the

crime because his DNA did not match up.  (24 RR 245.)   Dr. Coons admitted that his opinions

depended on the underlying information upon which they were based.  (24 RR 247.)   He also

admitted that the categories of a history of violence and an attitude toward violence would

overlap.   (24 RR 248.)   There is also an overlap between personality and attitude toward

violence.  (24 RR 249.)  "Conscience," as judged by Dr. Coons, was a factor which would also

overlap.  (24 RR 250.)   The witness admitted that, under his "methodology,"  there was no

standardized definition of "conscience."   (24 RR 250.)   Dr. Coons  stated that, in his

methodological framework, that going to death row would always be less of a future danger than

a life sentence.  (24 RR 250.)   The probability of committing future acts of violence would

always be greater in general population than on death row.  (24 RR 252.)   Dr. Coons admitted

that his evaluation depended on his "own personal evaluation" and what he termed  "experience

and all that."  (24 RR 254.)   He also admitted that just because someone had a positive attitude

toward violence did not mean that he would necessarily be a future danger.  (24 RR 255.)

Dr. Coons stated that his opinion at this trial was the same one that he gave 18 years ago

at the first trial.  (24 RR 256.)    That opinion was, of course, wrong, as Mr. Coble had no

incidents of violence in the past 18 years.   At the first trial, Dr. James Grigson opined that Mr.

Coble would not be a future danger.  (24 RR 257.)   Dr. Coons stated that his fee for this case

was $480.00 per hour  but his standard fee was $360.00 per hour.  (24 RR 260.)   He admitted

testifying in the *Espada* case, at which time he was charging $420 an hour.  (24 RR 261.)   He

also testified in the Joe Lee Guy case around 1995, when his fee was $300.00 an hour.  (24 RR

261-261.)    Dr. Coons admitted that the prosecution had not provided him with any acts of

violence committed by Mr. Coble in the last 18 years.  (24 RR 266.)  If the state had any such

incidents, they would have been given to this witness.  (24 RR 266.) According to the witness,

this made absolutely no difference as to his predictions.

Far from there being a "probability" that a 60-year-old inmate in poor health who had been non-violent for the past 20 years would commit future acts of violence, TDCJ statistics show that there as a fairly low level of violence in Texas prisons. Enclosed as Exhibit 17 is Texas Department of Criminal Justice statistics on the actual level of prison violence. They show that in 2008, out of a prison population of 155,924, there were a total of 5 offender deaths by homicide, 195 alleged sexual assaults, 65 serious staff assaults and 1,135 serious offender assaults.[143] Thus, the level of violence was not nearly as high as Dr. Coons implied.

**B. What the State Courts Held.**

This claim was brought on direct appeal (as points of error three, four and five) and the CCA held as follows:

> In points of error three and four, appellant contends that Dr. Richard Coons's expert testimony concerning future dangerousness was not admissible under Rule 702 because it was insufficiently reliable. We agree. In point of error five, appellant asserts that this type of evidence fails to meet the heightened reliability requirement of the Eighth Amendment, but the United States Supreme Court, in *Barefoot v. Estelle*, [463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)] rejected this argument, and we are required to follow binding precedent from that court on federal constitutional issues.
> *Coble,* 330 S.W.3d at 270.

Hence, the holding on points of error three and four was based on a rule of evidence, and, as to those points, as the CCA subsequently pointed out, "the holding in *Coble* does not give rise to a claim that is cognizable on habeas corpus." *Ex parte Ramey,* 382 S.W.3d 396, 397 (Tex. Crim. App. 2012). However, point of error number five on direct appeal was based on federal constitutional Eighth Amendment grounds, and hence is cognizable on federal habeas

---

[143]   Exhibit 17, Texas Department of Criminal Justice, Emergency Action Center Statistics, Summary of Selected Incidents, January 2002-May 2009.

On state habeas this claim was brought as Claims 7(a), (b), and (c).  Claims 7(a) and 7(c) were based on federal constitutional law and hence they are cognizable on federal habeas.  Claim 7(a) in state habeas corresponds to point of error number five on direct appeal, and they will be discussed here conjointly, although Claim 7(a) in state habeas also raised Fifth, Sixth, and Fourteenth Amendment grounds. Claim 7(b) is arguably based on a rule of evidence.  It presented here only as to the argument of the irrelevance of Coon's testimony that rests on the constitutional arguments of Claim 7(a), which was incorporated to Claim 7(b) by reference.

The CCA adopted the State's Proposed Findings and Conclusions and denied Claim 7, holding it to be procedurally barred.  *Ex parte Billie Wayne Coble,* No. WR-39,707-03 (Tex. Crim. App. Feb. 8, 2012)(*per curiam*)(unpublished). (Exhibit 31.)

Petitioner wishes to emphasize that the arguments presented herein *do not* relate to points of error three and four on direct appeal, or to any non-constitutional arguments in Claim 7(b). This is not simply a trial error claim, a violation of Texas Evidence Code 702, nor was it in state habeas, at least as to Claims 7(a) and 7(c).

### C. Why the State Court Holding Was Objectively Unreasonable Under 2254(d).

As to the holding that the claim was procedurally barred for having been brought on direct appeal, that was clear error, as Claim 7 on state habeas was not the same as points of error three, four and five on direct appeal.  Even in point of error number five on direct appeal, that constitutional challenge was made only on Eighth Amendment reliability grounds.

Claims 7(a) and 7(c) on state habeas could not have been brought on direct appeal because they relied on a great deal of extra-record evidence, such as Exhibits 9, 13, 14, 16, 17, and 18.  It is black-letter law in Texas that "the most basic characteristic of the appellate record is that it is limited to matters before the trial court. An appellate court may not consider such

extra-record materials as affidavits attached to appellate briefs." Dix, George E., *Criminal Practice and Procedure (Texas Practice Series)*, West, 3rd. ed. 2011, Sec. 55:48 ("Appellate Record") at p. 116 (emphasis added). *See, e.g., Hartman v. State,* 198 S.W.3d 829, 842-43 (Tex. App.–Corpus Christi 2006, pet. Stricken)(manual attached to appellate brief not considered because it was not in the record); *Flowers v. State,* 133 S.W.3d 853, 859 (Tex. App.–Beaumont 2004)(court of appeals refused to consider document attached to motion to abate the appeal). Even in the situation when an appellant moves to supplement the appellate record with *his own affidavit,* the appellate courts have responded that since the affidavit was not placed into the record in the trial court, it could not be a proper part of the appellate record. *Bowler v. State,* 822 S.W.2d 334 (Tex. App.–San Antonio 1992, pet. ref'd).

The only other possibility upon which the CCA based its denial was on the merits arguments made by the State when its adopted their proposed findings and conclusions. But, there too, the State simply argued that "[t]his matter has been raised and rejected on direct appeal." State's Answer (Exhibit 27) at 13. That holding, ultimately adopted by the CCA, was flat wrong, contrary to both the facts presented and clearly established law, and objectively unreasonable. The vast majority of the arguments as to Claims 7(a) and (c) had never been raised on direct appeal, nor could they have been so raised.

Thus, the CCA's holding that this claim on state habeas was "procedurally barred" was clearly an unreasonable determination of the facts *and* the law under 2254(d). Review here is *de novo*. The unreasonableness of the CCA's denial is discussed in greater detail in the analysis of Claim 7(a).

**Claim Seven(a):** **The predictions of Dr. Coons regarding "future dangerousness" were unconstitutionally unreliable. (Point of error five on direct appeal; Claim 7(a) on state habeas).**

The reliability of expert testimony rests on a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid and may properly be applied to the facts in issue. *Daubert,* 509 U.S. at 593-94.  A preliminary assessment of reliability is guided by (a) the validity of the underlying scientific theory (b) the validity of the technique applying the theory and (c) the proper application of the technique on the occasion in question. *Kelly,* 824 S.W.2d at 573; *Nenno*, 970 S.W.2d at 561. Questions of validity and proper application are to be guided by certain factors, which include, but are not limited to:

> a. The qualifications, experience, and skill of the person testifying;
> b. The extent to which the reasoning or methodology can be and has been tested;
> c. The extent to which the reasoning or methodology relies upon the subjective interpretation of the person testifying;
> d. Whether the reasoning or methodology has been subjected to peer review and/or publication, and whether the theory or technique has been rejected in such literature;
> e. The availability of other experts to test and evaluate the technique;
> f.  The potential or known rate of error of the reasoning or methodology;
> g. Whether the reasoning or methodology has been generally accepted as valid by the relevant scientific community;
> h. The non-judicial uses which have been made of the reasoning or methodology;
> i.  The clarity with which the underlying theory and technique can be explained to the court.
> *Daubert¸* 509 U.S. at 593; *Gammill,* at 972 S.W.2d at 720; *Kelly¸* 824 S.W.2d at 573.

The above-listed factors [*Daubert* and *Kelly* factors] are germane to evaluating the reliability of both scientific and non-scientific expert testimony, "[w]hether the expert would opine on economic valuation, advertising psychology, or engineering…." *Gammill*, 972 S.W.2d at 725. *See also Moore v. Ashland Chemical, Inc*. 151 F.3d 269 (5th Cir. 1998)(holding that clinical medical expert's testimony was not admissible because it did not fulfill the *Daubert* factors); *Perez v. State,* 25 S.W.3d 830 (Tex. App.- Houston [1ˢᵗ Dist.] 2000) (applying *Daubert*

analysis to non-scientific expert); *American Tourmaline Fields v. International Paper Co.*, No. CIV.A.3:96CV3363D, 1999 WL 242690 at *4 (N.D. Tex. April 19, 1999)(same). As such, the above-listed principles govern the admissibility of psychiatric and psychological testimony, which is based on a combination of training, experience, and scientific inquiry. *Nenno*, 970 S.W.2d at 560-62. *See also Muhammad v. State*, 46 S.W.3d 493, 506-507 (Tex. App. – El Paso [8[th] Dist.] 2001) (using the *Kelly* factors to determine whether psychological evidence should be admitted); *Green v. State*, 55 S.W.3d 633, 639-41 (Tex. App. – Tyler [12[th] Dist.] 2001)(same). In evaluating "fields of study aside from the hard sciences," courts should tailor the above analysis to examine closely the data collection procedures, such as personal interviews, document review, or statistical analysis, conducted by the witness in question. *Nenno*, 970 S.W.2d at 562.

Here, Dr. Coons' testimony as to whether Mr. Coble would constitute a continuing threat to society, or his "future dangerousness," was an ad hoc determination solicited by a hypothetical fact pattern presented to the witness by the State.   (24 RR 211-218.)   The prosecution read to Dr. Coons a lengthy hypothetical that purported to track the facts in Mr. Coble's case and allegations. *Id.*  This formed the basis for Dr. Coons' opinion.  (24 RR 219.) The hypothetical incorporated supplemental evidence, such as extraneous offenses, uncharged prior misconduct, and limited character evidence, to be considered in the ad-hoc determination. (24 RR 211-218.)

Dr. Coons' predictions of Mr. Coble's "future dangerousness," based on an ad-hoc determination based on hypothetical fact patterns prepared and presented by the State, were erroneously presented  because they failed to meet adequate standards for reliability. This issue was fully preserved by the defense, as they objected to his testimony on the basis of state and federal constitutional grounds "that the evidence is not reliable enough to meet the standards for

individualized sentencing and heightened reliability" under the Eighth Amendment; and under

the Fifth, Sixth, Eighth and Fourteenth Amendments; and under Tex. R. Evid. 702. (24 RR 199-

200, 201.)

**Dr. Cunningham's report.**

Dr. Mark Cunningham, who testified at Mr. Coble's trial, has analyzed the shortcomings

in Dr. Coons' testimony. Measured by almost any conceivable yardstick, it failed miserably in

terms of reliability, scientific acceptance, accuracy and methodology:

> Dr. Richard Coons described a risk assessment methodology of based on past
> history of violence; attitudes favorable to violence based on past conduct; personality as
> reflected in a history of criminal vs. law-abiding conduct, treating people nicely vs. being
> controlling, violent, or abusive; premeditation in the instant offense; and the presence of
> conscience. All of these factors constitute illusory correlations, i.e., they have intuitive
> appeal but do not predict violence in prison.

> In his capital risk assessment methodology, Dr. Coons makes 10 of 12 errors
> noted by Cunningham and Reidy (1999) [Cunningham, M. D., & Reidy, T. J. (1999).
> Don't confuse me with the facts: Common errors in violence risk assessment at capital
> sentencing. *Criminal Justice and Behavior, 26*, 20-43.] The only two errors *not*
> incorporated into Dr. Coons' methodology were simply unavailable to him, including
> over-reliance on clinical interview and misapplication of psychological testing. Errors
> actively endorsed and incorporated into Dr. Coons' methodology and testimony included:

> Inadequate reliance on base rates
> Failure to consider context [prison vs. community]
> Susceptibility to illusory correlation
> Failure define severity of violence [in specifying probability]
> Faulty implications of Antisocial Personality Disorder and Psychopathy
> Ignoring the effects of aging
> Misuse of patterns of behavior [assuming community behavior predicts prison behavior]
> Neglect of preventive measures
> Insufficient data
> Failure to express the risk estimate in probabilistic terms

> Dr. Coons' methodology and testimony ignores a well-regarded literature review
> and meta-analysis regarding risk assessment for prison demonstrating that the factors he
> asserts as predictive are not [see Edens, J., Buffington-Vollum, J., Keilin, A., Roskamp,
> P., & Anthony, C. (2005). Predictions of future dangerousness in capital murder trials: Is
> it time to "disinvent the wheel?" *Law & Human Behavior, 26,* 59-87.] This same article

reported the findings of a study of the prison behavior of 155 Texas capital offenders who were sentenced to death following State-sponsored expert testimony utilizing a similar methodology. If "criminal acts of violence that would constitute a continuing threat to society" are contemplated as assaults resulting in more than first aid injury, these predictions were wrong 95% of the time – including among a subsample who had been removed from death row after obtaining relief from their death sentences.

In his testimony, Dr. Coons cited no research or scholarship in support of his methodology. This is not surprising, as there is no peer-reviewed scientific support for the predictive value of any of these factors. In his persistence in representing these factors as predictive before Mr. Coble's jury, Dr. Coons ignored friend of the court briefs of relevant scientific/professional associations that specifically take issue with his methodology and testimony in risk assessments at capital sentencing. The *amici* curie brief of the Texas Psychological Association [Brief of the *Amici Curiae* Texas Psychological Association and Texas Appleseed in Support of Appellant, *Noah Espada vs. The State of Texas*, in the Court of Criminal Appeals of Texas at Austin (2007).] characterized Dr. Coons utilization of an almost identical methodology in *Espada* as follows:

Viewed against the established principles set forth above, the work done by Dr. Coons in this case did not satisfy current professional standards regarding the appropriate basis for developing an opinion regarding the future dangerousness of a capital defendant. Dr. Coons did not base his opinion on scientific methods. He did it his way. His testimony during the sentencing phase of Mr. Espada's trial offered nothing more than a wholly unstructured, subjective judgment—the type of prediction of "future dangerousness" that consistently has been shown to be unreliable. Dr. Coons gave no consideration to applicable base rates of violence, and he concluded without foundation that there was a "probability" that Mr. Espada, even while incarcerated, would present a "continuing threat to society." Further, Dr. Coons admitted that his opinion did not derive from statistically analyzed data drawn from valid and reliable research but rather solely from his personal experience. [footnotes deleted] (pp. 10-11)

Similarly, in an amicus brief in response to Dr. Coons' utilization of this same methodology in testimony in another capital case [Brief of *Amicus Curiae* American Psychological Association in Support of Defendant-Appellant, *U.S. v. Sherman Lamont Fields* in the United States Court of Appeals for the Fifth Circuit (2005).], the scientific analysis of his testimony produced the following characterization:

Measured against these established scientific principles, Dr. Coons' methodology and opinion in this case lacked sufficient indicia of reliability to be offered to the jury as expert testimony. Dr. Coons did not base his opinion on scientific methods. He did not consider applicable base rates of violence or utilize studies showing the correlation between particular risk factors and the likelihood of future violence. Indeed, Dr. Coons based his expert testimony almost exclusively on factors that have been shown *not* to have a strong correlation with the occurrence of serious acts of violence in prison. The

admittedly subjective methodology employed by Dr. Coons in this case has not been tested, has not been subjected to peer review and publication, has an unknown error rate, was not controlled by any standards, and is not generally accepted within the scientific community. Even more troubling is that, although Dr. Coons' expert opinion in this case had no scientific validity, research also indicates that expert testimony like that offered by Dr. Coons in highly influential with jurors, even when the weaknesses in the methodology are exposed. (pp. 10-11)

Dr. Coons dismissed the significance of Mr. Coble's age as a factor pointing to toward a markedly reduced risk of prison violence, testifying:

...However, there are plenty of people who are of age who have shanks, pieces of metal that have been sharpened down and handles wrapped with something. [24:225]

This testimony is analogous to a physician asserting that cigarette smoking has nothing to do with lung cancer, since there are "plenty" of smokers who never develop such malignancies. Such testimony ignores and attempts to discredit substantial scientific (i.e., statistical) data demonstrating the strong association – despite exceptions.

Dr. Coons' assertion that offenders on death row respond to a special incentive to maintain good conduct [24:209] is refuted by side-by-side comparison of the prison behavior of death-sentenced and life-without-parole inmates [see Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23,* 307-320.], as well as by research comparing the post-relief behavior of former death-sentenced offenders with inmates sentenced to life terms at trial [see Marquart, J.W., Ekland-Olson, S., & Sorensen, J. R. (1989). Gazing Into the crystal ball: Can jurors accurately predict dangerousness in capital cases? *Law & Society Review, 23,* 449-468.].

*Accepted science and assertions of future prison violence*

A large body of data and numerous peer-reviewed studies now demonstrate that the violence risk assessment of virtually any capital defendant will result in varying levels of *improbability* of committing a serious prison assault.  This conclusion was articulated in Cunningham (2006) [see Cunningham, M. D. (2006). Dangerousness and death: A nexus in search of science and reason. *American Psychologist, 61*, 828-839.], as follows:

This discussion and the extensive data referenced previously reviewed should not interpreted as evidence that all violence risk assessments at capital sentencing are unreliable; quite the contrary. It is only the assertions of high and disproportionate risk that are, as a class, unreliable. A finding that offenders similar to the defendant present a low and not disproportionate risk of serious violence in prison will be reached with high reliability in most capital cases

through the application of base rate and actuarially derived data. The specified improbability will vary in relation to the severity of violence being forecasted. Further, even that low probability can be reduced by the application of correctional interventions including more secure confinement.

How can only one pole of a determination be reliable? The answer, of course, is group data. For example, you could walk into an elementary school classroom and predict with a high degree of accuracy and reliability that all of the children will survive to adulthood. Admittedly, some of the children are likely to have risk factors such as asthma, diabetes, poverty, genetic predispositions to substance abuse, etc. These risk factors, however, only slightly reduce the extreme improbability of a premature demise. It is the "expert" who selects out a particular child as unlikely to survive to adulthood who must demonstrate the empirical basis for an assertion that cuts so diametrically against the known collective outcome. (pp. 836-837)

Additional research studies on the prison conduct of capital offenders, as well as on rates and correlates of prison violence [e.g., see my publication listing detailed earlier in this affidavit], published since 2006 have provided further support for this conclusion. Because the application of scientific methodology and peer-reviewed studies will invariably result in a finding of an improbability of serious prison violence at capital sentencing, any "expert" testimony offered by the State would either seek to supplant reliable methods with anecdotal appeals to fear, discounting of actual data, and/or assert intuitive "risk" factors that are directly contradicted by well-established science. Such misinformation, mis-characterized information, and pseudo-science are amply demonstrated by the testimony of Mr. Merillat and Dr. Coons.[144]

### i) The State failed to carry its burden of proving the reliability of Dr. Coons' testimony.

The proponent of psychiatric or psychological predictions of a defendant's future dangerousness bears the burden of proving the reliability of such predictions. *Robinson,* 923 S.W. 2d at 557.  In order to satisfy this burden the proponent must demonstrate his experience and skill in a sub-specialty of forensic psychology or psychiatry that addresses the prediction of future dangerousness of criminal defendants in capital cases. A general degree in psychiatry or psychology is not sufficient to establish expertise in the predictions of future dangerousness in capital cases.  *See Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)(holding that a testifying

---

[144]   *See* Exhibit 16, Affidavit of Mark D. Cunningham, at 20-24.

expert must have expertise on the very matter about which he is to give an opinion and that a medical degree is not sufficient to establish this expertise).  The proffered expert also bears the burden of proving his skill in predicting the future dangerousness of criminals. Experience testifying as an expert witness on the issue at hand is not sufficient to establish reliability. In fact, absent a showing of the reliability of the proffered testimony, the Texas Supreme Court has squarely rejected the testimony of those who have had long histories of testifying by noting that "'the only review the plaintiffs' experts' work has received has been by judges and juries, and the only place their theories and studies have been published is in the pages of the federal and state reporters.'" *Merrell Dow Pharmaceuticals v. Havner*, 953 S.W.2d 706, 726 (Tex. 1997)(quoting *Daubert v. Merrell Dow Pharamceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)). Furthermore, experience in the field is not sufficient to establish expertise if such experience is not skillful.  *See Sosa v. State*, 841 S.W.2d 912, 916 (Tex. App. - Houston [1st Dist.] 1992) (rejecting testimony of proffered "graphonalaysis" expert who had been a graphoanalyst for fifteen years and had reviewed thousands of handwriting samples because testimony otherwise not proved reliable).

Here, Dr. Coons had virtually nothing to recommend him as a witness other than the fact that he had testified repeatedly for the prosecution.  In addition, he himself admitted the unreliability of the foundations of his predictions. (24 RR 188-197.)  He was not aware of any psychiatric studies that supported his views (24 RR 188); was not aware of the accuracy rate of his long-term predictions of future dangerousness (24 RR 188); was not aware of any studies which supported his long-term predictions (24 RR 189-190); had never checked on the accuracy rate or reliability of his own predictions (24 RR 194-195); and had not even read any of the leading scholarly articles on the prediction of future dangerousness. (24 RR 196-197.)

In order to demonstrate a professed skill, the expert should be asked to proffer specific publications on the reliability and acceptability of the methodologies employed in predicting future dangerousness. *See Castellow v. Chevron*, 97 F.Supp.2d 780, 794-95 (S.D. Tex. 2000)(rejecting experts' testimony who did not point to medical or scientific literature supporting their conclusions); *Green,* 55 S.W.3d at 640 (rejecting expert's testimony who did not provide the trial court with any actual authorities and authorities supporting his analysis); *American Tourmaline Fields*, 1999 WL 242690 at *3 (rejecting testimony of proffered expert who has not provided court with copies of articles upon which he purported to rely and could not recall the name or citation for any articles that have discussed his technique).

Dr. Coons admitted that in a 40-year career, he had never published his methodology in an academic journal (24 RR 240-241); and had not published at all in his professed field of expertise since his licensing in 1968. (24 RR 243.)   In fact, no publications at all were cited at trial, remarkable in a career spanning almost half a century.  Even worse, Dr. Coons admitted that he had not even  *read* any of the leading scholarly articles on the prediction of future dangerousness. (24 RR 196-197.)

Further, the methodologies that the proffered expert employs in predicting future dangerousness must be consistent with the methodologies and principles of predicting future dangerousness that are detailed in those publications the expert brings to the court's attention. *See Green*, 55 S.W.3d at 640 (rejecting expert's testimony when expert did not indicate that he had followed the methodologies of the "authorities" that he cited); *Bennett v. PRC Public Sector, Inc.,* 931 F.Supp. 484, 494 (S.D. Tex. 1996) (rejecting expert's testimony noting that the methodology he employed was not consistent with the methodologies described by experts and literature in the field that he had named).

Here again, Dr. Coons failed the test by a wide margin.  Not only did he fail to bring any consistent scholarly or academic authority to the Court's attention in support of his views, he actually admitted that he was not aware of any such studies that supported his methodology (24 RR 189-190) and had not read the main articles in his professed field of expertise. (24 RR 196-197.)  The trial court's  finding that "by reason of his knowledge, skill, experience, training, and education" that Dr. Coons qualified as an expert was clearly erroneous. (24 RR 199.)  The same court's finding that "admitting the expert testimony will actually assist the factfinder in deciding this case"  (24 RR 199) was likewise erroneous.

### ii)  Dr. Coons' predictions of future dangerousness are inconsistent and contradictory.

In addition to being simply ad hoc and unreliable, Dr. Coons' predictions of future dangerousness are contradictory and inconsistent, seemingly dependent on who pays his hefty fees of $350 to $400 per hour, or, in this case, $480.00 per hour.[145]  The case of *McGinn v. State,* 961 S.W.2d 161 (Tex. Crim. App. 1998) involved circumstances far more aggravating and far more suggestive of a propensity for future violent acts than the evidence adduced in Mr. Coble's case.  In *McGinn,* the defendant was convicted of the murder of his 12-year old child (*Id.* at 163).  As the Texas Court of Criminal Appeals stated in a concurring opinion by Judge McCormick:

> The evidence supporting the jury's affirmative answer as to the future dangerousness special issue is compelling.  First, appellant had a substantial past criminal history, including a prior conviction for a kidnapping/beating in 1987.  Testimony was introduced of a violent assault and rape in 1985 committed by appellant, a repeated sexual assault at knife-point committed by appellant in 1986 and a 1987 molestation by appellant of his four-year-old daughter Latasha, which resulted in her hospitalization for five days.  There was testimony from Latasha's mother that appellant threatened to kill

---

[145]  In Mr. Coble's case, he was paid no less than $480.00 (24 RR 260), making him certainly by far the highest paid person in the courtroom. For his brief appearance at Mr. Coble's trial, his bill was $12,600.00. (Waco Tribune-Herald, "*Retrial of Billie Wayne Coble cost taxpayers at least $99,000,* October 11, 2008, by Tommy Witherspoon, Exhibit 6 at 69.)

her with a stick.  Appellant's history supports a rational finding he would likely commit violent acts of a sexual nature in the future.

The circumstances of the offense support the jury's finding as to the future dangerousness special issue.  Evidence adduced at trial showed appellant while alone in his car with his twelve-year-old stepdaughter, got her drunk, had sex with her, and beat her head in with multiple blows from an axe.  He then secreted her body in a ditch.  This evidence clearly shows appellant acted by himself, with forethought and deliberateness, and with calculation (there was testimony he attempted to eliminate or hide evidence of his commission of the offense).  There was no evidence he was under duress or domination of another, or that he was acting with other parties.

*McGinn,* 961 S.W.2d at 172 (McCormick, concurring).

These circumstances went well beyond the aggravating evidence of future dangerousness presented in Mr. Coble's case, without any of his substantially mitigating factors, most important of which was an 18-year completely violence-free period from 1989 to 2008 immediately prior to his penalty phase re-trial.  Yet, "[o]ne psychiatrist, Dr. Coons, testified it was his opinion appellant would not likely be a future danger within the structured environment of the penitentiary." *McGinn,* 961 S.W.2d at 172.  It is hard to imagine a more inconsistent opinion on future dangerousness comparing his opinion in *McGinn* to his opinion in Mr. Coble's case. Instead of the safety of "the structured environment of the penitentiary" referred to in *McGinn,* Dr. Coons turned that on its head in Mr. Coble' case, testifying that on death row everyone is "on appeal" and therefore motivated to behave. (12 RR 134.)  Mr. McGinn's assaults, rapes, kidnappings, beatings, molestations, and hiding the evidence did not bother Dr. Coons in *McGinn,* but Coble's "evil grin" of 10 years prior was a "bad sign," and truly troubling for this witness and an indication of Coble's future dangerousness. (24 RR 222.)   The only consistency in Dr. Coons' opinions seems to be a favorable opinion for whoever is paying his fees.

**B)  Dr.  Coons'  prediction  of  Mr.  Coble's  future  dangerousness  was unconstitutionally unreliable and therefore inadmissible due to the overwhelming potential error rate of these predictions.**

It is generally accepted by the scientific community that psychiatrists and psychologists

are more often incorrect in their assessments of future dangerousness than they are correct. The American Psychiatric Association [APA], has consistently maintained that "[t]he unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession." *Barefoot v. Estelle,* 463 U.S. 880, 920 (1983)(Blackmun, J., dissenting) (quoting Brief Amicus Curiae for the American Psychiatric Association, *Barefoot v. Estelle*, 463 U.S. 880 (1983)(No. 82-6080) [hereinafter APA Brief]. *See also Flores v. Johnson*, 210 F.3d 456, 463 (5th Cir. 2000)(Garza, J., specially concurring)(noting that the scientific community's rejection of the reliability of predictions of future dangerousness is "as true today as it was in 1983.") Predictions that a person will be dangerous in the future are wrong two out of three times. *Barefoot*, 463 U.S. at 920 (citing APA Brief at 9, 13); J. Monahan, The Clinical Prediction of Violent Behavior 47-49 (1981); C. Slobogin, *Dangerousness and Expertise*, 133 U. Pa. L. Rev. 97, 111-17 (1984) (citing results of the major studies: Baxstrom study: 20% accuracy; Thornberry Study: 20% accuracy; New York study 14% accuracy: Kozol study: 34.7% accuracy; Paxtuxent study: 41.3% accuracy; Wenk study: 8% accuracy). As such, a jury member could more accurately predict dangerousness by flipping a coin rather than relying on an expert psychologist or psychiatrist's testimony. Because the conclusions drawn from ad-hoc psychiatric or psychological predictions of future dangerousness are more often wrong than right, the amorphous and undefined methodologies they employ are unreliable. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)(holding that "conclusions and methodology are not entirely distinct from one another" and that erroneous conclusions may indicate a faulty underlying methodology).

Several studies have been conducted on the prison conduct of former death row inmates

in Texas.  One study by Marquart, Ekland-Olson, and Sorensen (1989)[146] examined the accuracy of jurors' determinations of future dangerousness by comparing the institutional behavior of 92 former death row inmates who had their sentences commuted or reversed with a control group of 107 capital murderers sentenced to life imprisonment.  In the case of the former group, juries had determined there was a probability of future dangerousness whereas in the case of the latter group the juries had determined the group to not constitute such a risk.  Moreover, these groups were compared to the entire TDCJ prison population in 1986 and a population of inmates housed in a single high-security prison.  Overall, the former death row inmates' total rate of assaultive institutional misconduct in the general population was lower than the rates for the comparison groups.  More specifically, the rate of violent prison rule violations was 1/5 and 1/10 the rate of the general population and a non-capital, high-security prison comparison sample, respectively. The annual base rates of violent rule infractions were 1.6 for commutees, 2.6 for life-sentenced murderers, 11.7 for the general population, and 19.3 for the high-security prison population.

Marquart and Sorensen (1989)[147]  followed a national sample of 558 *Furman* commuted inmates from 30 jurisdictions over a 15-year period.  In total, 6 murders and 59 serious acts of violence were perpetrated in the prisons by the former death row inmates after they had been commuted and were no longer on death row.  With respect to the serious rule violations, a small group (7.4%) of chronic offenders committed more than half of the total number of infractions. Of the 30% who committed any institutional infractions, half committed only one infraction over the 15-year period, and many served out their sentences without incident.  These rates are

---

[146]  "*Gazing Into the Crystal Ball: Can Jurors Accurately predict Dangerousness In Capital Cases?,*" Law & Society Review, 23(3), 449-468.

[147]  "*A National Study Of The Furman-Commuted Inmates:  Assessing the Threat To Society From Capital Murder Offenders*", Loyola of Los Angeles Law Review, 23, 5-24.

comparable to those reported by Marquart, Elkland-Olson, and Sorensen(1994) on the 421 death row inmates who passed through death row in Texas between 1974 and 1988. Specifically, 63 assaultive acts-including 37 involving a weapon on other inmates and 24 involving a weapon on guards- were committed by just over 10% of the inmates (n=45).

More recently, Reidy, Cunningham, and Sorensen (2001)[148] summarized the extant research on the incidence of violent prison misconduct in the general prison population of former death row inmates. Over varying follow-up periods (ranging from 2 to 53 years) across several jurisdictions, the rates of assault in the institution by death row, former death row, capital life, LWOP, and LWP inmates were relatively low, ranging from 0% to 31%. Aside from their literature review, Reidy et al. (2001) also reported a cumulative institutional violence rate at 35.9%, of which 20.5% occurred in the general population, in a sample of 39 former death row inmates in Indiana over an average of 16 years. Although indicating a rate somewhat higher than prior studies, of the 24 violent acts (committed by a total of 14 different inmates), only 7 were judged to be "serious."

Even more recently, the same authors conducted another study which concluded that

The U.S. Supreme Court in *Jurek v. Texas* (1976) affirmed that capital juries are able to identify those capital offenders who will commit serious violence in the future. The capability of capital juries to accurately make these judgments as a means of deciding which capital offenders should receive the death penalty has been widely endorsed in both statute and case law, as well as embraced by jurors. A growing body of research on rates and correlates of prison violence, however, points to this confidence being misplaced. Prior investigations of the accuracy of these capital jury predictions, though limited in number, have found alarming error rates. The current study retrospectively reviewed the post-trial (M=5.7 years) prison disciplinary misconduct of federal capital offenders. (N=72) for whom juries considered "future dangerousness" as an aggravating factor at sentencing. These jurors' predictive performance was no better than random guesses, with high error (false positive) rates, regardless of the severity of

---

[148] *"From Death To Life: Prison Behavior of Former Death Row Inmates in Indiana"*, Criminal Justice and Behavior, 28, 62-82.

the anticipated violence.  In light of prior studies, it is concluded that juror predictions of future violence lack sufficient reliability to play a role in death penalty determinations.[149]

Even the more generous studies, done under the most controlled settings, indicate that predictions of future dangerousness will be accurate only one-half of the time. As such, these predictions are no better than chance determinations of who will be dangerous in the future. Randy Otto, *On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature*, 18 Law & Psych. Rev. 43, 64 & n.65 (1994); *See also* Melvin Goldzband, *Dangerousness: A Mutating Concept Passes Through the Literature*, 26 J. Am Acad. Psych. & L. 649, 651 (1998)(noting that predictions of dangerousness are increasingly demanded by courts but because of their unreliability such predictions are "inherently fruitless" and "possibly dangerous."); George B. Palermo, et al. *On the Predictability of Violent Behavior*, 36 J. Forensic Sci. 1435, 1442 (1991)(noting that supportive scientific studies for the accuracy of long-term predictions of violence are lacking); David Freedman, *False Prediction of Future Dangerousness: Error Rates and the Psychopathy Checklist-Revised*, 29 J. Am. Acad. Psych. & L. 89, 92 (2001)("The prediction of complex behaviors such as violence remains exceedingly difficult and uncertain, and the plethora of new instruments fails to reach a scientifically reliable or valid standard of performance to be used to make decisions about a person's life or liberty in any setting.").

The reliability of psychiatric and psychological predictions of future dangerousness is tenuous when one considers how Texas courts have treated the admissibility of polygraph evidence. The Texas Court of Criminal Appeals has erected a "policy-based barrier to the

---

[149]  Exhibit 13, Cunningham, Sorensen and Reidy,  *"Capital Jury Decision-Making", the Limitations of Predictions of Future Violence"*, 15 Psychology, Public Policy and Law, 223-256 (2009).

admission of the existence and results of polygraph tests." *Reed v. State*, 48 S.W.3d 856, 860-61 (Tex. App. – Texarkana [6th Dist.] 2001). The court has held polygraph testimony categorically inadmissible "because it is not objective, but rather subjective, unreliable, and unduly persuasive." *Reed*, 48 S.W.3d at 863. The polygraph technique accurately predicts truth or deception "between seventy and ninety percent of the time." *United States v. Posada*, 57 F.3d 428, 434 (5th Cir. 1995). The best estimates of the accuracy of future dangerousness predictions indicate that they are correct merely fifty percent of the time. Psychiatric and psychological predictions of future dangerousness, which are both less reliable and more subjective than polygraph tests, should similarly be deemed inadmissible and should not have been admitted here.

Research and literature that may indicate a more accurate prediction rate of future dangerousness is based on methods of prediction that are very different from those used in capital trials. More accurate prediction rates are garnered from studies in which clinicians have the opportunity to observe behavior in a mental health facility over an extended period of time. The procedure used in this trial instead has been an ad-hoc determination of dangerousness based upon a hypothetical scenario provided by the State.

A report prepared by Texas Defender Service in 2004 examined the incidents of violence of 155 TDCJ inmates who a psychiatrist had said would be a future danger.  The report found that the mental health "experts" were wrong an astonishing 95% of the time. Texas Defender Service, "*Deadly Speculation — Misleading Texas Capital Juries with False Predictions of Future Dangerousness*" (2004).

Thus, merely on the grounds of general unreliability, Dr. Coons should not have been allowed to testify.  But there was another factor here that confirms this: he had already been

shown to be unreliable *in this case.*  One of the most striking features of Dr. Coons' testimony was that he predicted exactly the same thing in Mr. Coble's 1990 trial, as he himself admitted. (24 RR 256-257.)  Yet he was wrong, as Mr. Coble in the intervening 18 years had not so much as a disciplinary write-up for failure to report to work, let alone any instances of dangerous violence.[150]  (24 RR 266.)  Despite being spectacularly wrong in 1990, the trial court allowed Dr. Coons to again present this flawed and unreliable testimony, clothing quackery in a cloak of scientific respectability. In reality, the question of Mr. Coble's "future dangerousness" had already been answered by 2008, and the answer was negative.

**C) Dr. Coons' prediction of "future dangerousness" was unconstitutionally unreliable because it is not generally accepted in the relevant scientific community.**

The American Psychiatric Association [APA] has insisted that psychiatrists are not qualified to make determinations of long-term future dangerousness and has consistently urged that expert psychiatric expert testimony on future dangerousness be deemed inadmissible.  The APA has urged that "[a]bsent an in-depth psychiatric examination and evaluation, the psychiatrist cannot exclude alternative diagnoses; nor can he assure that the necessary criteria for making the diagnosis in question are met. As a result, he is unable to render a medical opinion with a reasonable degree of certainty." *Flores,* 210 F.3d at 467 (Garza, J., specially concurring) (quoting APA Brief). "The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness, is to put it bluntly, unreliable and unscientific." *Flores,* 210 F.3d at 463 (Garza, J., specially concurring). As an indication of the strength of the scientific community's rejection of this sort of ad-hoc psychiatric and psychological determinations, the

---

[150]   The defense had an affidavit received into evidence.  It was from Joni White, Chairman of Classification and Records for the Texas Department of Criminal Justice, Institutional Division, in Huntsville, Texas.  (25 RR 157.)  Ms. White stated in the affidavit that "Offender Coble...show[s] no disciplinary records for his entire incarceration."  (25 RR 157.)

APA expelled Dr. James Grigson because he consistently testified as to a defendant's future dangerousness without personal examination. Bruce Vincent, *A Dearth of Work for 'Doctor Death'; the Once Ubiquitous James Grigson Now Finds Little Demand for his Testimony in Texas Capital Murder Sentencings*, Texas Lawyer, Dec. 4, 1995, at 4.

Dr. Coons and his methodology are virtually without support amongst forensic psychiatrists. The psychiatric community as a whole has repeatedly rejected his methods.[151]   An American Psychiatric Association  task force found his methods of practicing psychiatry to be both unreliable and unprofessional.[152]

The wholesale refutation of Dr. Coons and his methods  is based on the widespread belief among the psychiatric profession that future dangerousness cannot be reliably predicted, and to testify otherwise is simply unethical.   Forensic psychiatrists as a profession oppose "recommending the death penalty specifically or expressing an opinion on a state's legal criteria virtually amounting to such a recommendation."[153]  The language of the Task Force on Clinical Aspects of the Violent Individual  underscores why Dr. Coons' claims are unsupported by his peers:

> Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or "dangerousness."  Neither has any special psychiatric "expertise" in

---

[151]  *See, e.g.,* Applebaum, Paul S., M.D., "Hypotheticals, Psychiatric Testimony, and the Death Sentence," *Bulletin of the American Academy of Psychiatry and the Law* 12.2 (1984): 169-77; Dix, George E., "The Death Penalty: 'Dangerousness,' Psychiatric Testimony and Professional Ethics."  *American Journal of Criminal Law* May, 1977; Ewing, Charles P. "'Dr. Death' and the Case for an Ethical Ban on Psychiatric and Psychological

[152]  American Psychiatric Association, "Clinical Aspects of the Violent Individual" (1974).

[153]  Weinstock, Robert, "Perceptions of Ethical Problems by Forensic Psychiatrists," *Bulletin of the American Academy of Psychiatry and the Law,* Vol. 17, No. 2, p. 194 (1989).

this area been established.[154]

Nevertheless, at the time of Mr. Coble's  trial in 2008, Dr. Coons, who was presented as an expert by the prosecutor because he frequently gives this testimony at the punishment phase of Texas capital trials, testified unequivocally that Mr. Coble would be dangerous in the future, despite the widespread discrediting of his methods.

Dr. Coons  claimed he was able to do what his profession as a whole recognizes cannot be done: reliably predict future dangerousness.  The APA Task Force on the Role of Psychiatry in the Sentencing Process pointed out that "[c]onsiderable evidence has been accumulated by now that long-term prediction by psychiatrists of future violence is an extremely inaccurate process."[155]  The APA Task Force on Clinical Aspects of the Violent Individual concluded "the ability of psychiatrists or any other professionals to reliably predict future violence is very unsatisfactory."[156]  Yet, Dr. Coons  continues to assert the accuracy of his predictions.

In an *amicus curiae* brief filed in *Barefoot v. Estelle,*[157] the American Psychiatric Association minced no words in arguing to the Supreme Court why testimony such as Dr. Coons'  should not be allowed in capital cases:

> Psychiatrists should not be permitted to offer a prediction
> concerning the long-term future dangerousness of a defendant in a
> capital case, at least in those circumstances where the psychiatrist

---

[154]  American Psychiatric Association, "Clinical Aspects of the Violent Individual" (1974) at 28.

[155]  Exhibit 18, *Psychiatry in the Sentencing Process*: A Report of the Task Force on the Role of Psychiatry in the Sentencing Process, American Psychiatric Association;  at p. 14.

[156]  American Psychiatric Association, Task Force Report No. 8: "Clinical Aspects of the Violent Individual" (July 1974).

[157]  *Barefoot v. Estelle,* 463 U.S. 880 (1983), *Amicus Curiae* Brief of the American Psychiatric Association.

purports to be testifying as a medical expert possessing predictive expertise in this area. Although psychiatric assessments may permit short-term predictions of violent or assaultive behavior, medical knowledge has simply not advanced to the point where long-term predictions---the type of testimony at issue in this case--may be made with even reasonable accuracy. The large body of research in this area indicates that even under the best of conditions, **psychiatric predictions of long-term future dangerousness are wrong in at least two out of every three cases.**

> Brief, at 8-9 (emphasis added).

Dr. Coons flagrantly violated professional standards in basing his assessment of future dangerousness on extremely limited information, mainly on the hypothetical fed to him by the State. (24 RR 211-218) and admitted he made his "diagnosis" of "future dangerousness" was based on material about the crime and the defendant furnished solely by the district attorney. (24 RR 153.) This method has been rejected by the APA Task Force on Sentencing.[158]

Dr. Coons' testimony in Mr. Coble's case could serve as a virtual parody of accepted scientific standards. This "expert" based his evaluation on alleged "evil grins," eating habits, a 40-year old report, secret prison information known only to the witness, and off-the-cuff

---

[158] *See* Exhibit 18. The Task Force stated in its report:

While the Supreme Court has ruled that such testimony may be admissible there is good reason for psychiatrists to shun such practices. The accuracy of such a report or testimony based on limited information and unsupported by the many clinical conferences that can be made by first-hand examination of the defendant is questionable. In situations in which such testimony is allowed, it is *imperative* that the psychiatrist fully acknowledge *all of the scientific limitations of opinions which are not based on clinical examination.*

Report at 15 (emphasis added). In its *amicus* brief in *Barefoot*, the APA judges these methods even more harshly:

Even if psychiatrists under some circumstances are allowed to render an expert medical opinion on the question of future dangerousness, amicus submits that they should *never* be permitted to do so unless they have conducted a psychiatric examination of the defendant...a diagnosis simply cannot be made on the basis of a hypothetical question. Absent an in-depth psychiatric examination and evaluation, the psychiatrist cannot exclude alternative diagnoses...as a result, he is *unable to render a medical opinion with a reasonable degree of certainty.*

Brief at 9.

theorizing about motivation. *See summary, supra.*  A fortune teller with a crystal ball would have equaled this witness in scientific credibility.

**D)   The Supreme Court has modified the standard of admissibility of scientific evidence, rendering Dr. Coons' testimony inadmissible because it violated due process and the Eighth Amendment.**

The new standard has been recognized in both the federal and the state courts. In *Barefoot v. Estelle,* the Supreme Court ruled--over the protestations of the American Psychiatric Association--that admitting opinion testimony based on a hypothetical to predict future dangerousness did not violate due process.  463 U.S. 880, 904, 905 (1983).  Essentially, it found that the jury was capable of independently evaluating the strength of such scientific testimony. *Id.* at 898, 899.

However, in *Daubert v. Merrill-Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court continued the trend it began in *Rock v. Arkansas,* 483 U.S. 44 91987), rejecting the unfettered introduction of scientific testimony and acknowledging the need for the trial court's gatekeeping role missing from *Barefoot.*

In *Daubert,* the Supreme Court ruled that the "*Frye*"[159] requirement that such evidence be "generally accepted" in the field to which it belongs must be superceded by the requirements of Federal Rule of Evidence 702. *Id.,* 113 S. Ct. at 2794.  Rule 702, the Court concluded, does not make "general acceptance" an absolute prerequisite to admittance, for doing so would "be at odds with" the 'general approach of relaxing the traditional barriers to opinion testimony." *Id.,* 113 S. Ct. at 2794, citing *Beech Aircraft v. Rainey,* 488 U.S. 153, 169 (1988).

Thus, the Court replaced *Frye* by placing the onus on the trial judge to determine "whether the expert is proposing to testify to (1) 'scientific knowledge' that (2) will assist the

---

[159]   *See Frye v. United States,* 293 F. 1014 (D.C. 1923).

trier of fact to understand or determine a fact in issue." *Daubert,* 113 S. Ct. at 2796. "Scientific" is defined as having "a grounding in the methods and procedures of science[,]"; "knowledge" as "more than a subjective belief or unsupported speculation." *Id.* at 2795.

To balance out this expansion of admissibility standards, the *Daubert* Court explicitly assigned to the trial judge the gatekeeping task of making this initial assessment, and the task of monitoring its use if the court allows it to be heard. *Id.* at 2795-96. With regard to "gatekeeping," the *Daubert* Court now requires the trial judge to make a preliminary assessment of the evidence *outside the presence of the jury* to see that it meets the two pre-requisites outlined above. *Id.*

If the evidence is admitted, the trial court's monitoring function begins. This monitoring should work to assure and encourage "[v]igorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof"---for those are "the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 2798.

The monitoring process continues after the testimony is heard. If the trial judge concludes that the evidence, though already admitted, is nonetheless "insufficient to allow a reasonable juror to conclude that the position [taken] more likely than not is true, the court remains free to direct a judgment..." *Id.* at 2798. In other words, not even admissibility guarantees that this information can ultimately present a jury issue.

### E) Dr. Coons' testimony was inadmissible under the modified *Barefoot* standard for reliability.

In *Jurek v. Texas,* the Supreme Court conditionally permitted a jury to make its own prediction of a capital defendant's future dangerousness upon its "hav[ing] before it all possible relevant information about the individual defendant whose fate it must determine." 428 U.S.

262, 274-76 (1976). Likewise, in *Barefoot v. Estelle,* the Court relied upon the "adversary system" to "uncover, recognize and take due account of [the evidence's] shortcomings"--thereby assuring due process. *See Barefoot,* 463 U.S. at 898-901.

Since then, however, the Court has deemed these methods inadequate in favor of a process that makes admissibility of scientific testimony contingent upon a showing of *reliability*--first in *Rock v. Arkansas*, 483 U.S. 44(1987), and more recently in *Daubert.* In *Rock*, the Supreme Court conditioned the admission of hypnotically-enhanced testimony (thereby conditioning recognition of hypnosis as a useful litigation tool) upon a showing of reliability. In that case, the reliability was found in the trial judge's ability to review and assess the method used by reviewing recordings of the hypnosis sessions--before the jury heard any of the testimony. *Daubert*, of course, prescribes similar gate-keeping measures. *See generally, supra.*

Based on the same principles set forth in *Rock* and *Daubert,* it has been suggested that the courts no longer give this testimony on future dangerousness such a free hand:

> Although Dr. Grigson's[160] testimony is not incompetent *per se*, his testimony should not receive our judicial stamp of approval...[T]he trial judge is required to independently determine the admissibility of Dr. Grigson's testimony in each case.

*Fuller,* 829 S.W.2d at 214 (Baird, J., concurring and dissenting). State courts across the country already have found that Coons-like purported expert scientific opinions based on hypothetical

---

[160] Dr. Grigson, who gave testimony in many Texas cases which was virtually identical to that of Dr. Coons in Mr. Coble's case, was expelled from the American Psychiatric Association in 1995 for making these predictions of future dangerousness without ever having personally examined the defendant. *See Flores v. Johnson,* 210 F.3d 456, 467 n. 16 (5th Cir. 2000)(*per curiam*)(Garza, J., concurring); Laura Beil, *Groups Expel Psychiatrist Known for Murder Cases,* THE DALLAS MORNING NEWS, July 26, 1995, at 21A; *Dr. Death Loses 2 Memberships Over Ethics Accusations,* THE FORT-WORTH STAR-TELEGRAM, July 27, 1995, at A25.

scenarios fail the *Daubert* requirements.[161]   Likewise, in applying the *Daubert* standards, Dr.

Coons' testimony in Mr. Coble's  case fails the prerequisite test.  His methodology does not have

a known or potential error rate, is not accepted in the scientific community, has not withstood

peer review, and cannot be fully tested.  *See Daubert,* 113 S. Ct. at 2796-97.


     **F) The *Rock/Daubert*  change in the law has Eighth Amendment implications as
well.**

     In the context of a capital criminal prosecution, the change in the law governing scientific

evidence also has Eighth Amendment implications.  At its core is the Eighth Amendment's

demand for "heightened reliability" of capital sentencing determinations and the corresponding

requirement that they be individualized.[162]   In short, jurors must be able to assess fully and

correctly "the character and record of the individual offender and the circumstances of the

particular offense" in determining whether death is the appropriate punishment.  *Woodson,* 428

U.S. at 304.

---

[161]   For instance, the Supreme Court of New Hampshire  looked to *Daubert* in rejecting a
psychologist's conclusion about a child being the victim of sexual abuse based on the expert's
"blind interpretation" of the child's drawings from the witness stand.  *State v. Luce,* 628 A.2d
707, 709 (N.H. 1993).  In particular, it grounded its *Daubert*-ian finding of unreliability on the
fact that the expert "had not reviewed the drawings prior to trial, had no knowledge of the
circumstances surrounding their creation, and had not interviewed the child who drew them.  *Id.*
(Conviction reversed).  *See also People v. Johnson,* 19 Cal.App.4th 778, 788-91 (Cal. App. 1st
Dist. [Div. 5] 1993)(citing *Daubert,* upholds trial court's preventing defense from presenting
expert sociologist's testimony and other expert opinion testimony about the incredibility of
prosecution witnesses on the grounds that these experts had not been shown to "research the
particular inmates in question, or had made any scientific study of their credibility").

[162]   *See Woodson v. North Carolina,* 428 U.S. 280, 305 (1976) ("Because of [the
qualitative difference between a term of years and a death sentence], there is a corresponding
difference in the need for reliability in the determination that death is the appropriate punishment
in a specific case.");  *Eddings v. Oklahoma,* 455 U.S. 104 (1982); *Lockett v. Ohio,* 438 U.S. 586
(1978).

In *Penry v. Lynaugh*, 492 U.S. 302 (1989)*,* the Supreme Court determined that without special instructions from the trial judge, the jury had no way to express its "reasoned moral response" to Penry's mitigating circumstances by imposing a sentence less than death.   Thus, there was an unacceptable risk that Penry was sentenced to death in spite of factors that might have called for a less severe penalty.   Under this analysis, the Eighth Amendment required re-sentencing.   *Penry,* 492 U.S. at 328; *see Lockett v. Ohio,* 438 U.S. 586, 605 (1978).   *Penry* made clear that the trial court has an affirmative responsibility in assuring that a truly individualized and reliable sentencing determination be made in capital cases.

All Dr. Coons presented was unsupported speculation, cloaked in the false respectability of "expert testimony."   The improper admission of this testimony improperly swayed the jury's evaluation of Mr. Coble's  propensity for future dangerousness and moral culpability. Consequently, he was denied his right to an individualized sentencing determination under the Eighth and Fourteenth Amendments to the United States Constitution and their counterparts in the Texas Constitution.

**G)   Texas Courts' reliance on expert testimony of "future dangerousness" is no longer constitutionally valid in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and *Kumho Tire v. Carmichael.***

A Fifth Circuit Court of Appeals concurring opinion discusses  the same testimony regarding future dangerousness as the jury heard in Mr. Coble's case.   In language that has direct relevance to Mr. Coble's  case, this "future dangerousness" testimony by a similar expert,  Dr. Clay Griffith[163],  was unequivocally condemned in the concurring opinion:

Such testimony lacking objective scientific testing or personal examination defies scientific rigor and cannot be described as expert testimony.   It is simply subjective

---

[163]  Dr. Griffith was also involved here as an expert who wrote a report on Mr. Coble, but he did not testify at either the first or second trials.  (24 RR 151-152.)

testimony without any scientific validity by one who holds a medical degree.  Given the paucity, indeed the complete lack, of mitigating evidence presented in this case, Dr. Griffith's testimony virtually compelled the jury's answer to the second special issue. *Flores, supra,* 210 F.3d at 458 (Garza, J., concurring).

The concurring opinion in *Flores* analyzes in detail the history, application and interpretation of the Texas capital sentencing structure.   "While states have discretion to structure their capital sentencing system as they please, the Supreme Court has made clear that whatever form they choose, individualization of the sentencing scheme 'selection' hearing is constitutionally mandated." *Flores,* 210 F.3d at 460.   As that opinion notes, the Supreme Court in *Barefoot v. Estelle,* 463 U.S. 880,   103 S. Ct. 3383 (1983), held that there was no constitutional problem with prosecutors supplying juries with psychiatric predictions of future dangerousness even though the psychiatric profession itself found such predictions to be unreliable more than 50% of the time.   As Justice Blackmun noted in dissent: "In no area is purportedly "expert" testimony admitted for the jury's consideration where it cannot be demonstrated that it is correct more often than not.  It is inconceivable that a judgment could be considered an 'expert' judgment when it is less accurate than the flip of a coin." *Barefoot,* at 931.

 But the majority of the *Barefoot* court relied on the adversarial process to assist the jury in deciding whether to credit such testimony, indicating that the normal process of cross-examination and presentation of opposing theories was all that was required. The majority there agreed with the district court's finding that the jury's purpose "is to sort out the true testimony from the false, the important matters from the unimportant matters, and, when called upon to do so, to give greater credence to one party's expert witnesses than another's." *Barefoot,* at 902. The *Barefoot* court buttressed its conclusion that the practice is constitutional by noting that this stance was embraced by the Federal Rules of Evidence:

> [T]he rules of evidence generally extant at the federal...[level[] anticipate that relevant, unprivileged evidence should be admitted and its weight left to the fact-finder, who would have the benefit of cross-examination and contrary evidence by the opposing party.
> *Id.* at 898.

At the time *Barefoot* was written, "no federal appeals courts had ever ruled that judges could condition the admissibility of expert testimony in a civil case on a demonstration of its reliability."[164]   In *Barefoot's* time, the courts screened proposed expert testimony merely to assure that the expert was qualified and to assure that the testimony was relevant to the issues, but not for reliability.   The majority in the 1983 *Barefoot* decision stated that "[w]e are unconvinced...***at least as of now***, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence..."   *Barefoot,* at 910 (emphasis added).   Thus, they left the issue open for re-examination in light of future developments.

A decade after *Barefoot*, in *Daubert v. Merrell-Dow Pharmaceuticals, Inc,* 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court shifted course, declaring that "under the [Federal Rules of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."   *Id.* at 589. The Court in *Daubert* found this requirement implicit in Rule 702's description of expert scientific testimony as testimony about "scientific...knowledge." Fed. R. Evid. 702.  As the Court stated:

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation.  The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."... Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a

---

[164]  Michael H. Gottesman, *From Barefoot to Daubert to Joiner: Triple Play or Double Error?,* 40 Ariz. L. Rev. 753, 755 (1998), cited in *Flores*, 210 F.3d at 465 n.11( mentioning the argument developed herein, the "viability of the *Barefoot* majority's analysis post-*Daubert." Id.*).

certainty; arguably, there are no certainties in science...But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method...In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.
*Daubert,* 509 U.S. at 590.

Given this shift from the qualifications of the expert and relevance to the reliability of the evidence, it is Petitioner's  contention that *Barefoot* is no longer  good law regarding the specific question of the admissibility of predictions of dangerousness. As the footnote in the concurring opinion points out, "several commentators have questioned the viability of the *Barefoot* majority's analysis post-*Daubert*."  *Flores,* 210 F.3d at 465, n. 11.

Even outside the sphere of *Daubert* and the Federal Rules of Evidence, the Supreme Court is raising the requirement of reliability in similar evidentiary matters.  For example in *United States v. Scheffer,* 118 S. Ct. 1261 (1998), the  Court  held that polygraph evidence was not admissible for the defense in criminal trials. The Supreme Court noted that "the exclusion of unreliable evidence is a principal objective of many evidentiary rules." *Id.,* at 1265.   The Supreme  Court has affirmed in *Kumho Tire v. Carmichael*, 119 S. Ct. 1167 (1999)  that the *Daubert* factors may apply to all expert testimony, scientific or otherwise. In *Kumho Tire,* the Court also observed that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho,* 119 S. Ct. at 1176, cited in *Flores,* 210 F.3d at 464 (Garza, J., concurring).

As Judge Garza's concurring opinion  indicates, psychiatric predictions of future dangerousness are rarely reliable. When the jury in this case was  called upon to make the determination whether Mr. Coble would commit future acts of violence as an aggravating factor, the inherent unreliability of psychiatric predictions of violent behavior was  so great that the jury

was  not  assisted in any way by the use of such prognostications.    *See also E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995)(Approving *Daubert*  and requiring proponent  to  show  relevance  and  reliability  of  scientific  expert  testimony).  Rather their predictions belong in the realm of what has become known to the courts as "junk science."[165]

While  the  use  of  psychiatric  predictions  of  future  dangerousness  is  not  new,  such predictions  remain  novel  in  the  sense  of  being  unusual  in  the  realm  of  psychiatric  practice. Scientific endeavors are not frozen in time: theories that in one era are widely approved may be later  disproved,  and  the  historical  respect  accorded  them  should  not  create  an  automatic presumption of admissibility.   "[Science] is advanced by a broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance." *Daubert*, at  597.

In  light  of  the  acknowledgment  in  *Daubert*  that  scientific  thinking  can  be  called  into question as the passage of time brings out its weaknesses, the precedential value of *Barefoot* can no  longer  be  considered  constitutionally  valid.    The  trend  toward  exclusion  of  unreliable

---

[165] *See* Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* (1991); *Brock v. Merrell Dow Pharmaceuticals*, 884 F.2d 167 (5th Cir. 1989); *Lust by and through Lust v. Merrell Dow Pharmaceuticals*, 89 F.3d 594 (9th Cir. 1996); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex. 1995) (discussing need to stem the flow of "junk science" and "kitchen chemistry" in our courts).  *See also* Odom, J., quoted in George E. Dix, *The Death Penalty, "Dangerousness," Psychiatric Testimony, and Professional Ethics*, 4 Am. J. Crim. Law 151, 164: "I am unable to find that much of the testimony offered [regarding future dangerousness] was from this side of the twilight zone."  Judge Garza commented on the reliability of such predictions as follows: "[o]ne commentator recently reviewed the psychological research on the issue post-*Barefoot* and concluded that "whereas first generation research suggested that perhaps one out of three people predicted to engage in some kind of violent behavior will actually go on to do so, more recent studies suggest that one out of every two people predicted to be violent would go on to engage in some kind of legally relevant, violent behavior." Randy Otto, On the Ability of Mental Health Professionals to "Predict Dangerousness":  A Commentary on Interpretations of the "Dangerousness" Literature, 18 LAW. & PSYCHOL. REV. 43, 63 & n.63 (1994)."  *Flores, supra,* 210 F.3d at 465, n. 11.

evidence, even evidence claimed to be scientific in basis, is a growing one, and one which tends to promote trustworthy fact-finding.  *See United States v. Scheffer*, 118 S. Ct. 1261 (U.S. (1998)(exclusion of polygraph evidence promoted interest in reliability of trial process).

Predictions of future dangerousness are not the product of any legitimate scientific research, methodology or practice.  They have no legitimate medical purpose.  The error rate for such "scientific" predictions is far higher than if the jury chose to "predict" future dangerousness by flipping a  coin.[166]   *See Ohio Adult Parole Authority v. Woodard*, 118 S. Ct. 1244, 1254 (1998)(concurring opinion of O'Connor, J.)(it would be due process violation to make clemency decision on basis of a coin toss).  In light of the considerably lesser due process rights that attach to clemency proceedings, there certainly would be a due process violation for a sentencing decision to be based on a prediction that has even less reliability than a coin toss.   No professional literature accepts the practice of making predictions of future dangerousness based on hypothetical questions. In fact, the psychiatric community utterly rejects the practice.[167]  They are in fact the antithesis of the types of scientific evidence upon which the courts have traditionally chosen to rely:

> The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific.  It is as true today as it was in 1983 that "[n]either the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right."  *Id*. at 920, 103 S.Ct. at 3409 (Blackmun, J., dissenting) (citing studies). As those

---

[166] *See* American Psychiatric Association Task Force Report, Clinical Aspects of the Violent Individual 28 (1974) "90% error rate [u]nfortunately ... is the state of the art").

[167]  American Psychiatric Association, *Draft Report on the Role of Psychiatry in the Sentencing Process*, 32-33: "Needless to say, responding to hypotheticals is just as fraught with the possibility of error as testifying in any other way about an individual whom one has not personally examined.  *Although the courts have not yet rejected the practice, psychiatrists should.*" (Emphasis added).

in the field have often noted, nothing within the training of a psychiatrist makes him or her particularly able to predict whether a particular individual will be a continuing threat to society...  In fact, not even the *Barefoot* majority could identify a "scientific" basis for predictions of future dangerousness;  its opinion expressly rests on the analysis that "even a lay person" could make such predictions.
*Flores, supra,* 210 F.3d at 463-464 (Garza, J., concurring).

The inherent unreliability of these predictions is made still more prejudicial by the fact that juries may be influenced by the mere labeling of a witness as "expert," with the connotations of scientific impartiality and learned authority that appellation brings. "[T]o the jury an expert is just an unbridled authority figure, and as such he or she is more believable."  Charles R. Richey, *Proposals to Eliminate the Prejudicial Effect of the Use of the Word "Expert" Under the Federal Rules of Evidence*, 154 F.R.D. 537, 544 (1994).  Although the traditional methods of attacking scientific evidence -- vigorous cross-examination or the presentation of rebuttal evidence -- remain available, some commentators contend that "ostensibly scientific testimony may sway a jury even when as science it is palpably wrong." Black et al., *Science and the Law in the Wake of Daubert: A New Search for Scientific Knowledge*, 72 Tex.L.Rev. 715, 801 (1994).

The Supreme  Court in *Daubert* outlined five non-exclusive factors to assist trial judges in determining the reliability, and hence admissibility of scientific evidence: Those factors are:

(1) whether the theory has been tested,

(2) whether the theory has been subjected to peer review and publication,

(3) the known or potential rate of error

(4) the existence of standards controlling the operation of the technique, and

(5) the  degree  to  which  the  theory  has  been  generally  accepted  by  the  scientific community.

*Daubert,* 509 U.S. at 593-94, 113 S.Ct. at 2796-97; *Flores,* 210 F.3d at 464.

As pointed out in Judge Garza's concurring opinion,

> it appears that the use of psychiatric evidence to predict a murderer's "future dangerousness" fails all five *Daubert* factors. First, "testing" of these theories has never truly been done, as "such predictions often rest ... on psychiatric categories and intuitive clinical judgments not susceptible to cross- examination and rebuttal." *Barefoot*, 463 U.S. at 932, 103 S.Ct. at 3414-15 (Blackmun, J., dissenting)... *see also* APA Br. at 17 ("Because most psychiatrists do not believe that they possess the expertise to make long-term predictions of dangerousness, they cannot dispute the conclusions of the few who do."). Second, as is clear from a review of the literature in the field, peer review of individual predictions is rare, and peer review of making such predictions in general has been uniformly negative. *See, e.g.*, Grant Morris, *Defining Dangerousness:  Risking a Dangerousness Definition*, 10 J. CONTEMP. LEGAL ISSUES 61, 85-86 (1999) (citing studies) ("More than twenty years ago, Alan Stone acknowledged that psychiatrists cannot predict whether a person will engage in dangerous behavior with a certainty, or beyond a reasonable doubt, or by clear and convincing evidence, or even by a preponderance of the evidence. As to clinically-based predictions of dangerousness, the passage of time has not altered the accuracy of Stone's judgment.").  Third, the rate of error, at a minimum, is fifty percent, meaning such predictions are wrong at least half of the time...  Fourth, standards controlling the operation of the technique are nonexistent. See APA Br. at 13 (noting that "the professional literature demonstrate[s] no reliable criteria for psychiatric predictions of long-term future behavior").  Overall, the theory that scientific reliability underlies predictions of future dangerousness has been uniformly rejected by the scientific community absent those individuals who routinely testify to, and profit from, predictions of dangerousness.
> *Flores, supra,* 210 F.3d at 463-64 (Garza, J., concurring).

It is axiomatic that capital cases require a heightened degree of reliability in their resolution, because of the grave consequences of a flawed decision at the sentencing phase.[168]

As Judge Garza points out in his concurring opinion, although in federal courts the rules of evidence do not apply at a sentencing hearing,

---

[168]  *See, e.g.,  Gardner v. Florida*, 430 U.S. 349, 359 (1977)("time invested in ascertaining the truth would surely be well spent if it makes the difference between life and death");  *Woodson v. North Carolina*, 428 U.S. 302, 305 (1976)(because of qualitative difference between death and life, there is correspondingly heightened need for reliability in determination that death is appropriate punishment); *Caldwell v. Mississippi*, 427 U.S. 325, 333 (1985) (intolerable danger presented when jurors tempted to minimize importance of their role, and to rely on authority of others to make sentencing decision).  *See also Dawson  v. Delaware,* 503 U.S. 159 (1992)(where state could not prove rational connection between evidence and aggravating circumstance, introduction of evidence was constitutional error).

the cardinal concern of the rules of admissibility for expert testimony--reliability, *see Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.")--is also the paramount concern in addressing the constitutionality of capital sentencing procedures.  This cannot be mere coincidence.
*Flores, supra,* 210 F.3d at 464, n.10 (Garza, J., concurring).

Widely recognized in the condemnation of such testimony is the danger that an unreliable

opinion, when clothed in an unwarranted aura of legitimacy, actually misleads the jury:

As some courts have indicated, the problem here (as with all expert testimony) is not the introduction of one man's opinion on another's future dangerousness, but the fact that the opinion is introduced by one whose title and education  (not to mention designation as an "expert") gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact.  As has been previously recognized, when a medical doctor testifies that "future dangerousness" is a scientific inquiry on which they have particular expertise, and testifies that a particular defendant would be a "continuing threat to society," juries are almost always persuaded.
*Flores, supra,* 210 F.3d at 465-66 (Garza, J., concurring).

Applying this analysis, Judge Garza outlines the unduly prejudicial effect the virtually

exactly identical testimony had in that case:

The testimony of Dr. Griffith, who has never met Flores, is particularly assailable.  First, Griffith testified that Flores's "character and crime" made him a future danger without ever examining him.   The practice of predicting future dangerousness without an individualized meeting with the subject is, while acceptable under Supreme Court precedent... condemned by most in the field as inherently unreliable and unscientific as well as unethical...   In fact, one psychiatrist notorious for predicting dangerousness without examining the subject, Dr. James Grigson, has been evicted from the American Psychiatric Association for ignoring repeated warnings to stop the practice... In this case, not only did Griffith testify that he could accurately predict a defendant's future dangerousness from a hypothetical, but he also told the jury that actually examining the defendant is "a hindrance in comparison to a hypothetical question.
*Flores, supra,* 210 F.3d at 466-67 (Garza, J., concurring).

Judge Garza continued his analysis of the prejudicial effects of this testimony:

Second, Griffith's deduction, with certainty, that Flores would be a "future danger," was based exclusively on the facts surrounding Flores's crime...The Court of Criminal Appeals noted that Griffith's conclusion that Flores was not remorseful was based on the fact that "[t]here was no evidence ... from which he could deduce any remorse or concern

-290-

or the victim." *Flores*, 871 S.W.2d at 716.  Given that Griffith never spoke to Flores, the fact that he failed to find "evidence" of any given personality trait is not surprising. Griffith's testimony to the extent that an individual with this "personality" would be dangerousness, moreover, was based on the "personality" of someone who would commit this unprovoked murder in general, not Flores's personality in particular.

In fact, as noted by the dissent on direct appeal, Dr. Griffith's testimony on cross-examination revealed his feeling that he could predict an individual's future dangerousness merely by knowing their crime, and his belief that anyone who committed capital murder in general, or murder in the course of sexual assault in particular, would be a "future danger" simply for the fact that they committed that particular crime.  *See Flores*, 871 S.W.2d at 724 (Clinton, J., dissenting).

*Flores v. Johnson,* 210 F.3d 456, 467-468.

In short, as the concurring opinion points out,

Based almost exclusively on this testimony, and irrespective of Flores's complete lack of a criminal record, family abuse, or truculent past, the jury answered "yes" to the second special issue. Accordingly, Flores was sentenced to death.

*Id.,* at 468.

This does not satisfy the Supreme Court's repeated insistence on

an individualized sentencing hearing, *see, e.g., Lockett v. Ohio,* 438 U.S. 586, 604 (1978),  "[i]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence.  Only then can we be sure that the sentencer has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence." *Penry*, 492 U.S. at 319, 109 S.Ct. at 2947, 106 L.Ed.2d at 279 (emphasis added) (citations omitted); see also *Woodson*, 428 U.S. at 304, 96 S.Ct. at 2991 ("A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.  It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.").

*Id.* at 469.

As  Judge Garza writes,

what separates the executioner from the murderer is the legal process by which the state ascertains and condemns those guilty of heinous crimes.  If that process is flawed because it allows evidence without any scientific validity to  push the jury toward condemning the accused, the legitimacy of our legal process is threatened.  The Supreme Court has made clear that the constitutionality of a state's capital sentencing scheme is

dependent on the individualized basis in which defendants are considered.  I question whether that concern for individuality exists under a system which not only admits expert testimony deduced without examining the subject but also, as in this case, accepts the possibility that jurors will allow that evidence, rather than factors more personal to a defendant's crime and character, to effectively condemn that individual to death.
*Flores, supra,* at 469-470.

The  gravity of the  flawed sentencing decision in this  capital case  is such that Mr. Coble  must be granted a reversal and a new sentencing phase,  as *Barefoot* is no longer constitutionally valid in light of *Daubert* and *Kumho Tire*.  "Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly ... Conjectures that are probably wrong are of little use ... in a quick, final and binding judgment -- often of great consequence -- about a particular set of events." *Daubert,* 509 U.S. at 597.

There is no *Teague v. Lane,* 489 U.S. 288 (1989) bar to this claim because  it would be similar to the Supreme  Court's decision in *Penry v. Lynaugh,* 492 U.S. 302 (1989), where it was held that the Texas statute as it had come to be applied was unconstitutional, and the Supreme Court's saying so was not "new."  Even if it is held to be a "new rule," *Teague* would still not apply as the claim would qualify under the second *Teague* exception,  for rules "implicit in the concept of ordered liberty," *Teague, supra,* 489 U.S. at 313, and it is certainly implicit in the Supreme Court's  death penalty jurisprudence that a defendant not be sentenced to death on the basis of fundamentally unreliable and misleading evidence.  The hallmarks of cases which meet this exception are those that implicate the reliability and fundamental fairness of adjudications, and can be described as "fundamental" or "watershed" rules.[169]

**H) Dr. Coons' purely subjective, ad-hoc predictions largely based on a hypothetical fact pattern prepared and presented by the State were unconstitutionally unreliable.**

---

[169]   *See, e.g., O'Dell v. Netherland,* 117 S. Ct. 1969, 1978 (1997)*; Graham v. Collins,* 506 U.S. 461, 478 (1993).

### i. The unscientific nature of the testimony.

Psychiatric or psychological predictions of a defendant's future dangerousness, particularly ad-hoc determinations based on hypothetical fact patterns prepared and presented by the State, are unreliable because they are "simply subjective testimony without any scientific validity." *Flores*, 210 F.3d at 458 (Garza, J., specially concurring). Each psychiatric or psychological prediction of future dangerousness is determined in a different manner. There is no established and consistent methodology applied or required for psychiatric or psychological analyses of future dangerousness, and "standards controlling the operation of the technique are nonexistent." *Id* at 465-66. *See also* Kenneth B. Dekleva, *Psychiatric Expertise in the Sentencing Phase of Capital Murder Cases*, 29 J. Am. Acad. Psych. & L. 58, 60 (2001)("'specific'… guidelines for making dangerousness predictions in forensic populations do not currently exist.").

An ad-hoc determination of dangerousness such as that presented to the jury by Dr. Coons is not externally verifiable by other experts. There has been no "testing" of the methodologies used in his predictions. The factors an expert normally uses in determining dangerousness were not weighted and did not correspond to any graded scale of factors that would contribute to or predict dangerousness. Other experts looking at the same data would be completely unable to determine whether Dr. Coons' particular weighting of such factors was accurate. Thus, peer review of predictions of future dangerousness is rare, and "peer review of making such predictions has been uniformly negative." *Flores,* 210 F.3d at 465-66 (Garza, J., specially concurring)(citing G. Morris, *Defining Dangerousness: Risking a Dangerousness Definition*, 10 J. Contemp. Legal Issues 61, 85-86 (1999)). *See also*, William M. Grove & Paul E. Meehl, *Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal*

*(Mechanical, Algorithmic) Prediction Procedures: The Clinical-Statistical Controversy*, 2 Psych. Pub. Pol'y & L. 293, 320 (1996) (noting that clinical experiences cannot resolve disputes among psychologists because each can appeal to his own unique clinical experiences which lack an objective referent). Testimony such as that is "subjective and 'not readily re-produceable [sic]'" by others in the field should not be admissible. *Green v. State*, 55 S.W.3d 633, 638 (Tex. App. – Tyler [12th Dist.] 2001).

### ii. *Daubert* and Karl Popper.

As the Supreme Court stated in *Daubert,* "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert,* 509 U.S. at 593; 113 S. Ct. at 2796.  As that Court added, "[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed this methodology id what distinguishes science from other fields of human inquiry." *Id., citing* Hempel, *Philosophy of Natural Science* (1966) at 49.  The Supreme Court in *Daubert* also cites the philosopher Karl Popper's well-known criteria of falsifiability, which is similar to testability: "the criterion of the scientific status of a theory is its falsifiability, or refutability, or testability," *Daubert,* 509 U.S. at 593, 113 S. Ct. at 2797, *citing* Popper, *Conjectures and Refutations: The Growth of Scientific Knowledge* (5th ed. 1989) at 37.

Popper's well-known theory of scientific knowledge was, of course, enormously influential long before the Supreme Court cited it in *Daubert.*  In *Conjectures and Refutations* (1963), Popper outlines in more detail his conclusions as to what is required in order to treat a theory or methodology as scientific:

1) "It is easy to obtain confirmations, or verifications, for nearly every theory–if we look for confirmations." *Conjectures and Refutations* at 47.  Here it is impossible for obtain any

confirmation or verification of Dr. Coons' alleged anecdotal evidence, as it is not written down, not quantified, not susceptible to fact-checking by Coble's attorneys or investigators, and thus impossible to confirm.

2) "Confirmations should count only if they are the result of *risky predictions;* that is to say, if unenlightened by the theory in question, we should have expected an event which was incompatible with the theory.." *Id.* at 48.  Dr. Coons' theory and methodology obviously fail this test, as confirmations themselves are impossible, much less a determination as to whether they are a result of risky predictions.

3) "Every 'good' scientific theory is a prohibition; it forbids certain things to happen." *Id.* Here, as Dr. Coons' testimony was based on mere anecdotal evidence, it was not quantifiable and thus made no assertions about what it might or might not prohibit or rule out.

4) "A theory which is not refutable by any conceivable event is non-scientific. Irrefutability is not a virtue of a theory (as people often think) but a vice." *Id.*  S we have seen, Dr. Coons' methodology was impervious to scrutiny as it was based solely on his own undocumented anecdotal "findings."  There would have been no conceivable manner for it to have been refutable.

5) "Every genuine test of a theory is an attempt to falsify it, or to refute it. Testability is falsifiability; but there are degrees of testability..." *Id.*  Coons fails here too, as his theory could not be tested.

6) "Confirming evidence should not count except when it is the genuine test of the theory; and this means that it can be presented as a serious but unsuccessful attempt to falsify the theory. (I now speak in such cases of 'corroborating evidence.') *Id.*  No genuine tests of the theory could be performed or researched here.

7) "Some genuinely testable theories, when found to be false, are still upheld by their admirers." *Id.*  With Dr. Coons, we are far from reaching even this stage.

Popper's *The Logic of Scientific Discovery* (1935) is a seminal work on the logic of scientific knowledge and it is widely recognized as one of the most important and influential books of the theory of science in the twentieth century.  There, Popper further showed that the growth of scientific knowledge rests on the doctrine of falsifiability: that only those theories that are testable and falsifiable by observation and experiment are properly open to scientific evaluation. As Popper writes,

> But I shall certainly admit a system as empirical or scientific only if it is capable of being tested by experience.  These considerations suggest that not the *verifiability* but the *falsifiability* of a system is to be taken as a criterion of demarcation.  In other words I shall not require of a scientific system that it be capable of being singled out, once and for all, in a positive sense; but I shall require that its logical form shall be such that it can be singled out, by means of empirical tests, in a negative sense: *it must be possible for an empirical scientific system to be refuted by experience.*
> Popper, *The Logic of Scientific Discovery,* at 18 (emphasis in original).

Popper's formulation, accepted by the Supreme Court in *Daubert,* is extremely useful here in showing how utterly unscientific Coons's testimony was.  Even without any of the other defects discussed herein, it should be rejected and held to be error of constitutional dimensions on this basis alone.

### iii.  Vagueness.

Key terms and concepts of Dr. Coons' testimony were amorphous and inexact. The scope of dangerousness and the length of time at issue were not defined.  Dr. Coons used concepts such as "conscience" (24 RR 180, 221, 222)[170]   and "evil grins" (24 RR 222)  upon which his

---

[170]   Indeed, his definition of "conscience" was laughably nebulous: "one of the things that keeps us on the straight and narrow...It makes you feel bad if you do something wrong."  (24 RR 222.)

determination of dangerousness relied, were  not adequately defined by the witness or the state.

He did not deal at all with the fact that Mr. Coble had been completely non-violent for the past

18 years except to opine that people under a death sentence are always on good behavior because

they are on "appeal."  (24 RR 223, 252.)  His reliance on secret, unpublicized  information from

the prisons regarding allegedly unreported violence (24 RR 227), mirroring the similar testimony

of Mr. Merillat, was particularly unreliable and prejudicial, as it lacked any context whatsoever

and was totally inexact as to the time and place to which it allegedly referred.

**I) Dr. Coons' ad-hoc psychiatric predictions were not reliable due in part to the absence of reliable data upon which to base a prediction of future dangerousness.**

As an essential component of assessing the reliability of the proffered testimony, "the

underlying data should be independently evaluated in determining if the opinion itself is

reliable." *Merrell Dow Pharmaceuticals v. Havner*, 953 S.W.2d 706, 713  (Tex. 1997)  The data

upon which  Dr. Coons based his testimony in this matter is not reliable and his opinion was

therefore not  admissible. The data upon which he relied had been prepared and furnished to him

by the prosecution (24 RR 153), and he had not verified it.    As such, it was not compiled

objectively, and, even worse, the data was specifically compiled by the prosecutor to prove

dangerousness. Compilation of data in this manner has been held to "give rise[] to a 'common-

sense skepticism' regarding the expert's evaluation" which has proved fatal to the reliability of

such testimony. *Munoz v. Orr*, 200 F.3d 291, 301 (5th Circ. 2000)(citations omitted). *See also*

*Castellow*, 97 F.Supp.2d at 797 (rejecting reliability of proffered expert noting that the "detailed

investigation" upon which the witness relied was prepared by Plaintiff's investigator); *Green*, 55

S.W.3d at 638 (rejecting reliability of proffered expert noting that witness had not independently

investigated data provided him).

Further, ad-hoc determinations based on a hypothetical fact pattern prepared and presented by the State are unreliable because they do not incorporate any personal interviewing, investigation, or background examination. Testimony which relies only on a hypothetical provided by the State decidedly lacks any of the investigation, examination, or interviewing that courts have stipulated as the bedrock of a testifying mental health professional and proper clinical opinion provider. Testifying experts "whose convictions about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests [may] properly be viewed by the district court as lacking the objectivity" that is required to assure the reliability of the testimony. *Castellow*, 97 F.Supp.2d at 792 (*quoting Claar v. Burlington Northern Railway Co.*, 29 F.3d 499, 503 (9th Cir.1994)).

The Texas Court of Criminal Appeals has acknowledged "the pivotal role that psychiatry has come to play in criminal proceedings" and has characterized that role as one in which "psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury." *Jackson v. State*, 992 S.W.2d 469, 473 (Tex. Crim. App. 1999) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 79 (1985)). The Supreme Court in *Ake v. Oklahoma* stipulated that a "competent psychiatrist" is one "who will conduct an appropriate examination." *Ake*, 470 U.S. at 83. Finally, the Texas Court of Criminal Appeals has held that psychiatrists assist the jury by "laying out their investigative and analytic process to the jury." *Jackson*, 992 S.W.2d at 473. It is thus clearly recognized that an essential role of a mental health professional in court is to conduct an "investigative process" which includes examinations and interviews of the defendant.

Dr. Coons' lack of personal investigation makes this method particularly unreliable

because, without more information he was unable to rule out other diagnoses and hypotheses with regard to Mr. Coble. *See* Paul S. Appelbaum, *Hypotheticals, Psychiatric Testimony, and the Death Sentence*, 12 Bull. Am. Acad. Psych. & L. 169 (1984). Dr. Coons was unable to ascertain all the facts that might make these alternate hypotheses or diagnoses more plausible for Mr. Coble's situation. *See Mata v. State*, 46 S.W.3d 902, 915 (Tex. Crim. App. 2001)(rejecting expert's testimony that did not take into account facts that the court found salient to the analysis). An expert's inability or failure to rule out other hypotheses for the question at issue has been held fatal to the reliability of his proffered testimony. *See Bennett v. PRC Public Sector, Inc.*, 931 F. Supp. 484, 492 (S.D. Tex. 1996)(limited fact collection impeded expert's ability to rule out other causes of Plaintiff's injury and indicated that expert's testimony was unreliable).

**J) Psychiatric and psychological predictions such as Dr. Coons' are unreliable because they are not used outside the judicial/legal context.**

The Texas Supreme Court has asked of experts whether the methodology or study they employ "was prepared only for litigation" and whether it has "been used or relied upon outside the courtroom." *Havner,* 953 S.W.2d at 726.  Dr. Coons' he expert testimony in this case was decidedly prepared only in the context of litigation and, given its lack of acceptance within the scientific community, would never be relied upon outside the courtroom. While it is true that determinations of future dangerousness are used in involuntary civil commitment of individuals, psychotherapists' liability for their patients' actions, and post-jail detention of sexual predators, these are all judicial uses of determinations of future dangerousness. Predictions about future dangerousness are non-existent outside of these judicial contexts.

Furthermore, the predictions of future dangerousness in these contexts are predictions of

dangerousness in the short term; whereas future dangerousness predictions in capital cases are predictions of behavior in the long term. There is no procedure in Texas for reevaluating determinations of future dangerousness during the span of the defendant's sentence. Thus, the prediction of future dangerousness may concern behavior that extends for over a decade into the future. Whereas short-term predictions may be made with some degree of accuracy, long-term predictions cannot be made accurately or reliably.   *See* Grant H. Morris, *Defining Dangerousness: Risking a Dangerous Definintion* 10 J.Contemp. L. Issues 61, 78 (1999); Douglas Mossman, *Dangerous Decisions: An Essay on the Mathematics of Involuntary Hospitalization* 2 U. Chi. L. School Round Table 95, 97 (1995).

### B. What the State Courts Held.

As discussed *supra,* the Court of Criminal Appeals denied this claim on direct appeal, holding that they were bound by *Barefoot v. Estelle,* [463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)] *Coble,* 330 S.W.3d at 270.

The CCA adopted the State's Proposed Findings and Conclusions and denied all sub-parts of Claim 7, holding it to be procedurally barred.  *Ex parte Billie Wayne Coble,* No. WR-39,707-03 (Tex. Crim. App. Feb. 8, 2012)(*per curiam*)(unpublished). (Exhibit 31.)

### C. Why the State Court Holding Was Objectively Unreasonable Under §2254(d).[171]

### i. The Ruling of the State Court

---

[171]   The argument in this section considers the Texas Court of Criminal Appeals' denial of the claim of the unreliability of Dr. Coons' testimony on direct appeal (point of error number five).  As discussed *supra,* a similar but broader claim based on the constitutional unreliability of Dr. Coons' testimony was also brought on state habeas (as Claim 7(a)) but this claim was erroneously denied on the grounds of procedural default, as having been raised on direct appeal. As discussed *supra,* the CCA erred because this broader state habeas claim could not have been brought on direct appeal as it relied extensively on extra-record evidence.  Thus, the argument of this section is also applicable to the state habeas claim, as the CCA should have considered it on the merits. Both claims were based on federal constitutional law.

As explained *supra*, on direct appeal the Court of Criminal Appeals examined exhaustively the issue of whether Dr. Coons' testimony on future dangerousness should have been admitted.[172]  The court produced a blistering critique of his fitness to testify on that subject, noting that he had provided no scientific, psychiatric, or psychological research or studies to support his "idiosyncratic" methodology for predicting whether someone would commit future acts of violence.  *Coble*, 330 S.W.3d at 277.

The Court of Criminal Appeals, however, found that the admission of Dr. Coons' testimony was harmless, even though the trial court had erred in its application of the Texas Rules of Evidence.  It also dismissed Petitioner's argument (made in point of error number five) that Dr. Coons' testimony was inadmissible because it failed to meet the heightened reliability requirement of the Eighth Amendment on the basis that "the United States Supreme Court, in *Barefoot v. Estelle*, [463 U.S. 880 (1983)], rejected this argument and we are required to follow binding precedent from that court on federal constitutional issues."  *Coble*, 330 S.W.3d at 270.[173]

## ii. The CCA did not actually "adjudicate" this claim, and it should be reviewed *de novo*.

In order for a claim to be "adjudicated" within the meaning of AEDPA, "the state's framing or analysis of the claim [must not omit] one or more dimensions of the requisite

---

[172]  Petitioner hereby incorporates the foregoing facts and discussion of Dr. Coons' evidence.

[173]  The Court of Criminal Appeals appeared to second-guess the wisdom of this ruling when it ordered briefing in another case, *Ex parte Ramey,* on possible constitutional violations engendered by the admission of Dr. Coons' testimony in that case: "Applicant and the State shall file briefs on the above claim specifically addressing whether the holding in *Coble v. State*, 330 S.W.3d 253 ([Tex. Crim. App.] 2010), impacts this claim in a federal constitutional setting." *Ex parte Ramey*, No. AP-76,533 (Tex. Crim. App. Apr. 6, 2011).   However, that court ultimately concluded again, without further substantive discussion, that it was bound by the precedent of *Barefoot.  Ex parte Ramey*, 382 S.W.3d 396, 397-398 (Tex. Crim. App. 2012).

constitutional analysis."  Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 23.1 (6th ed. 2011).  *See White v. Thaler*, 610 F.3d 890, 899, 907 (5th Cir. 2010)(state court "assumed without deciding" that counsel's performance was deficient: deficient performance prong of *Strickland v. Washington*, 466 U.S. 668, 687 (1984) therefore to be reviewed *de novo*); *Medellin v. Dretke*, 544 U.S. 660, 679 (2005)(O'Connor, J., dissenting from dismissal of certiorari as improvidently granted, joined by Stevens, Souter and Breyer, JJ.) ("The Texas court's disposition of Medellin's Vienna Convention claim is not entitled to deference under § 2254(d), and thus should not constrain a final decision in federal court about whether he deserves habeas relief ... The Texas Court never asked or answered the right question: whether an individual can bring a claim under *this* particular treaty.  Accordingly, any consideration of Medellin's Vienna Convention claim for habeas relief in federal court ... must proceeed *de novo*.")

Since the Texas court did not actually proceed to the process of adjudication by applying clearly established federal law to the facts at issue but, rather, abdicated on the false assumption that review was foreclosed by precedent that is in fact inapplicable, a *de novo* standard of review should apply.  *Miller v. Johnson,* 200 F.3d 274, 281 n.4 (5th Cir. 2000)(claims not adjudicated on the merits in state proceedings, are reviewed under a *de novo* standard).

### iii.    Alternatively, the CCA made "an unreasonable application of clearly established federal law" 2254(d)(1).

If the CCA's cursory discussion of point of error number five is deemed to have been an actual application of federal law, in that it concluded that *Barefoot* foreclosed further review, this Court should determine the reasonableness of the ultimate decision, considering whether the decision was "contrary to" or an "unreasonable application" of clearly established federal law, or

involved an unreasonable determination of the facts.  *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001)(federal courts review "for reasonableness the state court's ultimate decision, not every jot of its reasoning.")

### a. *Barefoot* Does Not Compel The Result Reached By The Texas Court of Criminal Appeals in *Coble*.

The CCA assumed that *Barefoot* barred any consideration of Petitioner's claim that Dr. Coons' testimony failed to demonstrate the  heightened reliability that the Eighth Amendment demands.  It is therefore necessary to examine what *Barefoot* actually held.  *Barefoot*'s argument in the United States Supreme Court had three facets:

First, he "urged that psychiatrists, individually and as a group, are incompetent to predict with an acceptable degree of reliability that a particular criminal will commit other crimes in the future and so represent a danger to the community."  463 U.S. at 896.  His position was supported by an amicus brief filed by the American Psychiatric Association.  463 U.S. at 899. With regard to that argument, the Court acknowledged that mental health professionals had expressed doubt about the usefulness of such predictions, in light of studies indicating that they are "often inaccurate," but declined to categorically bar such testimony.  463 U.S. at 901-03.[174]

Second, it was argued that "psychiatrists should not be permitted to testify about future dangerousness in response to hypothetical questions and without having examined the defendant

---

[174]   The majority in *Barefoot* indicated: "We are aware that many mental health professionals have questioned the usefulness of psychiatric predictions of future dangerousness in light of studies indicating that such predictions are often inaccurate."  463 U.S. at 901.   In dissent, Justice Blackmun, joined by Justices Brennan and Marshall, discussed at length the research literature demonstrating that predictions of future dangerousness are "purportedly scientific but actually baseless," and also highly prejudicial.  Justice Blackmun noted that "Neither [the majority] of the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right."   463 U.S. at 920-935.

personally." 463 U.S. at 897.  Noting that such testimony "is commonly admitted as evidence where it might help the factfinder do its assigned job," 463 U.S. at 903, the Court saw no constitutional barrier to applying the ordinary rules of evidence governing the use of expert testimony.  463 U.S. at 904.

*Barefoot*'s third contention was that in "the particular circumstances of this case, the testimony of the psychiatrists was so unreliable that the sentence should be set aside." 463 U.S. at 896. The Court noted various arguments that had been made regarding the use of hypotheticals involving Barefoot's own conduct, that opinions had been given on the "ultimate issue," and that the doctors' answers to the questioning was "so positive as to be assertions of fact and not opinion." 463 U.S. at 905.  The Court decided:

> These claims of misuse of the hypothetical questions, as well as
> others, were rejected by the Texas courts, and neither the District
> Court nor the Court of Appeals found any constitutional infirmity
> in the application of the Texas Rules of Evidence *in this particular
> case*.  We agree.
> 463 U.S. at 905 (emphasis added).

Thus, the primary issue presented in *Barefoot* was whether psychiatrists can *ever* testify competently about future dangerousness, not whether a particular expert's testimony was constitutionally unreliable.  463 U.S. at 884-85 (summarizing petitioner's arguments on appeal as concerning whether the predictions of psychiatrists "are so likely to produce erroneous sentences that their use violated the Eighth and Fourteenth Amendments").   The Supreme Court clearly rejected that primary argument, making the logical point that so long as future dangerousness, properly defined, is an acceptable aggravator at the penalty stage, expert as well as lay testimony may be admissible on the issue.  What was important, in the eyes of the Court, was that the jury should have all relevant information in making the sentencing determination,

including expert testimony.  *Id.* at 897 (quoting *Jurek v. Texas*, 428 U.S. 262, 274-76 (1976). The Court also expressed concern that prohibiting expert testimony about future dangerousness in capital cases "would immediately call into question those other contexts in which predictions of future dangerousness are constantly made."  463 U.S. at 898.[175]  Petitioner made, and makes, no argument concerning that holding.  His concern is not the competence of mental health experts in general, but that of Dr. Coons and his specific idiosyncratic methodology, and whether the admission of his testimony in this case violated the Eighth Amendment.

With regard to the use of hypothetical questions, made without the testifying expert having examined the individual, Petitioner again made, and makes, makes no complaint. That is long-standing practice and, if properly conducted, could possibly result in a reliable opinion.

Since neither the admissibility of psychiatric testimony *per se*, nor the use of hypothetical questions, was at issue either in the Court of Criminal Appeals or here, those issues can be left aside.   The particular aspects of the testimony of which *Barefoot* complained are strictly irrelevant here:   *Barefoot* was discussing different issues concerning different witnesses in different circumstances.[176]  To the extent that the Supreme Court ruled on the status of the actual

---

[175]   While predicting danger from specific individuals, for example in the context of civil commitment, is clearly a common practice, those short-term predictions, repeatedly reviewed on their merits, are in fact very different from the one-time prediction that takes place in a capital sentencing, which is not reviewed solely because of the passage of time:  For example, in Texas civil commitment proceedings, the finding that someone will harm themselves or others is reviewed at increasing intervals, from an initial period of 24 hours to a maximum period of twelve months.  *See* TEX. HEALTH & SAFETY CODE § 574.035.  In Sexually Violent Predator commitments, the commitment continues only "until the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence"  TEX. HEALTH & SAFETY CODE §841.081, and is reviewed every two years §841.102(1).

[176]   In fact, Dr. Coons did testify in *Barefoot*, but as a witness at an evidentiary hearing in the United States District Court for the Western District of Texas during federal habeas corpus proceedings, not at trial.  *See Barefoot*, 463 U.S. at 901.  The court reporter misspells his name

testimony specific to Barefoot himself, that holding cannot be said to have created a universal constitutional rule.  Because expert testimony may be relevant to the jury's decision does not necessarily mean that such evidence is also reliable: a distinction recognized by *Barefoot*, where the Court considered separately from the primary question, the issue of whether the evidence in that particular case was reliable.  It seems therefore that the Court of Criminal Appeals was simply mistaken in its assumption that  "the United States Supreme Court, in *Barefoot v. Estelle*, [463 U.S. 880 (1983)], rejected this argument and we are required to follow binding precedent from that court on federal constitutional issues." *Coble*, 330 S.W.3d at 270.  Curiously, the Texas court did not even specify which of the various arguments in *Barefoot* it had considered. Petitioner certainly claims that "this type of evidence fails to meet the heightened reliability requirement of the Eighth Amendment," *id.,* but he did so having raised his own arguments, arguments not raised in *Barefoot*.

Ultimately, it seems that the Court of Criminal Appeals' conclusion was that a type of evidence that is widely held to be significantly unreliable[177], had somehow, because of *Barefoot*, been made invulnerable to challenge even in the face of subsequent legal developments, or the many flaws in that evidence discussed in the CCA's opinion.  Yet *Barefoot* itself did not purport to hold as much.

As to the question that is relevant in this case, whether Dr. Coons' testimony violated that heightened reliability required in capital cases, the Supreme Court's decision in *Barefoot* offers scant guidance.  The Court adopted language asserting the ability of fact-finders to screen

---

as "Koons."

[177]   And, in this particular case, it actually agreed this evidence was insufficiently reliable to pass muster under the Texas Rules of Evidence.

reliable from unreliable evidence of future dangerousness, *id.* at 898-99, as was then the practice under the "rules of evidence generally extant at the federal and state levels." *Id.*  As discussed below, the "extant" rules of evidence are now largely extinct, having changed substantially in most states since  *Barefoot*, an eventuality actually anticipated by the Supreme Court.   The *Barefoot* Court was very much focused on addressing the thrust of the petitioner's argument that as a categorical matter psychiatric testimony regarding future dangerousness is always unreliable. *Id.* at  899 ("We are [not] convinced now that the view of the [American Psychiatric Association] should be converted into a constitutional rule barring an entire category of expert testimony."); *id.* at 900 ("Neither petitioner nor the Association suggests that psychiatrists are always wrong with respect to future dangerousness, only most of the time. Yet the submission is that this category of testimony should be excised entirely from all trials."); *id.* at 901 ("We are unaware of and have been cited to no case, federal or state, that has adopted the categorical views of the Association.").   Even so, *Barefoot* left the door open to such a challenge, stating that "[w]e are unconvinced, however, *at least as of now*, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case." *Id.* at 900 (emphasis supplied).

Thus, *Barefoot* did not state that psychiatric predictions of future dangerousness were perpetually shielded from constitutional scrutiny, simply that *Barefoot* was not the right case at the right time to require a decision in favor of the petitioner complaining of the testimony in his particular case.  The Court of Criminal Appeals opinion failed to identify which of the three arguments in *Barefoot* it was addressing, suggesting that the Texas court did not actually consider the holdings of *Barefoot* as precedent vis-à-vis Petitioner's actual case, and cannot

therefore be said to have adjudicated the issue in any real sense. To the extent that the Court of Criminal Appeals may have been applying *Barefoot* at all, it did so unreasonably because *Barefoot*'s actual holdings have no application to the specific issue in Petitioner's case.

Were it true that *Barefoot* completely bars constitutional arguments concerning the admission of psychiatric testimony, then no constitutional protection prohibits the introduction of profoundly unreliable expert testimony at the sentencing phase. If testimony like Dr. Coons' is viewed as constitutionally unobjectionable, however, it leaves open the door to other types of unreliable quackery. *See*, *e.g.*, *General Electric Co. v. Joiner*, 522 U.S. 136, 153 n.6 (1997) (Stevens, J., concurring) (using as an example of "junk science" a phrenologist who would testify that future dangerousness was linked to the shape of a defendant's skull). Indeed, some experts have offered opinions regarding future dangerousness based in part on the defendant's race. *See Saldano v. Cockrell*, 267 F. Supp. 2d 635, 642 (E.D. Tex. 2003), *aff'd in part and dismissed on other grounds sub. nom. Saldano v. Roach*, 363 F.3d 545 (5th Cir. 2004) (holding that reliance on defendant's race as part of psychological future dangerousness evaluation violated the Equal Protection Clause). The absence of constitutional safeguards regarding the admissibility of expert testimony in capital trials is an invitation to the arbitrary imposition of the death penalty.

**b. Fundamental Principles of Capital Punishment Jurisprudence Establish the Critical Importance of Reliability at the Punishment Phase.**

While permitted by the Constitution, the U.S. Supreme Court has consistently recognized that death is a sentence which differs from all other penalties in kind rather than degree. *See Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) ("When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and

restraint."); *Satterwhite v. Texas*, 486 U.S. 249, 262, (1988) (capital punishment is "qualitatively different from all other sanctions"); *Thompson v. Oklahoma*, 487 U.S. 815, 856 (1988)("Under the Eighth Amendment, the death penalty has been treated differently from all other punishments.") *Accord Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (opinion of Stewart, J.). While the Eighth Amendment allows the death penalty as an appropriate response to egregious crimes, it also strictly regulates the procedures by which death sentences are imposed and reviewed.

The penalty phase in capital trials has been treated with particular care by the Supreme Court. *Monge v. California*, 524 U.S. 721, 731-32 (1998). The decisions in the penalty phase must "be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Reliability is of paramount importance to avoiding the arbitrariness that would violate the Eighth Amendment. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (opinion of Burger, C.J.) (stating that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"); *accord Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985)("many of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion"); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986)("In capital proceedings generally, the[e] Court has demanded that fact-finding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.")(internal citations omitted).

Sentencing procedures for capital crimes must be created and enforced in a way that ensures "that the punishment will [not] be inflicted in an arbitrary and capricious manner."

*Gregg*, 428 U.S. at 189 (opinion of Stewart, J.).   Likewise, a sentence based on "materially inaccurate" information violates the Eighth Amendment's heightened reliability requirement, which is underpinned by a fundamental respect for humanity.  *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988)(death sentence cannot be predicated on mere caprice, constitutionally impermissible or irrelevant factors).

　　　　To ensure that death sentences are reliable and free from arbitrariness, the Supreme Court has required procedures calibrated to narrow the category of offenders subjected to capital punishment.  First, the State must "provide a meaningful basis for distinguishing the few cases in which the [death] penalty is imposed from the many cases in which it is not."  *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) (citations and internal quotation marks omitted); *see also Kennedy*, 554 U.S. at 420.  Second, the State must permit defendants to present any available evidence which might convince a jury that the defendant, no matter how severe his offense or reprehensible his past, should not be put to death.  *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 304 (1987); *cf. Penry v. Lynaugh*, 492 U.S. 302, 322-26 (1989), *abrogated on other grounds*, *Atkins v. Virginia*, 536 U.S. 304 (2002) (finding that instructions prevented jury from giving effect to defendant's mitigating evidence).  At base, capital sentencing procedures must ensure that jurors consider every offender as an individual.  *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 263-64 (2007) (jury must decide whether "death is an appropriate punishment for that individual in light of his personal history and characteristics."); *Accord Penry*, 492 U.S. 302 at 317; *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring); *Zant v. Stephens*, 462 U.S. 862, 879 (1983); *Enmund v. Florida*, 458 U.S. 782, 801 (1982); *Lockett*, 438 U.S. at 605.

　　　　Each of the procedural requirements for the penalty phase is informed by the overlapping

and substantial interest of both the defendant and the State in ensuring that criminal trials are accurate and reliable. S*ee United States v. Scheffer*, 523 U.S. 303, 309 (1998) (State and Federal Governments "unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial"); *Ake v. Oklahoma*, 470 U.S. 68, 78-79 (1985) (both the State and the defendant have an "almost uniquely compelling" interest in the accuracy of criminal proceedings); *Flores v. Johnson*, 210 F.3d 456, 469-70 (5th Cir. 2000) (Garza, J., concurring specially) ("[W]hat separates the executioner from the murderer is the legal process by which the state ascertains and condemns those guilty of heinous crimes.").

Related to the need that penalty phase procedures ensure accurate and reliable deliberations, these procedures must also be consistent with "evolving standards of decency." *See Kennedy*, 554 U.S. at 419-20; *Trop v. Dulles*, 356 U.S. 86 (1958) (plurality opinion); *Graham v. Florida*, 130 S.Ct. 2011, 2021 (2010). Although this standard is well-accepted as a substantive limit on the power of the state to punish, *see, e.g., Roper v. Simmons*, 543 U.S. 551, 560-61 (2005), *Atkins*, 536 U.S. at 311-12, it has functioned as a procedural limitation on capital sentencing procedures as well. *See Gardner*, 430 U.S. at 357 (opinion of Stevens, J.); *see also Gregg*, 428 U.S. at 171-173 (opinion of Stewart, J.); *Woodson v. North Carolina*, 428 U.S. 280, 289-93, 305 (1976) (plurality op.) (reviewing history of mandatory death penalty statutes to determine whether mandatory capital punishment was consistent with the Eighth Amendment, noting need for heightened reliability in death penalty proceedings).

The need for reliability and accuracy in expert testimony is profound when the subject of the testimony is future dangerousness in a capital case. A jury's assessment of future dangerousness can be affected by many arbitrary factors, highlighting the need to pay special attention to the evidence that is put before the jury regarding this aggravating factor. *See Deck v.*

*Missouri*, 544 U.S. 622, 632-33 (2005) (holding that shackling defendant during penalty phase violates due process because of "acute need" for reliability and possibility that an offender who appears shackled at the penalty phase "almost inevitably" would be taken by the jury to present a future danger); *Riggins v. Nevada*, 504 U.S. 127, 143-44 (1992) (Kennedy, J., concurring in the judgment) (finding that forcible administration of antipsychotic medication to capital defendant at penalty phase violated rights to due process in part because of effect of defendant's appearance on jury's assessment of future dangerousness); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1976)(state has constitutional obligation to "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty"); *Eddings v. Oklahoma*, 455 U.S. 104, 117-18 (1982)(O'Connor, J., concurring)("Because sentences of death are 'qualitatively different' from prison sentences, this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice or mistake.").[178] The Supreme Court's concern about the accuracy of juries' assessments of future dangerousness has even influenced its decisions about the substantive protections of the Eighth Amendment. *See Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (expressing concern about subjecting persons with mental retardation to the death penalty because retardation could be a mitigating factor but also "enhance[s] the likelihood that the aggravating factor of future dangerousness will be found by the jury").

---

[178] *See also California v. Brown*, 479 U.S. 538, 543 (1987)(discussing the heightened reliability required of capital sentencing systems by the Eighth Amendment); *Ake v. Oklahoma*, 470 U.S. 68, 87 (1984)(Burger, C.J., concurring)("In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases.") *See generally Beck v. Alabama*, 447 U.S. 625, 638 (1980)(collecting cases in which the Court invalidated procedural rules that diminished sentence reliability).

The critical role of expert witnesses in establishing future dangerousness is well understood.  Psychiatric testimony on future dangerousness is compelling because of the qualifications of psychiatrists, the "powerful content" of their testimony, and the "significant weight" that the prosecution may place on the witness's testimony.  *See Satterwhite*, 486 U.S. at 259-60;  *White v. Estelle*, 554 F. Supp. 851, 858 (S.D. Tex. 1982)("when this lay opinion is proffered by a witness bearing the title of 'Doctor,' its impact on the jury is much greater than if it were not masquerading as something it is not.")[179]  Moreover, indigent defendants are entitled to the assistance of the State in securing expert testimony when the defendant's mental state is "seriously in question" because psychiatric testimony plays a "pivotal role" in criminal proceedings.  *See Ake*, 470 U.S. at 79-80.  The role of a psychiatrist is particularly important because of the difficulty lay jurors have in rationally and accurately evaluating a defendant's mental condition.  *Id.* at 80-81 (providing psychiatric experts to defendants will "enable the jury to make its most accurate determination of the truth on the issue before them.").  It defies logic and intuition for the Constitution to require, for the sake of accuracy, that a defendant have reasonable access to expert psychiatric assistance while simultaneously permitting the State to introduce unreliable testimony by a psychiatrist as in this case.

Evolving standards of decency, accuracy, and reliability all play a role in determining the constitutional procedural standards that govern the penalty phase of a capital trial.  In this

---

[179]   The Texas Court of Criminal Appeals in Petitioner's case also noted the "highly persuasive value" of expert testimony: *See Coble*, 330 S.W.3d at 274 n. 45, 281 n. 77, citing J. Greenberg & A. Wursten, *The Psychologist and the Psychiatrist as Expert Witnesses: Perceived Credibility and Influence*, 19 Prof. Pscyhol. Res. & Prac. 373, 378 (1988)(noting the particular power of psychiatric rather than psychological testimony); Daniel A. Krauss & Bruce D. Sales, *The Effects of Clinical and Scientific Expert Testimony on Juror Decision Making in Capital Sentencing*, 7 Psych. Pub. Pol. & L. 267 (2001); *John W. Strong, Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability and Form*, 71 Or. L. Rev. 349, 361 n. 81 (1992).

framework, evidentiary rules that improve accuracy or reliability are unobjectionable.  *See*, *e.g.,*
*Crane v. K entucky*, 476 U.S. 683, 690 (1986) (States have power "to exclude evidence through
the application of evidentiary rules that themselves serve the interests of fairness and
reliability").   This is simply consistent with the well-established principle that a State's
evidentiary rules should meet important State interests, particularly when intruding on a
"significant interest of the accused."  *See Scheffer*, 523 U.S. at 309 (defendant's right to present
relevant evidence not undermined by rule precluding admissibility of polygraph test in light of
questionable reliability of that evidence).   In contrast, when state evidentiary rules fail to serve
the interests of fairness and reliability, those rules are suspect.  For example, the Supreme Court
in *Scheffer*, 523 U.S. at 316-17, contrasted the admissibility of polygraph tests with rules that
had been struck down in *Rock v. Arkansas*, 483 U.S. 44 (1987), and *Washington v. Texas*, 388
U.S. 14 (1967).  What differed in those cases was a combination of an intrusion on the right of a
defendant and a lack of legitimate interest for the State in maintaining the rule.  Thus, in *Rock*,
the Court held that a state rule barring the introduction of testimony that had been "hypnotically
refreshed" violated a defendant's right to testify in her own defense.  483 U.S. at 56-57.  And in
*Washington*, the Court reversed on Sixth Amendment grounds a conviction where the State of
Texas "could advance no legitimate interests in support" of the rule of evidence which
prohibited co-defendants or accomplices from testifying for one another.  388 U.S. at 22-23.

     In short, rules that are unconstitutionally arbitrary are those that permit the introduction
of unreliable evidence or exclude important evidence offered by the defense without serving any
legitimate interest.  *See Holmes v. South Carolina*, 547 U.S. 319, 325 (2006).  Permitting the
introduction of unreliable expert testimony at the penalty phase of a capital trial serves no
legitimate interests and undermines constitutionally significant interests in reliability and

accuracy.  Indeed, the provision of accurate information to the jury is absolutely necessary if the

death penalty to be imposed.  The joint opinion announcing the judgment in *Gregg v. Georgia*,

428 U.S. 153 (1976), explained:

> If an experienced trial judge, who daily faces the difficult task of imposing
> sentences, has a vital need for accurate information ... to be able to impose a
> rational sentence in the typical criminal case, then accurate sentencing
> information is an indispensable prerequisite to a reasoned determination of
> whether a defendant shall live or die by a jury of people who may never before
> have made a sentencing decision.
> 428 U.S. at 190.[180]

**c. The Evolving Consensus in Favor of the Exclusion of Unreliable Expert Testimony Demonstrates That Dr. Coons' Testimony Regarding Future Dangerousness Violated the Eighth Amendment.**

The legal landscape with regard to the developments in admissibility of expert testimony

has substantially changed since the time of the *Barefoot* decision, as a result of the decision in

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  One of the foundations on

which the Supreme Court rested its decision in *Barefoot* was the then-prevailing norm, that:

> [T]he rules of evidence generally extant at the federal and state levels anticipate
> that relevant, unprivileged evidence should be admitted and its weight left to the
> factfinder, who would have the benefit of cross-examination and contrary
> evidence by the opposing party.
> 463 U.S. at 898.

With regard to the admission of expert testimony, it is simply no longer the case that,

nationwide, evidentiary rules simply favor admissibility and allow the adversary system to sort

out issues of weight and crdibility.  *Daubert*, a landmark case concerning the Federal Rules of

Evidence, established that the trial judge must ensure that any and all scientific testimony or

---

[180]   The quality of the information provided to the sentencer therefore has constitutional
ramifications that elevate this issue beyond a mere question of state evidentiary rules. Cf.
*Goodrum v. Quarterman*, 547 F.3d 249, 261 (5th Cir. 2008)(it is not the province of a federal
habeas court to re-examine state-court determinations such as the admissibility of evidence
under state procedural rules)

evidence admitted is not only relevant, but reliable. 509 U.S. at 589.  Whereas the *Barefoot* court had entrusted the "adversary process ... to sort out the reliable from the unreliable evidence," relying on the jury as a "constitutionally competent" factfinder,  463 U.S. at 880 n. 6, 900, *Daubert* imposes on the judge a "gatekeeping" role in assessing the admissibility of expert testimony to be used in due course in arriving at a "quick, final, and binding legal judgment - often of great consequence." 509 U.S. at 597.  Therefore, the trial court's gatekeeper role is critical.

The expert's testimony must be reliable, and must actually assist the trier of fact. 509 U.S. at 590-91. The Supreme Court offered a non-exhaustive list of factors to help determine whether an expert's testimony is reliable, including whether the theory can be tested, whether it has been subject to peer review and publication, whether it has an acceptable rate of error and whether it had gained general acceptance in the relevant scientific community.  No single factor is dispositive of the entire question of reliability. 509 U.S. at 593.  The Court also noted that "the 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." 509 U.S. at 591-92.

Current evidentiary standards extant in the federal system as well as the several States, combined with the United States Supreme Court's continuing requirement that capital sentencing procedures be conducted so as to ensure a heightened level of reliability, therefore make it an inescapable conclusion that the Eighth Amendment prohibits the introduction of unreliable expert testimony regarding future dangerousness at the penalty phase.  The Supreme Court has traditionally looked to the actions of state and Federal legislatures as the best indication of evolving standards of decency.  *See Roper*, 543 U.S. at 564-66, *Atkins*, 563 U.S. at 314-15. Since the announcement of *Barefoot*, there has been a significant development in the area of

expert testimony and its admissibility: *Daubert* and its progeny.  After *Daubert*, it is no longer the case that in federal court issues of reliability are placed in the hands of the jury.  Rather, *Daubert* squarely places reliability determinations as a threshold matter in the hands of the trial court.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (referring to "gatekeeping obligation" created by *Daubert*); *Daubert*, 509 U.S. at 597 (referring to "gatekeeping role" of judge).[181]

*Daubert* interpreted Federal Rule of Evidence 702, which is mirrored in Tex R. Evid. 702.  Indeed, *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992), which was much-quoted in the CCA's *Coble* decision, utilizes essentially the same criteria as *Daubert*, but actually predated that Supreme Court decision.  The logic of *Daubert* is based on what is fundamental and essential to preventing the arbitrary imposition of capital punishment: reliability.  As *Daubert* reasoned, an expert's opinion must be reliable, because unlike lay witnesses, experts are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592.  As one moves farther away from the requirement of first-hand knowledge, a sufficient indicia of reliability at common law, expert testimony must find its reliability elsewhere.  *Id.*  Thus, expert testimony must be based on "scientifically valid" methodologies and reasoning.  *Id.* at 593-94 (describing factors that may guide reliability determinations).  Where legal disputes are of "great consequence," as in capital cases, the need for gatekeeping is even more pressing.  *Id.* at 597; *see also Kumho Tire Co.,* 526 U.S. at 152 (1999) (*Daubert*'s objective is to secure reliable and relevant testimony).

---

[181]   Even though the Federal Rules of Evidence do not apply in State sentencing proceedings, as one judge on the Fifth Circuit has observed, reliability is essential both to the Federal Rules and capital jurisprudence, something that "cannot be mere coincidence." *Flores*, 210 F.3d at 464 (E. Garza, J., concurring specially).

Numerous commentators have now found tension between the modern rules of evidence exemplified by *Daubert* and its progeny and the optimistic assessment of juror capabilities reflected by *Barefoot*.  *See, e.g.,* Erica Beecher-Monas & Edgar Garcia-Rill, *The Law & The Brain: Judging Scientific Evidence of Intent*, 1 J. APP. PRAC. & PROCESS 243, 222 (1999) ("In light of *Daubert*'s emphasis on acceptable error rates . . .  *Barefoot*'s decision is highly questionable."); Michael H. Gottesman, *From* Barefoot *to* Daubert *to* Joiner*: Triple Play or Double Error*, 40 ARIZ. L. REV. 753, 755 (1998) ("*Daubert* cannot be squared with *Barefoot*."); Randy Otto, *On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature*, 18 LAW & PSYCHOL. REVW. 43, 64 & n. 65 (1994); Paul C. Giannelli, *"Junk Science": The Criminal Cases*, 84 J.CRIM. L. AND CRIMINOLOGY 105, 112 (1993); David L. Faigman, *The Evidentiary Status or Social Science under Daubert: Is it "Scientific," "Technical," or "Other" Knowledge?*, 1 PSYCHOL PUB. POL'Y & L. 960, 967 n. 32 (1995)("Barefoot is inconsistent with Daubert."); Paul C. Giannelli, *Daubert: interpreting the Federal Rules of Evidence*, 15 CARDOZO L. REV. 1999, 2021(1994)("*Barefoot* is inconsistent with *Daubert ... Daubert* required a higher standard of admissibility for money damages than *Barefoot* required for the death penalty.")' John H. Mansfield, *Scientific Evidence Under Daubert*, 28 ST. MARY'S L.J. 1, 37 (1996)("If *Barefoot* does not necessarily conflict with *Daubert*, it certainly is in tension with it."); Craig J. Albert, *Challenging Deterrence: New Insights on Capital Punishment Derived from Panel Data*, 60 U. PITT. L. REV. 321, 338 (1999)("Notwithstanding the fact that *Barefoot* and *Daubert* can stand together as a matter of law, it may be fair to say that they cannot co-exist as a matter of common sense.")

The troubling tension between *Barefoot* and *Daubert* and its progeny has also been a

source of comment in the courts.  *See Flores*, 210 F.3d at 458-70 (Garza, J. specially concurring) (noting that the Supreme Court's decision in *Daubert* may have undermined *Barefoot*); *United States v. Sampson*, 335 F.Supp.2d 166, 220-21 (D. Mass. 2004) (stating that there is a "serious question" as to whether the Supreme Court would, in a post-*Daubert* world, continue to hold that a jury may impose the death penalty based on its prediction of a defendant's future dangerousness).  Indeed, Arizona's Supreme Court has concluded that it is "impossible" to reconcile *Daubert* with *Barefoot*.  *See Logerquist v. McVey*, 1 P.3d 113, 127 (Ariz. 2000).

In the wake of *Daubert*, some courts have still chosen to leave *Barefoot* undisturbed.  *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (rejecting contention that *Daubert* and its progeny altered the admissibility of future dangerousness testimony).  Indeed, some lower courts have interpreted *Barefoot* to mean that future dangerousness testimony is always admissible, regardless of how unreliable it is.  *Billips v. Commonwealth*,  630 S.E.2d 340, 352 & n.3 (Va. Ct. App. 2006), *rev'd on other grounds* 652 S.E.2d 99 (Va. 2007) (holding that *Barefoot* survived *Daubert* and that juries have the ability to distinguish between reliable and unreliable evidence).[182]

It must be acknowledged that the Fifth Circuit, in *United States v. Fields*, 483 F.3d 313, 341-46 (2007) - which also concerned the prediction of future dangerousness by Dr. Coons - held that *Daubert* was inapplicable to a capital sentencing proceeding conducted pursuant to the Federal Death Penalty Act, 18 U.S.C. § 3593 in part on the basis that the the rules governing the

---

[182]    In reversing the Court of Appeals, the Supreme Court of Virginia did not address the constitutional question, instead holding that the scientific evidence in question was unreliable under state law and that the error in its admission was not harmless.  652 S.E.2d at 101-02.

admission of evidence at federal criminal trials are inapplicable at a capital sentencing.[183]   In

addition to a statutory argument, Fields claimed that the admission of that testimony was also an

error of constitutional magnitude.[184]   The Fifth Circuit there endorsed *Barefoot*'s holding that

psychiatric predictions of future dangerousness are not impermissible *per se,* and held that the

adversarial system would suffice to expose any flaws in such testimony.   483 F.3d at 345.   It also

held that "Dr. Coons' testimony was probative because Fields's jury was required to make an

assessment of future dangerousness and because the jury could benefit from the opinion of a

psychological (sic) expert on that matter."   483 F.3d at 345.   *Id.*   Here, by contrast, the Texas

court had ascertained, after a careful review of the record of Dr. Coons' *voir dire* testimony, that

Dr. Coons was unfamiliar with the current literature in his field, knew of no studies regarding the

accuracy of long term predictions, did not know if other psychiatrists rely on the methodology he

uses, but doubted that they do, used criteria in his own "idiosyncratic" evaluations that "overlap

and blend," had never ascertained the accuracy of his own predictions, and could not tell what

his own accuracy rate might be.   *Coble*, 330 S.W.3d at 271-72, 277.   Consequently, the

prosecution had not satisfied its burden of demonstrating the admissibility of Coons' testimony.

*Coble*, 330 S.W.3d at 279-80.   Given the record made in *Coble*, concerning Dr. Coons'

deficiencies, it cannot seriously be argued that the jury benefitted in any legitimate sense from

---

[183]   However, that statute does provide for the exclusion of evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).

[184]   Even if *Daubert* was *per se* inapplicable to Fields' sentencing as a matter of federal statutory law, the constitutional error here in the form of admission of manifestly unreliable evidence remains, and the groundswell of judicial and legislative decision-making nationwide supports the assertion of the magnitude of that error.   "The FDPA expressly supplants only the rules of evidence, not constitutional standards."   *United States v. Johnson*, 239 F. Supp. 2d 924, 946 (N.D. Iowa 2003).

hearing Dr. Coons' opinion.

The Fifth Circuit also gave weight to Justice Stevens' dissenting opinion in *United States v. Scheffer*, 523 U.S. 303, 334 (1998) as "confirming the breadth and continuing vaiability of *Barefoot*." 483 F.3d at 344, n. 28. However, that opinion dissented from a majority opinion upholding the exclusion of polygraph evidence in court-martial proceedings, which stated that "State and federal governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial. Indeed the exclusion of unreliable evidence is a principal objective of many evidentiary rules." 523 U.S.at 309, citing *Daubert.* The majority opinion, authored by Thomas, J., did not even mention *Barefoot,* let alone confirm its "breadth and continuing viability."

Ultimately, the Fifth Circuit concluded that *Barefoot* foreclosed its consideration of Fields' constitutional claim and that "it is the Supreme Court's prerogative, not ours, to consider revisiting its precedent." 483 F.3d at 345. However, as explained above, the holdings in *Barefoot* should not act as a barrier to consideration of Petitioner's claim.

This confusion is unfortunate, given the fact that *Barefoot* does not squarely hold that reliability of expert testimony is constitutionally irrelevant. To the contrary, the *Barefoot* Court expressly rejected a categorical bar to the admission of such testimony, but implicitly suggested that developments in evidentiary standards might alter the constitutional background, as well as holding that the evidence in that particular case did not create any constitutional infirmity. In light of the constitutional commitment to reliability and accuracy in capital sentencing proceedings and subsequent developments in evidence law, the holding of *Barefoot* must be interpreted consistently with the notion that the constitution requires some indicia of reliability prior to the admission of expert testimony that may assist in a proceeding where life is at

stake.[185]   The context of evidentiary standards has changed.   No longer do the vast majority of courts leave it to jurors to assess reliability of expert testimony.   The trend has moved sharply in the direction of leaving threshold reliability determinations to the court, precisely because of the recognition that jurors are ill-equipped to make such determinations regarding evidence that can be "both powerful and quite misleading."   509 U.S. at 595.[186]   Recognizing this principle would be consistent with the many ways in which the Supreme Court has ensured the integrity of a capital trial.

*Daubert*'s admissibility requirements regarding expert testimony have been adopted by numerous state courts since the announcement of *Barefoot*.   By mid-2003, roughly twenty-seven states had adopted a test consistent with *Daubert*.     *See* Bernstein & Jackson, *supra*, 44 JURIMETRICS J. at 355-56.

As of 2010, thirty of the fifty states had "adopted or applied the Daubert standard to determine whether to admit a witness to testify as an expert in a given field."   Mark R. Nash, *Are We There Yet? Gatekeepers, Daubert and an Analysis of State v. White*, 61 S.C.L. Rev. 897, 897 n. 6 (2010).[187]   Since that time, Wisconsin has in effect adopted *Daubert* by statute, [188] the

---

[185]   Although *Barefoot* held that there was no categorical bar on psychiatric predictions, it noted that "[p]sychiatric testimony predicting dangerousness may be countered ... as erroneous in a particular case[.]" 463 U.S. at 898.   It certainly did not hold that testimony such as that of Dr. Coons automatically meets the threshold of heightened reliability under the Eighth Amendment. *contra Devoe v. State*, 354 S.W.3d 457, 476 (Tex. Crim. App. 2011).

[186]   Quoting The Hon Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991).

[187]   The jurisdictions that have adopted or which emulate *Daubert* are reflected in the following cases:   *State v. Coon*, 974 P.2d 386, 402 (Alaska 1999); *Farm Bureau Mut. Ins. Co. of Ark. v. Foote,* 14 S.W.3d 512, 519 (Ark. 2000*); People v. Shreck,* 22 P.3d 68, 78 (Colo. 2001); *State v. Porter*, 698 A.2d 739, 742 (Conn. 1997)*; Nelson v. State,* 628 A.2d 69, 73-74 (Del. 1993)*; Agri-Cycle LLC v. Couch,* 663 S.E.2d 175, 179 (Ga. 2008)*; State v. Escobido-Ortiz,* 126 P.3d 402, 410 (Haw. Ct. App. 2005) (citing *State v. Vliet,* 19 P.3d 42, 53 (Haw. 2001)*); State v.*

Arizona Supreme Court issued an order on January 1, 2012 amending the state's Rules of Evidence to mirror Rule 702 of the Federal Rules of Evidence and the *Daubert* principles it embodies,[189] and Virginia has done the same.[190]  California, while not having explicitly adopted *Daubert*, quotes, cites and relies on *Daubert* and its progeny.  *See, e.g, Sargon Enterprises v. University of Southern California*, No. S191550, Supreme Court of California, (Cal. Nov. 26, 2012) (quoting *Daubert* and also referring to *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141(1999) and *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997) in the context of the

---

*Parkinson,* 909 P.2d 647, 652 (Idaho Ct. App. 1996)*; Kempf Contracting & Design, Inc. v. Holland-Tucker,* 892 N.E.2d 672, 677 (Ind. Ct. App. 2008) (citing *Shafer & Freeman Lakes Envtl. Conservation Corp. v. Stichnoth,* 877 N.E.2d 475, 484 (Ind. Ct. App. 2007)*)); Leaf v. Goodyear Tire & Rubber Co.,* 590 N.W.2d 525, 531 (Iowa 1999)*; Burton v. CSX Transp., Inc.,* 269 S.W.3d 1, 6 (Ky. 2008) (citing *Toyota Motor Corp. v. Gregory,* 136 S.W.3d 35, 39 (Ky. 2004))*; State v. Foret,* 628 So. 2d 1116, 1123 (La. 1993)*; State v. MacDonald,* 718 A.2d 195, 198-99 (Me. 1998)*; Commonwealth v. Lanigan,* 641 N.E.2d 1342, 1349 (Mass. 1994)*; Gilbert v. DaimlerChrysler Corp.,* 685 N.W.2d 391, 408 (Mich. 2004)*; Miss. Transp. Comm'n v. McLemore,* 863 So. 2d 31, 35 (Miss. 2003)*; State v. Price,* 171 P.3d 293, 298 (Mont. 2007) (citing *State v. Cline,* 909 P.2d 1171, 1177 (Mont. 1996)*)* (limiting application of Daubert to novel scientific evidence); *Fickle v. State,* 735 N.W.2d 754, 770 (Neb. 2007)*; State v. Hungerford,* 697 A.2d 916, 925 (N.H. 1997)*; State v. Alberico,* 861 P.2d 192, 203-04 (N.M. 1993); *Miller v. Bike Athletic Co.,* 687 N.E.2d 735, 740 (Ohio 1998)*; Scruggs v. Edwards,* 154 P.3d 1257, 1259 (Okla. 2007); *State v. O'Key,* 899 P.2d 663, 672 (Or. 1995); *State v. Morel,* 676 A.2d 1347, 1355 n.2 (R.I. 1996); *State v. Hofer,* 512 N.W.2d 482, 484 (S.D. 1994); *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 265 (Tenn. 1997); *Kelly v. State,* 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)(actually decided before *Daubert*)*; E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex. 1995)*; State v. Brooks,* 643 A.2d 226, 229 (Vt. 1993)*; Wilt v. Buracker,* 443 S.E.2d 196, 203 (W. Va. 1993); *Springfield v. State,* 860 P.2d 435, 443 (Wyo. 1993).

[188]   *See* Daniel D. Blinka, *The Daubert Standard in Wisconsin: A Primer*, Marquette University Law School Faculty Publications, Paper 197, available at http://scholarship.law.marquette.edu/facpub/197 (Last accessed December 12, 2012).

[189]   The explanatory note to the amendment states "The amendment recognizes that trial courts should serve as gatekeepers in assuring that proposed expert testimony is reliable and thus helpful to the jury's determination of facts at issue."

[190]   *See* Virginia Rules of Evidence, Rule 2:702.

trial court's gatekeeper role, the possibility of an "analytical gap" between the data relied on and the opinion offered, and the need to ensure that expert testimony reflects the intellectual rigor characterizing the practice of an expert in the relevant field).[191]

Along with the reliability-based reasons, discussed above, for a gatekeeping role for judges prior to the admission of expert testimony, there appears to be a powerful nationwide trend toward incorporating the principles of *Daubert.*  This trend encompasses its provision of an active role for the judge as gatekeeper to protect the jury from being misled by inaccurate information, and its emphasis on scrutiny of the proffered evidence according to appropriate criteria.  In *Roper v. Simmons*, 543 U.S. 551, 564 (2003)(outlawing the death penalty for youths under age 18), the Court noted that at the time of its decision thirty states prohibited the death penalty for juveniles, and regarded that "objective indicia of consensus" as giving it "essential instruction" in its decision.  543 U.S. at 563-4.   Roper also noted an upward trend in the fact that five states that over fifteen years had moved from permitting such executions to prohibiting them.  *See Roper*, 543 U.S. at 565-67.  Likewise, in *Atkins v. Virginia*, 436 U.S. 304, 313-16 (2002), the Court identified thirty states as having prohibited the death penalty for the mentally retarded, twelve by abandoning the death penalty altogether and eighteen by specifically sparing mentally retarded individuals from the death penalty.   On both occasions the Court affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" in deciding whether the punishment involved was sufficiently disproportionate to be cruel and unusual.  Similarly in this context, the increasing consensus among the States, as well

---

[191]    An alternative tally is that at least thirty-three states have adopted *Daubert* or some other reliability-based admissibility test for expert scientific testimony.  *See* Paul C. Giannelli and E. J. Imwinkelried, SCIENTIFIC EVIDENCE (4th ed., 2007) §§ 1.14-1.15 (listing twenty eight states that have adopted *Daubert*, and five states that have adopted a variant of a reliability-based test).

as in the federal courts, is that scientific or technical evidence that may go to the jury must be screened with significant care by the trial court as "gatekeeper" and that its reliability must be established by its proponent as satisfying whatever criteria are appropriate for that field of expertise. *See* David E. Bernstein & Jeffrey D. Jackson, *The Daubert Trilogy in the States*, 44 JURIMETRICS J. 351, 355-56 (2004). Notably, there is no articulable State interest in introducing unreliable expert testimony. *See Scheffer*, 523 U.S. at 316-17. Indeed, the fact that so many states already prohibit such unreliable expert testimony suggests both the lack of legitimate interest and the lack of burden imposed by making clear the constitutional standards for admissibility at the penalty phase. *Cf. Ake*, 470 U.S. at 79-80 (holding that indigent defendants are entitled to assistance from State in securing expert psychiatric testimony, in part because more than 38 states already provided such assistance).

The admission of unreliable expert testimony threatens essential aspects of a constitutional death penalty regime. It undermines accuracy and reliability because it contributes to arbitrary verdicts of death. In addition, it is inconsistent with evolving standards of decency because, since *Daubert*, there has been this increasing trend towards subjecting expert testimony to threshold reliability determinations prior to its admission before a jury.

Moreover, the Supreme Court has readily acknowledged mounting evidence that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials" and has also noted that "[a] forensic analyst responding to a request from a law enforcement official may feel pressure – or have an incentive – to later the evidence in a manner favorable to the prosecution." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 317-18 (2009)(affirming that the ultimate goal of the Confrontation Clause is to ensure evidentiary reliability). A report from the National Academy of Sciences, cited in *Melendez-Diaz,* 557 U.S. at 318, remarked that

"[b]ecause forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particulat case, they sometimes face pressure to sacrifice appropriate methodology for the sale of expediency."[192]

Highlighting the need to carefully police the quality of evidence that is presented to a jury regarding future dangerousness is the likelihood that a juror's assessment of future danger will be biased towards the State's evidence.  Jurors, asked to determine whether an individual who committed at least one murder will act violently again, are understandably likely to defer to an "expert" determination which will eliminate the consequences of an incorrect determination, even if its reliability is questioned by another "expert."  *See* Christopher Slobogin, *Dangerousness and Expertise Redux*, 56 EMORY L. J. 275, 312-15 (2006) (summarizing data); Craig Haney, *Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death*, 49 STAN. L. REV. 1447, 1469-70 & n.113 (1997).

It does not help that expert opinions regarding future danger are notoriously inaccurate. Erica Beecher-Monas & Edgar Garcia-Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post-*Daubert *World*, 24 CARDOZO L. REV. 1845, 1845-46 (2003); Slobogin, *supra*, 56 Emory L. J. at 290-93 (discussing difficulty in evaluating validity of expert testimony on future dangerousness).   In part this is because psychiatrists and psychologists have less information than they realize and because they are just as likely as lay people to come to conclusions based on stereotype and bias.   Erica Beecher-Monas, *The Epistemology of Prediction: Future Dangerousness Testimony and Intellectual Due Process*, 60 WASH. & LEE L. REV. 353, 362-363 (2003).   Thus, although States are permitted to take future danger into

---

[192] *See* National Research Council of the National Academies, *Strengthening Forensic Science in the United States: A Path Forward* 183 (2009). Available for download at www.nap.edu (Last accessed December 12, 2012).

account in dispensing the death penalty, *Jurek v. Texas*, 428 U.S. 262, 274-276 (1976), the complexity of such determinations necessitates ample procedural protections be provided to a defendant.

If unreliable expert testimony is considered to be of no value to civil juries in damages cases, it should not be permitted when a jury is considering the possibility of a death sentence in a capital case. The fact that in *Coble*, 330 S.W.3d at 270, the Court of Criminal Appeals denied that Dr. Coons' testimony violated the heightened reliability requirement of the Eighth Amendment, saying that the issue was prevented because of the U.S. Supreme Court precedent *Barefoot v. Estelle*, 463 U.S. 880 (1983), does not foreclose this claim: *Barefoot* cannot stand for the proposition that all psychiatric expert testimony is admissible, without any threshold showing of minimal reliability. It cannot be that the Constitution imposes no limitations on the quality or validity of psychiatric expert testimony that can be presented to a jury deciding the critical question of whether a defendant lives or dies.

Because the ruling in *Coble* is unsupported by *Barefoot* itself, is in tension with developed jurisprudence regarding both capital punishment and expert witnesses, and is inconsistent with other constitutional principles, it should not be viewed as the last word on the subject.

The United States Supreme Court's jurisprudence of the death penalty in the modern era has always emphasized the need for accuracy and reliability in the practices and procedures of capital trials. Permitting expert testimony to be heard by the jury at the sentencing phase without meeting minimum standards of reliability undermines these interests, without vindicating any important State interest. Permitting unreliable expert testimony contradicts evolving standards regarding the admissibility of expert testimony in other federal and state proceedings, as

reflected in current rules of evidence.  Nothing in *Barefoot* suggests that the Constitution provides *carte blanche* for the introduction of scientifically unreliable expert testimony at the penalty phase.  At most, *Barefoot* can be read to permit States to introduce *some* testimony regarding future dangerousness.  And *Barefoot* itself anticipated that constitutional limitations on admissibility could change as modern rules of evidence evolve.

There was a time when "Men feared witches and burnt women."  *Whitney v. California*, 274 U.S. 357, (1927).  But fear of future dangerousness, without foundation in reliable evidence, does not justify the extinction of human life, any more than "[f]ear of serious injury [can] alone justify suppression of free speech." *Id.*  In the 21st century, capital sentencing procedure should not permit the "bondage of irrational fears" to prevail, resulting in arbitrary and capricious decision-making. *Id.*

### d. Any purported defense based on non-retroactivity must fail.

It is predictable that Respondent will assert that this claim should be deemed barred as violating non-retroactivity rules.  That allegation was brought up in a dissent to the Court of Criminal Appeals order for briefing on this issue in the case of *Kersean Ramey, supra.  See Ex parte Ker'sean Olajuwon Ramey,* No. WR-74-896-01 (Tex. Crim. App. April 6 2011)(Keasler, Hervey, JJ. and Keller, P.J., dissenting)("Further, any determination by this Court that the Due Process Clause and the Eighth Amendment were violated by the admission of Dr. Coons's testimony would create a new rule of constitutional law.  Generally, new rules of constitutional law ... do not apply retroactively on habeas.");  *See also* Rules Governing Section 2254 cases in the United States District Courts, "Habeas Rules" Rule 5 (b): "The answer must address the allegations in the petition.  In addition, it must state whether any claim in the petition is barred by ... non-retroactivity ...".  *See also Cook v. Cockrell*, 2002 WL 495455 (5th Cir. 2002) (unpub.

op.) (declining to "undercut *Barefoot* because AEDPA permits habeas relief only for violations of "clearly established" federal law); *Tigner v. Cockrell*, 264 F.3d 521, 526-27 (5th Cir. 2001) ("We decline Tigner's invitation to undercut *Barefoot*, because to do so on collateral review would constitute a new rule in violation of *Teague*'s non-retroactivity principle.").  However, because this claim in fact relies upon long-standing constitutional doctrine developed before Petitioner's conviction became final and that is clearly applicable to the issues presented, there is nothing about the relief that Petitioner seeks from this Court that would require it to apply a new rule in a retroactive manner.[193]

### e. Harmless error.

The burden of asserting the "harmless error" defense does not arise unless the State asserts it and it is waived unless they do so in a timely manner.  *United States v. Dominguez Benitez,* 542 U.S. 74, 82 n.7 (2004); *Jones v. Cain,* 600 F.3d 527, 540-541 (5th Cir. 2010)(state waived harmless error argument by failing to raise it in "its response to Jones' *pro se* habeas petition" and raising issue for first time in "surreply, to counter a separate argument" was insufficient).

As the State has not yet had an opportunity to assert any defense of harmless error, Petitioner can at this stage only outline his argument as to why that doctrine in inapplicable here. As there was no adjudication of either the direct appeal claim or the state habeas claim in the state court, harmless error review does not apply. *Fry v. Pliler*, 551 US 112 (2007).

For the reasons discussed herein, the CCA's finding of harmless error was unreasonable.

---

[193]A conviction becomes "final" for Teague purposes when direct state appeals have been exhausted and a petition for writ of certiorari to the United States Supreme Court has been disposed of.  *Greene v. Fisher*, 132 S.Ct. 38, 44 (2011).  In this instance, certiorari was denied on June 20, 2011, *Coble v. Texas*, 131 S.Ct. 3030, 2011 U.S.LEXIS 4622 (June 20, 2011).

The admission of Dr. Coons's testimony was actually not harmless and the CCA's holding was an unreasonable determination of the facts under §2254(d)(2). The five factors emphasized by the CCA in holding the error harmless are:

1) The first finding of the CCA that supported their holding of "harmless error" was alleged ample other evidence supporting a finding that there was a probability that the defendant would be a future danger. In its holding, the CCA first noted that many studies have shown the highly persuasive value of "scientific" expert testimony, concluding that

> "[t]hese studies and articles would support a determination that the erroneous admission of a psychiatrist's unreliable testimony concerning the defendant's future dangerousness affects a substantial right to a fair sentencing hearing...However, each case must be examined on its own facts, taking into account the specific evidence and the probable impact of the erroneously admitted expert evidence upon the jury's decisionmaking in the particular case."
> *Coble,* 330 S.W.3d at 281.

Then the CCA examined the evidence pointing to "future dangerousness":

In this case, there was ample evidence that there was a probability that appellant would commit future acts of violence quite apart from Dr. Coons's testimony. And, as noted above, it was some of that independent evidence that the jury requested to see during its deliberations. First, the psychiatric interview and evaluation done by Dr. Hodges more than twenty years before the offense and forty years before the trial reached the same basic conclusion as Dr. Coons did concerning appellant's character and his animosity toward women. Dr. Hodges's 1964 interview and clinical evaluation was completed long before any possible motive to view the facts and events of appellant's later life through any "future dangerousness" litigation prism had arisen. Expertise that is developed entirely independent of litigation by professionals acting in their normal field is more likely to be considered reliable than expertise developed especially for trials. The same is true with the  1967 military medical report which noted appellant's "lifelong maladjustment" and his jealous violent rage when he thought that his fiancée was having an affair with someone else. Significantly, the jury asked to see these two reports during its deliberations; it did not ask to see Dr. Coons's 1989 report. We have often held that erroneously admitting evidence "will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."  Although neither Dr. Hodges nor the military doctor specifically opined on whether there was a probability in 2008 that appellant would commit acts of future violence, their psychiatric and medical

assessment of appellant's character for violence is remarkably similar to that of Dr. Coons.
*Coble,* 330 S.W.3d at 281-282.

The CCA concluded that "[t]here was ample other evidence supporting a finding that there was a probability that appellant would commit future acts of violence." *Id.* at 286. However, there was hardly "ample" evidence of a probability that Coble would be a danger in the future and that finding flies in the face of the facts. Dr. Hodges' evaluation was a full forty-four years old at the time of the trial. The other piece of evidence that the CCA found significant, a 1967 military report, was forty one years old. To hold that an evaluation of a sixty-year-old person when they are fifteen and eighteen years old is "ample evidence" of future dangerousness is simply absurd. One's personality is simply not well-formed at the age of fifteen or eighteen. Emphasis on these reports tells more about the *absence* of any serious violence than it does about a sixty-year old's propensity for violence going forward. Coble's ex-wives testified to his periodic rages and mistreatment, but, even though there is ample to reason to suspect that their testimony was exaggerated,  that behavior was well over twenty years prior to the trial. It was entirely situational,  as Dr. Cunningham pointed out, and it would not reoccur in prison. The State searched high and low to find any evidence of violence in the nineteen years prior to his trial, found nothing, and was reduced to pointing to alleged "evil glances" instead of actual violence. In actuality, Coble was an elderly person with a history of heart attacks, with a record of perfect adjustment and good deeds in prison, hardly a high physical risk to others in that setting.

2) The second finding of the CCA supporting "harmless error" was that "[t]he same basic psychiatric evidence of appellant's character for violence was admissible and admitted, without

objection, through...the reports by Dr. Hodges and the military doctor years before appellant committed these murders." *Coble,* 330 S.W.3d at 286.   However, this makes little sense as the errors committed by Dr. Coons were also committed by Dr. Hodges, and the prosecutor repeatedly emphasized that their methods were similar.  29 RR 123, 174, 175.   Dr. Hodges also admitted that his evaluation and methods were, like Dr. Coons's,  somewhat subjective.  24 RR 64-68, 75.  Hodges' testimony and the military report were even more objectionable than Dr. Coons's as they were much older, and they were also erroneously admitted.   Any failure to object to their admission was ineffective assistance of counsel.

3) The third finding of the CCA in finding "harmless error" was the holding that "Dr. Coon's opinion was not particularly powerful, certain or strong; his opinion came after an extremely long and convoluted hypothetical and was simply that 'there is a probability that' appellant would be a continuing threat to society by committing criminal acts of violence." *Coble,* 330 S.W.3d at 286.

However, there was much more to Dr. Coons's testimony than a one-line opinion after a 'convoluted' hypothetical.   The hypothetical was at 24 RR 211-218, and Dr. Coons's opinion was at 24 RR 219.   But contrary to the CCA's holding, Dr. Coons continued to testify at length as to his reasons for that opinion.

a.  Dr. Coons said his "scheme" for considering it looked at the history of violence, "[i]t has escalated from minor things to multiple homicide" (24 RR 220.)   And he "didn't really start at the top....he has escalated as he went along..."  (24 RR 228.)

 b.  He opined that Mr. Coble killed his wife's family out of revenge and to control and punish her.  (24 RR 220.)

c.   Dr. Coons said Dr. Hodges' report showed criminal activity when Coble was young.

(24 RR 220.)   He also stated that Mr. Coble showed a need for control in his eating preferences for his spouses:  "first, you've got to eat your spinach and then you can eat your corn and then you can eat the meat or whatever."  (24 RR 221.)

    d.  Dr. Coons also opined that Coble had no conscience, as "it doesn't cover murder...it doesn't cover killing absolutely innocent people...I mean, that's a weak conscience."  (24 RR 221.)   He also made the observation that conscience is "one of the things that keeps us on the straight and narrow...It makes you feel bad if you do something wrong."  (24 RR 222.)

    e.  Dr. Coons also considered it a bad sign that Coble allegedly made "an evil grin" at his ex-wife.  (24 RR 222.)  This allegedly "evil grin" showed "a truly defective conscience."  (24 RR 222.)

    f.  Dr. Coons' "last issue" was that everyone on death row was "on appeal" so that they were on better behavior.  (24 RR 223, 252.)   This information was offered without recourse to statistics, but  it was the "basis of his opinion."  (24 RR 223.)

    g.   Dr. Coons testified that people in general population "threaten people, fight and so forth."  (24 RR 224.)

    h. The witness was asked about the "aging out" factor, a key part of Dr. Cunningham's testimony, the fact that as people age they become less violent, but he opined without citing any statistics  that "there are plenty of people of age who have shanks, pieces of metal that have been sharpened down and handles wrapped with something."  (24 RR 225.)   He testified that old people "can threat (sic)...they're wise about how they can threaten other people and get their commissary or have them do things for them or whatever."  (24 RR 225.)

    i.   Dr. Coons  claimed  to  know  more  about  the  prisons  than  the  prison  officials themselves,  and  claimed  to  have  "plenty  of  information  about  what  goes  on  in...the

penitentiary...that none of the officials ever know about..."   (24 RR 226.)    This hearsay testimony was allowed over the defense's objection as "a basis for the opinion."  (24 RR 227.) The witness also claimed to have special information and to know about "plenty of violence ...that nobody ever hears about" except, of course, himself. (24 RR 227.)[194]

j.    Despite the fact that Mr. Coble had no incarcerations prior to 1989, Dr. Coons testified that  a personality becomes "pretty well fixed by the early 20's."  (24 RR 228.)  He stated that "this is kind of a...uh, well, let's say at age 40 he's certainly able to bid (sic) a very extremely violent, planned, involved act that...that at that age, let's say, you know, this is a very active, aggressive, uh, act for a 40 year old."  (24 RR 229.)

k.   According to Dr. Coons, this is a "character flaw" that he will "continue to carry with him."  (24 RR 29-230.)

These facts belie the CCA's holding that Dr. Coons's opinion was just a short statement in response to a "convoluted" hypothetical.   The CCA's holding did not consider this other extensive testimony.

4) The fourth finding that allowed the CCA to find that the admission of Dr. Coons's testimony was harmless error was the holding that Dr. Coons' testimony was effectively "rebutted and refuted" by Dr. Mark Cunningham:

> Furthermore, Dr. Coons's testimony was rebutted and refuted by appellant's expert, Dr. Mark Cunningham, a forensic psychologist. Although Dr. Cunningham is not a medical doctor, he did win the 2005 Texas Psychology Association award for his outstanding contribution to science and, in 2006, he was awarded the American Psychological Association (APA) award for distinguished contributions to research in public policy. Both awards were for his research concerning factors that predict violence in prison and his research in capital sentencing. He is also among the 2,000–3,000 psychologists elected as a

---

[194]   This echoed the testimony of State's witness A.P. Merillat, who also claimed to be in possession of prison violence information that no one else knew about, including the prisons.

Fellow of the APA out of the 155,000 members. He has published a significant number of peer-reviewed studies and articles. He testified, with a PowerPoint slide presentation to illustrate, about the violence risk assessment factors that he uses to assess the probability of future dangerousness in prison. His factors are based on research data from prisons, as well as other research and scholarly writings. He explained how his research is "scientific," replicable, and less subjective: "It's not based on my gut feeling about something. It's based on what the data tells me. And so, it's accurate. It's reliable."

After explaining the various studies, data, and statistical analysis, Dr. Cunningham concluded that appellant fell within the lowest risk-of-violence category. He criticized "the hypothetical inference" mode of predicting future dangerousness as entirely speculative.... That's just blind guessing unless those factors have been demonstrated to be predictive of violence in prison. Critically important.... That's the problem with not knowing the literature, without knowing anything about the scientific studies that have been done in this area is then you have no idea whether the factors that you're looking at are predictive of anything or not.

According to Dr. Cunningham, if "what you're doing is basing it on your own gut and you haven't done anything to check whether your gut reaction is correct or not, then your accuracy level never improves."

He pointed to appellant's first trial as an example of the "tea-leaf-reader" school of subjective clinical assessments. In that trial, Dr. James Grigson, who used the same subjective methodology as Dr. Coons, testified that, in his opinion, appellant posed *no* risk of future violence: "[H]e said, the ladies and gentlemen of the jury are more likely to kill somebody in the future" than appellant. Dr. Coons, using that very same methodology and facts concerning appellant, came to exactly the opposite conclusion. Dr. Cunningham also told the jury that the major psychological associations had criticized Dr. Coons and his methodology as "unreliable and inconsistent with the standard of practice." In sum, Dr. Cunningham refuted Dr. Coon's expertise and the whole "tea-leaf-reader" notion of clinical psychiatric predictions of future dangerousness.
*Coble,* 330 S.W.3d at 282-283; *see also Coble* at 286-287 ("Dr. Coons's testimony was effectively rebutted and refuted by Dr. Cunningham, who not only relied upon specifically listed scientific materials and data during his testimony, but who also noted that Dr. Coons had been criticized by both the American and Texas Psychological Associations...")

However, this analysis fails to take into account several factors:

a.  This recitation of Dr. Cunningham's testimony hardly shows that it was effective in rebutting Dr. Coons' erroneously-admitted testimony.  In fact the verdict shows that it was not effective in rebutting or refuting it.

b.  The prosecutor repeatedly attacked Dr. Cunningham's testimony in his final argument and in fact telling the jury not to be hoodwinked by Dr. Cunningham's presentation.  He did that by

--telling the jury he was not impartial: "he wasn't an independent-just-the-facts witness." (29 RR 125.)

--distorting   Dr.   Cunningham's   testimony:   "They   would   like   to   say statistically...statistically speaking, Bill Coble is...is...well, actually, statistically, there is no human being in the prison system that is actually a danger, according to their statistics. (29 RR 168.)

--using faulty reasoning (the ex post facto error) and spurious appeals to 'common sense':

As I recall what was said was that out of 157,000 inmates, their proof was only 2 to 3 per cent were violent.  That means that 97 per cent don't need to be there.
Now, statistics are statistics.  And smart individuals...I'm not...I'm giving Dr. Cunningham his due.  But, you know, what are ...what is the risk factor of three people being murdered on the same afternoon by their son-in-law?  Even in his testimony, statistically Bill Coble couldn't have committed the crimes. Statistically, those three people that we have seen and heard about are still alive, statistically speaking....It's not an issue of numbers. And you cannot measure his responsibility by looking at the group, all of the prisoners and say, okay, this is a low incident because we choose what we want to look at.  You saw A.P. Merillat here.  He was talking about those numbers.  They...the doctor talked about his numbers.  A Ph.D talked about his numbers.  He only uses the numbers of serious injury, that is that which requires more than simply first aid.  You know, a busted lip.  How about a strike in the back of the head?  Is that...that's not going to go down in that doctor's statistics because his data needs to be moved in the direction that there is no dangerous person.  You cannot statistically because...do you know why?  Insurance companies use the same type of deal.  They determine risk, and then they assign that based upon these factors.
Now, he likes to talk, like, Dr. Coons, he was an absolute idiot.  And I think you know better.  You saw the man, you heard him testify, and you know the factors that he outlined when he makes the determination.  It wasn't...he didn't have any supersecret numbers.  But he outlines some of the factors that he considers.  And do you know something?  It's remarkably commonsensical.  It's

-336-

the same thing I look at, you look at every day to determine what future behavior
somebody is going to be.  You look at their history of violence.
(29 RR 169-172.)

–belittling Dr. Cunningham's statistical approach and urging the jury to ignore statistics:

They want to tell you that, okay, because we have a statistician who comes in and
looks at part of the data that supports his belief and his little...you notice all of his
little Power Point presentation slides up there, quoted himself, cited himself as the
authority for his own information.  I'm not saying he's not a smart man.  But, hey,
this...you can't use insurance statistics for an individual assessment of
somebody's behavior in the future.  So don't fall for that.
(29 RR 175-176.)

5) The fifth factor the CCA found in holding this was "harmless error" was that "the

prosecution did not rely heavily upon Dr. Coons' testimony during its closing arguments"

*Coble,* 330 S.W.3d at 283, and "[t]he State barely mentioned Dr. Coons during closing argument

and did not emphasize him or his opinions." *Id.* at 287.  The CCA explained that "[d]uring his

final argument, the prosecutor mentioned Dr. Coons very briefly by reminding the jury that

another psychiatrist, Dr. Hodges, had talked to appellant back in 1964..."  *Coble,* 330 S.W.3d at

285-286.  However, as shown above, a large part of the prosecutor's argument was devoted to

attacking Dr. Cunningham's testimony in an attempt to bolster that of Dr. Coons.  Even so, Dr.

Coons was mentioned four times in the prosecutor's final argument, contrary to the CCA's

holding that Dr. Coons was mentioned only once.  *See* 29 RR 123 (referring to Dr. Coons's

methods as "just common sense," this is apparently what the CCA was referring to); 29 RR 169

("Now, he [Cunningham] likes to talk, like, Dr. Coons, he was an absolute idiot"); 29 RR 174;

29 RR 175 (again repeating that Dr. Coons used the same methodology that Dr. Hodges used

forty-four years previously).

In short, the CCA's finding of "harmless error" simply does not comport with the facts

and was an objectively unreasonable determination of the facts under §2254(d)(2).  As the

Supreme Court has held, when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under §2254 unless the harmlessness determination itself was unreasonable. *Mitchell v. Esparza,* 540 U.S. 12 (2003)(*per curiam*). Petitioner has shown it to be unreasonable here.

  **f. Conclusion.**

  As discussed above, the Texas Court of Criminal Appeals did not actually adjudicate this issue since it did not actually give any consideration to the actual holdings in *Barefoot*, but merely assumed that it applied in this case. Alternatively, the Texas Court's ruling was an "unreasonable application of ... clearly established federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), because the state court failed to consider whether the United States Supreme Court requirement of heightened reliability was actually met or was violated in this case, simply deeming that it was precluded by *Barefoot* from even looking into that issue. As shown in the harmless error analysis, the CCA's holding was also an unreasonable determination of the facts under 2254(d)(2). The fact that there were three separate arguments made and rejected in *Barefoot*, none of which rationally applies to Petitioner's case, but the Texas court referred to a single "argument," demonstrates its unreasonableness in not engaging with the issue before it.

**Claim Seven(b): Dr. Coons' predictions of future dangerousness were irrelevant and should have been excluded under Tex. R. Evid. 702.**

  The facts and argument from Claim 7(a) are hereby incorporated by reference.

  Even if found to be reliable, as discussed *supra* in Claim 7(a), expert testimony must be shown to be relevant to a factual issue in question. In determining relevance, expert testimony

should be admitted only when it will aid the jury in making inferences regarding fact issues more effectively. *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997) (affirming trial court's exclusion of expert testimony on blood-banking procedure and industry); *Glasscock v. Income Prop. Servs. ,* 888 S.W.2d 176, 180 (Tex. App.-Houston [1st Dist.] 1994) (reversing trial court exclusion of expert testimony regarding security procedures in commercial office buildings because not an area of expertise within knowledge of reasonable juror).   Psychiatric and psychological predictions of future dangerousness do not aid the jury in determining questions of fact, and are therefore inadmissible due to irrelevance under Tex. R. Evid. 702.   Dr. Coons' predictions should have been excluded.

When the jury is equally competent to form an opinion regarding ultimate fact issues, the expert's testimony as to these issues should be excluded. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000)("That a witness has knowledge, skill, expertise, or training does not necessarily mean that the witness can assist the trier-of-fact."); *Williams v. State*, 895 S.W.2d 363, 366 (Tex. Crim. App. 1994)(same).   If a purported expert testifies to an analysis based on factors that an average layperson juror would generally be aware of and utilize absent the expert testimony, such testimony is irrelevant. *Douglas v. State*, No. 01-98-01151-CR, 2001 WL 1048533, at *7 (Tex. App.-Houston [1st  Dist.] Aug. 31, 2001) (affirming exclusion of expert testimony regarding the voluntariness of defendant's confession). Testimony that might be "of some benefit" to the jury is not admissible unless the jury would not be qualified to answer the question without the benefit of the expert's specialized knowledge. *Speer v. State*, 890 S.W.2d 87, 96-97 (Tex. App. - Houston [1st Dist.] 1994) (affirming exclusion of expert testimony regarding defendant's "dependent personality disorder").

Psychiatric predictions of future dangerousness are not offered in every capital case.

There are many instances in which juries decide the special question of future dangerousness without consideration of psychiatric testimony. *See, e.g., Jasper v. State*, No. 73,817, 2001 WL 1504674, at *1-2 (Tex. Crim. App. Nov. 28, 2001) (affirming jury finding of future dangerousness based on facts of crime, evidence of escalating criminal activity, and lack of remorse); *Conner v. State*, No. 73,591, 2001 WL 1043248, at *4 (Tex. Crim. App. Sep 12, 2001) (affirming jury finding of future dangerousness based on defendant's prior criminal history); *Trevino v. State*, 991 S.W.2d 849, 854 (Tex. Crim. App. 1999) (same); *Salazar v. State*, 38 S.W.2d 141, 146 (Tex. Crim. App. 2001) (affirming jury finding of future dangerousness based on facts of offense alone). As such, it is clear that jurors are qualified to answer the future dangerousness question, and unreliable psychiatric testimony regarding the same point, such as Dr. Coons' testimony here,  should have been excluded.

As discussed *supra* in Claim 7(a), Dr. Coons' predictions in this case were merely ad-hoc determinations solicited by a hypothetical fact pattern presented orally to the witness by the State. (24 RR 153; admission by Dr. Coons that he obtained all his information from the State; 24 RR 211-218; seven-transcript-page hypothetical presented to Dr. Coons by the prosecutor.) This hypothetical fact pattern was limited to the alleged  facts of the specific crime for which Mr. Coble had been convicted and it also incorporated supplemental evidence, such as extraneous offenses, uncharged prior misconduct, and limited character evidence. The factors used in constructing the hypothetical were insufficient, independent of any psychiatric or psychological analysis, to form the basis of a jury determination. *Jasper,* 2001 WL 1502674 at *1-2; *Conner,* 2001 WL1043248 at *4; *Trevino*, 991 S.W.2d at 854; *Salazar,* 38 S.W.2d at 146.

Further, Dr. Coons' psychiatric or psychological "spin" or interpretation of these same facts was unreliable, as described *supra.* Because psychiatric and psychological predictions of

dangerousness have been shown to be grossly unreliable, they had no relevance to the jury's determination of the factual question of future dangerousness. Unreliable information cannot be considered helpful, and is therefore relevant, to a jury. *See Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000) ("Naturally, testimony which is unreliable or irrelevant would not assist a juror in understanding the evidence or determining a fact in issue as is required by Rule 702."); *Griffith v. State*, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998) ("Evidence that is not reliable is not helpful to the jury because it frustrates rather than promotes intelligent evaluation of the facts."); *Bennett,* 931 F.Supp. at 500 (finding testimony unreliable where "completely lacks specificity" and "borders on sheer speculation," and therefore irrelevant).

Dr. Coons' predictions of future dangerousness relied exclusively on matters within the average juror's common knowledge, and thus should have been excluded. *K-Mart Corp*, 24 S.W.3d at 361. Whereas relevant scientific or expert testimony assists a juror by introducing new facts or expertise, psychiatric predictions of future dangerousness merely "tell the jury how they should view the facts." *Id.* This is not sufficient to meet the necessary criteria for relevance. *See also Flores v. State*, 871 S.W.2d 714, 724 (Tex. Crim. App. 1993) (Clinton, J., dissenting) (noting that expert psychiatric testimony regarding future dangerousness does not "add[] anything of substance to whatever inference of future dangerousness may be gleaned from the facts themselves."); *Speer*, 890 S.W.2d at 97 (finding that psychiatric testimony regarding defendant's dependent personality disorder could be found within the range of a layperson's knowledge).

For the reasons articulated above, Dr. Coons' psychiatric and psychological predictions of Mr. Coble's future dangerousness were irrelevant and inadmissible under Tex. R. Evid. 702 and reversible error.

**Claim Seven(c): Dr. Coons' prediction of future dangerousness unconstitutionally prejudiced Mr. Coble's jury and deprived him of a fair trial.**

The facts and argument from Claims 7(a) and 7(b) are hereby incorporated by reference.

Predictions of future dangerousness are irrelevant and unreliable, and thus, inadmissible under Tex. R. Evid. 702 as discussed *supra.* However, even if this Court holds that such predictions were reliable and relevant, they were unconstitutionally admitted in Mr. Coble's trial under Tex. R. Evid. 403, under which reliable and relevant evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403; *Morales,* 32 S.W.3d at 865-66; *Kelly,* 824 S.W.2d at 572.  Dr. Coons' presentation to the jury of his psychiatric/psychological predictions of future dangerousness created an unacceptable risk of prejudice and needless cumulative evidence, and it was impermissible under Rule 403.

In determining whether the prejudicial potential of evidence outweighs its probative value, courts must consider (a) how compelling evidence serves to make more or less probable a fact of consequence;  (b) the potential the evidence in question will impress the jury in an irrational and indelible way; and (c) the extent of the proponent's need for such evidence. *Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000).

**a) Because the future dangerousness predictions of Dr. Coons were unreliable and irrelevant, they did not make any fact of consequence and more or less probable at Mr. Coble's trial.**

Dr. Coons' psychiatric/psychological predictions of Mr. Coble's future dangerousness, because of unreliability and lack of relevance alone, as described above, created an unacceptable danger for unfair prejudice. His flawed underlying methodology and the high potential rate of

error rendered Dr. Coons' future dangerousness predictions insignificant as to whether future danger is any more or less probable. *See Morales*, 32 S.W.3d at 865 ("Naturally, testimony which is unreliable or irrelevant would not assist a juror in understanding the evidence or determining a fact in issue…"); *Griffith,* 983 S.W.2d at 288 ("Evidence that is not reliable is not helpful to the jury because it frustrates rather than promotes intelligent evaluation of the facts.")

### i) Dr. Coons' future dangerousness predictions only appealed to the jury in an irrational and inappropriate manner.

Expert testimony is placed under additional evidentiary constraints because courts have reasoned that jurors are unable to evaluate such testimony thoroughly and, therefore, give it excessive weight regardless of its reliability and veracity. *Gammill,* 972 S.W.2d at 722 (citing *Robinson,* 923 S.W.2d at 553). *See also Kelly*, 824 S.W.2d at 573. In capital sentencing proceedings, there are four preexisting juror biases that compound the general tendency of unchecked acceptance of expert testimony. These biases affect jurors' perceptions of the likelihood of violent recidivism, the opportunities for recidivism, the accuracy of clinical expert testimony in general and the accuracy of expert predictions of future dangerousness specifically. Such biases reduce the effectiveness of traditional methods of adversarial testing in capital sentencing proceedings. The result is unfair prejudice that might not arise in other legal contexts.

Jurors in capital cases have a predisposed tendency to overestimate the likelihood of violent recidivism. Capital jurors estimate the probability that a defendant charged with capital murder, and given a life sentence, will commit another homicide between 25 and 50%, whereas studies show the likelihood to be approximately 0.2% over a forty-year term. J.R. Sorenson & R. Pilgrim, *Criminology: An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. Crim. L. & Criminology 1251, 1269 (2000). Jurors estimate the probability

that a criminal defendant convicted of a violent crime will continue to engage in assaultive behavior between 50 and 85%. Again, studies show this sense to be greatly exaggerated; the risk of additional violent crimes in general is approximately 16%. Sorenson & Pilgrim, supra at 1269. Jurors in capital cases also have a predisposed tendency to overestimate the opportunity defendants will have to commit acts of violence in the outside community. Studies in Texas indicate that, on average, jurors believe a defendant sentenced to life in prison will be paroled after fifteen years, whereas under Texas law, defendants given a life sentence after conviction for a capital crime must serve forty years before becoming eligible for parole. V.T.C.A., Gov't Code § 508.145(b) (2001); Sorenson & Pilgrim, *supra* at 1255.

Furthermore, jurors also believe clinicians to be capable of predicting future dangerousness at a far more accurate rate than empirical studies have suggested. D.A. Krauss & B.D. Sales, *The Effects of Clinical and Scientific Expert Testimony on Juror Decision Making in Capital Sentencing*, 7 Psych. Pub. Pol'y & L. 267, 276, 301 (2001).  Finally, jurors have an extreme predisposition toward acceptance of "clinical" opinion expert testimony, which is based on a subjective, personal assessment of the evaluee. Krauss & Sales, *supra* at 305. Psychiatric or psychological predictions of a defendant's future dangerousness, particularly those based on an expert's ad-hoc analysis of a hypothetical fact pattern prepared and presented by the State, are clinical determinations. *Id.* Jurors weigh clinical opinion testimony heavily in final decisions and often fail to distinguish between more and less accurate clinical opinion testimony. *Id.*

In general, jurors do not scrutinize expert testimony as intensely as lay testimony and the presumption of credibility for expert witnesses is falsely enhanced.  "Consequently a jury more readily accepts the opinion of an expert witness as true simply because of his or her designation as an expert." *Gammill,* 972 S.W.2d at 722 (citing *Robinson,* 923 S.W.2d 549); *See also Flores*

-344-

*v. Johnson*, 210 F.3d 456, 465-6 (5th Cir. 2000) (Garza, J., specially concurring)("the problem here is not the introduction of one man's opinion on another's future dangerousness, but the fact that the opinion is introduced by one whose title and education (not to mention designation as an 'expert') gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact."); Krauss & Sales, supra at 273; C. Haney, *Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death*, 49 Stan. L. Rev. 1447, 1469-70 & n.113 (1997) ("In this light, capital penalty trials sometimes become forums in which grossly prejudicial and unreliable predictions of future dangerousness are presented with the imprimatur of state authority.") (citations omitted).

The preexisting tendencies of jurors in capital cases to overestimate the likelihood of violent recidivism, the opportunities criminal defendants have for recidivism, as well as the accuracy of clinical predictions of future dangerousness and the veracity and reliability of clinical predictions in general, reinforce the disproportionate credence jurors generally give expert testimony. These tendencies combined create a dangerous and unacceptable risk of prejudice in capital sentencing proceedings.

Adversarial testing is not a sufficient safeguard against the prejudicial effect of psychiatric or psychological predictions of future dangerousness. Faulty presuppositions and disproportionate acceptance of expert testimony may cause jurors to discredit expert testimony and cross-examination offered to counter a psychiatric or psychological determination of future dangerousness. Krauss & Sales, supra at 276; E.H. Mantell, *A Modest Proposal to Dress the Emperor: Psychiatric & Psychological Opinion in the Courts,* 4 Widener J. Pub. L. 53, 65-66 (1994) ("Given a choice between an expert who says that he can predict with certainty that the defendant, whether confined in prison or free in society, will kill again, and an expert who says

merely that no such prediction can be made, members of the jury charged by law with making the prediction surely will be tempted to opt for the expert who claims he can help them in performing their duty, and who predicts dire consequences if the defendant is not put to death."). The "apparent endorsement" of a medical or scientific community can be extremely detrimental to a defendant's substantive rights. *Perez v. State*, 25 S.W. 3d 830, 841 (Tex. App.-  Houston [1st Dist.]  2000) (finding trial court erred in allowing state's expert witness testimony as to "child abuse accommodation syndrome").

Adversarial procedures are generally insufficient to remove the prejudice caused by psychiatric or psychological predictions of a defendant's future dangerousness. Krauss & Sales, supra at 305. The ability to impeach, or discredit, expert witnesses through cross-examination is limited. Opposing counsel is allowed to question the expert using statements contained in treatises and authoritative scientific materials, however, such cross-examination is limited to publications that the witness recognizes as authoritative or publications upon which the expert has relied. *Reynolds v. Warthan*, 896 S.W.2d 823, 827 (Tex. App. - Tyler [12th Dist.] 1995)(citing *Carter v. Steere Tank Lines, Inc.*, 835 S.W.2d 176, 182 (Tex. App. - Amarillo [7th Dist.] 1992, writ denied). *See also Bowles v. Bourdon*, 219 S.W.2d 779, 783. (Tex. 1949). This detracts from the ability to legitimately subject the testimony to the rigors of adversarial testing.

In Mr. Coble's case, Dr. Coons' unreliable psychiatric opinion testimony created the risk that the jury was impressed in an irrational and indelible way.  The prejudice of such testimony was great and hence Mr. Coble's death sentence must be reversed.

**ii) The State had a limited need to present Dr. Coons' predictions of  future dangerousness.**

The State had  no pressing "need" for the admission of Dr. Coons' psychiatric/

psychological predictions of future dangerousness, because it had a variety of other means available to prove the Art. 37.071 (2)(b)(1) special question.  As discussed *supra,* Dr. Coons' testimony was basically ad-hoc determinations solicited by a hypothetical fact pattern limited to the facts of the crime and incorporating supplemental evidence, such as uncharged prior misconduct.  The hypothetical fact pattern given to Dr. Coons, with or without the supplemental evidence, and his resulting psychiatric/psychological prediction of Coble's future dangerousness, needlessly presented cumulative evidence, specifically prohibited by Rule 403.

Dr. Coons' predictions were needless because they lacked validity or reliability and thus, offered nothing to Mr. Coble's jury in addition to the mere repeat recitation of the facts of the crime, or other evidence, that had already been presented and made a part of the record.  Merely cumulative evidence that serves no additional purpose must be excluded. *Sims v. Brackett*, 885 S.W.2d 450, 454 (Tex. App. – Corpus Christi [13th Dist.] 1994) (reversing trial court exclusion of expert medical witness testimony as to cause of patient's intestinal leak because not "*merely cumulative"*)(emphasis added). *See also Pace v. Sadler*, 966 S.W.2d 685 (Tex. App. – San Antonio [4th Dist.] 1998) (excluding personal narrative describing facts already on the record in medical malpractice case because cumulative and would have only served to prejudice defendants).

Here, the admission of Dr. Coons' unreliable psychiatric predictions of Mr. Coble's future dangerousness shed no credible scientific, medical, or other light on the individual circumstances of Petitioner.  The potential rate of error of such predictions, described above, shows that Coons was no more qualified to accurately do so than any of the members of Mr. Coble's  jury panel.  Because the jurors otherwise had access to the underlying evidence presented to Dr. Coons in the hypothetical fact pattern, and had the authority to base their

determination of future dangerousness on this data alone, Dr. Coons' opinion testimony itself was useless except for its prejudicial impact. *See, e.g., Long v. State*, 823 S.W.2d 259 (Tex. Crim. App. 1991) (excluding autopsy photographs in murder case, even though relevant and probative, because of prejudicial nature and cumulative effect where less gruesome photographs were already in the record); *Penry v. Johnson*, 215 F.3d 504, 513    (5th Cir. 2000)(Dennis, J., dissenting) (expressing concern regarding the "cumulative effect and reinforcement" of the "erroneous" admission of psychiatric testimony regarding future dangerousness); *See also Jasper*, 2001 WL 1502674 at *1-2; *Conner*, 2001 WL1043248 at *4; *Trevino*, 991 S.W.2d at 854; *Salazar*, 38 S.W.2d at 146 (juries may find future dangerousness based on the facts of the offense alone or some combination of the facts of the offense, the defendant's prior criminal history, and juror interpretation of remorse or other character evidence).

Dr. Coons' psychiatric testimony offering a prediction of Mr. Coble's future dangerousness was cumulative to other testimony or evidence that had already presented to the jury. As a result,  his testimony, especially given its overwhelming prejudicial impact, indelible and irrational impression on the jury, should have been excluded under Rule 403.

For the reasons articulated above, the minimal, if any, probative value of Dr. Coons' psychiatric/psychological predictions of future dangerousness was far outweighed by the unfair prejudice his predictions caused.

**<u>CLAIM EIGHT</u>: THE TRIAL COURT ERRED IN ALLOWING IRRELEVANT, PREJUDICIAL AND UNRELIABLE TESTIMONY FROM STATE'S WITNESS A. P. MERILLAT.**

Petitioner's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and pursuant to Article 1, sections 3, 10, 13, 15 & 19 of the Texas Constitution, TEX. R. EVID. 401, 403, 702, 703 and 705, and such other law as may be set forth below, were violated when the State offered in evidence the purported "expert" testimony of A.P. Merillat, which consisted of non-confronted, inflammatory, inaccurate and unreliable hearsay.

There were myriad evidentiary and constitutional violations in the expert testimony of Mr. Merillat, evidenced by his past testimony in frequent capital sentencing trials, as shown herein. For the purported purpose of informing the jury of the unremarkable concept that there is an opportunity for violence in Texas prisons, Mr. Merillat's testimony transmitted sensational prison horror stories to Mr. Coble's jury through the unreliable and non-confronted hearsay he has collected on a haphazard basis. The most spectacular of his horror stories appears to be a fabrication. Further, his purported expert testimony on prison classification was false: he has repeatedly misstated the black-letter classification policy set forth by the Texas Department of Criminal Justice ("TDCJ"), resulting in a false impression about the safety precautions TDCJ takes to prevent prison violence. As the State's last witness, testifying just prior to the final arguments and hence prominent in the jury's mind, Mr. Merillat's testimony was particularly prejudicial.

**A. Facts Presented to the State Courts.**

This claim was presented on direct appeal as point of error number six, seven and eight, and also on state habeas as Claim 8.

### 1. Facts presented on direct appeal.

The facts presented on direct appeal, as point of error number six, were as follows:

The State introduced the testimony – over objection[195] - of A.P. Merillat, an Investigator for the Special Prosecution Unit. Merillat's job was to investigate and prosecute crimes committed in prison, including crimes committed by inmates, guards and civilians. The State offered Merillat as an expert on violence inside prison. His testimony covered several areas, including:

The prison classification system. According to Merillat a person convicted of capital murder would come in at a G3 classification:[196] he described that as the "middle of the road" classification. (29 RR 37-38.)

Ad seg (administrative segregation) is a punitive type of housing, which is reserved for inmates who commit some type of act of violence in prison. There is also "high security", which is more restrictive than ad seg (administrative segregation). (29 RR 41-43.)

Violence in prison is not accurately reflected by the statistics because different definitions are used. (29 RR 46-51.)

In addition to testifying about the reporting procedures, Merillat also testified there

---

[195]   Petitioner objected to Merillat before he testified, and was allowed to question him on voir dire. The trial court overruled Petitioner's objections, although he did limit the state's ability to go into specific instances without first approaching the bench. (29 R.R. 27)

[196] He testified there were five levels of classification – G1-5; the lower the number, the worst the inmate was. In other words, the best behaved inmates, with the least restrictions, would be G5 (29 R.R. 35)

opportunities for escape. He gave examples of inmates who are bench warranted to county jails where the security may not be as tight, and inmates released on furlough. (29 RR 53-57.)[197]

*Merillat was an expert witness, and not a fact witness.*

At the outset, the Court must determine if Merillat was an expert, or merely a fact witness. The Court asked whether his testimony about conditions in prison were based on his personal observations, and suggested he would be a fact witness for such testimony. The state responded that "He has specialized knowledge and would be qualified to give an opinion. But he is a fact witness first and foremost." (29 RR 53.) They also stated "he's qualified as a fact witness, that would certainly be helpful to the jury. His expertise and special knowledge would help them determine the fact in issue and that would be eventually future danger of this particular defendant by extrapolation in the general population serving a capital life sentence." (29 RR 24.)

From the above exchange it appears the State could not make up its mind whether Merillat was a fact witness or an expert witness. Petitioner suggests the question can be easily answered by looking at the substance of his testimony. He was testifying about TDCJ as a whole; something about which he could not possibly have firsthand knowledge. While he no doubt handled cases, he was not personally involved in every case that arose in TDCJ. As such, his testimony had to be based – to some extent at least – on what he was told by others. Such testimony could not be offered by a lay witness, since it would clearly be hearsay. It could only be admitted through an expert witness. Additionally, the testimony Merillat was put on to provide – that violence in TDCJ was not accurately reported – was an expert opinion. All the

---

[197]  Petitioner objected to the testimony about furloughs. Merillat testified there was nothing that prevented a capital defendant from getting one, although he was not aware of a furlough ever being granted to such a defendant. (29 RR 56-57.)

other testimony he offered in an attempt to support that opinion. As such, there should be no doubt he was an expert witness.

### 2. Facts presented in state habeas.

In state habeas, this was presented as claim eight.

### i. Merillat's trial testimony.

A main feature of the State's case was the testimony of a so-called "prison expert", A. P. Merillat. This witness had no special knowledge of Mr. Coble or the facts of his case, was not aware of his past or his prison history, had only a high school education and a few years of college, and provided no scientific methodology or basis for his testimony.  Yet Mr. Merillat was allowed to provide extensive hearsay and unverified testimony regarding his opinion of the rates of prison violence.  He also claimed that the prison system's statistics regarding violence were understated, and many acts of violence occurred in the Texas prison system were not reported and were not known to anyone except himself.

At a hearing on his qualifications, A. P. Merillat first testified out of the presence of the jury that he was a criminal investigator with the Special Prosecution Unit ("SPU") in Huntsville. (29 RR 8.)  He has two years of college but did not graduate and had no college degree. (29 RR 8.)[198]  He first stated that he does not predict future dangerousness (29 RR 9) and yet a few minutes later he contradictorily stated that he would be testifying "[a]s far as future

---

[198]   Merillat has had a less than stellar academic career.  *See* Exhibit 19, records of A.P. Merillat obtained through National Student Clearinghouse, and his academic transcripts from Sam Houston State University.  These records indicate that he enrolled in the college in the fall of 1975; received a 1.75 GPA average in the spring 1976 semester; received a failing grade in "Principles of American Government National and State;" grades of C in "Composition II" and "United States History;" re-enrolled in 1989 and 1990; took courses such as "Music Appreciation" and "Fundamentals of Public Speaking;" has been granted credit for "Elementary Keyboarding, Fitness for Living and Physical Education Activities;" and has about two years of college credit.

dangerousness." (29 RR 13.)[199]   Merillat admitted he had not reviewed any documents relating

to the Coble case, had only spoken briefly with the prosecutor, had not heard of any of the

circumstances of the case until the night before his testimony, had no training in statistics,

human behavior, psychiatry, or sociology,[200] and had never worked in the field of classification

of inmates.  (29 RR 10.)  He had what he called "on the job" training in investigating inmate

crimes for 19 years.   (29 RR 12.)   Merillat also claimed to be qualified in classification

procedures and to know the TDCJ prison classification system.  (29 RR 11-12.)  He claimed that

"[t]he primary documents which I have with me today is the classification plan itself." (29 RR

12.)   Merillat claimed to have special knowledge of "certain numbers that are important for a

jury or anyone else to know about homicides, for example, in the prison system."  (29 RR 14.)

But he did not know the number of felonies committed in TDC over a certain time, did not know

whether there was a breakdown between violent and non-violent felonies, and did not know the

statistical breakdown in rates of violence of capital inmates.  (29 RR 15.)[201]  Mr. Merillat did not

know how many cases TDC pursued against inmates, and did not know how many murders were

committed by capital life inmates.  (29 RR 16.)  Over the last 4 years, Merillat claimed that the

SPU   prosecuted 94 convicted capital murderers serving life sentences and 223 convicted

murderers in the same period but he did not know how many of these 223 were charged with

---

[199]   In fact, Mr. Merillat admitted his lack of qualifications to testify, and on that basis alone his testimony should have been excluded.  At the voir dire hearing, Mr. Merillat was asked "are you qualified to predict future dangerousness" and he answered "I will not do that, no sir." 29 RR 9.  Yet a few minutes later he was asked "what is the basis of your knowledge for testifying today" and he answered "As far as future dangerousness and the opportunities to be violent..." 29 RR 13.

[200]   As his college records verify.  (Exhibit 19.)

[201]   Yet these records are readily available. *See* Exhibit 17.

violent or non-violent crimes. (29 RR 17-18.)   Merillat did not know how many total murderers were in the Texas system, or any other numbers for specific crimes.  (29 RR 18.)  Nor did he have any statistics regarding the rates of murder between capital life sentenced individuals and those sentenced to death.  (29 RR 19.)

The defense objected to this testimony as they had never argued that the prison can control Mr. Coble and on the grounds that it would be prejudicial.  (29 RR 21.)  The prosecution stated that he was a "fact witness" to rebut Dr. Cunningham's conclusions and they claimed he was also a proper rebuttal witness.  (29 RR 23-24.)  The defense also objected to any mention of escapes.  (29 RR 25.)  The prosecution wanted to introduce an incident where an inmate was beaten and starved to death in prison "as an example for (sic)  under-reporting of violence." (29 RR 26.)  Over defense objection, the Court allowed this testimony.  (29 RR 27.)

Mr. Merillat then testified before the jury.  (29 RR 30.)  He stated he has been in his present position for over 19 years.  (29 RR 31.) and that his office prosecutes crimes on behalf of local district attorneys across the state.  (29 RR 31.)  The job involves preparing cases for the grand jury and presenting them on behalf of the office.  (29 RR 33.)   Then he will prepare for trial if the person is indicted and he will work with the prosecutor.  (29 RR 33.)

Mr. Merillat explained that "general population" meant that a prisoner is not segregated from other inmates "where the inmate does his time and goes about his business."  (29 RR 34.) He stated that there are classifications within the prison system, which is a very complex system. (29 RR 35.)   The classification goes from G1 to G5, with G5 being a very bad inmate.  (29 RR 35.)  A person coming in with a long sentence might be a G3 he stated.   (29 RR 36.)   Merillat stated that a prisoner in this category can come and go without shackles and move freely around the prison (29 RR 37.)  According to the witness, the prison system determines the classification:

"[y]ou folks can't or the judge cannot tell the prison, classify this man as such and such.  They

can't do that.  They'll do it the way they want to."  (29 RR 38.)    He further testified that if

classified as a G3, the inmate can be in a dayroom, have cellmates, go out to the rec yard, or

work.  (29 RR 38-39.)  "All of this is unrestrained."  (29 RR 39.)

    Merillat elaborated:

    "It's some people (sic) have a vision of the prison system where a convict, because he's a
    particularly bad convict, is going to be grabbed and held and shackled and escorted to
    and from, that's not true in general population.  If you have a job to do at a certain shift,
    you go do it and you come back when you're finished.  You're not searched every time
    you leave that cell.  You're not searched every time you come back into the cell."
    (29 RR 39.)

    Merillat claimed, without first-hand knowledge,  that "the working non-ranking prison

guards...don't know why an inmate is serving time."  (29 RR 40.)    He also claimed that the

inmates get a new set of clothes every day.  (29 RR 40.)    The witness was asked about "ad seg"

or administrative segregation, where inmates are sent after bad or violent acts.  (29 RR 41-42.)

But  "[e]ven then, we've prosecuted murders and escapes from administrative segregation."  (29

RR 42.)    He also talked about "high security", a housing when administrative segregation

"wasn't working," for "inmates who were too bad for ad seg, who were too bad for general

population."  (29 RR 43.)  The witness claimed that even this placement would be dangerous as

two murders happened there and inmates have escaped from high security...  "but still people do

bad things there."  (29 RR 43-44.)

    The witness was also allowed to testify regarding gangs in prison, though there was no

evidence that Mr. Coble had ever been in a gang.  The defense objection to this testimony was

overruled.  (29 RR 44.)

    The witness stated that there was unlawful activity in prison.  (29 RR 45.)   He stated that

there were 78 serious staff assaults last year.  (29 RR 47.)[202]   The witness claimed his office

prosecuted 197 assaults against staff members last year but that number might not be serious

assaults.  (29 RR 47.)  The witness claimed that the prisons "don't count in their numbers the

officers, the employees who were killed...There's no place on that form for an officer being

murdered in the line of duty...But there's no place for the prison to report, which I think is pretty

important if a prison guard is killed or murdered in the line of duty, whereas we do."  (29 RR

48.)

> The witness also gave the following scenario:
>
> If a prison inmate is beaten by other inmates to the point that he has to go to a free world
> hospital and might go into a coma or have some sort of brain damage, they put him into a
> coma, the prison will parole that individual based on the fact that he's probably not going
> to survive to come back and serve his time.  They will parole that individual.  If he dies,
> we go in and indict the people who caused those injuries that caused his death.  That's a
> homicide and it occurred within the penitentiary.  But the prison doesn't report that
> because that's not an inmate dying.  That's a civilian who died in a nursing home or in an
> operating room or something like that.  So there again, what they call a homicide or what
> they don't call a homicide, we do, which it is a homicide.  That's just a general
> description of the differences in their numbers and our numbers.
> Q.  Okay.  So basically if somebody doesn't...if somebody is injured within the prison
> walls but doesn't die within the prison walls, then it isn't a prison homicide; is that right?
> A.  Unless they have not yet paroled him. Like if he dies in a prison hospital, they could
> count that one.  But they won't if it's a free world situation.
> (29 RR 50.)

> The witness continued to assert, without any supporting evidence beyond his own

assertions, that there was a substantial number of unreported crimes and violence in the Texas

prison system:

> Q.  And can you tell me whether any of these...offenses you've talked about, are they
> ever handled in a informal manner?
> A.  Yes, sir, which those (sic) are not reported at all by the prison or by us and rightfully
> so. If an inmate misbehaves, acts up or even commits a felony such as having a weapon,

---

[202]  This number comes from TDCJ statistics.  *See* Exhibit 17, serious staff assaults for
2007.

for whatever reason, if a warden determines that I can better control this inmate's behavior by doing something informally instead of taking him through the court process or trying to get many years stacked upon his sentence, well, they go ahead. You know, he can say, look, I'm going to have you doing some odd job all night long for the next five years because you had this weapon and we're going to just drop the whole matter. But screw up again, we're going to take care of it. Well, they do that a lot and that won't hit the numbers.
(29 RR 51.)

The witness asserted that there had been 156 murders in the penitentiary since 1984. (29 RR 52.) When asked about escapes from prison, he stated that there have been such escapes, without specifying how many. (29 RR 53.) He also talked about prisoners being transported on bench warrants ("there opportunities for him to overpower people or bust out of the jail or have somebody get him out...the opportunities exist and it has happened before"). (29 RR 54.) Mr. Merillat went on: "he [the transported inmate] becomes the property, so to speak, of that county, the county that demanded his return...Once a prison inmate is bench warranted to a local county and they're through with him, they have to wait for their...spots available for him to go back into the penitentiary." (29 RR 54-55.)

When the witness discussed furloughs, the court allowed this testimony over defense objection, though furloughs were not a possibility for Mr. Coble or anyone who had been convicted of capital murder. (29 RR 56.) The prosecution was allowed to elicit the following testimony:

Q. Is there a provision for furloughs?
A. Yes, sir. An inmate can request under certain circumstances...a furlough or a leave from prison. Usually we think of it as a funeral for a loved one, certain close family members. It's important to know that there are no restrictions against a convicted capital murderer who is a G3 from (sic) being granted a furlough. That's not to say he's going to get it, but there's no restriction against him asking for one and being considered for one. The warden and the unit authorities will look at the whole picture and look at this particular individual's record and circumstances and make a determination. And I personally do not know of a convicted capital murderer who has gotten a furlough, but I do know that it's...not restricted, it's not prevented.

(29 RR 56-57.)

The witness stated that death row at the Polunsky Unit was the old "ad seg" unit at the prison, which is "the most restrictive housing we have in the whole state right now." (29 RR 58.)

The witness then gave the central point of his testimony:

Q.  Now let me ask you.  In your experience, do you believe that violence in prison is...is absolutely accurately reported or do you believe that the statistics do not reflect the level there?
A.  Well, like I said, it's not accurate because prison has made their own determinations on what to put on that form.  Not that they're wrong, it's just different.  They are wrong (sic).  Their figures are not right.
Q.  Can you explain that for the jury?
A.  Well, yes sir.  It's like I said, a homicide is a homicide.  A man is killed by a prison inmate, that is a prison homicide.  Now, they won't say it is, I'm telling you it is.  So that...that's a wrong figure.  If the ...if a guard is punched to the point of even a black eye or a split lip by a convict, that's a felony assault in the State of Texas.  The prison system says it's not if he didn't need more than first aid to get fixed up.  So that's wrong.  So the numbers that are put down under those parameters are incorrect.
Q.  All right sir.  Now, those are things that we absolutely know about, correct?
A.  Yes sir.
Q.  All right.  Is there violence that takes place in your experience that we don't document?
A.  Well, yes, sir.  First of all, there are assaults upon inmates that aren't reported because by telling on the person who did it, they are going to be much worse off ...
(29 RR 59-60.)

The witness created the impression that prison killings were not reported: "A man is killed by a prison inmate, that is a prison homicide.  Now, they won't say it is, I'm telling you it is." (29 RR 60.)  The witness claimed that the under-reporting was due in part to fear of being labeled a "snitch." (29 RR 61.)  He also stated that "attempts" sometimes do not show up in the statistics. (29 RR 62.)

Over defense objection (29 RR 63), this witness was allowed to relate the details of an unrelated incident:

-358-

At the Telford Unit over in Bowie County in general population, two inmates living in a cell, one of them was a member of a gang called the Black Gangster Disciples.  He...his cellmate was a weaker type of inmate.  The so-called bad guy was a strong inmate.  The cellmate was a weaker inmate.  Strong inmates prey upon weaker inmates in the prison system.  He, the stronger one, started beating and sexually assaulting his cellmate.  And when there was little resistance, he determined that he was able to do these things without this guy taking care of himself or defending himself.  So our investigation and the prosecution of this person revealed that over the period of a month inside that cell this inmate beat and tortured his cellmate.  He whipped him with an electrical cord just like you see in child abuse cases where the striations are all over his back and buttocks.  He...
(29 RR 64.)

Despite an objection from the defense that was sustained (29 RR 65) the witness was still

allowed to continue:

Over a period of a month, the inmate was beaten and tortured and he starved to death and there was no intervention by prison guards.  No guards noticed what was happening to the point of stopping that behavior for over a month until the inmate was finally discovered dead in his cell long after he had died.
(29 RR 66.)

On cross examination, the witness stated  that he was not expressing an opinion regarding

Mr. Coble's likelihood of committing a future danger (sic) in prison, nor was he qualified to do

that.  (29 RR 67.)   He had never interviewed Mr. Coble.  (29 RR 67.)  The witness did not know

how many inmates convicted of first degree murder were in the Texas prison system, did not

know how many were convicted of manslaughter, how many were sexual assaulters, did not

know what percentage were there for assaultive offenses.  (29 RR 68-70.)   He also did not know

how many times he has testified in this area.  (29 RR 70.)   The witness also stated that an inmate

such as Bill Coble could move to a less restrictive classification that what he started with, a G3:

Q.  Now, an inmate such as Bill Coble, would go into the system...I think you called it a G3?
A.  Yes, sir.
Q.  All right.  And he could move up a classification level and he could definitely move down a classification level; is that right?
A.  That's true.
Q.  Now, a classification level he could move up to, I guess, a G2 after serving ten years

of an adequate record?

A.  Right.  If he's convicted of capital murder with a life sentence, he'll go in as a G3, and then he has to stay as a G3 for at least ten years before he's eligible to be promoted up.  He can go down in that time, but he can't go up.

Q.  Now, can he ever get higher than a ...G3...than a G2? Excuse me.

A.  No, sir, not as a convicted capital murderer.  At this point we're at today, he cannot go to a G1.

Q.  Okay.  So after ten years of good behavior, maybe Mr. Coble can become a G2?

A.  Can be if he's good.

Q.  Okay.  And that would make him...if he's 60...let's say he's 60 now.  That would make him 70 before he could ever be promoted to a better less restrictive custody level?

A.  No, sir.  The custody level won't be less restrictive or more restrictive.  It's just going to be a change in his classification.  It's important to know that G3 and G2 can live in the same...in the same cell block....

(29 RR 72-73.)

The witness stated that there are still prison industries where the inmate could be productive.  (29 RR 73-75.)  He also stated that there were certain perks and privileges that would motivate inmates to good behavior.  (29 RR 77-79.)   Inmates used to have more privileges at the old Ellis Unit.  (29 RR 80.)   The witness stated  he "knew nothing" about Bill Coble.  (29 RR 84.) He also admitted that some inmates choose to be violent, others do not, "It's up to them what they're going to do with the opportunities that come to them."  (29 RR 84.)

On redirect, the witness stated that "death row is the most secure [incarceration] we have."  (29 RR 85.)   He again reiterated, again without attribution, that "[w]hat the prisons report on the level of violence is incorrect...It's just incorrect."  (29 RR 86.)

Merillat testified on the last day of Coble's trial and was the only witness testifying on that last day.  (29 RR 3.)  As such, his testimony was prominent in the jury's mind when they deliberated.   This prominence was compounded by the fact that the prosecutor repeatedly stressed Merillat's testimony  in his final argument. (29 RR 125, 169-170, 172.)

**ii.  Evidence of  Mr. Merillat's unreliable and false testimony.**

As noted above, Mr. Merillat purports to have "self taught" expertise in TDCJ

classification policy.  (29 RR 10, Merillat admits he had no specialized training; 29 RR 12, 31, 34, Merillat admits that his training is "on the job" expertise).  Courts have assumed that Mr. Merillat has expertise in this area.  *See*, *e.g.*, *Espada v. State*, 2008 WL 4809235, * 10 (Tex.Crim.App. 2008) (unpublished) (noting Mr. Merillat's purported expertise and testimony about "inmate classification").  Under mild scrutiny, however, his patina of expertise proves illusory.

### a. False claims about capital murderers sharing cells with offenders convicted of less serious crimes.

Raising the spectre that Mr. Coble could harm an offender incarcerated for a less serious crime, Mr. Merillat  testified that "G3 and G2 can live in the same...in the same cell block....He'll do...he's subject to being...living in the same cell blocks, the same areas, the same circumstances as a G2.  *That's real important to know*."  (29 RR 72.)(emphasis added).  In fact, G3 offenders will only be housed with other G3 offenders.   TDCJ CLASSIFICATION MANUAL Oct. 2003 at 79.[203]   Only under exceptional circumstances will they be housed with G2 offenders.  *Id.*

### b. Misleading Testimony that Inmates Have to Earn Administrative Segregation through Violent Acts.

The State offered Mr. Merillat's testimony to establish that a capital murderer must commit violent acts during his imprisonment for the capital murder before TDCJ would incarcerate him in administrative segregation, where the opportunity for crime is less:

Q.  Okay, sir.  Now, there's been a term used "ad seg."  Will you explain that to the jury, please?

---

[203]   *See also* Exhibit 20, TDCJ Unit Classification Procedure, July 2005,  at 5. ("General Population Level III (G3) custody offenders shall only be assigned to housing areas that are specifically designated for General Population Level III (G3) custody offenders.")

A.   Yes, sir.   Sure.   "Ad seg" is just a shortened version of the words administrative segregation.   We've talked about general population.   Administrative segregation is a punitive type of housing.   It's a very restrictive certain part of the prison system.   It's its own building.   It's the Building No. 12 in a prison unit.   In...within administrative segregation, the cells are single cells.   The inmates there have to earn their way there through bad or violent acts.   You can't just go to ad seg.   It's punitive.   It's very restrictive housing.

(29 RR 41.)

In fact, however, TDCJ CLASSIFICATION MANUAL Oct. 2003, the classification plan in effect at the time and presently,  states in black and white that inmates otherwise suitable for G3 custody will not be so assigned if the inmate has a "security precaution designation for escape (ES), staff assault (SA) or hostage (HS)" within the past 10 years (or longer if exceptional circumstances exist)  *Id.* at 79.[204]   Similarly, the manual states that inmates are placed in administrative segregation for these same security precautions.  *Id.* at 84.

And contrary to Mr. Merillat's testimony, these types of security precautions are precisely the kind of information TDCJ gathers when an inmate enters its custody.  The manual mandates that at TDCJ's "Reception and Diagnostic Centers," through which all inmates are received, the staff "

obtain all available reports, records, and documentary information necessary to make classification decisions, making all reasonable efforts required to obtain such information.  Information relevant to an Institutional offender's criminal and institutional history . . . is forwarded to the Classification and Records Office for placement in the offender's permanent folder. . . . During initial processing at the RDC, the offender is interviewed to substantiate and verify al information contained in the offender's records."  *Id.* at 18.  TDCJ staff then enter this "information on the offender's travel card and other appropriate documents."  *Id.*  Custody determinations are then made based on "all of the information contained in the offender's travel card . . . and other classification-related documents."  *Id.* at 18-19.

---

[204]   *See also* Exhibit 20 at 5.

Clearly, then, any inmate whose incarceration history requires a "security precaution designation" will not be permitted G3 custody status.  Mr. Merillat's overbroad testimony to the contrary was false, unreliabe and misleading.

### c.  False testimony regarding Telford Unit "horror story."

As discussed above, a main feature of Merillat's testimony was the horrific Telford Unit story he recounted in gory detail for Mr. Coble's jury.  However, his testimony reagrding this incident was both embellished and substantially false. As Dr. Cunningham summarizes it:

> The testimony of Mr. A. P. Merillat, criminal investigator with the Special Prosecution Unit in Huntsville, suffered from a number of scientific shortcomings. First, he provided no documentary basis for any of his representations that would allow them to be reasonably scrutinized or tested against the actual occurrence or data. This is particularly problematic as one of the more lurid anecdotal accounts he provided in his testimony is inconsistent with the description of this incident as summarized in the appellate record. More specifically, Mr. Merillat testified:

>> At the Telford unit over in Bowie County in general population, two inmates living in a cell, one of them was a member of a gang called the Black Gangster Disciples. He – his cellmate was a weaker type of inmate. The so-called bad guy was a strong inmate. The cellmate was a weaker inmate. Strong inmates prey on weaker inmates in the prison system. He, the stronger one, started beating and sexually assaulting his cellmate. And when there was little resistance, he determined that he was able to do these things without this guy taking care of himself or defending himself. So our investigation and the prosecution of this person revealed that over the period of a month inside that cell this inmate beat and tortured his cellmate. He whipped him with an electrical cord just like you see in child abuse cases where the striations are all over his back and buttocks. He – [objections and court ruling]…Over a period of a month, the inmate was beaten and tortured and he starved to death and there was no intervention by prison guards. No guards noticed what was happening to the point of stopping that behavior for over a month until the inmate was finally discovered dead in his cell long after he had died. [29:64-66]

> Mr. Merillat has identified the parties involved in this incident as Chris Hubbard (perpetrator) and Ronder Townsell [sic] (victim) in his book "Future Danger, 3rd Edition" published by the Texas District and County Attorneys Association.[205]

---

[205]   Exhibit 21, Excerpts from Merillat, "*Future Danger?*" 3rd ed. (TDCAA) at 114-115.

The summary of the facts of this offense by the appellate court [*Chris Hubbard, Appellant v The State of Texas*, Appellee, No. 06-02-00188CR, in the Court of Appeals Sixth Appellate District of Texas at Texarkana, on Appeal from the 202nd Judicial District Court, Bowie County, Texas, Trial Court No. 01F0561-202],[206] however, is quite different than represented by Mr. Merillat in his above testimony and publication. The appellate opinion described:

> Chris Hubbard awoke in his prison cell to find that his cellmate, Ronder Townsel, had pulled down Hubbard's boxer shorts, climbed on Hubbard's back, pressed his forearm to the back of Hubbard's neck to hold him down, and begun trying to rape him. During the ensuing struggle, Townsel was injured worse than Hubbard. In fact, Townsel's resulting broken ribs and sternum caused infection and ultimately death. [footnote: Early in the evening of April 19, 2001, a correctional officer making rounds at the Telford Unit of the Texas Department of Criminal Justice discovered Hubbard pacing the floor of his cell. When the officer paused to talk to Hubbard, he noticed Townsel had not touched his dinner and, on further investigation, was completely unresponsive. A nurse, one of the first responders to the scene, began to perform CPR on Townsel, even though she had no expectation he could be resuscitated; not only did the nurse find he lacked a pulse and was cold to the touch, but she also noted evidence of lividity and partial rigor mortis, indicating he had been dead for some time. An autopsy cited as the cause of death complications of blunt force trauma due to beating.]

> …Hubbard testified Townsel jumped on his back as he slept, pulled down his pants, and attempted to rape him. After struggling to get Townsel off of his bunk, Hubbard testified he tackled Townsel, with both falling to the floor, and hit him repeatedly in the chest, causing fractures to Townsel's sternum and to a number of his ribs.

> …Hubbard was faced with an entirely different scenario. According to his testimony, he had previously warded off one sexual assault by applying significant force on Townsel. [footnote: This previous force included repeatedly striking Townsel with a coaxial cable, which was unsuccessful in stopping Townsel's attack, then hitting him in the face with a fist, breaking Townsel's jaw and stopping Townsel's advance.] Thereafter, Townsel awakened him with his attempt to rape him. Townsel held Hubbard down with his forearm and began sucking on his ear and trying to rape him before Hubbard elbowed him and head-butted him in the face. Hubbard then tackled Townsel, and the two landed on the floor. Hubbard and Townsel continued struggling with each other, until Hubbard managed to get Townsel on his back, to hit him in the face and bloody his nose. Hubbard stopped fighting at this point and stood up, but Townsel came at him again. The fight only ended after they had again fallen to the floor and wrestled

---

[206]   Exhibit 22, *Hubbard v. Texas,* No. 06-02-00188-CR, (Tex. App.—Texarkana (2004).

-364-

for some time.

> Seizing on Hubbard's testimony describing what happened directly after he head-butted Townsel to get him off of his bunk, the State maintains Hubbard had time for reflection before beating Townsel with such force he caused several fractures to Townsel's ribs – reportedly the cause of the infection that ultimately killed Townsel. Hubbard said: "[Townsel] had got up, he was standing, just standing there with no clothes on. I got up and just went at him." Contrary to the State's position that this indicated Hubbard had become the aggressor, however, our review of the record suggests that these events took place within a very short time and that Townsel was not easily dismissed. It is instructive that that Townsel attacked Hubbard again even after Hubbard testified that he had bloodied Townsel's nose, and possibly even after the ultimately lethal chest punches by Hubbard – after Hubbard started to walk away from the fight.[207]

The discrepancy between Mr. Merillat's testimony and the appellate record is inexplicable. This discrepancy illustrates one of the problems with the recitation of an anecdotal incident that is accompanied by no documentation.[208]

Enclosed herein is an affidavit from attorney Adam O. Fellows, co-counsel for Mr. Hubbard at his trial in 2002 and also his appellate counsel.  (Exhibit 32).[209]  Mr. Fellows brings out in more detail the same discrepancies identified by Dr. Cunningham in his analysis of the *Hubbard* opinion.  Mr. Fellows, a graduate of the University of Texas School of Law, was a prosecutor in Bowie County from 2004 to 2007, and then a prosecutor for the Texas department of Licensing and Regulation from 2009 to 2012. He is now in private practice in Travis County. (Exhibit 32 at 1.)

Mr. Fellows was co-counsel in the case of *State v. Hubbard,* No. 01-F-0651-202 (202nd District Court of Bowie County), the same case addressed above.  Mr. Fellows confirms that his client was initially charged with the capital murder of his cellmate Ronder Townsel at the

---

[207]  *Id.*

[208]  Exhibit 16 at 17-19.

[209]  Mr. Fellows' affidavit was not presented in state habeas, but the issue he addresses, the Twwnel/Hubbard case, was.

Telford Unit in 2001. (*Id.* at 2.)  Mr. Merillat was the investigator for the prosecution. (*Id.*)  Mr.

Fellows states that the involvement of Mr. Merillat's Special Prosecutions Unit was unusual in

Bowie County, but this was because "[i]t is my understanding that the Special Prosecution Unit

viewed the case as a capital case and the District Attorney did not.  It is also my understanding

that the District Attorney would not handle the case as a capital case and that is how the Special

prosecution Unit became involved."  (*Id.*)  This was the only case during Mr. Fellows' time in

Bowie County that the SPU became involved, including his time as a prosecutor in that county.

(*Id.*)

As Mr. Fellows relates,

> "Chris [Hubbard] was charged with capital murder and the state sought
> the death penalty, but the jury's verdict was manslaughter.  At that point, the
> prosecution offered to agree to a thirty year sentence, but Chris rejected that and
> was sentenced to life.  I then represented Chris on his appeal to the Sixth Court of
> Appeals in Texarkana. The Court of Appeals reversed Chris's conviction on the
> ground that the jury should have been given an instruction on the defense of
> necessity, based on his belief that his actions were necessary to avoid the
> imminent harm of being raped by Townsel, since he could not flee from their
> locked cell. That instruction had been requested, but denied, at trial. *Hubbard v.
> State,* 133 S.W.3d 797 (Tex. App.–Texarkana 2004, pet ref'd)...in 2010 Chris
> pleaded guilty to manslaughter and was sentenced to 20 years.  After Chris's
> appeal, I retained a copy of the trial transcript, which I have referred to in the
> course of preparing this affidavit.
> (Exhibit 32 at 3.)

Mr. Fellows came across Mr. Merillat's book "Future Danger" 3rd ed. (Referred to

above).  As Mr. Fellows states, "Merillat described various facts that simply do not reflect the

actual evidence presented by the prosecution at Chris's trial.   His account was wildly

exaggerated and in parts simply untrue."  (Exhibit 32 at 4.)  Mr. Fellows was informed of Mr.

Merillat's testimony in this case, and he was asked to comment on it, using the Hubbard trial

transcript  (using the initials "CRR" to refer to Coble's transcript, and "HRR" to Hubbard's).

As Mr. Fellows states, "A.P. Merillat's testimony about Chris Hubbard in the Coble case is false and, in my opinion, highly inflammatory.  Having been present at Chris's trial, Merillat should be well aware that the jury rejected the State's theory of the homicide, and that his account of it is not supported by the facts." (*Id.* at 4.)

Mr. Fellows points to the following false testimony at Mr. Coble's trial:

1) At 29 RR 62, Merillat claims he investigated the Townsel/Hubbard case, which was not true.  The "Office of the Inspector General of the Texas Department of Criminal Justice actually investigated the case..." (Exhibit 32 at 5.)

2) Mr. Fellows verifies that Merillat's testimony related to the Hubbard case.  At 29 RR 62, Merillat testifies about a case in which a TDCJ inmate starved to death in the Telford Unit in Bowie County and it is clear he is referring to the Townsel/Hubbard case. (*Id.* at 5.)  This is clear because the description matches his description of the case in his book "Future Danger 3rd ed." (Exhibit 21 herein) where the names are mentioned and secondly, he testified that he "worked the trial of the person responsible" and "the only trial that the Special Prosecution Unit tried in Bowie County was the Hubbard case." (Exhibit 32 at 5.)

3) Mr. Fellows points to Merillat's testimony about Hubbard being a "strong inmate"; that Hubbard "started beating and sexually abusing his cellmate"; "he was able to do these things without this guy taking care of himself or defending himself...over a period of a month inside that cell this inmate beat and tortured his cellmate." 29 RR 64.  (Exhibit 32 at 6.)

4) Mr. Fellows also mentions Merillat's testimony that Hubbard whipped Townsel "with an electrical cord just like you see in child abuse cases...over a period of a month, the inmate was beaten and tortured and he starved to death and there was no intervention by prison guards.  No guards noticed what was happening to the point of stopping that behavior for over a month until

the inmate was finally discovered dead in his cell long after he had died." 29 RR 66.  (Exhibit 32 at 6.)

5) The facts that came out at Hubbard's trial "were very different from Merillat's account, although it is beyond dispute that Chris committed the physical acts that led to Townsel's death.  However, the context in which those acts were committed was very different from the scenario described by Merillat in his testimony in the Coble case." (Exhibit 32 at 6-7.)

6) In actuality, as shown in the appellate opinion in *Hubbard,* "Chris's testimony was that Townsel...had tried to sexually assault him on two occasions and he had physically warded off those attacks....Many of the relevant facts that were in evidence at the trial are reflected in the opinion of the Sixth Court of Appeals [Exhibit 22] , reversing Chris's conviction..."   (Exhibit 32 at 7.)

7) Contrary to Merillat's testimony that Townsel was starved to death, the autopsy showed "average nutritional status," 300 grams of food in the stomach, and the cause of death was "complications of blunt force trauma, due to: beating, remote." (Exhibit 32 at 7; also see Exhibit 32A for the autopsy report).

8) Mr. Fellows points out that the testimony of the medical examiner, Dr. Charles Harvey, did not suggest death by starvation, "only that some stretch marks on his body might be the result of weight loss."  (Exhibit 32 at 7; pointing to the Hubbard transcript at 12 HRR 53-55.) Additionally, "[t]here was no other testimony in the Hubbard trial relating to starvation." (Exhibit 32 at 8; *see also* excerpts of Dr. Harvey's testimony at Exhibit 32B).

9) Whereas Merillat testified that "Chris held Townsel in their cell for over a period of a month while beating, torturing and starving him," nurse Judy Dorsett encountered Townsel on April 11, 2001, only a few days before his death, and he was

out on the prison yard either playing basketball with the other inmates or walking around. 13 HRR 18, 24. She watched him walk off the yardm spoke to him and gave him his shot. She specifically asked him how he was doing and "Are you and your cellie [cellmate], everything going okay?" Townsel made no complaints to her. 13 HRR 18-19. She did not believe he could have had any internal injuries at the time. 13 HRR 26. Thus a prison employee who saw and interacted closely with Townsel only eight days before his death noticed no sign that anything was amiss, let alone that he was starving, and he reported no complaints to her.
(Exhibit 32 at 8-9.)

10) Whereas Merillat testified in Coble's trial that Chris "started beating and sexually assaulting his cellmate," 29 RR 64, Mr. Fellows reports that "there was testimony from inmates Deandre Moore, 12 HRR 174-192, Willie Reed, 12 HRR 192-203, Waylon Flemings, 12 HRR 203-213, and LaQuinston Lewis, 12 HRR 213-219, that it was Townsel who had been sexually inappropriate and aggressive, walking around naked, 12 HRR 179, saying he had "fucked" Chris, 12 HRR 196, and that he wanted to have sex with him, 12 HRR 205-6.

(Exhibit 32 at 9.)

11) Witnesses at Hubbard's trial testified about Townsel's mental instability.

Reed talked about Townsel having mental problems, 12 HRR 198 and Lewis described him as "saying things that were off the wall," and lying naked in the middle of the floor. 12 HRR 215-17. Moore said that he had seen Chris with a black eye after Townsel had punched Chris, 12 HRR 177-79, and Reed also saw Chris with a black eye. 12 HRR 199-201....there was no testimony about Chris having displayed the same overtly and sexualized behavior as Townsel."
(Exhibit 32 at 9.)

12) Mr. Fellows also states that "[f]ar from trying to prolong the time he was in contact with Townsel, there was evidence from inmate Wilson Cooper that Chris had tried to have himself moved to a different cell. 11 HRR 238-245. Waylon Flemings testified that he had told a Sergeant about the problems between Chris and Townsel, but that the Sergeant had told him to let the two men work it out. 12 HRR 203-213."

(Exhibit 32 at 10.)

13) Whereas Merillat testified that Chris whipped Townsel "with an electrical cord just like you see in child abuse cases," 29 RR 64, "Chris admitted that he had beaten Townsel with a coaxial cable and hit him in the jaw to ward off his sexual advances. 13 HRR 44-47.  Chris testified that Townsel had no clithes on at the time, which is why he was marked so extensively. 13 HRR 69.  No evidence was offered that Chris had beaten Townsel in that way on more than one occasion."  (Exhibit 32 at 10.)

14) Merillat also testified falsely about Chris being a "strong inmate" whereas Townsel was "a weaker inmate," 29 RR 64.  The autopsy indicated that Townsel was 71 inches tall and weighed 160 pounds.  Chris's medical records at the time of trial [Exhibit 32C] indicated he was 162 pounds and somewhat shorter than 5'11" [Townsel's height] and also Chris testified that Townsel was a "little taller than me." 13 HRR 35.  Fellows states that "Merillat's suggestion of a gross mismatch between Chris's and Townsel's physical stuture strikes me as simply false.  The record in the Hubbard case shows that they were approximately the same weight and that Townsel was slightly taller."

(Exhibit 32 at 11.)

15) Whereas Merillat testified that Chris was a member of the Black Gangster Disciples [BGD] gang, 29 RR 64,

> the prosecution unsuccessfully tried to introduce evidence to that effect during the guilt phase...inmate Murphy, who was also a prosecution witness, denied that Chris was even a 'prospect' for the BGD, a gang of which he was himself a member...Merillat's mis-characterization of Chris, turning him from someone who was at most a gang 'wannabe,' into a full-blown gang member, is highly exaggerated and misleading."
> (Exhibit 32 at 11-12.)

16) Merillat also testified that Townsel "was finally discovered dead in his cell long after

he had died."  29 RR 66.   However, Mr. Fellows reports that "there was testimony from prosecution witness Tracy Chivers, a correctional officer, that Townsel was still warm when first found lying in his bunk on April 19th, and that at first glance he did not appear to be dead. Excerpt of Testimony of Tracy Chivers, 11 HRR 76-85.   The implication that TDCJ had neglected an inmate to the extent that they had not discovered his corpse for an extended period is absurd."  (Exhibit 32 at 12.)

17) Merillat also testified falsely that the Hubbard case "happened in general population" at the Telford Unit.  29 RR 63-64.  Mr. Fellows states that "[t]he incident in the Hubbard case happened in Close Custody in the Telford Unit."  This is significant because

> "members of the public envision 'general population' in TDCJ as conferring a considerable degree of liberty by prison standards.  Close Custody/General Population 5 is, in contrast, a restrictive environment.  Being in Close Custody, Chris was locked down for most of the day....Merillat was therefore technically incorrect in his testimony, and therefore created a false picture of the setting in which the offense happened.  From what I know, such incidents are very much the exception in TDCJ, not the norm."
> (Exhibit 32 at 12-13.)

18) Mr. Fellows minces no words in terming Merillat's testimony in this case for what it was, perjury:

> As someone who has both defended and prosecuted criminal cases, including death penalty cases, I would identify Merillat's testimony as being extremely inflammatory, with its references to starvation and attempts to associate Chris with a gang, something to which jurors tend to react extremely adversely.  More importantly, given Merillat's detailed knowledge of the Hubbard case, and presence throughout the trial, I can only describe his testimony at the Coble trial as perjurious, particularly with regard to his inaccurate descriptions of the circumstances leading up to Townsel's death and Merillat's allegation that this was a death by starvation.
> (Exhibit 32 at 13.)

The prejudice of the recounting of this incident by Merillat was immense.  It recounted horrific prison violence, was calculated to appeal to the jurors' emotions and it occurred just

prior to their deliberations.  It would have been very difficult for the jurors, hearing this horror story, to put it out of their minds during their deliberations which followed immediately after Merillat's testimony.  In an effort to have the jury opt for the "safe option," they presented this false and extremely prejudicial fantasy. The facts of the case as reported cannot be reconciled with Merillat's version of events, as Dr. Cunningham points out.

### d. Additional problems with Merillat's testimony.

Dr. Cunningham has identified additional problems with Merillat's testimony:

### 1) It encouraged the jurors to inflate risk estimates for violence:

> The utilization of anecdotal stories of prison violence in the rebuttal of group statistical data is problematic methodologically in other respects as well. It is well-established in the risk assessment literature that both lay persons and mental health experts are prone to set aside sound probability information when confronted with a lurid specific instance. In other words, the nature of human information-processing is to erroneously inflate risk estimates when given anecdotal information. An analogous situation would be to "educate" the flying public about the risks of air travel by posting large photographs and video of crashed airliners in airport concourses. Such "education" would, of course, result in apprehensions regarding commercial aviation that profoundly exceeded the actual probabilities.[210]

### 2) Mischaracterizing TDCJ statistics:

> Mr. Merillat testified [29:48-49] that "…they [TDCJ] don't count in their numbers the officers, the employees who were killed…there is "no place on that form for an officer being murdered in the line of duty [29:49]. This is a mischaracterization. Of course TDCJ "counts" staff homicides and can readily provide a detailed listing/description of these. Mr. Merillat is referring the Emergency Action Center report compiled and published monthly by TDCJ. This testimony suggests that large numbers of such instances go uncounted. In fact, the absence of staff homicides from this report is a practical response to the extraordinary infrequency of such staff murders, which may be separated by decades. Thus, it is of little practical utility to maintain a line item description on a summary table for acts of this infrequency. These incidents are also sufficiently memorable in institutional memory that their placement on this table is unnecessary.[211]

---

[210]  *Id.* at 19.

[211]  *Id.*

**3) Exaggerating the rate of unreported violence**:

Mr. Merillat testified that inmate homicide rates are inaccurate because some victims might die in a civilian facility at a later date and thus go uncounted [29:49-50]. Mr. Merillat failed to provide any specific case names that would allow his assertion to be verified or even an opinion as to what underreporting rate he believed to be occurring from such delayed-death incidents. Instead, he simply asserted that the official reports of these rates were in error. Though Mr. Merillat's testimony is accurate in describing a theoretical possibility of inmate homicides that are not reflected in official counts, it injects confusion and misunderstanding regarding what remains a highly remote possibility. Rates of inmate homicide in TDCJ are so infrequent (i.e., <3 per 100,000 inmates annually) that even if an equal number died much later (an improbable scenario), the rates would remain extraordinarily low (i.e., <6 per 100,000 inmates annually. It begs credibility to believe that fully half of inmate homicide victims die in private facilities weeks, months, or years later; even this prospect does little to move the probability beyond the remotest possibility.

Mr. Merillat testified [29:47] that "our office prosecuted in district courts across the state of Texas 197 assaults against staff members last year," noting that this was discrepant from the 78 "serious" staff assaults reported by TDCJ. The inference was that the official TDCJ data was somehow unreliable. Three points are notable. First, Mr. Merillat's agency would become involved *on referral* from TDCJ for these offenses. Second, this reflects simple differences in operational definitions, reflecting level of injury in the TDCJ total as opposed to criminal prosecution in the Special Prosecutor total.   In 2002, TDCJ began disaggregating staff assaults by level of injury as this allowed the tracking of the assaults of greatest concern. TDCJ also reports a category of "disciplinary convictions for staff assault" which is not restricted to degree of injury. Third, 197 criminally prosecuted staff assaults among a 2007 inmate population of over 157,000 inmates represents an extremely low incidence (i.e., 0.000125). Thus whether a "serious" assault on staff is defined by degree of injury or free-world prosecution, it remains highly infrequent.[212]

Dr. Cunningham summarizes:

Mr. Merillat's testimony provided no information that would inform Mr. Coble's likelihood of violence in prison, either absolutely or as compared to other inmates. Rather, it appeared to represent an attempt to supplant an analysis based on actual factors and official data with a reaction based on unreasoned fear in response to anecdotal incidents.[213]

**4) Inconsistent claims of experience**.

---

[212]   *Id.* at 19-20.

[213]   *Id.* at 20.

In Mr. Merillat's September, 2006 Texas Bar Journal article, "*The Question of Future Dangerousness of Capital Defendants,* he claims that his unit, the Special Prosecutions Unit, prosecuted "upward of 10,000 [cases] in the unit's  22 year history."[214]  But at Mr. Coble's trial in August of 2008, he claimed "[o]ur office has prosecuted over 20,000 felony cases in the years that we've been in existence."  (29 RR 13.)   The unit could not have prosecuted 10,000 or more cases in less than two years.  This discrepancy goes to his credibility, no matter which figure is closer to the truth.

### e.  Bias.

Additionally, Mr. Merillat appears to be biased against defense attorneys. On March 31, 2009, Mr. Merillat gave a deposition in the case of *State v. Speer,* No. 99F0506-005B in the 5th Judicial District Court of Bowie County.[215]   This is from his *Speer* deposition:

> Merillat: And then I keep a Bible verse that I like to read all the time that I think is directed to defense lawyers.  It just gives me...it boosts my confidence that I'm doing the right thing.
> Q.  Let's hear it.  Let's hear the Bible verse.
> A. "He that justifies the wicked and he that condemns the just are both an abomination to the Lord." [Proverbs 17:15]  That's in proverbs, and I think that's directly on point, no offense to you sir.  But I mean, you offended me plenty, but I think that directly applies to a defense attorney trying to make a guilty cold-blooded capital murderer look better than a man who has been in the public service for 32 years...But I think what I do, I think what I do is more in light of what God considers righteous than what you do...You would like to see me suffer, I believe, and you'd like to see my reputation suffer.  And I think that Bible verse, see, all it does is just give me a little bit more confidence....
> Q.  And just so the record is clear, you've got a blue letter size Manila folder?
> A.  And nothing written on the tab.
> Q.  And I believe stapled to it at the top is a handwritten quote from Proverbs 17:15.

---

[214]   Exhibit 23, September, 2006 Texas Bar Journal article by A. P. Merillat,  "*The Question of Future Dangerousness of Capital Defendants.*" 69 Tex. Bar. J. 738.

[215]   Exhibit 24, Excerpts from March 31, 2009 Deposition of A. P. Merillat in the case of *State v. Speer,* No. 99F0506-005B in the 5th Judicial District Court of Bowie County.

A.  Yes, sir.
Deposition of A. P. Merillat in *State v. Speer*, No. 99F0506-005B, March 31, 2009, at 121-123.[216]

This testimony, in which he views defense attorneys as an "abomination," pretty much speaks for itself in terms of the frame of mind of Mr. Merillat and his biases.  As more and more of this evidence is revealed, the Texas courts should give very serious consideration as to whether this is a witness the State should be using to secure death sentences.

### f. Additional evidence of Mr. Merillat's false testimony.[217]

In his affidavit (Exhibit 33), prison expert Frank AuBuchon adds to our understanding of the inaccuracies of Mr. Merillat's testimony and provides additional discrediting information regarding that testimony. Mr. AuBuchon's credential are impressive: Administrator for Classification Operations of the Texas Department of Criminal Justice from 2000 to 2007; Administrator for Unit Classification in the six years prior to that; and prior to that, Court Room Coordinator, Chief of Unit Classification for the Huntsville Unit and a Lieutenant of Correctional officers at TDCJ prior to that, with a combined 26 years of experience working for TDCJ.  See Exhibit 33A, resume of Frank AuBuchon.

Mr. Aubuchon points to Mr. Merillat's testimony about the alleged leeway TDCJ has regarding the classification of inmates:

At 29RR38 of his testimony, Merillat testifies that, "You folks can't or the Judge cannot tell the prison, classify this man as such and such.  They cannot do that.  They'll do it the way they want to".  This statement is inaccurate and misleading.  The TDCJ does not classify offenders "the way they want to."  TDCJ is bound by the relevant Texas statutes

---

[216]  *Id.*

[217]  Mr. AuBuchon's affidavit was not presented in state habeas.  However, the subjects discussed in his affidavit were all presented to the state courts, as discussed *supra.*

and its own agency policies, specifically the TDCJ Classification Plan, in making custody and other classification decisions.  The classification process is designed to ensure an appropriate placement for the specific offender according to long-standing internal rules.  Inmates sentenced to life or a lesser term are ranked at one of five different levels, from G5, the most restrictive status, to G1, the least restrictive.
(Exhibit 33 at 1)

This testimony was important to the State's case in giving the jury the false impression

that Mr. Coble could be assigned anywhere in the prison system, which would, in turn, have

given them a false incentive to vote for death, where his classification would be certain and safe.

Rather than being placed at the whim of the classification officers, which would have led the

jurors to opt for the higher certainty of death row, Mr. Coble would have been classified

according to well-established procedures.   Next, Mr. AuBuchon points to Merillat's false

testimony regarding classification:

At 29RR36, Merillat states, "A capital murder---a capital life sentence is 50 years or more, so a person coming into the prison system day one will automatically be given a G3 classification."  This is inaccurate in several ways.  First, an offender on day one in the prison system does not yet have a determined custody level unless he is death sentenced, or if he is sentenced to life without parole, in which case he is classified as, at best, G3 or, ultimately, at the more restrictive G4 or G5 levels if required.  *See* Exhibit [33] B - TDCJ Unit Classification Procedure 2.00 and Attachment A.  Life without parole has only been available for non-death sentenced inmates convicted of capital murder since September 2005.  That is not a sentence for which Mr. Coble is eligible, because of the date of his conviction.  All non-death sentenced offenders are processed through the Reception and Diagnostic Process as described in the TDCJ Classification Plan.  *See* Exhibit [33] C,  TDCJ 2003 Classification Plan pp. 35-55.  This process, for a non-death sentenced offender takes 30 days to complete.  *See* Exhibit [33]D, TDCJ Classification Plan page 17-18 at 18 II.A; Exhibit[33]C Page 53 at I.A.  Only then can the appropriate custody level be determined.

The TDCJ Classification Plan describes the classification characteristics of G3 custody.  An offender must fit those characteristics to be assigned to G3 custody.   Those characteristics include having no pattern of recent in-prison assaultive behavior or other disciplinary convictions resulting in major penalties in the preceding six months and otherwise having "No requirement for a more restrictive custody."   Moreover, any inmate with a sufficiently bad disciplinary record or other negative characteristics, including those with a parole-eligible capital murder life sentence but with a poor disciplinary record, could be assigned to more restrictive custody, at the G4 or G5 levels.

> *See* Exhibit [33] E TDCJ Classification Plan at p. 73-86.
> (Exhibit 33 at 2).

This was false and misleading as an inmate entering the system could very well be classified at a more restrictive level than G3, contrary to Mr. Merillat's testimony.   It also ignored the obvious: that any mis-behavior by Mr. Coble in the future would result in a more restrictive classification.   Next, Mr. AuBuchon  notes Mr. Merillat's inaccurate testimony regarding administrative segregation:

> At 29RR41, Merillat states, "The inmates have to earn their way there through bad or violent acts.  You can't just go to Ad Seg (Administrative Segregation).  It's punitive". This is incorrect.    TDCJ Classification Plan, page 5, Glossary, Administrative Segregation/Special Management specifically define Administrative Segregation as:  "A *non-punitive*, maximum custody status…."  *See* Exhibit [33]F, TDCJ Classification Plan Glossary p. 5.    Further, there are offenders who are confined to Administrative Segregation that have not committed bad or violent acts while incarcerated within TDCJ. One group is offenders that are confined in Administrative Segregation Protective Custody Status.  These are offenders who must be kept separate from all other offenders because of either threats against them or because of their high profile status.  Another group is offenders who have been confirmed as members of a Security Threat Group (Prison Gang).  They need not have acted out in any way to be confined to segregation. Their gang status alone is enough for confinement to segregated housing.  *See* Exhibit [33]G,  TDCJ Administrative Segregation Plan 2005, Excerpts p. 1.

> At 29RR42, in describing hallway escort procedures in Administrative Segregation, Merillat states:  "When he comes out of that cell, all of the halls in that building have to be shut down.  There can be nobody else in the halls.  That's because the people in Ad-Seg are so violent, so unmanageable that they can't even let other inmates in the same hallway as the person being escorted in handcuffs by a guard.  It's just too dangerous". Again, this is inaccurate.   I have personally escorted Administrative Segregation offenders during my career.  Based on my experience and training as a Corrections Officer the reason for an inmate in restraints to be escorted by two (2) officers with riot batons in an otherwise empty hallway is to protect the person being escorted, as well as to ensure that the inmate can be controlled.  An offender in restraints is highly vulnerable to attack by other offenders.  Thus the need to clear the halls is for the offender's and the escorting officer's protection, and not necessarily because of the offender's own behavior.  The document supporting this is Post Order # PO-07-006.  *See* Exhibit [33]G TDCJ Administrative Segregation Plan, p. 18 at F.1.b.  Due to the sensitive nature of this document TDCJ excepts it from public disclosure.

> At 29RR42-44, Merillat describes High Security, now called Expansion Cellblocks, as a

higher form of Ad-Seg when previous Ad-Seg's weren't working to control inmates who present a management problem. He further states that TDCJ has two offenders housed together in Ad-Seg in these facilities. This is incorrect. The High Security buildings were designed to be used as either Ad-Seg or general population housing for G5 custody level offenders. Every cell consists of two bunks and a shower. The cellblocks within the building designated as Ad-Seg housing has only one person per cell. The cellblocks designated for G5 custody may have two offenders per cell. TDCJ operates Segregation housing in a variety of prison units that are of different ages and designs. While in some instances it may be determined that a certain offender should be housed at a High Security (expansion cellblock) facility, in my experience, the vast majority of the offenders are housed there because that is where an available cell was located. The Administrative Segregation Plan states that actual Administrative Segregation Offenders shall be single-celled. *See* Exhibit [33] G TDCJ Administrative Segregation Plan, p. Excerpts p. 16 at B.2.
(Exhibit 33 at 2-4.)

Here, Merillat's errors were prejudicial to Petitioner, as he tried to paint a picture of "Ad-Seg" as violent, out-of-control, dangerous prisoners who posed a threat to other prisoners and who only attained that status through bad behavior. This created a false picture in the jurors' minds as to the dangers of housing Coble anywhere but on death row. Next, Mr. Merillat gave false testimony regarding the alleged power of the prison to parole an inmate:

At 29RR49, Merillat states "If a prison inmate is beaten by other inmates to the point that he has to go to a free world hospital and might go into a coma or have some kind of brain damage…the prison will parole that individual based on the fact that he's probably not going to survive to come back and serve his time … what they … don't call a homicide, we do, which it is a homicide." Mr. Merillat thereby creates the impression that TDCJ purposely under-reports acts of violence, including homicides that occur. The prison system does not have the statutory authority to parole anyone. (See Chapter 501 Texas Government Code). What Merillat may be describing is that the Parole Board has the authority to release from custody certain offenders on Medically Recommended Intensive Supervision. TEX. GOV'T CODE § 508.146. This is a seldom-used program where if an offender is either terminally ill or in a persistent vegetative state they can be released to a free world medical facility for care until they expire. This frees TDCJ from incurring the expense of medical treatment that in some cases can reach millions of dollars.
(Exhibit 33 at 4.)

Merillat's testimony regarding the prison's authority to parole inmates was complete nonsense, designed to play to the jurors' false fears of Coble being paroled. It falsely

-378-

exaggerated that fear as well as promoting Merillat's main tactic of trying to have the jurors believe that a vast amount of prison violence was unreported.  That misinformation served both to falsely "discredit" Dr. Cunningham's statistics and, at the same time, to buttress Merillat's thesis that Coble's nineteen years of good behavior did not count for anything, as he might have actually been violent without it being reported. Merillat continued his testimony in this vein:

> At 29RR60, Merillat states: "If a guard is punched to the point of even a black eye or a split lip by a convict, that's a felony assault in the State of Texas.  The prison system says it is not if he didn't need more than first aid to get fixed up.  So that's wrong".  This misrepresents the role of the prison's reporting system: The purpose of the Emergency Action Reports of serious incidents, which are the documents mentioned at p. 46 of Merillat's testimony, is not to distinguish between felonious and non-felonious acts.  It is to report the occurrence of incidents within the system.  If one wanted a report on crimes committed within the prison, the Office of the Inspector General is the appropriate contact point and not the Emergency Action Center or the Special Prosecution Unit.  The Office of the Inspector General is charged with investigating crimes that occur within TDCJ and bringing those crimes to the appropriate office for prosecution.  *See* Exhibit [33]H,  Website of TDCJ Office of the Inspector General.
> (Exhibit 33 at 4.)

Here again we have Merillat's familiar tactic of confusing and misinforming the jury about the levels of violence in prison.   Next, Merillat gives false testimony regarding the classification system:

> At 29RR72:  Question: "That would make him 70 before he could ever be promoted to a better less restrictive custody level?"  Answer:  "No sir.  The custody level won't be less restrictive or more restrictive.  It's just going to be a change in his classification."  This misrepresents the TDCJ Classification system.  The TDCJ Classification Plan 2003, pp. 77-80 outlines the classification boundaries of G2 and G3 custodies.  G3 custody is clearly more restrictive in housing and job restrictions than G2 Custody.  *See* Exhibit [33]B,  Unit Classification Procedure 2.00 and Exhibit [33]E TDCJ Classification Plan, pp. 77-80.
> (Exhibit 33 at 4-5.)

The main point of Mr. Merillat's testimony and its principal prejudicial effect was again to give a false picture of a large amount of unreported violence in prison, both to convince the jurors to send Coble to death row and also to negate his nineteen years of good behavior.  Mr.

AuBuchon addresses this issue in his affidavit:

> I have also been asked by Mr. Coble's counsel to comment on the issue of whether there is unreported violence within TDCJ, which is discussed by Merillat in his testimony, see, for example, 29 RR 60 onward.  In the first instance, if an inmate is seen with obvious injuries or pain, the staff of TDCJ are trained to inquire what has happened and to intervene, if necessary, for example by transferring that inmate or  the person who has caused the problem.  While, realistically, the stigma of being labeled a "snitch" may be a deterrent to an inmate reporting an act of violence, there are channels through which that information can be communicated.  For example, when I worked in Classifications, I constantly received correspondence from inmates concerning all kinds of problems they were experiencing, or claimed to be experiencing.

> It is almost certainly the case that there is some unreported violence in TDCJ, since no system is ever perfect.  However there are safeguards against prison violence of which this jury was left unaware.  For example, there is a Security Threat Group Management Office ("STGMO") which coordinates the monitoring of gang activity throughout TDCJ and attempts to reduce gang violence. The STGMO has gang intelligence officers on all TDCJ Units to track both confirmed and suspected gang members.  The most violent gangs, designated as security threat groups, are placed in administrative segregation to protect staff and offenders alike.  *See* Exhibit [33]K Security Threat Group Management Office.

> Likewise TDCJ operates a Safe Prisons Program to prevent offender-on-offender sexual and physical assaults and extortion.  This program includes additional staff training, positive encouragement to offenders to report problems and education programs for offenders, consideration of offender characteristics in making cell and job assignments, use of protective custody and safekeeping, installation and use of surveillance cameras, tracking and reporting of incidents.  This program receives federal funding under the Prison Rape Elimination Act (PREA) of 2003 (Public Law 108-79) which requires specific timeframes for staff reporting of incidents, imposes a duty to investigate relevant incidents, disciplinary sanctions for staff who violate Safe Prison Program policies and other measures to ensure that violence is in fact reported and, where possible, prevented or deterred.  Merillat implies, however, at 29 RR 66, that TDCJ has only just begun addressing the problem of prison rape as of the time of Mr. Coble's trial in September 2008, whereas the Safe Prison Program Management Office was set up in 2003, and TDCJ had begun implementing appropriate polices prior to that.  *See* Exhibit [33]I, TDCJ PREA Ombudsman Brochure.

> As part of these efforts to eliminate sexual assaults in correctional facilities, the legislature in 2007 established a position of PREA Ombudsman to the Texas Board of Criminal Justice to monitor policies, oversee administrative investigation of incidents, and ensures impartial resolution of complaints and to collect statistics in accordance with the standards of the National Prison Rape Elimination Commission.  Any suggestion that the Texas prison system simply allows violence to occur, and that there are no official

channels for reporting it, is therefore ill-founded.    *See* Exhibit[33] I TDCJ   PREA Ombudsman Brochure; Exhibit [33] J TDCJ Administrative Review and Risk Management Division, TDCJ Ombudsman Program website.

Finally, Mr. AuBuchon comments on his availability at the time of Mr. Coble's punishment phase re-trial in 2008:

> Precisely because TDCJ is a world of its own, with its own rules and terminology, and because of the State's common practice, in death penalty cases, of utilizing Special Prosecution Unit employees to talk about classification of inmates and the opportunities for violence that exist in prison, defense attorneys have for many years recognized the need for specialized assistance when dealing with questions of classification and other issues that may be relevant to sentencing.  Consequently, former TDCJ employees such as myself have found themselves in demand to assist on cases such as Mr. Coble's.

> At the time of Mr. Coble's resentencing trial, I personally would have been available and willing to consult with his defense attorneys and to assist in preparing the case, and in helping to identify points for cross-examination at a *Daubert/Kelly* hearing or other hearing intended to exclude prosecution evidence about TDCJ.  I could also have testified before the jury.  For example, I could have explained that the best indicator of how an incarcerated individual may behave is based on their age and institutional adjustment record.  At the time of his resentencing, Coble was nearly 60 years old, had been incarcerated on death row for 18 years, and had maintained a clear disciplinary record. He was also in poor health.  Judging from my experience, he was therefore an inmate who would present a minimal risk of offending.  Such testimony could have helped persuade the jury that Coble no longer represented a threat of future dangerousness.  I am also aware that there are other former TDCJ employees who acted as consultants and expert witnesses in this field who may well also have been available.
> (Exhibit 33 at 7.)

The State certainly had a tough task in convincing the jury that a 60-year-old in bad health, with a history of heart attacks, and a 20-year unblemished record of good behavior was somehow going to be a "future danger."  They accomplished that task through false and misleading testimony such as this.

**B. What the State Courts Held on Direct Appeal and Why It Was Objectively Unreasonable.**

The CCA analyzed points of error six, seven and eight, all dealing with the admissibility of Mr. Merillat's testimony, in the direct appeal opinion. *Coble v. State,* 330 S.W.3d 253 (Tex. Crim. App. 2011). That analysis was multiply flawed and an unreasonable determination of the facts.

**A. Point of error number six: admissibility of Merillat's testimony.**

As to point of error number six, the CCA held as follows:

In his sixth point of error, appellant claims that the trial court erred in admitting the testimony of A.P. Merillat, an investigator for the Special Prosecution Unit, about the Texas prison classification system and violence in prison. Appellant argues that: (1) Mr. Merillat's testimony was irrelevant as it did not relate to appellant personally, and (2) this witness testified to information that was already common knowledge among jurors. The State argues that Mr. Merillat's rebuttal testimony was relevant to refute Dr. Cunningham's statistical data and to impeach the accuracy of his "low risk" future dangerousness prediction.[FN93] We agree that Mr. Merillat's testimony was admissible as rebuttal "educator-expert" evidence.

FN93. In the trial court, the State noted, "We have all of these statistics that Dr. Cunningham relied upon and we have a right to show that there's a substantial reason to believe that they may be inaccurate."

On voir dire, Mr. Merillat stated that his testimony is based on his specialized knowledge of Texas prisons and prison violence during his nineteen years as a criminal investigator with the Special Prosecution Unit. He proposed to testify concerning the under-reporting of prison violence in official data compilations, the prison classification system, and the opportunities for violence inside prison.

*Coble v. State,* 330 S.W.3d 253, 287 (Tex. Crim. App. 2011).

Here, the first problem with Mr. Merillat's testimony arises: "[h]e proposed to testify concerning the under-reporting of prison violence in official data compilations." Yet, as we will see, Mr. Merillat mainly proffered anecdotes to compare with the "official data compilations" he deemed inaccurate. The principal basis for his testimony were his own anecdotal experiences, the main one of which was false. Had Mr. Merillat proposed to testify as to the rates of under-

-382-

reporting, or the percentage of incidences of violence that did not show up in the official statistics, then the defense would have had some way of verifying his testimony for accuracy. Yet all he had were numbers on the number of cases his unit had prosecuted, which was not comparable with the TDCJ statistics. The jury had no reliable information as to the rate of under-reporting so that they could determine how significant it was. As it was, they had no way of knowing whether the "official data compilations" under-reported violence by 1%, 10% or 50%, or even that they under-reported it at all.

> The CCA's opinion continues:
> The trial judge allowed Mr. Merillat's testimony, although he granted appellant's motion in limine to avoid mention of any specific instances of misconduct by other inmates except for one anecdote concerning an inmate's forced starvation death which served as "a great example for underreporting of violence."
> *Id.*

As we shall also see, the one exceptional specific anecdote that was allowed was basically perjury. This incident, which was quite lengthy, and due to its gruesome and horrendous nature, must have had a significant impact on Mr, Coble's jury. It was all the more prejudicial because it was the only one allowed by the trial court. *Id.* It is significant that the rare instance where it is possible to check Mr. Merillat's veracity and *bona fides,* this anecdote turns out to be a fabrication.

> The CCA's opinion continues:
>
> Mr. Merillat then testified before the jury about the inmate classification system and the under-reporting of violence in prison. He also described administrative segregation and how it is used as "punitive housing" for recalcitrant inmates. Mr. Merillat explained why the official prison statistics used by Dr. Cunningham are not completely reliable: (1) the prison reporting system does not match the penal code definitions of "violent" behavior; [FN94] and (2) not all incidents of inmate-on-inmate incidents of violence are reported. Finally, he told the jury that, in the last few years, his unit had prosecuted 94 inmates who were serving life sentences for capital murder for both assaultive and non-assaultive felonies.

> FN94.  For example, Mr. Merillat said that the official TDCJ statistics define serious assaults on staff as only those that result in injuries requiring more than first aid. Thus, while the official prison data showed 78 serious assaults on staff for 2007, the Special Prosecution Unit prosecuted 197 assaults against prison staff members. Similarly, there is no official prison data entry for homicides of prison guards in the line of duty because it is not an inmate death.
> *Coble v. State,* 330 S.W.3d 253, 287-288 (Tex. Crim. App. 2011).

Here too, we have the same problems.  Of course no statistics are ever "completely reliable" but the jury was never given any way to determine how reliable or unreliable they were with Mr. Merillat's "anecdotal" evidence.  While Mr. Merillat purported to give some data on reported and unreported assaults, these are meaningless.  His testimony was that the prison records reflected "78 serious staff assaults all of last year [2007]" and his unit, "prosecuted 197 assaults against prison staff members" not all of which were "serious."  (29 RR 47.)  Mr. Merillat admitted that "[i]t's not the same thing we use, so our numbers are greatly different." (29 RR 48.)  In other words, by his own admission, Mr. Merillat was comparing apples and oranges.  The numbers the CCA points to in the opinion is not necessarily a disparity, as we have no way of knowing if the non-serious incidents were reported in a different category or the break-down of the 197 prosecuted incidents as serious and not-serious.   Thus, Mr. Merillat's thesis of a large amount of unreported violence cannot be shown from the data which he presented.  Additionally, defense counsel objected to this testimony as it was clearly hearsay and "we have the lack of ability to confront it and cross-examine it." (29 RR 47.)

> On cross-examination, Mr. Merillat agreed that he knew nothing about appellant except that his office had never prosecuted him. He agreed that he was not qualified to express any opinion regarding appellant's "future dangerousness." He also explained how death row inmates "had the run of the row" and could work in the garment factory when death row was in the Ellis Unit. Mr. Merillat agreed that the point of his testimony was that there are abundant opportunities for inmates to be either violent or good, depending upon their own decisions.
> *Coble v. State,* 330 S.W.3d 253, 288 (Tex. Crim. App. 2011).

Here again, Mr. Merillat's testimony is both problematic and ultimately confusing and misleading for Mr. Coble's jury.  His testimony had the effect of drastically over-estimating the incidences of non-reported violence.  The jury was given no guidance on how "abundant" the opportunities for violence were, nor how frequently those opportunities for violence were indulged.  The ultimate purpose of such testimony was to create fear in the juror's minds that Mr. Coble would have such opportunities in abundance, based on Mr. Merillat's anecdotal evidence.

> Appellant asserts that the primary subject of Mr. Merillat's testimony—opportunities for violence in prison—is within the common knowledge of the jurors. Indeed, most jurors probably have some understanding that violence can and does occur in prison, but a trial court need not exclude expert testimony when the general subject matter is within the comprehension of the average juror, as long as the witness has some specialized knowledge on the topic that will "assist" the jury.[FN95] It is only when the expert offers no appreciable aid that his testimony fails to meet the Rule 702 standard. [FN96] The question under Rule 702 is not whether the jurors know something about this subject, but whether the expert can expand their understanding in a relevant way.

> FN95. *See Duckett v. State,* 797 S.W.2d 906, 914 (Tex.Crim.App.1990) (under Rule 702, if "specialized knowledge will assist the jury to understand the evidence or will assist them to determine a fact in issue, an expert may be allowed to provide the jury with the benefit of that knowledge. Two themes are prevalent within the language of the rule. First, the jury must not be qualified to intelligently and to the best possible degree determine the particular issue without benefit of the expert witness' specialized knowledge. Second, the clear meaning of the rule must be observed.... The use of expert testimony must be limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror.") (internal citation omitted).

> FN96. *See, e.g., Pierce v. State,* 777 S.W.2d 399, 414 (Tex.Crim.App.1989). *Coble v. State,* 330 S.W.3d 253, 288 (Tex. Crim. App. 2011).

Yet Mr. Merillat's testimony fails the CCA's "appreciable aid" test under Rule 702.  Not only did his testimony not "expand [the jury's] understanding in some way" but it ultimately misled them through the  use of anecdotes and unverifiable assertions, some of which have been shown to be false.  His testimony was nothing less than a scare tactic to induce the jury to have

qualms about a life sentence that would, in Mr. Merillat's view, expose both prison staff and other inmates to a high risk of injury and even death, should they vote for life.  No reasonable juror would want to run the false and exaggerated degree of risk as presented by this witness. Not only did it offer "no appreciable aid" and thus fail the Rule 702 test, but it actually misled the jury with false testimony.

> In this case, Mr. Merillat confined his testimony to specific information about the operations of the Texas prison system and the opportunities for violence or productive behavior. His expert testimony was intended to (1) educate the jury about an area in which it lacked a thorough understanding; [FN97] and (2) cast doubt upon the official prison data that Dr. Cunningham relied upon. Mr. Merillat acted "as an advisor to the jury, much like a consultant might advise a business[.]" [FN98] Because Mr. Merillat's testimony was educator-expertise information designed to "assist" the jury under Rule 702, the trial judge did not abuse his discretion in admitting it. Point of error six is overruled.
>
> FN97. *See, e.g., Fielder v. State,* 756 S.W.2d 309, 321 (Tex.Crim.App.1988) (defense expert should have been allowed to testify about why a woman who was physically and sexually abused would continue to stay with an abusive husband because the "average lay person has no basis for understanding the conduct of a woman who endures an abusive relationship"); *see also* FED.R.EVID. 702 advisory committee note ("Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded. The rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts.").
>
> *Coble v. State,* 330 S.W.3d 253, 288-289 (Tex. Crim. App. 2011).

In its conclusions as to point of error number 6 in the direct appeal, the CCA concludes that Mr. Merillat's testimony was acceptable "expert testimony" that "educated the jury" and "cast doubt upon the prison data that Dr. Cunningham relied upon" and it was "educator-expertise information" that assisted the jury.  All of these premises are false.  First of all, the prosecution could not make up their minds as to whether Mr. Merillat was a fact witness or an expert witness.  The prosecutor stated that "[h]e has specialized knowledge and would be qualified to give an opinion. But he is a fact witness first and foremost." (29 RR 53.) They also

stated "he's qualified as a fact witness, that would certainly be helpful to the jury. His expertise and special knowledge would help them determine the fact in issue and that would be eventually future danger of this particular defendant by extrapolation in the general population serving a capital life sentence." (29 RR 24.)  Assuming he was an expert witness, he had no specialized education upon which to base his "data," he had never compiled it or published it, it was not quantified, and thus there was no way for the defense to show that it was inaccurate.  Nor could he be a proper fact witness because he did not observe the subject or "facts" of his testimony. The CCA's holding regarding point of error number sis was an unreasonable interpretation of the facts under 2254(d)(2).

### B.   Point of error number seven: Merillat's testimony as hearsay and the Confrontation Clause violation.

As to point of error number seven the CCA held:

In point of error seven, appellant contends that the trial court erred by allowing Mr. Merillat to testify to hearsay information in violation of the Confrontation Clause [FN99] and of the Texas Rules of Evidence. Out of six instances in which appellant claims that Mr. Merillat testified to hearsay information, we have found only three trial objections based on hearsay or the Confrontation Clause. We will address only those three instances:

FN99. Appellant's Confrontation Clause objection is based on his assertion that Mr. Merillat's testimony involved "testimonial hearsay" statements. *See Crawford v. Washington,* 541 U.S. 36, 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). If the testimony did not involve hearsay, it ineluctably follows that it did not involve "testimonial hearsay."

(1) Appellant objected on the basis of hearsay to Mr. Merillat's statement that 78 serious staff assaults were documented in the official prison report that Dr. Cunningham had used as the basis for his statistical analysis;

(2) Appellant objected on the basis of hearsay and the Confrontation Clause to Mr. Merillat's explanation of why inmate-on-inmate violence is under-reported—nobody wants to be a "snitch" which is the "very lowest form of life in the penitentiary"; and

(3) Appellant objected on the basis of hearsay and an inability to confront and cross-examine when Mr. Merillat cited the story of an inmate who had been beaten and

starved to death by his stronger, gang-member cellmate, as an example of why and when fellow inmates fail to report acts of violence.

The trial judge properly overruled these three hearsay and confrontation objections.

Hearsay is an out-of-court statement by a person offered for the truth of the matter asserted.[FN100] None of these three pieces of testimony fits that definition. In the first, Mr. Merillat was not offering his statement of the official prison data compilation of "78 serious staff assaults" for the truth of the matter asserted—that there were 78 serious staff assaults in the previous year. Quite the reverse. Mr. Merillat's point was that the official number of 78 was significantly lower than the actual number of serious assaults and thus the official prison statistics that Dr. Cunningham used as the basis for his expert opinion were inaccurate.[FN101] In the second, the testimony concerning why assaults upon inmates aren't reported "because by telling on the person who did it, they are going to be much worse off[,]" Mr. Merillat did not disclose any out-of-court statement.[FN102] He was simply explaining, as a general proposition, why inmates do not "snitch" on each other. In the third, the inmate who was beaten and starved to death, appellant does not point to any out-of-court statement. There is none. Mr. Merillat was recounting an event, not a verbal or written statement. He may have first heard of the event by someone telling him of it,[FN103] but he did not recite or imply any out-of-court statements.[FN104] Because the trial judge did not abuse his discretion in overruling appellant's hearsay and confrontation objections, we overrule point of error seven.

FN100. TEX.R. EVID. 801(d).

FN101. *See, e.g., Bell v. State,* 877 S.W.2d 21, 24 (Tex.App.-Dallas 1994, pet. ref'd) ("If the out-of-court statement is relevant only if the trier of fact believes that the statement was both truthful and accurate, then the statement is hearsay. If the relevancy of the statement does not hinge on the truthfulness of the statement, it is not hearsay.").

FN102. Appellant's objection would have merit if Mr. Merillat had testified, "Cool Hand Luke told me that he would never be a snitch for Dragline."

FN103. Mr. Merillat testified, however, that he investigated this case and "worked the trial of the person responsible" for the prison death, so he would have first-hand knowledge of at least the events that he briefly described.

FN104. When appellant objected that "the gruesome details of how some other individual tortured some other individual has nothing to do with the jury's decision here," presumably invoking Rules 401–403, the trial judge sustained his objection, and the prosecutor moved on.
*Coble v. State,* 330 S.W.3d 253, 289-290 (Tex. Crim. App. 2011).

Here again, the CCA has misconstrued the facts, and, as a result, the factual holding is

unreliable, most egregiously in footnote 104. While the trial judge did sustain the objection to the Townsel case testimony of Mr. Merillat, it came only after three prior objections were denied. The sustaining of the last objection had no effect, as Mr. Merillat was allowed to continue to testify as to the incident. At the beginning of Mr. Merillat's testimony, defense counsel objected on the grounds that "specific anecdotal information" had no relevance and the objection was overruled. (29 RR 62.) Mr. Merillat then proceeded to relate the Townsel incident. Another objection was made by defense counsel on the grounds of relevance, which was similarly denied. (29 RR 63.) More testimony about the incident ensued. Then defense counsel asked for a running objection to the testimony and that too was denied. (29 RR 64-65.) Defense counsel then made a lengthy objection on basically the exact same grounds as he did previously, and it was sustained, but the court allowed Mr. Merillat to continue to testify as to "basically what happened." (29 RR 66.) It was in this latter testimony that the basic (and we now know, false) "facts" of the incident were told. The sustaining of the objection to this perjured testimony, apparently rendering this error harmless in the CCA's analysis, was both too late and completely ineffective in lessening the prejudice to Mr. Coble.

Nor does the CCA's hearsay analysis hold up. In the first instance, defense counsel objected to Mr. Merillat's citing of an official prison report about 78 instances of serious staff assaults. (29 RR 47.) Mr. Merillat used that figure to compare it to the allegedly larger number of cases his unit prosecuted. The CCA held that it was not offered for the truth of the matter, but "[q]uite the reverse. Mr. Merillat's point was that the official number of 78 was significantly lower than the actual number of serious assaults and thus the official prison statistics that Dr. Cunningham used as the basis for his expert opinion were inaccurate." *Coble,* 330 S.W.3d at 289. This is pure sophistry, as Merillat was offering the report as an accurate depiction of the

prison's data, not of its accuracy in general.  His effort to show those figures were inaccurate and too low depended on the truth of his representation that the TDCJ report said what he purported it to say.   In order for his testimony to be meaningful, the jury had to accept that his representation of the serious incidents, as reported by TDCJ, was 78, which then allowed him to compare it to his own tally.   Thus, it was offered for the truth of the matter and it was testimonial.

Mr. Merillat's testimonial hearsay allegations thus violated the Confrontation Clause of the 6th Amendment.   In *Crawford v. Washington,* 124 S. Ct. 1354 (2004), the United States Supreme Court held that out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless the witnesses are unavailable and the defendants had prior opportunity to cross-examine them, regardless of whether such statements are deemed reliable by the court.

The Supreme Court explained that "even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object" *Crawford* at 1365.

> The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts. Rather, the 'right ... to be confronted with the witnesses against him,' Amdt. 6, is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." See *Mattox v. United States* (1895)*,* 156 U.S. 237, 243, 15 S.Ct. 337, 39 L.Ed. 409 (1895)...."
> (*Crawford v. Washington*, at 1365.)

The Supreme Court also held:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule.  Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation.

-390-

(*Crawford v. Washington*, at 1366.)

That Court explained that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." (*Id.* at 1371.)

"Testimonial" has been defined as an assertion "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." (*Melendez-Diaz, supra,* 129 S. Ct. at 2532 (quoting *Crawford,* 541 U.S. at 52.) "To rank as 'testimonial,' a statement must have a "primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to a later criminal prosecution." (*Bullcoming v. New Mexico* 131 S. Ct. 2705, 2714 n.6 (2011)(plurality)(quoting *Davis v. Washington,* 547 U.S. 813, 822 (2006); *see also Michigan v. Bryant,* 131 S. Ct. 1143, 1165 (2011).) Testimonial evidence includes "extrajudicial statements...contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." (*White v. Illinois,* 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part), *quoted in Crawford,* 541 U.S. at 52 and in *Melendez-Diaz,* 129 S. Ct. at 2543.) A statement need not "directly accuse [the defendant] of wrongdoing" to be testimonial. The Confrontation Clause applies to all testimony offered by the prosecution. (*Melendez-Diaz,* 129 S. Ct. at 2535.)

When testimonial reports are presented as evidence against a defendant, the Confrontation Clause guarantees the defendant the opportunity to test through cross-examination the "honesty, proficiency, and methodology" of the analyst who actually performed the forensic analysis. *Melendez-Diaz* 129 S. Ct. at 2536-38; *Bullcoming,* 131 S. Ct. at 2710.

**C. Point of error number eight: "heightened reliability."**

As to point of error number eight, the CCA held:

In his eighth point of error, appellant asserts that Mr. Merillat's testimony was inadmissible because of the Eighth Amendment's "heightened reliability" requirement in capital murder prosecutions. Appellant fails to cite any authority for increasing the admissibility requirements for evidence in a capital murder sentencing trial. Indeed, some state and federal courts have suggested that the Confrontation Clause, the Rules of Evidence, and the rule against hearsay do not apply with full force in capital murder sentencing trials.[FN105] We express no opinion on that matter, but we reject appellant's Eighth Amendment claim and therefore overrule point of error eight.

FN105. *See United States v. Fields,* 483 F.3d 313, 332 (5th Cir.2007) ("Here we are asked to decide whether the confrontation right applies with full force throughout capital sentencing, despite the fact that it is nonexistent at ordinary sentencing. Given that, as shown above, no other Sixth Amendment right has been applied (*vel non* ) differently at capital sentencing from how it is applied at noncapital sentencing, there is little reason to establish divergent rules with regard to the confrontation right when the sentencing authority is selecting a sentence from within an authorized range. On the basis of the Supreme Court's consistent treatment of Sixth Amendment rights across capital and noncapital cases alone, we find unpersuasive the dissent's textual argument for why the Confrontation Clause should extend through the entirety of the capital sentencing process, in light of the fact that the jury right extends only as far as the eligibility determination."), *cert. denied,* 552 U.S. 1144, 128 S.Ct. 1065, 169 L.Ed.2d 814 (2008); *see also United States v. Johnson,* 378 F.Supp.2d 1051, 1059–62 (N.D.Iowa 2005) (questioning whether the Confrontation Clause applies in capital sentencing phase); *State v. Johnson,* 284 S.W.3d 561, 583–84 (Mo.2009) (no abuse of discretion to admit written victim impact statement in capital murder sentencing trial over hearsay and confrontation objections). In *Fields,* the Fifth Circuit explained that in *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976),

The [Supreme] Court explained that the need for greater reliability in the selection of an appropriate punishment entails *not* stricter evidentiary rules, but the assurance of "individualized sentencing" once a defendant is eligible for the death penalty.
*Fields,* 483 F.3d at 336.
*Coble v. State,* 330 S.W.3d 253, 290 (Tex. Crim. App. 2011).

The analysis here fails under 2254(d)(1), as the decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."   The Eighth Amendment guarantees heightened reliability in death judgments (*Johnson v. Mississippi*, 486 U.S. 578, 584-585 (1988)) also compels reversal when the cumulative effect of errors undermines confidence in the reliability of the judgment, as it does here.

The following United States Supreme Court decisions clearly set forth the "heightened reliability" standard the CCA shrugged off: *Woodson v. North Carolina*, 428 U.S. 280 (1976) (Due to the uniqueness of the death penalty, heightened reliability is required in the decisions made by the jury and judge during the course of a capital trial); *Thompson v. Oklahoma*, 487 U.S. 815, 856 (1988)("Under the Eighth Amendment, the death penalty has been treated differently from all other punishments."); *Parker v. Dugger*, 498 U.S. 308 (1991)(Court re-emphasized "the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally."); *Herrera v. Collins*, 506 U.S. 390 (1993)(actual innocence, based on newly discovered evidence raised for the first time in collateral proceedings, would preclude the state from carrying out an inmate's death sentence); *Kyles v. Whitley*, 514 U.S. 419, 422 (1995)(Court reaffirmed that its "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.").

**C. What the State Courts Held on State Habeas and Why It Was Objectively Unreasonable.**

**1. The CCA's holding that this claim was "procedurally barred" on state habeas was contrary to the facts and the law under 2254(d)(1) and d(2).**

In state habeas proceedings, the CCA held that this claim was "procedurally barred." *Ex parte Coble,* WR-39,707-03 (Tex. Crim. App. Feb. 8, 2012). Because the state habeas claim depended on much extra-record evidence, and such evidence cannot be presented on direct appeal, this holding was clearly wrong as both an unreasonable determination of the facts and the law. Petitioner pointed this out to the trial court in his Proposed Findings of Fact and Conclusions of Law (at page 12) but it was ignored.

The habeas version of the claim was based on numerous extra-record exhibits that would

not have been admissible on direct appeal.  Those include, but are not limited to the following:

1) Exhibit 16, affidavit of Dr. Cunningham.  In this exhibit, Dr. Cunningham exposes the faulty methodology of Mr. Merillat and also exposes Merillat's perjury concerning the *Townsel* case.

2) Exhibit 17:  Texas Department of Criminal Justice, Emergency Action Center Statistics, Summary of Selected Incidents, January 2002-May 2009.  This was important in showing the official statistics which Merillat attempted to disprove.

3) Exhibit 19: College records of A. P. Merillat, Sam Houston State University.  This was relevant as to Mr. Merillat's lack of academic credentials.

4) Exhibit 20: TDCJ Unit Classification Procedure (Jul. 2005)(superseding  TDCJ Classification Manual Rev. Oct. 2003).  This was obviously relevant to Merrllat's testimony regarding the classification system.

5) Exhibit 21: Excerpts from Merillat, "*Future Danger?*" 3rd ed. (TDCAA) at 114-115.  Again, this was obviously relevant to discrediting Mr. Merillat in terms of his false reports of violence, the basis of his testimony.

6) Exhibit 22:  *Hubbard v. Texas,* No. 06-02-00188-CR, (Tex. App.—Texarkana (2004).  This was essential to showing that Mr. Merillat's extensive testimony about the *Townsel* incident was perjury.

7) Exhibit 23: September, 2006 Texas Bar Journal article by A. P. Merillat,  "*The Question of Future Dangerousness of Capital Defendants.*" 69 Tex. Bar. J. 738.  This article showed a discrepancy about the experience Mr. Merillat claimed.

8) Exhibit 24:  Excerpts from March 31, 2009 Deposition of A. P. Merillat in the case of *State v. Speer,* No. 99F0506-005B in the 5th Judicial District Court of Bowie County.  Again, this

exhibit goes to Mr. Merillat's credibility.

9) <u>Exhibit 25</u>: Correspondence of A. P. Merillat. This was essential for the same reason.

None of these exhibits, the factual basis for this claim, could have been introduced on direct appeal because they were not in the record. Article 11.071 proceedings are the first proceeding designated by Texas for a capitally-sentenced prisoner to adjudicate claims based upon extra-record evidence, *i.e.*, evidence that does not appear in the appellate record. This claim relies on *nine extra-record exhibits* that could never have been admissible on appeal. In fact, it is black-letter law in Texas that "the most basic characteristic of the appellate record is that it is limited to matters before the trial court. An appellate court may not consider such extra-record materials as affidavits attached to appellate briefs." Dix, George E., *Criminal Practice and Procedure (Texas Practice Series)*, West, 3rd. ed. 2011, Sec. 55:48 ("Appellate Record") at p. 116 (emphasis added). *See, e.g., Hartman v. State,* 198 S.W.3d 829, 842-43 (Tex. App.–Corpus Christi 2006, pet. Stricken)(manual attached to appellate brief not considered because it was not in the record); *Flowers v. State,* 133 S.W.3d 853, 859 (Tex. App.–Beaumont 2004)(court of appeals refused to consider document attached to motion to abate the appeal). Even in the situation when an appellant moves to supplement the appellate record with *his own affidavit,* the appellate courts have responded that since the affidavit was not placed into the record in the trial court, it could not be a proper part of the appellate record. *Bowler v. State,* 822 S.W.2d 334 (Tex. App.–San Antonio 1992, pet. ref'd).

Thus, the CCA's holding that the claim was "procedurally barred" was an unreasonable determination of the facts and the law under 2254(d).

**2. A. P. Merillat's testimony should not have been allowed because it did not meet the admissibility tests for experts under the Texas Rules of Evidence and it deprived**

Petitioner of due process.

**A. Mr. Merillat's testimony did not offer the jury information that assisted in the capital sentencing decision.**

After Mr. Merillat testified on voir dire, the defense argued, among several other grounds, that it should be excluded because "under Rule 702, it would not be admissible." (29 RR 21.)   The defense motion to exclude the testimony was denied and Mr. Merillat was allowed to testify. (19 RR 27.)  It was error for the trial court to deny the defense motion and to allow this testimony.

A witness is not permitted to testify as an expert merely because a party so designates him.  Instead, a witness must qualify under the Texas Rules of Evidence before being permitted to testify as an expert.  An indispensable part of that qualification requires that the purported expert's specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue."   TEX. RULE EVID. 702.   Interpreting this rule, the Texas Court of Criminal Appeals has repeatedly held that the "*use of expert testimony must be limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror*."  *Yount v. State*, 872 S.W.2d 706, 70-11 (Tex. Crim. App. 1993) (emphasis added) (citing *Duckett v. State*, 797 S.W.2d 906, 914 (Tex.Crim.App.1990) ("The use of expert testimony must be limited to situations in which the expert's knowledge and experience on a relevant issue are beyond that of an average juror."), *overruled on other grounds*, *Cohn v. State*, 849 S.W.2d 817, 819 (Tex.Crim.App. 1993).

Stated otherwise, if jurors are capable of answering a question without any assistance, then an expert adds nothing that could not be supplied by the attorneys in argument.  *See* 2 Stephen Saltzburg et al., Federal Rules of Evidence Manual 1219 n.4 (7th ed. 1998).

Knowledge of the opportunity to commit violence within prison to which Mr. Merillat testified (29 RR 34-86) however, is commonly held and unremarkable.  Indeed, it would be unusual to find a person called to jury service without this basic societal knowledge.  A person could scarcely read a newspaper, turn on a television,[218] or watch a movie[219] without being reminded of prison violence.   In fact, jurors naturally overestimate the amount of prison violence.  *See* Jonathan Sorensen & Rocky Pilgrim, *An Actuarial Risk Assessment Of Violence Posed By Capital Murder Defendants*, 90 J. Crim. Law & Criminology 1251, 1256 (Summer 2000) (finding that as "[p]rison violence is [] greatly overestimated by jurors").

Applying Rule 702, courts do not shy away from excluding expert testimony when it is addressed to issues so basic to public knowledge.  *See*, *e.g.*, *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008) (finding expert testimony of law enforcement officer about gang activity improper because it "concerned material well within the grasp of the average juror"); *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 449-50 (5th Cir. 1990) (analyzing admissibility of proffered expert opinion that it is not safe to move a heavy object on the deck of a ship at high seas, and concluding that "trial judge correctly decided that the jury could adeptly assess this situation using only their common experience and knowledge");[220] *Yount v. State*, 872 S.W.2d

---

[218]    *Prison Break* and *Oz* are modern day television dramas premised on the common understanding that prison violence occurs.

[219] A few examples over the last 70 years include *25th Hour* (2002), *Animal Factory* (2000), *American History X* (1998), *The Shawshank Redemption* (1994), *The Birdman of Alcatraz* (1962), *Cool Hand Luke* (1967), and *The Big House* (1930).

[220] As the Court of Criminal Appeals has held, "[a]lthough [Texas courts] are not bound by federal court decisions, when the Texas Rule is similar to the Federal Rule, cases interpreting the Federal Rules of Evidence can be used for guidance. Prior to a 2000 amendment to the Federal Rules of Evidence, Rules 701 and 702 of the Texas and Federal Rules of Evidence were substantively identical." *Osbourn v. State*, 92 S.W.3d 531, 537 n.4 (Tex.Crim.App. 2002) (citing *Wilson v. State*, 71 S.W.3d 346, 351 (Tex.Crim.App.2002)).  The pertinent part of Texas

706, 711 (Tex.Crim.App. 1993) (finding expert testimony purporting "that a particular witness is truthful" inadmissible under Rule 702); *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1124 (10th Cir. 1995) (noting that safety of a floor is within normal life experience of jurors and affirming preclusion of expert testimony to this effect); *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986) (excluding in a slip-and-fall case statistical evidence that women in high heels avoid sidewalk grates because such is common knowledge);  *Borden Inc. v. De La Rosa*, 825 S.W.2d 710, 718-19 (Tex. App.—Corpus Christi 1991) (finding that no specialized knowledge was necessary to assist the jury in answering whether the plaintiff was fired for filing a worker's compensation claim), *judgm't vacated to effect settlement agreement*, 831 S.W.2d 304 (Tex. 1992); *Garwood v. International Paper Co.*, 666 F.2d 217, 222-23 (5th Cir. 1982) (upholding exclusion of expert testimony that would have established "reasonable conduct the particular situation, and thus a lack of contributory negligence" because it would not assist the jury); *London v. MAC Corp. of Am.*, 44 F.3d 316, 318 (5th Cir. 1995) (upholding district court ruling that expert's proffered testimony that "it would not be safe to work on top of a gearbox cover ten feet off the ground was common knowledge" and therefore inadmissible); *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (rejecting the argument that the reasonableness of plaintiff's act of walking along railroad tracks was proper expert testimony); *Dieter v. Baker Serv. Tools*, 776 S.W.2d 781, 784 (Tex. App.—Corpus Christi 1989, *writ denied*) (stating that the question of foreseeability or cause of assault did not require any particular skill and judgment to warrant a need for expert testimony).

A second reason Mr. Merillat's testimony did not aid the jurors is that it was based on

---

Rule of Evidence 702 at issue here – whether "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" – is identical to the wording contained in Federal Rule of Evidence 702.

wholly unreliable factual assumptions and data, as demonstrated below.  *See*, *e.g.*, Suzanne B. Baker, *Gatekeeping in Texas*, 27 St. Mary's L.J. 237, 260 (1996) (explaining that "the question of whether such testimony assists the jury, as opposed to the plaintiff, requires an analysis of the precise fit of the expert's qualifications, the relevance of the expert's conclusions, and the reliability of the method reflected in those conclusions").  The unreliability of Mr. Merillat's testimony is set forth *infra*, is incorporated here by reference.

The common understanding that there are opportunities to commit violence in prison does not preclude all expert testimony concerning prison life.  For example, in an unpublished decision, the Court of Criminal Appeals has held that it would aid jurors to know that capital murderers are not automatically incarcerated in administrative segregation (where the opportunity to commit violence would be less).  *Allen v. State*, 2006 WL 1751227, * 6 n.45 (Tex. Crim. App. 2006) (not designated for publication).[221]

### B. Mr. Merillat's testimony was too unreliable to yield reliable and admissible expert opinion under *Daubert et. al.*[222]

Experts enjoy an "'aura of reliability'" that can be extraordinarily persuasive with a jury. *Schutz v. State*, 957 S.W.2d 52, 72 (Tex. Crim. App. 1997) (quoting approvingly *Matter of G.M.P.*, 909 S.W.2d 198 (Tex.App.-Houston 1995)).  Thus, "the basis of [expert] opinion must be carefully scrutinized by the trial judge."  *Cella v. United States*, 998 F.2d 418, 423 (7th Cir. 1993).  The trial court must act as a "gatekeeper" in determining the reliability of the proffered

---

[221] As demonstrated *infra*, however, Mr. Merillat's testimony on the availability of administrative segregation for capital murderers sentenced to life without parole has been inaccurate and unreliable, and further demonstrates his lack of qualification to testify as an expert.

[222] The legal arguments in Claim 7(a) relating to the unreliability of Dr. Coons's testimony are incorporated herein by reference.  Many of the problems regarding Dr. Coons's testimony are also present in addressing Mr. Merillat's testimony.

evidence.  *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993).  *See also Kumho Tire v. Carmichael,* 526 U.S. 137 (1999)(trial court is gatekeeper regarding expert testimony described in *Daubert*; the criteria used by trial court may include those described in *Daubert*); *General Electric Co. v. Joiner,* 522 U.S. 136 (1997)(rejecting studies of workers at an Italian capacitor plant because "there were no grounds for associating lung cancer deaths...and exposure"); *Allen v. Pennsylvania Engineering Corp.,* 102 F.3d 194 (5th Cir. 1996)(rejecting studies that failed to demonstrate statistical significance; *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706 (Tex. 1997)(rejecting evidence that was not statistically significant); *United States v. Barnette,* 211 F.3d 803 (4th Cir. 2000)(expert's opinion on future dangerousness admissible under *Daubert* but only because the expert relied on his clinical judgment as well as an actuarial instrument; Hare Psychopathy Checklist-Revised did not meet *Daubert* standards of reliability); *Tigner v. Cockrell,* 264 F.3d 521 (5th Cir. 2001)(5th Cir. acknowledged the issue of whether *Daubert* implicitly overruled *Barefoot,* but declined to reach that issue); *Flores v. Johnson,* 210 F.3d 456 (5th Cir. 2001)(per curiam)(Garza, concurring)(Judge Garza excoriated the Texas' courts use of expert future dangerousness testimony but found himself bound by *Barefoot*).  *But see Nenno v. State,* 970 S.W.2d 549 (Tex.Crim. App.1998)(holding clinical predictions meet scientific validity standards).

An expert's opinion must be based on a "reliable foundation."  *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).  Courts must look beyond an expert's averments and "independently evaluate[]" the expert's "underlying data."  *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 713 (Tex. 1997).  If the underlying data are unreliable, "an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable."  *Id.  See, e.g., Minnesota Mining & Mfg. Co. v. Atterbury*, 978

S.W.2d 183, 186, 200-01 (Tex. App.—Texarkana 1998, *pet. denied*) (finding expert who was qualified to give an opinion nevertheless unreliable because the opinion relied on unreliable data, and finding the opinion therefore "no evidence" of causation in legal sufficiency analysis).

As the Fifth Circuit has held, courts may reject opinions founded on critical facts that are plainly untrustworthy, principally because such an opinion cannot be helpful to the jury. *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) (en banc), *overruled on other grounds*, *Daubert*, 509 U.S. at 587 n.5. Stated otherwise, an opinion "based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant." *Id.*[223]

Basic scrutiny of the bases of Mr. Merillat's opinion reveals a pattern of unreliable assumptions, factual misunderstandings, substantial inconsistencies, and ignorance of black-letter prison policy.

### C. Mr. Merillat's "experience" is not the type of hearsay data upon which reasonable experts rely.

Texas Rule of Evidence 703 governs the type of data on which an expert may rely in reaching an opinion. It permits an expert to consider facts or data that would not be "admissible in evidence," if "of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject." TEX. RULE EVID. 703.

Interpreting this evidentiary principle, the Texas Supreme Court has explained,

The expert may not rely on just any hearsay. The appraiser may not use the price of a comparable sale overheard on the street from a stranger unless verified from sources recognized as authoritative by experts of the field. The economist may not base his opinion on figures on a sheet which the stranger drops unless such figures are properly verified by credible sources recognized in the field. *The hearsay source should be*

---

[223] The Court of Criminal Appeals has set forth a flexible standard for analyzing non "hard" sciences. *See Nenno v. State*, 970 S.W.2d 549, 561 (Tex.Crim.App. 1998). Nothing in the *Nenno* decision, nor any other Court of Criminal Appeals decision, purports to allow expert opinion based on faulty, unreliable, or incorrect data.

> *acceptable to the members of the expert's profession or class, and it should be confirmed insofar as that is practical.* There should be some necessity for allowing the expert to use hearsay information and some justification for receiving his opinion when his information is not proven.

*Lewis v. Southmore Sav. Ass'n*, 480 S.W.2d 180, 187 (Tex. 1972) (emphasis added).

Here, the hearsay on which Mr. Merillat relied is clearly not "of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject." TEX. RULE EVID. 703.

Mr. Merillat admitted he keeps no database, logs, ledgers, or statistics on the violence occurring in Texas prisons. (29 RR 18-19, 68-70.)   Instead, the hearsay bases for Mr. Merillat's opinions were based on his own experiences: the cases his office had prosecuted (29 RR 13); his "knowledge base" was based on his experience (29 RR 14);  "our numbers include what we take to the grand juries and what we prosecute across the state...[the prison numbers are] not the same thing we use, so our numbers are greatly different" (29 RR 48.); "we prosecute those [cases] and we will report those numbers" (29 RR 49).  Sometimes there was not even this justification for his own "numbers": "the numbers that are put down under those parameters are incorrect....there are assaults upon inmates that aren't reported..."  (29 RR 60.)[224]  In his own words, after cases came through the office, he based his "numbers" on "what we take to the grand juries" (29 RR 48) without any showing of how different his numbers may have been from those reported by the prison system.

The State did not  identify "the particular field" in which Mr. Merillat, formed his

---

[224]   However, even in this Mr. Merillat was inconsistent.  He also claimed that "if the prison doesn't recognize it as an attempted assault or doesn't think it warrants our intervention, we're not going to hear about it."  (29 RR 61-62.)   He also stated, without giving any source for his information, that "[w]hat the prisons report on the level of violence is incorrect."  (29 RR 86.)

opinions on the opportunity for violence in Texas prisons. TEX. RULE EVID. 703. Indeed, the assertion that there is an opportunity for violence in prisons is so unsurprising and commonly understood that it is difficult to conceive of a "field" dedicated to supporting that conclusion. And the case law does not reveal either the field dedicated to this study or the type of data on which it relies. In any case, it is safe to say that no professional person could rely on the type of haphazard allegations Mr. Merillat collects. Second-hand information he allegedly learned in his own investigations, and through multi-leveled hearsay conveyed by his office, is simply not the type of reliable evidence on which any expert would rely in any field. Similarly, as demonstrated *infra*, and incorporated here, Mr. Merillat's expert opinion inappropriately relied on non-confronted testimonial hearsay, which rendered his opinion inadmissible on that ground, too. *See also* U.S. Const. amend. VI, XIV.

Moreover, Mr. Merillat has admitted that he does not know how many of the alleged 20,000 cases (29 RR 13) were prosecuted and how many held back from prosecution (29 RR 16) and thus he could not know the ultimate dispositions of the cases, i.e., whether they are dismissed, not proven, or proven. That some of the cases result in indictments does not mean the allegations were reliable or substantiated: an indictment does not constitute evidence of guilt. *See* TEX. CODE CRIM. PROC. Ann. art. 38.03 (Vernon Supp.2004-05). *See also Harris v. State*, 475 S.W.2d 922, 924 (Tex. Crim. App. 1972) (approving the following instruction by trial court after prosecutor told the jury to rely on indictment, "'And, in this connection, you are instructed that the indictment in any criminal action, being only a written statement of the Grand Jury of the accusation against the defendant, is no evidence, and cannot be considered as such, or as any circumstance to show or tend to show the defendant's guilt, and you cannot legally, and must not, so consider it.'").

Mr. Merillat presented himself as a law enforcement officer who works closely with district attorneys to obtain convictions.  He collects information through investigation but his information is unreliable and kept haphazardly.  As shown above, he has an inadequate and unreliable understanding of classification procedures --- one, not incidentally that tilts heavily in favor of the State's attempt to win the death penalty.  He does not rely on the type of accurate and reliable information any expert requires as a bases for rendering opinion.  It was error to not have excluded his testimony and its reception by the jury fatally misinformed and prejudiced Mr. Coble's jury.

**3.  The introduction of Merillat's hearsay testimony violated basic evidentiary rules and the Confrontation Clauses of the United States and Texas Constitutions**.

**A. An expert may not disclose the hearsay allegations underlying the proffered expert opinion.**

The "state should not be permitted to launder inadmissible hearsay evidence, turning it into admissible evidence by the simple expedient of passing it through the conduit of purportedly 'expert opinion.'"  *State v. DeShay*, 669 N.Y.2d 878, 886 (Minn. 2003).  More specifically, here, Mr. Merillat's purported "expert opinion" is that capital murderers not sentenced to death enjoy an opportunity to commit violence in Texas prisons.  The underlying "facts" supporting the opinion are comprised of the hearsay horror stories Mr. Merillat told of prison violence. *E.g.,*  29 RR 42 (violence at recreation); 29 RR 43 (murders in ad seg); 29 RR 64-66 (long, horrific story of inmate beating and starving cellmate to death which, as discussed *supra,* was either misleading or false).

Texas courts, however, bar the otherwise inadmissible hearsay allegations on which an expert's opinion is based.  *See Birchfield v. Texarkana Memorial Hospital*, 747 S.W.2d 361, 365 (Tex. 1987) (stating that "[o]rdinarily an expert witness should not be permitted to recount a

-404-

hearsay conversation with a third person, even if that conversation forms part of the basis of his opinion," but noting that the hearsay recounted was invited by defense counsel on cross examination and that though it was "inadmissible . . . it was cumulative of other similar evidence and therefore harmless"); *Speering v State*, 763 S.W.2d 801, 807 (Tex. App. – Texarkana 1988) (holding inadmissible the hearsay opinion of a second expert relied upon as support for testifying expert's opinion), *reformed on other grounds,* 797 SW2d 36 (Tex. Crim. App. 1999); *First Southwest Lloyds Ins. Co. v. MacDowell*, 769 S.W.2d 954, 958 (Tex. App. – Texarkana 1989) (affirming trial court's exclusion of expert report based on hearsay accounts and stating "that the better judicial position is to not allow the affirmative admission of otherwise inadmissible matters merely because such matters happen to be underlying data upon which an expert relies").[225]

### B. Mr. Merillat's inflammatory hearsay allegations were unfairly prejudicial and their probative value fell far short of their prejudicial impact.

Even if this Court were to hold that the hearsay underlying an expert testimony is sometimes admissible, the jury's hearing Mr. Merillat's unreliable and prejudicial hearsay testimony was still reversible error.  Where, as here, the facts underlying an expert's opinion "would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial." TEX. RULE

---

[225] *See also Carlson v. State,* 524 S.E.2d 283, 285-86 (Ga.App. 1999) (holding that "when an expert's opinion is based solely on out-of-court hearsay not subject to any exception to the hearsay rule, that testimony is inadmissible"); *Kelly Realty Co., Inc. v. Com.,* 323 N.E.2d 350, 352 (Mass. 1975) ("It is settled that an expert witness may not, under the guise of stating the reasons for his opinion, testify to matters of hearsay in the course of his direct examination unless such matters are admissible under some statutory or other recognized exception to the hearsay rule.").

EVID. 705 (d).

This balancing rule restricts the admission of inadmissible evidence supporting an expert's testimony more aggressively than the balancing rule for otherwise admissible evidence set forth in TEXAS RULE OF EVIDENCE 403, which bars otherwise relevant evidence when "its probative value is *substantially* outweighed by the danger of unfair prejudice … [and] needless presentation of cumulative evidence." TEX. R. EVID. 403.  Rule 705 (d) balancing bars evidence where the danger of unfairness *outweighs* the probative value of the evidence, even if it does not do so *substantially*.   In any case, the hearsay allegations underlying Mr. Merillat's opinion that there was an opportunity for violence in Texas prisons woefully failed to meet the bars under both Rule 403 and 705 (d).

Mr. Merillat's repertoire of hearsay allegations of prison violence included repeated references to prison escapes (29 RR 42, 52-53, 57 (the notorious Martin Garule escape, 62); completely irrelevant furloughs for which Mr. Coble was not eligible (29 RR 56-57); rapes (29 RR 66); assaults  on staff and assaults on other inmates (29 RR 46-47, 48, 50, 52, 60, 61, 62, 64-66; an alleged Telford Unit beating/starvation case (29 RR 64-66).  As he alleged in on recent case, "we've prosecuted murders and escapes from administrative segregation" (29 RR 42.) Such testimony associated Mr. Coble with totally irrelevant incidents and some of the most notorious acts of violence in Texas prison history, if they even happened.

Permitting this otherwise inadmissible hearsay testimony was unfairly prejudicial in Mr. Coble's  capital sentencing re-trial because – in order to support the unremarkable point that there is an opportunity to commit crime in Texas prisons – Mr. Merillat was permitted to testify to a sample of some of the most violent acts in Texas prisons, unrepresentative of prison life generally.   This type of testimony left the unfair impression that these violent incidents are

rampant, instead of isolated, among the many thousands of inmates in TDCJ custody.

Moreover, Petitioner was unable to cross examine and confront Mr. Merillat's second-hand allegations to determine if they were accurate, as the defense counsel repeatedly pointed out. (29 RR 60, 61, 62.) Petitioner has presented herein evidence that shows that were indeed inaccurate. *Cf. Texas Workers' Comp. Com'n v. Wausau Underwriters Ins.*, 127 S.W.3d 50, 57 (Tex. App. – Houston 2003) (finding that "[c]ross-examination" of  declarants of hearsay on which expert relied, who also appeared and testified, "minimize[d] any prejudicial effect" of permitting admission of hearsay supporting expert opinion).

In addition, there was a clear probability  that the jury rendered its life and death decision in this case not on the special issues presented, but based on the fear Mr. Merillat's horror stories inevitably engendered.

In sum, permitting Mr. Merillat's hearsay horror stories into evidence unfairly prejudiced him wildly disproportionate to any conceivable need for this testimony.  Petitioner does not dispute that there are opportunities for violence in Texas prisons.  Bringing their common sense, the jurors will have no trouble accepting this observation. *See*, *e.g.*, Jonathan Sorensen & Rocky Pilgrim, *An Actuarial Risk Assessment Of Violence Posed By Capital Murder Defendants*, 90 J. Crim. Law & Criminology 1251, 1256 (Summer 2000) (finding that "[p]rison violence is [] greatly overestimated by jurors").  The justification for this inadmissible hearsay testimony was at best negligible.  Thus, its "value as explanation or support" paled in comparison to the unfair prejudice and the jury's consideration of  these non-confronted allegations for improper purposes. TEX. RULE EVID. 705 (d).  *See also* TEX. RULE EVID. 403.

**C.  Admitting the testimonial hearsay underlying Mr. Merillat's opinion violated the Confrontation Clauses of the United States and Texas Constitutions.**

Moreover, permitting Mr. Merillat's testimonial hearsay allegations violated the Confrontation Clause of the 6th Amendment.  *See  Crawford v. Washington,* 541 U.S. 36, 59 (2004); *Russeau v. State*, 171 S.W.3d 871, 880 (Tex.Crim.App. 2005) (finding confrontation clause violation due to admission of non-confronted testimonial hearsay).  *See also* Tex. Const. art. I, § 10 (setting forth, *inter alia*, Texas's confrontation clause); *United States v. Mejia*, 545 F.3d 179, 199 (2d Cir. 2008) (finding violation of Confrontation Clause in law enforcement's testimony as "expert witness" to testimonial hearsay about crime).

The Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54.  *See* U.S. Const. Amend. VI, XIV; Tex. Const. art. I, § 10; *Russeau*, 171 S.W.3d at 880.  Petitioner  had no opportunity to confront the hearsay allegations Mr. Merillat made to demonstrate Texas prison violence. Moreover, Mr. Merillat's hearsay allegations, allegedly  learned in the course of his "experience" (or third-hand from other investigators with the SPU), are quintessentially "testimonial." *Davis v. Washington*, 547 U.S. 813, 822 (2006) (holding that statements made to police officers are testimonial if not made to enable police to respond to an emergency and "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution").

For example, in *Russeau*, 171 S.W.3d at 880, the trial court, presiding over a capital sentencing hearing, admitted jail and prison disciplinary reports containing

> **s**tatements which appeared to have been written by corrections officers and which purported to document, in the most detailed and graphic of terms, numerous and repeated disciplinary offenses on the part of appellant while he was incarcerated. It further appeared that, in writing the statements, the corrections officers relied upon their own observations or, in several instances, the observations of others. None of the

*individuals who supposedly observed appellant's disciplinary offenses testified at his trial.* Appellant's alleged disciplinary offenses included threatening physical harm and even death to others, refusing to work or cooperate, breaking out of his cell at night, exposing himself and masturbating in front of jailers and other inmates, verbally abusing jailers and other inmates, fighting with other inmates, and possessing contraband, including improvised weapons.

*Id.* (emphasis added).  The Court of Criminal Appeals reversed the death sentence.  It found the reports to contain "testimonial statements which were inadmissible under the Confrontation Clause, because the State did not show that the declarants were unavailable to testify and appellant never had an opportunity to cross-examine any of them."  *Id.* at 880-81.  "Indeed, the statements in the reports amounted to unsworn, ex parte affidavits of government employees and were the very type of evidence the Clause was intended to prohibit."  *Id.* at 881.

Mr. Merillat's hearsay allegations of prison violence are indistinguishable from the testimonial hearsay statement at issue in *Russeau*.  His allegations are based on the observation of witnesses who did not testify in this trial, who are not unavailable, and whom Mr. Coble has never had an opportunity to cross examine.   Moreover, the hearsay allegations involve graphic acts of violence (29 RR 64-66), and irrelevant furloughs and escapes (29 RR 56-57, 62.)

The rules of evidence permitting experts, in appropriate circumstances, to rely on hearsay do not permit the State to violate the Confrontation Clause.  *See Crawford*, 541 U.S. at 61 (holding that the Sixth Amendment is not subject to the "vagaries of the rules of evidence").  Indeed, courts have repeatedly barred testimonial hearsay offered through the mouths of state experts.  *See, e.g., United States v. Crockett*, 586 F.Supp.2d 877, 888 (E.D. Mich. 2008) (citing Confrontation Clause and *Crawford* in prohibiting government expert from relying on testimonial hearsay reports purporting to establish that cocaine expert tested was the same substance the defendant, a former police officer, had stolen from a police property room and

noting that Rule 705(d) balancing test is not available to the government because Crawford disavowed "the idea that judicial balancing tests can substitute for cross examination"); *United States. v. Taveras*, 585 F.Supp. 327, 340 (E.D.N.Y. 2008) (stating that the Court will not permit psychologist testifying to transmit to the jury, in the guise of expert testimony, testimonial hearsay whose admission would violate *Crawford*).   *See also Loredo v. State*, 2007 WL 2380346, \*7 (Tex. App. – Tyler 2007) (not designated for publication) (rejecting claim that expert relied on testimonial hearsay and violated *Crawford* because hearsay on which expert relied was not testimonial evidence in that it was not of the type anticipated to be used in litigation and, in any case, hearsay was not placed before jury); *Floyd v. State*,__ So.2d __, 2007 WL 2811968, \*2 (Ala. Crim. App. 2007) (assuming *Crawford* violation where ballistics expert's testimony was "mixed in terms of his own experiences with shotguns and cases involving shotguns and in terms of the findings of Joe Saloom-Saloom, who was characterized as a state firearms expert, did not testify and there is no indication in the record as to his availability"); Jennifer Mnookin, *Expert Evidence and the Confrontation Clause after Crawford v. Washington*, 15 J.L. & Pol'y 791, 834 (2007) ("However, in those instances when an expert's basis evidence is testimonial, cross-examining the expert cannot be deemed a constitutionally adequate substitute under *Crawford* for being able to confront whoever actually issued the testimonial statements. . . . To see why this is so, imagine the same issue outside of the expert context: it is abundantly clear that under *Crawford* the policeman who interrogates a witness cannot testify about the substance of the witness' statement in lieu of having the witness herself take the stand.").

Notably, even Courts that have permitted experts to rely on testimonial hearsay have emphasized that it should not be transmitted to the jury.  *United States v. Henry*, 472 F.3d 910,

914 (D.C.Cir.2007) ("*Crawford*, however, did not involve expert witness testimony and thus did not alter an expert witness's ability to rely on (*without repeating to the jury*) otherwise inadmissible evidence in formulating his opinion under Federal Rule of Evidence 703.") (emphasis added); *United States v. Lombardozzi*, 491 F.3d 61, 73-74 (2d Cir.2007) ("McCabe's reliance on out-of-court testimonial statements in forming his opinion that Lombardozzi is affiliated with organized crime may only have been permissible if McCabe applied his expertise to those statements but did not directly convey the substance of the statements to the jury."); *State v. Lewis*, 235 S.W.3d 136, 151 (Tenn. 2007) ("Dr. Melton's expert opinion was an evaluation of the data. She did not communicate any out-of-court statement made by" another doctor.)

In addition to the evidentiary rules set forth above, the Confrontation Clause, thus, unequivocally barred the admission of Mr. Merillat's non-confronted testimonial hearsay allegations of prison violence and its admission by the court was reversible error.

### 4. Mr. Merillat's opinion testimony and his hearsay allegations of prison violence violated the Eighth Amendment.

The Supreme Court has held that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988). Accordingly, while there is no "perfect procedure for deciding in which cases governmental authority should be used to impose death," the Court "[has] made it clear that such decisions cannot be predicated [on] factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Id.* In that case, a unanimous Court concluded that the Eighth Amendment's requirement of "heightened

reliability" in capital cases mandated reversal of Johnson's death sentence.

In *Gardner v. Florida,* 430 U.S. 349 (1977), the United States Supreme Court held that a defendant was denied due process when confidential information in a pre-sentence report was not disclosed to the defendant, but was relied upon, at least in part, in imposing a death sentence. Reiterating that "death is a different kind of punishment from any other," *Gardner, supra, citing Gregg v. Georgia,* 428 U.S. 153, 181-88 (1976), the Court expressed concern that "critical unverified information may be inaccurate and determinative in a particular case." *Gardner,* 430 U.S. at 360.

These heightened standards apply in this capital sentencing proceeding.  Clearly, they do not permit the introduction of non-confronted hearsay allegations of inflammatory acts of prison violence – committed by inmates other than defendant – for the bare purpose of supporting the uncontroversial opinion that the opportunity for criminal violence exists in prison.   Were it otherwise, the Court would uphold a procedure that is the antithesis of reliable capital sentencing.

Moreover, Mr. Merillat's one-size fits all testimony would apply to any capital defendant in any capital sentencing proceeding.  Thus, to permit it would violate the Eighth Amendment's strict requirement of individualized sentencing.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303-304 (1976).

In addition to the evidentiary and Confrontation Clause bases set forth above, these constitutional precepts, as well as those additional protections under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, barred Mr. Merillat's expert testimony. *See also* Tex. Const. art. 1, §§ 3, 10, 13, 19.  The trial court committed reversible error in admitting the testimony and in denying the motion to disallow it.

**5. Mr. Merillat's testimony was unconstitutional because it  rendered mitigating evidence irrelevant, contrary to *Penry, Tennard, etc.***

The purpose of Merillat's testimony in Mr. Coble's case was to bolster  the State's argument is  that no matter the quantum of mitigating evidence, there are always ample opportunities for violent acts in prison and therefore the jury should not take a chance and send him to the safest place, death row.   Although the prosecutor did not explicitly argue it, the message was that mitigation doesn't count.  Merillat's testimony violates *Penry v. Lynaugh,* 492 U.S. 302 (1989)(Texas capital sentencing scheme inadequate because it failed to adequately guide jurors in considering sentencing factors) and *Tennard v. Dretke,* 542 U.S. 274 (2004)(sentence invalid if constitutionally relevant evidence was minimized in the sentencing process; relevant mitigating evidence is evidence which tends to logically prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value).

This testimony is particularly egregious in cases such as this, where the defendant has a lengthy stretch of violence-free time on death row. Mr. Coble had 18 years of discipline-free death row incarceration.  Yet, this did not count because, according to Merillat, death row has limited possibilities for violence.  In effect, the jury was urged to ignore 18 years of good behaviour because all that counts is the possibility for violence *going forward*.  There was also an anti-intellectual argument in this case: what are you going to believe, statistics or your own common sense? (29 RR 124, 175, referencing Dr. Coons).

The effect of Merillat's testimony is to completely nullify the defendant's mitigating evidence such as good behavior, age, prior lack of violence, poverty, childhood abuse, good deeds, military service, etc., because the jury sees themselves as having a duty to lessen the risk of future violent acts.  No matter what the defendant may have done in the past, it counts for

-413-

nought as, going forward, he will always be a lesser risk on death row according to both Dr. Coons and Mr. Merillat.

There is also a strong public policy argument against this testimony.  If good deeds and behaviour on death row count for nothing, when weighed against the risk of future violence, then there will be no incentive for death row inmates to behave well, as Merillat claims they do, because their cases are always on appeal.  *See also Abdul-Kabir v. Quarterman,* 127 S. Ct. 1654 (2007)(reaffirming *Penry*, jury not told how to consider mitigating evidence);  *Smith v. Texas,* 543 U.S. 37 (2004)(jury prevented from adequately considering mitigating evidence; jury could have disregarded all other forms of mitigation other than the restrictive ambit of the special issues);  *Woodson v. North Carolina,* 428 U.S. 280 (1976)(mandatory death penalty unconstitutional); *Lockett v. Ohio,* 438 U.S. 586, 695 (1978)("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases...[and that] treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in non-capital cases"); *Eddings v. Oklahoma,* 455 U.S. 104 (1982)(refusal to consider family history of a 16-year old defendant as a mitigating factor regarding imposition of the death penalty violated the Eighth Amendment requirement that all relevant factors be considered).  Telling Mr. Coble's jury to ignore nearly 20 years of exemplary behaviour is contrary to public policy as this takes away any incentive towards that good behaviour.  It also negates Mr. Merillat's own argument that death row prisoners are on good behaviour because their cases are always on appeal if this good behaviour means nothing.  It also negates *Penry* as the jurors are led to believe that it does not enter into the life or death question they are required to answer.

**CLAIM NINE:** **THE PROSECUTION'S SUPPRESSION OF EVIDENCE CONCERNING STATE WITNESS A. P. MERILLAT VIOLATED MR. COBLE'S CONSTITUTIONAL RIGHTS**.

Mr. Coble's confinement and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of  the United States Constitution, and comparable state law, because the prosecution suppressed evidence regarding State witness A. P. Merillat, and the State's suppression of the evidence prevented the defense from challenging the witness's credibility.

The declarations and other exhibits accompanying this claim, as well as the allegations and facts set forth elsewhere in this application, are hereby incorporated by reference into this claim as though set forth in full.

The facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, include the following.

**A.  Facts Presented to the State Courts.**

This claim was presented in state habeas as claim nine.

**1. Factual Outline.**

Prior to his testimony at Mr. Coble's trial, Mr. Merillat was questioned as to his proposed areas at a hearing outside the presence of the jury.  (29 RR 7-20.)   During this testimony, Merillat claimed to have extensive knowledge of the prison classification system:

> ....I've had to learn the classification system primarily because when I'm interviewing inmates, witnesses or suspects to particular offenses, if they're offering me an alibi or a statement as to where they were when a particular crime happened as a witness or as a suspect, I have to know if they're telling the truth, for one thing....And without knowing the classification system, I would not know if that inmate was even telling the truth or not or even on the right course.
> (29 RR 11.)

Defense counsel stated many bases for excluding his testimony, including that they had

never argued that the prison can control Mr. Coble (29 RR 21, 24); that Merillat lacked sufficient knowledge of what he was testifying about and it was inadmissible under Rule 702 (29 RR 21); that it would be unduly prejudicial (29 RR 21, 27); Eighth Amendment grounds (29 RR 22); that Merillat would refer to specific instances of violence within the Texas prison system, which were not relevant to the allegation that Mr. Coble himself would commit acts of violence while incarcerated (29 RR 22, 26);  that it was not proper rebuttal (29 RR 25); that testimony regarding escapes and furloughs was not proper (29 RR 25); and that it was not individualized testimony. (29 RR 21).

Despite this, the Court allowed the testimony.  (29 RR 27.)   The Court failed to limit Merillat to testimony  as to events or circumstances based on his personal knowledge.

Merillat was a Senior Criminal Investigator with the Special Prosecution Unit.  (29 RR 30.) The unit for which he worked, the SPU, acts as an adjunct to the district attorney's office, prosecuting "crimes on behalf of local district attorneys across the state...We're like a D.A.'s office in ourselves....we'll prosecute those crimes on behalf of the local district attorneys."  (29 RR 31-32.). "We go in whenever we're invited....We're invited in by the D.A.   And our prosecutors act as assistant D.A.'s and take the cases from grand jury all the way through the appellate process, as far as the D.A. want us to go, all or part of the case or none at all."  (29 RR 32.)   Merillat emphasized that he did not work for the prison system: "See, I don't work for the prison.  I don't know if that's clear to y'all or not.  I work for an independent agency, I'm not a prison employee."  (29 RR 47-48.)   Merillat's personal duties included taking "our cases, prepar[ing] them for presentation to grand juries and...present them on behalf of our office."  (29 RR 32-33.)  Merillat would also act as a quasi-district attorney or district attorney investigator. He would

move forward with the prosecution of the case and get ready for a trial in district courts throughout the state.  Pick juries just like this one or go to bench trials....I'll make sure the case is ready as far as it can be with witnesses, evidence, and just get it all put together.   And then I testify in the area of fingerprints and bloodstain pattern interpretation...And I work the trial with my prosecutor in the courtroom, coordinate witnesses and such as that.   That's a generalized version of the many duties I have.  But it's very similar to a D.A.'s investigator like you have in the free world here.
(29 RR 33-34.)

According to Merillat, the Governor of Texas created the SPU to prosecute crimes committed within the prison system which could not be prosecuted by counties where a given prison was located.  (29 RR 32.)   He testified that his office has prosecuted "over 20,000 cases in 24 years."  (29 RR 45.)   He claimed that over the last 4 years, they had prosecuted 94 convicted capital murderers serving life sentences and 223 convicted murderers in the same period.  (29 RR 17-18.)

Asked whether there would be a way to ensure Mr. Coble was confined within the highest level of security in the prison system, Merillat testified that no one could tell the prison system how to house an inmate:

Q.     Who determines what level you go in as or placed in?
A.  Well, it's established by what they call a classification plan, which is a pretty thick document.  I have one with me here today.  It's the procedures adopted by the prison system classification committees on how to classify inmates.  It's not state law and it's not governed by the legistature or anything like that.  It's a prison interior...prison policy.
Q.  Okay, sir.  So a judge or somebody like that doesn't determine the level.  It's...
A.  No, sir.
Q.  It's the people at TDCJ; is that right?
A.  That's right.  There's not...there's not outside influences upon the classification system.  It's within the prison system itself.  You folks can't or the judge cannot tell the prison, classify this man as such and such.  They can't do that.  They'll do it the way they want to.
(29 RR 37-38.)

To compound the error, this point was stressed by the prosecutor at final argument.  He told the jury that the prison system alone determines the inmate's classification.  "You folks

can't or the judge cannot tell the prison, classify this man as such and such.  They can't do that. They'll do it the way they want to."  (29 RR 38.)

This was repeatedly told to Coble's jury at the final argument: "And just like you mentioned before, a judge, a jury, the governor, nobody can order that the prison put this person in ad seg.  You cannot do that.  The prison will put who they think belongs there inside ad seg." (29 RR 44.)

He again reiterated, again without authority or attribution, that "[w]hat the prisons report on the level of violence is incorrect...It's just incorrect."  (29 RR 86.)

### 2.    Suppressed Evidence.

Unbeknownst to defense counsel at trial, Merillat's testimony was false, and his credibility could have been challenged but for the State's suppression of the evidence.

As far back as 1998, Merillat was assisting an inmate achieve "deconfirmation" as a gang member (a benefit in the prison system) so that the inmate could procure information for the SPU which the SPU would in turn use against other inmates.[226]   Merillat continued assisting that inmate even though he knew the inmate had not given up his gang activity.[227]

As far back as 1999, Merillat acknowledged that although an inmate who had been providing SPU with information concerning another inmate had been caught manufacturing a weapon by prison authorities,  "just because a disciplinary case was written, it does not mean that our office will file a criminal charge."[228]

---

[226]    *See* Exhibit 25, Correspondence of A. P. Merillat (identified by page number at lower right). SPU letter of June 15, 1998 at 1193.

[227]    *Id.* [Eason letter to Merillat 6/2000] at 1194-1198.

[228]    *Id.* [SPU 10/14/99 Letter] at 1199.

As far back as 2000, Merillat was arranging for inmates to be transferred within the prison system[229] and even get out of segregation units.[230]

Also as far back as March 2000, Merillat was making arrangements with prison officials to allow letters from gang members to reach an inmate informant, even though that inmate, with help from Merillat, had informed prison authorities he had renounced his gang affiliation.[231]

Unbeknownst to Mr. Coble's defense team, the SPU prosecutorial team in a capital murder case against an inmate had suppressed exculpatory evidence against that defendant. *See Anibal Canales Jr. v. Quarterman*, CV No. 03-69-TJW (E. Dist. Tex). Merillat, as a Senior Criminal Investigator and part of that SPU team, was intrinsically involved with that suppression.[232]("As far as a witness list, we haven't sent one out yet, Mr. Mullin [the SPU prosecutor] and I are holding off as long as we can.").[233]

### 3. Investigation into Merillat *Brady* Claim.

The information described above only came to light in September, 2008 when the attorney for another inmate on Texas's death row, Anibal Canales sent to colleagues of Mr. Coble's habeas attorney  information (the foregoing exhibits) on Mr. Merillat that Mr. Canales's

---

[229]   *Id.* [SPU 7/12/2000 Letter] at 1200.

[230]   *Id.* [Whited 4/4/2000 Letter] at 1201-1221.

[231]   *Id.* [Innes Notes 3-01-00] at 1222-1223.

[232]   *Id.* [Merillat 6/12/2000 Letter] at 1224.

[233]   In his pending petition for federal habeas relief, Mr. Canales alleges the prosecutorial team:  suppressed evidence, contrary to *Brady*; allowed a material witness to testify falsely in violation of *Napue* and its progeny; and that the SPU, including Merillat, deliberately elicited information from a defendant in custody and under indictment in violation of *Massiah v. United States*, 377 U.S. 201 (1964), and its progeny.  (*Canales v. Quarterman*, CV03-69 [Docket no. 7].)

attorney was only able to uncover through his access to federal discovery procedures in Mr. Canales's case. Undersigned counsel subsequently became aware of this information after he was appointed. Thus, the soonest counsel could have learned of this evidence was after September, 2008, after Mr. Coble's trial had concluded. Co-counsel Mr. Calhoun has stated that he too was not aware of this information until later:

> Subsequent to Mr. Coble's trial, I have learned of some aspects of Merillat's general testimony, such as his citation of specific "violence" statistics in prison, his statements concerning the numbers and types of cases in which the Special Prosecution Unit has prosecuted within the past several years, and his statement regarding the prison inmate classification system is either false, or materially misleading. Had I known of this information at the time of Mr. Coble's penalty phase re-trial, I would have cross-examined him differently.[234]

Thus, counsel could not have been aware of this information at the time of the trial.

**B. What the State Courts Held.**

This claim was presented to the state courts on state habeas as claim nine. The State addressed this claim in their Answer, at pages 15-20. (Exhibit 27.) Several arguments were made:

1) The first argument was that "[h]ere, Applicant alleges nothing upon which relief can be granted." *Id.* at 16. The State added "[t]he facts must be sufficiently detailed to permit both the trial court and the Court of Criminal Appeals to determine if a hearing is required." *Id.*

2) The next argument is that the evidence was not material and "[i]n the face of strong evidence non-disclosure is not ground for reversal...if the remaining 'unscathed' evidence remains intact, the evidence is not 'material' in the *Brady* sense." *Id.* at 17-18. "Specific acts of conduct which merely 'cast [Merillat] in a different light' are not material." *Id.* at 19.

3) The next was an irrelevant argument as to Dr. Coons, and "in the same manner the

---

[234]   Exhibit 14.

speculative impeachment of Merillat's rebuttal of Cunningham's counter to Coon's testimony does nothing to undermine confidence in the outcome of this trial." *Id.* at 19.

4) Lastly, the State argued that there was no duty to turn it over and

[r]evealing such specific acts of conduct to Coble's jury wouldn't show that Merillat was not an employee of the SPU or that he was an employee of TDCJ, contrary to his testimony before that jury. While investigating the Canales capital murder within the prison walls, an offense over which the SPU had jurisdiction, certain inside informants were utilized and incriminating information was sought by SPU eliciting the cooperation of prison officials. That could not so undermine the 'credibility and the accuracy of his testimony' as to render this re-sentencing trial unreliable due to a violation of fundamental or constitutional rights. This was not, as applicant asserts, proof that Merillat 'could tell the prison system how to house an inmate who was assisting SPU obtain evidence against other inmates. *Id.* at 20.

The State recommended that no hearing be held on this issue as it "presents no controverted, previously unresolved factual issues material to the legality of Applicant's confinement." *Id.* The trial court denied the claim without holding a hearing on it. The CCA adopted that finding.

**C. Why the State Court Holding was Objectively Unreasonable.**

**1. Errors in the CCA's Holding.**

None of the above holdings stand up to scrutiny under the 2254(d) standards. Since the CCA adopted the trial court's findings verbatim and the trial court adopted the prosecutor's Answer, we must look to the prosecutor's arguments in the Answer to determine what the state courts held.

The first boilerplate argument is obviously wrong and a misinterpretation of the facts as this claim was a detailed and specific presentation of certain facts and allegations regarding Mr. Merillat. In no way can it be characterized as "alleging nothing" or "not sufficiently detailed" to

allow the trial court and the CCA to determine if a hearing was required.  The prosecutor's pleading and the CCA's holding that this issue presented "no controverted previously unresolved factual issues material to the legality of Applicant's confinement" (Answer at 20) is simply a fiction.  The numerous issues detailed *supra* are *all* controverted and material.

Nor can the evidence be dismissed as not being material.  There is strong evidence that Mr. Merillat committed perjury in this case.  Two capital cases have been reversed for arguably less important misinformation given to the jurors by this witness.

The third argument is also flawed.  Had the jurors been made aware of these facts, it would have put Mr. Merillat's testimony in an entirely different light.  Combined with the facts presented in the prior claim, it would have made a material difference.  There was a duty to turn over this evidence because it was material.  Even if the prosecutors were unaware of it, which they do not claim (Answer at 20), there would have been a duty to diligently investigate Mr. Merillat's background before presenting him as a witness.

### 2. Relevant Law.

The main authorities are well known. *Brady v. Maryland,* 373 U.S. 83 (1963); *Giglio v. United States,* 405 U.S. 150 (1972)(withholding of evidence on promise of leniency to witness ground for new trial); *United States v. Bagley,* 473 U.S. 667 (1985)(failure to disclose impeaching evidence on request constitutes constitutional error if it deprives defendant of a fair trial); *Kyles v. Whitley,* 514 U.S. 419 (1995)(government has a duty to disclose exculpatory evidence even in the absence of a request if the withheld evidence, considered as a whole, results in a "reasonable probability" that a different result would have obtained, that the suppressed evidence "undermined confidence in the outcome of the trial."  The obligation exists regardless of the good or bad faith of the prosecutor and even if the police have failed to disclose the

evidence to him); *Banks v. Dretke,* 540 U.S. 668 (2004)(failure of the state to disclose that it had rehearsed the testimony of two witnesses used in both the guilt and penalty phases of a capital trial, especially when the witnesses denied any prior conversations with the prosecution, and one of the witnesses received both money and accommodations from the state, was a violation of due process under *Brady*).  As previously stated, it is clearly established  law that "[t]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilty or punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at  87; *Mahler*, 537 F.3d at 499; *Kopycinski v. Scott*, 64 F.3d 223, 225 (5th Cir. 1995).  The duty to provide favorable evidence applies "even when the accused fails to specifically request such evidence."  *Mahler*, 537 F.3d at 499 (*citing Strickler*, 527 U.S. at 280; *Kyles*, 514 U.S. at 433).

To prevail on a *Brady* claim, a petitioner "must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material" to his guilt or punishment.  *Mahler*, 537 F.3d at 500 (*citing Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994)).

### 3.  The Prosecution Suppressed Evidence Concerning A. P. Merillat.

Under *Brady*, the prosecution's duty to disclose favorable evidence is not limited to evidence within the actual knowledge or possession of the prosecutor.  It is well-settled that *Brady* obligates the "individual prosecutor . . . to learn of any favorable evidence known to the others acting on the government's behalf . . .  [,] including the police."  *Mahler*, 537 F.3d at 499 (*citing Kyles*, 514 U.S. at 437).  Furthermore, under certain circumstances, the prosecution may be deemed in constructive possession of *Brady* material.  *See United States v. Webster,* 392 F.3d 787, 798 n.20 (5th Cir. 2004) (*citing Martinez v. Wainwright*, 621 F.2d 184, 186-87 (5th Cir.

1980) (finding no suggestion in *Brady* "that different 'arms' of the government are severable entities" and thus holding that prosecutor had suppressed deceased's rap sheet, which resided in medical examiner's office and had been provided by the FBI); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (finding prosecution was in possession of criminal history of witness even though no background check was conducted, reasoning, in part, that "[i]f disclosure were excused in instances where the prosecution has not sought out information readily available to it, [the court] would be inviting and placing a premium on conduct unworthy of representatives of the United States Government."); *United States v. Deutsch*, 475 F.2d 55, 57-58 (5th Cir. 1973) (finding prosecutor was, for purposes of *Brady*, in possession of information in Postal Service files).

Although the availability of information is measured in terms of whether the information is in the possession of some arm of the State, *Crivens v. Roth*, 172 F.3d 991, 997-98 (9th Cir. 1999) (*citing United States v. Perdomo*, 929 F.2d 967, 971 (3d Cir. 1991)), for purposes of *Brady* "the prosecution is deemed to have knowledge of information readily available to it." *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991).

In Mr. Coble's case, the State was in possession of evidence challenging Merillat's credibility.  As Merillat testified, part of his responsibilities included investigating felonies occurring in the Texas prison system, and providing special investigative assistance to local district attorneys and Statewide Capital Murder prosecution assistance.  Thus, Merillat's assistance to the prosecutorial team in Mr. Coble's case in the form of his testimony, at the minimum, means the prosecutorial team against Mr. Coble was in possession of Merillat's knowledge concerning his dealings in the Canales  case.  *See e.g. United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) (imputing knowledge of state law enforcement team that witness'

-424-

lawyer had been paid from state funds to federal prosecuting team and finding that "nondisclosure, whether stemming from negligence or design, was the responsibility of the prosecutor.").

Furthermore, as the Fifth Circuit has held in the past, there is no suggestion in *Brady* "that different 'arms' of the government are severable entities." *Martinez*, 621 F.2d at 186-87. As in *Martinez*, here, the prosecution team was in constructive possession of the letters written by Merillat, when Merillat, funded by the Governor's office of the State of Texas, was required to assist and consult with local district attorney's offices as part of the Statewide Capital Murder prosecution assistance.

As in the case of *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980), the prosecution in Mr. Coble's case cannot argue that it did not possess the impeaching evidence against Merillat because it did not seek it. As in *Auten*, "[i]f disclosure were excused in instances where the prosecution has not sought out information readily available to it, [the court] would be inviting and placing a premium on conduct unworthy" of representatives of a State seeking the death penalty against a defendant. *Id.*

Nor could Petitioner easily access the information through the "well-honored, traditional non-*Brady* method of simply asking the witness while he is testifying." *See e.g. Crivens v. Roth*, 172 F.3d at 998; *Titsworth v. Dretke*, 401 F.3d 301, 307 (5th Cir. 2005). Merillat ducked the subpoena issued to him and the prosecutor and the trial court denied Mr. Coble a hearing on this claim. Any testimony Merillat gave, had he honored the subpoena and testified at the hearing, would have been limited to the claims on which the hearing was granted: the ineffective assistance of counsel claims.

Thus, evidence that could be used to impeach Merillat's testimony was suppressed at Mr.

Coble's death penalty trial.

Independent of this error, to the extent this information was available at the time of trial, counsel was ineffective for investigating and presenting it.

### 4. Evidence That Could Be Used to Impeach Merillat Was Favorable to Mr. Coble.

"*Brady* encompasses evidence that may be used to impeach a witness's credibility." *Kopycinski*, 64 F.3d at 225 (citing *Bagley*, 473 U.S. at 676).

The communications between Merillat and various inmates raises doubt as to Merillat's credibility and the accuracy of his testimony. While Merillat testified that no one, either a judge or a jury, could tell the prison system where or how to house an inmate (29 RR 37-38), Merillat's letters show that he, although independent from the prison system, could tell the prison system how to house an inmate who was assisting SPU obtain evidence against other inmates. (Exhibit 25, [SPU 6/15/98 Letter]; [Eason to Merillat 6/2000]; [SPU 7/12/2000 Letter]; [Whited 4/4/2000 Letter].)

Merillat testified that

there are only seven or eight particularly very bad gangs that will get you automatically sent to ad seg. That's the only time you're automatically going to be sent to ad seg, if you're a confirmed member of eight gangs out of the numerous gangs....Because they're fixing to take a lot of privileges away from a human being and put them in ad seg, so they have to document the fact that he belongs to one of the seven or eight gangs. It's a very lengthy process."
(29 RR 44-45.)

But he neglected to mention that gang members, even while still participating in gang related activities, can get out of Administrative Segregation merely in exchange for their cooperation with SPU. (Exhibit 25 [Whited 4/4/2000 Letter].)

The evidence of Merillat's dealing with these inmates in exchange for favors and suppressing exculpatory evidence would certainly have cast him in a different light in the mind

of the jury, to say the least.  The suppressed evidence concerning Merillat's role in the Canales investigation and prosecution was favorable to Mr. Coble's case because it is quintessential impeaching evidence.

### 5. The Suppressed and Favorable Evidence Was Material for Mr. Coble's Death Sentence.

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *Kopycinski*, 64 F.3d at 225-26.  "[O]nce a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review.  Assuming, *arguendo*, that a harmless-error enquiry were to apply, "a *Bagley* error could not be treated as harmless, since a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict." *Kyles*, 514 U.S. at 435 (internal quotation marks and citations omitted).  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  *Bagley*, 473 U.S. at 682.

Merillat's credibility was instrumental to the finding that there was a probability that Mr. Coble would commit acts of violence while in the prison system if given a life sentence, because Merillat testified that opportunities of violence were abundant there.  Merillat went as far as saying that his testimony, at least when it came to the number of escapes within the prison system, was more believable than what the Department of Corrections itself published.  (35 RR at 126.)

As Merillat himself has described in his article, "[i]n the numerous capital cases [he has]

been called to testify in, that question -- the "future danger" issue -- has become the central, significant matter under consideration."[235]   According to Merillat himself, his testimony is instrumental in capital death cases, because:

> [T]he information that I bring to juries quite frequently rebuts defense testimony and theories that if a capital murderer is given a life sentence, the restrictions placed upon him would make it nearly impossible for him to continue a course of violence after arriving at prison. It is not uncommon for capital murder juries to hear testimony from many retired TDCJ administrators who travel across the state testifying for the defense. If jurors hear only testimony from these witnesses who attempt to portray a picture of a super-secure prison system designed to prevent convicted killers from victimizing anyone during their time in prison, then verdicts can render favorably to defendants.  But those verdicts might not be rendered on what is factual. The information that follows is a sampling of what I testify to when called into capital trials.  The facts will illustrate why jurors over the years may have been convinced to issue affirmative answers to the future dangerousness question after hearing this testimony.  A benefit to you readers who are on the defense bar is that you can examine and dissect this information, put your heads together, and come up with ways to rebut my testimony and convince jurors that I am a crackpot.  Most important, however, the citizens who pay for the Texas prison juggernaut deserve to know the facts.  When I write articles, give lectures, or even have informal conversations regarding the crime situation in Texas prisons, I never fail to receive reactions betraying the fact that few people know what it's really like in our state's penitentiary system.
>
> (Exhibit 23 at 1175 [Merillat Article].)

Basically, as has been and is being shown in the Canales cases and others, Merillat is a "crackpot" and a complete disclosure of his actions, including those in the case of Mr. Canales, would have allowed Mr. Coble's attorneys  to prove this to the jury and come up with ways to rebut his testimony by showing that Merillat has himself suppressed exculpatory evidence in at

---

[235]   Exhibit 23  at 1174 [A. P. Merillat, *The Question of Future Dangerousness of Capital Defendants*, 69 Tex. B.J. 738, 738 (2006)].)

least one death penalty case, thereby putting into question his credibility.

Had Merillat's trickery in the investigation of Mr. Canales and his trial been revealed,[236] defense counsel in Mr. Coble's case would no doubt had reminded the trial court, as well as the jury, of the utmost duty a prosecutorial team has to follow the law.  As the Supreme Court has stated:

> [A Prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor -- indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629,  79 L. Ed. 2d 1314 (1935).

As part of the SPU, and in particular, as part of the prosecutorial team that prosecuted Mr. Canales, Merillat not only struck hard blows, as he should have, but he also struck foul ones. Without the disclosure of the evidence illustrating Merillat's foul strokes in other death penalty cases, Mr. Coble's defense team could not challenge Merillat's credibility.

Because Texas law requires the jury to be unanimous when voting for death, "the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death." *Kirkpatrick v. Whitley*,  992 F.2d 491, 497 (5th Cir. 1993) (discussing Louisiana law).  Thus,

---

[236]  Canales was prosecuted by the Special Prosecution Unit out of Hunstville.  *Canales v. State*, 98 S. W. 3d 690 (Tex. Crim. App. 2003); Appellant Canales' Opening Brief,  2001 WL 34386405, *3.  Trial in the Canales case was conducted from October 24 to October 27, 2000. *Id*. at *9.

there is a reasonable probability that, had the evidence been disclosed to the defense, at least one juror could have changed with respect to the imposition of the death penalty.  In Mr. Coble's case, the suppressed evidence is sufficient to undermine confidence in the outcome of Mr. Coble's death sentence.[237]

Because the State suppressed impeaching evidence concerning Merillat, and because Merillat's testimony was material to the jury's finding that Mr. Coble could commit acts of violence while in prison if given a life sentence, rather than a death penalty, Mr. Coble's death sentence was the result of a *Brady* violation which deprived him of due process.  As such, Mr. Coble's sentence to death does not pass constitutional muster and should therefore be vacated.

### 6.  The State Deprived Mr. Coble of His Right to Confront Merillat.

Independent of the error described above, the State deprived Mr. Coble of his right to confront Merillat when it suppressed the evidence described above.  *See Burbank*, 535 F.3d at 358 (defendant's confrontation rights violated where he refused to permit cross examination on witnesses' plea deal); *Davis*, 415 U.S. at 316-17.

The State argued falsely that this issue presented "no controverted previously unresolved factual issues material to the legality of Applicant's confinement" (Answer at 20) and the trial court and the CCA adopted that argument.  By not designating any of the Merillat claims as the subject of the live evidentiary hearing, Mr. Coble was deprived of the opportunity to cross examine and confront Merillat on these issues.  When subpoenaed by Petitioner for that hearing, he ducked that subpoena and did not inform counsel that he was allegedly "out of town" until the

---

[237]If, through the course of Mr. Coble's habeas proceedings, counsel discovers that the prosecutors were aware that Merillat was testifying falsely or allowed his untrue testimony to go uncorrected, in violation of *Napue* and its progeny, counsel will amend his Application accordingly.

day prior to the hearing.

This error, in conjunction with the errors described above, warrants habeas relief.

**7.  Conclusion**

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do  not mandate relief standing on their own, relief is required when this claim is  considered together with the additional constitutional errors outlined in the  remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Coble's sentence.

<u>**CLAIM TEN**</u>**: TRIAL COURT ERRORS DEPRIVED PETITIONER OF DUE PROCESS AND A FAIR TRIAL.**

Petitioner's death sentence is unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and applicable provisions of the Texas Constitution, because he was denied a fair and impartial tribunal due to the many errors committed by the trial judge.

<u>**Claim Ten(a)**</u>**: Trial error and a Confrontation Clause violation in the admission of hearsay testimony from Amy Zuniga.**

This sub-claim was presented as point of error number eleven on direct appeal and as Claim 10(a) on state habeas.

**A. Facts Presented to the State Courts.**

The facts presented on direct appeal were as follows:

Amy Zuniga testified about an incident when she was approximately 17 years old. According to Zuniga, she had taken a shower and was in her room changing clothes when she heard her sister rapping on the window and yelling. Zuniga looked outside and saw Petitioner leaving in his truck. Her sister Karen came in and told her she had seen Petitioner outside looking through the window at Zuniga. (20 RR 208-09.)

Petitioner objected to Zuniga's testimony and the trial court took the issue up outside the jury's presence. (20 RR 196.) In that hearing Zuniga testified that her sister was standing in the kitchen, which was when she "banged" on the window. She then went outside, and after Petitioner drove away came back inside. She then came into Zuniga's room and told her what happened. (20 RR 198-99.) Upon questioning by the State, she

said her sister was still upset, excited and irritated. (20 RR 203.) The State offered the statement as both a present impression and excited utterance, and it was admitted on that basis. (20 RR 204-05.)

The facts presented on state habeas were similar, as follows:

During the testimony of Amy Ivy Zuniga, the prosecution attempted to introduce hearsay testimony regarding a prior extraneous act relating to Mr. Coble alleged conduct in 1989, twenty years prior to the re-trial.  (20 RR 192 *et. seq.*)  The witness related an alleged incident where she had taken a shower and heard a commotion that indicated her sister was "very mad and frustrated."  (20 RR 193.)  The defense objected to this on the grounds of hearsay and Confrontation Clause.  (20 RR 194.)  The prosecution countered that it was an excited utterance. (20 RR 194.)

Outside the presence of the jury, the witness testified that "my sister said that she observed my uncle (Petitioner) watching me through the window while I...was dressing."  (20 RR 195.)  "She had caught him."  (20 RR 195.)  Her sister was "very angry."  (20 RR 196.)  Her sister was beating on the kitchen window and then came into Ms. Zuniga's bedroom and said that Mr. Coble had driven away.  (20 RR 198.)  After she observed Mr. Coble, she went through her room into the back yard, Mr. Coble drove off and then she came back in and made the statement.  (20 RR 199-200.)  Mr. Coble's truck was about 30 feet from the window.  (20 RR 201.)  The whole transaction took about three minutes.  (20 RR 201.)

The state argued that the statement was "made under the stress of that event, which is the excited utterance."  (20 RR 196-197.)  The defense countered that it was not a present sense impression but a three-minute series of events which is not a present sense impression.  (20 RR

203.)  She was not excited, she was angry.  (20 RR 204.)  The defense also stated that it was a

violation of the Confrontation Clause because it was a person telling another person an

impression of what they saw.  (20 RR 204.)  The sister was available and could come in and

testify.  (20 RR 204.)

The State argued that under Rule 803(1), present sense impressions and statements made

immediately after are allowed.  (20 RR 204.)  The Court allowed the testimony as a present

sense impression and an excited utterance.  (20 RR 205.)  Clearly it was neither.

**B. What the State Courts Held.**

On direct appeal, the CCA held as follows:

> In his eleventh point of error, appellant claims that the trial judge erred in
> admitting Amy Zuniga's testimony that her sister, Karen, told her that appellant
> was looking in her bedroom window as she was dressing. Appellant objected to
> hearsay, but the trial judge admitted Amy's testimony as both an excited utterance
> and a present sense impression. We conclude that the trial judge did not abuse his
> discretion in finding that Karen's out-of-court statement was admissible as an
> excited utterance exception to the hearsay rule.
>
> Amy Zuniga testified that appellant was her uncle and, when she was
> young, she thought he was a model of how a parent should be because he was so
> nice to his own son. However, Amy changed her mind about appellant when she
> was fifteen. She explained that one day she was sitting in a rocking chair in her
> nightgown, when appellant came in and pulled her legs apart; then he made "a
> vulgar display like he was licking me" between her legs. After that, she avoided
> him. But right before appellant moved into Amy's mother's home shortly before
> the murders, Amy came out of the shower and was changing her clothes in her
> bedroom when she heard a "commotion from the kitchen, a beating on the
> window." Then Karen ran through Amy's bedroom door from the kitchen, went
> outside through her back bedroom door, and started yelling. Amy peeked out
> through the curtains and saw appellant driving off in his truck. Then Karen came
> back inside, "very mad and frustrated. She was red, angry." Karen told Amy that
> she had seen appellant outside looking through the curtains as Amy was dressing.
>
> The trial judge admitted Karen's out-of-court statement to Amy based on it
> being both an excited utterance and a present sense impression. We need examine
> its admissibility only under the excited utterance exception. An excited utterance
> is a statement that relates to a startling event or condition, and it is made when the
> declarant is still under the stress of excitement caused by the event or condition.
> Appellant contends that Karen's statement was not admissible as an

excited utterance because there was no showing that she was in the "grip of violent emotion, excitement or pain." She was angry, not excited. The critical question, however, is not the specific type of emotion that the declarant is dominated by—anger, fear, happiness—but whether the declarant was still dominated by the emotion caused by the startling event when she spoke. Appellant also argues that Karen's statement was not admissible because there was no independent evidence of the startling event—appellant's "Peeping Tom" conduct. Appellant cites to a Texas Supreme Court case, *Richardson v. Green,* which applied the common-law "res gestae" rule. But Rule 803(2) changed the common law; the current rule does not require independent evidence of the exciting event before the trial judge may admit the declarant's statements relating to that event. The trial judge decides, under Rule 104(a), whether there is sufficient evidence to prove an exciting event, and he may consider the statement itself in making that decision. Here, for example, the trial judge could consider the evidence that Amy said that she (1) heard her sister banging on the kitchen window, (2) saw Karen run through her bedroom and out the door, and (3) saw appellant driving off just before Karen returned to tell her that appellant was peeping in her bedroom window. That evidence, when combined with Karen's statement, would support a finding of the startling event—appellant's "Peeping Tom" conduct.

Because we conclude that the trial court did not abuse his discretion in admitting Karen's excited utterance, we overrule appellant's eleventh point of error.

(*State v. Coble,* 330 S.W.3d 253, 293-295 (Tex. Crim. App. 2011)(footnotes omitted.)

On state habeas, in the State's Answer, the prosecutor argued the claim was raised and rejected on direct appeal. State's Answer at 21. The CCA adopted that finding in its opinion and held it to be procedurally barred. *Ex parte Billie Wayne Cobie,* WR-39,070-03 (Tex. Crim. App. Feb. 8, 2012).

### C. Why the State Court Was Objectively Unreasonable.

The CCA erred because:

### a) This Was An Excited utterance.

There is no doubt that Zuniga's testimony about what her sister told her is hearsay, and therefore inadmissible unless it falls within an established exception. One such exception is the excited utterance exception, which is set forth in Rule 803(2), TEX. R. EV. An excited utterance

-435-

is a statement that relates to a startling event or condition and that is made while the declarant is under the stress or excitement caused by the event or condition.  This exception is based on the idea that when statements are "made in the grip of violent emotion, excitement or pain" the capacity for reflection necessary to fabricate a falsehood does not exist. *King v. State*, 631 S.W.2d 486 (Tex. Crim. App. 1982)

Petitioner suggests there was no showing that Zuniga's sister was in the "grip of violent emotion, excitement or pain." At best, the evidence shows she was irritated, upset or angry. Zuniga also referred to her as "angry". Someone operating under anger is someone who may be prone to exaggerate or fabricate. In Texas Rules of Evidence Handbook (4th ed. 2001), it is noted that the relationship requirement is to ensure that the statement is "truly spontaneous and not the result of reflection, which could inject such factors as self-interest, anger or vindictiveness into the utterance." In other words, statements attributed to anger are suspect.

Even if the declarant was in the necessary state of excitement, the statement would still not be admissible because there is no independent proof of the incident. In *Richardson v. Green*, 677 S.W.497 (Tex. 1984) the court held there must be independent proof of the occurrence to which the statement relates, and the statements themselves cannot be used to prove the exciting event. The court also held that evidence establishing an event "could" have occurred is not sufficient.  *Richardson* was a pre-rules case. It's continued validity was addressed in *Rodriquez v. State*, 802 S.W.2d 716 (Tex. App. - San Antonio, 1990). There, the court held that even if the new Rule brought forth a less demanding standard, there still had to be some evidence establishing that the event occurred. In this case, the only independent evidence was that Zuniga saw Petitioner drive away in his car, which is not sufficient to establish he was even standing outside in the yard, much less looking through her window.

-436-

**b) Present sense impression**

The CCA did not examine the present sense impression theory, as it held the statement was admitted as an excited utterance. Statements of present sense impression are admissible when made while the declarant is perceiving the event or condition, or immediately thereafter. *See,* Rule 804(1) There is no doubt the statement was made after the alleged event, and after she had gone outside and come back inside, which is not sufficiently contemporaneous with the event to be trustworthy. By the time she had walked back inside she had an opportunity to reflect and therefore had the opportunity to fabricate.

**c) Harm**

The State introduced this evidence as part of its theme that Petitioner had an unnatural attraction to young girls. As already discussed above, Petitioner had been a model prisoner, and there was little likelihood that a jury could rationally find he would be a danger while confined in prison. To secure an answer to the special issue the State needed evidence that appealed to the jury's passions, such as the evidence here. In light of the lack of other evidence, the introduction of this evidence resulted in harm, and therefore his sentence should be vacated.

Petitioner also respectfully refers the court to the discussion at the end of this claim, which relates to all sub-claims of trial error.

**<u>Claim Ten(b)</u>: Trial error for admitting hearsay from J. R. Vicha.**

Witness J.R. Vicha was allowed to testify regarding hearsay, a conversation he had with his father Bobby Vicha, a few days before his death.  A few days before this happened, Bobby Vicha told J.R. where certain valuables were hidden in the house.  (22 RR 198-199.)  Mr. Vicha thought his father was doing that because he felt that something might happen to him.  (22 RR

200.)   Defense counsel objected to the question regarding whether the witness felt his father thought something might happen to him on the basis of hearsay and that it was speculation on the part of J.R. Vicha.   (22 RR 198.)  They also objected as to relevance, and 404(b), unduly prejudicial.  (22 RR 199.)  But the testimony was allowed.  22 RR 200.  This was clearly hearsay.

**Claim Ten(c): Trial error for admitting  hearsay from Mike Voss.**

The prosecution elicited hearsay from Mike Voss:

Q.  Okay.  Now you...you knew the family because you were dating Anne Marie; is that right?
A.  Correct.
Q.  Can you tell us whether that had a pretty devastating effect on them?
A.  It's still to this day.  I mean the girls still have nightmares.  Anne Marie still has nightmares.  It's traumatic for everybody.
(23 RR 20.)

**Claim Ten(d): Trial error in the denial of motions for a mistrial.**

The portion of this claim relating to Karen Vicha was brought on direct appeal as points of error number nine and ten and also on state habeas as part of habeas Claim 10(d).

The portion of this claim relating to Lorna Sawyer was brought on direct appeal as point of error number nine and also on state habeas as part of claim 10(d).

On direct appeal, these incidents were presented as claims of trial error under Texas law. On state habeas, these incidents were presented as constitutional claims of the deprivation of the right to a fair trial.

**A. Facts Presented to the State Courts.**

The facts presented to the state courts on direct appeal and on state habeas were essentially the same.

The prosecution's main witness, Karen Vicha, blurted out the following from the stand:

-438-

THE WITNESS: "And I hate you for making me go through this again and my kids. You're mean." (23 RR 94.)  At a recess, counsel pointed out that she made the statement "in a very tearful state. What the witness did was to turn in her chair, look directly at Mr. Coble and say something along the lines of, I hate you for making me go through this.  That was an unsolicited comment not made in response to any of the Government's questions."  (23 RR 94.) The court instructed the jury to ignore the remark.  (23 RR 96.) A motion for a mistrial was denied. (23 RR 96.)

Petitioner suffered prejudice, as the jury was given the false impression that the new trial and the prosecution's decision to seek another death penalty for a sixty-year-old inmate in poor health was somehow Coble's decision and within his powers to prevent.  We know that Karen Vicha's testimony elicited extreme emotions from both the jury and the prosecutor.[238] This was another indication that the trial should have been held in a different venue, as the level of animosity and hate toward Petitioner was large. Failure to grant a mistrial only rewarded the prosecution for this witness' deliberate prejudicing of the jury.

Another similar incident occurred when Lorna S. Sawyer, Petitioner's cousin, as she was being seated, blurted out "evil piece of shit" directed at Petitioner.  (24 RR 101.)  Defense attorneys asked for a mistrial, citing Rule 403, and the Fifth, Sixth, and Eighth Amendments. (24 RR 103-104.)  The motion for a mistrial was denied.  (24 RR 104.)

Later she was asked: Q.  Lorna, are you still afraid of the defendant? A.  Actually, uh, without being ugly, I'd like to go there and just knock the shit out of him.  (24 RR 110.)  Yet again, a motion for a mistrial was denied.  (24 RR 111.)

---

[238]   *See* Exhibit 6 at 67, where juror "Clay Brown was among jurors who cried during testimony, specifically that of Karen Vicha."  The prosecutor Mr. Segrist stated that "he broke down in tears four times."  *Id.* at 66.

**B. What the State Courts Held.**

The CCA's holding as to points of error nine and ten was as follows:

A trial judge's denial of a motion for mistrial is reviewed under an abuse of discretion standard, and his ruling must be upheld if it was within the zone of reasonable disagreement. We have held that an outburst from a bystander or witness "which interferes with the normal proceedings of a trial will not result in reversible error unless the defendant shows that a reasonable probability [exists] that the conduct interfered with the jury's verdict."  In the context of such outbursts, the trial judge's instructions to disregard are generally considered sufficient to cure the impropriety because it is presumed that the jury will follow those instructions.

Appellant relies upon *Stahl v. State*, [749 S.W.2d 826 (Tex. Crim. App. 1988)] for his claim that the judge's instruction to disregard the spontaneous outbursts could not have cured their prejudicial effect and those outbursts must have interfered with the jury's verdict. But *Stahl* was decided upon the basis of prosecutorial misconduct, not merely the witness's emotional outburst. In *Stahl,* the prosecutor called the victim's mother to the stand, knowing that she was prone to emotional outbursts, and asked her to identify a photograph of her dead son. She burst into tears and yelled, "Oh, my god. My baby. My God.... May he rest in hell. May he burn in hell. Oh, my baby." The judge instructed the jury to disregard, but the prosecutor "exacerbated" the impact by repeatedly referring to the incident in closing argument. The prosecutor's "deliberate" and "persistent" conduct, "in direct contravention of prior rulings by the judge" indicated "a desire to impermissibly sway the jury." Indeed, the court of appeals had suggested that the *Stahl* prosecutor "actually orchestrated the original outburst."

In this case, however, there is no suggestion that the prosecutor anticipated the short emotional outburst by Ms. Vicha in the middle of her lengthy testimony or the entirely inappropriate start of Ms. Sawyer's testimony. In the first instance, the prosecutor agreed with the correctness of an instruction to disregard and, in the second, he did not attempt to justify Ms. Sawyer's outburst. The trial judge immediately instructed the jury to disregard those outbursts, and we must presume that the jurors followed these instructions.  The prosecution did not refer to, or attempt to capitalize upon, the outbursts during closing arguments. Furthermore, they occurred during the sentencing stage of a capital murder trial, not the guilt stage as in *Stahl.* At the punishment hearing, evidence of the defendant's character is both relevant and admissible as is the opinion testimony concerning good or bad character traits by those who know him. Obviously, character evidence must be offered in a proper form and be responsive to specific questions, so these outbursts were not proper, but their potential for prejudice was less than had they occurred during the guilt phase of a trial.

Because we conclude that nothing in the record suggests that the outbursts were of such a nature that the jury could not follow the trial judge's instructions to disregard them, we overrule appellant's points of error nine and ten.

(*Coble v. State,* 330 S.W.3d 253, 292-294 (Tex. Crim. App. 2011)(footnotes omitted)

On state habeas, the CCA adopted the prosecutor's proposed findings and conclusions, which held that the issue was "addressed and rejected on direct appeal." State's Answer at 22, Exhibit 27. The State did not request a hearing on the issue. The CCA held the issue to be procedurally barred. *Ex parte Billie Wayne Coble,* WR-39,707-03 (Tex. Crim. App. Feb. 8, 2012.)

### C. Why the State Court Holding Was objectively Unreasonable.

To the extent that Petitioner's argument on direct appeal only went to trial error, that is not cognizable federal constitutional error. However, on direct appeal, petitioner argued, as to point of error number nine, that the outbursts in this case must be considered together. Petitioner also suggested that it is significant that the comments were made by a witness; as a witness, the jury was made aware of their situation and their involvement in the case. Also, as one of the State' witnesses, the State was hoping the jury would find them to be credible. The comments here evidenced an extreme dislike – even hatred  - of appellant.  It is hard to imagine how that could not influence a jury; they were being asked to decide whether appellant should live or die, and the obvious strong feelings exhibited by Sawyer is something they would be expected to consider.  As such, the Court should have granted a mistrial, and the failure to do so requires the reversal.

As to point of error number ten, Ms. Vicha's outburst, Petitioner admitted on direct appeal that he must establish that the comment had some impact on the jury's verdict. Put another way, did it cause the jury to return the verdict on something less than a fair evaluation of the evidence?  As with the statements made by Sawyer, Petitioner suggested the

emotions exhibited by Vicha was clearly something that would impact most jurors. The comment also referred indirectly to the fact that Petitioner had already been convicted and sentenced once before. She blamed Petitioner for making her testify again, and in doing so may have also influenced the jurors to do so. In fact though, it was the State who chose to place her on the stand. After his sentence was reversed, that decision was out of Petitioner's hands. He clearly could not agree to a death sentence; if the State wanted a death sentence again, they would have to go through another trial. They could have agreed to a life sentence, and Petitioner could have agreed to that. However, they did not do so, and therefore the decision was theirs.[239] In short, the jurors may have chosen to punish Petitioner for something that was not within his control.

Petitioner suggested that even if these two instances are not sufficient standing together, they are when taken together. There is no doubt that this court can consider cumulative error. As such, the court can consider the cumulative effect the comments by both Sawyer and Karen Vicha. Taken together they interject the possibility that the jury's decision was based on an improper factor, and therefore his sentence should be set aside.

As to the question of how the CCA erred as to the denial of the claims on state habeas, Petitioner refers the Court to his arguments at the end of this section.


**Claim Ten(e): Trial error in limiting cross-examination of Ms. Sawyer.**

**A. Facts Presented to the State Courts.**

This claim was brought on state habeas as Claim Ten(e).

---

[239]Although there was testimony on this, you would assume that decision was made with some input from the family.

The defense attorney attempted to ask witness Ms. Sawyer, the source of the two outbursts discussed above, if she had made accusations of sexual assault, such as she made against Mr. Coble, against other members of her family and an objection was sustained.  (24 RR 115.)  The defense stated that it went to her credibility as none of these accusations were ever proved and she had not come forward with any of them nor "made any comments until recently. She's making a false accusation."  (24 RR 116.)  The prosecutor stated that she had been victimized as a child, but had not provided the defense with this information.  (24 RR 117.) However, the court ruled that "this ground of inquiry is [not] appropriate."  (24 RR 119.)  The defense was also not allowed to ask whether she had been under a psychiatrist's care (24 RR 123) or whether she had been diagnosed with a mental illness or whether she was taking any kind of psychotropic medication.  (24 RR 124.)

The defense objected and put on a Bill of Exception on the grounds that they had been deprived of the right to effective cross-examination and confrontation under the Sixth Amendment, the right to effective assistance of counsel under the Sixth Amendment, due process under the Fifth Amendment and deprived Mr. Coble of a fair individualized sentencing proceeding.  (24 RR 126-127.)  Defense counsel also objected under Rule of Evidence 601, in that mental status, if it goes to credibility, is admissible.  (24 RR 127.)  The defense cited *Green v. Georgia* and *Holmes v. South Carolina.*  (24 RR 128.)  The prosecutor cited Rule of Evidence 608(b) where "specific instances of conduct for a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime that's provided by 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence."  (24 RR 129.)  The defense then made a proffer that they would ask the witness if she had ever accused her uncle Kenneth Atkins, her brothers Joe and Darrell Atkins, her sister's first husband

Charles Baker,  or her cousin Melvin Fuller of sexually assaulting her.  (24 RR 133-134.)  They would also ask whether she is currently under a mental health professional's care and whether she was taking mental health drugs.  (24 RR 134.)

In denying inquiry into this area, the court erred in forbidding legitimate impeachment of this witness.

### B. What the State Court Held.

The State in its Answer argued that the claim should have been brought on direct appeal. Answer at 22.  The trial court adopted this finding and so did the CCA.  *Ex parte Coble,* WR-39,707-03, Tex. Crim. App. Feb. 8, 2012).

This claim is record-based and could have been brought on direct appeal, as the CCA held.  However, as shown above, the claim is meritorious and the failure to bring it was ineffective assistance of appellate counsel, brought on state habeas as Claim 19.

**Claim Ten(f)**: **Trial error in allowing the prosecutor to cross-examine defense expert Dr. Cunningham regarding a tremendously prejudicial and irrelevant past case involving  Al Qaida and Osama Bin Laden.**

### A. Facts Presented to the State Courts.

Probably the most serious, and certainly the most prejudicial trial error occurred when the trial court allowed completely irrelevant and extremely prejudicial cross-examination of a defense expert.  The following testimony occurred as the prosecution tried to prejudice the jury against Dr. Cunningham and Mr. Coble on a totally unrelated matter concerning Al Qaida terrorism:

> Q.   And you've testified in the United States of America versus Osama bin Laden in New York in July of 2001, didn't you?
> A.   Yes, sir.  June or July of 2001.
> Q.   It was July the 26th.
> A.   Okay.

Q.   And you were testifying at that time about a -- an Al-Qaida member who was being tried, were you not?

A.   No, sir.  That doesn't characterize my testimony.

Q.   All right.  You were called by the attorneys for an Al-Qaida member who was on trial; is that correct?

A.   Yes, sir.

Q.   And the -- the defendant's name in that case was Khalfan Khamis Mohamed, right?

A.   Yes, sir.

Q.   Okay.  And he was an Al-Qaida member, correct, that -- Mr. Mohamed was an Al-Qaida member, right?

A.   I did not know the facts specifically of the case other than what any of us would know from the newspaper.  But my understanding is --      Q.   You testified in the trial, correct?

A.   Yes, sir.

Q.   You didn't know the facts of the case you were testifying in, sir?

A.   Only indirectly.  My role was to testify about conditions of confinement, super maximum conditions of confinement in the Federal Bureau of Prisons that could be brought to bear with an inmate and also to testify about the rates of violence among convicted terrorists in the bureau of prisons up to that point.  I was a teaching witness about violence among terrorists in federal prisons and about super maximum confinement in federal prison.  I did no risk assessment of Khalfan Mohamed.  I was not testifying specifically about the facts of the case.

Q.   All right.  So, the thing is somebody -- the defense attorney dialed you up and said, oh, I'm not going to tell you a thing about the case, but just come in and talk about federal prisons; is that what happened?

A.   No, sir.

Q.   So you knew who you were testifying for, correct?  You knew who you were being called by the defense attorneys to give testimony in that case, right?

A.   Yes, I did.

Q.   And you were paid for it, correct?

A.   I was paid for my time.

Q.   You were paid for your time.  And you charged for your time, didn't you?

A.   Yes, sir, I did.

Q.   Okay.  And you testified -- now, Mr. Mohamed was charged as being part of a conspiracy that bombed the United States embassies in Tanzania; was he not?

A.   Yes, sir.

Q.   And over 200 people were killed; is that right?

A.   That's my recollection.  I don't have the specifics of that.  There were two bombings, in Nairobi and in Tanzania.  Which one he was affiliated with exactly, which casualties were associated with which incident, I don't recall.

Q.   Well, he was charged as a conspirator in both of them.

MR. HUNT: Your Honor, I'm going to have to object to this line of questioning.  This is not a terrorism.  That's just a grossly prejudicial line of questioning.  He didn't do the

-445-

same kind of analysis

that he's done in this particular case, so I fail also to see the relevance to this particular case of this line of questioning.

Q.    (BY MR. LONG)  Let me ask you this.  You testified about the federal prison system, correct?

A.   Yes, sir.

Q.    Okay.  Now, there's no psychological area of evaluating federal prisons, is there? There's no area in psychology about evaluating federal prisons?

MR. HUNT:  I'm also going to have to object to this testimony about the federal prisons. This is not a case that implicates the federal prison system.  This is a Texas state system.

MR. LONG:  He's testified all about the federal prison system.

MR. HUNT:  Maybe he has, but that's not relevant to this -- to what this jury has to do in this case.

THE COURT:  I'm going to overrule the objection.

A.   That is within the area of psychology.

Q.    (BY MR. LONG)  So you told -- do you -- when Mr. Patrick Fitzgerald asked you that question, you told him it was not?

A.   I don't recall that answer.  I would want to see the transcript and its context.

Q.    I'll be happy to find it in a minute.

A.   Thank you.

Q.    Well, I'm not going to take the jury's time. But you were asked by Mr. Fitzgerald if that was part of the discipline of psychology and you answered, no, it was not evaluating the federal prison system.

A.   I don't accept that representation without seeing the transcript and the context that it was in. It has been seven years ago.  And so, I don't have an instantaneous and photographic memory.  But I would want to see that.

Q.    Now, you testified that the federal prison system can safely harbor this Al-Qaida member; did you not?

A.   No, sir.  I don't think I made an individualized determination in that case.

Q.    Well, you were being called to testify on behalf of -- you were called by the defense attorneys  to give testimony that they believed to be beneficial for Mr. Mohamed, an Al-Qaida member, correct?

A.   That was their determination.

Q.    That was their determination. And that was the person that they were representing when they put you on the stand to say that a federal prison system could safely house an Al-Qaida member?  That's what --

A.   No, sir.  That was not my testimony.

Q.    Your -- your testimony -- you testified about the federal prison system and their ability to house  terrorists, didn't you?

A.   I testified about conditions of confinement at ADX Florence.  I tested -- which is a super maximum facility and rates of violence within that facility.  I testified about the prison behaviour outcomes of convicted terrorists in the bureau of prisons.

Q.    And your testimony was basically that they could house him, a terrorist like him there safely, right?

A.   I don't recall coming to any particularized conclusion about Khalfan Mohamed.

-446-

Q.   Well, you testified about some members of the -- you did specifically mention some members of the World Trade Center bombing and -- that said the prison system could house them successfully?

A.   I don't recall that I said it could house them successfully.  I recall discussing the rates of violence in the bureau of prisons, about various -- the terrorists that included those that were involved in the first World Trade Center bombing.

Q.   And you said that you -- your idea was that they could bring enough force to bear on him that he --they would be able to house him without his being a substantial risk to the society, didn't you?

A.   No, sir.  You have mischaracterized my testimony again.  I repeatedly described that I was describing what conditions could be brought to bear,  what rates of violence were in those facilities and what the historical experience of violence had been among convicted terrorists.   I did -- I made no   individualized application to Mr. Mohamed.

Q.   And rates of violence on terrorists, correct?

A.   I described the experience of violence among those inmates in federal custody.

Q.   And we talked about terrorists, did we not?

A.   Those are the rates that I described.

Q.   Okay.

A.   Based on the convicted terrorists who had been in custody up to that time.

Q.    All right.  So by testifying about the success -- what you showed is the ability to house  terrorists, you were talking about being able to house this Al-Qaida member, right?

A.   No, sir.  I described the rates from a scientific standpoint.  I described the conditions of confinement from a scientific standpoint.  The application of that was something that the attorneys or the jury did.  I provided the best understanding of what conditions are available and what rates of violence are in that setting.

Q.   And what did your statistics show?

A.    The statistics demonstrated that -- that serious assaults in ADX, in this super maximum confinement are relatively low.   They're even lower now because of subsequent changes in procedures.  But I described that those rates -- I presented them.  I didn't say they were low.  I presented the statistics about how often assaults occur of various severities.  I described the history of incidents, misconduct, assaults associated with those who had been convicted of terrorism and related experiences who were in..At that time, very few of them in super maximum confinement.  They were in other facilities at that time.

Q.   Now, you would agree with me, would you not,that if the federal prison system is housing somebody like an Al-Qaida member, they need to take extreme measures to make sure that person isn't a threat to the United States, correct?

A.   Yes, sir.  I don't have an expert opinion about that.  I'm not involved in policy decisions about what security is required for what inmates.  But I do think it's proper prison procedure to evaluate inmates and determine what level of custody they require and what level of security they require to provide for safety.

Q.   And you would agree with me that an Al-Qaida member would be more dangerous than the ordinary federal inmate, right, statistically?

A.   I -- I have not looked at those -- at those data for seven years.  At the time that I was

testifying, at that point in time, the incidents of serious violence among those individuals in federal

custody was not very high, despite the horror and gravity of what they had done in the community at large.  Now, the specifics of it, I would have to go back to my testimony and -- and identify.  But they were -- I don't recall that there was an extraordinary incidence of serious assaults among that group.

Q.   We hadn't been dealing with them for real long, have we?

A.   Some of them had been in custody at that point for probably a decade.  Others more recent.  They weren't all Al-Qaida.  There were other terrorists related groups as well who were in custody.

Q.   I'm talking about the Al-Qaida members.  We didn't have a lot of them in custody then, did we?

A.   The total sample that I looked at may have been less than 20 of all the groups.  And so, there couldn't have been too many Al-Qaida.  But I don't recall the specifics of it.

Q.   And, of course, 9/11 happened less than three months after that where the Twin Towers were knocked down, right?

A.   Yes, sir, that's correct.

 Q.   Now, you would agree with me, would you not, that a person that is willing to commit suicide in order to -- or willing to kill themselves in order to accomplish an objective can be very dangerous, can't  they?

A.   Yes, sir, depending on where they are and what means they have access to.

Q.   Okay.  Well, just real -- the World Trade Center, for instance, the first time they tried to bomb it, right?

MR. HUNT:   Your Honor, I completely question the relevance of this line of questioning.

MR. LONG:  I'll get to the relevance in just a moment, if you'll indulge m

THE COURT:  Okay.  I'll give you a little leeway.

Q.   (BY MR. LONG)  They tried to bomb the World Trade Center first, right?

A.   Yes, sir, by driving a van full of explosives underneath one of the towers.

Q.   And --

A.   In the '93 range, as I recall.

Q.   And they left, correct, and the truck was detonated and the tower didn't come down, right?

A.   That's correct.

Q.   Okay.  That group of people weren't willing to -- didn't commit suicide in order to try to get  their objective done, did they?  They tried to do it by leaving a bomb and walking away from it, right?

A.   That's correct.

Q.   Okay.  Then on 9/11, they flew planes into the tower, killed themselves and were able to accomplish their objective, right?

A.   Yes, sir.  Tragically, they did.

Q.   Okay, sir.  So a person that's willing to give up his life to accomplish a goal can be more dangerous than somebody that's willing to -- isn't willing to make that sacrifice, is willing to keep themselves safe, correct?

A.   They may be harder to stop if they're willing to die in the process.

-448-

Q.   And that makes them more dangerous, doesn't it?

A.   Well, if --

Q.   It can?

A.   I don't know that it makes them more dangerous.  It makes them -- it makes them more difficult to stop on that operation.  Now, if somebody were dangerous who decides to plant explosives all over the country and -- and stay at large for months, are they more dangerous than somebody who commits a single

incident.   In terms of lives lost and destruction, the guy that stayed alive and did widespread damage clearly represented a larger threat and took more lives.  But it is -- it is difficult to -- to -- it's more difficult to stop someone in approaching a target if they're willing to die in the process.

Q.   All right, sir.  That's what I'm talking about.   And let's say if someone was being escorted by a sheriff's deputy out of the courtroom in the rotunda here, if the person tried to push the deputy over the railing, drop him down to the concrete below, he might -- he might succeed or he might not, right?

A.   Yes, sir.

Q.   Okay.  Now, if that person grabbed the deputy and threw himself over the rail and was hauling the deputy with him, his chances of succeeding would probably be greater than the person that just pushed, wouldn't it?

A.   I don't know that that's the case.

Q.   Good possibility, though, right?

A.   I'm not a physics person to give you an estimate of -- of exactly what's involved in the guys dropping as opposed to pushing --

Q.   I'm just asking you for common sense here. Not physics.

A.   I don't have a common sense answer to which way is more successful, to push or grab and hold.  I don't know which one of those would work better to go

over the rotunda.

Q.   Now, if somebody like an Al-Qaida member has an abiding hatred for the west, the older they get, that may not temper them in their pursuit of trying to

cause harm, would it?

A.   That might not.

Q.   Now --

A.   Many of these individuals are young as they are engaging in this.  Most of the suicide bombers are very young.  So youthfulness seems to be a part of that

zealous -- zealous sort of thing as opposed to folks that are 40 or 50.  But somebody could be in a leadership position and not age out of their political agenda.

Q.   So a person that hadn't -- like an Al-Qaida member with an abiding hatred of the west, they could very well possibly continue to be dangerous all their

life, right?

MR. HUNT:  Your Honor, again I'm going to have to object to the relevance of this whole line of questioning and that it's unfairly prejudicial under

403 because, again, we're talking about a terrorist and that is not related to this case at all.

THE COURT:  Overruled.

(27 RR 238-252.)

This testimony went on for no less than 14 pages of trial transcript, perhaps a quarter of an hour. Mr. Coble's case had nothing whatsoever to do with terrorism, Osama Bin Laden, or Al Qaida. The only possible purpose was to bias and prejudice Petitioner's jury against him and his expert. The Court seriously relinquished its duty to guard against undue prejudice. This error alone, given its severity, deprived Petitioner of a fair trial.

**B. What the State Court Held.**

This claim was brought on state habeas as Claim 10(f). The State in its Answer argued that the claim could and should have been brought on direct appeal, but it was not. The trial court and the CCA adopted this holding and the claim was held to be procedurally barred. *Ex parte Coble,* WR-39,707-03, Tex. Crim. App. Feb. 8, 2012).

**C. Why the State Courts Holding Was Objectively Unreasonable.**

This claim is record-based and could have been brought on direct appeal, as the CCA held. However, as shown above, the claim is meritorious and the failure to bring it was ineffective assistance of appellate counsel, brought on state habeas as Claim 19. This error was major and very blatant as well as highly prejudicial and it was objected to by defense counsel. It occupied 14 pages of trial transcript. Failure to bring this claim on direct appeal falls well outside the prevailing range of expertise of appellate counsel.

Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has the right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). This right extends not only to effective assistance at trial, but also to effective assistance of counsel on state appeals as of right. *Evitts v. Lucey*, 469 U.S. 387, 394-397 (1985). Petitioner's appeal in this case was an appeal as of right. Tex. Code Crim. Proc. Art. 11.071. Accordingly, Petitioner's right to the effective assistance of counsel extended to his

appeal in this case.

Appellate counsel herein rendered ineffective assistance of counsel in unreasonably failing to investigate, research, prepare or present this claim.

**Claim Ten(g): Trial error in limiting Dr. Cunningham's testimony by excising statistics and references to life-without-parole inmates.**

**A. Facts Presented to the State Courts.**

Dr. Cunningham collected data on inmates serving life without possibility of parole sentences.  (27 RR 55-57.)  He stated that he would confine his risk analysis to the risk in prison but the jury could consider other factors.  (27 RR 57.)  He stated that the statute did not restrict testimony to future risk in prison society.  (27 RR 58.)

Dr. Cunningham was asked about his studies on life-without-parole inmates.  (27 RR 71.) These prisoners were used to show statistically how capital offenders behave in prison as they were all capital inmates.  (27 RR 72-74.)  The study showed that life-sentenced individuals and those sentenced to death were only about one-half as likely to be involved in prison assaults as the parole eligible inmates.  (27 RR 75.)  The study also showed that when death-sentenced inmates are mainlined, and they still have a death sentence pending, they have the same rate of assaults as the life-without-parole inmates who don't have a death sentence pending, which would negate the testimony that death-sentenced individuals have an incentive to behave.  (27 RR 75.)  The witness stated that you could not predict how violent someone is going to be in prison from the seriousness of the offense that sent them to prison.  (27 RR 76.)    The statistics showed that the life-without-parole inmates had about the same rates of violence as those serving long prison sentences.  (27 RR 78.)

The Court ruled that all statistics based on inmates who are serving life-without-parole sentences were irrelevant and this part of Dr. Cunningham's presentation was redacted.  (27 RR 90-94.)  The Court also ordered Dr. Cunningham to redact and not refer to any data that was obtained from his interview with Mr. Coble, or else the defendant would lose his Fifth Amendment privilege.  (27 RR 60-94.)

The trial court decimated Dr. Cunningham's testimony by excising all references to life-without-parole statistics. This was error, as the references to the statistics would not have been interpreted as meaning that such a sentence was available for Coble, which is what the statute is concerned about.  Petitioner was prejudiced thereby, as the error caused the defense to be unable to refute the prosecution's main point, presented through Dr. Coons and Mr. Merillat, that life-sentenced individuals are more likely to commit future acts of violence than those on death row. Cu

It was additionally prejudicial because this opened the door to the prosecution's fallacious  point  that ALL of Coble's good behaviour on death row for 19 years was  irrelevant because no mater how well he had behaved, it was still more likely that he would be dangerous if given a life sentence than a death sentence.  It had the pernicious and unlawful effect of totally invalidating all of Coble's mitigating evidence.  If the jury believed, erroneously, that he would still be more dangerous with a life sentence than a death sentence, then they could safely ignore the lack of any dangerous or violent acts in the last 19 years.

**B. What the State Courts Held.**

This claim was presented on state habeas as Claim 10(g). The State in its Answer argued that the claim could and should have been brought on direct appeal, but it was not. Answer at 23. The trial court and the CCA adopted this holding and the claim was held to be procedurally

barred. *Ex parte Coble,* WR-39,707-03, Tex. Crim. App. Feb. 8, 2012).

### C. Why the State Courts Holding Was Objectively Unreasonable.

This claim is record-based and could have been brought on direct appeal, as the CCA held. However, as shown above, the claim is meritorious and the failure to bring it was ineffective assistance of appellate counsel, brought on state habeas as Claim 19. This error, like the previous one, was major and very prejudicial as it severely limited the testimony of Dr. Cunningham.

Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has the right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). This right extends not only to effective assistance at trial, but also to effective assistance of counsel on state appeals as of right. *Evitts v. Lucey*, 469 U.S. 387, 394-397 (1985). Petitioner's appeal in this case was an appeal as of right. Tex. Code Crim. Proc. Art. 11.071. Accordingly, Petitioner's right to the effective assistance of counsel extended to his appeal in this case. Appellate counsel herein rendered ineffective assistance of counsel in unreasonably failing to investigate, research, prepare or present this claim.


### Claim Ten(h): Trial error for allowing Ms. Yamada to testify.

### A. Facts presented to the State Courts.

The prosecutor committed misconduct when it called Ms. Patricia Yamada (Wooley), the sister of Mr. Coble's ex-wife Ms. Wooley, to testify regarding an alleged sexual assault. (20 RR 90-91.) The defense received inadequate notice and objected to this witness's testimony. (20 RR 91.) The witness's statement was tendered only immediately before her testimony. (20 RR 94.) Thus, the trial Court erred when it allowed this testimony. (20 RR 94-95.)

The defense had previously filed a formal motion to request prior extraneous offenses and made several oral requests for notice of these events.  (20 RR 91.)  While the prosecution claimed they had provided her statement to the defense, the defense denied ever having seen it.  (20 RR 92.)   The prosecution claimed there was no obligation to produce her statement as they had listed her in the witness list. (20 RR 92.)  But the prosecution had 119 named witnesses on that list, making any prior preparation by the defense problematic.  (20 RR 93.)  The defense objected to Ms. Yamada's testimony on Eighth Amendment grounds, as this was a capital case.  (20 RR 93.)

The Court overruled the defense objection.  (20 RR 94-95.)  But the Court apparently then had second thoughts and called the parties back to chambers.  (20 RR 99.)  The prosecution admitted they had received a formal request for extraneous incident evidence, and the defense stated they had never received any response.  (20 RR 99.)  The prosecution claimed there was no notice requirement.  *Id.*  The defense stated that they made, in addition to the written request,  an oral request for any extraneous offenses.  (20 RR 100.)  They claimed a Fifth Amendment due process violation as well as Eighth Amendment grounds.  (20 RR 101.)  The prosecution stated that Lorna Sue Atkins never gave a statement and they thought the defense already knew about it.  (20 RR 102-103.)   The Court stated that the prosecution had complied with all the provisions of Tex. Code Crim. Proc. 37.0711, overruled the defense objection that they had not received notice, and allowed the testimony of Ms. Yamada.  (20 RR 104-105.)

### B. What the State Courts Held.

This claim was presented on state habeas as Claim 10(h).  The State in its Answer argued that the claim could and should have been brought on direct appeal, but it was not. Answer at 23. The trial court and the CCA adopted this holding and the claim was held to be procedurally

barred. *Ex parte Coble,* WR-39,707-03, Tex. Crim. App. Feb. 8, 2012).

### C. Why the State Courts Holding Was Objectively Unreasonable.

This claim is record-based and could have been brought on direct appeal, as the CCA held. However, as shown above, the claim is meritorious and the failure to bring it was ineffective assistance of appellate counsel, brought on state habeas as Claim 19.

Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has the right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). This right extends not only to effective assistance at trial, but also to effective assistance of counsel on state appeals as of right. *Evitts v. Lucey*, 469 U.S. 387, 394-397 (1985). Petitioner's appeal in this case was an appeal as of right. Tex. Code Crim. Proc. Art. 11.071. Accordingly, Petitioner's right to the effective assistance of counsel extended to his appeal in this case. Appellate counsel herein rendered ineffective assistance of counsel in unreasonably failing to investigate, research, prepare or present this claim.


**Claim Ten(i): Trial error in allowing an unqualified witness, Philip Pierce, to testify.**

### A. Facts Presented to the State Courts.

Phillip Pierce, an administrator in the Criminal District Attorney's Office in McLennan County, testified that he reviewed some military records of Mr. Coble. (20 RR 220.) Mr. Pierce was not in the military at the time the records related to, 1965 to 1969. 20 RR 222. The witness entered the military in 1974. (20 RR 223.) The defense objected to his testimony on Sixth Amendment grounds if the purpose of the testimony was "to elicit any kind of misconduct." (20 RR 224.) The Court allowed Mr. Pierce's summary. (20 RR 225.)

Mr. Pierce's lack of relevant personal knowledge of the military in the years Coble

served became evident on cross-examination. The witness was completely uninformed regarding the details of the various campaigns Mr. Coble participated in (20 RR 238-240); had "no personal knowledge of his activities in Vietnam" (20 RR 238); did not know where Quang Tri province was, where most of Coble's missions took place (20 RR 239-240); was not familiar with Mr. Coble's educational record (20 RR 243); had no knowledge of what conditions were like at Guantanamo Bay (20 RR 248); did not know what the pay schedule was or how the demotions affected Coble financially (20 RR 248); and did not know whether Mr. Coble was entitled to legal representation at the disciplinary hearing in 1969 (20 RR 250).

### B. What the State Courts Held.

This claim was presented on state habeas as Claim 10(i).  The State in its Answer argued that the claim could and should have been brought on direct appeal, but it was not. Answer at 23-24. The trial court and the CCA adopted this holding and the claim was held to be procedurally barred.  *Ex parte Coble,* WR-39,707-03, Tex. Crim. App. Feb. 8, 2012).

### C. Why the State Courts Holding Was Objectively Unreasonable.

This claim is record-based and could have been brought on direct appeal, as the CCA held.  However, as shown above, the claim is meritorious and the failure to bring it was ineffective assistance of appellate counsel, brought on state habeas as Claim 19.

Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has the right to the effective assistance of counsel.  *Strickland v. Washington,* 466 U.S. 668, 686 (1984).  This right extends not only to effective assistance at trial, but also to effective assistance of counsel on state appeals as of right.  *Evitts v. Lucey*, 469 U.S. 387, 394-397 (1985).  Petitioner's appeal in this case was an appeal as of right. Tex. Code Crim. Proc. Art. 11.071.  Accordingly, Petitioner's right to the effective assistance of counsel extended to his

appeal in this case.  Appellate counsel herein rendered ineffective assistance of counsel in unreasonably failing to investigate, research, prepare or present this claim.

**Claim Ten(j): Trial error for allowing Ms. Ryan to express an opinion on future dangerousness.**

**A. Facts Presented to the State Courts.**

The defense objected to the prosecution asking witness Candy Ryan whether she thought Mr. Coble would be violent in the future, on the grounds that it called for speculation; it went to the ultimate issue; and she was not qualified to render such an opinion.  (21 RR 52.)  She though he would be violent in the future.  (21 RR 52.)  Ms. Ryan also thought he would continue to be violent the rest of his life.  (21 RR 53.)

Clearly Ms. Ryan was unqualified to render such an opinion.  The incidents of violence which she recounted, none of which apparently required either hospitalization or medical attention, had occurred well over 20 years prior to the re-trial.  She had no contact with Mr. Coble in the interim;  was perhaps unaware of his violence-free record in the more than 20 years; was not an expert on the propensity for future violence.  Her "opinion" was nothing more than deep-seated prejudices and animosity dressed up as relevant evidence of future dangerousness, one of the special issues which the jury was charged with answering.  Her "opinion" was far more prejudicial than probative and it should not have been allowed.

**B. What the State Courts Held.**

This claim was presented on state habeas as Claim 10(j).  The State in its Answer argued that the claim could and should have been brought on direct appeal, but it was not. Answer at 23. The trial court and the CCA adopted this holding and the claim was held to be procedurally

barred. *Ex parte Coble,* WR-39,707-03, Tex. Crim. App. Feb. 8, 2012).

### C. Why the State Courts Holding Was Objectively Unreasonable.

This claim is record-based and could have been brought on direct appeal, as the CCA held. However, as shown above, the claim is meritorious and the failure to bring it was ineffective assistance of appellate counsel, brought on state habeas as Claim 19.

Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has the right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). This right extends not only to effective assistance at trial, but also to effective assistance of counsel on state appeals as of right. *Evitts v. Lucey*, 469 U.S. 387, 394-397 (1985). Petitioner's appeal in this case was an appeal as of right. Tex. Code Crim. Proc. Art. 11.071. Accordingly, Petitioner's right to the effective assistance of counsel extended to his appeal in this case. Appellate counsel herein rendered ineffective assistance of counsel in unreasonably failing to investigate, research, prepare or present this claim.

### Claim Ten (k): Cumulative trial error.

### A. Facts presented to the State Courts.

Even if this Court holds that none of these errors individually deprived Mr. Coble of a fair trial, cumulatively they had this effect. In *Taylor v. Kentucky,* 436 U.S. 478 (1978), the Supreme Court accepted the notion that several errors, none of which individually rise to constitutional dimensions, may have the cumulative effect of denying a defendant a fair trial. In *Taylor,* the Court did not assess each error to determine whether it was individually harmless. Nor did the Court concern itself only with errors which individually were of constitutional dimension. Instead, the Court evaluated the circumstances surrounding the defendant's trial to

determine that the state had denied the defendant fundamental fairness as guaranteed by the Due Process Clause of the Fourteenth Amendment. As the Fifth Circuit has held, a trial is fundamentally unfair if "there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Kirkpatrick v. Blackburn,* 777 F.2d 272, 278-79 (5th Cir. 1985), *cert. denied,* 476 U.S. 1178 (1986).

### B. What the State Courts Held.

This claim was presented on state habeas as Claim 10(k). The State in its Answer argued that the claim could and should have been brought on direct appeal, but it was not. Answer at 24. The trial court and the CCA adopted this holding and the claim was held to be procedurally barred. *Ex parte Coble,* WR-39,707-03, Tex. Crim. App. Feb. 8, 2012).

### C. Why the State Courts Holding Was Objectively Unreasonable.

This claim, to the extent that it is record-based, could have been brought on direct appeal, as the CCA held. However, as shown above, the claim is meritorious and the failure to bring it was ineffective assistance of appellate counsel, brought on state habeas as Claim 19.

Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has the right to the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). This right extends not only to effective assistance at trial, but also to effective assistance of counsel on state appeals as of right. *Evitts v. Lucey*, 469 U.S. 387, 394-397 (1985). Petitioner's appeal in this case was an appeal as of right. Tex. Code Crim. Proc. Art. 11.071. Accordingly, Petitioner's right to the effective assistance of counsel extended to his appeal in this case. Appellate counsel herein rendered ineffective assistance of counsel in unreasonably failing to investigate, research, prepare or present this claim.

### D. Argument and harmless error analysis.[240]

The State has a burden to prove that a trial court violation of a constitutional right was harmless beyond a reasonable doubt.  *Chapman v. California,* 386 U.S. 18 (1967).   Under *Chapman,* it was held that a conviction must be reversed unless it can be said beyond a reasonable doubt that the *jurors did not give any weight* to any of the tainted evidence.  *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1991) ("Harmless-error review [under *Chapman*] looks...to the basis on which the jury *actually rested* its verdict...The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict surely would have been rendered, but whether the guilty verdict in *this* trial was surely unattributable to the error." (emphasis in original; citations and internal quotation marks omitted).  The state cannot meet its heavy burden of proving that a trial error was harmless beyond a reasonable doubt merely by showing that the untainted evidence was legally sufficient to support the jury's verdict.  *Satterwhite v. Texas,* 486 U.S. 249 (1988).  "The question is whether there is a reasonable possibility" that the error "might have contributed to the verdict." *Fahy v. Connecticut,* 375 U.S. 85, 88 (1963).

Under *Chapman,* reversal is required unless the state can show beyond a reasonable doubt that the constitutional violation had no effect on the judgment.  *Arizona v. Fulminante,* 111 S. Ct. 1246, 1258 (1991).  The *Chapman* standard has been applied to many constitutional violations, including admission of improperly obtained confessions and other "trial error...error which occurred during the presentation of the case to the jury."  *Id.* at 1263-64.  *Chapman* is an exacting standard of review—the state must prove that the error "did not contribute to [the petitioner's] conviction."  *Id.* at 1257.

---

[240]   This analysis is applicable not just to this claim, but to any claim  in which harmless error analysis may be thought appropriate.

There are some constitutional violations as to which "there is no need for...harmless error review" because the error "could not be treated as harmless." *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).   Examples are the kind of all-pervasive errors and prosecutorial misconduct analyzed in this claim  and others herein. This exception was announced in Justice Stevens concurring opinion in *Brecht:*

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not"substantially influence" the jury's verdict.  *Cf. Greer v. Miller,* 483 U.S. 756, 769 (Stevens, J., concurring in judgment) *Brecht,* 507 U.S. at 638 n.9.

As Justice Stevens explained in his concurrence in *Greer v. Miller,* "there may be extraordinary cases in which the...error is so egregious, or is combined with other errors or incidents of prosecutorial misconduct, that the integrity of the proceeding is called into question." *Greer,* at 768-69.

**CLAIM ELEVEN: MR. COBLE WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW BY THE MISCONDUCT OF THE PROSECUTOR.**

During Mr. Coble's trial, several improper and prejudicial cross-examinations and statements by the prosecutors so infected the proceedings as to make the sentencing re- trial fundamentally unfair. These comments and argument denied Mr. Coble due process of law as required by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and similar provisions of the Texas Constitution.

**A. Facts Presented to the State Courts (as to all sub-claims).**

**Claim Eleven(a): The prosecution committed misconduct in cross-examining Dr. Mark Cunningham on irrelevant incidences, including his testimony in an unrelated terrorism case.**

The prosecution asked defense expert witness Dr. Mark Cunningham extensive questions regarding a totally unrelated case in which Dr. Cunningham had testified in 2001, *United States v. Osama bin Laden,* in a further attempt to bias the jury against Mr. Coble. (27 RR 238-252.) Despite a total lack of relevance to the current case, the prosecutor was allowed to pursue this line of questioning for no less than 14 pages of trial transcript. (*Id.*) The defense objected after three pages of this testimony. (27 RR 241.)

Dr. Cunningham was questioned about a case seven years prior to Mr. Coble's trial, in 2001, where he was called by the defense attorneys for Khalfin Khamis Mohamed, an alleged Al Qaida member. (27 RR 238-239.) Dr. Cunningham was asked to testify regarding conditions of confinement in federal prisons, which was not in issue in this matter and completely irrelevant. (27 RR 240.) He did not perform any risk assessment on Mr. Mohamed. (27 RR 240.) Yet the prosecutor was allowed to elicit that 200 people were killed in the crime for which Mr. Mohamed was charged, the U.S. embassy bombings in Kenya and Tanzania (27 RR 241); that at

that trial he was paid by Mr. Mohamed's defense team (27 RR 240-241); that Mohamed  was charged as a conspirator in both embassy bombing crimes (27 RR 241); and that Dr. Cunningham  "was called by the defense attorneys to give testimony that they believed to be beneficial for Mr. Mohamed, an Al-Qaida member." (27 RR 243.)

The prosecutor repeatedly mischaracterized this irrelevant testimony and asserted that Dr. Cunningham had testified that "the federal prison system can safely harbor this Al-Qaida member" (27 RR 243); that the federal prison system could safely house terrorists (27 RR 243-244); that Mr. Mohamed could be safely housed at a super-max federal facility (27 RR 244); that some members of the World Trade Center bombing could be safely housed in prison (27 RR 244); that he had said that Mr. Mohamed could be housed "without him being a substantial risk to the society." (27 RR 244.)  Dr. Cunningham was also asked about whether Al Qaida members needed special security (27 RR 246); and that Al Qaida members "would be more dangerous than the ordinary federal inmate." (27 RR 247.)  He was also asked numerous details about the first and second World Trade Center bombings, even though they were not at all relevant to this matter.  (27 RR 248-249.)   Even after this lengthy exercise in irrelevant prejudice, the prosecutor acknowledged after a defense objection that the World Trade Center bombing and the whole line of questioning had been irrelevant: "Mr. Long [prosecutor]: I'll get to the relevance in just a moment, if you'll indulge me."  (27 RR 248.)   Even after the Court gave him "a little leeway", he failed to do this.  (27 RR 248-249.)   The jury was told that the World Trade Bombings of 9-11-2001 happened three months after Mr. Mohamed's trial; that the first bombers tried to demolish it by parking vans with explosives underneath one of the towers; that these bombers were not willing to commit suicide; and that the 9-11 bombers were able to bring the towers down.  (27 RR 249-250.)   Dr. Cunningham was asked

-463-

if somebody like an Al Qaida member has an abiding hatred for the west, the older they
get, that may not temper them in their pursuit of trying to cause harm, would it?" and "a
person...like an Al Qaida member with an abiding hatred of the west, they could very
well probably continue to be dangerous all their live, right?"
(27 RR 251-252.)

Then the prosecutor tried to make a point about a hypothetical person who wanted to
throw himself over the courthouse rotunda.  (27 RR 250-251.)  If the prosecutor's point in this
questioning was to try to show that "revenge is something people can carry with them all their
lives" (27 RR 254), then it was clear that delving into Al Qaida was both totally irrelevant and
done solely for the purpose of biasing and prejudicing the jury against this witness and Mr.
Coble.

Dr. Cunningham pointed out the utter irrelevance of the whole Al Qaida line of
questioning: "That's [Mr. Coble's crime] not the same as a terrorism political agenda.  That is a
relationship driven event that may have been entirely extinguished by the act itself."  (27 RR
252.)

The prosecutor again mentioned the alleged "evil smile" of Mr. Coble at the hearing.  (27
RR 253.)  He then  improperly stated that "you're coming up here and presenting this show for
Billie Coble, right."  (27 RR 255.)[241] The prosecutor then went on to suggest that the future
dangerousness special issue could be evaluated in such a way as to have the jury consider the
relevant society as the free world, even though there was no chance of this occurring:

Q.   And the statute here reads whether there is a probability that the defendant would
commit criminal acts of violence that would constitute a continuing threat to society,
correct?
A.   That's correct.
Q.   It doesn't just say prison society, does it?

---

[241]   He later stated that he "shouldn't have characterized it as a show."  (27 RR 256.)

-464-

A.  No, sir.
(27 RR 257-258.)

More misconduct followed shortly.  The prosecutor then suggested Mr. Coble might be

paroled:

Q.  Now, we never know, even if somebody has received a life sentence in the Texas
Department of Corrections or if they have received a death sentence, we never know
from any given time if they are going to be incarcerated within the unit there in the Texas
Department of Criminal Justice, do we?
A.  We have a lot of information about that.  We don't have a certainty about that
question.  But we have a great deal of information to inform our judgments about it.
Q.  But we never know at any given time whether someone who's received a sentence
there of either death of (sic) life is going to be incarcerated within the prison system
there, do we?
A.  I think we have a reasonable confidence, yes.
(27 RR 258.)

Even after a bench conference, which was unrecorded, the prosecutor persisted after first

noting that two persons serving life sentences had testified in the trial:

Q.  But...so we never know for sure where anybody is going to be in the prison system at
any time, do we, for certain?
A.  We know they're in custody.  We don't know their exact location.
Q.  And I mentioned it being in the...in the Texas Department of Criminal Justice housed
within that unit.  That's why I asked you.  We never know for sure that anybody, even a
person with a death sentence, is going to always be within those walls, do we?
A.  That's correct.
Q.  And have you done any checking to see if Billie Coble has also been benched out and
testified in other inmates's trials around the state?
A.  That I don't know.
...
Q.  Did you also know that he was here in court about ten years ago for a hearing on his
appeal when he turned around and leered at Karen Vicha?
A.  Yes, sir.  I understand that he was there at that time.
Q.  And he was serving a death sentence in the Texas Department of Criminal Justice,
right?
A.  Yes, sir.
Q.  But he wasn't there that day, was he?
A.  No, sir.  He's still in secure custody, but not within those walls.
Q.  And, of course he's been sitting here for several weeks during this trial, right?
A.  Yes, sir.
Q.  So we don't just look at the Texas Department of Criminal Justice however well they

-465-

may be able to keep them or anywhere else.  The jury is not limited by that question to whether they're going to be a risk in prison.  They have to consider it.  But they also consider how will they be...whether they will be a threat to society?

A.  Yes, sir.  The data that I've provided was not just within the walls.  Those are inmates that are assigned to the...to TDCJ.  So those...those statistics incorporate people that are benched out or taken to the hospital or those kind of things.  That was part of the data that I provided.  And they're pretty professional in the way they secure those inmates to do those transports.

B.  But the jury is supposed to look not just at the prison system, but whether the person constitutes a continuing threat to society, right?

A.  Whether there is a probability that they would commit criminal acts of violence.  Not just that they would be a threat, not just to society, but that they would [commit] criminal acts of violence.  There is a probability of that, a disproportionate or meaningful probability.

(27 RR 260-262.)

The prosecution then improperly tried to get across the idea that all these inmates would always be dangerous to society:  Q.  "As far as the safety of our community, we shouldn't open the doors and let them all out, should we, as far as the safety?" (27 RR 263.)

The prosecution, in another attempt to bias the jury, asked Dr. Cunningham about Mr. Coble having pictures of young gymnasts in his cell.  (27 RR 265-266.)    In a final attempt to appeal to the jury's prejudices, the prosecutor asked a hypothetical that assumed that Mr. Coble still hates Karen Vicha, was essentially delusional, was homicidally angry with her even today, was suddenly at large in the community without supervision, and had access to her.  (27 RR 278-279.)

This cross-examination was obviously improper, irrelevant, and designed only to prejudice the jury against Mr. Coble.  It was nothing but a crude and cynical attempt to bias the jury and inflame their passions and appeal to their obvious hostility toward terrorist organizations.  It was totally irrelevant because nothing in this case had anything to do with terrorism.    As the leading case of *Sheppard v. Maxwell* observed, "legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper."

*Sheppard,* at 350, quoting *Bridges v. State of California,* 314 U.S. 252, 271 (1941).  A defendant

is entitled to a fair trial "in a public tribunal free of prejudice, passion, excitement, and tyrannical

power." *Id.*  There is the requirement that "the jury's verdict be based on evidence received in

open court, not from outside sources", *Sheppard,* at 351, and the "prejudice from such material

'may indeed be greater' than when it is part of the prosecution's evidence 'for then it is not

tempered by protective procedures'" *Id.,* quoting *Marshall v. United States,* 360 U.S. 310, 313

(1959).


**Claim Eleven(b):** **Prosecutorial misconduct in asking a witness to vouch for the truthfulness of the State's witnesses.**

The prosecution repeatedly asked a defense witness, Tom Marvin,  to vouch for the

truthfulness of the State's witnesses.

> Q. [Prosecutor] And at the time that you hired Mr. Coble, you didn't have any knowledge that he was in...had a background of battering women or molesting young girls, did you?
> A.  Certainly not.  And I wouldn't believe that to be true, sir.
> Q.  Okay, sir.  So even if there was evidence of that, you wouldn't accept it; is that correct?
> A.  Uh, I'm not sure what your question means, "If I would not accept"...
> Q.  Well, you said you wouldn't accept it.  Suppose...
> A.  Sir, this is gravity.  I accept that's gravity.  So if you can show me a fact like gravity, I would have to accept it.  Yes, sir.
> Q.  Okay.  But you won't accept testimony in court; is that right?
> A.  I'm not sure where you're going with this line of questioning, sir.  I've already stated that that would be his character.  If you have facts like gravity, I would have to accept it.
> Q.  All right, sir.
> A.  Is that clear?
> Q.  If witnesses came in and testified to those facts that he was battering women, that he was molesting young girls, would you accept those facts if you accepted the witnesses?
> A.  I really don't know where you're going with this flying question.
> The Court: Well, you need to answer the question is what you need to do, okay?
> The Witness: Okay.
> The Court: Would you answer his question?
> Q. [by Mr. Long] If someone came...witnesses came in and testified that Billie Coble was battering women, that he was molesting young girls, if you accepted the truth of the

witnesses, would you accept those facts?
A.  The way that you've stated the question, I would have to say, yes, sir.
(22 RR 68-69.)

## Claim Eleven(c):  Prosecutorial misconduct in referencing and mischaracterizing  Mr. Coble's non-testimonial demeanor in the courtroom in terms of "evil stares."

The prosecution committed numerous instances of misconduct in repeatedly referring to and stressing in argument Mr. Coble's alleged non-testimonial demeanor in the courtroom. Lacking any evidence of "future dangerousness" for the previous twenty years, they resorted to repeatedly referring to alleged "evil stares" by Mr. Coble.  The stares related to an alleged incident at an evidentiary hearing in 1998 when Mr. Coble was admonished by the court not to look at Ms. Vicha.  Ms. Vicha interpreted this as an "evil stare" as she told the jury.  (23 RR 122-123.)  Of course, as she believed Mr. Coble himself was evil, any stare coming from him would also be by definition  "evil."  This meaningless, improper, and prejudicial evidence and argument served to greatly prejudice the jury against Mr. Coble.  This misconduct also shows the utter lack of anything since the 1990 trial that would indicate Mr. Coble had a propensity to commit future acts of violence.

1) The prosecutor questioned Dr. Coons, who, based on the questions,  considered as a bad sign that Coble allegedly made "an evil grin" at his ex-wife.  (24 RR 222.)  This allegedly "evil grin" showed "a truly defective conscience."  (24 RR 222.)

2) In his cross-examination of Dr. Cunningham, the prosecutor again mentioned the alleged "evil smile" of Mr. Coble at the hearing.  (27 RR 253.)

3) In final argument, the prosecutor again mentioned an "evil smile" allegedly occurring at  the hearing ten years ago.  (29 RR 120):   'There was a hearing in this court ten years later and she was sitting out there in the audience.  This man turned and was glaring at her, giving her

an evil smile ten years after slaughtering her family and giving her heartache that lasts for a life. He's grinning at her.  Is that any remorse?" (29 RR 120.)

    4) Yet again at final argument:  "I asked him [Cunningham] about Billie Coble, you know, giving that evil smile to Karen Vicha." (29 RR 124.)

    5) Once again: "Nothing took for him because those evil looks, the I've got you to a person's life he's irreparably damaged, young children." (29 RR 126.)

And when the defense tried to clarify it, an objection was sustained. The defense argued as follows: "I didn't see an evil look.  I didn't see a leer.  But I can understand why Karen would interrupt any look he gave her as being an evil look."  An objection was sustained.  (29 RR 162.)

These improper references to Petitioner's  non-testimonial demeanor in the courtroom have been widely and repeatedly disallowed.  *Wead v.* State, 129 S.W. 3d 126, 128 (Tex.App. 2004); *Good v. State*, 73 S.W. 2d 734, 737 (Tex.App. 1986); *Reynolds v. State*, 505 S.W.2d 265 (Tex. Crim. App. 1974); *Good v. State*, 723 S.W.2d 734 (Tex. Crim. App. 1986).


**Claim Eleven (d): Prosecutorial misconduct in improperly prejudicing the jury.**

The prosecution  presented the argument, mainly through A. P. Merillat, that even administrative segregation and high security would be a risk, even though Mr. Coble had never had any disciplinary infractions in 18 years.  Their position was that no security is ever high enough to protect from future acts of criminal violence, so send him to death row, and the jury bought it.

Mr. Merillat claimed, without first-hand knowledge,  that "the working non-ranking prison guards...don't know why an inmate is serving time."  (29 RR 40.)  He also claimed that the inmates get a new set of clothes every day.  (29 RR 40.)  Despite Mr. Coble's discipline-free

18 years, the witness was asked about "ad seg" or administrative segregation, where inmates are sent after bad or violent acts.  (29 RR 41-42.) The witness tried to give the impression that even that restrictive confinement would be dangerous:  "Even then, we've prosecuted murders and escapes from administrative segregation."  (29 RR 42.)   He also talked about "high security", a housing when administrative segregation "wasn't working," for "inmates who were too bad for ad seg, who were too bad for general population."  (29 RR 43.)  The witness even claimed that this placement would be dangerous as two murders happened there and inmates have escaped from high security...still people do bad things there.  (29 RR 43-44.)

This was wildly improper questioning and should have been disallowed by the trial court, as it was merely unsupported conjecture with no factual backing that allowed the jury to vote for death on the belief that the only safe place for Petitioner was death row.

**Claim Eleven(e):**   **Prosecutorial misconduct by presenting irrelevant and prejudicial evidence regarding  gang activity in prison.**

The witness A. P. Merillat was even allowed to testify regarding gangs in prison, even though there was no evidence that Mr. Coble had ever been in a gang.  The defense objection to this testimony was overruled.  (29 RR 44.)   Mr. Merillat continued:

> Out of the numerous types of gangs that are in prison and the free world, there are only seven or eight particularly very bad gangs that will get you automatically sent to ad seg. That's the only time you're automatically going to be sent to ad seg, if you're a confirmed member of eight gangs out of the numerous gangs.  And confirmation is not simply saying I'm a member or somebody saying he's a gang member.  It's a long process because they have to document.  Because they're fixing to take a lot of privileges away from a human being and put them into ad seg, so they have to document the fact that he belongs to one of the seven or eight gangs.  It's a very lengthy process.
> (29 RR 45.)

Despite the total irrelevance of this testimony, it allowed the jury to consider non-existent

gang activity as a reason to put Mr. Coble on death row again.

**Claim Eleven (f):  Prosecutorial misconduct in bringing up prior irrelevant escapes.**

Despite being warned against any mention of specific acts of misconduct before notifying the defense (29 RR 27), witness A. P. Merillat mentioned an escape:

> Q.  Now, can you give us a contrast between what you've talked about in general population and the Polunsky Unit where people under a death sentence are held?
> A.  Yes, sir.  Death row was moved to the Polunsky Unit in Livingston, Texas after Gurule escaped from Ellis I.
> (29 RR 57.)

The defense objected, which was sustained.  (29 RR 57.)    They also moved for a mistrial, which was denied.  (29 RR 58.)

**Claim Eleven(g):  Prosecutorial misconduct in improperly impeaching the defense witnesses.**

The prosecution attacked virtually all the defendant's witnesses in the same manner. The defense presented much mitigating evidence in the form of past good deeds, an even temper, kindness, meekness, ability to control his temper, and the like. The prosecution would then relate the facts of the 1989 crime and say that showed that he had two sides and that he could effectively hide one side of his personality from the witness.  Not only was the mitigating evidence denigrated, but it showed deviousness and mendacity in so doing. Of course, if Coble had no mitigating evidence, then the prosecutor would have argued that he had only one side, a bad side.

For instance with witness Paul Midgett who was familiar with Mr. Coble's work coaching peewee football, this was the cross-examination:

> Q.  So your assessment from...14, 15 years before these murders was that he was a meek person; is that right?
> A.  Right.
> Q.  And he treated others fine as far as you knew; is that correct?

A.  Yes.
Q.  He...he was a sportsman, he showed good sportsmanship; is that correct?
A.  Yes, sir.
Q.  And he had...his feelings toward children were proper; is that...
A.  As far as I could see.
Q.  As far as you could see.  Well, now you know there's a different side to Bill Coble that you didn't see; you're aware of that; aren't you now?
A.  Well, I'm aware of what happened on the offense, yes.
Q.  Okay.  You know that out of revenge for his wife leaving him, killed his wife's mother, killed his wife's father and killed his wife's brother and kidnaped her and...and pretty near killed her too?
(27 RR 13.)

**<u>Claim Eleven (h)</u>: Prosecutorial misconduct in the definition of the second special issue of future dangerousness.**

The prosecution defined the second special issue, whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, in a manner that is constitutionally deficient in that it would apply to virtually anyone. The prosecutor framed the special issue so that even an instance of momentary threat at some unspecified time in the future would qualify. The trial court committed error when it allowed this testimony and defense counsel were ineffective for failing to object.

At voir dire, the prosecution followed a script and asked the prospective jurors "educational" questions concerning the special issues.  The questioning was largely similar from one juror to the next.  We will here examine the questioning of jurors who actually served on Mr. Coble's jury.

Juror number four, Clay Brown, was asked about the second special issue as follows:

Q.  Okay, sir.  That's...and then...all right.  That would constitute a continuing threat to society.  And the word we'll focus on again is constitutes a continuing threat...the word continuing threat to society.  And notice again the word is continuing, not continuous.
A.  Right.
Q.  It doesn't mean every minute of every day, you know, 24 hours a day, 7 days a week. It just means the defendant would be a ...threat on into the future.  It might be a week from now.  It might be a month from now...It could be way on into the future...*if he had*

-472-

*the opportunity, 10, 20 years from now....*
(9 RR 68.)(emphasis added)

Other jurors faced the same misleading statements regarding this special issue.   Mr.

William Rhoden, juror number five, was questioned as follows:

> Q.  It says criminal acts of violence that would constitute a continuing threat to society.
> And notice again, the word here is continuing, not continuous.  It doesn't mean that he
> has to be a threat every minute of every hour of every day.  It could be on in the future.
> It could be a month from now.  It could be a year from now.  It could be a period of time
> in the future.  What you do is you make a determination, is...is this person such that *some
> point in the future*, given the opportunity, he would...there's a probability that he would
> cause harm to somebody else?
> (11 RR 232-233.)(emphasis added)

Juror number 8, Sammie Campbell, was given the same definition of only momentary

future danger:

> Q.  Okay.  So criminal acts of violence could constitute a continuing threat to society.
> Notice it doesn't say continuous, every minute of every day, you know, 24 hours a day,
> you know, seven days a week.  But it means...it's just on in...*sometime in the future
> because of the background, what you've heard about him, that he's a threat to do
> something to harm somebody*.  Could be a year from now.  Could be 10 years from now.
> A.  Yeah.
> (13 RR 66.) (emphasis added)

Juror number 10, Ms. Leslee Huggins was also similarly instructed:

> A.  That would constitute a continuing threat to society.  And notice here, it doesn't say
> continuous, every minute of every day, but it's a continuing act...it's continuing on into
> the future.  *The person might be dangerous a month from now, a year from now, 10 years
> from now.*  You know, a person might not do anything for some period of time to injure
> anybody or try to harm anyone.  But if you look on...on into the future, based on his
> background, what you've heard about him, decide whether there is a probability into the
> future if he had the desire to do it, was able to, *that he might commit criminal acts of
> violence that would be a danger to society.*
> (15 RR 134)(emphasis added.)

So too, juror Gary Szanto was told by the prosecutor: "Notice that it says not a

continuous threat?...Not all the time every day, but he's the type of person that based upon his

background, his character, what he's done, that he would...he would constitute a continuing

threat sometime...sometime in the future, circumstances present itself, he would be a threat.

**Claim Eleven(i): There were numerous incidences of prosecutorial misconduct at the final argument.**

At the prosecution's final argument (29 RR 117 *et. seq.*) There were many instances of

misconduct:

1) The prosecutor argued as follows:

The thing I think you need to answer first when you make this decision for yourself is Billie Wayne Coble, as he sits in the courtroom today, the same person that he was on August the 29th of 1989. And I submit to you, the person that sits here is the same person that murdered Robert Vicha and Bobby Vicha and Zelda Vicha. This is the same person 20 years later exactly. There is no difference.
(29 RR 119-120.)

This was improper as it was false and contrary to the evidence. It urged and allowed the

jurors to totally ignore all of Mr. Coble's mitigating evidence in arriving at their answer to

Special Issue Number 3 (XIII CR 2350). It also allowed the jurors to ignore 18 years of

violence-free behavior since the first trial.

2) The prosecution also attempted to improperly prejudice the jury against Mr. Coble in

suggesting that he was a paedophile. The prosecutor stated that he

has an unnatural attachment to young girls that he did when he was out in the free world molesting them. You've heard that testimony. You've heard what he did. There's no questioning the evidence about that. And so now, what does he do in his jail cell? He's got pictures of...not pinups of 30-year old women from Playboy. He's got pictures of young girls in various gymnast positions. He's the same person that was a molester and a murderer back on August 29, 1989.
(29 RR 121.)

In reality, the prosecution cherry-picked through hundreds of pages of clippings Mr.

Coble had in his cell, and chose several innocuous non-suggestive pictures of clothed young

women, including a girl holding a flower from a fitness magazine (State's Exhibit 224);

Olympic gymnasts (State's Exhibits 226, 227, 228); and a girl's volleyball team (State's Exhibit

229).   The jury somehow deemed these pictures to be important in their determination of Mr.

Coble's sentence and asked to see them during their deliberations. (29 RR 183.)   This deliberate

prejudicing of the jury was improper.

      3) The prosecutor allowed the jury to base their determination of future dangerousness on

the premise that Mr. Coble would be in the free world or paroled:

> ...ask yourself this question, do you think he's dangerous, would you put him out in the
> street this minute and let him walk out of this courthouse, would anyone vote that way?
> And if you wouldn't, he's dangerous.   And if he's dangerous, there is the probability...he
> hasn't done it yet.   We don't say it is a certainty.   Remember, the law says you look at
> society.   You don't...you're not limited in your view of tunnel vision just to prison.   You
> consider the whole thing, free world and prison.   Is he dangerous?  Yes. No question.
> (29 RR 126.)

      And again he suggested parole or a free-world environment for Petitioner: "Every waking

day of their life they live in dread of this man.   What would he do to us if he had the

opportunity?" (29 RR 127.)

      Prior to argument, the defense specifically objected to this, stating  that introducing the

consideration that the state's argument that Mr. Coble could be a future danger to the Vicha

family were he ever released to the free world rendered the statute, Article 37.0711,

unconstitutional under the Eighth Amendment as it introduced the possibility of Mr. Coble

getting out when that was not a viable option.  (29 RR 103.)  The defense stated that the jury was

being asked to make a decision on future dangerousness based on a situation which they are not

supposed to contemplate, the possibility of his being paroled.  (29 RR 103-104.)

      4) The prosecutor mis-characterized the defense's position on future dangerousness and

misled them regarding probability and statistics:

> Mr. Segrest: They would like to say statistically...statistically speaking, Bill Coble
> is...is...well, actually, statistically, there is no human being in the prison system that is
> actually a danger, according to their statistics.

(29 RR 168.)

This outrageous distortion was objected to by the defense:

Mr. Hunt: Your Honor, that is not correct.  Our statistics don't indicate whether a person

is a danger or not.  That's a misstatement of the facts. (*Id.*)

The Court simply stated that "The jury will recall the evidence as they've heard it

testified to by the witnesses. (29 RR 168.)   Thus enabled by the Court, Mr. Segrest continued

and compounded the misconduct:

> As I recall what was said was that out of 157,000 inmates, their proof was only 2 to 3 per cent were violent.  That means that 97 per cent don't need to be there.
> Now, statistics are statistics.  And smart individuals...I'm not...I'm giving Dr. Cunningham his due.  But, you know, what are ...what is the risk factor of three people being murdered on the same afternoon by their son-in-law?  Even in his testimony, statistically Bill Coble couldn't have committed the crimes.  Statistically, those three people that we have seen and heard about are still alive, statistically speaking....It's not an issue of numbers. And you cannot measure his responsibility by looking at the group, all of the prisoners and say, okay, this is a low incident because we choose what we want to look at.  You saw A.P. Merillat here.  He was talking about those numbers.  They...the doctor talked about his numbers.  A Ph.D talked about his numbers.  He only uses the numbers of serious injury, that is that which requires more than simply first aid.  You know, a busted lip.  How about a strike in the back of the head?  Is that...that's not going to go down in that doctor's statistics because his data needs to be moved in the direction that there is no dangerous person.  You cannot statistically because...do you know why?  Insurance companies use the same type of deal.  They determine risk, and then they assign that based upon these factors.
> Now, he likes to talk, like, Dr. Coons, he was an absolute idiot.  And I think you know better.  You saw the man, you heard him testify, and you know the factors that he outlined when he makes the determination.  It wasn't...he didn't have any supersecret numbers.  But he outlines some of the factors that he considers.  And do you know something?  It's remarkably commonsensical.  It's the same thing I look at, you look at every day to determine what future behaviour somebody is going to be.  You look at their history of violence.
> (29 RR 168-170.)

The prosecutor grossly misled the jurors by improperly denigrating statistics by using the

ex post facto fallacy ("what is the risk factor of three people being murdered on the same

afternoon by their son-in-law?  Even in his testimony, statistically Bill Coble couldn't have

committed the crime"). Of course this was complete and utter nonsense, as we are looking at an unusual event, the crime, after the fact, and this has no bearing regarding probabilities of a future event going forward. This improper argument continued:

> They want to tell you that, okay, because we have a statistician who comes in and looks at part of the data that supports his belief and his little...you notice all of his little Power Point presentation slides up there, quoted himself, cited himself as the authority for his own information. I'm not saying he's not a smart man. But, hey, this...you can't use insurance statistics for an individual assessment of somebody's behavior in the future. So don't fall for that.
> (29 RR 175-176.)

It was also incorrect. It is not at all clear why one can't do this, as insurance companies do it regularly. This basically irrational argument urged the jury to ignore statistics in favour of anecdotal conjecture. As such, it was improper.

Continuing in this vein, the prosecutor told the jury that if Petitioner were given a life sentence, he would, to a certainty, be violent:

> And when you put a man like that in population with the general prison population, he will continue to commit criminal acts of violence and constitute a continuing threat to society, statistically or otherwise, that's because he is a violent, a dangerous person.
> (29 RR 176.)

Similarly, the prosecutor also argued: "And he will be violent if given the opportunity. I don't care where he is. Let's put him on death row where he cannot get to other people." (29 RR 177.)

> He will..is...a probability beyond a reasonable doubt, a probability that he will continue to commit criminal acts of violence and constitute...constitute a continuing threat to society whether it's in or out of prison, especially in general population as a G3.
> (29 RR 180.)

This was completely contrary to the evidence of non-violence for the past nineteen years.

5) The prosecutor repeatedly urged the jury to ignore all the mitigating evidence and told the jury that "justice" equated to a death sentence:

It's no longer about...it's about justice now.  It's no longer about Bill Coble.
(29 RR 177.)

It's not about Bill Coble anymore.  It's about justice for these people.
(29 RR 177.)

It's not about him any longer.  It's about justice, justice for these victims, it's justice for this family over here, the witnesses that you saw.  It's time to put an end to their suffering and render a verdict that is just on this evidence.  This man is violent, he's dangerous, and will continue to be so.
(29 RR 178.)

It is about time that we render justice in this case and so that the people that Bill Coble left in his wake, including his son...
He's a violent killer that deserves to be securely placed on death row.  If he dies there, so be it.  At least he won't continue to be a threat, as great a threat on death row as he would in the general population with a life...capital life sentence.  That's where he should be.  And if some day he pays the price for what he's done, so be it.  That would be justice.
(29 RR 180.)

He has no...there is no...no mitigating evidence that reduces his responsibility and moral guilt for the commission of this crime...
(29 RR 180.)

I'm going to turn back the balance of my time and I'm going to thank you for your verdict on behalf of the people of this State and on behalf of the victims of Billie Wayne Coble.  All of them.
(29 RR 180-181.)

By repeatedly telling the jury that they should ignore the mitigating evidence, the prosecutor rendered this sentencing trial just as unreliable as Mr. Coble's first one, which was reversed because of the possibility the jury thought they could not consider Mr. Coble's mitigating evidence.  Here, the jury was being explicitly told to ignore it.

### B. What the State Court Held.

This claim, and all sub-claims were brought as Claim Eleven on state habeas. The CCA held that this claim was procedurally barred.  (*Ex Parte Billie Waynes Coble,* WR-707-03 (Tex. Crim. App. Feb. 8, 2012).

**C.  Why the State Court Holding Was Objectively Unreasonable Under 2254(d).**

The CCA's holding that these claims are procedurally barred may mean several different things.  The first is that were procedurally barred for failure to raise them on direct appeal.  The State, in its Answer, argued that "when the trial record reveals that the factual bases for 'prosecutorial misconduct' claims were known to Appellant at the time of trial and, therefore, that he could have raised such claims on direct appeal as trial error, those claims are not cognizable on habeas."  State's Answer at 27, Exhibit 27.  Petitioner submits that most or all of these claims, as they involve facts that were in the trial record, were indeed capable of being raised on direct appeal, but they were not.  If so, then these claims should be treated as a part of Petitioner's claim of ineffective assistance of appellate counsel, which was Claim Nineteen in his state habeas application and is also Claim Nineteen herein.

The other possibility is that they were procedurally barred for failure to raise a timely objection at trial.[242]  As to most of the sub-claims, the State explicitly argued this.  *E.g.*, Claim 11(b), "in this claim Applicant does not indicate that he interposed an objection to this testimony.  Clearly this is at its worse trial error..." Answer at 28); Claim 11(c) ("According to this application Applicant did not object," Answer at 28); Claim 11(d) ("According to this application Applicant did not object on these grounds.  Nothing was preserved for direct appeal...", Answer at 29); Claim 11(e) (""Again, no objection was made which would have preserved the claim for direct appeal.  Because of the procedural default the claim could not have been considered on appeal." Answer at 30); Claim 11(g) ("There is no indication of an objection"); Claim 11(h) ("Applicant admits no objection was ever lodged against such characterization, so nothing was preserved for appeal," Answer at 31); Claim 11(I) ("Applicant's

---

[242]   The third possibility is that they were held to be procedurally barred on both grounds.

failure to object to a jury argument forfeits his right to complain about the argument on appeal," Answer at 32.)

The State, in its Answer, also raised this defence to all of the sub-claims: "[t]he facts are clearly established in the record.  This matter should have been litigated at the trial level...(*Id.* at 27-32.)  If so, then they are the result of ineffective assistance of trial counsel, which is the subject to the next claim, Claim Twelve.

**D. The Claims are Meritorious.**

The requirement that information conveyed to juries not be unduly prejudicial is a crucial component of ensuring the effective fulfillment of justice in sentencing proceedings.  Indeed, as the Supreme Court has stated, "[J]urors are not infallible guardians of the public good.  They are ordinary citizens whose decisions can be shaped by influences impermissible in our system of justice. … Arbitrariness, caprice, passion, bias, and even malice can replace reasoned judgment and law as the basis for jury decisionmaking." *TXO Production Corp v. Alliance Resource Corp.*, 509 U.S. 443, 474 (1993).  This is a primary reason why our justice system incorporates safeguards against such influences.  Restricting the State to confine its jury arguments to non-prejudicial matters is one such necessary safeguard.

Where capital cases are at issue, these concerns are greatly heightened.  As the Supreme Court has many times recognized, "death is a punishment different from all other sanctions in kind rather than degree. *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976); *Furman v. Georgia*, 408 U.S. 238, 306 (Stewart, J., concurring).  From this, the Court has reasoned that "heightened reliability is required at all stages of the capital trial. *Shiro v. Farley*, 510 U.S. 222, 238 (1994).  Indeed, it is the "universal experience in the administration of criminal justice that those charged with capital offenses are granted special considerations" and afforded heightened

procedural protections. *Furman v. Georgia*, 408 U.S. 238, 286 (1972); *Stein v. New York*, 346 U.S. 156, 196 (1953) ("In death cases doubts … should be resolved in favor of the accused); *Andres v. United States,* 333 U.S. 740, 752 (1948) (Reed, J., concurring) ("I do not concede that whatever process is 'due' an offender faced with a fine or a prison sentence necessarily satisfies the requirements of the Constitution in a capital case.  The distinction is by no means novel, …nor is it negligible, being literally that between life and death.").

It has long been recognized that misconduct by a prosecutor in closing argument may be grounds for reversing a conviction.  *Berber v. United States,* 295 U.S. 78, 85-88 (1934).  Part of this recognition stems from a systematic belief that a prosecutor, while an advocate, is also a public servant "whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id.,* at 88.

It is the responsibility of the trial court to ensure that final argument is kept within proper and accepted bounds.  *United States v. Young,* 470 U.S. 1, 6-11 (1985).  That responsibility must be discharged with full awareness that "the prosecutorial mantle of authority can intensify the effect on the jury of any misconduct."  *Brooks v. Kemp,* 762 F.2d 1383, 1399 (11th Cir. 1985) (*en banc*).

Decisions concerning penalty phase prosecutorial misconduct, like those regarding other aspects of a capital trial, have been predicated by the maxim that "death is a different kind of punishment from any other which may be imposed in this country."  *Gardner v. Florida,* 430 U.S. 349, 357 (1977).  This difference has required the courts to ensure, by means of procedural safeguards and a heightened degree of judicial scrutiny under this super due process standard, that the death penalty is not the product of arbitrariness or caprice.  "To pass constitutional scrutiny under this heightened standard, the death penalty must not be applied in an arbitrary or

capricious manner.   Rather, there must be 'an individualized determination whether the defendant in question should be executed, based on the character of the individual and the circumstances of the crime.'" *Adamson v. Ricketts,* 865 F.2d 1011, 1021 (9th Cir. 1988) (*en banc*).

Consequently, "[a] decision on the propriety of a closing argument must look to the Eighth Amendment's command that a death sentence be based on a complete assessment of the defendant's individual circumstances, and the Fourteenth Amendment's guarantee that no one be deprived of life without due process of law." *Coleman v. Brown,* 802 F.2d 1227, 1239 (10th Cir. 1986).   The avoidance of arbitrariness in the jury's exercise of its discretion also requires that jurors be "confronted with the truly awesome responsibility of decreeing death for a fellow human..." *Lockett v. Ohio,* 438 U.S. 586, 598 (1978). There are only four permissible areas of jury argument for the State:

    a.  A summary of the evidence;

    b.  Discussion of reasonable deductions from the evidence;

    c.  Response to arguments of Defense counsel; and

    d.  A proper plea for law enforcement.

*Walker v. State*, 664 S.W.2d 338 (Tex.Crim.App. 1984) (citing *HighTower v. State*, 629 S.W. 2d 920 (Tex.Crim.App. 1981)). The examples cited *supra* do not meet this test.

The United States Supreme Court has made it quite clear that the prosecutor may not "attach the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Zant v. Stephens,* 462 U.S. 862, 885 (1983).   It has also been held that it is "clearly improper for a prosecutor to urge the imposition of death because of the race, religion, sex, or social status of the victim." *Brooks v. Kemp,* 762 F.2d 1383, 1409

(11th Cir. 1985) (*en banc*).  *See also Derden v. Wainwright*, 477 U.S. 168, 181-82 (1986) ("the prosecutor's argument may not manipulate or misstate the evidence, or implicate other specific rights of the accused such as the right to counsel or the right to remain silent").

The errors outlined above in part 5 of the oral argument section, wherein improper references were made to the victims, have been found to be constitutional error.  The South Carolina Supreme Court reversed a death judgment for prosecutorial argument in closing argument very similar to that in Mr. Coble's case.  Among other improper arguments, the prosecutor told the jury that the victim's constitutional rights "didn't do much for her that night because [defendant] was her judge, jury and executioner.  And she didn't have the right to be represented by a lawyer to have independent people on her jury."  *State v. Cockerham*, 363 S.E. 2d 22 (S.C. 1988).  The court held this argument improper because it was an indirect comment on defendant's exercise of his right to counsel and jury trial.

In *Commonwealth v. Crowley,* 526 A.2d 334 (Pa. 1987), the Supreme Court of Pennsylvania held improper a prosecutor's argument exhorting the jury to return a death sentence as a message to the judicial system.  The Court found this argument "extremely prejudicial" because "[t]he jury's determination must be based solely upon the evidence of aggravating and mitigating circumstances, not upon an emotional appeal or crusading incitation to make a statement in response to what it portrayed as a failing judicial system."  *Id.* at 344.

A prosecutor's improper closing argument violates the due process clause of the Fourteenth Amendment if it was so prejudicial that it "infected the trial with unfairness." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).  Whether a prosecutor's argument is an impermissible comment on the defendant's right not to testify is reviewed *de novo. United States v. Johnston*, 127 F.3d 380, 396 (5th Cir. 1997);

*United States v. Martinez*, 151 F.3d 384, 391 (5th Cir. 1998).

    **E. Petitioner   was prejudiced by these improper questions, cross-examination and arguments.**

    In the leading case of *Whiting v. State,* 797 S.W.2d 45 (Tex. Crim. App. 1990) the prosecutor argued repeatedly that the State's only burden was to prove the elements of the offense as set out in the information filed in the case.   The court's charge, however, had instructed the jury on self-defense and had correctly placed the burden of persuasion on the State to disprove self-defense beyond a reasonable doubt.   The Court of Criminal Appeals held the trial court erred in overruling the defendant's objection to the State's argument: "the misstatement of law directly impacted upon the jury's perception of the burden to which the state was to be held before a verdict of guilt could be returned against appellant." *Id.* at 48.   The Court of Criminal Appeals remanded the case to the Court of Appeals for a harmless error analysis.

    One of the purposes of the prosecutor's argument was to try to relieve the State from its burden on the third special issue, by improperly stating that the jury could ignore Petitioner's mitigating evidence.   Presumptions or arguments which act to preclude consideration of an element of the crime conflict with the presumption of innocence.   *Tyler v. Phelps*, 643 F.2d 1095, 1098 (5th Cir. 1981).   This is an unconstitutional result under *In re Winship*, 397 U.S. 358 (1970).

    The prosecutor's comment on Mr. Coble's decision not to testify, by asking "is there any remorse?" (29 RR 120)  has been explicitly disapproved.   In *Griffin v. California,* 380 U.S. 609 (1965) the United States Supreme Court held that an argument by the prosecutor that invited a jury to consider the defendant's failure to testify as evidence of his guilt was prohibited by the privilege against compelled self-incrimination clause of the Fifth Amendment.   The Court stated,

"[C]omment on the refusal to testify...is a penalty imposed by courts for exercising a constitutional privilege.  It cuts down on the privilege by making its assertion costly." *Id.,* at 614.

As mentioned above, whether a prosecutor's argument is an impermissible comment on the defendant's right not to testify is reviewed *de novo*.  *United States v. Martinez*, 151 F.3d 384, 391 (5th Cir. 1998).  "The test for determining whether a prosecutor's remarks constitute a comment on a defendant's silence is a two-fold alternative one: (1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence."  *United States v. Mackay*, 33 F.3d 489, 495 (5th Cir. 1994).  The comment here passes both tests, as referring to a lack of "remorse" could have only had the effect of drawing the jury's attention to the fact that Mr. Coble did not testify, and, since it was a direct comment on the Mr. Coble's alleged lack of remorse,  it would almost necessarily have  been construed by the jury as a comment on Mr. Coble's silence.

The prohibition includes both direct and indirect references to a defendant's silence. *United States v. Martinez*, 151 F.3d 384, 391 (5th Cir. 1998).  The fact that Mr. Coble did not testify at the suggests that there was a high probability that the prosecutor's statement influenced the jury verdict.

In the leading case of *Dickinson v. State,* 685 S.W.2d 320 (Tex. Crim. App. 1984) the prosecutor, in a penalty phase argument in which the defendant did not testify, invited the jury to consider the courtroom demeanor of the defendant and commented that the jury had not "seen one iota of remorse, one iota of shame" from the defendant.  The court stated that "the necessary and natural effect of the prosecutor's comments, that went to  "remorselessness'...amounted to directing the jury's attention to the failure of the appellant to testify ..." *Dickinson*, 685 S.W.2d

at 324.

Similarly, the argument, "You've looked at him throughout the trial...Have you seen by his actions one single iota of remorse?", has been held to be a comment on the defendant's failure to testify. *Coyle v. State,* 693 S.W.2d 743 (Tex. App.--Dallas 1985). In *Johnson v. State,* 611 S.W.2d 649, 650 (Tex. Crim. App. 1981), where the prosecutor argued the defendant never said he was sorry or expressed remorse, the court characterized the argument as "a direct and flagrant reference to what the jury had not heard the appellant say" and reversed the conviction. In a similar analysis, the Court of Criminal Appeals has held that a prosecutor's comment at the sentencing phase of a capital trial about a non-testifying defendant's failure to show remorse in an unconstitutional indirect comment about his failure to take the stand, unless there was some evidence of a lack of remorse in the record. *Caldwell v. State,* 818 S.W.2d 790, 799-801 (Tex. Crim. App. 1991); *Davis v. State,* 782 S.W.2d 211,222 (Tex. Crim. App. 1989).

The prosecutor made many improper comments on the possibility of parole when he made repeated references to free society, the risk that Mr. Coble posed to the victims' family, and the like. (27 RR 257-258; 29 RR 126-127.) This was a clear invitation for the jury to discuss Mr. Coble's parole eligibility in their deliberations.

Texas has long required the trial court to instruct the jury at the penalty phase that it may not consider parole in fixing punishment. *See, e.g., Marshburn v. State,* 522 S.W.2d 900, 905, n.7 (Tex. Crim. App. 1975)("In determining the punishment in this case you are instructed that you are not to discuss among yourselves how long the defendant will be required to serve any sentence you decide to impose.")

The prosecutor made improper comments that the community demanded a conviction and death sentence, when he stated repeatedly that "justice" demanded a death penalty

particularly right at the end of his argument immediately before the jury deliberations.  (29 RR 177, 178, 180.)  His final statement to the jury was similarly prejudicial: "I'm going to turn back the balance of my time and I'm going to thank you for your verdict on behalf of the people of this State and on behalf of the victims of Billie Wayne Coble.  All of them." (29 RR 180-181.)

While it is permissible for a prosecutor to argue that the jury should, by its verdict, send a message to the community that crime will not be tolerated, the prosecutor is not permitted to argue that the jury must return a particular verdict because the community expects it to do so. This is a form of arguing facts outside the record, and it is improper at either the guilt/innocence or the punishment phase.  For instance, the argument that "the only punishment that you can assess that would be any satisfaction at all to the people of this county would be life" has been condemned.  *Cortez v. State,* 683 S.W.2d 419, 420 (Tex. Crim. App. 1984).  Similarly, the argument that "[t]he people of Nueces County expect you to put this man away" has been condemned. *Pennington v. State,* 171 Tex. Crim. 130, 345 S.W.2d 527, 528 (1961).

These arguments asked the jury to consider how the victim's family and relatives feel about the crime.  *Brandley v. State,* 691 S.W.2d 699, 712 (Tex. Crim. App. 1987).  This kind of argument is so inherently prejudicial that the error cannot be cured with an instruction to disregard it.

The cumulative effect of these egregious errors and misconduct in the prosecution's arguments and statements was that they "infected the trial with unfairness."  *Darden v. Wainwright,* 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).  Thus, even if this Court holds that any one of the misconduct and errors alone was not sufficient to create this fundamental unfairness, the proper framework for the analysis is to examine the argument as a whole, as the jury heard it, and not simply to test the individual claims separately.

# CLAIM TWELVE: PETITIONER'S COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE RE-TRIAL.

Mr. Coble's sentence is invalid because he was deprived of his constitutional right to effective assistance of counsel, due process of law, equal protection of the laws, cross-examination and confrontation,  and a reliable sentence due to the failure of trial counsel to provide reasonably effective assistance at his punishment  phase re-trial.   U.S. Const. Art. VI, Amends. V, VI, VIII, XIV; International Covenant on Civil and Political Rights, Art. XIV and applicable provisions of the Texas Constitution.

In addition to the instances of ineffective assistance of counsel discussed *supra* in Claim 2 (failure to file change of venue motion), Claim 3 (ineffective assistance at voir dire) and Claim 6 (ineffective assistance for failure to recuse the district attorney's office), there were also various other instances of ineffective assistance of counsel at the trial itself.  The facts and legal argument of those claims are hereby incorporated by reference.

### A. Facts presented to the State Courts (as to all sub-claims).

### Claim Twelve(a): Lead counsel failed to adequately prepare for Mr. Coble's trial and thereby rendered himself and second-chair counsel ineffective.

Lead trial counsel Russell Hunt Jr. was appointed on October 17, 2007.[243] Mr. Scott Stevens was appointed as assistant trial counsel on the same date.[244]  In mid-December a motion for experts is filed. (II CR 237-252.)  Then, nothing much seems to happen until the end of April, 2008, when some motions are filed  (II CR 268-331) including, very belatedly and six months after the appointment, a discovery motion. (II CR 310-318.)  Mr. Stevens withdrew as

---

[243]   Exhibit 1.

[244]   *Id.*

assistant trial counsel on April 25, 2008 and on May 14, 2008, Mr. Alex Calhoun was appointed

as assistant trial counsel.[245] This was a mere two-and-a-half months prior to when the trial was

scheduled to begin.[246]  The lateness of the discovery motion, over six months after appointment

and a mere two and a half month before the trial was due to start, is in itself evidence of a failure

to adequately prepare.

Second chair counsel Alexander Calhoun has explained the situation in which he was

placed due to Mr. Hunt's inexplicable inactivity.  When Mr. Calhoun was appointed in late May,

> I soon realized that very little had been done on the case to date.  The mitigation
> investigator who was retained to develop the mitigation evidence, Mr. Gerald Byington,
> of Austin, Texas had not done much, if anything.  His participation appeared to me to be
> minimal during the time that we were both on the case, in June and leading into July.  He
> subsequently disappeared and stopped working on the case entirely.  I remember
> emailing as well as verbally complaining to Mr. Hunt on several occasions about
> Byington's lack of development of mitigation in Mr. Coble's case.
>
> I understood the purpose of my appointment was to develop the mitigation
> evidence for Mr. Coble's case, although I anticipated that this would be with the
> assistance of a qualified mitigation investigator....Due to my late appointment in mid-
> May, coupled with Byington's lack of effort, and the general lack of evidence in support
> of the defense, I felt rushed as the trial date fast approached.[247]

Additional problems occurred for Mr. Calhoun as a result of Mr. Hunt's lack of diligence

since he was first appointed.  The judge was unwilling to continue the case from August 1, 2008,

a mere two-and-a-half months from Mr. Calhoun's appointment:

> Lead counsel, Mr. Hunt and I discussed the need for a continuance on more than
> one occasion, but it was my understanding that Judge Johnson was determined to start in
> August.  Mr. Hunt discussed the need for a continuance with the judge in his chambers
> on more than one occasion, but the trial date did not vary from the August starting

---

[245]  *Id.*

[246]  *Id.*

[247]  Exhibit 14, Affidavit of Alexander Lee Calhoun.

point.[248]

This failure to continue the trial affected everything that followed and it shows prejudice under *Strickland*'s second prong.  After his appointment, Mr. Calhoun did the vast majority of the work on the case.  But it was too little, too late.  One cannot fault Mr. Calhoun for this failure, due to his late appointment, but it is clear that his work was rushed and hampered and ultimately rendered ineffective due to the inactivity of lead counsel from the date of his appointment in October of 2007.  The other failures enumerated herein all show prejudice as a result: the failure to effectively cross-examine Dr. Coons and Mr. Merillat, the failure to present psychiatric evidence,

**Claim Twelve(b): Ineffective assistance of counsel for failure to present psychiatric evidence regarding Petitioner's severe depression, Post-Traumatic Stress Disorder, bi-polar disorder, mood swings, heredity and childhood hardships and their effect on his behaviour at the time of the murders.**

This sub-claim hereby incorporates by reference the facts summarized *supra* in the Statement of Facts and in the factual summaries of the claims discussing ineffective assistance of counsel and Dr. Coons and Mr. Merillat.  This sub-claim also incorporates the legal argument from those claims.

A striking feature of Mr. Coble's sentencing phase re-trial, compared to his first trial, was the complete lack of any expert testimony linking his behavior at the time of the murders to various mental and psychiatric problems he was experiencing.  As discussed *supra,* Mr. Coble's background and psychiatric problems have been well summarized by an impartial observer, the Fifth Circuit Court of Appeals:

Coble's father died before he was born and when he was eleven, his mother suffered a

---

[248]  Exhibit 1, setting of trial date on May 14, 2008 and Exhibit 14, Affidavit of Alexander Lee Calhoun.

nervous breakdown so Coble was sent to live at a state facility.  He lived at the orphanage until he was seventeen, at which point he joined the Marines and served in Vietnam.  During his four years of service, Coble served as a machine gunner and was involved in combat.  Upon his return to the states, Coble was hospitalized due to trauma he had suffered in the war. Likewise, Coble's sister testified he was different when he returned from Vietnam. Coble offered testimony that he was involved with various youth programs over the years, that he had a good relationship with his son and that he got along well with co-workers.  Coble served as a section leader in the U.S. Army reserves and was well respected....[a [psychiatrist] also testified that Coble suffered from post-traumatic stress disorder (PTSD)...and bipolar disorder...[the psychiatrist] traced the post-traumatic disorder to Coble's experience in Vietnam, and suggested that the bi-polar disorder might be hereditary...these illnesses made Coble susceptible to severe mood swings, which resulted in a loss of control on the day of the murders...Coble was suffering from severe depression at the time of the murders...Coble linked the loss of his wives with the loss of his mother, such that the divorces triggered severe bouts of suicidal depression...No one seems to dispute that the illnesses stemmed from events beyond Coble's control–such as hereditary factors, his childhood, and his combat experience...the psychiatrists seemed to agree that it was Coble's episodic depression, manic mood swings, and propensity for violence created by his combat experience that led him to act as he did when committing the crime...
*Coble v. Cockrell,* 80 Fed. Appx. 301, 306-308 (5th Cir. 2003).

These facts cry out for psychiatric testimony that would have shown, as the Fifth Circuit held, that "the illnesses stemmed from events beyond Coble's control–such as hereditary factors, his childhood, and his combat experience...the psychiatrists seemed to agree that it was Coble's episodic depression, manic mood swings, and propensity for violence created by his combat experience that led him to act as he did when committing the crime...*Id.*

At the first trial, Dr. Stephen Mark was hired by the defense and testified that Mr. Coble suffered from two different psychiatric disorders:  post traumatic stress disorder brought about by his Vietnam experiences, and a bi-polar disorder, or manic-depressive disorder.[249]  Dr. Mark testified that the bi-polar disorder could be hereditary.[250]   Additionally, he stated that the

---

[249]   VIII SOF 949-50. "SOF" refers to the Reporter's Record (then called the "Statement of Facts") from Mr. Coble's 1989 trial in the 54th District Judicial Court, the same trial court as his 2008 trial was held.

[250]   VIII SOF 949-54.

conditions were treatable with drugs, and "[t]here would be less likelihood of any criminal acts if he were adequately treated for both disorders."[251]

Dr. James Grigson, a second psychiatrist called by the defense, testified that Mr. Coble suffered from a severe depression at the time of the killings.[252]  Dr. Grigson testified that it was so improbable that Mr. Coble would do something like this offense again,  it was more likely that one of the jurors would do a crime similar to the one that they had found Mr. Coble to have done.[253]  Dr. Grigson also testified that Mr. Coble was more horrified by the gruesome pictures of the victims than anyone else in the courtroom.[254]

Even more striking, Mr. Coble's 1989 trial was held when the prior restrictive special issues of "deliberateness" and "future dangerousness" would have precluded the jury from giving any mitigating value to these factors.  Mr. Coble's treatable conditions were not relevant under the former special issues, and this is the basis upon which the Fifth Circuit reversed his death sentence.  His 1989 trial was prior to  *Penry  v. Johnson ("Penry II")*, 532 U.S. 782 (2001) and *Tennard v. Dretke*, 542 U.S. 274 (2004) which held that these restrictions on jury consideration of mitigating evidence were unconstitutional.  As the United States Supreme Court held in *Penry I*, the presentation of such evidence, absent curative instructions, could only have been used against the defendant given the narrow focus of the special issues.[255]   Even so, Mr.

---

[251]   VIII SOF 958.

[252]   IX SOF 1122-23.

[253]   IX SOF 1133.

[254]   IX SOF 1146.

[255]   In *Penry* the Court noted that the prosecutor had done just that with the mental retardation evidence in that case, and cited this "double-edged" sword aspect as one of the primary constitutional defects in the Texas scheme.  492 U.S. at 324.

Coble's attorneys still presented that evidence through both Dr. Mark and Dr. Grigson.

Yet in 2008, when there was no such impediment, and the so-called "mitigation" issue had been added (XIII CR 2350), there was no psychiatric testimony.   The defense did call Dr. Cunningham who presented statistical data on the likelihood of future dangerousness but he did not and could not diagnose Mr. Coble's mental problems.

Another striking feature of this failure is that the first trial concerned guilt and sentencing whereas here the only focus was on sentencing.  All of these factors, had they been presented through expert psychiatric testimony, would have been mitigating as they would have shown the jury that Mr. Coble's illnesses, and hence his actions in August of 1989, stemmed from "events beyond Coble's control" as the Fifth Circuit held.  The expert testimony would have buttressed the testimony of the witnesses that were called who, as summarized *supra,* testified to this depression, testified regarding his military service, depression and the like.

The prejudice prong of *Strickland, supra,* is readily evident. This failure completely crippled the defense's entire presentation and especially their final argument.   Instead of showing the jurors how Mr. Coble's mental state at the time of the murders was characterized by severe depression, and without expert testimony regarding the life-long effects of his bi-polar disorder and  post-traumatic stress disorder due to his Vietnam service, the defense was reduced to arguing that Vietnam was a "bad place" and that he had seen horrors there. (*E.g.,* 29 RR 145, 154.) This missed the point.  Through the failure to link his depression, bi-polar disorder and the horrors of Vietnam to Mr. Coble's subsequent behavior in 1989, the jurors were unable to give it significant mitigating value in terms of special issue three.  Had they been shown a defendant whose actions were the result of these illnesses which were "beyond his control," there is a substantial probability that the jurors would have answered special issue three differently and

hence the verdict would have been different.


**Claim Twelve(c): Ineffective assistance of counsel for failure to effectively cross-examine and impeach Dr. Coons.**

The facts and argument from Claim 7 are hereby incorporated by reference. In that Claim, it was shown that there were a multitude of readily-available studies that would have totally discredited the methodology used by this witness. None of the various amicus briefs that have been filed, discussed in Claim 7, were used. Nor were the inconsistencies in his testimony probed. This witness was never simply confronted with the fact that in 1990 he had predicted that Mr. Coble would have a probability of committing future violent acts, but that prediction, 18 years later, was simply wrong. It is inexplicable why Dr. Coons was not made to at least confront his 1990 error and explain why the jury should now, after 18 years of violence-free tenure on death row, expect that a near-60-year-old inmate in very poor health would pose a threat to anyone.

Second-chair counsel Alexander Calhoun has forthrightly admitted this sub-claim:

It was my responsibility to cross-examine the psychiatrists and State's experts, including Dr. Richard Coons, a forensic psychiatrist and Mr. A. P. Merillat, a criminal investigator with the Special Prosecution Unit in Huntsville, Texas. Both Coons and Merillat frequently testify on behalf of the State during capital sentencing procedures. With respect to Dr. Coons, I believe that he bettered me on cross-examination floundered, I decided to discontinue my questioning. There were matters of impeachment, however, for example an almost identical defendant to Mr. Coble's case for whom Coons, who was retained by the defense, had testified precisely the opposite of how he testified about Coble, upon which I had intended to cross-examine him, but I simply neglected to do so under the circumstances.[256]

Thus, counsel has forthrightly admitted this sub-claim and relief must be granted.

_____
[256] Exhibit 14 at 2-3.

**Claim Twelve(d): Ineffective assistance of counsel for failure to effectively cross-examine and impeach A. P. Merillat.**

The facts and argument from Claims 8 and 9 are incorporated herein by reference.  In addition to all the shortcomings and inconsistencies of Mr. Merillat's testimony, most of which was known at the time of Mr. Coble's trial, **t**he latest edition of Merillat's own book[257] would have provided excellent rebuttal material.  In that book, Merillat writes:

> Of the 149 inmates studied in 1999 who had been convicted of capital murder and found by juries to be future dangers but were subsequently released from death row, six have <u>no record of ever having received a prison disciplinary case</u>....To people familiar with the Texas prison system, the fact that an inmate is able to avoid even the least significant disciplinary infraction (such as failing to shave one morning or having a shirttail untucked) is quite an achievement.  *For six capital murderers—including a cop-killer, a man who took careful aim through a scoped rifle and murdered a uniformed policeman answering a disturbance call–to have clear disciplinary records, could reveal that perhaps their juries were wrong when believing those men to be future dangers.*"  (Emphasis added, underlining in original).[258]

Had defense counsel confronted Mr. Merillat with this, it would have completely destroyed the basis for his testimony in the Coble case, as he suggests that with inmates with absolutely clean disciplinary records over a period of time, that their juries were wrong to believe they would be a future danger.  Mr. Merillat also wrote in his book:

> A man made a conscious decision to stop his violent lifestyle.  That is the crux of the future danger question.  And, it is at the heart of attempts to convince jurors of whether to answer the special issue in the affirmative or in the negative.  *What will the defendant on trial do when presented with opportunities to commit violent acts in the future—whether those opportunities are on death row or in general population?*  *Id.* at 32 (emphasis in original).

Assistant trial counsel Alexander Calhoun has stated that he did not know much of this information at the time of the trial:

---

[257]   Exhibit 21, Merillat, A.P., *Future Danger?,* 3rd ed. (2004), Texas District and County Attorneys Association (Austin, Texas) at 30-31.

[258]   *Id.* at 30-31.

-495-

Subsequent to Mr. Coble's trial, I have learned of some aspects of Merillat's general testimony, such as his citation of specific "violence" statistics in prison, his statements concerning the numbers and types of cases in which the Special Prosecution Unit has prosecuted within the past several years, and his statement regarding the prison inmate classification system is either false, or materially misleading. Had I known of this information at the time of Mr. Coble's penalty phase re-trial, I would have cross-examined him differently.[259]

Thus, the nature of Mr. Merillat's false and misleading testimony was not known to trial counsel responsible for cross-examining him, Mr. Calhoun. The prejudice here is obvious: the defense was unable to counter Merillat's prison horror stories regarding allegedly unreported violence in prisons, and argument that death row would be the only safe place for Coble. The prosecution repeatedly stressed and highlighted Merillat's testimony at the final argument. (28 RR 125, 169, 172.) There is a substantial probability that the jury would have answered special issue number two differently had they been presented with this impeachment evidence.

## Claim Twelve(e): Ineffective assistance of counsel for failing to object to irrelevant incidents used as aggravation.

In an effort to obtain the death sentence, the prosecution presented many irrelevant and trivial incidents that were not proper aggravating evidence.

1) A 34-year old argument about food. Witness Pamela Wooley complained about an incident from 1974, in which Petitioner became agitated in an argument over food that she had cooked. (20 RR 43.)

2) Patricia Wooley complained of a thirty-eight year old "brief caressing on the outside of her upper thigh" while riding in a car with other passengers. (20 RR 106, 131-132.)

3) The same witness complained of a thirty-five year old incident where she was tickled

---

[259]   Exhibit 14.

"outside of [her] clothing" (20 RR 108) and about the same time was touched outside her bathing suit. (20 RR 128.)

4) A forty-year old incident from November of 1968 when Mr. Coble was found sleeping at his guard post.  (20 RR 228.)

5) Candy Ryan, an ex-wife of Mr. Coble, complained  that more than twenty years ago he wanted her to eat her food in a certain way, to complete one food item before she started on another.  (21 RR 21-22.)

6) Ms. Ryan had many other complaints, all more than 20 years old:  a mid-1980s incident when Mr. Coble yelled at her about an incident at the mall (21 RR 27); a 1985 fight in the shop when she was shoved against a wall (21 RR 29);  an incident at the gas station when Mr. Coble accused her of flirting, yelled at her, and threw her purse (21 RR 37-38);   and accusing her of flirting with the customers. (21 RR 34.)

As these incidents were all more than 20 years old, some much older, they had no relevance to the three special issues of deliberation or future dangerousness and their relevance to the mitigation was so minimal that it was outweighed by predjudice, these instances should have been objected to on the grounds of irrelevance.


**Claim Twelve(f): Ineffective assistance of counsel for failure to object to hearsay.**

The prosecution elicited hearsay from witness Mike Voss:

Q.  Okay.  Now you...you knew the family because you were dating Anne Marie; is that right?
A.  Correct.
Q.  Can you tell us whether that had a pretty devastating effect on them?
A.  It's still to this day.  I mean the girls still have nightmares.  Anne Marie still has nightmares.  It's traumatic for everybody.
(23 RR 20.)

This prejudicial hearsay comment regarding Anne Marie's "nightmares" should have been objected to.  Petitioner was prejudiced by this failure.


**Claim Twelve(g): Defense counsel shackled and rendered their own expert, Dr. Cunningham, ineffective by voluntarily restricting much of his testimony.**

Defense counsel agreed to virtually all of the prosecutor's demands that the testimony of Dr. Cunningham be curtailed without waiting for the Court to rule on the objection.  Much of the testimony could have been salvaged.

The defense voluntarily removed the slide on the bottom right of page 3 of Dr. Cunningham's presentation even though it was only "largely" from Mr. Coble's interview.  (27 RR 80.)  They removed two at the top of page 4 even though they were only "supplemented with information from Billie Coble."  (27 RR 80.)  On page 5, "even though most of this information came from independent sources, the chart, the timeline certainly comes from Mr. Coble" and they agreed to remove it.  (27 RR 80-81.)  Also on the bottom left of page 5, regarding family and friend relationships, they agreed to excise it.  (27 RR 81.)  They agreed to excise the entire page 7 slide "and just ask Dr. Cunningham to talk about studies not solely based on life without parole" although it is difficult to see how this was validly excluded.  (27 RR 81.)

The exclusion of the page 7 slide was particularly prejudicial.  Dr. Cunningham stated that

> I didn't put any slides in as fillers.  This is a very important study.  It's 10,000 inmates.  It says something about my stature as a scientist, as well.  We were engaged in research of this scale, and it's a very powerful study in terms of demonstrating that long-term inmates are pretty similar to each other....This is the largest study of its type, the largest and most well-designed of its type....But this is recent strongly peer reviewed extremely large scale research that answers a very important question with minimal risk of confusion."
> (27 RR 79.)

The basis of the exclusion of the "life without parole" data was flimsy and completely illogical in the extreme and not challenged by the defense.  The prosecution argued that

> we're going to object to...the slide ...that refer[s] to LWOP, because we're talking about life without parole.  And I think the Court is going to instruct the jury that they're not going to consider whether a person will be paroled or not.  And so, we think that if we're talking about life without parole...this is a Florida case...these are Florida cases. Obviously not Texas cases under this charge.  And we think that's going to give a totally misleading impression for the jury, plus the fact that we're referring to life without parole and they're not to consider it in any form is my understanding....[referring to the page 7 slide] if they want to mark out the life without parole, then that's all right with us, I think."
> (27 RR 59-60.)

This argument was a complete non sequitur.  The statute forbade references to life without parole considerations for Mr. Coble, not for a statistical sample used for comparative purposes only.  The statute did not forbid the jury from looking at data that included LWOP prisoners, because they would know that LWOP was not under consideration as a sentence in this case.  Yet the prosecution's faulty logic was not challenged by the defense.  The defense went well beyond what even the state requested, and agreed to excise all of the crucial page 7 data.  This was crucially important and crucially prejudicial, as Dr. Coons and Merillat had built their presentation around the faulty premise that people on death row, capital sentenced individuals, present a lesser risk of future violence than if he were to receive a life sentence.

The State still had problems (27 RR 82-83) with these extensive redactions.  They again argued with faulty logic that "If these studies are based upon any factors, life without parole, that's a portion of the study, then it's not relevant to this particular inquiry and then we would run the risk of opening up that particular issue before this jury."  (27 RR 83.)  Of course there was no such risk, as the testimony regarding the life without parole prisoners would not indicate to the jury in any way that such a sentence would be available for Mr. Coble.  Even if the Court

-499-

feared some questioning might necessarily delve into the option of such a sentence for Coble, the judge could simply have ordered both parties to refrain from any such questioning or cross-examination that would open up that area.  Or the Court could have given a limiting instruction to the effect that the jury was not allowed to speculate as to the availability to Mr. Coble of any of the sentences discussed in the statistical samples. The State again used faulty logic in posing this false dilemma:

> I do...we do have questions about this parole testimony, and particularly life without parole, any mention of it before the jury in slides or testimony.  Because we're going to be in an interesting situation of the defense talking about parole.  The Court's going to, as I assume, give an instruction that they're not to consider parole, which the defense will be testifying about.  And then, the State not being allowed to ask about something that the defense is testifying about...if they want to talk about parole, fine, as long as we're allowed to question him about the subject that they raised."
> (27 RR 84-85.)

Again, this contention rests on faulty logic.  The discussion of a group of prisoners serving sentences of life without parole would in no way have prejudiced the State because the jury would have understood that it did not implicate parole as a possibility for Mr. Coble, especially if the Court had so instructed them.  Yet neither the Court nor the defense brought up this important point.

The Court may have panicked the defense into its capitulation when it abruptly stated "When can Dr. Coons be here [to examine Coble]?  Because the defense represented on the record that there was going to be no information from the Defendant passed along through their expert and now they're backing up on what they told the State and the Court in the past."  (27 RR 61.)

Dr. Cunningham testified as to how the defense was prejudiced by the restriction on presenting data to rebut Dr. Coons' testimony about death row inmates having an incentive to

behave well:

> It's my understanding that Dr. Coons testified that an inmate under sentence of death had a unique incentive for good conduct to get relief because he knew that his death sentence was under appeal.  In that way, essentially identifying that however Billie Coble has behaved in the last 19 years has no relevance to how he may act from here when that incentive is no longer present...
>
> This study on the bottom of page 6 looks at inmates who have that penalty of death over their head and also looks at inmates who do not have that penalty of death over their head.  The inmates that are serving life terms, who do not have that penalty hanging over their head, behave the same way as the guys who do have that penalty hanging over their head.  This study directly refutes Dr. Coon's conclusions in that regard.  It's not the only study that does, but it's a very important and direct one that establishes that point that his assertion of...of death sentence[d] individuals having a unique incentive to behave well is...what we would call an illusory correlation.  It's one that seems to make sense when you sit in your chair...but doesn't in fact hold any scientific water at all."
>
> (27 RR 87-88.)

Dr. Cunningham also had available data that directly invalidated Dr. Coons' false

assumptions, the study that was specifically omitted by the court:

> There's another study that we have that it looks at murderers in Texas...of parole eligible murderers, capital murderers and inmates on death row.  And it looks at their disciplinary records to see if the death row inmates are behaving better than the guys that are serving capital life sentences.  In that study, as I recall, the death sentence inmates have a higher rate of assaults, despite Dr. Coons purported incentive that they have, as compared to the capital inmates that are serving...who are not under a sentence of death...This one is very powerful and direct in that way.  And it's the cumulative weight of those studies.  It's not just a single study in isolation, but it's as we have looked at this issue with different samples, large scaled in different prison systems, Missouri, Florida, federal, Texas, and we keep coming up with the same data.  That's waht makes these findings so powerful or as we would say in a scientific way, so robust.
>
> (27 RR 89-90.)

However, immediately after this testimony, the defense agreed to redact these slides "and

also the matters that have been included in them."  (27 RR 90.)

Then the Court ruled that the life without parole statistics were irrelevant:

> As far as the life without parole issue, I don't...I don't see how the studies that evaluate people who are in prison on a life without parole sentence are relevant to this case, so I'll grant the State's objection to those studies.  If there are other studies that the

doctor...Dr. Cunningham can rely upon that deal with inmates that are life with the possibility of parole and then people who are there on a death sentence that he can rely on, then I think that's appropriate in this situation.  But life without parole studies, I just don't, because that's not an option here in this case.   And so I'll grant the State's objection along those lines.
(27 RR 90.)

The error was preserved as the defense lodged an abjection:

The defense would note for the record that we have made the...redactions to the PowerPoint...But we would lodge an objection for the record that the Court has found irrelevant the studies dealing with life without parole and we would argue that these are relevant under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.   And our proffer as to what the testimony would contain is as Dr. Cunningham discussed earlier on the stand during the voir dire examinations and what's contained in his unredacted PowerPoint presentation, which is Defendant's Exhibit No. 209.  And that's our bill of exception for that.
(27 RR 94.)

The objection was overruled.  (27 RR 94.)

**Prejudice.**

Dr. Cunningham has explained in detail in his affidavit how these redactions hurt and

hobbled his defense and prejudiced Petitioner.  With regard to the slide dealing with "Federal

Capital LWOP Misconduct by Age at Conviction:

One of the most important factors associated with Mr. Coble adjusting to postconviction confinement without serious violence is his age at the time of trial in 2008. This age- related effect was demonstrated for inmates in general in testimony accompanied by the preceding slide [27: 146-150]. In that testimony, I referenced a study I had conducted of capital murderers in Texas prisons that found this same effect. The redacted study illustrated in the slide above would have provided a tangible and specific illustration of this age-related effect as it examined the postconviction prison behavior of 145 federal capital inmates, averaging over six years in prison following their capital murder convictions and life sentences. The relevance of this study is that it demonstrates that capital offenders, as well as general population inmates, display an inverse relationship between age and violence-related misconduct. This study additionally demonstrates that the more serious the prison violence, the less often it occurs.[260]

With regard to the slide regarding "past behavior in jail:

---

[260]   Exhibit 16, Affidavit of Mark D. Cunningham, at 6.

The above slide regarding Mr. Coble's prior activities and adjustment to the McLennan County Jail, and associated testimony, was disallowed by the Court because it was based on information obtained in interview from Mr. Coble. This testimony would have demonstrated two important points. First, he had a pattern of compliance and constructive activity in custody. This and the information on the subsequent two slides (also substantially redacted by the Court) were quite important in establishing Mr. Coble's pattern of conduct in prison, a critical variable in his risk assessment for prison. Second, in full knowledge of his charges and history, the correctional professionals in the McLennan County Jail did not consider him an imminent risk to staff or other inmates – as demonstrated by their allowing his participation in janitorial roles....

The rationale for excluding information obtained from Mr. Coble regarding his 1989-1990 jail adjustment is unclear, as the State's expert, Dr. Richard Coons, testified that he had interviewed Mr. Coble in 1990 in preparation for the first sentencing phase. Had I known that I would not be able to rely on my interview of Mr. Coble for information regarding his McLennan County Jail adjustment 2007-2008, I could have interviewed jail staff to obtain this information.[261]

With regard to the slides about Petitioner's past behavior in prison:

The above two slides provided a detailed description of the conditions of Mr. Coble's confinement in TDCJ during the 17 years preceding his 2008 re-sentencing trial. This was among the most important information of the violence risk assessment, as it demonstrated his positive and nonviolent adjustment. This positive response was whether confined under the more open conditions during the "work capable" program years prior to 2000 or the super-maximum conditions 2000-2007. The demonstration of his positive adjustment 1990-2000 was particularly important as this custody more closely corresponds to the movement and direct contact with staff and other inmates of the general prison population.[262]

With regard to the slide about "community employment":

The above slide and anticipated testimony, disallowed by the Court as this information was obtained in the course of my interview of Mr. Coble, outlined his employment history in the community. An overview of this history was embedded in the question posed of me by the defense [27:164]. The details of this history as reflected in the slide and potential testimony would have demonstrated both the sustained nature of this employment and the associated responsibilities. This was important both in making this history tangible to the jury, as well as illuminating an implicit assertion by the State throughout sentencing that Mr. Coble was broadly malevolent and antisocial in his community interactions and conduct. Had I known that I would not be allowed to rely on my interview of Mr. Coble, I could have obtained this information from Social Security

---

[261]  *Id.* at 8.

[262]  *Id.* at 9-10.

records.[263]

With regard to the slide on "Continued Relationship and Visitation with family and Friends":

> The information on the above slide was disallowed by the Court as having been obtained in the course of my interview of Mr. Coble. This slide identified specific persons with whom Mr. Coble has had continuing contact and interaction. The implications of these relationships for prison adjustment were briefly discussed in my testimony [27:165].[264]

With regard to the slide about 'Federal Capital LWOP inmates":

> The above slide was redacted and the associated testimony disallowed by the Court because it derived from a study of capital offenders serving life-without-parole. This study and the associated testimony were quite important to the violence risk assessment of Mr. Coble for a number of reasons. This study involved the retrospective review of the disciplinary records of 145 federal capital offenders who had been sentenced to life-without-possibility of release by plea bargain or their capital juries at trial. They had averaged 6.17 years in the Bureau of Prisons following their convictions. Almost all had been classified to the general population of U.S. Penitentiaries (i.e., high security). Thus these offenders had had an ample tenure and daily opportunities to exhibit violence. In 104 cases of the 145, the Government had alleged as a nonstatutory aggravating factor that there was "a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society" (i.e., "future dangerousness"). The data demonstrated that offenders who were targets of this aggravating factor were not more likely to be violent in prison. The likelihood of prison violence among these offenders became increasingly remote as its seriousness increased. Only 1 in 11 committed an assault with the potential for serious injury. Less than 1 in 100 committed an assault resulting in a hospital admission for non life-threatening injury. No offender committed n assault resulting in life threatening injury or death. No offender committed a serious assault on a staff member. The discussion of this spectrum of probabilities provides data to inform a jury's determination of what level of violence and probability reflects a "continuing threat to society."

> Specific data on the incidence of prison homicide among capital offenders is also relevant in dispelling misconceptions that have been held by Texas capital juries. To illustrate, Pilgrim and Sorensen (1999) [Pilgrim, R. L. & Sorensen, J. R. (1999). Jury deliberations on future dangerousness. Paper presented at the Annual Meeting of the American Society of Criminology in Toronto, Canada.] described the estimates of former

---

[263] *Id.* at 11.

[264] *Id.* at 12.

capital jurors regarding the likelihood of future violence by defendants had they sentenced them to life imprisonment rather than death. These jurors estimated that there was an 85% likelihood of a violent crime and a 50% likelihood the defendant would commit a new homicide if sentenced to life imprisonment.[265]

With regard to the slide entitled "Relationship of death or LWOP Sentence to Prison Adjustment":

> The above slide was redacted and the associated testimony disallowed by the Court because it included inmates sentenced to life-without-parole. This study was important to Mr. Coble's violence risk assessment in several respects. First, it demonstrated that the seriousness of the offense that sent the offender to prison is not a good predictor prison violence. Second, it demonstrated that offenders sentenced to death do not demonstrate some special incentive for compliance and nonviolence as opposed to capital offenders who are not sentenced to death. Third, the data demonstrate that inmates facing lifetimes in prison do not respond as if they "have nothing to lose." This study provided specific rebuttal to Dr. Coons' testimony to that effect:

However, on the – if a person is sent to the general population, they then have a life sentence and they have – they're not in jeopardy for a death penalty anymore. So, what are you going to do to somebody besides a life sentence? [24:210]

> I would have testified regarding this study that Missouri has been mainstreaming its death-sentenced inmates since 1991. That means that rather than confining death-sentenced inmates on a segregated death row under super-maximum conditions, these death-sentenced inmates are mixed in the general prison population of a high security prison (i.e., Potosi Unit) in Missouri DOC. Death-sentenced inmates are celled with non-death inmates, on units with non-death inmates, on the prison yard with non-death inmates, at jobs and programming with non-death inmates, and at contact visitation with non-death inmates. This study examined their comparative rates of misconduct and assault. The death-sentenced and life-without-parole inmates displayed very similar rates of assault. This assault prevalence was only *half* that of parole eligible inmates. These data strongly refute intuitive assumptions regarding capital offenders and their prison conduct, as well as intuitive but erroneous assumptions that life-sentenced inmates have "nothing to lose."[266]

With regard to the slide entitled "Florida DOC 10 years to LWOP":

> The above slide was redacted and the associated testimony disallowed by the Court because it included inmates sentenced to life-without-parole. This study and the

---

[265]  *Id.* at 13-14.

[266]  *Id.* at 15.

associated testimony was important to Mr. Coble's violence risk assessment, as well as illuminating the Court's ruling of whether data from life-without-parole samples is irrelevant to capital offenders facing paroleable life sentences. This large-scale study compared life-without-parole inmates to offenders sentenced to long, but paroleable terms. These data demonstrate that inmates sentenced to long terms, particularly more than 20 years, have very similar rates of assaultive misconduct. This study additionally debunks a "nothing to lose" assumption. It also elaborates on the findings of the previous study of the Potosi Unit, clarifying that it is a long sentence and not necessarily a life-without-parole sentence that is associated with low rates of assaultive misconduct.[267]

Dr. Cunningham concludes:

> Inspection of the above redacted slides and studies will reflect that I was the principle or co-investigator on each. The admission of these documents and studies, then, was a tangible demonstration of my direct involvement in peer-reviewed research directly regarding rates and correlates of violence in prison. This would have provided important information to the jury as they evaluated my qualifications and expertise in relation to those of Mr. A. P. Merillat and Dr. Richard Coons.[268]

Thus, Petitioner has shown prejudice as a result of the defense's voluntarliy agreeing to the redaction of this important material.  Dr. Cunningham's affidavit shows exactly how these deletions prejudiced the defense under the *Strickland* standard.  There is a substantial probability that the juror's answer to special issue number two would have been different had they been presented with this data.

**B. What the State Courts Held.**

This claim and all sub-claims were brought on state habeas as claim twelve.  As to sub-claims 12(a) through 12(d), the prosecution, in its Answer, argued that the sub-claim "presents controverted, previously unresolved factual issues which could possibly be material to the legality of Applicant's confinement, and should be designated for resolution."  State's Answer at 33.  The trial court adopted the State's Answer verbatim, and those sub-claims were the partial

---

[267] *Id.* at 16.

[268] *Id.* at 16-17.

subject of the evidentiary hearing.

As to Claim 12(a), the trial court and the CCA adopted verbatim the prosecutions proposed findings and conclusions. As to this claim, the holding was that "[t]he performance of Applicant's counsel was within the standard of prevailing professional norms and counsel was at all times functioning as the counsel guaranteed Applicant by the Sixth Amendment to the United States Constitution. (State's Proposed Findings and Conclusions at 7; Exhibit 29.) The facts supporting this conclusion were taken from Mr. Hunt's affidavit. *Id.* at 6-7.

As to Claim 12(b), the holding was identical to the above. *Id.* at 8. The facts supporting this holding were likewise taken from Mr. Hunt's affidavit. *Id.* at 7-8.

As to Claim 12(c), the failure of trial counsel to effectively cross-examine Dr. Cunningham, the holding was that the CCA has ruled his testimony was error but harmless, and "Counsel was effective in that they preserved the issue of his qualifications for appellate review and rendered his testimony harmless by the presentation of evidence from Dr. Cunningham. Therefore, the issue of Dr. Coons' testimony and any cross-examination has already been decided and is not properly a subject of this writ." *Id.* at 8.

As to Claim 12(d), the failure of trial counsel to effectively cross-examine Mr. Merillat, the holding was

> There was no new evidence presented by Applicant on this issue. Applicant failed to serve Mr. Merillat with a subpoena for the hearing and was unable to otherwise secure his attendance at the hearing. The Court of Criminal Appeals found that Mr. Merillat's testimony was properly admitted and relevant. Nothing in the record indicates that Mr. Calhoun's cross-examination of Mr. Merillat constituted ineffective assistance of counsel, even if he, personally, felt 'bested' by the witness. Mr. Calhoun and Mr. Hunt obtained transcripts of prior testimony for Mr. Merillat and used those to develop their cross-examinations accordingly.
> *Id.* at 9.

As to the conclusions of law, the holding was the generic one in Claim 12(a), that the performance of Applicant's counsel "was within the standard of prevailing professional norms and counsel was at all times functioning as the counsel guaranteed Applicant by the Sixth Amendment to the United States Constitution." *Id.* at 9.

As to Claim 12(e), the State argued that, as to trial counsel's failure to object to six irrelevant incidents, "the Trial Court did not deem such matters relevant to sentence, or that in deeming such matters relevant the Trial Court was so clearly wrong as to lie outside the zone within which reasonable persons might disagree." *Id.* at 34.

As to Claim 12(f), as to trial counsel's failure to object to witness Mike Voss's hearsay testimony about the "trauma" the victim's family suffered, that '[h]e apparently testified from his personal knowledge, not hearsay." *Id.* at 35.

As to Claim 12(g), as to trial counsel's agreeing to redact much of Dr. Cunningham's affidavit as to "life without parole" inmates, the State argued that Applicant, if sentenced to life in this case, was not in a 'life without parole' situation.  In fact, much of the testimony in this punishment phase dealt with Applicant's potential placement in general population if sentenced to life." *Id.* at 35.

**C. Why the State Court Holding Was Objectively Unreasonable Under 2254(d)(2).**

The factual summary of each sub-claim discussed *supra* shows both deficient performance and prejudice under the *Strickland* standards sufficient to meet the 2254(d) standards.

Additionally, evidence adduced at the evidentiary hearing held on Claims 12(a) through 12(d) show that the state court's holding was an unreasonable interpretation of the facts under 2254(d)(2) as to those sub-claims.  The following is an analysis of how that evidence as to

Calims 12(a) through 12(d) lends additional support for the showing that Petitioner has met the 2254(d) standards:

**<u>Claim Twelve(a)</u>: Lead counsel failed to adequately prepare for Mr. Coble's trial and thereby rendered himself and second-chair counsel ineffective.**

At the hearing, Mr. Calhoun testified forthrightly as to the lack of preparation, and his own ineffectiveness.  He stated that there was a division of responsibilities where he was to look into mitigation because he "was familiar with the concept of doing an investigation of the client's background."  (EHT 180-181.)  When Mr. Calhoun began work on the case, his impression was that "not much had been done." (EHT 181.)  Not many substantive motions had been filed. (EHT 182. Mr. Calhoun was dissatisfied Calhoun was dissatisfied with the work of the mitigation investigator as he did not provide much feedback and Mr. Calhoun did not see much work product. (EHT 182.) Mr. Byington had not done much work prior to coming on the case, "not as much as I would have liked to see him do," and had only met with Mr. Coble once. (EHT 183-184.) At a certain point when they were in trial, Mr. Byington stopped working on the case and subsequently disappeared. (EHT 184.) Mr. Calhoun remembered that he complained to Mr. Hunt about Mr. Byington's lack of work. (EHT 185.)  Shown Mr. Byington's bills, Mr. Calhoun said that he could not say whether or not Mr. Byington pads his bills, but "he has a very bad reputation in Travis County [where Mr. Calhoun practices]" (EHT 213.)  Many attorneys will not hire him any more and "most judges feel that he probably does not do the work that he claims he does." (EHT 225.)  Mr. Byington "typically" charges about $6000 for his services in these capital cases"it's like a standard $6,000 bill." (EHT 226.)  And "his work product that he gave to me was somewhat lacking." (EHT 226.)

As to evidence of Mr. Coble's PTSD, Mr. Calhoun admitted this was not presented and

Mr. Calhoun did not know whether that was a strategic decision. (EHT 215.)  He could not say whether Mr. Coble was ever evaluated for this condition, and although PTSD was ultimately rejected as a theory of mitigating evidence, he could not say why.  (EHT 216.)  The defense attorneys looked into his medical records but Mr. Calhoun testified that his heart problems and ill health were not presented to the jury through expert testimony. (EHT 219.)   Mr. Calhoun felt "rushed" for the trial, and "would have liked more time just to see what else we could have come up with." (EHT 185.)

It was Mr. Calhoun's impression that not much happened in the case from the date that Mr. Hunt was appointed, October 17, 2007, until the date Mr. Calhoun was appointed, May 14, 2008. (EHT 194.)  A discovery motion was filed on April 25, 2008, and Mr. Calhoun found that unusual, in that he would not normally wait six months to file such a motion. (EHT 195.) Seventeen motions were filed before the trial. (EHT 211.)  However, fifteen of these motions were filed on one day, April 25, 2008, and they were all "boilerplate" motions. (EHT 225.)   Mr. Calhoun stated that he did not feel he was qualified to say whether his representation in this case was effective under the *Strickland* standards. (EHT 202.)  Nor could he say that his performance was in compliance with the American Bar Association Guidelines. (EHT 222.)

One cannot fault Mr. Calhoun for this failure, due to his late appointment, but it is clear that his work was rushed and hampered and ultimately rendered ineffective due to the inactivity of lead counsel Mr. Hunt from the date of his appointment in October of 2007.   The other failures enumerated herein all show prejudice as a result: the failure to effectively cross-examine Dr. Coons and Mr. Merillat, the failure to present psychiatric evidence, and the like.

**<u>Claim Twelve(b)</u>: Ineffective assistance of counsel for failure to present psychiatric evidence regarding Applicant's severe depression, Post-Traumatic Stress Disorder, bi-polar disorder, mood swings, heredity and childhood hardships and their effect**

**on his behaviour at the time of the murders.**

Here, the record speaks for itself.  A striking feature of Mr. Coble's sentencing phase re-trial, compared to his first trial, was the complete lack of any expert testimony linking his behaviour at the time of the murders to various mental and psychiatric problems he was experiencing.

At Mr. Coble's first trial, the penalty phase testimony focused on psychiatric evidence. His trial attorneys obtained the court's approval to hire Dr. Stephen Mark, a Waco psychiatrist, and Dr. James Grigson, a Dallas psychiatrist, as defense experts, pursuant to Art. 26.05.  Dr. Mark testified that Mr. Coble suffered from two different psychiatric disorders:  post traumatic stress disorder brought about by his Vietnam experiences, and a bi-polar disorder, or manic-depressive disorder.[269]  Dr. Mark testified that the bi-polar disorder could be hereditary.[270]

Dr. James Grigson, a second psychiatrist called by the defense at the first trial, testified that Mr. Coble suffered from a severe depression at the time of the killings.[271]  Dr. Grigson testified that it was so improbable that Mr. Coble would do something like this offense again,  it was more likely that one of the jurors would do a crime similar to the one that they had found Mr. Coble to have done.[272]   Dr. Grigson also testified that Mr. Coble was more horrified by the gruesome pictures of the victims than anyone else in the courtroom.[273]

---

[269]   VIII SOF 949-50 ("SOF" refers to the Statement of Facts, the trial transcript of Mr. Coble's first trial.

[270]   VIII SOF 949-54.

[271]   IX SOF 1122-23.

[272]   IX SOF 1133.

[273]   IX SOF 1146.

At the first trial, one of Mr. Coble's attorneys questioned Dr. Grigson about, and offered to be admitted,  Dr. Hodges' psychiatric report on Mr. Coble from 1964 when he was 15 years of age (State's trial exhibit 121).  Other documents, including other state's exhibits pertaining to Mr. Coble's past mental and emotional history, were also admitted into evidence after being offered by Mr. Coble's attorneys.[274] While not all of this evidence, such as Dr. Hodges' report,  was helpful to Mr. Coble, there was at least an effort made to present his psychiatric problems as mitigating evidence.  The Fifth Circuit found this evidence to be of mitigating value, as they wrote in one of their opinions:

> Coble's father died before he was born and when he was eleven, his mother suffered a nervous breakdown so Coble was sent to live at a state facility.  He lived at the orphanage until he was seventeen, at which point he joined the Marines and served in Vietnam. During his four years of service, Coble served as a machine gunner and was involved in combat.  Upon his return to the states, Coble was hospitalized due to trauma he had suffered in the war.....[a [psychiatrist] also testified that Coble suffered from post-traumatic stress disorder (PTSD)...and bipolar disorder...[the psychiatrist] traced the post-traumatic disorder to Coble's experience in Vietnam, and suggested that the bi-polar disorder might be hereditary...these illnesses made Coble susceptible to severe mood swings, which resulted in a loss of control on the day of the murders...Coble was suffering from severe depression at the time of the murders...Coble linked the loss of his wives with the loss of his mother, such that the divorces triggered severe bouts of suicidal depression...No one seems to dispute that the illnesses stemmed from events beyond Coble's control–such as hereditary factors, his childhood, and his combat experience...the psychiatrists seemed to agree that it was Coble's episodic depression, manic mood swings, and propensity for violence created by his combat experience that led him to act as he did when committing the crime...
> *Coble v. Cockrell,* 80 Fed. Appx. 301, 306-308 (5th Cir. 2003).

However, in 2008, when there was no  impediment to the introduction of such evidence, and the so-called "mitigation" issue had been added (XIII CR 2350), there was no such psychiatric testimony.  The defense did call Dr. Cunningham who presented statistical data on

---

[274]   The defense offered State's Exhibits 119 (1970 Report of V.A. medical examination); State's Exhibit 120 (1970 V.A. Rating decision); and State's Exhibit 122 (1967 Clinical Narrative).  IX SOF 1140.

the likelihood of future dangerousness but he did not and could not diagnose Mr. Coble's mental problems and how they affected his actions on the day of the murders.

Another striking feature of this failure is that the first trial concerned guilt and sentencing whereas here the only focus was on sentencing.  All of these factors, had they been presented through expert psychiatric testimony, would have been mitigating as they would have shown the jury that Mr. Coble's illnesses, and hence his actions in August of 1989, stemmed from "events beyond Coble's control" as the Fifth Circuit held.  The expert testimony would have buttressed the testimony of the witnesses that were called who, as summarized *supra,* testified to this depression, testified regarding his military service, depression and the like.

The prosecutor-prepared findings and conclusions relied almost totally on Mr. Hunt's self-serving affidavit.  Hunt Affidavit at 7-8.  Here Mr. Hunt alleges that they had Mr. Coble evaluated by Dr. William Carter but they decided not to present his testimony because he "felt that any credible psychological or psychiatric evaluation of Mr. Coble would result in testimony which would be extremely negative and harmful to our mitigation case."  *Id.*  Mr. Hunts also alleges that had they presented Dr. Carter's results to the jury, then the State could have "submitted Mr. Coble to an examination by Dr. Coons, out of our presence.  As stated above, the results of such a personal examination by Dr. Coons would have strengthened the credibility of Dr. Coons's opinion regarding future dangerousness.  We were concerned that this would in turn strengthen the State's argument that Coble was a sociopath and thus a future danger, thereby warranting the death penalty."  Hunt Affidavit at 7.  It is hard to imagine how Dr. Carter's proposed findings could have been so negative, as Mr. Coble had a 19-year unblemished record of non-violence in prison, was elderly (age 60) and in bad health, suffered heart problems, and whose 20-year-old violence arose in a situational context (concern about the break-up of his

marriage and impending criminal charges) that could never re-occur in prison.  Linkage of his mental problems, state of mind, post-traumatic stress syndrome, mood swings—all "beyond Coble's control" as the Fifth Circuit held—to explain his "loss of control on the day of the murders" crime could have been of mitigating value.  As far as the fear of Dr. Coons's personal examination of Mr. Coble, his opinion at the trial was that Mr. Coble was likely to be a future danger, with or without the personal examination and this was known or should have been known to Mr. Hunt.  It is hard to see the decision to forego the presentation of psychiatric evidence as a valid strategic decision in light of what Dr. Coons's actual testimony.

The prejudice prong of *Strickland, supra,* is readily evident. This failure completely crippled the defense's entire presentation and especially their final argument.  Instead of showing the jurors how Mr. Coble's mental state at the time of the murders was characterized by severe depression, and without expert testimony regarding the life-long effects of his bi-polar disorder and  post-traumatic stress disorder due to his Vietnam service, the defense was reduced to arguing that Vietnam was a "bad place" and that he had seen horrors there.  (*E.g.,* 29 RR 145, 154.) This missed the point.  Through the failure to link his depression, bi-polar disorder and the horrors of Vietnam to Mr. Coble's subsequent behaviour in 1989, as the Fifth Circuit did in their summary, the jurors were unable to give it significant mitigating value in terms of special issue three.  Had they been shown a defendant whose actions were the result of these illnesses which were "beyond his control," there is a substantial probability that the jurors would have answered special issue three differently and hence the verdict would have been different.

**Claim Twelve(c): Ineffective assistance of counsel for failure to effectively cross-examine and impeach Dr. Coons.**

The facts and argument from Claim 7 are hereby incorporated by reference.  In that

Claim, it was shown that there were a multitude of readily-available studies that would have totally discredited the methodology used by this witness.  None of the various amicus briefs that have been filed, discussed in Claim 7, were used.  Nor were the inconsistencies in his testimony probed.  This witness was never simply confronted with the fact that in 1990 he had predicted that Mr. Coble would have a probability of committing future violent acts, but that prediction, 18 years later, was simply wrong.   It is inexplicable why Dr. Coons was not made to at least confront his 1990 error and explain why the jury should now, after 18 years of violence-free tenure on death row, expect that a near-60-year-old inmate in very poor health would pose a threat to anyone.

Second-chair counsel Alexander Calhoun has forthrightly *admitted* this sub-claim:

> It was my responsibility to cross-examine the psychiatrists and State's experts, including Dr. Richard Coons, a forensic psychiatrist and Mr. A. P. Merillat, a criminal investigator with the Special Prosecution Unit in Huntsville, Texas.  Both Coons and Merillat frequently testify on behalf of the State during capital sentencing procedures.  With respect to Dr. Coons, I believe that he bettered me on cross-examination floundered, I decided to discontinue my questioning.   There were matters of impeachment, however, for example an almost identical defendant to Mr. Coble's case for whom Coons, who was retained by the defense, had testified precisely the opposite of how he testified about Coble, upon which I had intended to cross-examine him, but I simply neglected to do so under the circumstances.[275]

Thus, counsel has forthrightly admitted this sub-claim and relief must be granted.

**Claim Twelve(d)**: **Ineffective assistance of counsel for failure to effectively cross-examine and impeach A. P. Merillat.**

First, the basis of the state court's holding was an unreasonable interpretation of the facts under 2254(d)(2).  That holding was "[t]here was no new evidence presented by Applicant on this issue."  State's Proposed Findings and Conclusions at 8. The alleged reason for this failure was that "Applicant failed to serve Mr. Merillat with a subpoena for the hearing and was unable

---

[275]   Exhibit 14 at 2-3.

to otherwise secure his attendance at the hearing." *Id.*   However, at the hearing the trial court was informed that Petitioner *had subpoenaed* A.P. Merillat at his workplace, the Walker County Constable, but they informed defense counsel the day prior to the hearing that Mr. Merillat was out of town and would be out of town for about two weeks. (EHT 12.)[276]   The trial court was also informed that Mr. Merillat's office did not contact defense counsel about his unavailability although they knew about it about ten days prior to the hearing.   As a result, Mr. Merillat did not appear for the hearing. (EHT 13.) Thus, it was quite clear that the cause of the "failure to present new evidence" as to this claim was not Petitioner's failure to subpoena him but Mr. Merillat's ducking the subpoena by untimely representing, the day prior to the hearing, that he was allegedly "out of town."

The facts and argument from Claims 8 and 9 are incorporated herein by reference.   In addition to all the shortcomings and inconsistencies of Mr. Merillat's testimony, most of which was known at the time of Mr. Coble's trial, the latest edition of Merillat's own book[277] would have provided excellent rebuttal material.   In that book, Merillat writes:

> Of the 149 inmates studied in 1999 who had been convicted of capital murder and found by juries to be future dangers but were subsequently released from death row, six have no record of ever having received a prison disciplinary case....To people familiar with the Texas prison system, the fact that an inmate is able to avoid even the least significant disciplinary infraction (such as failing to shave one morning or having a shirttail untucked) is quite an achievement.   *For six capital murderers—including a cop-killer, a man who took careful aim through a scoped rifle and murdered a uniformed policeman answering a disturbance call–to have clear disciplinary records, could reveal that perhaps their juries were wrong when believing those men to be future dangers.*"

---

[276]   "EHT" stands for "evidentiary hearing transcript," the transcript of the February 11, 2011 hearing, with the page number following.

[277]   Exhibit 21, Merillat, A.P., *Future Danger?,* 3rd ed. (2004), Texas District and County Attorneys Association (Austin, Texas) at 30-31.

(Emphasis added, underlining in original).[278]

Had defense counsel confronted Mr. Merillat with this, it would have completely destroyed the basis for his testimony in the Coble case, as he suggests that with inmates with absolutely clean disciplinary records over a period of time, that their juries were wrong to believe they would be a future danger.  Mr. Merillat also wrote in his book:

> A man made a conscious decision to stop his violent lifestyle.  That is the crux of the future danger question.  And, it is at the heart of attempts to convince jurors of whether to answer the special issue in the affirmative or in the negative.  *What will the defendant on trial do when presented with opportunities to commit violent acts in the future—whether those opportunities are on death row or in general population?*
> *Id.* at 32 (emphasis in original).

Assistant trial counsel Alexander Calhoun has stated that he did not know much of this information at the time of the trial:

> Subsequent to Mr. Coble's trial, I have learned of some aspects of Merillat's general testimony, such as his citation of specific "violence" statistics in prison, his statements concerning the numbers and types of cases in which the Special Prosecution Unit has prosecuted within the past several years, and his statement regarding the prison inmate classification system is either false, or materially misleading.  Had I known of this information at the time of Mr. Coble's penalty phase re-trial, I would have cross-examined him differently.[279]

Thus, the nature of Mr. Merillat's false and misleading testimony was not known to trial counsel responsible for cross-examining him, Mr. Calhoun.  The prejudice here is obvious: the defense was unable to counter Merillat's prison horror stories regarding allegedly unreported violence in prisons, and argument that death row would be the only safe place for Coble.  The prosecution repeatedly stressed and highlighted Merillat's testimony at the final argument.  (28 RR 125, 169, 172.)  There is a substantial probability that the jury would have answered special

---

[278]   *Id.* at 30-31.

[279]   Exhibit 14.

issue number two differently had they been presented with this impeachment evidence.

**Claims 12(e), (f) and (g).**

Petitioner respectfully represents that the CCA's holdings misrepresent the facts and/or the law and would rest on his recitation of the facts and law *supra.*

**CLAIM THIRTEEN:** PETITIONER'S PROLONGED CONFINEMENT UNDER SENTENCE OF DEATH AND HIS EXECUTION FOLLOWING SUCH CONFINEMENT CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT

Petitioner's confinement is unlawful in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and their state constitutional analogs, and international law, covenants, treaties and norms because of his lengthy confinement under sentence of death (now 20  years) and because his execution after such prolonged confinement would constitute cruel and unusual punishment.   Carrying out Petitioner's death sentence after the inordinate delay described in this claim would violate the Eighth and Fourteenth Amendments because his confinement under a sentence of death for this extremely prolonged period of time constitutes cruel and unusual punishment.    It subjects Petitioner to extraordinary psychological duress as well as the severe physical and social restrictions that inhere in life on death row.  Because execution of Mr. Coble so long after his conviction and judgment of death would be excessive, the penalty would no longer serve the penological purposes of either deterrence or retribution, which are the only legitimate and constitutionally recognized justifications for capital punishment.

The errors set forth in this claim violated Petitioner's constitutional rights as set forth in, among other cases, *Furman v. Georgia*, 408 U.S. 238 (1972) and *Gregg v. Georgia*, 428 U.S. 153 (1976).

### A. Facts and Legal Argument Presented to the State Courts.

Petitioner alleges the following facts in support of this claim, among others to be presented after full investigation, discovery, access to this Court's subpoena power, adequate funding for investigation and experts, and a hearing on the merits of the claim.

-519-

### i. Prolonged Confinement is Cruel and Unusual.

As recounted *supra,* Petitioner was originally sentenced to death in 1990 and was re-sentenced to death in 2008.  Hence, he has been on death row for almost 20 years.

Confinement under a sentence of death subjects a condemned inmate to extraordinary psychological duress, as well as the extreme physical and social restrictions that inhere in life on death row; accordingly, such confinement, in and of itself, constitutes cruel and unusual punishment in violation of the Eighth Amendment.

The psychological torment of awaiting execution for a long period of time has been termed the "death row phenomenon."  See *Pratt v. Attorney General for Jamaica,* 4 All.E.R. 769 (U.K. Privy Council) (1993); *Soering* v. *United Kingdom*, 11 Eur.Ct. H.R. (Ser. A) 439, ¶ 111 (Euro. Ct. of Human Rights) (1989); Renee E. Boxman, Comment, *the Road to Soering and Beyond: Will the United States Recognize the "Death Row Phenomenon*?" 14 Hous. J. Int'l L. 151 (1991).

While the label is relatively new, the phenomenon it describes is not.  Over a century ago, the United States Supreme Court recognized that "when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it."  *In re Medley*, 134 U.S. 160, 172 (1890).

In *Medley*, the period of uncertainty was just four weeks.  As Justice Stevens observed, Medley's description should apply with even greater force in a case such as this, involving a delay that has lasted "many years."  *Lackey v. Texas,* 514 U.S. 1045 (1995) (Stevens, J., joined by Breyer, J., respecting the denial of certiorari).

Two justices of the Supreme Court have urged repeatedly that certiorari should be granted to consider whether such prolonged confinement on death row, and execution after such

confinement, violates the Eighth Amendment's prohibition on cruel and unusual punishments. *Id.*; *Foster v. Florida*, 537 U.S. 990, 123 S.Ct. 470 (2002) (Breyer, J., dissenting from denial of certiorari); *Knight v. Florida*, 528 U.S. 990, 120 S.Ct. 459 (1999) (Breyer, J., dissenting from denial of certiorari); *Elledge v. Florida*, 525 U.S. 944 (1998) (Breyer, J. dissenting from denial of certiorari); *see also Ceja v. Stewart*, 134 F.3d 1368 (9th Cir.1998) (Fletcher, J., dissenting from order denying stay of execution).

The California Supreme  Court found a similar argument persuasive in *People v. Anderson*:

> The cruelty of capital punishment lies not only in the execution itself and the pain incident thereto, but also in the dehumanizing effects of the lengthy imprisonment prior to execution during which the judicial and administrative procedures essential to due process of law are carried out. Penologists and medical experts agree that the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture.

*People v. Anderson*, 6 Cal. 3d 628, 649 (1972), cited in *Lackey*, 514 U.S. at 1046 n. 1 (Stevens, J., respecting denial of certiorari); *but see, e.g.*, *People v. Frye*, 18 Cal.4th 894, 1030-1031 (1998) (rejecting *Lackey* claim).

The "frightful toll" exacted "during the inevitable long wait between the imposition of sentence and the actual infliction of death" has thus long been a concern of Eighth Amendment jurisprudence. *Furman*, 408 U.S. at 288-89 (Brennan, J., concurring).  As Justice Frankfurter observed, the "onset of insanity while awaiting execution of a death sentence is not a rare phenomenon." *Solesbee v. Balckom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting).  As delays grow longer, and conditions on death row become more restrictive, the psychic toll, including insanity and suicide, also grows.  *See Knight,* 120 S.Ct. at 462 (Breyer, J., dissenting from denial of certiorari) (citing study showing 35 percent of Florida death row inmates had attempted suicide).[280]

---

[280] *see also*, Mark Donald, *Stuck in Habeas Hell: Bush Breathes New Life into Texas Death-Row Inmate's Case*, TEXAS LAWYER (May 2, 2005) (recounting mental decompensation of inmate confined on Texas' death row for 25 years despite potentially meritorious claims).

Dr. Stuart Grassian, a leading expert on the psychological effects of stringent conditions of confinement explained in the case of a Connecticut inmate who sought to waive his appeals, "[t]he conditions of confinement are so oppressive, the helplessness endured in the roller coaster of hope and despair so wrenching and exhausting, that ultimately the inmate can no longer bear it, and then it is only in dropping his appeals that he has any sense of control over his fate."[281]

The average time under sentence of death, before execution, in the United States is over 10 years.[282]   Petitioner has already spent about 20 years on death row.  Thus, Petitioner  has been, and will continue to be, subjected to unlawful pain and suffering due to his prolonged, uncertain confinement on death row.

## 2.   Evolving Standards of Decency

Petitioner's prolonged confinement under sentence of death, and his execution after such confinement, constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

The Supreme Court has recently reaffirmed that

> [t]he prohibition against "cruel and unusual punishments," like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design.  To implement this framework we have established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so disproportionate as to be cruel and unusual.  *Trop v. Dulles,* 356 U.S. 86, 100-101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion).

*Roper v. Simmons*, 125 S. Ct. 1183, 1190 (2005).  "[A]t least since" its decision in *Trop*, the Court has "referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual

---

[281] Death Penalty Information Center, *Time on Death Row,* available at www.deathpenaltyinfo.org/article.php?&did=1397.

[282] U.S. Dept of Justice, Bureau of Justice Statistics Bulletin, T. Bonczar & T. Snell, Capital Punishment, 2003, p.11 (Nov. 2004).

punishments.'" *Id.* at 1198-99 (collecting cases).  The Supreme Court accordingly cited the international community's "overwhelming" disapproval of executing the mentally retarded and juvenile offenders in concluding that such executions also ran afoul of the Eighth Amendment. *Atkins*, 536 U.S. at 316 n.21; *Simmons,* 125 S.Ct. at 1198 ("Our determination that the death penalty is disproportionate punishment for offenders under 18 finds confirmation in the stark reality that the United States is the only country in the world that continues to give official sanction to the juvenile death penalty.").

The United States similarly stands virtually alone among the nations of the world in confining individuals for periods of many years continuously under sentence of death.  The international community is increasingly recognizing that prolonged confinement under these circumstances is cruel and degrading and in violation of international human rights law.  *See Foster*, 537 U.S. at 991 (Breyer, J., dissenting from denial of certiorari) ("[c]ourts of other nations have found that delays of 15 years or less can render capital punishment degrading, shocking, or cruel") (citing *Pratt* and *Soering, supra*); *see also Knight*, 528 U.S. at 995-96 (Breyer, J., dissenting from denial of certiorari) (collecting cases).  The Canadian Supreme Court recently cited such delays as "a relevant consideration" in its decision that extradition of a murder suspect to the United States without first obtaining assurances that the death penalty would not be imposed "violates principles of 'fundamental justice.'" *Foster*,123 S.Ct. at 472 (Breyer, J., dissenting from denial of certiorari) (citing *United States v. Burns*, (2001) 1 S.C.R. 283, 353 ¶ 123).  In so holding, the Canadian Supreme Court reversed the position it had taken in *Kindler v. Canada*, (1991) 2 S.C.R. 779 and *Reference re Ng Extradition*, (1991) 2 S.C.R. 858. The court explained that "[t]he arguments against extradition without assurances have grown stronger since this Court decided *Kindler* and *Ng* in 1991." *Burns*, 1 S.C.R. at ¶ 131.

Based largely on the "*Soering* principle," it has become the general practice of abolitionist nations to oppose extradition of criminal suspects to the United States without assurances that the death penalty will not be imposed. *Burns*, 1 S.C.R. at ¶ 83 (citing brief of

Amnesty International); *Mohamed v. President of the Republic of South Africa*, 2001 (3) SA 893 (CC) ¶ 45 (Constitutional Court of South Africa).[283]   As of 2001, more than half the world's nations were abolitionist, including every Western democracy except the United States.  *Burns*, 1 S.C.R. at ¶ 91 (citing brief of Amnesty International).   This has had a significant impact in the United States.[284]

In the wake of Al Qaeda bombings of United States embassies in Africa, at least four suspects were extradited to the United States from Great Britain and Germany only after assurances were obtained that the death penalty would not be imposed.  *See United States v. Bin Laden*, 156 F.Supp.2d 359, 370 (S.D.N.Y. 2001).  The South African Constitutional Court ruled that its law enforcement officials had acted unlawfully in handing over one of the suspects, Khalfan Khamis Mohamed, to the FBI without obtaining assurances against the death penalty, which the South African Court had previously held to be "cruel, inhuman and degrading punishment."  *Id.* at 364-65; *Mohamed*, (3) SA 893 ¶¶ 55, 68.  Mohamed was permitted to introduce as mitigating evidence at his penalty hearing a synopsis of the South African court opinion, along with the information that numerous co-defendants extradited from other countries would not be subject to the death penalty; he received a life sentence.  *Bin Laden*, 156 F.Supp.2d at 370-71.

Nevertheless, some lower U.S. courts  have rejected *Lackey* claims on the ground that delays in the imposition of the death penalty are inevitable:

> The delay has been caused by the fact that McKenzie has availed himself

---

[283] James Finsten, *Extradition or Execution? Policy Constraints in the United States' War on Terror*, 77 S.CAL.L.REV. 835, 846 (2004); Daniel Givelber, *Innocence Abroad: The Extradition Cases and the Future of Capital Punishment*, 81 Or. L. Rev. 161 (2002).

[284] James Finsten, *Extradition or Execution? Policy Constraints in the United States' War on Terror*, 77 S.CAL.L.REV. 835, at 840-48; see also Exh 351, Ginger Thompson, *An Execution in Texas Strains Ties with Mexico and Others*, N.Y. Times, Aug. 16, 2002; Exh 350, Steven Erlanger, *Traces of Terror: The Terror Trail; German Chancellor Hopes To Release Evidence Soon*, N.Y. Times, June 12, 2002 (discussing refusal of European Union countries to extradite suspects to the United States without assurances against the death penalty).

> of procedures our law provides to ensure that executions are carried out only in appropriate circumstances. That this differs from the practice at common law, where executions could be carried out on the dawn following the pronouncement of sentence, see Pratt & Morgan, advance copy at 2, is a consequence of our evolving standards of decency, which prompt us to provide death row inmates with ample opportunities to contest their convictions and sentences. Indeed, most of these procedural safeguards have been imposed by the Supreme Court in recognition of the fact that the common law practice of imposing swift and certain executions could result in arbitrariness and error in carrying out the death penalty.

*McKenzie v. Day*, 57 F.3d 1461, 1466-67 (9th Cir. 1995); *see also Frye*, 18 Cal.4th at 1030-1031.

This reasoning is erroneous. Indeed, the acknowledgment that capital punishment cannot be reliably administered without subjecting death row inmates to agonizing limbo only further undermines the constitutionality of the punishment the state seeks to exact on Petitioner.

Thus, the Canadian Supreme Court's *primary* concern in *Burns* was the fallibility of the criminal justice system. The court reviewed the history of wrongful convictions in Canada, the United Kingdom, and the United States, taking note of death row exonerations in this country. *Burns*, 1 S.C.R. at ¶¶ 95-117. Death row exonerations now stand at 119.[285] This history, the Canadian court concluded, "provide[s] tragic testimony to the fallibility of the legal system, despite its elaborate safeguards for the protection of the innocent." *Burns*, 1 S.C.R. at ¶ 117. The court agreed that "lengthy delays, and the associated psychological trauma" were inevitable in the not always successful effort to avoid wrongful convictions. *Burns*, 1 S.C.R. ¶ 122. The inevitability of delay did not, however, provide an excuse for subjecting death row inmates to the psychological torment of the death row phenomenon, but rather was grounds for concluding that the death penalty itself was cruel and unusual punishment. *See id.* at ¶ 78 (death penalty is contrary to the prohibition on cruel and unusual punishment because it is "final," "irreversible," and "[i]ts implementation necessarily causes psychological and physical suffering"). The

---

[285]   Death Penalty Information Center, Innocence and the Death Penalty, available at www.deathpenaltyinfo.org/article.php?did=412&scid=6.

Constitutional Court of South Africa relied on a similar rationale in concluding that the death penalty constituted "cruel, human and degrading punishment" under its constitution.  See *The State v. Makwanyane & Mchunu*, 1995(3) SA 391 ¶¶ 55-56 (CC) (Constitutional Court of South Africa) ("The difficulty of implementing a system of capital punishment which on the one hand avoids arbitrariness by insisting on a high standard of procedural fairness, and on the other hand avoids delays that in themselves are the cause of impermissible cruelty and inhumanity is apparent.") (op. of Chaskalson, P.) (citing *Callins v. Collins*, 510 U.S. 1141 (1994) (Blackmun, J., dissenting) (concluding that "the death penalty experiment" in the United States "has failed").

This developing international consensus demonstrates that, in addition to being cruel and degrading, what the Europeans refer to as the "death row phenomenon" in the United States is also "unusual" within the meaning of the Eighth Amendment and the corresponding provision of the Texas Constitution, entitling Petitioner to relief for that reason as well.  To the extent that the death penalty cannot be reliably administered without subjecting inmates to the death row phenomenon, it violates Petitioner's rights under the due process clause of the Fourteenth Amendment and the corresponding provision of the Texas Constitution.

### 3.      The Purposes of Capital Punishment

Carrying out an execution after such prolonged confinement also fails to withstand Eighth Amendment scrutiny because it does not serve legitimate and substantial penological goals:

> [T]he penalty has not been considered cruel and unusual punishment in the constitutional sense because it was thought justified by the social ends it was deemed to serve.  At the moment that it ceases realistically to further these purposes, . . . its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernable social or public purposes.  A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment.

*Furman*, 408 U.S. at 312-13 (White, J., concurring).

The Supreme Court has "identified  'retribution and deterrence of capital crimes by

prospective offenders'" as the two constitutionally-legitimate purposes served by the death penalty. *Atkins*, 536 U.S. at 319 (quoting *Gregg*, 428 U.S. at 183). Unless imposition of the death penalty "measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment. *Id.* (quoting *Enmund v. Florida*, 458 U.S. 782, 798 (1982)); *see also Gregg*, 428 U.S. at 183 (joint op. of Stewart, Powell, & Stevens, JJ.) ("The sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering.").

Thus, if the death penalty "serves no penal purpose more effectively than a less severe punishment,' *Furman*, 408 U.S. at 280 (Brennan, J., concurring), then it is unnecessarily excessive within the meaning of the Punishments Clause." *Ceja*, 134 F.3d at 1373 (Fletcher, J., dissenting); *see also Simmons*, 125 S.Ct. at 1196-97 (finding that "neither retribution nor deterrence provides adequate justification for imposing the death penalty on juvenile offenders"); *Atkins*, 536 U.S. at 319-20 (death penalty for mentally retarded individuals violates the Eighth Amendment because it does not serve the penological purposes of retribution and deterrence).

As Chief Justice Rehnquist has recognized, "[t]here can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution." *Coleman v. Balkcom*, 451 U.S. 949, 960 (1981) (Rehnquist, J., respecting denial of certiorari). Similarly, the deterrent effect of capital punishment, if any, is undermined by inordinate delays between sentencing and execution. *Id.* at 959. ("When society promises to punish by death certain criminal conduct, and then the courts fail to do so, the courts . . . lessen the deterrent effect of the threat of capital punishment . . ."). Actually executing a defendant under such circumstances is an inherently excessive punishment that no longer serves any legitimate purpose. *See Ceja*, 134 F.3d at 1373 (Fletcher, J., dissenting); *see also Furman*, 408 U.S. at 312 (White, J., concurring).

The ability of the State of Texas to further the ends of retribution and deterrence has been drastically diminished here as a result of the extraordinary period of time that has elapsed since

the date of Mr. Coble's arrest, conviction and judgment of death.  *See Knight,* 120 S.Ct. at 462 (Breyer, J., dissenting from denial of certiorari).

Because it would serve no legitimate penological interest to execute Petitioner after this passage of time and because his confinement for nearly 20 years on death row, in and of itself, constitutes cruel and unusual punishment, execution of Petitioner is prohibited by the Eighth and Fourteenth Amendments.

### 4.    International Law

Petitioner's prolonged confinement and subsequent execution also violates international law.  Customary international law, which is part of United States federal law, includes the right against "torture or other cruel, inhuman or degrading treatment or punishment."  *Restatement 3d of Foreign Relations Law of the United States* § 702 (1987).

Article 7 of the International Covenant on Civil and Political Rights provides in part: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." In 1992, the United States ratified the International Covenant on Civil and Political Rights ("the ICCPR").  In giving its consent to the ICCPR, the United States Senate made a declaration that several of the provisions of the ICCPR, including Article 7, are not self-executing.  This declaration violates federal constitutional and separation-of-powers principles. It is also invalid because it conflicts with the object and purpose of the ICCPR and, therefore, violates the rule on reservations contained in the Vienna Convention on the Law of Treaties, and because declarations that a provision is non-self-executing do not apply to persons who attempt to invoke a treaty provision defensively.  Under the Supremacy Clause (article VI, clause 2) of the United States Constitution, the State of Texas is obligated to abide by and obey the provisions of the ICCPR.

Petitioner's confinement under threat of imposition of the death penalty and under a sentence of death, under the circumstances and conditions set forth in this claim constitutes

cruel, inhuman or degrading treatment or punishment in violation of Article 7 of the ICCPR, which has the force and effect of federal law under the Supremacy Clause (article VI, clause 2) of the United States Constitution, and customary international law, which applies directly in the United States.

Execution of Petitioner after his prolonged confinement under threat of imposition of the death penalty and under a sentence of death, under the circumstances and conditions set forth in this claim would constitute cruel, inhuman or degrading treatment or punishment in violation of Article 7 of the ICCPR, which has the force and effect of federal law under the Supremacy Clause (article VI, clause 2) of the United States Constitution, and customary international law, which applies directly in the United States.

The process used to implement Petitioner's death sentence violates international treaties and laws that prohibit cruel and unusual punishment, including, but not limited to, the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the Torture Convention), adopted by the General Assembly of the United Nations on December 10, 1984, and ratified by the United States ten years later.[286]

The length of Petitioner's confinement under threat of a death sentence and on death row, along with the constitutionally inadequate guilt and penalty determinations in his case have caused him prolonged and extreme mental torture and degradation, and denied him due process, in violation of international treaties and law.

Article 1 of the Torture Convention defines torture, in part, as any act by which severe pain or suffering is intentionally inflicted on a person by a public official or at the direction of a public official.[287]  Pain or suffering may only be inflicted upon a person by a public official if the

---

[286] *United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. GAOR, 39th Sess., Agenda Item 99, U.N. Doc. A/Res/39/46 (1984).

[287] *Id.*

punishment is incidental to a *lawful* sanction.[288]  Petitioner has made a prima facie showing that his convictions and death sentence were obtained in violation of federal and state law.

The violation of international law occurs even when a condemned prisoner is afforded post-conviction remedies beyond an automatic appeal.  These remedies are provided by law, in the belief that they are the appropriate means of testing the judgment of death, and with the expectation that they will be used by death-sentenced prisoners.  Petitioner's use of post-conviction remedies does nothing to negate the cruel and degrading character of his long-term confinement under judgment of death.

Petitioner's death sentence must be vacated permanently, or a stay of execution must be entered permanently.

**B. What the State Courts Held.**

This claim was presented as Claim 13 on state habeas.  It was denied on the merits by the CCA.  *Ex parte Coble,* WR-39,707-03 (Tex. Crim. App. Feb. 8, 2012).  The CCA adopted the trial court's findings and conclusions which were written by the prosecutor.  That argument was that any delay was "entirely due to Applicant's attempts to overturn his death sentence" and, as Petitioner had pointed out in his application, the United States Supreme Court has rejected this argument. State's Answer at 36, Exhibit 27.

Petitioner would respectfully refer the Court to the arguments made *supra.*

---

[288]  *Id.*

**CLAIM FOURTEEN:   LETHAL INJECTION – AS IT IS CURRENTLY ADMINISTERED IN TEXAS – PRODUCES UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, AND VIOLATES THE EIGHTH AMENDMENT.**

**A. Facts Presented to the State Courts.**

The Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a sentence of death. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (opinion of Reed, J.); *Fierro v. Gomez*, 865 F. Supp. 1387, 1413 (N.D. Cal. 1994) (execution by lethal gas in California held unconstitutional where evidence indicated "death by this method is not instantaneous.  Death is not extremely rapid or within a matter of seconds.  Rather . . . inmates are likely to be conscious for anywhere from fifteen seconds to one minute from the time that the gas strikes their face" and "during this period of consciousness, the condemned inmate is likely to suffer intense physical pain" from "air hunger"; "symptoms of air hunger include intense chest pains . . . acute anxiety, and struggling to breath"), *aff'd,* 77 F.3d 301, 308 (9th Cir. 1996), *vacated on other grounds*, 519 U.S. 918 (1996).  Further, "[p]unishments are cruel when they involve . . . a lingering death." *In re Kemmler*, 136 U.S. 436, 447 (1890).  A punishment is particularly constitutionally offensive if it involves the *foreseeable* infliction of suffering. *Furman v. Georgia*, 408 U.S. 238, 273 (1973), citing *Resweber*, *supra* (had failed execution been intentional and not unforeseen, punishment would have been, like torture, "so degrading and indecent as to amount to a refusal to accord the criminal human status").

It is not only foreseeable, it is predictable that death by lethal injection as it is currently practiced in Texas – using a paralytic agent in combination with a sedative – will produce unnecessary pain, torture, and lingering death.  Evidence has existed for at least fifty years that the "drugs used in lethal injections pose a substantial threat of torturous pain to persons being executed." *Chaney v. Heckler*, 718 F.2d 1174 (D.C. Cir. 1983), *overturned on other grounds*, *Heckler v. Chaney*, 470 U.S. 821 (1985) (citing ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949-1953 REPORT (1953)).  The Court of Appeals found that

> Appellants have presented substantial and uncontroverted evidence to support their claim that execution by lethal injection poses a serious risk of cruel, protracted death.   See ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949-1953 REPORT (1953), Exhibit 1 to Letter to the Secretary, supra, JA 34-40.   Even a slight error in dosage or administration can leave a prisoner conscious but paralyzed while dying, a sentient witness of his or her own slow, lingering asphyxiation.
> *Id*. at 1191.

Further, an employee of the Texas Department of Criminal Justice has admitted that the Texas lethal injection protocol has not changed since it was first used in 1982. *Judge Denies Stays of Three Executions*, HOUSTON CHRONICLE, Dec. 9, 2003, at A29 (quoting a TDCJ official who acknowledges that no changes have been made to the procedure in place since 1982).

What has changed over the last two decades, however, is that numerous states, most recently the State of Texas, have enacted statutes regulating the euthanasia of animals which preclude using the same combination of drugs currently administered to human beings during executions.[289]   If evolving standards of decency, as reflected by legislative action and professional association of veterinarians, preclude the use of these particular drugs when killing a dog or a cat, then certainly those same standards of decency would require a more humane, readily available version of the lethal injection for human beings as well.   "'The basic concept underlying the Eighth Amendment is nothing less than the dignity of man . . . .   The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Atkins v. Virginia*, 311-312 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-101(1958)).

A.    **The combination of chemicals used to execute inmates in Texas creates a strong probability of unnecessary suffering and torture**.

The State of Texas proposes to execute Mr. Coble by poisoning him with a lethal combination of three chemical substances: Sodium Thiopental, or Sodium Pentothal (an ultrashort-acting barbiturate); Pancuronium Bromide, or Pavulon (a curare-derived agent which paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness,

---

[289]   *See* Vernon's Tex. Health & S. §821.052 and 821.055 and related statutes forbidding for animal euthanasia the combination of drugs used to execute humans in Texas.

cognition or sensation); and potassium chloride (an extraordinarily painful chemical which activates the nerve fibers lining the person's veins and which can interfere with the rhythmic contractions of the heart and cause cardiac arrest).[290]   While each of these chemicals individually creates concern about their use in the execution process, in combination they cannot pass constitutional muster.   Far from producing a rapid and sustained loss of consciousness and humane death, this particular combination of chemicals often causes the inmate to consciously suffer an excruciatingly painful and protracted death.

### 1.    Sodium Thiopental

Sodium thiopental, or sodium pentothal, is a short-acting barbiturate which is ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on their own power if any complications arise in inserting a breathing tube pre-surgery.   Because of its brief duration, sodium thiopental may not provide a sedative effect throughout the entire execution process.   Dr. Dennis Geiser, the chairman of the Department of Large Animal Clinical Sciences at the College of Veterinary Medicine at the University of Tennessee, recently explained:

> Sodium thiopental is not a proper anesthetic for use in lethal injection.   Indeed, the American Veterinary Medical Association standards for euthanasia indicate that the ideal barbituric acid derivative for animal euthanasia should be potent, long acting, stable in solution, and inexpensive.   Sodium pentobarbital (not sodium thiopental) best fits these criteria.   Sodium thiopental is a potent barbituric acid derivative but very short acting with one therapeutic dose.

(Affidavit of Dr. Dennis Geiser, in the case of *Texas v. Jesus Flores*, No. 877,994A).

Due to the chemical combination used in the Texas execution process, there is also a probability that the sedative effect of the sodium thiopental is neutralized by the second chemical, pancuronium bromide.   As Dr. Mark Heath, Assistant Professor of Clinical Anesthesia at Columbia University states:

> Sodium thiopental is an ultra short-acting barbiturate.   It would not be used to maintain a patient in a surgical plane of anesthesia for purposes of performing surgical procedures. It is unnecessary, and risky, to use a short-acting anesthesia in the execution procedure.

---

[290]   From TDCJ website "Death Row Facts" at p. 2.

> If the solution of sodium thiopental comes into contact with another chemical, such as pancuronium bromide, the mixture of the two will cause the sodium thiopental immediately to precipitate or crystallize. These factors are significant in the risk of the inmate not being properly anesthetized, especially since no-one checks that the inmate is unconscious before the second drug is administered.
>
> (Affidavit of Dr. Heath, in the case of *Texas v. Jesus Flores*, No. 877,994A).

Concerns about using sodium thiopental are heightened by the lack of medical personnel, the lack of proper monitoring of the inmate during the process and the lack of inmate-specific dosing of the barbiturate. According to Dr. Geiser:

> [T]he dosage of thiopental sodium must be measured with some degree of precision, and the administration of the proper amount of the dosage will depend on the concentration of the drug and the size and condition of the subject. Additionally, the drug must be administered properly so that the full amount of the dosage will directly enter the subject's blood stream at the proper rate. If the dosage is not correct, or if the drug is not properly administered, then *it will not adequately anaesthetize the subject, and the subject may experience the untoward effects of the neuromuscular blocking agent*. . .

Affidavit of Dr. Dennis Geiser, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), *cert. granted on other grounds*, 122 S .Ct. 1463 (U.S. April 8, 2002) (No. 01-9094).(emphasis supplied).[291]

Moreover, drug manufacturers warn that without careful medical supervision of dosage and administration, sedatives can cause "paradoxical excitement" and can heighten sensitivity to pain. *See* Physicians Desk Reference, 50th Ed. (1996) at 438-440. Manufacturers warn against administration by intravenous injection unless a patient is unconscious or out of control. *Id*.

## 2.   Pancuronium Bromide

The second chemical involved in the lethal injection process, pancuronium bromide, or Pavulon, is a derivative of curare that acts as a neuromuscular blocking agent. If, as is probable

---

[291]   The problems inherent in Texas' use of sodium thiopental and pancuronium bromide cannot be directly discounted because of TDCJ's sudden administrative decision in 1989 to cease conducting autopsies of executed individuals. Texas' failure to collect any post-mortem data precludes the State from presenting any direct evidence to argue that the dosage of sodium pentothal injected into the veins of Texas condemned inmates still provides therapeutic levels of sodium pentothal: the terrible specter of inadequate anesthesia can never be ruled out for any Texas condemned inmate.

in the Texas execution process, the sedative effect of the sodium thiopental is ineffective or neutralized, the pancuronium bromide would serve only to mask the excruciating pain of the condemned inmate.

> Pancuronium bromide makes the patient look serene because of its paralytic effect on the muscles.  The face muscles cannot move or contract to show pain and suffering.  It therefore provides a 'chemical veil' over the proceedings.  By completely paralyzing the inmate, pancuronium bromide masks the normal physical parameters that an anesthesiologist or surgeon would rely upon to determine if a patient is completely unconscious and within a proper surgical plane of anesthesia.  Because pancuronium bromide is an invisible chemical veil and not a physical veil like a blanket or hood that is easily identifiable, the use of pancuronium bromide in lethal injection creates a double veil.  It disguises the fact that there is a disguise over the process.
> (Affidavit of Dr. Heath, in the case of *Texas v. Jesus Flores*, No. 877,994A).

In *Abdur' Rahman v. Bell*, Dr. Geiser asserted that while Pavulon paralyzes skeletal muscles, including the diaphragm, it has *no effect on consciousness or the perception of pain or suffering*.  Administration of Pavulon is "*like being tied to a tree, having darts thrown at you, and feeling the pain without any ability to respond.*"  Affidavit of Dr. Dennis Geiser, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), *cert. granted* on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094) (emphasis added).   This assertion is corroborated by the experience of eye surgery patient, Carol Weihrer.   During Ms. Weihrer's surgery the sedative she received was ineffectual and Ms. Weihrer was conscious of the entire surgery.   Due to the administration of a neuromuscular blocking agent like pancuronium bromide, however, she was unable to indicate her consciousness to doctors:

> I experienced what has come to be known as Anesthesia Awareness, in which I was able to think lucidly, hear, perceive and feel everything that was going on during the surgery, but I was unable to move.  It burnt like the fires of hell.  It was the most terrifying, torturous experience you can imagine.  The experience was worse than death.
> (Affidavit of Carol Weihrer, in the case of *Texas v. Jesus Flores*, No. 877,994A)

In short, the second chemical, pancuronium bromide, or Pavulon, in the lethal injection protocol serves no purpose other than to guarantee that the condemned inmate will be forced into a total chemical straightjacket and gag while he consciously experiences the potassium chloride ravaging his internal organs.   Persons viewing the lethal injection procedure and the public will

-535-

never realize that a cruel fraud is being perpetrated upon them: instead of witnessing an inmate quiet and motionless while being "put to sleep," they are in fact witnessing the cover-up of a deliberate act of excruciating torture for which only the inmate is fully conscious.[292]

###    3.    Potassium Chloride

Finally, the use of potassium chloride itself raises important Eighth Amendment concerns.  James J. Ramsey, a certified perfusionist and currently the Program Director in the Program in Cardiovascular Perfusion at Vanderbilt Medical Center, Nashville, Tennessee, gave a lengthy statement in Abdur Rahman's case regarding the use of potassium chloride in lethal injections.  Perfusion involves the study of medicine related to the artificial circulation technologies, including but not limited to the operation of the heart-lung machine, a medical device commonly used during open-heart surgeries of all kinds.  The arena involving the chemical arrest of the heart lies uniquely within the practice of the clinical perfusionist.

Regarding the administration and efficacy of potassium chloride in the lethal injection context, Ramsey stated that:

> It is my understanding that during the performance of lethal injection as carried out during the death penalty, potassium (and other agents) are administered intravenously to the defendant.  Such administration is, in my professional opinion based upon my knowledge, training, and experience, and within a reasonable degree of medical certainty, *entirely inadequate in order to achieve reasonable cardiac standstill*.  Since the agents are introduced intravenously, there will occur an immediate dilution of the solution, weakening any potential effect it may have.  By illustration an 80 kilogram person would have a blood volume of approximately 5.5 to 6 liters.  An administration of 100 milli-equivalents of potassium intravenously to the 80 kilogram person would result in a blood concentration of <u>only</u> 16.6 meq/L.  Such a dose is according to scientific literature… and as evidenced in my practice, inadequate to achieve cardiac standstill.
>
> Furthermore, it must be remembered that [in contrast to the administration of potassium chloride in the surgical context] such administration is: (1) NOT DIRECTED INTO THE CORONARY ARTERIES; (2) DIRECTED ONLY IN AN ANTEGRADE FASHION; AND (3) IS AT MORMOTHERMIA (37 degrees Celsius, NOT at five degrees Celsius).  Without reasonable data regarding any one person's anatomic and pathologic state as to their myocardial function prior to administration of the potassium, there can be no reasonable certainty that the potassium solution intended to arrest the heart would be distributed in a fashion that would arrest the heart.  Thus, the very orchestrated and

---

[292]   *See also*  "Critics Say Execution Drug May Hide Suffering" by Adam Liptak, New York Times, Oct. 7, 2003.

methodical methods used in surgery should not be thought of as optimizing the arrest of the heart, but should be considered to be necessary as the only reasonable means of ensuring that the heart is arrested.  If the heart could be arrested by intravenous objections, cardiac surgery today would be a very different animal-science and research tell us that mere intravenous injection of potassium is not sufficient.

...

Additionally, in my professional opinion and within a reasonable degree of medical certainty, barring an effective cardiac arrest, it is entirely possible that a lethal injection as I understand it will serve ONLY to arrest the function of the pulmonary system, thereby causing a state of ischemia to the entire body (no oxygen delivery), which, in turn, will ultimately arrest the heart as well (with no oxygen delivery to it.)  ***As a result, the defendant is simply suffocated due to lack of oxygen***.

Affidavit of James J. Ramsey, in the case of *Abu-Ali Abdur' Rahman v. Bell*, 226 F.3d 696 (6th Cir. 2000), cert. granted. on other grounds, 122 S.Ct. 1463 (U.S. April 8, 2002) (No. 01-9094) (emphasis supplied).

**B.    The danger of lethal injection creating unnecessary suffering and torture is greatly increased by the lack of physician involvement in the execution process.**

The risk of inflicting severe and unnecessary pain and suffering upon Mr. Coble in the lethal injection process is particularly grave in Texas because the meager procedures and protocols designed by TDCJ fail to include safeguards regarding the manner in which the execution is to be carried out, fail to establish the minimum qualifications and expertise required of the personnel performing the critical tasks in the lethal injection procedure, and fail to establish appropriate criteria and standards that these personnel must rely upon in exercising their discretion during the lethal injection procedures.  For instance, TDCJ execution protocols do not explain what to do in case an IV port cannot be established.  The experience of other states teaches that, in such a case, a medically trained person must perform a "cut down" to expose a deeply buried vein, or perform an infraclavicular catheterization, or other invasive medical procedure to facilitate the subsequent lethal injection such as an attempt to establish a port through the carotid enclosure in the neck.  In Texas, the physician's services are limited to his or her pronouncing death.

There are no directions and no standards for the necessary training, education, or

expertise of the personnel who will be exercising this critical discretion and performing these tasks and duties.  TDCJ  guidelines totally fail to articulate the criteria or standards that such personnel must rely upon in exercising this discretion.[293]  The consequences of this failure will likely result in the unnecessary and wanton infliction of severe pain and suffering.

Perhaps most importantly, there are no apparent  answers to  critical questions governing a number of crucial tasks and procedures in the lethal injection procedure such as

(a)     the minimum qualifications and expertise required for the different personnel performing the tasks involved in the lethal injection procedure after the catheter is inserted;

(b)     the methods for obtaining, storing, mixing, and appropriately labeling the drugs, the minimum qualifications and expertise required for the person who will determining the concentration and dosage of each drug to give, and the criteria that shall be used in exercising this discretion;

(c)     the manner in which the IV tubing, three-way valve, saline solution and other apparatus shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

(d)     the manner in which the heart monitoring system shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

(e)     the manner in which the IV catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required of the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned and the cut down procedure begun, and the criteria that shall be used in exercising this discretion;[294]

---

[293]     The protocols also fail to provide any direction regarding how TDCJ  is to obtain these controlled substances in a manner that insures the drugs are effective, how to store the drugs in a manner to keep them effective, how to "mix" the drugs, or how to store and label the drugs once they have been prepared and transported to the execution chamber.

[294]     *See* Deborah Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 106, n. 303 (February 2002) (citing Thomas O. Finks, Lethal Injection: An Uneasy Alliance of Law and Medicine, 4 J. Legal Med. 383, 397 (1983) (explaining that "(l)ethal injections may not work effectively on diabetics, drug users, and people with heavily pigmented skins"); Harold L. Hirsh, Physicians as Executioners, Legal Aspects of Med. Prac., Mar. 1984, at 1 (noting that

(f)     the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next procedure would not inflict severe and unnecessary pain and suffering on the condemned prisoner;

(g)     the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering on the condemned prisoner, and the criteria that shall be used in exercising this discretion; and

(h)     the minimum qualifications and expertise required of the person who is given the responsibility and discretion to insure that appropriate procedures are followed in response to unanticipated problems or events arising during the lethal injection procedure, and the criteria that shall be used in exercising this discretion.

This disturbing lack of outlined medical procedure and personnel in Texas contributes in part to the numerous execution errors in Texas.  *See e.g.* Deborah Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 111 (February 2002) (quoting Fred Leuchter, "the highly controversial and later-discredited creator of much, if not most, of the execution equipment in this country," as admitting that "'about eighty percent' of the lethal injections in Texas "have had one problem or another.").

Some of the previous errors in Texas executions include:[295]

- **Stephen Peter Morin** -- March 13, 1985 – "Technicians" punctured him repeatedly in both arms and legs for 45 minutes before they found a suitable vein.

- **Randy Woolls** – August 20, 1986 – A drug addict, Woolls had to help the executioner technicians find a good vein for the execution.

_____

"if a person is nervous or fearful, his veins become constricted"); *On Lethal Injections and the Death Penalty*, 12 Hastings Center Rep. 2, 2 (Oct. 1982) (explaining that lethal injections are particularly difficult to administer "to people with heavily pigmented skins . . . and to diabetics and drug users"); Jacob Weisberg, *This is Your Death: Capital Punishment: What Really Happens, New Republic,* July 1, 1991, at 23 (describing the 45 minutes required for technicians to find a serviceable vein in a former heroin addict); Another U.S. Execution Amid Criticism Abroad, N.Y. Times Apr. 24, 1992, at B7 (reporting that the difficulty in executing Billy Wayne White was due to his history as a heroin user).)

[295]   Sources for this information include: Michael Radelet, "On Botched Executions" Peter Hodgkinson and William Schabas (eds.), *Capital Punishment: Strategies for Abolition* (Cambridge University Press, 2001) and Stephen Trombley, *The Execution Protocol*, (1992).

- **Elliot Johnson** – June 24, 1987 – Executioners struggled for 35 minutes to insert the catheter into his veins.

- **Raymond Landry** -- December 13, 1988 – Pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started flowing into his arms.  Two minutes into the killing, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward the witnesses.  The execution team had to reinsert the catheter into the vein.  The curtain was drawn for 14 minutes so witnesses could not see the intermission.

- **Stephen McCoy** -- May 24, 1989 – Had such a violent physical reaction to the drugs (heaving chest, gasping, choking, etc.) that one of the witnesses (male) fainted, crashing into and knocking over another witness.  Houston attorney Karen Zellars, who represented McCoy and witnessed the execution, thought that the fainting would catalyze a chain reaction.  The Texas Attorney General admitted the inmate "seemed to have a somewhat stronger reaction," adding "The drugs might have been administered in a heavier dose or more rapidly."

- **Billy Wayne White** – April 23, 1992 – It took 47 minutes for authorities to find a suitable vein, and White eventually had to help.

- **Justin Lee May** – May 7, 1992 – May had an unusually violent reaction to the lethal drugs.  According to Robert Wernsman, a reporter for the Item (Huntsville), Mr. May "gasped, coughed and reared against his heavy leather restraints, coughing once again before his body froze . . ."  Associated Press reporter Michael Graczyk wrote, "He went into coughing spasms, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down.  After he stopped breathing his eyes and mouth remained open."

- **Joseph Cannon** – April 22, 1998 – After his final statement, the execution commenced.  A vein in Cannon's arm collapsed and the needle popped out.  Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone."  Officials then pulled a curtain to block the view of witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and execution process resumed.

**C.**   **Euthanasia Practices that Include the Use of a Sedative in Conjunction with a Neuromuscular Blocking Agent Violate Evolving Standards of Decency.**

Recent legislative changes regarding pet euthanasia cast serious doubt as to whether the Texas execution protocol passes constitutional muster.  Since 1981, at least nineteen states, including Texas, have passed laws that preclude the use of a sedative in conjunction with a neuromuscular blocking agent.[296]   Moreover, in the year 2000, the leading professional

---

[296]   As has Texas.  *See* Vernon's Tex. Health & S. §821.052 and 821.055 and related statutes forbidding for animal euthanasia the combination of drugs used to execute humans in Texas.

association of veterinarians promulgated guidelines for euthanasia that preclude the practice. Those guidelines specifically state that "[a] combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent."   Appendix 5 (*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218 Journal of the American Veterinary Medical Association, 669, 681 (2001)) at 680.   A euthanasia practice widely considered unfit for a dog is certainly unfit for humans as well, especially in light of the fact that the State may easily accomplish the same result with a more humane combination of chemicals. Given the consistency in the statutory regulation of euthanasia, the method currently practiced by the State of Texas is outside the bounds of evolving standards of decency.

Texas recently passed legislation mandating inhumane methods of euthanizing animals which precludes the use of neuromuscular blocking agents such as pancuronium bromide.  TEX. HEALTH & SAFETY CODE ANN. § 821.052(a), (b) (Vernon 2003) (specifically prescribing the methods of euthanasia for cats and dogs in the custody of animal shelters and requiring that shelters euthanize all other animals "only in accordance with the applicable methods, recommendations, and procedures set forth in the 2000 Report of the American Veterinary Medical Association Panel on Euthanasia . . . .").[297]  With this legislation, Texas has joined numerous states with laws recognizing that use of these chemicals would be inhumane in the euthanasia of dogs and cats.  *See* Florida, Fla. Stat. §§ 828.058 and 828.065 (enacted in 1984); Georgia, Ga. Code Ann. § 4-11-5.1 (enacted in 1990); Maine, Me.Rev.Stat. Ann., Tit. 17, § 1044 (enacted in 1987); Maryland, Md.Code Ann., Criminal Law, § 10-611 (enacted in 2002); Massachusetts, Mass.Gen.Laws § 140:151A (enacted in 1985); New Jersey, N.J.S.A. 4:22-19.3 (enacted in 1987); New York, N.Y.Agric. & Mkts § 374 (enacted in 1987); Oklahoma, Okla. Stat., Tit. 4, § 501 (enacted in 1981); Tennessee, Tenn.Code Ann. § 44-17-303 (enacted in 2001).  Other States have implicitly banned such practices.  *See* Illinois, 510 Ill. Comp. Stat., ch. 70, § 2.09; Kansas, Kan. Stat. Ann. § 47-1718(a); Louisiana, La. Rev. Stat. Ann. § 3:2465;

---

[297]   *Id.*

Missouri, 2 CSR 30-9.020(F)(5); Rhode Island, R.I. Gen. Laws § 4-1-34, Connecticut, Conn. Gen.Stat. § 22-344a; Delaware, Del.Code Ann., Tit. 3, § 8001; Kentucky, Ky.Rev.Stat. Ann. § 321.181(17) and 201 KAR 16:090, § 5(1); South Carolina, S.C.Code Ann. § 47-3-420.

In addition to explicitly forbidding the use of sedative with a neuromuscular blocking agent, the American Veterinary Medical Association stressed that only personnel trained and knowledgeable in anesthetic techniques should administer potassium chloride (the third drug in Texas' lethal injection) in conjunction with any anesthesia:

> [i]t is of utmost importance that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously. Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli.
> (*2000 Report of the American Veterinary Medical Association Panel on Euthanasia*, 218

Journal of the American Veterinary Medical Association, 669, 681 (2001)). The statutes in at least five other states, in addition to Texas, expressly reference the AVMA guidelines when delimiting humane methods of animal euthanasia. Illinois, 510 Ill. Comp. Stat., ch. 70, § 2.09; Kansas, Kan. Stat. Ann. § 47-1718(a); Louisiana, La. Rev. Stat. Ann. § 3:2465; Missouri, 2 CSR 30-9.020(F)(5); Rhode Island, R.I. Gen. Laws § 4-1-34.

"A claim that punishment is excessive is judged not by the standards that prevailed in 1685 when Lord Jeffreys presided over the 'Bloody Assizes' or when the Bill of Rights was adopted, but rather by those that currently prevail." *Atkins*, 536 U.S. at 311. The scope of the substantive protections afforded by the Eighth Amendment, as the *Atkins* Court reiterated, is defined by "evolving standards of decency that mark the progress of a maturing society." *Id.* at 312 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). The *Atkins* Court re-emphasized that evolving standards of decency are best reflected in the various relevant laws enacted throughout the country:

> Proportionality review under those evolving standards should be informed by "'objective factors to the maximum possible extent,'" *see Harmelin,* 501 U.S., at 1000, 111 S.Ct. 2680 (quoting *Rummel v. Estelle,* 445 U.S. 263, 274-275, 100

> S.Ct. 1133, 63 L.Ed.2d 382 (1980)).  We have pinpointed that the "clearest and
> most reliable objective evidence of contemporary values is the legislation enacted
> by the country's legislatures."  *Penry,* 492 U.S., at 331, 109 S.Ct. 2934.

*Id.*  Moreover, "[i]t is not so much the number of these States that is significant, but the consistency of the direction of change."  *Id*. at 315.

The unmistakable trend over the past two decades of condemning the use of neuromuscular blocking agents, such as pancuronium bromide, in euthanasia is clear evidence that the practice violates the Eighth Amendment ban on cruel and unusual punishment.  These recent alterations of euthanasia protocols for pets underscore the inhumanity of the chemicals currently used in Texas.  It can hardly be disputed that if certain euthanasia techniques are banned as overly cruel to animals, those same practices must violate our current standards of decency regarding the execution of humans.

**CLAIM FIFTEEN**:  **THE MITIGATION SPECIAL ISSUE   IS UNCONSTITUTIONAL BECAUSE IT OMITS A BURDEN OF PROOF AND MAKES IMPOSSIBLE ANY MEANINGFUL APPELLATE REVIEW OF THE JURY'S DETERMINATION.**

The mitigation special issue given to Petitioner's jury is unlawful in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and their state constitutional analogs, and international law, covenants, treaties and norms because it omitted any burden of proof, thus making any meaningful appellate review impossible.

**A.  Facts Presented to the State Courts.**

On April 25, 2008 Petitioner's counsel submitted written pretrial motions alleging that on its face, the mitigation special issue in Art. 37.071, Sec. 2(e) and (f), V.A.C.C.P., is infirm as a matter of state and federal Eighth Amendment law because it omits any burden of proof placing no burden upon the State to prove aggravating factors, remaining silent as to any standard of proof on either party and provided no opportunity for a meaningful appellate review of the mitigation verdict.  (II CR 289-297.) On July 10, 2008, the trial court denied these motions.  (4 RR 6-7.)

After the trial court overruled these objections to the constitutionality of the mitigation special issue, the jury received the statutory instruction found in Art. 37.071, Sec. 2(e), V.A.C.C.P., telling them they were to proceed to answer the following question:

Special Issue No 3:

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?
(XIII CR 2350.)[298]

The court gave the following instructions:

A jury has previously found the defendant, Billie Wayne Coble, guilty and he is guilty of the offense of Capital Murder, namely....

_____

[298]   *See* Exhibit 2.

The State must prove Special Issues One and Two beyond a reasonable doubt.  It is not required that the State prove an answer is "Yes" beyond all possible doubt.  It is required, however, that the proof excludes all reasonable doubt concerning Special Issue One and Special Issue Two.

The jury may not answer Special Issues One and Two "Yes" unless you agree unanimously.  Before you may answer Special Issues One or Two "yes" all jurors must be convinced beyond a reasonable doubt that the answer to that issue should be "yes."...

If the jury returns affirmative or "Yes" findings on both Special Issue One and Special Issue Two you shall then, and only then, answer Special Issue Three.  You shall answer Special Issue Three "Yes" or "No."  The jury may not answer "No" to Special Issue Three unless you all agree unanimously that the answer should be "No."  The jury may not answer "Yes" to Special Issue Three unless 10 or more of you agree that the answer should be "Yes."

(XIII CR 2347-2349.)[299]

### B. What the State Courts Held.

This issue was presented on direct appeal as point of error number sixteen. The CCA held as follows:

> In his sixteenth point of error, appellant relies on *Apprendi* and *Ring* to argue that Article 37.0711 is unconstitutional because it fails to require the State to prove beyond a reasonable doubt that there are no mitigating circumstances that warrant a life sentence. He fails to mention that this Court has rejected that claim in numerous cases, and he fails to persuade us that our prior decisions were mistaken.
>
> *Coble v. State,* 330 S.W.3d at 296.

A similar claim was brought on state habeas as Claim Fifteen.  The State in its Answer argued that the Texas courts have considered and rejected this issue.  Answer at 38.  The claim was denied on the merits by the CCA and also held to be procedurally barred.

### C. Argument.

Petitioner's argument is that the state courts have a federal constitutional duty to review for "sufficiency" the jury's negative answer to the mitigation special issue. What has become apparent is that the Texas death penalty scheme is <u>functioning</u> like the schemes in "weighing" states, even though on its face it is framed in "non-weighing" terms.   It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory

---

[299]  *Id.*

aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from <u>any</u> possibility of review for sufficiency.

There are certainly other states which provide the meaningful appellate review the Supreme Court required in *Clemons v. Mississippi*, 494 U.S. 738 (1990) by considering whether the mitigating evidence was outweighed by aggravating evidence. In Texas, however, the result of the code's failure to assign a burden or proof and a standard of proof regarding mitigation is that the death penalty will be applied arbitrarily, inconsistently and without clear preventive measures properly to select the persons who receive the penalty of death. The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances comprised by "all of the evidence, including the circumstances of the offense" as the mitigation special issue requires, aggravating factors it had not necessarily proved up to that point.

Why should the reviewing court simply defer to the jury's conclusion "that the evidence was not sufficient to warrant a life sentence" without at the same time asking whether it is fair for such a state of affairs to exist?

In *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995) the dissenting opinion noted that the Court could not "say that the evidence was mitigating as a matter of law" any more than it could say in a non-capital case that the particular punishment assessed was not supported by the evidence, while another particular punishment should have been assessed. Of course the answer should be, again, to assign a burden of proof to both the State and the defense and to begin the process of analyzing what the Court believes was shown to be, or not to be, sufficiently mitigating in a particular case, to overcome the aggravating factors.

The capital jury's mitigation verdict is normative only to the extent that it is informed by subjective analysis of the evidence. Every time a state court affirms or reverses a jury's verdict on future dangerousness, it reviews the jury's normative judgment and does not select some other

punishment it finds appropriate, it substitutes the proper <u>answer</u> to the punishment question and the law assigns the proper punishment to that answer. The same process should apply to the mitigation special issue.

After all, the Court has not pronounced any factor as establishing "dangerousness as a matter of law," but it has been able to isolate and list factors to be used in assessing sufficiency to prove the continuing threat issue. It could do the same for mitigating and aggravating circumstances. Arizona has done it by statute, as have other "weighing" states.

As for the statutory requirement of review of sufficiency to support a negative mitigation verdict, under Art. 44.251(s), V.A.C.C.P., Petitioner argues that the Legislature having been once burned (by *Penry)* was twice shy, and realistically anticipated that some reviewing court might one day decide that the U. S. Constitution required some kind of sufficiency review of the mitigation special issue. That day has come, and the purpose of 44.251 may now be fulfilled. The scheme as it is now interpreted and implemented allows the State to offer and use extra-statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of evaluation by review. The result is that rather than an opportunity for the defendant to gain a reprieve from death through an issue that "does not <u>involve</u> consideration of aggravating factors," the mitigation special issue is wide open for the unfettered introduction and argument of extra-statutory aggravating factors.

### i. Omission of Burden of Proof.

As to this mitigating issue, the code is silent as to which party has the burden of production or persuasion. The CCA has held that the defendant, as the only supposed "beneficiary" of the mitigation special issue, bears the burden of production on that issue, and has specifically declined to review the jury's subjective "normative" weighing of mitigation evidence. *McFarland v. State*, *supra,* 928 S.W.2d at 499.

Acknowledging the Court's *McFarland* opinion, Petitioner respectfully disagrees with its result on this issue, presenting the following arguments which he believes were not advanced in

*McFarland* and not addressed by the Court in that case or in any later case. *E.g.*, *Baker v. State*, *supra* ; *Eldridge v. State*, 940 S.W.2d 646, 652 (Tex. Crim. App. 1996).

The Texas Court of Criminal Appeals has wavered as to whether or not it has a constitutional duty to review for sufficiency the jury's negative answer to the mitigation special issue submitted under Sec. 2(e). Judge Baird has issued a dissenting opinion in which he states, "I joined the majority in *Lawton*, supra and *Broussard v. State*, 910 S.W.2d 952 (Tex. Crim. App. 1995). However, for the reasons stated infra, I now believe my doing so was erroneous." Judge Overstreet, who had joined Judge Clinton in finding review of the mitigation verdict impossible in *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995), joined Judge Baird in his opinion, some two years later, that such review was possible and was constitutionally mandated. *Moms v. State*, ___ S.W.2d ___, (Tex. Crim. App. No.71,799, delivered September 11, 1996) (Baird, J., joined by Overstreet, J., dissenting).

That the dissenting opinion has failed to gain any additional converts is apparent from subsequent opinions.[300] However, what is also apparent is that mitigation counts for nothing in the sufficiency review that is provided under the Texas scheme. In *Soria v. State*, 933 S.W.2d 46 (Tex. Crim.App. 1996), the majority granted the State's motion for rehearing and reversed its original opinion, in which it had reformed the death sentence to life based upon the insufficiency of evidence to prove future dangerousness. In its changed view, the majority adjusted its original assessment of the evidence and found the same evidence sufficient, once all mitigation evidence was disregarded.[301]

---

[300]   *Shannon v. State*, 942 S.W.2d 591 (Tex. Crim. App. 1996); *Matchett v. State*, 941 S.W.2d 922 (Tex. Crim. App. 1996), cert. denied 117 S. Ct. 2487; *Bell v. State*, 938 S.W.2d 35 (Tex. Crim. App. 1996); *Eldridge v. State*, 940 S.W.2d 646 (Tex. Crim. App. 1996); *Anderson v. State*, 932 S.W.2d 502 (Tex. Crim. App. 1996), cert. denied, 117 S. Ct. 2517

[301]   The defense psychiatrist, who had personally examined the defendant, testified that he did not present a continuing threat. "However," the majority noted, "because we view the evidence in a light most favorable to the verdict, we do not factor that opinion into our analysis or weigh his testimony against the testimony of (the State psychiatrist)." Id. at 47, n.2.

Thus, it is clear that in Texas the reviewing court will not balance or weigh mitigating evidence against aggravating evidence within the special issues it does review for sufficiency, nor within the mitigation special issue itself nor will it weigh all the defense evidence proffered as mitigating against the statutory aggravating factors proven in the other special issues.

It has become a fiction to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutorily defined constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from any possibility of review for sufficiency.

Judge Baird lists, in his *Morris* opinion, other states which provide the meaningful appellate review he maintains the Supreme Court required in *Clemons v. Mississippi,* 494 U.S. 738,749, 1105 S. Ct. 1441 (1990) by considering whether the mitigating evidence was outweighed by aggravating evidence: *State v. Breton*, 663 A.2d 1026, 1039 (Conn. 1995); *State v. Richardson*, 462 S.E.2d 492 (N.C. 1995); *Sheridan v. State*, 852 S.W.2d 772 (Ark. 1993); *State v. Hernandez*, 562 N.E.2d 219 (111. App. 2 Dist. 1990); *Lowery v. State*, 547 N.E.2d 1046 (Ind. 1989) and *Fisher v. State*, 736 P.2d 1003 (Okl.Cr. 1987). *Morris*, supra, (slip opinion at 11 of opinion of Baird, J., joined by Overstreet, J., dissenting).

The result of the code's failure to assign a burden of proof and a standard of proof regarding mitigation, even after the CCA  has assigned a burden of production, with no possibility of review for the defense, is that the death penalty will be applied arbitrarily, inconsistently and without clear preventive measures properly to select the persons who receive the penalty of death. The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances comprised of "all of the evidence, including the circumstances of the offense" as the mitigation special issue requires, aggravating factors it had

not necessarily proved up to that point.

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. See, e.g., *Walton v. Arizona*, 497 U.S. 639, 650 (1990) (State's method of allocating the burdens of proof during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors"). In order to understand why *Walton* applies to the statutory *Penry* special issue, rather than solely to the aggravating factors under the <u>other</u> special issues, this Court should recognize that <u>this special issue is a conduit for aggravating factors (victim impact evidence for example) as well as mitigating factors</u>. By asking jurors to determine whether there are "sufficient ... mitigating circumstances," Art. 37.071, Sec. 2(e), V.A.C.C.P., the statutory special issue in effect tells jurors to consider any possible aggravating factors present in all the evidence, including the circumstances of the case, that may outweigh the mitigating factors. Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute, and that is how the state argues the issue. Cf. *Johnson v. Texas*, 113 S. Ct. 2658 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances).

In *Walton v. Arizona*, *supra,* four members of the Supreme Court found constitutionally permissible the Arizona scheme that placed upon capital defendants the burden of establishing, by a preponderance of the evidence, the <u>existence</u> of mitigating circumstances <u>sufficiently</u> <u>substantial</u> to call for leniency in spite of the fact that the State had established (by what standard, the opinion did not say) the <u>existence</u> of one or more of ten statutorily defined aggravating factors:[302] "So long as a State's method of allocating the burdens of proof does not

---

[302]   It is clear from a reading of *Walton* and also from the CCA's opinions cited below in the brief that the State if it bears any burden at all under the mitigation special issue bears only the burden of proving the <u>existence</u> of facts which it may argue are aggravating (or which are defined by statute as aggravating, under the Arizona scheme) while the defendant hears the burden of producing the <u>existence</u> of facts <u>sufficient to warrant a sentence of life rather than</u> <u>death</u> or to call for leniency in the face of aggravating facts.

In fact the CCA held in *McFarland* that the State hears no burden to prove aggravating

lessen the State's burden to prove .... the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton*, supra, 497 U.S. 639,650 (1990).

The Texas statutory scheme <u>does</u> lessen the State's burden to prove the existence of aggravating factors that fall outside the scope of the special issues that preceded the mitigation special issue. (Again, victim impact evidence, which can only pertain to the mitigation special issue, is the most significant aggravating factor.) If the defendant had to establish mitigating evidence sufficient to overcome or outweigh <u>only</u> the statutorily-defined aggravating circumstances, then the process would be similar to Arizona's -and the defendant could obtain review of the question just as the Arizona defendant did. The syllabus of the *Walton* opinion states that the Arizona Supreme Court "in an independent review" concluded not only that the evidence was sufficient to prove the existence of both aggravating factors found by the trial court but also "<u>agreed</u> that there were no mitigating factors sufficient to call for leniency..." *Walton*, *supra,* Syllabus at 111 L. Ed.2d 511, 519 (1990); 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989).

The Texas defendant, however, as the statute is now interpreted, may obtain review of the sufficiency of the evidence to prove only the aggravating factors upon which the State is assigned the burden of proof. He may <u>not</u>, however, obtain the CCA's review of his proffered mitigation evidence to see if the Court agrees that it was not sufficient to call for a life sentence. See, *McFarland*, *supra.*

The reality is that in Texas, the State submits in argument many aggravating factors that

---

factors because there <u>is</u> no burden of proof to assign regarding aggravating factors outside the other special issues in the Court's view, ". . . the special issue under Sec. 2(e) <u>does not involve consideration</u> of aggravating factors." *McFarland*, *supra*, slip opinion at 84. (Yet a plurality of the Court in *Ford*, infra, found victim impact evidence, which is clearly an aggravating factor, to he relevant to the issue of moral blameworthiness under Sec. 2(e). These two positions cannot he resolved without correcting one situation or the other.)

are not set out in the statute (factors upon which it has no independent burden of proof at guilt or at punishment) for the jury to weigh against the defense's mitigating evidence.

The mitigation special issue in Texas, by omitting a burden of proof entirely, opens up the range of aggravating factors to include whatever the prosecution wishes to argue from the evidence, yet places no burden of proof on the State with respect to those factors; it prevents a reviewing court from evaluating the sufficiency of evidence to prove those extra-statutory aggravating factors[303] and it prevents a rational, meaningful review of the sufficiency of mitigating evidence (even if the sufficiency issue is more precisely a determination whether the jury's answer was against the great weight and preponderance of evidence).

### ii. Impossibility of Reviewing Mitigation under Texas Statute.

Petitioner notes that members of the CCA recently expressed the opinion in dictum (and have now specifically held, in *McFarland*, supra) that the mitigation special issues <u>does</u> impose, at least by implication, a burden of proof and a standard of proof on the capital defendant: he must establish sufficient mitigating facts to overcome the jury's prior answers to the special issue or issues by a preponderance of evidence. He may argue on appeal only that the jury's verdict was against the great weight and preponderance of evidence, yet he may not obtain review as to whether he met his burden. Petitioner cites the following excerpts from the dissenting opinion of Judge Clinton, joined by Judge Overstreet, in *Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995):

> Appellant nakedly contends that the mitigating evidence was so compelling that we should reform his sentence to life imprisonment. Whether this is a "sufficiency" review appellant thus requests, as the majority characterizes it (slip op. at 16), or a claim that the verdict is against the great weight and preponderance of the evidence, depends upon who carries the burden of proof under Article 37.071, '2(e), supra. We have yet to resolve this question.
>       We came closest in *Barnes v. State,* 876 S.W.2d 316 (Tex.Cr.App. 1994), where

---

[303] For instance in deciding that the Arizona "heinous and depraved" aggravating factor was not unconstitutionally vague and overbroad, the Supreme Court noted that the State court had <u>not</u> considered as aggravating the fact that the victim had not died for some time from his head wound, that he had floundered, blind in the desert for days before dying of dehydration, starvation and pneumonia. *Walton v. Arizona*, supra, 497 U.S. at 654 111 L.Ed.2d at 529 (1990).

we commented on the question in passing. *Barnes* had argued that the trial court erred not to instruct the jury at the punishment phase of his capital murder trial that the State had a burden to negate evidence proffered in mitigation of the death penalty. This Court held that the trial court had not erred because neither the Eighth Amendment, nor any state provision implementing it, had assigned such a burden to the State. In a footnote we remarked:

"Currently, Article 37.071 mandates that a jury that finds beyond a reasonable doubt, as required by Subsection (c), that the special issues under Subsection (b) should be answered affirmatively must go on pursuant to Subsection (e) to decide whether mitigating circumstances nevertheless warrant a life sentence. However, neither Subsection (c) nor Subsection (e) itself expressly assigns a particular burden of proof on the issue of mitigation. It might be argued, although we certainly have no occasion here to hold, that Subsection (c) implicitly assigns the burden to the beneficiary of a finding of 'sufficient mitigating circumstances to warrant that a sentence of life . . . be imposed. Cf. *Arnold v. State*, 786 S.W.2d 295, at 298 (Tex.Cr.App. 1990) (State has burden of proof to establish harmless error under Tex.R.App.P. 81(b)(2), as beneficiary of the error). That, of course, would be the defendant."

Id., at n.17.

I agree with the *Barnes* footnote that Article 37.071, '2(e) assigns at least a burden of production to the defendant. Before a capital jury can even reach the '2(e) issue, it must have affirmatively found the existence of aggravating facts under Article 37.071, '2(b), for which the State expressly shoulders the burden of proof under '2(c). Once these facts have been established to the jury's satisfaction to a level of confidence beyond a reasonable doubt, the jury proceeds to the '2(e) special issue, viz: "whether. . . there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." (Emphasis added.) If there are not sufficient mitigating circumstances, the default position is that a sentence of death will be imposed. This means that it is the capital defendant who stands to benefit from the presentation of mitigating evidence.

Because appellant is, thus, the beneficiary of mitigating evidence, the burden of production falls to him. *Arnold v. State*, supra. Therefore, if the jury verdict is against him, Petitioner can only argue on appeal that the verdict was against the greater weight and preponderance of the evidence. *Cf., Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Cr.App. 1990) (defendant has burden to prove affirmative defense of insanity, and appellate review of a verdict against him inquires whether verdict as against the great weight and preponderance of the evidence); *Bigby v. State,* 892 S.W.2d 864, at 875 (Tex.Cr.App. 1994) (same). Strictly speaking, the majority errs to characterize Petitioner's contention as a claim that the evidence is not "sufficient."

In any event the majority is correct that we cannot review the claim on appeal, however we characterize it. Subsection 2(f)(4) of Article 37.071 defines as mitigating anything "that a juror might regard as reducing the defendant's moral blameworthiness." (Emphasis added.) Thus the statute assigns exclusively to the jury the task of evaluating what evidence proffered in mitigation of the death penalty is sufficient and what is not. We cannot say that evidence was mitigating as a matter of law any more than we can say, in a non-capital case, that the evidence is insufficient to support a twenty year sentence, or that the greater weight and preponderance of the evidence establishes that the proper sentence would have been ten years, probated. There is simply no way for an appellate court to review the jury's normative judgment "that the evidence was not sufficient to warrant a sentence of life imprisonment." Slip op. at 16. Though it should not have reached this sub-contention in appellant's fifth point of error, the majority correctly disposes of it on the merits.

*Colella v. State*, supra, (Clinton, J., dissenting, joined by Overstreet, J.) (Emphasis in Opinion).

The majority opinion in *Colella* began its answer to the Petitioner's sufficiency argument on mitigation by stating that no burden of proof exists for either the State or the defendant "to disprove or prove the mitigation evidence." *Colella v. State*, *supra*, slip opinion at 16. Noting that there is no evidence that is per se mitigating, i.e., that a juror must view as reducing a defendant's moral blameworthiness under the Texas definition of mitigation, the majority declined to review the evidence on that issue to see if it supported the jurors' subjective determination that it did not warrant a life sentence. *Id.*

Petitioner submits that if a listing of aggravating and mitigating factors, together with an assignment of a burden of proof and a requirement of special findings as to those factors, permits appellate review like the review in *Walton*, supra, and the Texas scheme with its lack of specific factors and its omission of burdens of proof forecloses appellate review, then the Texas procedure is unconstitutional on its face.

It is rare, certainly, for the defense to ask for a burden of proof. Nevertheless, if the defense could at the same time require the State to shoulder a burden it should bear (in proving extra-statutory aggravating circumstances it offers in opposition to the mitigating circumstances) and thereby obtain review of the mitigation verdict similar to the kind of review available in Arizona, then he should welcome the burden. He could then obtain review of the State's evidence offered as aggravating on the mitigation special issue as well, just as in *Walton* the reviewing courts assessed and approved the narrow application of the "heinousness" aggravating factor to the facts of the case.

The Texas appellate courts now sit routinely as a "thirteenth juror" on review of factual sufficiency when the Petitioner claims he met his burden of proving some defensive issue; the appellate courts determine whether the verdict was so against the great weight and preponderance of evidence as to be manifestly unjust. E.g., *Meraz v. State*, supra, cited in the

*Colella* dissent.

The *Colella* dissenting opinion noted that the Court could not "say that the evidence was mitigating as a matter of law" any more than it could say in a non-capital case that the particular punishment assessed was not supported by the evidence, while another particular punishment should have been assessed. Of course the answer should be, again, to assign a burden of proof to both the State and the defense and to begin the process of analyzing what the Court believes was shown to be, or not to be, sufficiently mitigating in a particular case, to overcome the aggravating factors.

The CCA does, after all, review the jury's "subjective" and "normative" judgment that the evidence was sufficient to prove the defendant's future dangerousness. After all, the answer is based upon evidence that any juror might regard as increasing the likelihood, to the required degree, that the defendant will be a continuing threat. In the face of longstanding defense arguments that such a prediction is too subjective and too abstract to be proven or reviewed, the Court has taken on and performed the task of reviewing the sufficiency of evidence on that issue. The Court has not pronounced any factor as establishing "dangerousness as a matter of law," but it has been able to isolate and list factors to be used in assessing sufficiency. It could do the same for mitigating and aggravating circumstances. Arizona has done it by statute, as have other "weighing" states. This Court could do it by its opinions, as it has on the future dangerousness issue, or it could hold that the present statute as framed does not permit a fair review and is therefore unconstitutional, leaving the Texas Legislature to formulate a structure that will permit review.

The CCA's review of "sufficiency" under a preponderance standard would not be similar to the setting aside of a term of years and assigning a different term of years as the dissent stated in *Colella*. Neither the State nor the defense bears any burden of proving the proper term of punishment in a non-capital case. The capital jury's mitigation verdict is "normative" only to the extent that it is informed by subjective analysis of the evidence. Every time a State court affirms

or reverses a jury's verdict on future dangerousness, it reviews the jury's normative judgment and does not choose some other punishment it finds appropriate, it substitutes the proper <u>answer</u> to the punishment question and the law assigns the proper punishment to that answer. The same process should apply to the mitigation special issue.

### iii.  Statute Requires Sufficiency Review of Mitigation Verdict.

Article 44.251(a) of the Code of Criminal Procedure requires that a State court shall reform a sentence of death to a sentence of life imprisonment if the Court finds there is insufficient evidence to support "a negative answer to an issue submitted to a jury under Section 2(e), Article 37.071 of the Code. Appellants have argued in the past that the statute mandates a sufficiency review of a negative ' 2(e) answer. The CCA has answered by finding, essentially, that the Legislature in adding the mitigation-review was attempting to avoid a loophole by which an appellant who successfully challenged sufficiency under 2(e) could gain an entirely new trial, when in fact the intent of the statute when first passed was to avoid retrial. By providing this "remedy" for a possible unwarranted mitigation verdict, the CCA has held the Legislature did not mean to create any additional scope for review or relief for a capital defendant. See, e.g., *McFarland*, supra, (concurring opinion of Keller, J.).

Petitioner can hardly argue that the Legislature ever intended to enlarge upon the opportunities for a capital petitioner to gain review of any issue that would result in a life sentence where a death sentence had been pronounced. He does argue that the Legislature having been once burned (by *Penry*) was twice shy, and realistically anticipated that some reviewing court (the CCA or the Supreme Court) might one day decide that the Constitution required some kind of sufficiency review of the mitigation special issue.

That day has come, and the purpose of 44.251 may now be fulfilled. The scheme as it is now interpreted and implemented allows the State to offer and use extra-statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of evaluation by review. The result is that rather than an opportunity for the defendant to gain a

reprieve from death through an issue that "does not <u>involve</u> consideration of aggravating factors." *McFarland*, *supra,* 928 S.W.2d at 520. The mitigation special issue is wide open for the unfettered introduction and argument of extra-statutory aggravating factors.

Petitioner submits that as a consequence the Court should either grant habeas relief and reform his sentence to life imprisonment or remand his case to the state courts for retrial of the punishment issue pursuant to a scheme that permits the proper assignment of the burden of production (if not proof) the proper introduction of evidence pursuant to that scheme followed by the meaningful review of the mitigation answer if it is negative.

**CLAIM SIXTEEN: THE DEATH PENALTY, AT LEAST AS PRESENTLY ADMINISTERED IN TEXAS, IS CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

**A. Facts and Argument Presented to the State Courts.**

**1.   Evolving Standards of Decency Dictate That Capital Punishment Violates the Eighth Amendment**.

In *Trope v. Dulles*, 356 U.S. 86, 101 (1958) the Supreme Court stated that the Eighth Amendment draws its meaning from evolving standards of decency that mark the progress of a maturing society.   *Id.* at 101.   The constitutional prohibition against cruel and unusual punishment encompasses contemporary standards of decency, which may be reflected in the actions of legislatures and juries as well as in society's history and traditions.   *See Gregg v. Georgia*, 428 U.S. 153 (1976).   It is these evolving standards of decency which dictate that the death penalty, as presently administered in the State of Texas, constitutes punishment which is both cruel and unusual and therefore violative of the Eighth and Fourteenth Amendments to the United States Constitution and the Texas Constitution.

In March 1997, the American Bar Association issued a Resolution calling for a moratorium against carrying out the death penalty because of the failure of the post-*Furman* "justice" system to alleviate the constitutional infirmities described in that case.   The ABA's decree places that association in harmony with many of the Western industrial nations, and in opposition to such despotic regimes as Nigeria, Iraq and Saudi Arabia.   South Africa, long a repressive state under apartheid, has abolished the death penalty.   Ironically, the basis for abolition stemmed from their assessment of   America's death penalty as a failure and the inequity of the application of capital punishment based on race and economic status.

The Supreme Court has assessed the appropriateness   of the death penalty in light of international mores.   In *Thompson v. Oklahoma*, 487 U.S. 815, 834 (1988) the Supreme Court examined the issue of executing juveniles in light of the almost total international bar against the practice.   *Id.* ; *See also, Gregg v. Georgia*, 428 U.S. at 174-5 n.19.

The United Nations General Assembly has adopted the Second Optional Protocol to the International Covenant on Civil and Political Rights, obligating representative members to take all necessary steps to abolish the death penalty in their jurisdictions.  The 1983 Protocol Six to the European Convention on Human Rights deemed desirable the abolition of the death penalty in  times of peace on the basis that capital punishment was inhuman and degrading.  Finally, despite strong American dissent, the 1984 Protocol to the American Convention on Human Rights to Abolish the Death Penalty resolved, in accordance with the spirit of Article 4 of that Convention and the universal trend to eliminate the death penalty, to call on all countries in the Americas to abolish it.

> **2.** **The Dual Requirements of the Eighth Amendment -- the Elimination of Arbitrary Jury Decisions and the Need for Individualized Sentencing-- Cannot Be Met and Therefore the Current System of Capital Punishment in Texas Violates the Mandate of *Furman*.**

Petitioner herein adopts the cogent arguments of Justice Harry Blackmun, which were recently made in his dissent from denial of certiorari in the Texas capital case of *Callins v. Collins*, 114 S. Ct. 1127 (1994).  Justice Blackmun, who dissented in *Furman* and who voted in the majority in the 1976 cases affirming various states' post-*Furman* death penalty statutes, *see, e.g., Jurek v. Texas*, 428 U.S. 262 (1976), did not condemn capital punishment in the abstract as a cruel and unusual method of punishment that offends "evolving standard of decency."  *Cf. Gregg v. Georgia*, 428 U.S. 153, 227-41 (1976) (Brennan & Marshall, JJ., dissenting).  Rather, Justice Blackmun contended, *inter alia*, that capital sentencing procedures employed in the post-*Furman* era are *per se* unconstitutional because they are the product of paradoxical constitutional commands: on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence, while, on the other hand, there must be "structured discretion" in sentencing, as required by *Furman.  See Callins*, 114 S. Ct. at 1127-38 ("Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death ... can never be achieved without compromising and an equally essential

-559-

component of fundamental fairness -- individualized sentencing.").

Former U.S. Supreme Court Justice Marshall clearly documented his opposition to the death penalty: 'I continue to adhere to my view that the death penalty is in all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments." *Zant v. Stephens,* 462 U.S. 862, 906, 103 S. Ct. 2733, 2757-58 (1983) (Marshall, J., dissenting).  Former Justice Brennan agreed and joined Justice Marshall in his dissent in *Zant*:

> Death is today a cruel and unusual punishment prohibited by the Clause. 'Justice of this kind is obviously no less shocking than the crime itself, and the new 'official' murder, far from offering redress for the offense committed against society, adds instead a second defilement to the first.'
> *Gregg v. Georgia,* 428 U.S. 227, 231, 96 S. Ct. 2971, 2973 (1973) (Brennan, J., dissenting).

Justice Brennan also wrote:

> The fatal constitutional infirmity in the punishment of death is that it treats 'members of the human race as nonhumans, as objects to be toyed with and discarded.  (It is) thus inconsistent with the fundamental premise of the Clause that even the vilest criminal remains a human being possessed of common human dignity.'
> *Gregg,* 428 U.S. at 231, 96 S. Ct. at 2972.

Justice Blackmun in *Callins* discussed the failure to reconcile the two conflicting requirements of consistency and individualized sentencing.  He also discussed the apparent discrimination that still exists in assessing death, that those of certain races and those that are poor are more likely to be sentenced to death.  Systematic racism continues to plague the Texas death penalty, particularly regarding racial discrimination based on the race of the victim. Numerous studies of the Texas death penalty have shown that a capital murderer of a white person is as much as five times more likely to receive a death sentence than a person who murders a black.  *See, e.g.*, William J. Bowers & Glenn L. Pierce, *Arbitrariness and Discrimination under Post-Furman Capital Statutes*, 26 CRIME & DELINQ. 563, 596 (1980) (study based on Texas homicide data from 1973-78); Sheldon Eckland-Olson, *Structured Discretion, Racial Bias, and the Texas Death Penalty*, 69 POL. SCI. Q. 853 (1988) (study based on Texas capital murder statistics from 1974-88); Jonathen R. Sorensen & James Marquart,

*Prosecutorial and Jury Decision-Making in Post-<u>Furman</u> Texas Capital Cases*, 18 N.Y.U. REV. L. & SOC. CH. 743 (1990-91) (study based on Texas capital murder statistics from 1980-86); *see generally* James Marquart et al., THE ROPE, THE CHAIR, AND THE NEEDLE: CAPITAL PUNISHMENT IN TEXAS, 1923-1990 163-75 (1994).

Reports confirm the factor that race plays in capital sentencing:

> The race of the victim plays a crucial role in determining whether the murderer will die. Although more than half of all murder victims are from ethnic minorities, 88 per cent of those executed were convicted for the murder of a white. Racial minorities are also over-represented on Texas' death row, particularly among juvenile offenders: of the 25 juveniles on death row, 23 are from ethnic minorities—an astounding 92 per cent. Death sentences also fall disproportionately on the poorest members of society.
> USA: The Legal Lottery of Execution in Texas (Amnesty International News release, 6 April 1998).

Justice Blackmun further noted the federal courts' lessening role in scrutinizing the constitutionality of death sentences. He concluded that, although the death penalty in the abstract is allowed by the U.S. Constitution, our justice system is unable to fairly administer it. He concluded it must be abolished. *Callins,* 114 S. Ct. at 1138.

In addition to the above noted Supreme Court justices who oppose the death penalty, Federal District Court Judge Lynn Hughes has expressed the following misgivings about it:

> The government's use of the death penalty is both popular and controversial. Both the popularity and controversy are misguided. Aside from vengeful retribution and insipid moralism, no rule can be sound jurisprudentially if it generates a complex, convoluted, lengthy, and expensive process.
> The death penalty has three principal defects. First, the State probably ought not be allowed to do things it cannot undo because it is at least as error prone as other human organizations. Second, the State spends scarce resources on capital punishment that are badly needed elsewhere; Texas spends about $20 million a year more in accomplishing death sentences than it would cost to convict and maintain them for life without parole....Third, the death penalty attracts the attention of law enforcement, prosecution, courts and the public to gruesome, sensational, but largely irrational, episodic murders, deflecting that attention from the routine crimes that actually destroy the quality of life generally.
> Beyond those practical factors, reasonable people question whether the infliction of death does not undermine our society's humanity much more than it deters the beasts among us. It is bad policy, and it may be immoral, but it is constitutional.
> *Davis v. Johnson,* 8 F. Supp.2d 897, 907 (S.D. Tex. 1998).

Judge Hughes presented a thoughtful analysis of the problems inherent in our capital

sentencing scheme.   However, Petitioner respectfully urges that Judge Hughes came to the wrong conclusion. If, as he asserted, all these problems exist with the administration and infliction of death, then the death penalty must be a cruel and/or unusual punishment.

Petitioner  was indigent at the time of his trial.  If, as the studies suggest, discrimination still occurs in sentencing capital defendants, Petitioner clearly  would have been a capital defendant that faced such discrimination.   Bias and prejudice cannot play a part in deciding whether a person lives or dies, at least not in a civilized society.

This  scheme of race-based prosecution and death-sentencing  violates the mandate of *Furman* and renders the death penalty, at least as it is presently being administered in Texas, *per se* unconstitutional under the Eighth and Fourteenth Amendments.   Accordingly, this Court should reverse Petitioner's death sentence and order a new trial.

**B. What the State Courts Held.**

This claim was brought on state habeas as Claim 16.  The State in its Answer argued that "the United States Supreme Court has consistently held that the Texas death penalty scheme is constitutional."  Answer at 39.   The trial court adopted that argument and so did the CCA. Additionally, the CCA held the claim to be procedurally defaulted.

Petitioner respectfully refers the Court to the arguments presented *supra.*

**CLAIM SEVENTEEN: MR. COBLE'S JURY WAS UNCONSTITUTIONALLY SELECTED BY DEATH QUALIFYING THE JURY MEMBERS**

A 'death qualified' jury is said to be "one from which prospective jurors have been excluded for cause in light of their inability to set aside their views about the death penalty that would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath." *Buchanan v. Kentucky,* 483 U.S. 40 at fn. 6 (1987).   Death qualification is the process by which these prospective jurors are sought out and excluded during voir dire.

The jury in this case was death qualified.   For the numerous reasons discussed below, death qualification in Texas, in general and as applied in this case, violates the Fifth, Sixth, Eighth and Fourteenth Amendments, as well as International Law, Treaties, Norms, and Customs.

**A.  Facts Presented to the State Courts.**

Several prospective jurors in this case were removed for cause during death qualification based on alleged opposition to the death penalty. For instance, prospective juror Carolyn June Jackson was challenged by the State and excused due to her unwillingness to impose the death penalty. (11 RR 12-13.)   Richard Reyes Jr. was also excused for cause due to his reservations about the death penalty.  (10 RR 40-51.)  Prospective juror Tina Kolar was excused due to her opposition to the death penalty.  (10 RR 125-153.) Donald Ray Walker was also excused due to his opposition to the death penalty.  (15 RR 38.)   Others were similarly removed.

**B. What the State Court Held.**

This claim was presented to the state courts on state habeas, as Claim 17.  The State, in their Answer, first argued that the issue was waived because trial counsel failed to object. State's Answer at 40, Exhibit 27.   The State also argued that the claim was not adequately preserved because it was not brought on direct appeal.  *Id.* at 41.  The CCA apparently adopted both arguments. *Ex Parte Coble,* WR-707-03 (Tex. Crim. App. Feb. 8, 2012).

**C. Why the State Court Holding Was Objectively Unreasonable.**

The State did not directly engage Petitioner's arguments under the Sixth Amendment to the United States Constitution, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." (U.S. Const., Amend. VI.)   The Fourteenth Amendment extended the right to an impartial jury to criminal defendants in all state criminal cases. *Duncan v. Louisiana*, 391 U.S. 145 (1968). In addition, the Due Process Clause of the Fourteenth Amendment independently requires the impartiality of any jury empaneled to try a cause. *Morgan v. Illinois* (1992) 504 U.S. 719, 726 (1992).  The right to a fair jury is a fundamental right which cannot be waived by trial counsel.

As to the failure to bring the claim on direct appeal, the claim is record-based and could have been so raised. Any failure to do so is the result of ineffective assistance of appellate counsel, Claim 19 herein.

**D. The Merits of the Claim.**

**Claim Seventeen(a): Death Qualification in Texas   Is Unconstitutional Based on the Supreme Court's "Evolving Standards" Jurisprudence**

The standard for death qualification in Texas is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 41, 424 (1985) and *Adams v. Texas,* 448 U.S. 38, 45 (1980).  When viewed properly in the context of the Texas death penalty scheme, as interpreted by the Texas Court of Criminal Appeals and the Supreme Court's Eighth Amendment jurisdiction, this standard is unconstitutional.

In Texas, the "crucial" determination during death qualification is whether a potential juror's views about capital punishment in the abstract would substantially impair their ability to perform their duties. The only question that a trial court needs to resolve during death

qualification is whether any prospective juror has such conscientious or religious scruples about capital punishment, in the abstract, that his views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *See Wainwright v. Witt*, 469 U.S. at 420 and *Adams v. Texas*, 448 U.S. 38, 45.

The standard for death qualification in Texas is focused on the abstract, conscientious, or religious scruples of prospective jurors. A scruple is defined as "an ethical consideration or principle that inhibits action." Merriam-Webster's Collegiate Dictionary (1995) 10th Edition. In other words, the "views" that matter here are, ultimately, moral ones.

Whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," is the courts controlling question. *Wainwright v. Witt,* 469 U.S. 41, 424 *quoting Adams v. Texas,* 448 U.S. 38, 45. A juror's oath is a vow to follow the law. The "impairment" issue revolves around what duties a juror has under the Texas death penalty law.

A juror's duty at the penalty phase is to determine whether the penalty shall be death or confinement in state prison for a term of life by answering the special issues. General guidance to consider and weigh the evidence is all that the statute provides.

The jury's duty in a death penalty case is further explained in the jury instructions. The jury's duty at the penalty phase of a death penalty case in Texas is quite different from a jury's typical duty. Jurors at the penalty phase do not merely find facts and apply the law to those facts. Instead, these jurors are explicitly called upon to make their own moral and sympathetic judgment on various factors in deciding an appropriate penalty.

The jurors' duty includes numerous types of "moral and sympathetic" judgments. They must determine if evidence exists to support a special issue. For instance, Special Issue No. Two asked: "Do you find from the evidence beyond a reasonable doubt that there is a probability that Billie Wayne Coble would commit criminal acts of violence that would constitute a continuing threat to society?" (29 RR 186.) Likewise, Special Issue No. Three asked: "Do you find from

the evidence taking into consideration all of the evidence including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?" (29 RR 186-187; XIII CR 2358-2363.)

The jury had to determine whether Mr. Coble's evidence, character and background were aggravating or mitigating based on its moral context, and they must determine the weight of each factor.  Finally, they must weigh all of the factors against each other and determine, which penalty is justified and appropriate. The jury was called upon to make moral determinations.

A jury's duty at the penalty phase in Texas is the extraordinary duty of making moral and sympathetic determinations about a human being whose life hangs in the balance.  There is a serious, underlying problem in the death qualification standard as it applies to the Texas death penalty scheme.  Under the standard, a potential juror is removed for cause if their moral views will substantially impair their duty.  As shown above, some jurors were so removed. Yet, their duty is to make "moral and sympathetic" determinations.  Thus, a juror can be removed if their moral views on the death penalty substantially impairs them from making a moral and normative decision.  This standard is illogical and irrational on its face.

An irrational law cannot withstand even the most minimal scrutiny under the Fourteenth Amendment. *See e.g. San Antonio Ind. School Dist. v. Rodriguez,* 411 U.S. 1, 40 (1973)[The traditional standard of review under the Equal Protection Clause requires only that the State's system be shown to bear some rational relationship to legitimate state purposes.]; *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487-488 (1955) [State laws must be rational under the Due Process Clause of the Fourteenth Amendment.]; *Hudson v. United States,* 522 U.S. 93, 103 (1997) ["The Due Process and Equal Protection Clauses . . . protect individuals from sanctions which are downright irrational."].

In addition, because death is a qualitatively different punishment, heightened reliability is

required in capital cases, and procedural rules that tend to diminish the reliability of the sentencing and guilt determination are invalidated.  *See e.g. Beck v. Alabama*, 447 U.S. at 638; *Woodson v. North Carolina,* 428 U.S. at 305. An irrational procedure for selecting and removing prospective jurors who will determine a defendant's guilt and punishment cannot meet this heightened review.  For these reasons alone, Texas's death penalty scheme is unconstitutional and Mr. Coble's sentence should be reversed.

Even more important is the fact that this Eighth Amendment aspect of *Witherspoon,* which was ignored in *Witt*, was the embryo of a long line of Supreme Court cases that now completely undermine the constitutionality of death qualification in Texas. Under the Eighth Amendment, the Supreme Court has the constitutional duty to determine whether a punishment is cruel and unusual – that is whether the evolving standards of decency have reached the point where society deems the punishment to be cruel and unusual.

One of the best sources of objective information on the evolving standards is to look to the jurors who have the responsibility of deciding whether to impose the punishment.  *See e.g. Furman v. Georgia,* 408 U.S. at 278-279, and 299 (concurring opinion of J. Brennan); *Id.* at 439-442 (J. Powell, C.J. Burger, J. Blackmun, and J. Rehnquist dissenting);  *Gregg v. Georgia*, 428 U.S. at 181-182 (plurality opinion of J. Stewart, J. Powell, and J. Stevens); *Woodson v. North Carolina,* 428 U.S. at 288, fn 13, 293-296, and 301 (plurality opinion of J. Stewart, J. Powell, J. Stevens) [holding that, based upon the "crucial indicator" of jury determinations, a mandatory death penalty violates the evolving standards of decency]; *Coker v. Georgia,* 433 U.S. 584, 592 and 596-597 (1977) (plurality opinion of J. White, J. Stewart, J. Blackmun, and J. Stevens) [holding that, based upon the "response of juries reflected in their sentencing decisions," the death penalty for rape of an adult woman violates the evolving standards of decency]; *Id.* at 603-604 (concurring and dissenting opinion of J. Powell); *Enmund v. Florida,* 458 U.S. 782, 788-789 and 794-796 (1982) (majority opinion by White, J., in which Brennan, Marshall, Blackmun, and Stevens, JJ., joined.) [holding that, based upon the sentencing

decisions of juries, the death penalty for those defendants who did not kill or even intend to kill the victims violated the evolving standards of decency]; *Id*. at 814, 815, 816, 818-819, and 825-826 (dissenting opinion of J. O'Connor, C.J. Burger, J. Powell, and J. Rehnquist) [disagreeing with conclusion but agreeing with analysis]); *Thompson v. Oklahoma*, 487 U.S. 815, 822-823, fn 7 and 831-833 (1988) (plurality opinion of J. Stevens, J. Brennan, J. Marshall, and J. Blackmun) [holding that, based upon jury determinations as an "indicator of contemporary standards of decency," the death penalty for offenses committed by defendants who were under 16 violates the evolving standards of decency]; *Id*. at 852-853 (O'Connor concurring); *McCleskey v. Kemp*, 481 U.S. 279, 300 (1987)(majority opinion by Powell, J., in which Rehnquist, C. J., and White, O'Connor, and Scalia, JJ., joined); *Penry v. Lynaugh*, 492 U.S. at 331 and 334 (majority opinion by O'Connor, in which Rehnquist, C. J., and White, Scalia, and Kennedy, JJ., joined) [holding that the death penalty for mentally retarded persons is not unconstitutional and noting that defendant here offered no evidence on jury behavior on this topic].

Recently, three Supreme Court Justices wrote a separate opinion to emphasize their belief that the actions of sentencing juries, along with legislative judgments, are the *sole reliable factors* in the "evolving standards" analysis. *See Atkins v. Virginia,* 536 U.S. at 322-325 and 328 (C.J. Rehnquist, J. Scalia, and J. Thomas dissenting).) In summarizing this long line of decisions, Chief Justice Rehnquist wrote for the dissenters:

> Our opinions have also recognized that data concerning the actions of sentencing juries, though entitled to less weight than legislative judgments, "'is a significant and reliable index of contemporary values,'" *Coker v. Georgia*, 433 U.S. 584, 596 (1977) (plurality opinion) (quoting *Gregg, supra*, at 181), because of the jury's intimate involvement in the case and its function of "'maintaining a link between contemporary community values and the penal system,'" *Gregg, supra*, at 181 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 519, n. 15 (1968). In *Coker*, 433 U.S. at 596-597, for example, we credited data showing that "at least 9 out of 10" juries in Georgia did not impose the death sentence for rape convictions. And in *Enmund v. Florida*, 458 U.S. 782, 793-794 (1982), where evidence of the current legislative judgment was not as "compelling" as that in *Coker* (but more so than that here), we were persuaded by "overwhelming [evidence] that American juries . . . repudiated imposition of the death penalty" for a defendant who neither took life nor attempted or intended to take life.
>
> In my view, these two sources – the work product of legislatures and sentencing

> jury determinations – ought to be the sole indicators by which courts ascertain the contemporary American conceptions of decency for purposes of the Eighth Amendment. They are the only objective indicia of contemporary values firmly supported by our precedents. More importantly, however, they can be reconciled with the undeniable precepts that the democratic branches of government and individual sentencing juries are, by design, better suited than courts to evaluating and giving effect to the complex societal and moral considerations that inform the selection of publicly acceptable criminal punishments.

*Id.* at 323-324; emphasis added.

The Supreme Court has repeatedly held that death penalty juries have a constitutional duty to represent the evolving standards of decency of society. Since juries represent community values, their verdicts inform the Supreme Court's determination of how far society has evolved.

However, inexplicably, potential jurors in Mr. Coble's case were removed *precisely because* they represented community values as to their views on the death penalty. This improper "death qualification" resulted in a skewed jury that could not properly perform its constitutional functions. "A penalty jury can speak for the community only insofar as the pool of jurors from which it is drawn represents the full range of relevant community attitudes." *Hovey v. Superior Court*, 28 Cal. 3d 1, 73 (1981). Thus, death qualification in Texas stifles society from evolving by insuring that reliable evidence of certain community values as to the death penalty are never brought to the attention of the Supreme Court. Death qualification in Texas also results in unconstitutional stifling of evolving standards and skewing of community values in capital juries.

In *Gregg v. Georgia,* 428 U.S. 153 (plurality opinion of J. Stewart, J. Powell, and J. Stevens), the Supreme Court held that society had yet to evolve to the point that the death penalty per se was deemed to be cruel and unusual. One of the key factors the Court examined was the actual verdicts of jurors. In doing so, the Court stated:

> The jury also is a significant and reliable objective index of contemporary values because it is so directly involved. See *Furman v. Georgia*, 408 U.S., at 439-440 (POWELL, J., dissenting). See generally Powell, Jury Trial of Crimes, 23 Wash. & Lee L. Rev. 1 (1966). The Court has said that "one of the most important functions any jury can perform in making... a selection [between life imprisonment and death for a defendant convicted in a capital case] is to maintain a link between contemporary

community values and the penal system."

*Witherspoon v. Illinois*, 391 U.S. 510, 519 n. 15 (1968). *Id*. at 181; emphasis added.

The Court then reviewed the evidence on jury behavior and held that it did not show that society had evolved to the point where the death penalty was per se cruel and unusual.  By definition, these "evolving standards of decency" are constantly changing.  Thus, it is an open question whether at some point in the future they will have evolved to the point where the death penalty is unconstitutional per se. *Compare Penry v. Lynaugh*, 492 U.S. 302[holding that society had yet to evolve to the point where the death penalty for the mentally retarded is unconstitutional] *with Atkins v. Virginia*, 536 U.S. 304 [holding that society has evolved to the point where the death penalty for the mentally retarded is unconstitutional].  In other words, the *Gregg* issue will have to be addressed again by a future court as society evolves.

Yet, when a future court addresses this issue, they will not have the proper constitutional evidence and guidance because all people who believe that the death penalty is cruel and unusual per se will have been disqualified from serving on a death penalty jury via death qualification. This shows how death qualification in Texas stifles the evolving standards of decency and thus violates the Eighth Amendment.

The underlying premise of the *Gregg* issue – as well as the principle of the jury as indicator of evolving standards in general – is that the jury maintains a link to community values. By allowing some values to be excluded, the premise disappears and the future court grappling with the *Gregg* question is left with a guidepost that represents only some community values – namely those that support the status quo – which cannot possibly indicate evolving standards of society as a whole.  Indeed, the only way that a jury can be an accurate guidepost on the *Gregg* question of whether the death penalty is unconstitutional per se is if jurors whose values reflect this view are actually deciding cases.  Aversion to imposing the death penalty is also part of the conscience of the community. For the *Gregg* question to be properly answered there must be jurors who decide –  or at least contemplate deciding – death penalty cases based on their moral

-570-

views of whether the death penalty is per se appropriate.  If not, the future court will be looking at jury data, which will not address the question that they are asking: Do members of society believe that the death penalty per se is wrong?  The effect is to stifle the evolving standards of decency.

When a future court addresses the *Gregg* issue as to the constitutionality of  the death penalty per se again, they will look to jury statistics that will have been drastically skewed against capital defendants, including Mr. Coble. *See e.g. Stanford v. Kentucky*, 492 U.S. at 387, fn 3 (dissenting opinion of Brennan, J.).   And even if the future Court in some manner acknowledges that the proper statistics were not available, it is likely that the future Court may view the lack of statistics as an obstacle to relief.  *See e.g. Atkins v. Virginia*, 536 U.S. at 324, fn. 13 (dissenting opinion of Rehnquist, Scalia, and Thomas) *quoting Stanford v. Kentucky,* 492 U.S. 361, 373  (1989) [“Petitioner's inability to muster studies in his favor ought to cut against him, for it is his ‘heavy burden,’ to establish a national consensus against a punishment deemed acceptable by the Virginia Legislature and jury who sentenced him.”]   Thus, Texas’s death qualification not only makes certain that a jury skewed to death and guilt was improperly chosen at Mr. Coble’s trial, but also makes certain that he will be unjustly prevented of any future relief no matter how much society evolves.  A process of death qualification that guarantees these results is not constitutional.

Moreover, it is entirely proper under Texas law for a juror to decide not to inflict death based upon their moral beliefs about the death penalty. As the community's representative, the jury has ultimate responsibility for determining if death is the appropriate penalty for the particular offense and offender. In exercising this essentially normative task, it may apply its own moral standards to the aggravating and mitigating evidence presented. It may reject death if persuaded to do so on the basis of any constitutionally relevant evidence or observation. A juror’s moral beliefs are constitutionally relevant.  Indeed, the Supreme Court has repeatedly held that they are constitutionally required so as to inform the Court’s analysis of “evolving

standards of decency." Further, a juror who morally believes that the death penalty is not appropriate for any individual can properly consider the evidence and then allow these moral standards to influence their views of aggravating and mitigating evidence. In other words, these jurors can properly perform their duty under Texas law to make moral and sympathetic determinations at the penalty phase through their vote on the mitigation special issue.

The Supreme Court has made it explicitly clear that the very reason that juries are allowed to have broad discretion in capital cases is so that they may represent the conscience of the community by allowing their values to influence their disposition of individual cases. The Supreme Court was adamant that this required functioning of the capital jury is necessary for assessing the constitutionality of the death penalty.

Mr. Coble has demonstrated that death qualification in Texas results in an unconstitutional death penalty scheme. It is clear that the current "death qualification" test is inappropriate, as well as simply irrational, and thus in violation of the Eighth and Fourteenth Amendments. Further, death qualification in Texas is contrary to the Supreme Court's long-standing Eighth Amendment jurisprudence requiring that death penalty juries represent the values of the community and inform the Supreme Court's ability to discern evolving standards of decency. Death qualification in Texas stifles evolving standards of decency and prevents defendants from having mitigating evidence considered and given effect by sentencers in violation of the Eighth Amendment.

All of these constitutional violations are only made more egregious by the fact that death qualification also results in juries that are skewed towards convictions and death sentences. Since Mr. Coble's jury was chosen via Texas' unconstitutional death qualification process here, his death sentence cannot stand.

Given these serious Federal Constitutional violations, as well as violations of International Law, Treaties, Norms, and Customs, this Court should grant the petition for writ of habeas corpus the relief requested.

**Claim Seventeen(b)**: **Death Qualification Violated Petitioner's Fundamental Right to a Penalty Jury under the Equal Protection and Due Process Clauses of the Fourteenth Amendment**.

Death qualification violates the Fourteenth Amendment for another reason. A capital defendant in Texas has a federal constitutional right under the Sixth Amendment to a jury trial at the penalty phase. As detailed above, a right is deemed fundamental for Fourteenth Amendment analysis if explicitly or implicitly protected by the Constitution. *See San Antonio Independent Sch. Dist. v. Rodriguez,* 411 U.S. at 17.  Texas has vested its people with this right to a penalty phase jury and that  right is fundamental. Like the legal situation in *Bush v Gore*, the Supreme Court has held: "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental." *Bush v. Gore,* 531 U.S. at 104 [Where the Supreme Court held that since Florida gave its citizens the right to vote for President, it was a fundamental right for equal protection analysis].

The right to a jury in a criminal trial is a bedrock principle in the American justice system.  Further, a penalty phase jury provides a vital role in maintaining a link to the values of the community both in deciding specific cases and in the overall constitutional death penalty scheme. *See e.g. Gregg v. Georgia*, 428 U.S. at 190 ["Jury sentencing has been considered desirable in capital cases in order to maintain a link between contemporary community values and the penal system - a link without which the determination of punishment could hardly reflect the evolving standards of decency that mark the progress of a maturing society."]   In fact, in *McCleskey v. Kemp,* 481 U.S. at 309-311, the Supreme Court extensively defended the importance of the jury at the penalty phase, going so far as to refer to the jury at the penalty phase both as a "fundamental protection" *id*. at 310 and as having a "fundamental value" in the American criminal system.  *Id.* at 313.  Thus, just like in *Bush*, the statutory right to a jury trial at the penalty phase is a fundamental right.

The Texas legislature has not enacted any clear, uniform standards for death qualification.  It has been entirely left up to the courts to set standards for death qualification.

Confusion as to how the trial courts should conduct death qualification reigns. The Texas courts have failed to establish any uniform standards.  Instead, the court simply defers to the trial court's discretion and never addresses its own jurisprudence. .

This discretion inevitably results in non-uniform standards and unequal treatment, just like the discretion condemned in *Bush*.  Death qualification in Texas is thus "inconsistent with the minimum procedures necessary to protect the fundamental right" to a penalty phase jury. *Bush v. Gore,* 531 U.S. at 109.  Therefore, it is unconstitutional under the Equal Protection Clause.

In addition to the unequal manner in which juries are death qualified in Texas, death qualification also vastly impinges upon a capital defendant's fundamental right to a penalty phase jury by resulting in a jury that is skewed towards voting for death.  Thus, Texas both impinges upon a capital defendant's individual right to an impartial jury at the penalty phase and distributes that right in an unequal manner. Since Mr. Coble's jury was chosen in an unconstitutional manner, his penalty must be reversed.

Death qualification violated Mr. Coble's rights under the Fourteenth Amendment for yet another reason.  The penalty jury is more death prone.  Each similarly situated capital defendant also receives vastly different juries who decide both phases.  These results are impermissible when a fundamental right is involved.  And here, the most fundamental right of all is involved – the right to life.

The Supreme Court has referred to the "fundamental right to life." *Ford v. Wainwright,* 477 U.S. at 409; *see also e.g. generally Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886) ["The fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws."]; *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938)["fundamental human rights of life and liberty"]**.**

-574-

Life is a fundamental right. Since it is the jury that ultimately deprives capital defendants of this fundamental right, the type of jury selected vastly affects this right. The state bears the heavy burden of justifying death qualification under strict scrutiny, justifying these differences as to further a compelling government interest. *See e.g. Plyler v. Doe,* 457 U.S. 202, 216-217 (1982). Texas cannot meet this burden of justifying the death qualification as necessary. Further, the lack of uniform standards for selecting jurors via death qualification cannot withstand the required *Bush* equal protection analysis.

Due to death qualification in Texas –capital defendants face significantly different juries at the guilt phase than non-capital defendants. Capital defendants such as Mr. Coble face juries more prone to inflict a death sentence. Similarly situated capital defendants face penalty juries that are vastly different in any given capital case. Texas has failed to establish uniform guidelines for death qualification. Death qualification in Mr. Coble's case was unconstitutional. His convictions, and penalty must therefore be reversed.

Given these serious Federal Constitutional violations, as well as violations of International Law, Treaties, Norms, and Customs, this Court should grant the petition for writ of habeas corpus the relief requested.

**<u>Claim Seventeen(c)</u>: Death Qualification in Texas Violates the Eighth Amendment**

There is yet another reason that death qualification in Texas violates the Constitution by skewing the jury to be more conviction prone and more prone to inflict death upon capital defendants. Non-capital defendants do not face these skewed juries. This result is unacceptable under the Eighth Amendment, as well as International Law, Treaties, Norms, and Customs.

The Supreme Court has consistently made it clear that since "death is different," the Eighth Amendment requires "heightened reliability" at all phases of a capital case. *See e.g. Beck,* 447 U.S. at 638. Death qualification vastly affects the jury that has the power to impose this ultimate penalty in a manner so as to make death more likely. It cannot survive the requirement of "heightened reliability."

This "heightened reliability" applies to the guilt phase of capital cases as well. Capital defendants receive juries at the guilt phase that are more skewed towards conviction than guilt juries in non-capital cases.

Death qualification only targets capital defendants.  It results in capital defendants receiving juries at both phases that are far less "impartial" than any other defendant.  A capital defendant is forced to face a jury unfairly skewed towards reaching a guilt verdict with a death sentence.  Death qualification violates the "heightened reliability" requirement of due process and the Eighth Amendment.

It is "cruel and unusual" to put a human being on trial for his life, yet systemically force him to face a jury that is more prone to convict than the typical criminal jury and also more prone to condemn him to die by excluding the jurors who would at least be open to the defense evidence.[304]  Since Mr. Coble faced such treatment via the death qualified jury at his trial, his death penalty must be reversed.

Given these serious Federal Constitutional violations, as well as violations of International Law, Treaties, Norms, and Customs, this Court should grant the petition for writ of habeas corpus the relief requested.

**Claim Seventeen(d): Death Qualification Is Unconstitutional Because It Results in a Jury Prone to Vote for Death.**

The Supreme Court's decision in *Lockhart* did not end the discussion or solve the problems relating to these important constitutional issues involving death qualification in Texas because it was based on a faulty analysis of the scientific evidence, severe misunderstandings of the claims, and baffling logic.[305]  *Lockhart* also failed to address numerous claims, while later

---

[304] Moreover, Texas has especially established a capital system whereby all the jurors who would consider and give effect to mitigating evidence are systemically removed by particularized death qualification in contravention of the Eighth Amendment.

[305] As one commentator stated: "The majority opinion in *Lockhart v. McCree* demonstrates the inability of the highest court in the land to accurately interpret and apply social science data. The tragedy here – and there is a far reaching one –  is that the Supreme Court has

cases and data continue to undermine its "constitutional facts."

One day the Supreme Court will acknowledge this untenable situation and reverse course – as it has done recently in other areas of its capital jurisprudence. *See e.g. Atkins v. Virginia,* 536 U.S. 304 [reversing its earlier decision in *Penry v. Lynaugh*, 492 U.S. 302 and holding that it is unconstitutional to execute mentally retarded people]; *Ring v. Arizona*, 536 U.S. 584 [reversing its earlier decision in *Walton v. Arizona,* 497 U.S. 639 and holding that it is unconstitutional for a judge, not a jury, to find aggravating circumstances].   Indeed, given the "evolving standards of decency" aspect of its capital jurisprudence, the Supreme Court in the future will have to admit that society has evolved to the point where death qualification is unconstitutional.

The most telling aspect of the scientific data on death qualification is the consistency in which it points in the same direction – which is that death qualification results in a jury that is prone to convict and prone to vote for the death penalty.

Death qualification also disproportionately excludes women, blacks, other "minorities," and religious persons.   The very process of death qualification by its indoctrination of jurors skews the jury towards assuming guilt and returning death sentences. One researcher has aptly summarized the varied effects of death qualification detailed in the studies as follows:

> [J]uries in capital cases are considerably different from non-capital juries, both in membership and in operation. The people whose attitudes and prejudices qualify them for service on capital juries also tend to favor the prosecution and its witnesses and are generally distrustful of persons accused of crime and their attorneys. The typical juror in a death case is also probably more likely to believe minority defendants are guilty, because capital jurors are more likely than non-capital jurors to be white males, with a lower threshold of reasonable doubt.

> Their attitudes and biases make "death-qualified" jurors more likely to vote for conviction at the guilt phase of the trial. If a penalty phase is required, these jurors are also less likely to accept mitigation evidence and argument, and consequently are more likely to vote for the death penalty than a jury comprising a typical cross-section of the community.

---

licensed the imposition of death sentences by juries who are more likely to convict than juries empaneled in any other type of criminal case." Seltzer et al., *The Effect of Death Qualification on the Propensity of Jurors to Convict: The Maryland Example* 29 How. L.J. 571, 573 (1986).

Smith, *Due Process Education for the Jury: Overcoming the Bias of Death Qualified Juries*, 18 Sw. U.L.Rev. 493, 498 (1989); footnotes omitted.

For these reasons, death qualification in Texas must be deemed to be unconstitutional under the Sixth, Eighth, and Fourteenth Amendments, as well as International Law, Treaties, Norms, and Customs. Given these serious Federal Constitutional violations, as well as violations of International Law, Treaties, Norms, and Customs, this Court should grant the petition for writ of habeas corpus the relief requested.

**CLAIM EIGHTEEN: PETITIONER'S DEATH SENTENCE VIOLATES INTERNATIONAL LAW, WHICH IS BINDING ON THIS COURT, AS WELL AS THE EIGHTH AMENDMENT**.

### A. Facts Presented to the State Courts.

A few years ago, the Supreme Court of Canada placed the use of the death penalty in the United States for ordinary crimes into an international context:

> Amnesty International reports that in 1948, the year in which the Universal Declaration of Human Rights was adopted, only eight countries were abolitionist.  In January 1998, the Secretary-General of the United Nations, in a report submitted to the Commission on Human Rights (U.N. Doc. E/CN.4/1998/82), noted that 90 countries retained the death penalty, while 61 were totally abolitionist, 14 (including Canada at the time) were classified as abolitionist for ordinary crimes and 27 were considered to be abolitionist *de facto* (no executions for the past 10 years) for a total of 102 abolitionist countries.  At the present time, it appears that the death penalty is now abolished (apart from exceptional offences such as treason) in 108 countries.  These general statistics mask the important point that abolitionist states include all of the major democracies except some of the United States, India and Japan … According to statistics filed by Amnesty International on this appeal, 85 percent of the world's executions in 1999 were accounted for by only five countries:  the United States, China, the Congo, Saudi Arabia and Iran.

(*Minister of Justice v. Burns* (2001) 1 S.C.R. 283 [2001 SCC 7], ¶ 91.)  The California death penalty scheme violates the provisions of international treaties and the fundamental precepts of international human rights.  Because international treaties ratified by the United States are binding on state courts, the imposition of the death penalty is unlawful.  To the extent that international legal norms are incorporated into the Eighth Amendment determination of evolving standards of decency, Petitioner raises this argument  under the Eighth Amendment as well.  (*See Atkins v. Virginia* (2002) 536 U.S. 304, 316, fn. 21; *Stanford v. Kentucky* (1989) 492 U.S. 361, 389-390 (Brennan, J., dissenting.).)

### i. International Law

Article VII of the International Covenant of Civil and Political Rights ("ICCPR") prohibits "cruel, inhuman or degrading treatment or punishment."  Article VI, section 1 of the ICCPR prohibits the arbitrary deprivation of life, providing that "[e]very human being has the inherent right to life.  This right shall be protected by law.  No one shall be arbitrarily deprived of life."

The ICCPR was ratified by the United States in 1992, and applies to the states under the Supremacy Clause of the federal Constitution.  (U.S. CONST., art. VI, § 1, cl. 2.)  Consequently, this Court is bound by the ICCPR.[306]  The United States Court of Appeals for the Eleventh Circuit has held that when the United States Senate ratified the ICCPR "the treaty became, coexistent with the United States Constitution and federal statutes, the supreme law of the land" and must be applied as written.  (*United States v. Duarte-Acero* (11th Cir. 2000) 208 F.3d 1282, 1284; *but see Beazley v. Johnson* (5th Cir. 2001) 242 F.3d 248, 267-268.)

Mr. Coble's death sentence violates the ICCPR.  Because of the improprieties of the capital sentencing process challenged in this appeal, the imposition of the death penalty on  him constitutes "cruel, inhuman or degrading treatment or punishment" in violation of Article VII of the ICCPR.   There is a growing recognition that international human rights norms in general, and the ICCPR in particular, should be applied to the United States.  (*See United States v. Duarte-Acero*, *supra*, 208 F.3d at 1284; *McKenzie v. Daye* (9th Cir. 1995) 57 F.3d 1461, 1487 (Norris, J., dissenting).)  Thus, Petitioner requests that the Court reconsider and, in the context of this case, find his death sentence violates international law.  (*See Smith v. Murray* (1986) 477 U.S. 527 [holding that even issues settled under state law must be reasserted to preserve the issue for federal habeas corpus review].)

### ii.    The Eighth Amendment

As noted above, the abolition of the death penalty, or its limitation to exceptional crimes

---

[306]  The Senate attempted to place reservations on the language of the ICCPR, including a declaration that the covenant was not self-executing.  (*See* 138 Cong. Rec. S4784, § III(1).)  These qualifications do not preclude Petitioner's reliance on the treaty because, inter alia, (1) the treaty is self-executing under the factors set forth in *Frolova v. U.S.S.R.* (7th Cir. 1985) 761 F.2d 370, 373; (2) the declaration impermissibly conflicts with the object and purpose of the treaty, which is to protect the individual's rights  enumerated therein (*see* RIESENFELD & ABBOT, *The Scope of the U.S. Senate Control Over the Conclusion and Operation of Treaties*  (1991) 68 Chi.-Kent L. Rev. 571, 608); and (3) the legislative history indicates that the Senate only intended to prohibit private and independent causes of action (*see* 138 Cong. Rec. S4784) and did not intend to prevent defensive use of the treaty (*see* Quigley, *Human Rights Defenses in U.S. Courts* (1998) 20 Hum. Rts. Q. 555, 581-582).

such as treason – as opposed to its use as a regular punishment for ordinary crimes – is particularly uniform in the nations of Western Europe.  (*See, e.g.*, *Stanford v. Kentucky* (1989) 492 U.S. 361, 389 (Brennan, J., dissenting.); *Thompson v. Oklahoma*, *supra*, 487 U.S. at  830 (Stevens, J., plurality opinion)).  Indeed, *all* nations of Western Europe – plus Canada, Australia, and New Zealand – have abolished the death penalty.  (Amnesty International, "The Death Penalty:  List of Abolitionist and Retentionist Countries" (as of August 2002) at <http://www.amnesty.org> or <http://www.deathpenaltyinfo.org>.)[307]

    This consistent view is especially important in considering the constitutionality of the death penalty under the Eighth Amendment because our Founding Fathers looked to the nations of Western Europe for the "law of nations" as models on which the laws of civilized nations were founded and for the meaning of terms in the Constitution.   "When the United States became an independent nation, they became, to use the language of Chancellor Kent, 'subject to that system of rules which reason, morality, and custom had established among the civilized nations of Europe as their public law.'"  (*Miller v. United States* (1870) 78 U.S. 268, 315 (Field, J., dissenting), quoting l Kent's Commentaries 1; *Hilton v. Guyot* (1895) 159 U.S. 113, 163, 227; *Sabariego v. Maverick* (1888) 124 U.S. 261, 291-292.)  Thus, for example, Congress's power to prosecute war is, as a matter of constitutional law, limited by the law of nations; what civilized Europe forbade, such as using poison weapons or selling prisoners of war into slavery, was constitutionally forbidden here.  (*Miller v. United States*, *supra*, 78 U.S. at 315-316, fn. 57 (Field, J., dissenting).)

    "Cruel and unusual punishment" as defined in the Constitution is not limited to whatever violated the standards of decency that existed within the civilized nations of Europe in the 18th century.  The Eighth Amendment "draw[s] its meaning from the evolving standards of decency

---

[307]   Many other countries including almost all Eastern European, Central American, and South American nations also have abolished the death penalty either completely or for ordinary crimes.  (*See* Amnesty International's  "List of Abolitionist and Retentionist Countries," *supra,* at <http://www.amnesty.org> or <http://www.deathpenaltyinfo.org>.)

that mark the progress of a maturing society." (*Trop v. Dulles* (1958) 356 U.S. 86, 100.)  And if the standards of decency as perceived by the civilized nations of Europe to which our Framers looked as models have evolved, the Eighth Amendment requires that we evolve with them.  The Eighth Amendment thus prohibits the use of forms of punishment not recognized by several of our states and the civilized nations of Europe, or used by only a handful of countries throughout the world – including totalitarian regimes whose own "standards of decency" are supposed to be antithetical to our own.  (*See Atkins v. Virginia*, *supra*, 536 U.S. at  316, fn. 21 [basing determination that executing mentally retarded persons violated Eighth Amendment in part on disapproval in "the world community"]; *Thompson v. Oklahoma*, *supra*, 487 U.S. at  830, fn. 31 ["We have previously recognized the relevance of the views of the international community in determining whether a punishment is cruel and unusual"].)

Assuming *arguendo* that capital punishment itself is not contrary to international norms of human decency, its use as regular punishment for substantial numbers of crimes – as opposed to extraordinary punishment for extraordinary crimes – is contrary to those norms.  Nations in the Western world no longer accept the death penalty, and the Eighth Amendment does not permit jurisdictions in this nation to lag so far behind.  (*See Hilton v. Guyot*, *supra*, 159 U.S. 113; *see also Jecker, Torre & Co. v. Montgomery* (1855) 59 U.S. 110, 112 [municipal jurisdictions of every country are subject to law of nations principle that citizens of warring nations are enemies].)  Thus, Texas's use of death as a regular punishment, as in this case, violates the Eighth and Fourteenth Amendments, and Petitioner's death sentence should be set aside.

### B. What the State Courts Held.

This claim was presented on state habeas as Claim 18.  In their Answer, the State argued that "[t]reaties establish state-to-state rights and obligations—not rights of individuals...If the United States Supreme Court decides that all jurisdictions in the United States must enforce the ICCPR or the Western European Law of Nations, as currently imagined, then this Court and the

State of Texas would be bound, under the Supremacy Clause, to give effect to that holding.

State's Answer at 42, Exhibit 27.

The CCA apparently adopted this reasoning and also held that the claim was procedurally barred. *Ex Parte Coble,* WR-707-03 (Tex. Crim. App. Feb. 8, 2012)

**C. Why the State Court Holding Was Objectively Unreasonable.**

Petitioner would respectfully rest on the above facts and argument.

**CLAIM NINETEEN: APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.**

Petitioner's right to due process of law, equal protection of the laws, and a reliable sentence, trial by jury, and by an impartial sentencer, was violated by his failure to receive effective assistance of appellate counsel, through state court action.  U.S. Const. Amends. V, VI, VIII, XIV and applicable provisions of the Texas Constitution. Petitioner's direct appeal is still pending, but in advance of the holding on that appeal, Petitioner  raises this issue in order to preserve it for future state or federal review.

**A. Facts and Argument Presented to the State Courts.**

Every criminal defendant has a right to effective assistance of counsel on his first direct appeal as a matter of right.  *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).  Counsel's role on direct appeal is "that of an expert professional whose assistance is necessary in a legal system governed by complex rules and procedures for the defendant to obtain a decision at all -- much less a favorable decision -- on the merits of the case." *Evitts*, 469 U.S. at 394.  Appellate counsel must make "a conscientious examination" of the record to identify all of the potential issues for an appeal, thoroughly research every colorable claim, and make a reasonable professional judgment about which points to raise. *Anders v. California*, 386 U.S. 738, 744 (1967).  Therefore, appellate counsel "must have a firm command of the facts of the case as well as governing law before [they] can render reasonably effective assistance of counsel."

In reaching its conclusion in *Evitts,* the Supreme Court rejected the state's argument that the Due Process Clause did not apply to state appeals because the state did not have to grant appeals as of right at all.  The Court stated, "[i]n short, when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and,  in particular, in accord with the Due Process Clause." *Evitts,* at 401.  *See also Goeke v. Branch,* 514 U.S. 115, 119-20 (1995).

The Supreme Court in *Evitts* concluded that "[a] first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney... In short, the promise...that a criminal defendant has a right to counsel on appeal—like the promise...that a criminal defendant has a right to counsel at trial—would be a futile gesture unless it comprehended the right to the effective assistance of counsel.

*Evitts,* at 396-97.  *See also Goeke v. Branch,* 514 U.S. 115, 120 (1995).

Petitioner's direct appeal was pending at the time this claim was raised in the state courts. Any purely-record-based claims or sub-claims discussed herein could and should have been raised on the direct appeal if the basis for them was entirely present in the record itself.  As to any such claims or sub-claims, direct appeal counsel's performance was unreasonable under the prevailing professional norms and there is a reasonable probability that, but for appellate counsels' errors,  Petitioner's conviction or sentence would have been reversed on direct appeal. The two-pronged *Strickland* standard of deficient performance and prejudice governing claims of ineffectiveness of trial counsel likewise applies to the ineffectiveness of direct appeal counsel. *Evitts,* 469 U.S. 387.  Appellate counsel's inexcusable failure to raise a point of error that had a reasonable probability of success would be sufficient to make the showing of deficient performance.

Should this or any subsequent Court hold that any purely-record-based claims or sub-claims were not properly brought on the direct appeal, Petitioner submits that although he had counsel on appeal, that counsel did not provide the representation mandated by the Constitution. *Evitts v. Lucy,* 469 U.S. 387, 396 (1985) ("To be sure, counsel did have nominal representation when he brought this appeal.  But nominal representation on an appeal as of right – like nominal representation at trial – does not suffice to render the proceeding constitutionally adequate; a party whose counsel is unable to provide effective representation is in no better position that one who has no counsel at all.")

**B. What the State Courts Held.**

This claim was brought as Claim 19 on state habeas.  The State, in its Answer, acknowledged that the claim was brought to preserve it for future or federal review, but that as it

presented no facts, relief was not available. State's Answer at 43.

The CCA denied this claim on the merits.

The state habeas petition was filed while the direct appeal was pending, before the CCA had ruled that Claims 1, 4, 5, 7, 8, 10, 11, and 15-18 were procedurally barred for failure to bring them on direct appeal.  Hence, if this Court finds any of these claims to be meritorious, the failure to raise those claims was the result on ineffective assistance of direct appeal counsel.

Petitioner has shown that many of these claims were meritorious and there was no reasonable excuse for appellate counsel not to bring them on direct appeal.  This claim could not have been presented in more developed form to the trial court and the CCA because Petitioner's direct appeal was still pending when the state habeas petition was filed.

**CLAIM TWENTY:    THE CUMULATIVE EFFECT OF THE ERRORS AT MR. COBLE'S TRIAL DENIED HIM OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT.[308]**

**A. Facts Presented to the State Courts and Argument.**

In his presentation of the above claims, Petitioner has shown how each individually merits relief as a denial of his constitutional rights or a violation of federal law. However, there are situations in which a petitioner alleges several constitutional errors or violations of federal law, each of which is found harmless by the court, or none of which is found to be a constitutional violation, but which, in the aggregate, deny the petitioner a fair trial. Hence, this claim is presented in the alternative to the analysis of Mr. Coble's other claims contained in this writ, not as a comment on their individual merits.

In *Taylor v. Kentucky,* 436 U.S. 478 (1978), the Supreme Court accepted the notion that several errors, none of which individually rise to constitutional dimensions, may have the cumulative effect of denying a defendant a fair trial. In *Taylor,* the Court did not assess each error to determine whether it was individually harmless. Nor did the Court concern itself only with errors which individually were of constitutional dimension. Instead, the Court evaluated the circumstances surrounding the defendant's trial to determine that the state had denied the defendant fundamental fairness as guaranteed by the Due Process Clause of the Fourteenth Amendment. As the Fifth Circuit has held, a trial is fundamentally unfair if "there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Kirkpatrick v. Blackburn,* 777 F.2d 272, 278-79 (5th Cir. 1985), *cert. denied,* 476 U.S. 1178 (1986).

The Fifth Circuit, in *Derden v. McNeel,* 978 F.2d 1453 (5th Cir. 1992)(en banc), *cert. denied,* 113 S. Ct. 2928 (1993), recognized that, "[w]ith one exception, however, our sister circuits have held in dicta that federal habeas relief may issue if a defendant was denied

---

[308] This claim is argued in the alternative to the above claims, each of which merits relief individually.

-587-

fourteenth amendment  due process by the cumulative effect of errors committed in a state trial, which together deny fundamental fairness." *Id.,* at 1456.  Adopting a "particularly cautious approach to granting habeas relief for cumulative errors", the *Derden* court articulated a four-prong test delineating the types of errors the court will consider:

> First, any cumulative error theory must refer only to errors committed in the state trial court.  A habeas petitioner may not just complain of unfavorable rulings or events in the effort to cumulate errors...
> Second, the error complained of must not have been procedurally barred from habeas corpus review...Beyond the notion of procedural bar, it is important that a defendant objected to errors to demonstrate that they were believed at the time of trial to have had an adverse effect on the defense...
> Third, errors of state law, including evidentiary errors, are not cognizable in [federal] habeas corpus as such... Errors of state law rise to constitutional dimension only if they "so infused the trial with unfairness as to deny due process of law...
> Fourth, the federal court must review the record as a whole to determine whether the errors more likely than not caused a suspect verdict.
> *Derden,* at 1457-58.

The Fifth Circuit's approach in *Derden* imposed three limitations that are not part of cumulative error analysis in federal criminal cases or in direct appeal cases.  Once federal courts recognize the concept of cumulative error analysis, as they have overwhelmingly done, the next question is whether courts should apply a different analysis depending on whether the claim is raised in a direct appeal or in a habeas corpus petition.

In *Derden,* the Fifth Circuit justified the more limited standard for cumulative error on habeas review for several reasons.  First, "[t]he standard for reversal on direct appeal of a criminal conviction...should logically be more flexible than that available on collateral review." *Id.* at 1457.  But the opinion, by Judge Jones, failed to explain why this should "logically" be so.  Rather, the Court pointed to Supreme Court opinions that limited the application of the  Due Process Clause, and that "the category of infractions that violate 'fundamental fairness' [has been defined] very narrowly." *Id.,* quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990).  Therefore, courts must exercise caution, the *Derden* court held, in holding that an error which does not amount to a constitutional error "by itself might suddenly, when aggregated with other non-constitutional errors, become worthy of habeas relief." *Id.*

However, the Supreme Court has not imposed a different standard for fundamental fairness in habeas corpus cases. The Court has never developed or implemented different standards for other constitutional rights when a habeas petitioner has alleged a violation. An allegation that a defendant has been deprived of a fair trial is a constitutional claim. Cumulative error analysis usually centers on the fairness of the trial, and thus constitutes a claim that the petitioner has been denied due process under the Fourteenth Amendment. The Fifth Circuit's four-pronged test is therefore too restrictive because it eliminates errors which, although individually are "non-constitutional", excludes the possibility that several individually non-constitutional errors might operate in the aggregate to deprive a defendant of a fair trial. In *Taylor v. Kentucky,* 436 U.S. 478 (1978) the Supreme Court held that several non-constitutional errors cumulatively deprived the defendant of a fair trial. *Id.* at 487-88. A similar approach should be taken to an analysis of Mr. Coble's claim of cumulative error.

**B. What the State Courts Held.**

This claim was presented to the state courts on habeas as Claim 20. The State in its Answer argued that "[t]here is no precedent for holding that non-fundamental, non-jurisdictional, and non-constitutional errors may in their cumulative effect create jurisdictional defects, or denials of fundamental or constitutional rights." Answer at 44. The trial court and the CCA adopted this finding and the CCA summarily denied the claim on the merits. *Ex parte Coble,* WR-39,707-03 (Tex. Crim. App. Feb. 8, 2012).

**C. Why the State Court Holding Was Objectively Unreasonable.**

Petitioner would respectfully refer the Court to the above arguments.

**CLAIM TWENTY-ONE: THE EVIDENCE WAS INSUFFICIENT TO PROVE FUTURE DANGEROUSNESS.**

**A. Facts Presented to the State Court.**

One of the key indicators regarding future dangerousness is conduct during incarceration.[309] Here, Petitioner's disciplinary history was spotless - no small feat for someone who had spent 18 years on death row. The jury heard absolutely no evidence to suggest that Mr. Coble's behavior would change if sentenced to life.

Petitioner turned 60 years of age at the time of his re-trial, and was in poor health. Given his age, if he didn't die in prison he was going to spend most of his remaining life there. Thus, the relevant "society" was TDCJ. The State failed to produce any evidence - much less evidence beyond a reasonable doubt - that he would constitute a danger within the confines of the Texas Department of Criminal Justice.

At the time of his 2008 penalty phase re-trial, Petitioner had been incarcerated for over 18 years - since 1989 when he was first arrested for the offense. During that time he had accomplished the remarkable feat of avoiding of any disciplinary cases. And he didn't simply stay out of trouble, he made a positive contribution to the "society" where he was, death row. Testimony about his life in prison included the following:

• He worked in the prison garment factor when he was at the old death row at the Ellis Unit, where he occasionally had access to potentially dangerous items such as scissors

---

[309] Compare *Marras v. State*, 741 S.W.2d 395, 407-08 (Tex. Crim. App. 1987) (finding insufficient evidence of future dangerousness where officers testified he "was a peaceable and trusted inmate"), overruled on other grounds, *Garrett v. State*, 851 S.W.2d 853 (Tex. Crim. App. 1993) with *Williams v. State*, ____ S.W.3d _____, 2008 WL 2355932, at *21-22 (Tex. Crim. App. June 11, 2008) (finding sufficient evidence of future dangerousness and noting "violent behavior in jail, gang membership," and "prison disciplinary reports, show(ing) that appellant was involved in numerous fights while incarcerated…"); *Masterson v. State*, 155 S.W.3d 167, 173 (Tex. Crim. App. 2005) (same and noting "Appellant's violent conduct… in the county jail, including fighting with other inmates and …verbal threats to one deputy…"); *Chambers v. State*, 866 S.W.2d 9, 17 (Tex. Crim. App. 1993 ("Officers from the smith County jail testified that appellant was a disciplinary problem who had to be segregated from the prison population because of his inability to interact with the others and his propensity to resort to violence.")

• At the old death row he was allowed to function as an orderly, which allowed him to mingle and work with prison guards

• He helped other inmates deal with the frustrations and demands of living within the confines of prison, which included guiding other inmates

• He helped diffuse situations, by talking "sense" into inmates

• He formed a prison sports league to give inmates an outlet and something to do

• He helped other inmates who had no money with commissary items

• He helped an inmate learn English, and helped inmates who had difficulty with reading or writing

• He was someone who was respected by both inmates and guards

The State is fond of stating the best predictor of future behavior is past behavior. If that is true, there is absolutely no doubt whatsoever that Petitioner poses no threat of violence. Dr. Cunningham did nothing more than tell jurors what anyone who looked at the records could state - Petitioner was in the lowest risk group for violence. That's not to say his testimony was not significant. He had statistics and studies to back up his testimony - something which Dr. Coons admitted he did not have. Even if, for the sake of argument, one accepts the State's premise that Dr. Cunningham's statistics were not entirely accurate, he also had unchallenged information about certain characteristics that suggest someone will be violent or not. Not surprisingly, all those characteristics, especially his advanced age, were in Petitioner's favor.

The predictions of future dangerousness made by psychiatrists are nothing more than blind guesses. Witnesses such as Dr. Coons have an incentive to not familiarize themselves with the literature, and not try to validate their statistics. They know that if they did so, their testimony would never be admissible.[310]

---

[310] The predictions of witnesses such as Dr. Coons are based on nothing more than the facts of the offense. If it is a serious, brutal crime, the person will be a future danger. If there was some mitigating aspect of the crime, they will not. Clearly, they will never admit that, because the court's have recognized the death penalty decision must be based on something more than that.

The CCA, as it discussed in its opinion, has repeatedly held the facts of the offense can be sufficient to support a finding of future dangerousness. However, the facts of the offense can work both ways and can also suggest that a defendant is not deserving of the death penalty. Logically, it is indisputable that the farther removed the trial is from the actual offense, the less impact that offense has and the less weight it should be given.  Here, the offense was over 18 years earlier. Additionally, the offense was situational and occurred in a context that can never be replicated:  the despondency caused by the break-up of Mr. Coble's marriage to Karen Vicha. The court cannot look at the evidence the same way it did back in 1990 because the situation in 2008 was vastly different.  The facts of the offense allow a jury to make a prediction based on the offense itself. In this case, the prediction made by the original jury and Dr. Coons was wrong; Mr. Coble was nothing but a model inmate, not a perpetrator of violence. As such, the facts of the offense should carry no weight in the analysis.

In light of Petitioner's age, poor health, and his exemplary prison record, the only rational finding in this case is that he was not be a continuing threat to society.

**B. What the State Court Held.**

This issue was presented by Petitioner on direct appeal as points of error one and two. The CCA held as follows:

> In his first and second points of error, appellant asserts that the evidence is legally and factually insufficient to support the jury's finding that there is a probability that he would commit criminal acts of violence in the future. As appellant acknowledges, we have consistently held that we lack authority to conduct a factual sufficiency review of the jury's future-dangerousness verdict. Appellant's arguments do not persuade us otherwise.
>
> In assessing the legal sufficiency of the evidence to support future dangerousness, we "view the evidence in the light most favorable to the jury's findings and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that [the defendant] would commit criminal acts of violence that would constitute a continuing threat to society." Only if, after reviewing all of the record evidence, we conclude that a rational jury would necessarily have entertained a reasonable doubt about the defendant's future dangerousness, will we find that the evidence is legally insufficient.
>
> Appellant does not suggest that the evidence of his gruesome triple murder and his life-long history of violence toward women and young girls is—viewed in a  vacuum—insufficient to support the jury's finding. Clearly it is

sufficient. Instead, he argues that, like Saul on the road to Damascus, he has experienced a character conversion while spending the last eighteen years in prison with a spotless disciplinary record. He has proven that he no longer poses any realistic threat of violence. This is, at first blush, a compelling argument.

Appellant notes that he was almost sixty years old and in poor health [Medical evidence showed that appellant has a history of heart disease, including a heart attack in 2004. He takes medications for high blood pressure and high cholesterol at the time of the present trial.] Appellant points to the evidence that shows that he has not merely stayed out of trouble for eighteen years in prison, but that he has made positive contributions to his prison society. He worked in the prison garment factory when he was housed in the Ellis Unit; he helped diffuse potential conflicts by talking "sense" into frustrated inmates; he formed a prison sports league; he gave commissary items to inmates who did not have money; he helped an inmate learn English and draft legal papers. Dr. Cunningham, his expert forensic psychologist, placed appellant in the lowest risk group for violence in prison. But, as the prosecutors pointed out, appellant had done many of these same positive things before the murders as well: he coached one of Karen's daughter's baseball teams; he fixed things around the house; he tended the garden; he praised Karen; he repaired their car; he helped organize a school sports banquet. Appellant's son, Gordon, testified that his father helped him with sports and took him fishing and hunting. He taught Gordon welding, electrical work, and a good work ethic. He was a very patient teacher and friendly, talkative, happy, and helpful to others.

Appellant agrees with the proposition that "the past is the best predictor of the future," and he relies upon a spotless, positive prison record as a realistic predictor of the future. Appellant concludes that, "[i]n light of [his] age and his prison record, ... the only rational finding in this case is that he would not be a continuing threat to society. For that reason, his sentence must be vacated."

This is the same argument that appellant made during the trial, and the jury must have taken it seriously because it asked for just three pieces of evidence during its deliberations, evidence that was directly relevant to this argument:

(1) Dr. Hodges's Austin State School psychiatric report from 1964 when appellant was 15. That report stated that appellant seemed paranoid and distant and "extremely hostile to women"; Dr. Hodges's impression was that "this boy represents a sociopathic personality disturbance of the dissocial type." He concluded, "The long term prognosis does not look good."

(2) The military medical record from appellant's 1967 self-inflicted stabbing wound in his thigh after he had a fight with his girlfriend. According to the military doctor, appellant "revealed evidence of lifelong maladjustment." On the hospital ward he was "hostile and belligerent" and only slowly "began to conform to the ward milieu."

(3) The pictures and cards that appellant had in his death row cell. These included numerous pictures of scantily clad young women and girls—young gymnasts and skaters—as well as romantic cards and photographs from a female pen pal.

The jury had also heard from several different sources about appellant's mercurial moods: one moment calm and sweet, the next moment in a towering rage.

The jury also heard evidence that appellant, after all his time on death row, was still hostile to women. Karen testified that when she appeared for a hearing in 1998, almost ten years after appellant's original conviction, appellant "turned around and watched me sit down. And then, after that, he kept turning

around and looking at me and grinning." It was a "weird evil grin." Karen "called it to the Judge's attention, and then he told him to stop. And then, he did it again. And [the judge] told him—I think his words were, I have to admonish you for that and I'll have to call you in contempt if you don't stop it." According to Karen, appellant had that same grin when she testified at the 2008 trial.

Appellant's attorney explained at trial that, "I'm not saying Bill Coble is a different person—okay—than he was in 1989. But you can see that he's made changes. You can see that he has adapted himself to prison environment, that[ ] he's adapted himself to institutional life. That's very clear." That is clear; appellant has adapted very well to prison life, but that fact, by itself, does not resolve the special issue:

Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

This question is essentially a normative one as the Legislature declined to specify a particular level of risk or probability of violence. But the "future dangerousness" special issue ensures that no defendant, regardless of how heinous his capital crime, will be sentenced to death unless the jury finds that he poses a real threat of future violence.

The special issue focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person. As we recently stated in *Estrada v. State,* [313 S.W.3d 274 (Tex.Crim.App.2010).] "This Court's case law has construed the future-dangerousness special issue to ask whether a defendant would constitute a continuing threat 'whether in or out of prison' without regard to how long the defendant would actually spend in prison if sentenced to life." That is, this special issue focuses upon the internal restraints of the individual, not merely the external restraints of incarceration. It is theoretically possible to devise a prison environment so confining, isolated, and highly structured that virtually no one could have the opportunity to commit an act of violence, but incapacitation is not the sole focus of the Legislature or of our death penalty precedents.

The Supreme Court has stated that "a state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." Thus, juries appropriately focus upon the defendant's individual character for violence and the probability that he would commit acts of violence in whatever society he found himself. Obviously, the likelihood that a defendant does not or will not pose a heightened risk of violence in the structured prison community is a relevant, indeed important, criterion, but it is not the exclusive focus of the "future dangerousness" issue.

There is no denying appellant's impressive history of nonviolence in prison. Nor did the prosecutors at trial try to minimize that record. They noted that appellant has always done some good things in his life. The issue, however, is whether he is the same person—with the same character for sudden explosive violence—that he was when he was diagnosed at age 15 as having a "sociopathic personality disturbance of the dissocial type." Has his character changed since he was again diagnosed as having a lifelong history of maladjustment, belligerence and violence, when he was hospitalized at the age of 19 after fighting with his fiancee and stabbing himself in the thigh as a Marine? Was the "evil grin" Karen said that he gave her in court when appellant was fifty years old, and then again when he was sixty, indicative of a continuing animosity and character for

-594-

brutality toward women? And did the pictures in his death row cell indicate an unnatural interest in young, athletic, scantily clad women for a sixty-year-old man with a heart condition? It was the jury's duty to assess appellant's present character for future dangerousness, and there was ample evidence to support its finding, beyond a reasonable doubt, that appellant had not experienced a conversion on the road to Damascus; rather, he had the same character for violence at age 60 that he did at ages 15, 19, and 40, despite his spotless prison record.

The evidence is legally sufficient to support the jury's finding on the future dangerousness special issue. We overrule points of error one and two. (*Coble v. State,*

**C. Why the State Court Holding Was Objectively Unreasonable.**

The standard for judging the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 n.12, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). A similar standard prevails in Texas state courts. When it reviews legal sufficiency of the future dangerousness special issue, the CCA "view(s) the evidence in the light most favorable to the jury's finding and determine(s) whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that the Applicant would commit criminal acts of violence that would constitute a continuing threat to society." *Berry v. State*, 233 S.W.3d 847, 860 (Tex. Crim. App. 2007) (citation omitted). If, given all the record evidence, a rational jury would have necessarily entertained a reasonable doubt about a defendant's future dangerousness, the evidence is legally insufficient. *Id.*

In *Berry* the defendant killed her newborn child and abandoned another newborn. The State showed the Appellant's pattern of keeping "children sired by one man and discarding the children sired by other men." *Id*. But it did not show a threat of future danger in any other circumstance. *Id*. This Court found only "a very low probability that, if sentenced to life in prison, she will have any more children, and that therefore it is unlikely that would be a danger in the future." *Id*. The Court also found that the State's summation misstated that law and misdirected the jury's attention by asking it to assume that "Appellant would be living in the free

world," posing a danger to another child. *Id.* at 863.  Under the law then in effect, the Appellant, if not sentenced to death, would have served 40 years before becoming eligible for release, past her childbearing years and ability to repeat her crime. *Id*. at 864. This Court found the evidence of future dangerousness legally insufficient. *Id*.

And, as *Berry*, without any evidence of future dangerousness, the State employed a misleading summation to obtain a death sentence.  Similarly, the prosecutor sought to convince the jury of future dangerousness by calling Mr. Coble "evil".  As this Court  explained in *Berry*, however, "'evil' does not equate with 'a probability that the  defendant would commit criminal acts of violence that would constitute a continuing  threat to society.''' *Berry*, 233 S.W.3d at 864 n.6.

There is some tension in the CCA's decisions concerning the "society" the jury is allowed to focus. The basic question is whether the jurors should concentrate on prison society, or the free world. There is no doubt that the court has held the term "society" encompasses more than prison. See, e.g. *Muniz v. State*, 851 S.W.2d 238 (Tex. Crim. App. 1993) As such, the State can argue that a defendant will be threat if released from danger. Clearly, that would be a concern to most jurors, and something most prosecutors will emphasize. In a scheme only the court system could devise though jurors are not told how likely it is that a defendant will be released, or even when that might occur. Jurors are left to speculate on whether the defendant could be released next year, or perhaps never. No one can argue that would not be a significant factor in answer the question of whether a defendant will be a future danger.

Although the limits are not entirely clear, there are limits on the State's ability to argue that society includes the free world. In *Berry*, this court found the State's argument "clearly asked the jury to assume that [she] would be living in the free world." The court noted the reality was that the defendant would not be released for at least 40 calendar years. The court found fault with the State's argument because it suggested the only society the jury could consider was the free world, and held such argument "misdirected the attention of the jury away from a

determination of whether she would be a continuing danger in the actual circumstances in which she would be living (prison)." The State did the same thing here as it did in *Berry* as it was the only way they could convince the jury to return a finding of future dangerousness.

There are several troubling aspects to the CCA's holding.  The CCA first points out that Petitioner's argument that "he has proven that he no longer poses any realistic threat of violence....is, at first blush, a compelling argument." *Coble, supra,* at 266.  Then the CCA proceeds to enumerate the good points of Petitioner's character in a very detailed analysis, concluding that "there is no denying appellant's impressive history of nonviolence in prison." *Coble,* at 269.  The essential question is then posed: "[t]he issue, however, is whether he is the same person–with the same character for sudden explosive violence–that he was diagnosed at age 15 as having a 'sociopathic personality disturbance of the dissocial type.'" *Id.*  The CCA's analysis come down to this one question, and the answers it provides do not withstand even cursory scrutiny.

In seeking this answer, the CCA points to the three items of evidence the jury requested during its deliberations.  The first was Dr. Hodges' 1964 report, 44 years prior to the 2008 re-trial, that pointed to Coble's hostility toward women.  While at the 1990 trial the prosecution could point to the relevance of that "diagnosis," 44 years later, after 20 years of non-violence and positive deeds, one would be hard-pressed to conclude, as did the CCA, that there has been no change in Mr. Coble, that he was "the same person" with "the same character" as when he was 15 years old. *Id.* While the CCA professed to weigh and consider Mr. Coble's good deeds, in actuality they counted for nought as apparently nothing had changed in the last 20 years.  Such a holding is tantamount to stating that one's character can never change.  It also is an argument that good deeds in prison or excellent prison adjustment mean nothing, which would remove the incentive for such good behavior.

However, Dr. Hodges 1964 "diagnosis" did not weigh at all in the CCA's determination, as the question that Court posed was "whether he is the same person–with the same character for

sudden explosive violence–that he was diagnosed at age 15." Thus, the 1964 report was apparently the lodestar, or comparison point, against which Mr. Coble's character change, or lack of it, was to be measured.

The second item mentioned by the CCA was the military incident of over 40 years ago: "[h]as his character changed since he was again diagnosed as having a lifelong history of maladjustment, belligerence and violence, when he was hospitalized at the age of 19 after fighting with his fiancee and stabbing himself in the thigh as a marine?" *Id.* Here again, under the CCA's analysis, this 40-year old incident is merely the starting or reference point in asking the question: "has he changed since then"?

The third item mentioned by the CCA and requested by the jury was the pictures in his cell.  In probably the most bizarre holding, the CCA stated that "[a]nd did the pictures in his death row cell indicate an unnatural interest in young, athletic, scantily clad women for a sixty-year-old man with a heart condition?"  (*Id.*)  How this relates to "future dangerousness" is entirely unclear and patently unreasonable.   Additionally, the pictures in question were newspaper clippings taken from articles on the Olympics and youth sports, selected culled by the prosecution from many hundreds of innocuous pictures in Coble's possession, in order to attempt to make that point.   These pictures showed Petitioner's continued interest in youth sports, not an "unnatural interest in young women."   One wonders what the State would have made of it if the confiscated pictures were actually hard-core.

Thus, the CCA's analysis of future dangerousness depends on the pictures in his cell, since the other two items were only reference points.   These pictures in no way support the CCA's conclusion: "It was the jury's duty to assess appellant's present character for future dangerousness, and there was ample evidence to support its finding, beyond a reasonable doubt, that appellant had not experienced a conversion on the road to Damascus; rather, he had the same character for violence at age 60 that he did at ages 15, 19, and 40, despite his spotless prison record." *Id.*

The CCA also held that "[t]here is no denying appellant's impressive history of nonviolence in prison. Nor did the prosecutors at trial try to minimize that record." *Coble,* at 269.  Yet they did precisely that in final argument: "[w]hat reduces his moral blameworthiness for this, for that act, for this murder?  That he made crafts afterwards?  He has no—there is no—no mitigating evidence that reduces his responsibility and moral guilt for the commission of this crime." (29 RR 120.)

The CCA also emphasized the so-called "evil grin" of Petitioner: "[w]as the "evil grin" Karen Vicha said that he gave her in court when appellant was fifty years old, and then again when he was sixty, indicative of a continuing animosity and character for brutality toward women?" ( *Id.*) This is patently absurd.  Because Karen considered Coble to be evil, any glance or grin whatsoever from him would be therefore be, in her eyes, "evil."  If anything, the weight the prosecution and the CCA put on this so-called "evil grin" shows the utter lack of anything more substantive or serious upon which to base their case for future dangerousness over the prior twenty years.  All it shows is that perhaps Mr. Coble should not have been looking at his ex-wife when she claimed he was, but as far as evidence of future dangerousness, it is sorely lacking.

In summary, the CCA's case for future dangerousness, as they themselves posed it ("[t]he issue, however, is whether he is the same person"), with the complete lack of any post-1989 incidents of violence, rested on some newspaper photos of young gymnasts and "evil grins."  If this special issue is to mean anything at all beyond empty rhetoric, this evidence was clearly insufficient.

## V.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Coble  prays that this Honourable Court:

A.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

B. Conduct a hearing at which evidence and argument may be offered concerning the allegations of his petition;

C. Grant him the authority to obtain subpoenas *in forma pauperis* for witnesses and discovery of documents, and grant him the authority to take depositions and obtain other information necessary to prove the facts as alleged in his petition;

D.  Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of law raised by this petition or such hearing;

E.  Enter Findings of Fact and Conclusions of Law recommending that his conviction and sentence of death be vacated and that his case be remanded for a new sentencing hearing,  and

F.  Grant such other relief as may be necessary and appropriate.


Respectfully submitted,


*s/s A. Richard Ellis*

_____
**A. Richard Ellis**
Attorney at Law
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
Attorney for Petitioner

Dated: January 15, 2013.

**VERIFICATION**

I, A. Richard Ellis, am  the attorney for Billie Wayne Coble, the  petitioner in the foregoing Petition for Writ of Habeas Corpus.  I have read the petition and am familiar with its contents.  On behalf of Billie Wayne Coble  and upon information and belief, I hereby verify, under penalty of perjury, that the factual matters stated in the petition are true and correct.

DATED: January 15, 2013.


*/s/ A. Richard Ellis*
_____
A. RICHARD ELLIS
Attorney for Petitioner

## CERTIFICATE OF ELECTRONIC SERVICE

In accordance with Rule 5(b) of the Federal Rules of Civil Procedure, the undersigned, counsel for Petitioner, being over the age of 18 and competent to make this declaration, hereby certifies that on the 15th day of January, 2013, a true and correct copy of the foregoing **"Petition for Writ of Habeas Corpus"** and accompanying **"Exhibits in Support"** was served upon counsel of record for Respondent via the Court's automatic electronic noticing service, addressed as follows:

Mr. Jeremy C. Greenwell
Attorney General's Office for the State of Texas
P.O. Box 12548
Austin, TX 78711-2548
jeremy.greenwell@oag.tx.us


*/s/ A. Richard Ellis*
_____
A. RICHARD ELLIS
Attorney for Petitioner Billie Wayne Coble