

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF TEXAS

## WACO DIVISION

| | | |
|---|---|---|
| **BILLY WAYNE COBLE,** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. W-12-CV-039** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Institutional Division,** | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION
## AND ORDER

Two separate juries have unanimously determined that Petitioner Billy Wayne Coble ("Petitioner" or "Coble") should be sentenced to death. In this, his most recent federal habeas corpus application, he seeks review of his sentence. There is no question of his guilt for the brutal slaying of his wife's family. Having reviewed the parties' briefs and the record in this case, the Court is persuaded the request for federal habeas relief is without merit and should be denied.

## I. PROCEDURAL BACKGROUND

In 1990, Coble was found guilty of capital murder and was sentenced to death. Coble brutally murdered his mother-in-law, Zelda Vicha, his father-in-law, Robert John Vicha, and his brother-in-law, Bobby Vicha, who was a police officer. After his original conviction and death sentence were affirmed on appeal, Coble's initial petition for a writ of certiorari was denied. *Coble v. State*, 871 S.W.2d 192

(Tex.Crim.App. 1993), *cert. denied sub nom. Coble v. Texas*, 513 U.S. 829, 115 S.Ct. 101, 130 L.Ed.2d 50 (1994). In 1997, Coble filed his first application for a state writ of habeas corpus which was denied by the Texas Court of Criminal Appeals after an evidentiary hearing in the trial court. *Ex parte Coble*, No. 39-707-01 (Tex.Crim.App. 1999). Coble then filed for federal habeas relief, which was denied by this Court. However, a certificate of appealability was granted as to Coble's issue of ineffective assistance of counsel and later as to the issue regarding the constitutionality of the jury instructions regarding mitigation. The Fifth Circuit granted Coble's certificate of appealability on the issue of whether the "special issue" interrogatories in the Texas capital sentencing instructions were constitutionally inadequate. *Coble v. Cockrell*, 80 Fed.Appx. 301 (5th Cir. 2003). The Fifth Circuit then affirmed the dismissal of his federal habeas petition. *Coble v. Dretke*, 417 F.3d 508 (5th Cir. 2005). On rehearing, the opinion was withdrawn, but the Fifth Circuit still affirmed the dismissal of Coble's federal habeas petition. *Coble v. Dretke*, 444 F.3d 345 (5th Cir. 2006). On further rehearing, that opinion was withdrawn, and the Fifth Circuit reversed the denial of habeas relief on the sentencing special issues and remanded the case. *Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007).

After a trial on sentencing only, Coble was again sentenced to death on September 4, 2008.

2

## II. FACTUAL BACKGROUND

The evidence introduced during the new sentencing trial was set out by the

Texas Court of Criminal Appeals:

Karen Vicha was appellant's third wife. They were married in July 1988 and lived in a house down the road from her brother and across the street from her parents. Appellant was almost forty years old. The marriage quickly disintegrated,[3] and, after a year, Karen told appellant to move out. She wanted a divorce. Appellant attempted to talk her out of this decision and would randomly call her and show up at her work place.

Appellant then kidnapped Karen as a further effort to dissuade her from divorcing him. He hid in the trunk of her car while she was at a bar one evening with a girlfriend. When Karen started to drive home, appellant folded down the back seat and "popped out of the trunk with a knife." He jumped over the console, halfway into the front seat, and stuck the knife against Karen's ribs. He told her to keep driving until they came to a field. Karen stopped the car, and appellant said that if he couldn't have her, then no one else could. He pulled out a roll of black electrical tape, but Karen kept talking, and, after about two hours, she convinced him that she would reconsider the divorce issue. He let her go, and she called her brother, Bobby, who was a police officer. Bobby told Karen to report the kidnapping.

After he arrested appellant for kidnapping Karen, Officer James Head looked in his patrol-car mirror and saw appellant staring at him with a look that "made the hair on the back of [his] head stand up." He got "the heebie-jeebies." Appellant muttered something like "They're going to be sorry." Officer Head called Karen's brother, Bobby, and warned him about appellant. When appellant was released on bail for the kidnapping charge, Bobby got Karen a German shepherd for protection. A few days later, appellant told Karen, "Oh, I see you–you've got a dog now. . . . [T]hat's a big mean dog you've got." Shortly thereafter, Karen found the dog lying dead in front of her house.

---

[3]Karen was worried by appellant's sudden personality switches from calm to aggressive–"agitated and angry"–as well as his interest in watching young girls.

Nine days after he had kidnapped Karen, appellant went to her house in the early afternoon. As Karen's three daughters each came home from school along with Bobby's son,[4] appellant handcuffed them, tied up their feet, and taped their mouths closed. Karen's oldest daughter testified that she heard appellant cut the telephone lines. Then he left to ambush and shoot Karen's father, mother, and brother Bobby as each of them came home.[5]

Appellant returned to Karen's house after the triple killings and waited for his wife to come home from work. He told the children, "I wish I had blown you away like I intended to." When Karen arrived, appellant came out of one of the bedrooms with a gun. Appellant said, "Karen, I've killed your momma and your daddy and your brother, and they are all dead, and nobody is going to come help you now." She didn't believe him, so appellant showed her Bobby's gun lying on the kitchen table and pulled the curtains so she could see her father's truck parked behind the house. He showed her $1,000 in cash that he had taken from her mother. Appellant told Karen that she was lucky that he hadn't molested her daughters, and he told her to kiss them good-bye. She did. He made her put on handcuffs. Karen talked appellant into

---

[4]All four children, ages 16, 14, 11, and 10, testified that they had liked appellant prior to the murders.

[5]Karen's father, the first victim, was found inside his home, covered with blankets and towels. Karen's mother was found in her garage. Bobby was found in his car in his garage.

Later that day, appellant told Karen that her brother was tough. "He put up one hell of a fight. . . . I chased him down the road one way, and I chased him back. And then I shot him, and he was going for the gun in his car. And he wouldn't die. . . . So, finally I had to blow a hold that big in his neck." Appellant also told Karen that he "really hated to do that to your mom. But when she found out about your dad, she just went crazy."

4

leaving the house and taking her with him.[6]  He said he was going to take her away for a few weeks and torture her.[7]

As appellant drove, Karen tried to escape by freeing one hand from the handcuffs and grabbing at the steering wheel, making the car swerve into a ditch.  She grabbed one of appellant's guns, point it at his stomach, and pulled the trigger, but nothing happened.  Then Karen and appellant fought over the gun, with appellant repeatedly pulling the trigger, but still the gun did not fire.  Appellant pistol-whipped Karen until she couldn't see for all of the blood on her face.  A woman passerby started shouting at appellant, "[W]hat are you trying to do to that woman," so appellant drove the car out of the ditch as Karen lay in the passenger seat.  He shouted at her that if she got blood on his clothes, he would kill her.  But he was also rubbing her between her legs as he drove.  He told her that his reputation was ruined because she had had him arrested and his name was in the papers.

He drove to a deserted field in Bosque County where he threatened to rape her.  After dark, he drove out of the field, but they passed a sheriff's patrol car which turned around to follow them. Appellant grabbed a knife and started stabbing Karen's chin, forehead, and nose, as he was driving.  Appellant said that he did not want to die in prison, so he "floored it" and rammed into a parked car.  After the crash, appellant turned to Karen and said, "I guess now you'll get a new car."  Both appellant and Karen were injured in the crash.  Officers had to cut the car door open to get Karen out.  Appellant was found with Karen's father's watch and wallet, as well as .37 and .38 caliber revolvers.

Although appellant was forty years old when he committed this triple murder, the State's evidence showed that he was no stranger to violence.  He had a long history of brutalizing and molesting women.

---

[6]While Karen and appellant were still at her house, Bobby's girlfriend dropped by and saw Karen in handcuffs.  She then went to Bobby's house and called Karen's uncle to tell him about seeing Karen in handcuffs.  After that call, she looked around Bobby's house and saw blood everywhere, plants and furniture up-ended, and general disarray.  She called the sheriff's office.  Officers then came to Karen's house, talked to the four children, found the bodies of the three victims, and started the hunt for appellant.

[7]Karen testified that when she came to a court hearing in 1998, appellant kept turning around and smiling at her with "a wicked evil grin."  Even in 2008, she was still scared of him and felt that he was a continuing threat to her.

Appellant beat both of his former wives and molested several young girls, including relatives.

His first wife, Pam Woolley, testified that they were married in 1970 when appellant was twenty-two. They had two children, but their marriage started downhill after two years. By 1974, appellant had become violent, and he used to beat her on the head so that her hair would hide the marks.[8] Pam said that appellant could go from normal to extremely angry in a split second, and he always blamed her for his violent acts. Appellant told her that if she ever filed for divorce, he would "fix her" so no other man would look at her again.

During this ten-year marriage, appellant molested Pam's younger sister and punched her on the mouth, "busting" her lip. He molested his children's thirteen-year-old babysitter while teaching her how to water ski. He groped the breast of another neighborhood girl. In 1979, when appellant was thirty, he raped his cousin who was about fifteen at the time. When appellant's niece was fifteen, he grabbed her ankles as she sat in a chair wearing a nightgown, spread open her legs, and gestured with his tongue as if he were performing oral sex on her. Later that same day, he forcibly kissed her and then threw her a $5 bill.

Appellant married Candy Ryan, his second wife, when he was thirty-five and she was eighteen. After one year of marriage, appellant started physically abusing her. He regularly hit her on the head. Once he grabbed her by the hair and repeatedly hit her against the cabinet and floor. After she dared to throw something at him, he hit her with a sledge hammer. Candy said that appellant had a "switch-type" personality–changing from sweet to nasty in a split-second. He stalked her, both during and after their marriage. He would sit in his car outside the gas station where Candy worked, and, if a customer stayed inside too long, appellant came in and gave the customer an intimidating look. After Candy left appellant, he would call her late at night and tell her where she had been, whom she had been with, and what she had been doing. Appellant threatened Candy's father when he tried to help Candy leave.

Appellant's childhood did not augur well for his future. His earliest years were spent in the custody of an alcoholic stepfather who worked only periodically and a sickly, withdrawn, and depressed

---

[8] He also threw a plate at Pam when she cooked something he did not like; he knocked her to the floor with an open-hand slap; he hit her on the back with a baseball bat so hard that she had to go [to] the hospital; and he sat on her chest and punched her in the face, breaking her nose.

mother. When appellant was four, his mother was institutionalized in the Austin State Hospital with a psychoneurotic disorder. Appellant, his brother, and his older sister were sent to the Corsicana State Home for Children. Because of her promiscuous acting-out, appellant's older sister was sent to a convent school, and his problematic older brother was placed under the supervision of the Waco Probation Department. Appellant remained at the Home for twelve years.

When appellant was fifteen, a psychiatrist, Dr. Hodges, evaluated him, and concluded that he was paranoid, distant, and impulsive; he showed poor self-control, displayed hostility to women, and blamed others for his own bad conduct. Dr. Hodge's impression was that appellant "represent[ed] a sociopathic personality disturbance of the dissocial type." People with this diagnosis gratify their own desires without regard for the cost to others. Appellant's "long term prognosis [did] not look good."

At age seventeen, appellant joined the Marine Corps and was sent to Vietnam. Although he received an honorable discharge after his four-year tour of duty, he was not recommended for re-enlistment because of a series of violations and convictions. He married his first wife shortly after he left the Marines.

Dr. Richard Coons, a psychiatrist, had testified at appellant's 1990 trial that he would be a future danger. Dr. Coons testified at the 2008 retrial that appellant would still be a future danger even though appellant did not have a single disciplinary report for the eighteen years that he had been on death row. Dr. Coons explained this discrepancy by stating that all those on death row have an incentive to behave because their convictions are on appeal, and thus they are less violent than they would be in the general prison population.

Appellant called several witnesses to attest to his prison reformation and lack of violence for the entire time that he had been on death row. According to one fellow inmate, appellant was well liked by everyone; he was always even-tempered and had the ability to "talk sense" into some of the more violent inmates. He said that appellant had organized a sports league at the Ellis Unit and that he had helped inmates write letters and would read them their letters from family members. After Death Row was moved to the Polunsky Unit, appellant's behavior was the same; he was always helpful and upbeat.

Another inmate testified that appellant would take people "under his wing" and help the "agitated" ones. He stated that, while at the Ellis Unit, appellant was an SSI, which was like a trustee, and would often walk around with female officers. A third inmate testified that appellant

was generous and gave commissary items to other inmates. A fourth inmate said that appellant helped him to learn English and to file a federal habeas petition. Appellant helped mentally-retarded inmates and was known for his respect for the law and God.

Appellant's older sister testified about their childhood and how appellant charged for the worse after coming home form Vietnam. She said that, shortly before the triple murders, she saw appellant throwing away many of his most prized possessions, and he began talking about his experiences in Vietnam, something he had never done before. On the day of the murders, appellant threw his truck keys at her and said that, if anything happened, the truck was hers. Appellant's son testified that appellant taught him welding, and he described his father as loving and helpful to others.

Dr. Cunningham, a forensic psychologist, testified that he had reviewed appellant's prison record which contained no disciplinary write-ups. Dr. Cunningham conducted a violence risk assessment of appellant. In his opinion, appellant had a very low probability of committing acts of violence while in prison.

*Billy Ray Coble v. State of Texas*, 330 S.W.253, 261-265 (Tex. Crim. App., 2010), *cert. denied*, --- U.S. ----, 131 S.Ct. 3030, 180 L.Ed.2d 846 (2011).

The sentencing jury heard from a variety of witnesses relative to Coble's background, including his service in Vietnam, the physical and emotional abuse experienced by his ex-wives, a variety of inappropriate behavior with minor females, and the kidnapping of Karen Vicha which occurred prior to the murders. The evidence revealed the picture of an abusive, controlling and manipulative man. The jury also heard the events that occurred on August 29, 1989, the day of the murders. Testifying were the children Coble had physically restrained while he murdered the Vichas, including J.R. Vicha, who was then an assistant prosecutor in the McLennan

8

County District Attorney's office.  Although the jury was informed that he was an attorney, they were not informed where he practiced.

The State also called Dr. Ralph G. Hodges, a physician and psychiatrist, who performed a psychiatric consultation Coble in 1964.  Dr. Hodges had no independent recollection of the interview, but read his report to the jury.  It contained various incidents of anti-social behavior committed by Coble, who was 15 at the time of the interview.  Coble and his siblings had been sent to the Corsicana Home after removal by the courts for lack of supervision.  Coble was 11 when he was sent to the Corsicana Home and stayed until the age of 17.  Dr. Hodges' conclusion at that time was that Coble represented "a sociopathic personality disturbance of the dissocial type."  24 R.R. 12.  Subsequent changes in diagnostic criteria made his diagnosis obsolete, as modern psychiatry recognizes that a diagnosis of sociopathy is unreliable until after the age of 18.

Dr. Richard Coons, who testified at the first trial and predicted Coble would constitute a continuing threat to society, testified at the re-sentencing hearing as to Coble's propensity for future dangerousness. The Texas Supreme Court determined that the trial court abused its discretion in admitting Dr. Coons's testimony before the jury, but his testimony did not harm Coble's substantial rights because other evidence introduced in the case supported the jury's finding of future dangerousness.

9

The defense called a number of witnesses who had seen no anger or violence or dangerousness in Coble, including relatives, former employers, fellow Army Reservists, fellow children's coaches, and fellow residents from the Corsicana Home.

Dr. Joseph Bond Browder, the medical director of the McLennan County jail, testified regarding Coble's physical ailments, including high blood pressure, hypertension, high cholesterol, heart disease, and acid reflux. Coble had a heart attack in 2004 and was prescribed long-lasting and short-acting nitroglycerin pills.

A number of witnesses were called who were serving sentences for murder. Martin Draughton testified that he had known Coble since 1991 or 1992 when they met at the Ellis Unit in Huntsville and later at the Polunsky Unit. He never saw Coble lose his temper, and he was well liked by both inmates and guards. At the Ellis Unit, Coble was trusted enough to work in the garment factory, where he had access to scissors and shears and other tools and sharp objects. Coble also organized sports programs, was a reporter for the prison paper, "The Echo," and counseled younger inmates. At the Polunsky Unit, however, the inmates were locked down and let out one hour a day for recreation. Similar testimony was elicited from death row inmates Antonio Barrientes, Mariano Rosales, and Bernardo Tercero.

Dr. Mark D. Cunningham, a clinical and forensic psychologist, first testified outside the presence of the jury, after which the Court narrowed the range of his testimony. Dr. Cunningham testified that Coble made a positive adjustment to

10

prison, which in his research is associated with a reduced likelihood of serious violence in prison. Coble had no disciplinary infractions during his 18 years in TDCJ. In Dr. Cunningham's view, it was unlikely and a very low probability that Coble would commit serious violence if confined for life in TDCJ. He also testified that statistics show that the risk of violence is higher in younger inmates and that individuals with a history of prison violence are more likely to commit future violence. Lower rates of violence also correlate with education, community employment and involvement, links to others outside of prison, and length of time in prison. All of the factors and statistics in Dr. Cunningham's opinion indicated Coble had a substantially lower risk of violence than other inmates.

Dr. Cunningham also posited that Dr. Coons' opinion was not based upon factors recognized by the American Psychological Association and the Texas Psychological Association.

Based upon the jury's answers to the special interrogatories, Coble was sentenced to death.

Coble's second sentence of death was affirmed on direct appeal. *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) (*Coble II*), *cert. denied*, 131 S.Ct. 3030 (2011). While his direct appeal was pending, Coble filed a state application for writ of habeas corpus. After an evidentiary hearing was held by the trial court, the Court of Criminal Appeals adopted the findings and conclusions and denied Coble's application. *Ex parte Coble*, No. 39,707-03.

11

Testifying at the evidentiary hearing were Tommy Witherspoon, a reporter with the Waco Tribune-Herald, Scott Stevens, Coble's appointed attorney during the initial proceedings in the second sentencing proceeding, a venireperson who was not selected for the jury, and Dr. Coons. Coble's subsequently appointed second-chair attorney, Alex Calhoun, testified that he did not believe the actions taken by Russ Hunt, Jr., Coble's lead attorney, met the ABA standards for capital cases. Calhoun additionally testified that he felt "rushed" due to the short time period between his appointment and the start of trial. He was also unimpressed by the mitigation expert, who had a bad reputation in the Austin area. Calhoun additionally thought there were grounds for motions to change venue and to recuse the district attorney's office, but those were not filed.

After Petitioner rested, the State called J.R. Vicha, who testified that he was not involved in either the preparation or prosecution of Coble's re-trial.

Ultimately the trial court adopted the State's Proposed Findings of Fact and Conclusions of Law, and the Texas Court of Criminal Appeals denied Coble's habeas application on February 8, 2012.

### III. STANDARD OF REVIEW

Section 2264 provides that review of a state capital case is limited to those claims that were raised and decided on the merits in the state courts. 28 U.S.C. § 2264(a). Those claims may be reviewed if the failure to raise the claims properly was:

12

(1)     the result of State action in violation of the Constitution or laws of the United States;

(2)     the result of the Supreme Court's recognition of a new Federal right that is made retroactively applicable; or

3)     based on a factual predicate that could not have been discovered through the exercise of due diligence in time to present the claim for State or Federal post-conviction review.

Review is also subject to subsections (a), (d), and (e) of 28 U.S.C. § 2254, which provide:

(a)     The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

. . .

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)     (1)     In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden

of rebutting the presumption of correctness by clear and convincing evidence.

       (2)    If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --

       (A)    the claim relies on --

       (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme court, that was previously unavailable; or

       (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and

       (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Federal courts must defer to a state court's adjudication of a claim if the claim has been adjudicated on the merits in the state court proceeding unless the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *Woodfox v. Cain*, 609 F.3d 774, 789 (5TH Cir. 2010). *See also White v. Woodall*, --- U.S. ----, 134 S.Ct. 1697, 188 L.Ed.2d 698 (2014). Under the AEDPA, the Court must examine the last reasoned state court decision. *Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014).

A decision is "contrary to federal law" if it contradicts a decision of the Supreme Court on a question of law or if it "resolves a case differently from the way the Supreme Court has on a set of materially indistinguishable facts." *Reed v. Quarterman*, 504 F.3d 465, 471 (5th Cir. 2007), *quoting Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). *See also Woodfox v. Cain*, 609 F.3d at 789. "Clearly established" under § 2254(d)(1) is "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). "Clearly established" is limited to determinations by the Supreme Court and refers to actual holdings of the Supreme Court as opposed to dicta. *Williams v. Taylor*, 529 U.S. at 381.

A state court "unreasonably" applies federal law when it identifies the correct governing principle established by the Supreme Court, but unreasonably applies it to the facts of the case. *Williams v. Taylor*, 529 U.S. at 407; *Woodfox v. Cain*, 609 F.3d at 789. *See also Woodward v. Epps*, 580 F.3d 318, 325 (5th Cir. 2009); *Rogers v. Quarterman*, 555 F.3d 483, 488-89 (5th Cir. 2009). Unreasonableness is evaluated objectively rather than subjectively. *Williams v. Taylor*, 529 U.S. at 409-10. An unreasonable application of federal law is distinguished from a state court decision that is merely incorrect or erroneous. *Woodfox v. Cain*, 609 F.3d at 789. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schirro v. Landrigan*, 550 U.S. 465, 473 (2007).

15

Habeas relief is merited only when the state court decision is both incorrect and objectively unreasonable. *Williams v. Taylor*, 529 U.S. at 411.

It is the state court's ultimate decision that is to be tested for unreasonableness. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*), *cert. denied*, 537 U.S. 1104 (2003) (focus should be "on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"). Even in cases where the state court fails to cite applicable Supreme Court precedent, or is even unaware of such precedent, the state court decision is still entitled to deference "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).

When evaluating an unreasonable determination of the facts, the state court's findings of fact are entitled to a presumption of correctness which a petitioner may overcome only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005), *cert. denied*, 547 U.S. 1073 (2006). Relief may be granted only if "a factual determination is unreasonable based on the evidence presented to the state court." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004), *cert. denied*, 541 U.S. 1087 (2004). Review is limited to the record that was before the state court that adjudicated the claim on te merits. *Cullen v. Pinholser*, 563 U.S. 170, 131 S.Ct. 1388, 1398 (2011); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

16

In addition to the foregoing, the amendments to § 2254 contained in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") did not overrule prior precedent which forecloses habeas relief in the following instances: (1) claims which are procedurally barred as a consequence of a failure to comply with state procedural rules;[9] (2) claims for which the petitioner seeks retroactive application of a new rule of law on a conviction that was final before the rule was announced;[10] or (3) claims for which the petitioner asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict."[11]

Federal habeas review of a state court opinion is also precluded when the state court's decision was based upon an independent and adequate state law ground. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Rosales v. Dretke*, 444 F.3d 703 (5th Cir. 2006). "This rule is grounded in concerns of comity and federalism. It is designed to prevent federal courts from deciding cases on federal constitutional grounds regarding a petitioner's confinement that would be advisory because the confinement can be upheld on an independent and adequate state law basis." *Rosales v. Dretke*, 444 at 707. One of these grounds is procedural default, where dismissal is based upon a petitioner's failure to abide by state procedural

---

[9] *Coleman v. Thompson*, 501 U.S. 722 (1991).

[10] *Teague v. Lane*, 489 U.S. 288 (1989).

[11] *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

17

rules. The procedural default rule prevents a habeas petitioner from avoiding exhaustion requirements by defaulting federal claims in state court. *Id.* "A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a defendant's claim." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999). A claim should be construed as one involving federal law when "the state court decision rests 'primarily on federal law' or the state and federal law are 'interwoven,' and if 'the adequacy and independence of any possible state law ground is not clear from the face of the opinion. . . .'" *Id., quoting Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007).

In order to be "adequate" to support the judgment, the state law ground must be both "firmly established and regularly followed." *Ford v. Georgia*, 498 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). "If the state law ground is not firmly established and regularly followed, there is no bar to federal review and a federal habeas court may go to the merits of the claim." *Rosales v. Dretke*, 444 at 707, citing *Barr v. Columbia*, 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964). The Fifth Circuit has held that Texas's abuse-of-the-writ doctrine has "provided an adequate state ground for the purpose of imposing a procedural bar." *Barrientes v. Johnson*, 221 F.3d 741, 759 (5th Cir. 2000). *See also Emery v. Johnson*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998); *Rocha v. Thaler*, 626 F.3d 815, 829-30 (5th Cir. 2010).

A petitioner may be excused from a procedural default only if he can demonstrate cause and prejudice for the default, or show that the failure to consider the claim will result in a miscarriage of justice. *Coleman v. Thompson*, 501 U.S. at 750.

## IV.  GROUNDS OF ERROR

Petitioner asserts that habeas relief should be granted due to the following errors:

(1)  Due to pervasive and extremely prejudicial pre-trial and trial publicity, Petitioner's trial was conducted in an atmosphere that rendered it inherently unfair.

(2)  Defense counsel was ineffective for failing to file a motion for change of venue.

(3)  Petitioner received ineffective assistance of counsel at voir dire.

(4)  Petitioner was deprived of due process and a fair trial when the court did not allow the defense to "Life-Qualify" the jurors or allow inquiry into whether they would consider mitigating evidence or impose the death penalty automatically.

(5)  The prosecutor in Petitioner's trial had an automatically disqualifying conflict of interest.

(6)  Petitioner was deprived of due process and a fair trial because his attorneys had a conflict of interest and they were ineffective because they failed to file a motion to recuse the prosecutor.

(7)  The admission of unreliable and unscientific testimony of "future dangerousness" by Dr. Coons violated Petitioner's rights under the Eighth and Fourteenth Amendments of the United States Constitution.

(8)  The trial court erred in allowing irrelevant, prejudicial and unreliable testimony from State's witness A.P. Merillat.

19

(9)   The prosecution's suppression of evidence concerning State witness A.P. Merillat violated Petitioner's constitutional rights.

(10)   Trial court errors deprived Petitioner of due process and a fair trial through admission of inadmissible testimony and due to cumulative trial errors, particularly with regard to the following:

    (a)   admitting the hearsay testimony of Amy Zuniga;

    (b)   admitting the hearsay testimony of J.R. Vicha;

    (c)   admitting the hearsay testimony of Mike Voss;

    (d)   denying the defense's motions for a mistrial;

    (e)   limiting the cross-examination of Lorna Sawyer;

    (f)   allowing the prosecutor to cross-examine Dr. Mark Cunningham regarding a past case in which he had testified;

    (g)   limiting Dr. Cunningham's testimony by excising statistics and references to life-without-parole inmates;

    (h)   allowing Patricia Yamada Woolley to testify;

    (i)   Allowing Phillip Pierce to testify;

    (j)   allowing witness Candy Ryan to express an opinion on future dangerousness;

    (k)   cumulative trial error.

(11)   Petitioner was denied a fair trial and due process of law by the misconduct of the prosecutor.

(12)   Petitioner's counsel rendered ineffective assistance of counsel by counsel's failure to adequately prepare for trial and inadequate performance at trial, particularly with regard to the following:

    (a)   failing to adequately prepare for trial;

20

(b)    failing to present psychiatric evidence regarding Petitioner's various mental and psychological disorders;

(c)    failing to effectively cross-examine and impeach Dr. Richard Coons;

(d)    failing to effectively cross-examine and impeach Marillat;

(e)    failing to object to irrelevant incidents used as aggravation;

(f)    failing to object to hearsay testimony;

(g)    shackling and rendering their own expert, Dr. Cunningham, ineffective by voluntarily restricting much of his testimony;

(13)    Petitioner's prolonged confinement under sentence of death and his execution following such confinement constitutes cruel and unusual punishment.

(14)    Lethal injection – as it is currently administered in Texas – produces unnecessary pain, torture, and lingering death, and violates the Eighth Amendment.

(15)    The mitigation special issue is unconstitutional because it omits a burden of proof and makes impossible any meaningful appellate review of the jury's determination.

(16)    The death penalty, at least as presently administered in Texas, is cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

(17)    Petitioner's jury was unconstitutionally selected by death qualifying the jury members.

(18)    Petitioner's death sentence violates international law, which is binding on this court, as well as the Eighth Amendment.

(19)    Appellate counsel rendered ineffective assistance of counsel.

(20)    The cumulative effect of the errors at Petitioner's trial denied him due process under the Fourteenth Amendment.

(21)    The evidence was insufficient to prove future dangerousness.

## V. DISCUSSION

As Respondent notes, numerous claims raised by Petitioner are procedurally barred as they were rejected by the state court on independent and adequate state procedural grounds, and Petitioner has presented nothing that would excuse procedural default. The following grounds are procedurally defaulted: (1), (5), (7)(c), (8)(d), (10)(b), (10)(c), (10)(e), (10)(f), (10)(g), (10)(h), (10)(i), (10)(j), (10)(k), (16), (17), and (18). To the extent those grounds are not procedurally defaulted, they are without legal or factual merit.

Insufficient Evidence. Petitioner asserts that the evidence in his re-trial was insufficient to prove the future dangerousness issue, mainly due to his "age, poor health, and [ ] exemplary prison record." The Court of Criminal Appeals on direct appeal summarized Petitioner's claim:

> [Coble] does not suggest that the evidence of his gruesome triple murder and his life-long history of violence toward women and young girls is--viewed in a vacuum--insufficient to support the jury's finding. Clearly it is sufficient. Instead, he argues that, like Saul on the road to Damascus, he has experienced a character conversion while spending the last eighteen years in prison with a spotless disciplinary record.

*Coble II*, 330 SW.3d at 265-266.

However, as noted previously, under the AEDPA, the appropriate inquiry is whether the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

22

presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  This Court must presume the state court's factual findings to be correct, and the Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  Petitioner has failed to meet this burden.

After considering all of the evidence presented to the jury, the state court determined that the evidence was legally sufficient to support the jury's finding on future dangerousness. *Coble II*, 330 S.W. 3d at 270.  Specifically, the state court found the following:

> There is no denying [Coble]'s impressive history of nonviolence in prison.  Nor did the prosecutors at trial try to minimize that record. They noted that [Coble] has always done some good things in his life. The issue, however, is whether he is the same person—with the same character for sudden explosive violence—that he was when he was diagnosed at age 15 as having a "sociopathic personality disturbance of the dissocial type." . . .  It was the jury's duty to assess [Coble's] present character for future dangerousness, and there was ample evidence to support its findings, beyond a reasonable doubt, that [Coble] had not experienced a conversion on the road to Damascus; rather he had the same character for violence at age 60 that he did at ages 15, 19, and 40, despite his spotless prison record.

*Id.* at 269-70.  Nothing presented by Petitioner rebuts by clear and convincing evidence the presumption of correctness given to the foregoing.

Even under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which was used by the state court, Petitioner has not met his burden.   Under *Jackson*, when a state prisoner challenges the

23

sufficiency of the evidence in a federal habeas proceeding, the reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*, at 319 (emphasis in original). Again, the federal habeas court is to give great deference to a state court's determination of the sufficiency of the evidence. *Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir. 2000). Under either standard, the evidence was more than sufficient to support the jury's verdict. Petitioner's mere disagreement with the jury's finding is insufficient to support habeas relief.

Unconstitutionality of Death Penalty. Petitioner argues that the death penalty as it has been applied to him is unconstitutional because of the length of time he has spent on death row, because of the way that the death penalty is administered in Texas, and because the lethal injection protocol causes undue pain, torture and a lingering death. He also argues that the death penalty is in violation of international law. None of these claims are meritorious.

The Fifth Circuit has rejected the claim that prolonged incarceration on death row is unconstitutional. *See Shisinday v. Quarterman*, 511 F.3d 514. 526 (5th Cir. 2007); *Felder v. Johnson*, 180 F.3d 206, 215 (5th Cir. 1999); *White v. Johnson*, 79 F.3d 432 (5th Cir. 1996). The Fifth Circuit has also rejected Petitioner's claim regarding the lethal-injection protocol. While Petitioner's argument addresses a three-drug protocol, this method is no longer in use, and the state now uses a single

drug.   Both arguments are foreclosed by Fifth Circuit authority.   *See Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010) (three-drug protocol); *Thorson v. Epps*, 701 F.3d 444 (5th Cir. 2012) (single drug protocol).   *See also Sells v. Livingston*, 561 Fed.Appx. 342 (5th Cir. 2014) (*per curiam*).

Even if not procedurally barred, Petitioner's claim that the death penalty as applied in Texas is unconstitutional is without merit, including his assertion that the mitigation special issue currently in use prevents appellate review and omits a burden of proof.   The current mitigation special issues in use have been upheld by the Fifth Circuit, as has the death penalty in general.   *See Ortiz v. Quarterman*, 504 F.3d 492 (5th Cir. 2007), *cert. denied*, 553 U.S. 1035, 128 S.Ct. 2428, 171 L.Ed.2d 234 (2008) ; *Sonnier v. Quarterman*, 476 F.3d 349, (5th Cir. 2007), *cert. denied*, 552 U.S. 948, 128 S.Ct. 374, 169 L.Ed.2d 259 (2007); *Jasper v. Thaler*, 466 Fed.Appx. 429 (5th Cir. 2012) (*per curiam*), *cert. denied*, — U.S. —, 133 S.Ct. 788 (2012).

Finally, Petitioner's claim that the death penalty is in violation of international law has also been rejected by the Fifth Circuit.   *See Beazley v. Johnson*, 242 F3d 248 (5th Cir.), *cert. denied*, 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001) (noting that the International Covenant on Civil and Political Rights was ratified by the United States with the reservation of the right to impose capital punishment on any person duly convicted under existing or future laws).

Pretrial and Trial Publicity.   Petitioner asserts that there was extensive media coverage prior to and during the punishment retrial which deprived him of a fair

retrial in violation of his due process rights. Petition at 126-54. He bases this claim on newspaper articles, noises he reported hearing from the gallery during trial, and the voir dire testimony of venirepersons who did not serve on the jury. *Id.* Petitioner's assertion is that the pre-trial publicity prevented the prospective jurors from being impartial.

While the Sixth Amendment guarantees a criminal defendant the right to an impartial jury, the Constitution does not require that jurors be completely ignorant of the facts and issues to be tried. *Dobbert v. Florida*, 432 U.S. 282, 301 (1977). *See also Skilling v. United States*, 561 U.S. 358, 381, 130 S.Ct. 2896, 2914-15, 177 L.Ed.2d 619 (2010) ("juror *impartiality* . . . does not require *ignorance*.") (emphasis in original). In order to be eligible for habeas relief due to pervasive, pretrial publicity, the petitioner must demonstrate "an actual, identifiable prejudice on the part of members of the jury that is attributable to that publicity." *Moore v. Johnson*, 225 F.3d 495, 504 (5th Cir. 2000) (quoting *Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1984)).

Petitioner does not present anything to suggest that the individuals who actually served on his jury had any type of identifiable prejudice attributable to the publicity. Nor has he presented anything to indicate that the general environment in McLennan County was "utterly corrupted by press coverage." *Dobbert*, 432 U.S. at 303. Prejudice is presumed in a high-profile case when the petitioner produces "evidence of inflammatory, prejudicial publicity that so pervades or saturates the

26

community as to render virtually impossible a fair trial by an impartial jury drawn from that community[.]" *Willie v. Maggio*, 737 F.2d at 1386.  That presumption, however, is rarely applicable and "attends only the extreme case." *Skilling*, 130 S.Ct. at 2915. Petitioner's retrial was not one of those cases.

Petitioner inflates the publicity and interest in his re-trial.  The murder and first trial occurred over 20 years prior; sufficient time for almost two generations of citizens to become eligible to serve on a jury, who had not been exposed to the level of publicity and public interest which surrounded his first trial.

Prosecutorial Issues.  As noted above, Petitioner asserts numerous errors committed by the prosecution: (1) that the district attorney's office had a conflict of interest because two witnesses were also employees: J.R. Vicha and Phillip Pierce; (2) that the district attorney's office withheld material evidence relating to witness A.P. Merillat ("Merillat"); and (3) the prosecutor made improper arguments at closing and asked improper questions.

One of the victims of Petitioner's actions who testified at the re-trial, J.R. Vicha, was also employed by McLennan County as an Assistant District Attorney. Even if not procedurally barred by failing to preserve the issue for appeal, the claim is without merit.  Petitioner fails to identify any constitutional rights which was violated by the introduction of this witness's testimony.  Nor has Petitioner identified any factual or other legal error which occurred due to J.R. Vicha's employment or testimony, particularly in light of the fact that J.R. Vicha was not involved in the

27

prosecution. Additionally, he was never identified to the jury as an employee of the district attorney's office. Nor does Petitioner present anything other than speculation that the death penalty was pursued on re-trial merely because J.R. Vicha was an employee of the district attorney's office.

Petitioner next argues that the prosecution "suppressed" evidence relating to the credibility of witness Merillat, who was called in rebuttal to address data used by the defense witness, Cunningham, relating to Petitioner's potential for future dangerousness. Merillat testified that statistics do not tell the entire story regarding prison violence.  The evidence supposedly suppressed consists of letters written around 1999-2000 to or from Merillat while he was an investigator with the SPU . The correspondence related to the investigation of a murder at the Telford Prison Unit.  Petitioner asserts the letters purport to demonstrate the following: (1) that Merillat assisted an inmate in "deconfirmation" as a gang member; (2) that SPU had discretion whether or not to file criminal charges in cases referred to them by prison authorities; (3) that Merillat arranged for cooperating inmates to be transferred within the prison system and sometimes out of administrative segregation; (4) that Merillat made arrangements with prison officials to allow gang letters to be delivered to his cooperating inmate informant; and (5) as part of the prosecution strategy in the afore-mentioned murder case, Merillat and the SPU prosecutor held off as long as possible before releasing a witness list to the defense.  Petitioner argues that if allowed to impeach Merillat with this testimony, it would have damaged his credibility

regarding his testimony that no one could tell the prison system how or where to house an inmate. The state habeas court determined that there was no prosecutorial misconduct in this regard, and Petitioner fails to demonstrate that the state court's determination was contrary to, or an unreasonable application of, clearly established federal law.

A *Brady* violation may occur if the State fails to disclose material, exculpatory evidence to the defense. *Brady v. Maryland*, 373 U.S. at 87. In order to establish such a claim, the Petitioner must demonstrate the following: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material to either guilt or punishment. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 67, 684 (1985).

Petitioner presents nothing to establish that the prosecution suppressed the Merillat letters. Merely because the witness was employed by the State prison system does not equate to knowledge on the part of the McLennan County District Attorney's office. Nor is there any indication that Merillat had any connection to Petitioner's re-trial other than being called as a witness to testify generally about prison classification and misleading statistics regarding prison violence.

Additionally, the prosecution is not obligated to supply a defendant with exculpatory evidence that is fully available to the defendant through the exercise of

reasonable diligence. *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir.), *cert. denied*, 536 U.S. 978, 123 S.Ct. 14, 153 L.Ed.2d 877 (2002). The information also does not appear to be "material," as it relates to a matter that was not the primary focus of Merillat's testimony. Finally, the letters do not establish that Merillat had the authority to have inmates classified or housed where he ordered, but merely that he made recommendation of such to prison authorities.

Finally, Petitioner asserts that the prosecutor made improper closing arguments and asked improper questions of witnesses. To the extent this claim is not procedurally barred, it is without merit. With the laundry list of supposed improprieties, Petitioner merely cites to the record and claims the actions were "improper" or "prejudicial" without providing any further argument or explanation. Such conclusory arguments are insufficient to state a claim for federal habeas corpus relief.

To the extent the prosecutor's comments or questions could be construed as erroneous, the Petitioner must establish that such misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Geiger v. Cain*, 540 F.3d 303, 308 (5th Cir. 2008) (citing *Darden v. Wainwright*, 477 U.S., 168, 180 (1986). Totaling all of Petitioner's claims regarding prosecutorial misconduct does not reach this level. Nor has Petitioner established that the evidence against him was so insubstantial, that he would not have received the death penalty absent the prosecutor's improper behavior. *See Harris v. Cockrell*,

313 F.3d 238, 245 (5th Cir. 2002), *cert. denied*, 540 U.S. 1218, 124 S.Ct. 1504, 158 L.Ed.2d 152 (2004).

Jury Issues.  Petitioner argues that the "death qualification" of jury members is unconstitutional and that he was deprived of the opportunity to question the jurors regarding their ability to consider mitigating evidence.  To the extent these issues are not procedurally barred, they are without merit.

As Petitioner acknowledges, the current standard for determining whether a juror can be struck due to his views on the death penalty is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). *See also Uttecht v. Brown*, 551 U.S. 1, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007).  Therefore, the parties are entitled to ask questions of the venire to investigate their ability to follow and apply the law as given to them by the court.  Accordingly, Petitioner's claim regarding the unconstitutionality of the death qualification practice is without merit.

When dealing with the exclusion of a particular potential juror, "a veniremember may not be excluded from sitting on a capital jury merely because she voices general objection to the death penalty or expresses conscientious or religious scruples against its infliction."  *Ortiz v. Quarterman*, 504 F.3d 492, 500 (5th Cir. 2007), *cert. denied*, 553 U.S. 1035, 128 S.Ct. 2428, 171 L.Ed.2d 234 (2008). Whether a jury is excludable is a question of fact, and the state court's determination

that the exclusion of a juror is justified is presumed to be correct unless the Petitioner rebuts that presumption by clear and convincing evidence. *Id.* at 501. None of the jurors identified by Petitioner ever indicated that they could not be impartial jurors or could not abide by the jurors' oath.

At the opposite end of the spectrum, Petitioner argues that the trial court committed error in refusing to allow him to question prospective jurors on specific mitigating evidence in order to "life-qualify" the jury. The trial court did not allow Petitioner to question the venire regarding whether they would commit to finding specific circumstances mitigating. The Court of Criminal Appeals rejected this argument, which opinion is neither contrary to, nor an unreasonable application of, clearly established federal law.

While the government has the right to challenge for cause any prospective juror who would not impose the death penalty under any circumstance, "the capital murder defendant has a right to challenge for cause any juror who will automatically vote for the death penalty in every case,. . . ." *U.S. v. Webster*, 162 F.3d 308, 341 (5th Cir. 1998), *cert. denied*, 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999). Under Texas law, a commitment question is one that commits a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact. *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). This includes open-ended questions that ask the prospective juror to set the hypothetical parameters for his decision-making, such as asking what circumstances would

warrant the imposition of the death penalty.  *Id.* at 179. "Commitment questions require a venireman to promise that he will base his verdict or course of action on some specific set of facts before he has heard the evidence, much less all of the evidence in its proper context.  It is this prejudgment of the value and importance of certain evidence that is the evil to be avoided unless the law requires such a commitment." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005) (citing *Standefer*, 59 S.W.3d at 181-182).  "An improper commitment question attempts to create a bias or prejudice in the venireman before he has heard the evidence, whereas a proper voir dire question attempts to discover a venireman's preexisting bias or prejudice." *Id.*  A commitment question is improper "(a) when the law does not require the commitment, such that a juror would not be disqualified for cause by being influenced by a particular fact or by having a particular attitude or opinion, or (b) even if the question meets the challenge for cause requirement, if it also includes facts in addition to those necessary to establish a challenge for cause." *Id.*  While "it is proper to pose hypothetical fact situations to explain the application of the law, it is improper to inquire how a veniremember would respond to particular circumstances." *Penry v. State*, 903 S.W.2d 331, 336 n.6 (Tex. Crim. App. 1987). Petitioner impermissibly attempted to question the jurors regarding whether they would find particular circumstances specific to him mitigating, such as his age or work ethic, making them thinly-veiled "attempts to commit a veniremember to a

particular resolution based upon facts peculiar to the trial." *Rhoades v. Texas*, 934 S.W.2d 113, 122 (Tex. Crim. App. 1996).

Petitioner argues that the trial court's decision to disallow his questions prevented him from determining whether the jurors would automatically impose the death penalty, citing to *Morgan v. Illinois*, 504 U.S. 719 (1992). However, *Morgan* only "involves the narrow question of whether, in a capital case, jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant." *Trevino v. Johnson*, 168 F.3d 173, 183 (5th Cir. 1999) (quoting *United States v. Greer*, 968 F.2d 433, 437 n. 7 (5th Cir. 192)). It does not permit unfettered voir dire even in determining whether a juror would automatically vote to impose a death sentence.

Trial Court Errors. Petitioner asserts that the trial court erred in a number of different ways: (1) admitting Dr. Coons' testimony of future dangerousness; (2) allowing the unreliable testimony of Merillat; (3) admitting the hearsay testimony of Amy Zuniga; J.R. Vicha, and Mike Voss; (4) denying Petitioner's motions for mistrial; (5) limiting the cross-examination of Lorna Sawyer; (6) allowing impermissible cross-examination of Dr. Mark Cunningham; (7) allowing Patricia Yamada Woolley to testify; (8) allowing Phillip Pierce to testify; and (9) allowing witness Candy Ryan to express an opinion on future dangerousness.

Generally, the mere admissibility of evidence under state law is not reviewable in a habeas action. *Little v. Johnson*, 162 F.3d 855 (5th Cir. 1998), *cert. denied*, 526

U.S. 1118, 119 S.Ct. 1768, 143 L.Ed.2d 798 (1999). It is only when errors "are so extreme that they constitute a denial of fundamental fairness" that a state court's evidentiary rulings will mandate habeas relief. *Id.* "[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted." *Id.* None of the evidence identified by Petitioner falls within this definition.

Petitioner asserts that the testimony of Dr. Coons should not have been permitted because (1) his predictions concerning future dangerousness were unconstitutionally unreliable, (2) his testimony was irrelevant under Rule 702 of the Texas Rules of Evidence, and (3) his testimony was unfairly prejudicial under Rule 703 of the Texas Rules of Evidence. To the extent these issues are not procedurally barred, they are without merit.

The trial court held a hearing on Dr. Coons's proposed testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 59 U.S. 579 (1993) and determined that he qualified as an expert by reason of his knowledge, skill, experience, training, and education. The trial court further found that the subject matter of his testimony was an appropriate one for experts and that his testimony would assist the factfinder in deciding the case. The state court determined on direct appeal that such evidence of future dangerousness was Constitutionally permissible, citing *Barefoot v. Estelle*, 463 U.S. 880 (1983). Petitioner presents nothing to indicate that the state court's opinion was either was contrary to, or involved an unreasonable application of,

clearly established Federal law. He presents nothing to establish that *Barefoot* does not remain viable in light of *Daubert*. In fact, the Fifth Circuit has rejected such an argument. *See Tigner v. Cockrell*, 264 F.3d 521, 526-27 (5th Cir. 2001), *cert. denied*, 534 U.S. 1164, 122 S.Ct. 1177, 152 L.Ed.2d 210 (2002).

In regard to Petitioner's claims under the Texas Rules of Evidence, he fails to identify a constitutionally cognizable claim for which federal habeas relief may be granted. The Court of Criminal Appeals found no harm in the trial court's decision to permit Dr. Coons to testify regarding Petitioner's future dangerousness. This Court must defer to the state court's determination of Texas law. *See Swarthout v. Cooke*, 562 U.S. 216, 219, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011) ("federal habeas corpus relief does not lie for errors of state law.") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2 385 (1991).

Even if there were some basis for Petitioner's claims in this regard, he would still not be entitled to habeas relief absent a showing that the error resulted in actual prejudice. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See also Davis v. Ayala*, — U.S. —, 135 S.Ct. 2187, 2197-2198, 192 L.Ed.2d 323 (2015) (outlining distinction between "actual prejudice" under Brecht and the requirements of the AEDPA). Petitioner has failed to make such a showing, particularly in light of the extensive and detailed cross-examination to which Dr. Coons was subjected and the contradicting testimony given by Petitioner's expert, Dr. Cunningham. Additionally, Dr. Coons' testimony was only a small portion of the

State's case regarding future dangerousness.  There was more than sufficient evidence for the jury to ascertain that Petitioner would be a continuing danger.

Petitioner next contends that the testimony of Merillat should not have been allowed for a variety of reasons.  Merillat testified that he was a criminal investigator for the Special Prosecution Unit ("SPU") of the Texas Department of Criminal Justice and that he was qualified as an expert in the area of prison violence.  His testimony was offered by the State in rebuttal of the testimony of Petitioner's expert, Dr. Cunningham.  After a hearing, the trial court determined that Merillat's testimony would be admissible, but would he would exclude any reference to defense experts and would include only one specific example of violence committed by other inmates that illustrated the under-reporting of prison violence.  Before the jury, Merillat described the inmate classification system and the differences between general population and administrative segregation.  He also testified that statistical data regarding prison violence was not reliable due to the fact that the prison reporting system did not match the penal code definition of "violent" behavior and that many acts of violence go unreported.  In short, Merillat testified that violence was such an every day occurrence in the prison system that only assaults resulting in serious injury were reported.

To the extent Petitioner's claims regarding Merillat are not procedurally defaulted, they are without merit.  As previously noted, to the extent Petitioner objected in the state courts regarding the admissibility of Merillat's testimony under

37

state law, this Court must defer to the state courts as federal habeas relief is not available for errors of state law.

Nor did his testimony violate the Confrontation Clause despite Petitioner's argument that Merillat's testimony was based on inadmissible hearsay. The "main and essential purpose of confrontation is to secure for the opponent the opportunity of cross examination." *Davis v. Alaska*, 415 U.S. 308, 315-316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (internal quotations and citation omitted). "[T]he Confrontation Clause is generally satisfied if the defense is given a full and fair opportunity to expose [testimonial] infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Delaware v. Fensterer*, 474 U.S. 15, 22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (*per curiam*). Even if some "error" was occasioned by Merillat's testimony, it was harmless. Merillat's testimony was only a small portion of the State's overall case and was used in rebuttal regarding Dr. Cunningham's statistical analysis.

As for the remainder of Petitioner's evidentiary errors, they are also without merit to the extent they are not procedurally barred. As the trial court's rulings were based on state law, this Court must defer to that's court's application of Texas law. In many instances, Petitioner presents no argument regarding his conclusory allegations of error; merely a recitation of the record followed by the assertion that the testimony was either hearsay or prejudicial. (Of course, the State's case is

prejudicial to some degree, or it wouldn't be offered against a defendant.)  In the other instances, there was a basis for the admissibility of the testimony.

The objectionable part of Amy Zuniga's testimony was admissible as an excited utterance.  J.R. Vicha's testimony did not rely upon statements made to him by another witness, but merely actions which were taken.  Mike Voss's testimony was based upon his own personal knowledge rather than any out of court statements.  The objection to the lack of notice regarding the testimony of Patricia Woolley, who testified about being molested by Coble when she was 15, was mooted when the defense was given a copy of her statement in open court and given time by the trial court to review it before she testified.  The testimony of Phillip Pierce was merely the recitation of the contents of Petitioner's military service file, which had already been introduced in evidence at the previous guilt/innocence phase of Petitioner's original trial.  Petitioner's argument that the testimony of Candy Ryan, who testified regarding her continued fear of Petitioner and her opinion as to his future violence, is without basis–she was not offered as an expert on his propensity for future violence but as a fact witness who had an opinion of Petitioner based upon her past experience.

Petitioner next argues that the trial court erred by restricting Dr. Cunningham from testifying about any statistics concerning inmates serving life-without-parole sentences.  Because Petitioner was not eligible for a life without parole sentence, such evidence was irrelevant to his case.  The cross-examination of Dr. Cunningham

39

with testimony from another case was also not in error.  The fact that Dr. Cunningham was cross-examined regarding his testimony in a trial involving Al-Qaida terrorists was not irrelevant to Petitioner's case.  Dr. Cunningham admitted that if somebody like an Al-Qaida member had an abiding hatred for someone or something, that hatred would not necessarily dissipate over time, thus making them potentially dangerous for the rest of their life.  Dr. Cunningham then admitted that if Coble had a similar abiding anger and hatred for the Vicha family, that was something that he could also potentially carry with him for many years.

The trial court also overruled motions for mistrial made by Petitioner in response to unsolicited comments from his former wife, Karen Vicha, and Lorna Sawyer, Petitioner's cousin.  In both instances, the trial court called recesses and instructed the jury to disregard their comments.  As jurors are assumed to follow their instructions, there is no basis for this argument.

Petitioner further argues that the trial court impermissibly limited his cross-examination of Lorna Sawyer, who testified that Petitioner raped her when she was 16. Petitioner wished to impeach her credibility with prior instances when she had accused other family members of sexual assault, or whether she had been under any type of psychiatric or psychological care or treatment.  Such questioning was not proper under Texas law which precludes cross-examination into specific instances of conduct for the purpose of attacking or supporting credibility.  *See* TEX. R. EVID. 608(b); *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997).

Ineffective Assistance of Counsel. Petitioner presents numerous instances which he claims establishes ineffective assistance of counsel, which are listed above. The state court determined that Petitioner did not receive ineffective assistance of counsel. Petitioner has failed to establish that this determination was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *Woodfox v. Cain*, 609 F.3d at 789.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is difficult. "The standards created by *Strickland* and §2254(d) are both 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly' so, . . . ." *Harrington v. Richter*, 562 U.S. 86, 105, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011). Petitioner can satisfy the "unreasonable application" prong of § 2254(d)(1) "only be showing that 'there was no reasonable basis' for the [state court's] decision." *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1402, 179 L.Ed.2d 557 (2011). The question is not whether counsel's actions were reasonable, but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, at 788.

The Sixth Amendment to the Constitution provides that the accused in a criminal prosecution has the right to assistance of counsel for his defense. The purpose of this guarantee is "not to improve the quality of legal representation . . .

41

[but] simply to ensure that criminal defendants receive a fair trial." *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011) (quoting *Strickland*, 466 U.S., at 689, 104 S.Ct. 2052).   In evaluating whether counsel's performance is inadequate, the *Strickland* Court developed a two-prong test requiring a defendant to establish: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense so as to deprive him of a fair trial.   *Strickland*, at 689.   The proper standard for evaluating counsel's performance is that of reasonably effective assistance, considering all of the circumstances existing as of the time of counsel's conduct. *Hill v. Lockhart*, 474 U.S. 52 (1985).   Scrutiny of counsel's performance is "extremely deferential;" *Bell v. Lynaugh*, 828 F.2d 1085, 1088 (5th Cir. 1987); and counsel's conduct is "strongly presumed to fall within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690.   Counsel's advice need not be perfect -- it need only be reasonably competent within the "range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970).   "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052).

The standard used to evaluate counsel's conduct is necessarily a general one. *Bobby v. Van Hook*, 558 U.S. 4, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) (*per*

*curiam*).   "'No particular set of detailed rules for counsel's conduct can satisfactorily take into account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'" *Id*. (quoting *Strickland*, 466 U.S., at 688-689, 104 S.Ct. 2052).   Such things as restatements of professional standards may be "useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Id*. This includes the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), which are treated only as a guide to what reasonableness means, "not its definition." *Id*. See also, *Druery v. Thaler*, 647 F.3d 535, 541 n. 2 (5th Cir. 2011), *cert. denied*, --- U.S. ---, 132 S.Ct. 1550, 182 L.Ed.2d 180 (2012).

As to the second prong of the *Strickland* test, in order to establish prejudice, the petitioner must show that his attorney's errors were so serious that they rendered "the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 362, 372 (1993).   "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. The *Strickland* court further noted that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The likelihood of a different result must be "substantial," not just "conceivable." *Cullen*, 131 S.Ct. at 1403

(quoting *Harrington v. Richter*, 562 U.S. ---, ---, 131 S.Ct. 770, 791, 178 L.Ed.2d 624 (2011)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052 (emphasis added). It is insufficient for a defendant to "show that the errors had some conceivable effect on the outcome of the proceeding" *Richter*, 131 S.Ct. at 787 (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88 (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052).

> Although courts may not indulge "post hoc rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." . . . After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

*Richter*, 131 S.Ct. at 790 (citations omitted).

*Strickland* and its progeny do not guarantee perfect representation, only a "'reasonably competent attorney.'" *Id.*, at 791 (citation omitted). "Just as there is no

expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 131 S.Ct. at 791. If there is any "reasonable argument that counsel satisfied *Strickland's* deferential standard," the state court's denial will be upheld. *Id.* at 788.

To the extent Petitioner's claims of ineffectiveness relate to any of the previously addressed grounds, they are without merit. An attorney cannot be held ineffective for failing to act when there is little or no likelihood of success on the merits, or to file motions which have no likelihood of success.

Petitioner argues that counsel was ineffective for failing to file a motion to transfer. The state habeas court determined that there was no ineffectiveness in this regard, holding after an evidentiary hearing that Petitioner did not meet his burden of overcoming the strong presumption that counsel's performance fell within the wide range of reasonable and professional assistance in not pursuing a change of venue motion. VII SHCR 1225. That decision is neither contrary to, nor an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed2d 674 (1984).

Petitioner's lead counsel, Russ Hunt, Jr., had a variety of reasons why a change of venue would not be sought, primarily because such a request was denied in the Petitioner's original trial in 1989. Also, if a change of venue were granted, the new location could have resulted in a more conservative, pro-death-penalty jury

panel. Even with co-counsel's disagreement, the state court's determination that this did not constitute ineffective assistance of counsel is not unreasonable.

Additionally, Petitioner has failed to establish that he was prejudiced. As noted with his complaint regarding pre-trial publicity, there is nothing to indicate that the individuals selected for the jury were anything other than impartial. Nor is there anything to indicate that if the trial were held in a different venue, the outcome would have been different considering the strength of the State's case.

The same is true as to Petitioner's claim of ineffectiveness during voir dire. He asserts that counsel did not "weed out biased and unqualified jurors," and mentions seven jurors he believes should have been challenged or stricken. Hunt's affidavit gives his rationale for not challenging those jurors, which falls within the category of trial strategy. The attorney must make hard decision as to which jurors should be stricken through peremptory challenge. Petitioner also fails to establish prejudice because he identifies no specific juror who was biased or unable to make an impartial decision.

Finally, Petitioner's claims regarding the other issues which he claims establish ineffectiveness of counsel are not supported by the record. Counsel spent a great number of hours preparing for trial and he adequately cross-examined the witnesses identified by Petitioner. Counsel's decision to not present psychiatric evidence regarding Petitioner falls within the category of trial strategy, and presents the classic "doubled-edged sword" wherein such evidence could be more harmful

46

to Petitioner's case than mitigating. Additionally, there is no basis for his claim that counsel failed to object to "irrelevant" incidents used as aggravation, as there would have been little opportunity of success since the incidents supported the State's claims regarding Petitioner's abusive nature toward women and his incidents of controlling, violent and manipulative behavior. Also, the failure to raise a hearsay objection to one witness's testimony would have little chance of success since the witness was recounting information from his own personal knowledge. Finally, Petitioner's claim of ineffectiveness as it related to agreeing to redact Dr. Cunningham's testimony to eliminate statistics related to inmates sentenced to life without parole is meritless as Coble, even if sentenced to life, would not have been eligible for life without parole.

Even if the foregoing somehow constituted ineffective assistance of counsel, Petitioner has presented nothing to call into doubt the state court's determination that there was no prejudice. The lack of prejudice is clear in this case since the evidence of Petitioner's future dangerousness was overwhelming. *See Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002).

Nor was Petitioner denied effective assistance of counsel on appeal. His allegations of ineffectiveness in this regard match the claims he raised in his habeas petitions but not on direct appeal. As with an evaluation of trial counsel, an appellate attorney is not obligated to present every conceivable ground which might be raised, rather he should present only those grounds with have some likelihood of success.

47

*Jones v. Barnes*, 463 U.S. 745, 751-53 183).   Each of the claims raised by Petitioner, however, as previously determined, are foreclosed by precedent, unsupported by the record, or both.

Cumulative Error.   Petitioner has raised this issue in connection with other grounds and as a stand-alone argument.  In either case, the issue is without merit. The issue in such a claim is whether the trial as a whole was fundamentally unfair. However, "any cumulative error theory must refer only to errors committed in the state trial court.  A habeas petitioner may not just complain of unfavorable rulings or events in the effort to cumulative errors."  *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (en banc), *cert. denied*, 508 U.S. 960, 113 S.Ct. 2928,124 L.Ed.2d 679 (1993).  The errors must also not have been procedurally barred, must have been errors of constitutional rather than state law, and a review of the record as a whole must be conducted "to determine whether the errors more likely than not caused a suspect verdict."  *Id.*   Petitioner's claims of error do not fit within the foregoing analysis.  There is no support for his claim that errors so proliferated in his trial he was denied due process.

In summary, Petitioner has failed to carry his burden of establishing that the decisions of the state courts were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or were "based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding."   28 U.S.C. § 2254(d). Accordingly, it is

**ORDERED** that Petitioner's application for federal habeas corpus relief is **DENIED** and this case is **DISMISSED**.  It is further

**ORDERED** that any motions not previously ruled upon by the Court are **DENIED**.

Additionally, having considered the findings and conclusions set forth above and the requirements of 28 U.S.C. § 2253, the Courts finds, *sua sponte*, that a certificate of appealability should not issue, as Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Pursuant to 28 U.S.C. § 2262(b)(3), the stay of execution previously entered in this case is lifted.

**SIGNED** this _30_ day of September, 2015.

_____
**WALTER S. SMITH, JR.**
**United States District Judge**

49